Russell A. Nevers (Utah Bar No. 13940)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
Telephone: (385) 355-4826
Email: russ@freemanlovell.com

James Rogers (Utah Bar No. 18783)
Nicholas Barry (Pro Hac Vice App Forthcoming)
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave, SE #231
Washington, DC 20003
Telephone: (202) 964-3721
Email: nicholas.barry@aflegal.org
         james.rogers@aflegal.org

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| BLUERIBBON COALITION, INC.; PATRICK MCKAY; and COLORADO OFFROAD TRAIL DEFENDERS, <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF THE INTERIOR, <br><br> Defendants. | **COMPLAINT** <br><br><br> Case No. _____ <br><br> Honorable _____ |

Plaintiffs BlueRibbon Coalition, Inc., Patrick McKay, and Colorado Offroad Trail Defenders seek relief from this Court against Defendants Bureau of Land Management and the United States Department of the Interior and would show the Court as follows:

## INTRODUCTION

1.      The Labyrinth/Gemini Bridges Travel Management Area ("TMA") encompasses about 303,994 acres of land managed by the Bureau of Land Management ("BLM") near Moab in eastern Utah. The area is well-known for its stunning scenery which includes canyons, mesas, and arches.

2.      Because of its stunning scenery and accessibility by off-highway vehicles ("OHVs"), it is home to, in the Defendants' own words, "several world class" routes used by such motorized vehicles.[1]

3.      These world-class routes have led to the TMA becoming one of the most sought-after locations in the country for motorized recreation. It is known in the offroad community as a "bucket-list" destination.

4.      Nevertheless, BLM has continued ratcheting down the available routes that are available for motorized recreation in this remote and spectacular area.

5.      This lawsuit challenges BLM's approval of the Labyrinth/Gemini Bridges Travel Management Plan ("TMP"), which closes over 300 miles of previously available routes to motorized recreation in violation of the U.S. Constitution and federal statutes.

6.      On September 29, 2023, BLM released a Final Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI"), and Decision Record ("DR") adopting the Labyrinth/Gemini Bridges Travel Management Plan ("TMP").[2] The EA analyzed four alternative

---

[1] *See* Bureau of Land Management, *Labyrinth/Gemini Bridges Travel Management Plan Environmental Assessment*, DOI-BLM-UT-Y0101-2020-0097-EA at 88 (Sept. 2023).

[2] *See* Bureau of Land Management, *Labyrinth/Gemini Bridges Travel Management Plan Environmental Assessment*, DOI-BLM-UT-Y0101-2020-0097-EA (Sept. 2023); Bureau of Land Management, *Finding of No Significant Impact*, DOI-BLM-UT-Y0101-2020-0097-EA (Sept. 2023);

travel plans, from which the final TMP was ostensibly meant to choose. BLM instead chose a plan that fit none of the proposed alternatives, but was closest to Alternative B.

7.      Alternative B was the most restrictive of motorized recreation and meant to "constrain" such recreation within the TMA. EA at 16.

8.      In adopting the TMP, BLM violated a myriad of constitutional and statutory provisions. First, it failed to abide by the John D. Dingell, Jr. Conservation, Management, and Recreation Act (the "Dingell Act"), 16 U.S.C. § 1132 et seq., by using the TMP to create a buffer zone around a wilderness area. Second, the closures were enacted by an employee of the United States and not an officer, as required by the Appointments Clause of the Constitution. Third, the closures were arbitrary and capricious or otherwise not in accordance with law because BLM ignored important aspects of the decision, offered explanations that ran counter to the evidence, and failed to respond to relevant and significant public comments. Fourth, BLM failed to take a "hard look" at how the choices before them affect the environment in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. §§ 2201-02 (declaratory and injunctive relief); and the Administrative Procedure Act ("APA") 5 U.S.C. §§ 701-06.

---

Bureau of Land Management, *Labyrinth/Gemini Bridges Travel Management Plan Decision Record*, DOI-BLM-UT-Y0101-2020-0097-EA (Sept. 2023). These documents are available on BLM's website: https://eplanning.blm.gov/eplanning-ui/project/2001224/570.

10. Venue is proper in the United States District Court for the District of Utah, Central Division, pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to the claim occurred in the district.

