TODD KIM, Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

PAUL A. TURCKE, Trial Attorney
Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (202) 532-5994
paul.turcke@usdoj.gov

*Attorneys for Defendants*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| BLUERIBBON COALITION, INC., et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>U.S. BUREAU OF LAND MANAGEMENT, et al.,<br><br>    Defendants,<br><br> and<br><br>SOUTHERN UTAH WILDERNESS ALLIANCE,<br><br>    Defendant-Intervenor-Applicant. | Case No. 2:23-cv-00923-DAK-JCB<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge Dale A. Kimball<br>Magistrate Judge Jared C. Bennett |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 1

    I.     Legal Background ................................................................................................ 1

          A.     BLM Regulation of OHV Use on Public Lands ......................................... 1

          B.     National Environmental Policy Act ........................................................... 3

    II.    Factual and Procedural Background ...................................................................... 4

LEGAL STANDARDS ........................................................................................................ 6

    I.     A Preliminary Injunction is an Extraordinary Remedy ........................................ 6

    II.    Administrative Procedure Act Review of Agency Action ..................................... 7

ARGUMENT ....................................................................................................................... 7

    I.     Plaintiffs Are Not Likely to Succeed on the Merits ............................................... 8

          A.     Appointments Clause .................................................................................. 8

          B.     Dingell Act ................................................................................................ 12

          C.     Arbitrary and Capricious Agency Action ................................................. 17

          D.     NEPA ........................................................................................................ 21

    II.    Plaintiffs Do Not Demonstrate a Likelihood of Irreparable Injury ...................... 24

    III.   The Public Interest and Balance of Equities Favor Defendants ........................... 26

CONCLUSION ................................................................................................................... 27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alliance for Wild Rockies v. Marten,*
253 F. Supp.3d 1108 (D. Mont. 2017) ............................................................... 25, 26

*Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC,*
562 F.3d 1067 (10th Cir. 2009) ............................................................................ 6

*Bicycle Trails Council of Marin v. Babbitt,*
82 F.3d 1445 (9th Cir. 1996) .............................................................................. 19

*Bitterroot Ridge Runners Snowmobile Club v. U.S. Forest Serv.,*
329 F. Supp. 3d 1191 (D. Mont. 2018) ............................................................... 23

*Bitterroot Ridge Runners Snowmobile Club v. U.S. Forest Serv.,*
833 Fed. Appx. 89 (9th Cir. 2020) ...................................................................... 23

*Buckley v. Valeo,*
424 U.S. 1 (1976) ................................................................................................. 10

*Califano v. Sanders,*
430 U.S. 99 (1977) ............................................................................................... 17

*Colorado v. EPA,*
989 F.3d 874 (10th Cir. 2021) .................................................................... 6, 7, 25

*Comm. to Preserve Boomer Lake Park v. Dept. of Transp.,*
4 F.3d 1543 (10th Cir. 1993) ................................................................................ 3

*Consolidated Gas Supply Corp. v. FERC,*
606 F.2d 323 (D.C. Cir. 1979) ............................................................................ 20

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
746 F. Supp. 2d 1055 (N.D. Cal. 2009) ................................................................ 3

*Denver Homeless out Loud v. Denver,*
32 F.4th 1259 (10th Cir. 2022) ...................................................................... 7, 27

*Earth Island Inst. v. U.S. Forest Serv.,*
87 F.4th 1054 (9th Cir. 2023) ............................................................................. 22

*Edmond v. United States,*
520 U.S. 651 (1997) .............................................................................................. 9

*Granat v. U.S. Dep't of Agric.*,
    238 F. Supp. 3d 1242 (E.D. Cal. 2017) ............................................................. 18, 22

*Granat v. U.S. Dep't of Agric.*,
    720 Fed. Appx. 879 (9th Cir. 2018)............................................................................ 18

*Hells Canyon All. v. U.S. Forest Serv.*,
    227 F.3d 1170 (9th Cir. 2000) .................................................................................... 19

*Idaho Conservation League v. Guzman*,
    766 F. Supp. 2d 1056 (D. Idaho 2011) ...................................................................... 22

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
    140 F. Supp. 3d 1123 (D.N.M. 2015) ......................................................................... 17

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018)..................................................................................... 8, 9 12

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997)...................................................................................................... 7

*Mont. Wilderness Ass'n v. Connell*,
    725 F.3d 988 (9th Cir. 2013) ...................................................................................... 22

*Morrison v. Olson*,
    487 U.S. 654 (1988)...................................................................................................... 9

*Nat.Res. Def. Council, Inc. v. EPA*,
    822 F.2d 104 (D.C. Cir. 1987) ..................................................................................... 3

*Nken v. Holder*,
    556 U.S. 418 (2009)...................................................................................................... 7

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004)........................................................................................................ 2

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
    18 F.3d 1468 (9th Cir. 1994) ............................................................................. passim

*Olenhouse v. Commodity Credit Corp.*,
    42 F.3d 1560 (10th Cir. 1994) ................................................................................ 1, 7

*PDK Lab'ys Inc. v. DEA*,
    362 F.3d 786 (D.C. Cir. 2004) ................................................................................... 20

*Renewable Fuels Ass'n v. EPA*,
    948 F.3d 1206 (10th Cir. 2020) ................................................................ 7

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ........................................................................... 3, 23

*Rocky Mt. Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*,
    40 F.4th 1133 (2022) ............................................................................ 3

*S. Utah Wilderness All. v. Babbitt*,
    No. 2:99-cv-852K, 2000 U.S. Dist. LEXIS 22170 (D. Utah Dec. 22, 2000) ........................... 2

*S. Utah Wilderness All. v. Burke*,
    908 F.3d 630 (10th Cir. 2018) ................................................................. 4

*S. Utah Wilderness All. v. Norton*,
    301 F.3d 1217 (10th Cir. 2002) ................................................................ 2

*S. Utah Wilderness All. v. U.S. Dep't of the Interior*,
    No. 2:13-cv-01060-EJF, U.S. Dist. LEXIS 140624 (D. Utah Oct. 3, 2016) ........................... 19

*S. Utah Wilderness Alliance v. Bernhardt*,
    512 F. Supp. 3d 13 (D.D.C. 2021) ............................................................. 16

*SCFC ILC, Inc. v. VISA USA, Inc.*,
    936 F.2d 1096 (10th Cir. 1991) ................................................................ 7

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    140 S. Ct. 2183 (2020) ........................................................................ 9

*Sierra Trail Dogs Motorcycle & Rec. Club v. U.S. Forest Serv.*,
    470 F. Supp. 3d 1186 (D. Nev. 2020) ......................................................... 22

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
    433 F.3d 772 (10th Cir. 2006) ................................................................ 19

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
    No. 02-RB-325, 2004 U.S. Dist. LEXIS 30844 (D. Colo. Nov. 1, 2004) ............................. 19

*Tennessee Valley Authority v. Hill*,
    437 U.S. 153 (1978) ......................................................................... 26

*U.S. ex rel. New v. Rumsfeld*,
    350 F. Supp. 2d 80 (D.D.C. 2004) ............................................................ 10

*United States v. Arthrex, Inc.*,
  141 S. Ct. 1970 (2021) ........................................................................ 9

*Utah Shared Access All. v. U.S. Forest Serv.*,
  288 F.3d 1205 (10th Cir. 2002) ...................................................... 3, 23