11. On September 29, 2023, BLM released the DR and FONSI for the Labyrinth/Gemini Bridges TMP, and the closures are now in effect. *See Order Denying Petition for Stay*, *BlueRibbon Coalition, Inc. et al.*, DOI-BLM-UT-Y010-2020-0097-EA (Nov. 28, 2023). This constitutes final agency action.

## PARTIES

12. Plaintiff BlueRibbon Coalition, Inc. ("BlueRibbon") is a non-profit organization with a mission to improve access to public lands by securing, protecting, and expanding shared outdoor recreation access and use. BlueRibbon is headquartered in Idaho and has members in all 50 states. Its members use and enjoy public lands in the TMA and often travel the routes closed by the TMP. They participate in many activities on public lands—such as dirt biking, mountain biking, e-biking, backcountry aviation, base jumping, hiking, wildlife viewing, photography, scenic driving, dispersed camping, water sports, and rock climbing—but are especially interested in activities involving their OHVs. These activities include organized rides with clubs, informal get-togethers, family vacations, and solo recreation rides. BlueRibbon and its members have been actively involved in BLM's process of creating the TMP. It submitted a comment, Exhibit A ("BRC Comment"), and was an intervenor in the previous litigation that led to BLM agreeing to reconsider a previous travel plan, Exhibit B ("RMP Settlement Agreement").

13. Plaintiff Patrick McKay is the Vice President of Colorado Offroad Trail Defenders and a member of BlueRibbon. He works to promote and protect access to motorized trails and

frequently participates in motorized recreation on public lands. He has extensively participated in the process of developing the TMP, including traveling almost all of the TMA and submitting a comment that analyzes the TMA in great detail. Exhibit C ("McKay/COTD Comment"). He regularly visits Moab for the purpose of OHV recreation and plans to again visit in the spring of 2024. His plans included traveling many of the closed routes.

14. Plaintiff Colorado Offroad Trail Defenders ("COTD") is a 501(c)(3) advocacy organization dedicated to keeping full-size offroad trails open to motorized recreation on public lands. It frequently submits comments and objections to the United States Forest Service and BLM travel management plans. The comment Plaintiff McKay submitted was made on behalf of both himself and COTD.

15. Defendant Bureau of Land Management is the agency within the United States Department of the Interior that is responsible for the management of approximately 23 million acres of federal public land in Utah, including the public lands in the TMA at issue in this litigation. BLM is directly responsible for carrying out the Department of the Interior's obligations under statutes and regulations governing land use management and for complying with NEPA, which requires the agency to carefully consider the environmental impacts of its actions.

16. Defendant United States Department of the Interior is responsible for overseeing the management of approximately five hundred million acres of federal public land across the United States.

## LEGAL BACKGROUND

*A.    Appointments Clause*

17. The Appointments Clause states, in pertinent part:

"[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

U.S. Const. Art. II, § 2, cl. 2

18. The Appointments Clause sets forth the "exclusive means of appointing 'Officers.' Only the President, a court of law, or a head of department can do so." *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (citing U.S. Const. Art. II, § 2, cl. 2).

19. Accordingly, there are three types of individuals serving under the President: principal Officers, inferior officers, and all other employees.

20. Officers hold duties that are "continuing and permanent" and exercise "significant authority pursuant to the laws of the United States." *Lucia*, 138 S. Ct. at 2044.

21. Employees hold duties that are only "occasional or temporary." *Id.* at 2052 (quoting *United States v. Germaine*, 99 U.S. 508, 510 (1879)).

B.     *The John D. Dingell, Jr. Conservation, Management, and Recreation Act*

22. The Dingell Act, 16 US.C. § 1132 et seq., P. Law 116-9, created numerous "wilderness areas" and other specially managed conservation areas throughout the United States.

23.     One of the wilderness areas is the Labyrinth Canyon Wilderness Area, designated in Section 1231(a)(7). It makes up much of the western border of the TMA and must be managed by BLM in accordance with the Wilderness Act, 16 U.S.C. § 1131 et seq.

24.     The designation of wilderness areas was not meant to lead to restrictions in the surrounding areas. Congress was clear that it did "not intend for the designation of wilderness areas to create protective perimeters or buffer zones around the wilderness areas." Section 1232(e)(1) of the Dingell Act. "The fact that non-wilderness activities or uses can be seen or heard from areas within a wilderness shall not preclude the conduct of those activities or uses outside the boundary of the wilderness area." Section 1232(e)(2) of the Dingell Act.