*Westlands Water Dist. v. U.S. Dep't of the Interior*,
  376 F.3d 853 (9th Cir. 2004) .......................................................... 22

*Williams v. Bankert*,
  No. 2:05-cv-503-DAK, 2007 U.S. Dist. LEXIS 77503 (D. Utah Oct. 18,  2007)............. 17, 18

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).......................................................................... 3, 6

**Statutes**

42 U.S.C. § 4332(C) ......................................................................... 3
43 U.S.C. § 1701 ............................................................................ 2
43 U.S.C. § 1702(c) ......................................................................... 2
43 U.S.C. § 1732(a) ......................................................................... 2
5 U.S.C. § 706(2)(A)......................................................................... 7
5 U.S.C. §§ 701-706 ......................................................................... 7
Pub. L. 116-9, 133 Stat. 580 (2019)........................................................ 13

**Regulations**

40 C.F.R. § 1501.3 (2020) .................................................................. 23
40 C.F.R. § 1503.4.......................................................................... 18
40 C.F.R. § 1508.27 (2019) ................................................................. 23
43 C.F.R. § 8340 ........................................................................ 2, 12
43 C.F.R. § 8341 ............................................................................ 2
43 C.F.R. § 8342.1 ................................................................. 2, 11, 15, 16
43 C.F.R. Part 1600......................................................................... 11
43 C.F.R. Part 4............................................................................ 10
43 C.F.R. Part 8340......................................................................... 17

## INTRODUCTION

This case challenges the U.S. Bureau of Land Management ("BLM") Travel Management Plan ("TMP") decision record ("DR") designating routes for off-highway vehicle ("OHV") use on BLM-managed public lands within the Labyrinth/Gemini Bridges Travel Management Area ("TMA") near Moab, Utah. BLM's September 28, 2023, DR closed 317.2 miles of routes previously available for OHV use, while leaving 810.5 miles of TMA routes available for some form of OHV travel. Plaintiffs appealed to the Department of the Interior's Board of Land Appeals ("IBLA"), which denied their petition for a stay on November 28, 2023, finding that Plaintiffs failed to show that the DR would cause them irreparable harm while their appeal was pending. Plaintiffs filed this action on December 22, 2023, and moved the same day for a preliminary injunction raising essentially the same arguments that they raised in their IBLA stay petition. This Court too should deny Plaintiffs' request for emergency relief. In sum, BLM made a reasoned decision to provide for varying types of recreational use in the TMA, and Plaintiffs' claims provide no basis for enjoining BLM's decision.[1]

## BACKGROUND

I.  **Legal Background**

A.  BLM Regulation of OHV Use on Public Lands

---

[1]    The DR, finding of no significant impact ("FONSI"), environmental assessment ("EA"), and other project documents are available on BLM's ePlanning website at https://eplanning.blm.gov/eplanning-ui/project/2001224/570 (last visited Jan. 18, 2024). The Court will ultimately evaluate whether BLM's decision is sufficiently supported by the administrative record. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994). Since Plaintiffs' Motion precedes filing of the administrative record, Defendants provide foundational elements such as the DR, FONSI and EA as exhibits to the Declaration of Nicollee Gaddis-Wyatt, ECF No. 31, filed contemporaneously herewith.

The Court is familiar with BLM's administration of OHV use on public lands. *See generally S. Utah Wilderness All. v. Babbitt*, No. 2:99-cv-852K, 2000 U.S. Dist. LEXIS 22170 (D. Utah Dec. 22, 2000), *rev'd*, 301 F.3d 1217 (10th Cir. 2002), *rev'd sub nom*, *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004). The Federal Land Policy and Management Act, 43 U.S.C. § 1701 et seq. ("FLPMA"), broadly directs that BLM manage public lands for "multiple use management" – "a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'" *Norton*, 542 U.S. at 58 (quoting 43 U.S.C. § 1702(c)). In balancing continuing access for "recreational use of so-called off-road vehicles (ORVs)" with associated "soil disruption and compaction, harassment of animals, and annoyance of wilderness lovers" BLM frequently "faces a classic land use dilemma of sharply inconsistent uses." *Id*. at 60.[2]

BLM implements FLPMA's multiple use mandate by first developing land use plans referred to as "resource management plans (RMPs)," 43 U.S.C. § 1732(a), that, among other things, designate areas as open, limited, or closed to OHV use. *See* 43 C.F.R. § 8342.1; *id*. §§ 8340.0-1, 8340.0-5(e)-(h). BLM's area designations often impose terms and conditions on OHV travel in "limited" areas, such as limiting OHV travel to designated routes. *See* 43 C.F.R. § 8341.1(b). When BLM makes OHV area or route designations in RMPs and TMPs,

---

[2]     The acronyms ORV and OHV are often used synonymously and refer to "any motorized vehicle capable of, or designed for, travel on or immediately over land, water, or other natural terrain." 43 C.F.R. § 8340.0-5(a). This definition includes general public use of full-size cars and trucks as well as utility terrain vehicles, all-terrain vehicles, motorcycles, and similar motorized means of conveyance, while excluding official, authorized, and emergency use. *Id*.

respectively, its decisions must "minimize" harm to soil, vegetation, and other resources, including wildlife resources. 43 C.F.R. § 8342.1(a)-(b). BLM also must minimize conflicts between OHV uses and other recreational uses on public lands. *Id*. § 8342.1(c); *see Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009).

      B.    <u>National Environmental Policy Act</u>

The National Environmental Policy Act ("NEPA") seeks to ensure that federal agencies consider the environmental impacts of proposed major federal actions. 42 U.S.C. § 4332(C); *see also Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 16 (2008). NEPA imposes purely procedural requirements, and "does not require that certain outcomes be reached as a result of the evaluation." *Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987). "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (footnote omitted).

NEPA requires agencies to take a "hard look" at the environmental consequences of a proposed federal action. *Id*. at 350. For "major Federal actions significantly affecting the quality of the human environment" an agency must prepare an environmental impact statement ("EIS"), 42 U.S.C. § 4332(C). An agency decision supported by a more concise EA must be accompanied by a FONSI, which "is 'a document by a federal agency briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared.'" *Rocky Mt. Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1143 (10th Cir. 2022) (quoting 40 C.F.R. § 1508.13). An agency's compliance with NEPA by relying on an EA and FONSI "'is a factual determination which implicates agency

expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review.'" *Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002) (quoting *Comm. to Preserve Boomer Lake Park v. Dept. of Transp.*, 4 F.3d 1543, 1555 (10th Cir. 1993)).

## II.       Factual and Procedural Background

Plaintiffs challenge the TMP for Labyrinth/Gemini Bridges TMA. *See* Compl. ¶¶ 1-8, ECF No. 1. The TMA comprises 303,994 acres of public land located north and west of Moab, within the BLM Utah Moab Field Office ("MFO") planning area. EA at 1. In 2008, the MFO finalized an RMP that, among other things, "designated a travel network consisting of 1,127.7 miles for OHV use within the TMA." *Id.* at 3. But the 2008 MFO RMP and travel plan were challenged by conservation groups, along with similar decisions in five other BLM Utah field offices, leading to "a longstanding, complex dispute" that was ultimately resolved through a settlement agreement approved by this Court. *S. Utah Wilderness All. v. Burke*, 908 F.3d 630, 632-33 (10th Cir. 2018). The settlement agreement provides that BLM will issue new TMPs for specified TMAs throughout the six field offices, including the Labyrinth/Gemini Bridges TMA. *See* Settlement Agreement at 6-7, ECF No. 1-3.