25.     This prohibition on "buffer zones" appears 20 other times in the Act, making it clear that Congress did not intend the designation of a wilderness area to affect adjacent lands.

C.     *Administrative Procedure Act*

26.     The APA provides for judicial review for agency actions. "A person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

27.     A reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A)-(D).

*D.*     *National Environmental Policy Act*

28.     NEPA was enacted in 1970 and requires federal agencies to consider the environmental impact of projects before approving or rejecting them. *See* 42 U.S.C. § 4321 et seq.

29.     Its "purpose and function" is to show that "Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process." 40 C.F.R. § 1500.1.

30.     NEPA does this by requiring procedures that force agencies to take a "hard look" at the environmental impacts of their decision before it is made. *Ctr. for Biological Diversity v. United States*, 72 F.4th 1166, 1178 (10th Cir. 2023).

31.     This requires utilizing "public comment and the best available scientific information." *Id.* (quoting *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1171 (10 Cir. 1999)).

32.     Agencies must consider direct, indirect, and cumulative effects of the action. *Id.*

33.     NEPA also requires agencies to conduct an Environmental Impact Statement ("EIS") for federal actions that significantly affect the quality of the human environment. *See* 42 U.S.C. § 4332(C).

34.     The "human environment means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment." 40 C.F.R. § 1508.1(m). In contemplating the human environment, agencies must consider the effects of their policies, whether beneficial or detrimental. *Id.* § 1508.1(g)(4).

35.     If an agency does not prepare an EIS, it must prepare an environmental assessment ("EA") to determine whether an EIS is necessary. 40 C.F.R. §§ 1502.14, 1502.16.

36.     In the absence of an EIS, the EA must "provide sufficient evidence" to support a Finding of No Significant Impact ("FONSI"). *Id.* § 1508.9(a)(1). The evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id.* § 1508.13.

## FACTUAL BACKGROUND

37.     The TMA encompasses about 303,994 acres of land near Moab and is managed by BLM's Moab Field Office. EA at 1.

38.     The area surrounding Moab has long been regarded as a prime destination for four-wheel-drive recreation. Famous for its world-class routes and breathtaking scenery, millions[3] of off-road enthusiasts visit the greater Moab area to travel the TMA on full-size 4x4s, side-by-sides, ATVs, dirt bikes, and other OHVs.

39.     The TMA is home to parts of the "Easter Jeep Safari," a nationally known, multi-day event that brings tens of thousands of OHV enthusiasts to the TMA. The annual event started in 1967 and is so well-known that the DR and EA both acknowledge its importance. DR at DR-5, DR-6, A2-44, A2-73; EA at 88, 234.

40.     Many of the visitors to the TMA have been traveling it for years, decades even, for OHV recreation. In many ways, it is a way of life in the American West, and families have been enjoying this area for generations. BRC Comment at 6, 21, 23.

41.     The TMA is, in short, considered the "Mecca" for off-road recreation in America. McKay/COTD Comment at 3.

---

[3] The MFO's 2008 Regional Management Plan estimated about 2 million visitors at that time. *See* Bureau of Land Management, *Record of Decision and Approved Resource Management Plan*, DOI-BLM-UT-Y010-2008-0001-RMP-EIS (Oct. 2008) ("2008 RMP"), available at: https://eplanning.blm.gov/eplanning-ui/project/66098/570.

*A.     The DR represents the latest closure of the shrinking availability of motorized recreation in the TMA.*

42.     Despite this long history of use, OHV users have had to advocate for their continued access to the routes.

43.     The 2008 RMP closed 766 miles of motorized routes in the TMA leaving only 1127.7 available, EA at 1, 11, and resulted in extensive litigation that only settled in 2017 when BLM agreed to redraw a multitude of travel plans, including the one at issue in this case, RMP Settlement Agreement at 7.

44.     OHV access to the region, in general, runs up against manmade and natural barriers. The TMA is bordered by the Green River to the west, Canyonlands National Park to the south, Arches National Park to the east, and Interstate 70 to the north. EA at 2. OHV access in these surrounding areas is even more severely limited than the TMA. BRC Comment at 2.