BLM initiated the TMP process in 2019 and through a working group of BLM and other specialists catalogued route attributes and associated resources for each inventoried route in the TMA.[3] EA at 11-12. Then, the team proposed designations for each route across a range of

---

[3]       The baseline route inventory was comprised of all routes designated available for OHV use in the 2008 RMP (as amended). The individual route reports are available on ePlanning at: https://eplanning.blm.gov/eplanning-ui/project/2001224/570 (last visited Jan. 18, 2024).

network alternatives.[4] *Id*. In early 2021, BLM conducted scoping to solicit public input and in September 2022 BLM released a preliminary EA for public review. *See* EA at 96. The EA analyzed four alternatives in detail: Alternative A, the "no action" alternative consisting of the 1,127.7-mile route network designated for public OHV use in the 2008 MFO RMP; Alternative B prioritizing resource protection and providing for a total OHV route network of 690 miles; Alternative C balancing OHV access and resource conflicts providing for a total OHV route network of 960.1 miles; and Alternative D emphasizing access and providing for OHV use on 1,075.2 miles of routes. EA at 14 (Fig. 1), 15-17.

Certain key facts were reaffirmed and amplified during the planning process. Motorized recreation is popular in the TMA, particularly on routes used during the annual Easter Jeep Safari event. *Id*. at 88.[5] The TMA is also popular for non-motorized recreation, such as mountain biking, horseback riding, hiking, backpacking, and canyoneering. *Id*. at 89. In particular, the portion of the Green River forming the western boundary of the TMA known as Labyrinth Canyon is popular for flatwater float trips by canoe or raft. *Id*. Under the 2008 RMP, approximately 28 miles of OHV travel routes were located within the 100-year floodplain and directly adjacent to this stretch of the Green River, including Hey Joe, the Tubes, Dead Cow, and

---

[4]      Proposed designations for all evaluated routes were one of the following categories: OHV-Open (open year-round to all OHV travel); OHV-Limited (allows for public OHV use subject to limits such as vehicle type/width or seasonal use restrictions); and OHV-Closed (route not available for public OHV use). EA at 13.

[5]      There are approximately 671 miles of designated routes throughout the MFO planning area that are commonly referred to as "Jeep Safari" routes. *See* EA, Appx. H. Several times per year OHV enthusiasts participate in popular events held pursuant to BLM-issued Special Recreation Permits on these routes. Under Alternative A, approximately 305 miles of Jeep Safari routes are designated OHV-Open within the TMA. *Id*. at 91. Under the DR, approximately 91 percent of these routes remain available for OHV use. DR at 5.

Hell Roaring Canyon. *Id*. BLM has received oral and written complaints from boaters concerning noise-induced conflicts associated with OHV use occurring within the TMA along this section of the Green River. *Id*.

BLM signed the DR on September 28, 2023, designating an OHV travel network that blended several alternative networks analyzed in the EA. *See* DR at 2. BLM's decision designated a total of 810.5 miles of routes as available for public OHV use in the TMA, with 98.4 miles designated as OHV-Limited and the remaining 721.1 miles designated as OHV-Open and thus available for travel by all OHVs at all times of the year. *Id*. at 3. BLM's decision designated 317.2 miles of routes as OHV-Closed. *Id*. The DR includes a detailed summary of the rationale for every route's designation within the selected travel network. *See* DR, Att. 2.

Plaintiffs, and other advocates for motorized access, sought administrative review of the DR before the IBLA. *See* Notice of Appeal and Petition for Stay, ECF No. 1-12. On November 28, 2023, the IBLA issued a written decision denying the petitions for stay for failure to show that the DR would cause Plaintiffs irreparable harm while their appeal was pending. *See* Order, Petitions for Stay Denied ("IBLA Order"), ECF No. 1-13. Plaintiffs filed this action on December 22, 2023, along with the instant motion for a preliminary injunction.

## LEGAL STANDARDS

### I.      A Preliminary Injunction is an Extraordinary Remedy

To obtain a preliminary injunction a movant must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021); *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (clarifying that movant

must establish that all four factors "weigh in its favor").[6] "[T]he final two factors 'merge when the Government is the opposing party.'" *Denver Homeless out Loud v. Denver*, 32 F.4th 1259, 1278 (10th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Because a "preliminary injunction is an extraordinary and drastic remedy," *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citation omitted), the party seeking such an injunction must make "a clear showing that [it] is entitled to such relief." *Winter,* 555 U.S. at 22; *see also SCFC ILC, Inc. v. VISA USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991) (right to preliminary injunctive relief "must be clear and unequivocal").

## II.     Administrative Procedure Act Review of Agency Action

The Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), waives the sovereign immunity of the United States to allow for judicial review of certain types of agency action. Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is "narrow" and "deferential." *Renewable Fuels Ass'n v. EPA*, 948 F.3d 1206, 1254 (10th Cir. 2020). "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse*, 42 F.3d at 1574 (footnote omitted).

## <u>ARGUMENT</u>

Plaintiffs failed to satisfy any aspect of the four-factor test for a preliminary injunction. Their claims on the merits each suffer serious flaws. As the IBLA correctly found, Plaintiffs

---

[6]     A request for "a stay of agency action under section 705 of the APA" is evaluated under the same preliminary injunction standard.  *Colorado*, 989 F.3d at 883.

provide no credible basis for finding that they will suffer irreparable injury in the absence of preliminary injunctive relief. And the TMP enjoys broad support and represents the outcome of a public planning process serving varied goals, including resource conservation. The balance of equities and public interest are thus best served by allowing its continued implementation. In sum, Plaintiffs fail to meet their burden in seeking the extraordinary remedy of a preliminary injunction, and the Court should deny the Motion.

## I.    Plaintiffs Are Not Likely to Succeed on the Merits

Plaintiffs fail to show that any of their legal claims are likely to succeed on the merits.

### A.    Appointments Clause

Plaintiffs' Appointments Clause claim asserts that the BLM Canyon Country District Manager is an employee who lacked authority to issue the DR because in doing so she exercised "significant authority pursuant to the laws of the United States" that could only be performed by an "officer" appointed under the Appointments Clause. Compl. ¶¶ 67-73; *see also Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018). Plaintiffs cite the BLM District Manager's "decision to permanently close [OHV routes]" as their sole basis for her alleged exercise of "significant authority" requiring appointment as an "officer." Pls.' Mot. for Relief Under 5 U.S.C. § 705, or, Alternatively, for a Prelim. Inj. 6, ECF No. 4 ("Pls.' Br."). Plaintiffs are unlikely to succeed on this claim because the District Manager's issuance of the DR making OHV route designations does not, under governing precedent, amount to the exercise of significant authority or discretion such that it must be performed by an appointed officer. Rather, OHV route designations are permissibly (and customarily) made by a nonofficer employee – as occurred in this instance – because they reflect routine decision-making with limited discretion, subject to the control of

multiple officials in the chain of command, appeal to the IBLA, and the direction of pre-existing management policies and decisions, as shown below.