45.     The new TMP closes another 317.2 miles, limits in some way 98.4 miles more, and only leaves 712.1 miles open to OHVs. DR at DR-3. In other words, despite decades of motorized recreation in the TMA and beneficial use to the human environment, BLM has closed almost two-thirds of the available routes to OHV access in less than 15 years.

46.     Further, the new route closures in the TMP represent a dramatic change from the 2008 RMP, which was affirmed as recently as 2015. *See* Bureau of Land Management, *Land Use Plan Evaluation Report*, at C-97-C-110 (Sept. 2015) (attached as Exhibit D). That Report concluded that even with an increase in motorized use, there was "no change needed." *Id.* at C-97.

47.     Nevertheless, the MFO began a new process of redrawing the TMP after the 2017 settlement. This included a scoping period, draft EA, and public comment period. DR at DR-8-9.

BLM received over 12,000 comments, including ones from BlueRibbon, McKay, and COTD. *Id.*; BRC Comment; McKay/COTD Comment.

48.    The draft EA proposed four alternative travel plans. Alternative A would have left the routes as they were. EA at 15-16. Alternative B prioritized natural resources and would have resulted in the closure of 437 miles. *Id.* at 16. Alternative C had a "multiple use emphasis" and would have closed 167.7 miles of routes. *Id.* Alternative D emphasized access and would have closed 52.5 miles. *Id.* at 17. None of the alternatives considered adding new routes or opening the routes closed by the 2008 RMP. EA at 11.

49.    Plaintiffs raised a multitude of concerns with the proposed alternative plans in the draft EA. *See generally* McKay/COTD Comment; BRC Comment.

50.    Plaintiffs also requested BLM consider route additions and explained in detail the benefit of adding three new routes. McKay/COTD Comment at 517-525.

51.    Plaintiffs' comments included the Dingell Act's prohibition of buffer zones. BRC Comment at 2-3; McKay/COTD Comment at 20-23, 156, 272.

52.    BLM never addressed this concern in the EA or DR.

53.    Plaintiffs also raised the issue of route closures leading to no access for disabled and elderly visitors to the TMA, and that closing the trails would violate President Biden's Executive Order meant to protect equal opportunity for disabled persons.[4] BRC Comment at 11-13; McKay/COTD Comment at 38-39, 54, 267, 310, 435, 465.

---

[4] *See Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government* (Jan. 20, 2021) (noting that "persons with disabilities" are among the populations that "have often been denied equal opportunity"), available at: https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.

54. BLM did not address this concern.

55. The final DR chose none of the alternatives. It combined Alternatives B, C, and D in a way most similar to Alternative B, the natural resource emphasis alternative. DR at DR-3. It closed almost twice as many route miles as the "multiple use emphasis" alternative, Alternative C. This is despite the fact that the EA recognized that all four alternatives meet "the purpose and need and respond[] to the issues described in Chapter 1." EA at 11.

*B.      BLM plans to "obliterate" the closed routes.*

56. The EA explains in detail BLM's plan for the closed routes. In a section titled "Route Reclamation," BLM explains that the "first step in reclamation is to obliterate obvious tracks and other evidence of use." EA at 348.

57. The EA makes clear that BLM plans to actively work to obliterate the closed routes. EA at 347-50.

58. As described by the EA, BLM has an entire "toolbox" for hiding routes from users. EA at 348. These measures range from "engineering/grading"—using heavy equipment to make impassable barriers—to "passive/natural reclamation"—merely letting a closed route regrow. EA at 348-49.

59. BLM will also disguise routes with natural materials, making the routes difficult to see by placing rocks, dead wood and plants, and live vegetation on a route to make it look like the surrounding area. EA at 347.

60. It will also "mechanically remove[] routes" and "revegetate[] them." *Id.* This technique is called "ripping and reseeding" and will make routes "undetectable." *Id.*

61.     BLM may also install barriers, signs, and fences to prevent travel on closed routes. *Id.* at 348-50.

C.     *Plaintiffs filed a notice of appeal and request for stay in the administrative proceedings.*

62.     After BLM issued the DR. Plaintiffs filed a Notice of Appeal and Petition for Stay. Exhibit E ("Petition for Stay").

63.     The Petition for Stay raised all the issues raised in this Complaint, as well as explained Plaintiffs' Standing, the relative harm of a stay, the likelihood of immediate and irreparable harm, and the public interest in issuing the stay.