The Appointments Clause is a "significant structural safeguard" of the Constitution that "preserve[s] political accountability" by specifying a process of appointment for those officers who assist the President in carrying out his or her responsibilities within the Executive Branch, while also recognizing that not every federal employee qualifies as an officer. *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1982 (2021) (quoting *Edmond v. United States,* 520 U.S. 651, 663 (1997)). What separates these "Officers of the United States" who must be appointed from individuals who are "simply employees of the Federal government" is their degree of authority; more specifically, officers hold "significant authority pursuant to the laws of the United States," and exercise "significant discretion" when carrying out "important functions," *Lucia*, 138 S. Ct. at 2047-49, whereas mere employees do not. The "significant discretion" and "extensive adjudicatory and regulatory powers" that underpin the duties of officer positions include some combination of exercising discretion to issue subpoenas, administer oaths, rule on evidence, impose sanctions, and prosecute federal crimes. *See*, *e.g*., *Morrison v. Olson*, 487 U.S. 654 (1988) (investigation and prosecution of federal crimes under the Ethics in Government Act of 1978); *Edmond*, 520 U.S. 651 (1997) (adjudicating cases at the Court of Criminal Appeals); *Lucia*, 138 S. Ct. 2044 (2018) (deciding administrative cases as SEC Administrative Law Judges); *Seila Law LLC v. Consumer Fin. Prot. Bureau,*, 140 S. Ct. 2183 (2020) (financial regulators exercising "extensive adjudicatory authority").

Conversely, the functions of "employees" are described as "lesser responsibilities" that are performed by the "broad swath of lesser functionaries" in the Government's workforce who carry out their duties "subject to the control or direction of any other executive" and have duties

that are "carefully circumscribed" or "specific in [their] objects[.]" *U.S. ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 98 (D.D.C. 2004); *see also Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976).

In this case, the District Manager's OHV route designations reflected in the DR involve a high degree of "control or direction" by other executives. Specifically, the BLM Canyon Country District Manager reports to no fewer than three officials in her direct chain of command within the BLM alone: the Associate State Director for BLM Utah; the State Director for BLM Utah; and the BLM's Deputy Director for Operations. *See* DEP'T OF INTERIOR, BLM ORG. CHART, STATE OFFICES (2024) (Gaddis-Wyatt Decl. Ex. 5, ECF No. 31-5); BLM – UTAH TABLE OF ORGANIZATION (2024) (Gaddis-Wyatt Decl. Ex. 6, ECF No. 31-6). These BLM officials in turn report to the Director of the BLM, who reports to the Assistant-Secretary for Land and Minerals Management, who reports to the Deputy Secretary, who, in turn, reports to the Secretary. DEP'T OF INTERIOR, 105 DM 2, GENERAL ORGANIZATION OF THE DEPT. (2020) (Gaddis-Wyatt Decl. Ex. 7, ECF No. 31-7). Each of these latter positions are officers of the United States, appointed by the President and confirmed by the Senate, which provides the political accountability protected by the Appointments Clause. Furthermore, the BLM District Manager's implementation-level decisions such as OHV route designations are appealable under 43 C.F.R. Part 4 to the IBLA – a class of appointed administrative judge officers – similarly ensuring political accountability, and from whom the Plaintiffs have already sought relief. *See* Compl. ¶¶ 62-65.

Moreover, the DR that Plaintiffs contends constitutes the exercise of "significant authority" requiring an appointed Officer is in fact a decision that is both "carefully circumscribed" and "specific in its objects," thus appropriate for a nonofficer employee. *Rumsfeld*, 350 F. Supp. 2d at 98; *see also Buckley*, 424 U.S. at 126 n.162. Relevant here, when issuing route designation decisions that form a travel management plan, the authority and

discretion of BLM District Managers is constrained by governing regulations and the applicable

RMP, and guided by relevant policy, including BLM's Travel and Transportation Management

(TTM) Manual 1626.[7]

The broad constraints and limitations inherent to a District Manager's TMP decision are

initially laid out in the regulations at 43 C.F.R. subpart 8342, which establishes route designation

criteria and procedures as well as the requirement to monitor OHV use and adapt designations

over time. In particular, 43 C.F.R. § 8342.1 requires that route designations minimize user

conflicts and resource impacts stemming from OHV use, and BLM policy directs a District

Manager to ensure the route designations are "tied" to the objectives and "land use planning

decisions" made in respective RMPs, including the RMP's OHV *area* designations (e.g., open,

limited, closed) that the individual route designations implement. TTM Manual 1626 at 1-7, 3-1,

4-1. Additionally, the RMPs are subject to multi-layered regulatory review and approval as

prescribed by 43 C.F.R. Part 1600.

With respect to the decision being challenged by Plaintiffs, the BLM Canyon Country

District Manager's decisional authority in developing the TMP and its individual route

designations was "carefully circumscribed" by the 2008 MFO RMP, including its OHV *area*

designations. The Labyrinth/Gemini Bridges TMP (and the DR's challenged OHV route

designations) were explicitly made in conformance with the land use planning decisions and

goals of the RMP, and "does not alter any OHV area designations made in the 2008 RMP." *See*

DR-3. In addition, TMP route designation is inherently "specific in its object" as it is "is one of

---

[7]     The TTM Manual is available at
https://www.blm.gov/sites/blm.gov/files/documents/files/Media%20Center%20BLM%20Policy
%20Manual%20MS%201626.pdf (last viewed Jan. 18, 2024).

several decisions required to govern travel and transportation comprehensively" in the TTM

process, and as an implementation-level decision, "any limitation applied in an OHV limited area

may change . . .based on resource concerns, changes in resource uses, and new information."

BLM TTM Manual 1626 at 4-2, 7-3.

Finally, while violations of route designations by OHVs may be subject to fines or other

penalties (*see* 43 C.F.R. § 8340.0-7), these are not penalties, despite what Plaintiffs imply, that

the BLM District Manager has the power to create or prosecute herself. *See* Compl. ¶ 72 ("the

DR is . . . creating new crimes").

The foregoing clearly demonstrates that Plaintiffs have not, and cannot, point to any

degree of this BLM District Manager's individual authority or discretion with respect to the

designation of individual OHV routes in the Labyrinth/Gemini Bridges TMA that is sufficient to

reach the "significant authority" that "must be vested in an officer of the United States." *See*

Compl., ¶¶ 67-73. Instead, her decision-making here manifestly represents the "routine business

of the agency," (*see* BLM TTM Manual 1626, 1-15), appropriate for the performance by a BLM

employee rather than a Constitutional officer.

For the above-stated reasons, the OHV route designation decision does not require the

exercise of "significant authority" and discretion, and thus need not be made by an officer

appointed pursuant to the Appointments Clause. Instead, it is proper for the BLM Canyon

Country District Manager who is "not [an] officer[] at all, but instead [a] non-officer employee"

to have made the decision. *See Lucia*, 138 S. Ct. at 2051. As such, Plaintiffs' Appointments

Clause argument is not likely to succeed on the merits.

B.   <u>Dingell Act</u>

Next, Plaintiffs argue that the TMP violates the John D. Dingell, Jr. Conservation,

12

Management, and Recreation Act ("Dingell Act"), Pub. L. 116-9, 133 Stat. 580 (2019). *See* Pls.'
Br. 7-9. First, they argue that through certain unspecified route closures, BLM created a
protective perimeter, or "buffer," around the Labyrinth Canyon Wilderness, in contravention of
section 1232(e)(1) of the Dingell Act. Second, Plaintiffs appear to argue that BLM
impermissibly considered noise from OHVs in the TMA that can be heard within the Labyrinth
Canyon Wilderness when designating routes. Neither the law nor the record support these
arguments.