64.     The Interior Board of Land Appeals ("IBLA") denied Plaintiffs' request for a stay. *Order*, DOI-BLM-UT-Y010-2020-0097-EA (Nov. 28, 2023) (attached as Exhibit F). In doing so, it did not consider any of the legal issues raised in the stay request, but only decided that there was not immediate and irreparable harm.

65.     Because this constitutes final agency action, this lawsuit followed.

## <u>COUNT I</u>

### AGENCY ACTION VIOLATES THE APPOINTMENTS CLAUSE

66.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

67.     District Manager Nicollee Gaddis-Wyatt issued the DR, but she cannot make the decision to permanently close trails because she was not properly appointed.

68.     Ms. Gaddis-Wyatt is a "District Manager," which is a position classified by BLM regulations as one occupied by a BLM employee, and not an officer. 43 C.F.R. § 1601.05. She is not a principal officer appointed by the president and confirmed by the senate, nor an inferior officer appointed by the president. As an employee, she has no power to exercise the federal

government's sovereign authority to close hundreds of miles of previously public routes and thereby criminalize their use.

69.     Her actions make it a crime for citizens to travel on the closed routes. 43 C.F.R. § 8340.0-7. Violating the DR criminalizes activity on public lands and carries up to a $1,000 fine and up to a year in prison. 43 C.F.R. § 8340.0-7.

70.     The Founders expected that only someone accountable to the President could wield such power and only officers could exercise "significant authority pursuant to the laws of the United States." *Lucia*, 138 S. Ct. at 2051.

71.     Ms. Gaddis-Wyatt, an employee of BLM that has not been appointed can only have duties that are "occasional or temporary." *Germaine*, 99 U.S. at 510.

72.     But the DR is making permanent changes, creating new crimes and "obliterate[ing]" routes. EA at 347-50.

73.     The power exercised by the District Manager is an authority that must be vested in an officer of the United States, and this exercise of authority by an employee violates the Constitution and invalidates the TMP.

<u>**COUNT II**</u>

**AGENCY ACTION VIOLATES THE DINGELL ACT**

74.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

75.     The John D. Dingell, Jr. Conservation, Management, and Recreation Act (the "Dingell Act"), 16 U.S.C. § 1132, forbids restrictions in a wilderness area from seeping into adjacent areas.

76. The Labyrinth Canyon Wilderness Area was designated by Section 1231(a)(7) the Dingell Act. It makes up most of the TMA's southwestern border across the Green River.

77. Wilderness Areas are some of the most protected areas of land in the country. The Wilderness Act of 1964 defined wilderness as areas "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this Act an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value."

78. The wilderness area designation seeks to preserve these areas in a condition that emphasizes their very natural and unmodified (by humans) characteristics. *Wyoming v. U.S. Dept. of Agric.*, 570 F. Supp 2d 1309 (D. Wyo. 2008).

79. The TMA is not a federally designated wilderness area. DR at DR-7.

80. The Dingell Act, which designated the Labyrinth Canyon Wilderness Area across the River from the TMA as a wilderness area, specifically forbade the creation of "protective perimeters or buffer zones" around the wilderness areas and explicitly stated that non-wilderness activities and uses being seen and heard from inside a wilderness area "shall not preclude the

conduct of those activities or uses outside the boundary of the wilderness area." Section 1232(e)(1), (e)(2).

81.     Nevertheless, the DR makes a de facto buffer zone around the Labyrinth Canyon Wilderness, closing long segments of routes along the Green River. *See* DR at A1-4. The only routes along the wilderness area left open were well-maintained county rounds along the southwestern tip of the TMA.

82.     The DR explains these closures in a way that makes it clear BLM is creating a buffer zone around the wilderness area. In justifying its closure of Route D2759, for example, the DR says it is meant "to minimize known visual and noise-induced conflicts with non-motorized users on the Green River." DR at A2-123. The same is true for other routes along the Green River, such as D1223 and D2763, where the DR justified closure because of visual and noise-induced conflicts. DR at A2-125.

83.     The Dingell Act forbids the BLM from using the Green River as a pretext for creating a buffer zone around a wilderness area.