Among other things, the Dingell Act designated eighteen new areas as part of the
National Wilderness Preservation System, including the 54,643-acre BLM-managed Labyrinth
Canyon Wilderness in Emery County, Utah. *See* Dingell Act § 1231(a), 133 Stat. 671-73. The
Act provides that these lands shall be managed in accordance with the Wilderness Act, *id*. §
1232(a), 133 Stat. 673, but clarifies that "Congress [did] not intend for the designation of the
wilderness areas to create protective perimeters or buffer zones around the wilderness areas," *id*.
§ 1232(e)(1), 133 Stat. 674. "The fact that nonwilderness activities or uses can be seen or heard
from areas within a wilderness shall not preclude the conduct of those activities outside the
boundary of the wilderness area." *Id*. § (e)(2).[8]

"Buffer zone" provisions like those in the Dingell Act have become relatively common
when Congress designates new wilderness. Contrary to Plaintiffs' view, such language does not
enshrine continuing motorized travel up to the wilderness boundary. Rather, such language

---

[8]     BLM's website discusses implementation of the Dingell Act in Utah. *See*
https://www.blm.gov/about/laws-and-regulations/dingell-act/utah (last visited Jan. 18, 2024).
The Labyrinth Canyon Wilderness lies westward of the Green River in Emery County, outside
the TMA. *See* EA at 127 ("No congressionally designated wilderness areas exist in the TMA.").;
https://www.blm.gov/sites/blm/files/EmeryCounty_020519_v1%20%281%29_0.pdf (map,
last visited Jan. 18, 2024).

"prohibits use restrictions on nonwilderness areas based *solely* on the potential impact that use might have on the Wilderness." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1480 (9th Cir. 1994) ("*Northwest Motorcycle*"). Impacts of motorized travel, even within the adjacent wilderness, "can be considered when allocating uses of adjoining nonwilderness area, so long as it is not the only reason." *Id*. at 1481.

BLM's route designations for routes in the TMA east of the Green River comply with the plain language of the Dingell Act and the principles of *Northwest Motorcycle*. BLM did not create a "buffer zone" along the eastern side of the Green River. The record makes clear that multiple "overlook" routes above Labyrinth Canyon remain open for OHV use. *See*, *e.g*., Route #D1497B (EA Appx. M.2 at 236; DR at Att. A2-43); Route #D1504 (EA Appx. M.2 at 238; DR at Att. A2-43) Route #D1509 (EA Appx. M.2 at 239-40; DR at Att. A2-44). These are all routes where Plaintiffs (or other vehicle use advocates) advised BLM it could not form "buffer zones around designated wilderness on the other side of the river" while other commenters thought the route should be closed because it "creates user conflicts via noise in Labyrinth Canyon" and is "reclaiming" to a natural state. EA Appx. M.2 at 239-40 (Route #1509 comments). For example, BLM left Route #D1509 open to OHV use because "it leads to a viewpoint overlooking Labyrinth Canyon as well as accessing several dispersed campsites" and "is the only one of the three overlook spurs that is officially considered part of the Jeep Safari Trail System." DR Att. A2-44. Conversely, BLM closed other "overlook" routes that received similar comments for and against OHV use. *See*, *e.g*., EA Appx. M.2 at 237-39; DR at Att. A2-43, 44 (Route #s D1501, D1507, D1507B, D1510). BLM indicated it made these closures to minimize impacts to desert bighorn sheep and minimize route proliferation, noting that OHV "viewpoint" access remains available via Route #D1509. DR Att. A2-44. This record not only rebuts the factual assertion that

14

BLM created a "buffer zone" eliminating motorized travel across the Green River from the designated wilderness, but also reflects BLM's reasoned application of the regulatory criteria at 43 C.F.R. § 8342.1 in making route designations.

In addition to the overlook routes above Labyrinth Canyon, Plaintiffs complain about designations of routes that enter the Canyon. *See* Pls.' Br. 8-9. Among them is Hey Joe, providing access to the Green River at the mouth of Hey Joe Canyon. *See* EA at Appx. M.2 at 244-45 (Route #s D1527, -28). Another is Dead Cow Loop, a motorcycle trail paralleling the River that riders contend "provides a valuable recreation experience with unique features that often contain water." *Id*. at 278-79 (Route #D2763B). The DR designates these routes as OHV-Closed. For Hey Joe, BLM explained the closure will minimize "impacts to wetlands and riparian habitats," "impacts to wildlife habitat" for wild sheep and migratory birds, and "the potential for conflicts between [ORV] users and dispersed, non-motorized/non-mechanized forms of recreation (e.g., canoeists)." DR at A2-46. BLM acknowledges that this conclusion differs from the one it reached in the 2008 RMP. *Id*.[9] Similarly, BLM explained the designation for Dead Cow is intended to minimize "visual and noise-induced conflicts between motorized and non-motorized users (e.g., canoeist on the Green River)" and to minimize "potential for soil erosion, including soil erosion into the Green River." *Id*. at A2-125. Again, these designations are based on both physical resource impacts and user conflict in the TMA. In sum, BLM simply did not create a "buffer" around the perimeter of the wilderness but made reasoned route-by-

---

[9]     BLM considered, in part, comments and user reports of perceived conflict in making these determinations. *See e.g.,* EA at 89 ("The BLM has received verbal and written complaints from boaters concerning the noise made by motorized vehicles along the Labyrinth Canyon river corridor.") This is a suitable means of addressing BLM's duty to evaluate and minimize conflicts between users. *Northwest Motorcycle*, 18 F.3d at 1480-81.

route designations under the regulatory criteria that were divorced from the routes' proximity to the Labyrinth Canyon Wilderness.

Plaintiffs' second argument is also easily rejected. Neither the EA nor the DR contain any discussion whatsoever about user experiences, or any other impact, within the Labyrinth Canyon Wilderness. Instead, BLM's analysis addressed impacts along the Green River corridor that is located within the TMA. *Id*.; EA at 90 (focusing not on perceived conflict within the wilderness, but on "[u]sers seeking quiet, non-motorized recreation experiences . . . near the Green River and its tributary canyons *in the TMA*") (emphasis added).

At most, section 1232(e)(2) of the Dingell Act constrains BLM's authority to restrict OHV use for the *sole* basis of improving statutory values or user experiences inside the Labyrinth Canyon Wilderness. Plaintiffs provide no evidence BLM did that, nor could they. Instead, BLM acted within its broad discretion in administering uses of lands in the vicinity of, but outside of, the wilderness area. *See S. Utah Wilderness Alliance v. Bernhardt*, 512 F. Supp. 3d 13, 22 n.8 (D.D.C. 2021).[10] BLM reasonably addressed its regulatory obligations in that portion of the TMA near the Green River. Plaintiffs do not approach their burden of showing that their Dingell Act argument is likely to succeed.

---

[10]     Plaintiffs' suggestion that the District Manager improperly relied on the regulations to minimize impacts to "neighboring public lands" in the wilderness is a non sequitur. *See* Pls.' Br. 8 (quoting 43 C.F.R. § 8342.1(c)). Again, BLM  did not rely on impacts in the Labyrinth Canyon Wilderness  in making TMA route designations. Plaintiffs admit as much by saying "the District Manager incorporated noise and visual conflicts *along* the Labyrinth Canyon Wilderness when making determinations on which routes to close." *Id*. (emphasis added). Similarly, Plaintiffs fail to develop any argument involving Wild and Scenic Rivers Act designations. *Id*. 9. A river's "scenic" status neither prohibits the existence of a nearby road nor constrains BLM's application of the minimization criteria in making OHV designations. The TMP route designations reflect BLM's reasonable exercise of discretion.