84.     Further, the plain language of the Dingell Act trumps the "minimization criteria" the DR claims to have used in closing these routes. *See* 43 C.F.R. § 8342.1(c). Minimizing conflicts with wilderness area activities is exactly what the Dingell Act prohibits.

**COUNT III**

**AGENCY ACTION IS ARBITRARY AND CAPRICIOUS**

85.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

86.     Defendants' actions were arbitrary and capricious in a multitude of ways.

87.    First, the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (quotations omitted).

88.    BLM also failed to respond to relevant and significant public comments. *See N.M. Health Connections v. United States HHS*, 340 F. Supp. 1112, 1167 (D. N.M. Oct. 19, 2018) (quoting *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014)). This demonstrates that it was not based on consideration of the relevant factors.

89.    BLM ignored multiple comments explaining the closed routes' value to elderly and disabled visitors.

90.    For Route D1515A, for example, multiple commenters, including Plaintiffs, noted that the .76-mile route offers scenic views of the Green River that will otherwise be unavailable to elderly and disabled users. EA at 241-42. The BLM response acknowledges the route is used for "scenic driving," but makes no mention of considering the needs of elderly and disabled members of the public. *Id.*

91.    BLM never addressed commenters' (including Plaintiffs) concerns about the Dingell Act.

92.    BLM justified closures based on "noise" without explaining how it determined what would be an appropriate level of noise. BLM partially justified closures on Route Numbers D1223A, D2759B, D2763B, and D2763C—totaling over 14 miles—to "minimize known conflicts

between OHV public and river users that is caused by vehicle-based noise." TMP at A2-21, A2-123, A2-125. This is arbitrary and capricious for two reasons. First, there is no standard or meaningful measure of what BLM considers too much noise. *Accord S. Utah Wilderness Alliance v. United States DOI*, 2016 U.S. Dist. LEXIS 140624, at *23-24 (D. Utah Oct. 3, 2016) (failure to use "any scientific protocol for assessing noise impacts" failed NEPA's hard look requirement and constituted arbitrary action). Second, the record itself does not support that these routes result in a lot of noise.

93.     The Route Report for D1223A refers to the route as a "primitive road" that only gets "medium" use. The Route Report for D2759B is also a primitive road, but only has "low" use and is not even accessible by a stock vehicle. D2763B is also primitive with low use, and BLM did not include D2763C in its route reports. In other words, BLM claimed these low-use roads are resulting in such a high level of noise that it results in user conflicts large enough to support closure. This cannot be the case. BLM also failed to respond to Appellant McKay's comment that its map has D2763B in the incorrect place. McKay/COTD Comment at 509. The real route is further from the river than BLM mapped it.

94.     Errors abound in the DR. Route D1503B, for instance, is listed as "Closed," but the listed rationale in the TMP then explains why the route is being kept open. DR at A2-43. The TMP also closes D1879, which is listed as 0.05 miles in length, but the route report says the route is 0.54 miles in length. TMP at A2-73. Over a dozen routes are being closed to "reduce route proliferation," but route proliferation is only listed as a problem in one of the route's areas (D1748). TMP at A2-64. The EA, on the other hand, states that "route proliferation is generally not a significant issue" in the TMA. EA at 11.

95.     BLM also failed to use its own scientific evidence when closing routes. It relied on the presence of bighorn sheep as a rationale for closing many trails. Such a claim is contradicted by BLM's own documents, which acknowledge that wildlife, including bighorn sheep, are more disturbed by hikers and rock climbers than OHVs. BLM, *Limiting Roped and Aerial Activities in Mineral and Hell Roaring Canyons*, Environmental Assessment: DOI-BLM-UT-Y010-2020-0068, at 9 (August 2020) (attached as Exhibit G). That document acknowledges that bighorn sheep are more sensitive to hikers because of the unpredictability of their locations and are more likely to be found off-trail, unlike road traffic. *Id.* at 33, 35. Bighorn sheep "coexist best with people when human activity in sheep habitat is predictable." *Id.* at 34. Nevertheless, under the TMP, these routes remain open to hikers and closed to OHVs. Such a decision is the epitome of arbitrary and capricious.

96.     BLM also closed many historic routes in the TMA with irrational or unsupported justifications. These are outlined in detail in Plaintiffs' Petition for Stay. *See* Petition for Stay at 16-27. In many instances, BLM just ignored the reality on the ground and the evidence and comments provided by Plaintiffs and other commenters.