C.     Arbitrary and Capricious Agency Action

Plaintiffs further ask the Court to declare that the TMP is "arbitrary and capricious" because it "is riddled with factual errors and unresponsive answers to comments." Pls.' Br. 10. Again, Plaintiffs' flawed arguments provide no basis for a preliminary injunction.

Initially, Plaintiffs seemingly argue that any instance of "arbitrary and capricious" behavior by BLM entitles them to relief under the APA. However, the APA does not provide an independent basis for jurisdiction. *Califano v. Sanders*, 430 U.S. 99, 107 (1977). Arbitrary or capricious review may not be conducted under the APA independent of another statute that provides substantive law for a court to apply. *See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1202 (D.N.M. 2015) (collecting cases).

Even if one assumes that Plaintiffs can properly frame their various complaints under some other authority (such as FLPMA or the regulatory designation criteria at 43 C.F.R. Part 8340), they fail to meet their heavy burden under the arbitrary and capricious standard. Plaintiffs first argue that BLM failed some unspecified duty to make Route #s D1515A and D1520A available for OHV use by "elderly and disabled users." Pls.' Br. 10. But other routes designated OHV-Open offer similar "scenic views of the Green River and feature[ ] an overlook of the Labyrinth Canyon." *Id*.; DR at A2-44. BLM designated the identified routes as OHV-Closed to minimize impacts to wildlife, soils, and vegetation. DR at A2-45. And notwithstanding Plaintiffs' reference to an Executive Order broadly addressing racial equity and underserved communities, Pls.' Br. 10 n.3, this Court has correctly upheld the agency's authority to make route-by-route vehicle route designations, even when those designations might limit the ability of disabled individuals (or anyone else) to use an OHV to reach a particular location. *See Williams v. Bankert*, No. 2:05-cv-503-DAK, 2007 U.S. Dist. LEXIS 77503, *31-34 (D. Utah Oct. 18,

2007) (addressing relevant analysis "of the federal program" under the Rehabilitation Act and observing that "there is no requirement that a disabled person have access to every trail that an able bodied person can access").

Plaintiffs next claim that designations of "multiple routes . . . created 'buffer zones' in violation of the Dingell Act," and that "BLM failed to respond to [Plaintiff McKay's] comment" on these routes. Pls.' Br. 10 (addressing Route #D1501, D1507, D1507B). But this simply repackages the flawed argument addressed above and ignores BLM response to the referenced comments. *See* EA, Appx. M.2 at 237-39. Moreover, Plaintiffs fail to discuss applicable law that addresses an agency's duty under NEPA to respond to comments. *See Granat v. U.S. Dep't of Agric.*, 238 F. Supp. 3d 1242, 1254-55 (E.D. Cal. 2017), *aff'd*, 720 Fed. Appx. 879 (9th Cir. 2018). *Granat* evaluated requirements of 40 C.F.R. § 1503.4 that apply to an EIS, not a more concise EA, but even if those standards applied, "Plaintiffs have only identified dissatisfaction with the ultimate decisions made by Defendants in adopting the [TMP]. All the identified comments received adequate responses as required under NEPA." *Id.* at 1256; *see also Bankert*, 2007 U.S. Dist. LEXIS 77503, at *28 ("The BLM's responses to comments on specific routes demonstrates that the BLM fully considered and responded to the public comments."). BLM here provided detailed route-by-route responses to comments. *See* EA, Appx. M.2 at 213-297

Plaintiffs further attack BLM's analysis of user conflict, contending that minimizing known conflicts between OHV use and public river users must be based on some "standard or meaningful measure" identifying the threshold between acceptable and unacceptable noise. Pls.' Br. 11. Similarly, Plaintiffs dispute BLM's conclusion concerning user conflicts, asserting that "the record itself does not support the conclusion that these routes result in a lot of noise." *Id.* To support their argument Plaintiffs cite a case purportedly advancing the proposition that "failure

18

to use 'any scientific protocol for assessing noise impacts' failed NEPA's hard look requirement and constituted arbitrary action." *Id.* (citing *S. Utah Wilderness Alliance v. U.S. Dep't of the Interior*, No. 2:13-cv-01060-EJF, 2016, U.S. Dist. LEXIS 140624, at *23-24 (D. Utah Oct. 3, 2016)). But while plaintiffs in that case alleged that "BLM failed to follow any scientific protocol for assessing noise impacts," *id.* at *21, the court did not rule for plaintiffs on that basis, because "'disagreement among experts or in the methodologies employed is generally not sufficient to invalidate an EA[.]'" *Id.* at *22 (quoting *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 782 (10th Cir. 2006)). Instead, the court held "the BLM committed reversible error *by failing to provide any analysis* of noise impacts on Green River recreation." *SUWA*, 2016 U.S. Dist. LEXIS 140624, at *23 (emphasis added).

BLM's approach to evaluating user conflicts is well recognized in the motorized travel planning context. A land management agency is justified in relying upon user comments to evaluate user conflict in making OHV route designations. *See Northwest Motorcycle*, 18 F.3d at 1475 ("[i]ndividual comment is a very persuasive indicator of 'user conflict,' for determining the existence of conflicts that cannot be numerically calculated or counted"); *Silverton Snowmobile Club v. U.S. Forest Serv.*, No. 02-RB-325, 2004 U.S. Dist. LEXIS 30844, *10 n.3 (D. Colo. Nov. 1, 2004), *aff'd*, 433 F.3d 772 (10th Cir. 2006) (rejecting argument that findings of user conflict based on comments "are not objectively quantifiable"); *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1464-65 (9th Cir. 1996), *as amended* (June 17, 1996). This is exactly what BLM did here. *See*, *e.g.*, EA at 89-93, 96, 198, 202, 217, 223, 224, 231, 235, 236, 238, 239, 244-46; DR at 5-6, A2-9, A2-19, A2-21, A2-46. Moreover, and contrary to Plaintiffs' suggestion, BLM is not required to use any particular scientific protocol for evaluating user conflict. *See Hells Canyon All. v. U.S. Forest Serv.*, 227 F.3d 1170, 1184-85 (9th Cir. 2000), *as*

19

*amended* (Nov. 29, 2000); *Northwest Motorcycle*, 18 F.3d at 1475 (upholding a comment-based rationale for user conflict OHV closures that "has a significant subjective element to it.").

Plaintiffs refer to two routes that "contradict BLM's own documents." Pls.' Br. 11-12 (discussing Routes #D1503B and #D1879). And Plaintiffs are correct – Route #D1503B was inadvertently listed as closed at one place in the decision, but is in fact open. *See* Gaddis-Wyatt Decl. ¶ 14. Similarly, Route #D1879 is in fact 0.54 miles long, rather than 0.05 miles. *Id*. These are minor errors that cause Plaintiffs no prejudice – in APA litigation "there is a harmless error rule" and "it would be senseless to vacate and remand for reconsideration" the entire TMP on this basis. *PDK Lab'ys Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004); *see also Consolidated Gas Supply Corp. v. FERC*, 606 F.2d 323, 328-29 (D.C. Cir. 1979). It would similarly be senseless to temporarily enjoin the entire DR in response to these two harmless errors that do not prejudice Plaintiffs.