97.     Accordingly, the Court should declare the DR arbitrary and capricious and set it aside.

## COUNT IV

## AGENCY ACTION VIOLATES NEPA

98.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

99.     NEPA requires agencies to take a "hard look" at how the choices before them affect the environment. *Ctr. for Biological Diversity v. United States*, 72 F.4th at 1178. This requires more than general statements.

100.    Instead, BLM must use accurate scientific analysis and protocols.

101.    BLM's talismanic invocation of "noise induced conflict" is the perfect example. DR at A2-21, A2-123, A2-125. It contains no objective criteria, no understanding of the extent of the conflict, and no protocols or analysis of how it arrived at such a conclusion.

102.    BLM also failed to conduct an EIS as required by NEPA. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14.

103.    BLM should not have issued a FONSI, finding that their closure of 317.2 miles that had been lawfully utilized for decades had no significant impact on the human environment.

104.    An EIS is required whenever a "major Federal action[] significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(C). A major federal action is one that "requires substantial planning, time, resources, or expenditure." *Nat'l Resources Defense Council, Inc. v. Grant*, 341 F. Supp. 356, 366 (March 15, 1972). "Typically, a project is considered a major federal action when it is funded with federal money." *Southwest Williamson County Comty. Ass'n v. Slater*, 243 F.3d 270, 278 (6th Cir. 2001).

105.    The amount of planning that went into the TMP is significant. Hundreds of miles were inventoried. The DR shows each route and explanation for opening or closing the route. Further, there were hundreds of "route reports" issued where multiple experts considered the natural, recreational, commercial, cultural, and historical value of the routes. *See, e.g.*, Bureau of Land Management, *Route Report for B1118* (March 11, 2019). As shown in that one route report,

there were 16 evaluators for just one route, including a GIS Specialist, Aquatic Ecologist, Archaeologist, Policy Analyst, local official, Wildlife Biologist, Geologist and more. It is impossible to say that it did not take substantial planning, time, resources, and expenditures. Yet, for all that planning, the Defendants cherry-picked only the evidence that would support their predetermined outcome.

106.     Accordingly, BLM wrongly issued a FONSI and should have conducted an EIS. Such an action violates NEPA and the TMP should be set aside.

## **PRAYER FOR RELIEF**

Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, it is appropriate and proper that a declaratory judgment be issued by this Court, declaring that the DR is contrary to the Constitution and Federal Statute.

Furthermore, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that the Court issue a permanent injunction prohibiting Defendants from enforcing the new policy.

WHEREFORE, Plaintiffs pray for judgment against Defendants and that the Court:

(1)     Declare that Defendants' Labyrinth/Gemini Bridges Travel Management Plan violates the Dingell Act, Appointments Clause, Administrative Procedure Act, and U.S. Constitution;

(2)     Hold unlawful and set aside the Labyrinth/Gemini Bridges Travel Management Plan;

(3)     Issue a permanent injunction against Defendants, as well as all agents, administrators, employees, or other persons acting on behalf of the Defendants from enforcing the Labyrinth/Gemini Bridges Travel Management Plan;

(4)     Award Plaintiffs their costs and expenses incurred in bringing this action, including, but not limited to, reasonable attorney fees pursuant to 28 U.S.C. § 2412; and

(5)     Grant such other and further relief as the Court deems equitable, just, and proper.

Date: December 22, 2023

FREEMAN LOVELL, PLLC

*/s/ Russell A. Nevers*
Russell A. Nevers

AMERICA FIRST LEGAL FOUNDATION

*/s/ James Rogers*
James Rogers

TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone:     (512) 472-2700
Facsimile:      (512) 472-2728

ROBERT HENNEKE
(Pro hac vice forthcoming)
Texas Bar No. 24046058
rhenneke@texaspolicy.com

CHANCE WELDON
(Pro hac vice forthcoming)
Texas Bar No. 24076767
cweldon@texaspolicy.com

MATTHEW MILLER
(Pro hac vice forthcoming)
Texas Bar No. 24046444
mmiller@texaspolicy.com

NATE CURTISI
(Pro hac vice forthcoming)
Arizona Bar No. 033342
ncurtisi@texaspolicy.com

*Attorneys for Plaintiffs*