Finally, Plaintiffs dispute whether BLM can restrict OHV access based on impacts to bighorn sheep. Pls.' Br. 12 (arguing that an EA for a different project compels the conclusion that "bighorn sheep are more sensitive to hikers" than OHV travel). Again, Plaintiffs identify no legal authority supporting this contention. Conceptually, it is akin to arguing that one cannot be cited for speeding when other drivers are failing to use turn signals. And Plaintiffs' argument has no support in the TMP record, for BLM again presents a reasoned analysis, based largely on the research and findings of subject matter experts from academic institutions, non-governmental organizations dedicated to wild sheep conservation, and the Utah Division of Wildlife Resources. *See* EA at 68-69. The "vital habitats" for this herd mostly include canyon systems overlapping with Plaintiffs' disputed route closures, and the herd population is estimated at 223, below the population objective of 300. *Id*. at 69. BLM's analysis focuses on "human disturbance" (whether

20

from motorized or non-motorized activities) and logically observes that any human disturbance can increase sheep travel time, decrease feeding/resting time, cause indirect habitat loss and impair forage availability. *Id*. These impacts "can escalate seasonally during sensitive birthing, rearing, and breeding seasons" in relation to "miles of routes . . . designated as OHV-Open, OHV-Limited, and OHV-Closed in areas of wildlife habitats." *Id*. at 69-70. BLM therefore adequately, if not persuasively, explains why it chose to restrict OHV access to certain routes (or maintained OHV access on others) in vital wild sheep habitats. *See*, *e.g.*, DR at A2-4, A2-6, A2-10, A2-14, A2-19, A2-21.[11]

The TMP makes reasonable determinations about whether to allow or discontinue existing OHV travel. Plaintiffs' mere disagreement with some of these individual route determinations fails to show that any BLM action is arbitrary and capricious.

D.   <u>NEPA</u>

Plaintiffs' final merits argument contends that BLM failed to take a sufficient "hard look" under NEPA. Pls.' Br. 12-13. These arguments rehash Plaintiffs' otherwise failed claims or reflect similarly basic flaws.

Plaintiffs first argue that BLM provided no more than a "talismanic invocation of noise causing user conflicts." Pls.' Br. 13. Again, this only repackages Plaintiffs' flawed argument, addressed above, that a failure to provide "objective criteria" or follow "scientific protocol" in analyzing noise levels/conflict somehow violates NEPA. *Id*. Plaintiffs again mistakenly cite

---

[11]      Nearly all of the DR rationales for closing routes to minimize impacts to sheep also include minimization of impacts to other resources including soils, vegetation, and other wildlife species such as raptors and migratory birds. *See id*. In other words, even if BLM could not rely on minimizing impacts to bighorn sheep habitat to designate certain routes as OHV-Closed, its decisions would still be justified on other valid minimization concerns.

*SUWA* and fail to address the case law that universally validates the approach that BLM took in the TMP in evaluating subjective user conflict.

Plaintiffs next argue that BLM violated NEPA by "failing to choose one of the prescribed alternatives in the EA[,]" preventing BLM from "underst[anding] the cumulative impact of the TMP's particular combination of closures." *Id*. Yet again, there is case law directly on point in the OHV travel planning context rejecting this theory. *See Sierra Trail Dogs Motorcycle & Rec. Club v. U.S. Forest Serv*., 470 F. Supp. 3d 1186, 1192-1193 (D. Nev. 2020) (finding adopted alternative "fell within the spectrum of alternatives discussed" in the NEPA document); *Earth Island Inst. v. U.S. Forest Serv*., 87 F.4th 1054, 1069-71 (9th Cir. 2023) (applying same legal analysis to an EA). And to the extent that Plaintiffs argue there should have been more mid-range alternatives offering different route network mileage options, that argument too has been soundly rejected. *See*, *e.g*., *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1004-05 (9th Cir. 2013) (rejecting argument that BLM was required to consider additional "mid-range alternative[s]"); *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 871-72 (9th Cir. 2004). Moreover, Plaintiffs' argument defies common sense – BLM considered in detail alternatives that would have designated total motorized route networks of 690 miles (Alt. B), 960.1 miles (Alt. C), 1075 miles (Alt. D), and 1,127.1 miles (Alt. A). EA at 14-17. The DR fell between alternatives B and C, designating a total motorized route network of 810.5 miles of routes for public OHV use in the TMA, while designating 317.2 miles of previously motorized routes as OHV-Closed. DR at 3. BLM's impacts analysis of a range of alternatives surrounding the ultimately selected motorized route network is a typical travel plan outcome that satisfies NEPA. *See Granat*, 238 F. Supp. 3d at 1251-52; *Idaho Conservation League v. Guzman*, 766 F. Supp. 2d 1056, 1069-70 (D. Idaho 2011).

Plaintiffs further argue that the EA failed to "provide site-specific impact analyses" addressing the impacts of closing motorized travel on "routes that had been lawfully utilized for decades by the public." Pls.' Br. 13. This argument too lacks legal support while ignoring contrary legal authority. *See Bitterroot Ridge Runners Snowmobile Club v. U.S. Forest Serv.*, 329 F. Supp. 3d 1191, 1201 (D. Mont. 2018), *aff'd*, 833 Fed. Appx. 89 (9th Cir. 2020) (rejecting "blanket statement" asserting lack of site-specific analysis and concluding the agency assessed impacts of vehicle use "at a site-specific level to the best of its ability"). Similarly, Plaintiffs' argument that BLM was required to prepare an EIS lacks merit. Pls.' Br. 13-14. Plaintiffs ignore the relevant authority – a FONSI addresses the regulatory criteria at 40 C.F.R. § 1501.3. *See* FONSI at 2.[12] The FONSI, relying on the analysis in the EA, provides a resource-by-resource evaluation of short- and long-term effects, including for recreation. FONSI at 12. The District Manager concluded that "[b]ecause all action alternatives would continue to provide recreation opportunities to a variety of user types . . . significant effects to recreation opportunities would not occur as a result of any of the action alternatives." *Id*. at 18. This is a factual determination implicating agency expertise. *Utah Shared Access All.*, 288 F.3d at 1213. Plaintiffs' narrative frustrations with the FONSI or the TMP in general provide no basis for relief.

Plaintiffs' arguments on the merits are all deeply flawed. As such, they cannot satisfy the threshold requirement for seeking a preliminary injunction.

---

[12]     Courts have found the Council on Environmental Quality regulations implementing NEPA "are entitled to substantial deference." *Robertson*, 490 U.S. at 355. Historically, the regulatory criteria addressing whether a proposed action will have significant effects were found at 40 C.F.R. § 1508.27 (2019). But the FONSI applied new regulations issued by the Council in 2020. *See* 40 C.F.R. § 1501.3(b) (2020).

## II.      Plaintiffs Do Not Demonstrate a Likelihood of Irreparable Injury

Plaintiffs fare no better in their attempt to demonstrate a likelihood of imminent, irreparable injury essential to obtaining a preliminary injunction. They contend they "can demonstrate three distinct types of irreparable harm." Pls.' Br. 14. Again, they are mistaken.

*First*, Plaintiffs argue that any deprivation of constitutional rights they possess under the Appointments Clause necessitates the issuance of preliminary injunction. *Id*. 15. But as demonstrated above, the OHV route designation decision did not require the exercise of "significant authority" and discretion, and thus did not need to be made by an officer appointed pursuant to the Appointments Clause. Since their underlying argument to the contrary is devoid of legal support, Plaintiffs are not suffering constitutional injury.

*Second*, Plaintiffs assert that BLM will imminently obliterate closed routes and, once so, such trails "cannot be remade" and will be lost forever. Pls.' Br. 15-16. But they provide no legal or factual basis for these speculative assertions. Their legal premise is unfounded, for the inability to ride an OHV on an obliterated (or closed) route is not irreparable injury, particularly when route closures are not permanent, any route (reclaimed or not) can be reestablished on the ground in the future, and there remain over 810 miles of routes available for continuing OHV use, including approximately 91 percent of Jeep Safari routes. *See* DR at 5-6; Gaddis-Wyatt Decl. ¶¶ 12-13.

Plaintiffs' factual premise relies solely on the existence of a BLM "toolbox" for implementing route designations. *See* Pls.' Br. 15 (citing EA, Appx. N). Nowhere have Plaintiffs identified active BLM efforts that have obliterated, or will soon obliterate, any route(s). Nor could they, as BLM has not taken such action and does not have immediate plans to do so. *See* Gaddis-Wyatt Decl. ¶ 11 (stating that BLM has implemented closures "on approximately 10.7

miles" of routes, none of which were "obliterated"). Contrary to Plaintiffs' unsupported assertion that BLM might obliterate all 317 miles of OHV-Closed routes that are "a precious resource" for "millions of Americans," Pls.' Br. 16, implementation is far more nuanced and typically includes signing and user education, "using non-disruptive closure methods such as concealing entrance points to routes with natural materials," allowing routes to naturally reclaim, or using hand tools to conceal tracks and berms. Gaddis-Wyatt Decl. ¶ 11.

And travel management is a continuing and evolving process, and Plaintiffs are simply wrong in theorizing that designations only ratchet down permanent closures. BLM has authority, acknowledged in the TMP, to make different future designations including authorization of use on new or formerly open routes. *See* EA at 23-24, 201, 203, 204; DR at 3. Plaintiffs offer nothing more than hypothetical scenarios about route obliteration or lost recreational opportunities. Such "speculative or theoretical injury will not suffice" to show irreparable injury, particularly when the harm Plaintiffs' assert relating to route closures is reversible. *Colorado*, 989 F.3d at 884.

*Third*, Plaintiffs argue "a plaintiff's 'expressed desire to visit an area in an undisturbed state is all that is required to sufficiently allege harm . . . .'" Pls.' Br. 16 (quoting *Alliance for Wild Rockies v. Marten*, 253 F. Supp.3d 1108, 1111 (D. Mont. 2017)) (ellipses in Pls.' Br.). As an initial matter, it is unclear whether Plaintiffs want their access to be "undisturbed" or whether they seek access to "undisturbed" areas and, if the latter, how the DR results in irreparable harm to these unspecified "undisturbed" areas. Moreover, the IBLA decision denying Plaintiffs' failed petition for stay, while not binding on this Court, cogently distinguishes the cases Plaintiffs rely upon because they involve preservationist plaintiffs seeking to stop activities like timber sales that "are ground-disturbing and by design immediately alter the natural environment upon implementation." IBLA Order at 12. In fact, Plaintiffs' cite clips a word (and an acronym) from

*Marten*, which actually said the expressed desire to visit an area "in an undisturbed state is all that is required to sufficiently allege harm *under ESA*." *Marten*, 253 F. Supp. 3d at 1111 (emphasis added).[13] Relatedly, they suggest that Plaintiff McKay and/or unspecified BlueRibbon members will suffer irreparable injury by not being able to ride OHVs on "the closed routes in spring 2024." Pls. Br. 17. But again, these individuals "may still use hundreds of miles of routes within the area for their recreational and other pursuits," and any suggestion that disruption of a planned OHV trip constitutes irreparable injury "is meritless because it assumes recreationists have a legally cognizable interest in using a particular route on a particular date, which is not true." IBLA Order at 13.

Plaintiffs speculate that 317.2 miles of closed routes will be lost forever and erroneously suggest that the interruption of some nonexistent right to drive an OHV on a certain trail constitutes irreparable harm. Both contentions are wrong, and the Motion should be independently denied based on Plaintiffs' failure to show irreparable injury.

### III.     The Public Interest and Balance of Equities Favor Defendants

On the final two factors of the preliminary injunction standard, Plaintiffs argue that preliminary injunctive relief "is not adverse to the public interest" and will cause "no meaningful harm to other parties." Pls.' Br. 17. But this statement misapprehends the standard and would shift the burden to Defendants (or some other party who enters the litigation to purportedly assert the public interest) to show why a preliminary injunction would disserve the public interest.

---

[13]     Of course, ESA refers to the Endangered Species Act, through which Congress directed there be a "first priority to the declared national policy of saving endangered species." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 185 (1978). These cases are of no benefit to Plaintiffs, who seek to continue the disturbed state of existing routes if not add to the level of disturbance through ongoing motorized access that BLM found was causing adverse impacts.

Plaintiffs fail to acknowledge the heavy burden they shoulder and the extraordinary nature of a preliminary injunction. *See Denver*, 32 F.4th at 1278.

Plaintiffs otherwise repeat their flawed irreparable injury arguments, lamenting the inability to drive OHVs on closed routes and passionately asserting that such inability to travel routes that are "treasured" and "very popular" in the OHV community will disserve "the public interest to keep public lands as accessible as possible." Pls.' Br. 17-18. Aside from lacking record or other factual support for these statements, they are simply Plaintiffs' beliefs; they do not speak to how a preliminary injunction might affect the *public* interest in balancing resource conservation with recreational use of the TMA.

Arguments based on the behavior of elected officials are similarly misplaced. Pls.' Br. 18. The views of a Member of Congress do little more than "fulfill[ ] his sworn obligation to his constituents" and provide neither a basis to affirm nor invalidate BLM's analysis, let alone justify a preliminary injunction. *Northwest Motorcycle*, 18 F.3d at 1479 n.3. Indeed, BLM received extensive public comments from people near Moab and throughout the state supporting Alternatives B and C, and Grand County representatives "expressed a desire to see a more robust discussion of user conflicts," "provided a list of routes which they wished to see designated OHV-Closed or OHV-[L]imited in Alternative B," and suggested other changes intended to "reduc[e] conflicts with 'quiet recreation.'" EA at 96. The public interest is best served by implementing the TMP.

## CONCLUSION

For the above reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted this 19th day of January 2024.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

_/s/ Paul A. Turcke_
PAUL A. TURCKE, Trial Attorney
Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (202) 532-5994
paul.turcke@usdoj.gov

_Attorneys for Defendants_

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum contains 8,477 words and complies with the type-volume limitation of DUCivR 7-1(a)(4)(C), as would be extended by the request seeking leave to file excess pages. This memorandum has been prepared in a proportionately spaced typeface, Times New Roman 12-point font, and I obtained the word count using Microsoft Word 365 Apps for enterprise (Version 2310 Build 16924.20180).

_/s/ Paul A. Turcke_
Paul A. Turcke