Robert Henneke (Admitted Pro Hac Vice)
Chance Weldon (Admitted Pro Hac Vice)
Matthew Miller (Admitted Pro Hac Vice)
Clayton Way Calvin (Admitted Pro Hac Vice)
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78741
(512) 472-2700
rhenneke@texaspolicy.com
cweldon@texaspolicy.com
mmiller@texaspolicy.com
ccalvin@texaspolicy.com

James Rogers (Utah Bar No. 18783)
Nicholas Barry (Admitted Pro Hac Vice)
AMERICAN FIRST LEGAL FOUNDATION
611 Pennsylvania Ave., SE #231
Washington, DC 20003
(202) 964-3721
nicholasbarry@aflegal.org
james.rogers@aflegal.org

Krystaly N. Koch (Utah Bar No. 16491)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
(385) 355-4826
krystaly.koch@freemanlovell.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BLUERIBBON COALITION, INC.; PATRICK MCKAY; and COLORADO OFFROAD TRAIL DEFENDERS, <br><br> and <br><br> STATE OF UTAH, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> U.S. BUREAU OF LAND MANAGEMENT; U.S. DEPARTMENT OF THE INTERIOR, <br><br> *Defendants.* <br> and <br><br> SOUTHERN UTAH WILDERNESS ALLIANCE, <br><br> *Intervenor-Defendant.* | Case Nos.   2:23-cv-00923-DAK <br> 4:24-cv-00046-DAK <br><br> **OPENING BRIEF OF PLAINTIFFS BLUERIBBON COALITION, INC., COLORADO OFFROAD TRAIL DEFENDERS, AND PATRICK MCKAY** <br><br><br> Judge Dale A. Kimball <br> Magistrate Judge Jared C. Bennett |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

ISSUES PRESENTED FOR REVIEW .............................................................................. 1

STATEMENT OF THE CASE .............................................................................................. 1

SUMMARY OF THE ARGUMENT ................................................................................... 4

ARGUMENT ........................................................................................................................... 5

I.      THE TRAVEL MANAGEMENT PLAN IS VOID BECAUSE IT VIOLATES THE APPOINTMENTS CLAUSE OF THE U.S. CONSTITUTION. .......................................................... 5

II.     DEFENDANTS VIOLATED THE DINGELL ACT BY CREATING AN ILLEGAL BUFFER ZONE AROUND A WILDERNESS AREA. ....................................................................... 10

III.    THE CLOSURES ARE ARBITRARY AND CAPRICIOUS. ........................................ 13

        A.      The Plan Is Arbitrary and Capricious Because It Applies a Legal Standard That Ignores the Controlling Statute........................................................ 14

        B.      Many Closures Are Based on Factors Not Found in the Statute and That Are Otherwise Arbitrary and Capricious. ................................................ 16

        C.      Even Closures Based on Arguably Statutory Factors Are Shown to Be Arbitrary and Capricious on Closer Examination................................. 22

                1.      The Plan's use of soil erosion to justify closures is arbitrary and capricious. ...................................................................................... 22

                2.      The way in which the Plan uses "user conflicts" to close trails is arbitrary and capricious.......................................................... 26

                3.      The bighorn sheep rationale is arbitrary and capricious. ......................... 29

                4.      Other "habitat fragmentation" rationales are also arbitrary and capricious. ....................................................................................... 36

IV.     DEFENDANTS FAILED NEPA'S "HARD LOOK" TEST BECAUSE THE PLAN IS A MAJOR FEDERAL ACTION SIGNIFICANTLY AFFECTING THE QUALITY OF THE HUMAN ENVIRONMENT, FOR WHICH BLM WAS REQUIRED TO CREATE AN EIS. .......................... 38

CONCLUSION AND REQUEST FOR RELIEF ...................................................... 42

CERTIFICATE OF COMPLIANCE ................................................................................ 44

CERTIFICATE OF SERVICE ............................................................................................ 44

i

EXHIBITS

PLAINTIFFS' EXHIBIT A: CHART OF CLOSURE JUSTIFICATIONS

PLAINTIFFS' EXHIBIT B: SUMMARY OF CLOSURE JUSTIFICATIONS

PLAINTIFFS' EXHIBIT C: EXCERPTS FROM THE ADMINISTRATIVE RECORD

PLAINTIFFS' EXHIBIT D: OTHER SOURCES

**TABLE OF AUTHORITIES**

*Cases*

*A. L. A. Schechter Corp. v. United States,*
    295 U.S. 495 (1935) ................................................................................................ 5

*Braidwood Mgmt. v. Becerra,*
    104 F.4th 930 (5th Cir. 2024) ........................................................................... 7, 10

*Breckenridge v. Rumsfeld,*
    537 F.2d 864 (6th Cir. 1976) ............................................................................ 43, 44

*Caring Hearts Personal Home Servs., Inc. v. Burwell,*
    824 F.3d 968 (10th Cir. 2016) ................................................................................ 16

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) .............................................................................................. 41

*Colo. Envtl. Coal. v. Dombeck,*
    185 F.3d 1162 (10th Cir. 1999) ............................................................................. 44

*Columbia Basin Land Prot. Ass'n v. Schlesinger,*
    643 F.2d 585 (9th Cir.) ......................................................................................... 44

*Comm. to Pres. Boomer Lake Park v. United States Dep't of Transp.,*
    4 F.3d 1543 (10th Cir. 1993) ................................................................................. 42

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
    72 F.4th 1166 (10th Cir. 2023) .............................................................................. 32

*Ctr. for Biological Diversity v. U.S. Forest Serv.,*
    349 F.3d 1157 (9th Cir. 2003) ............................................................................... 41

*Earth Island Inst. v. U.S. Forest Serv.,*
    442 F.3d 1147 (9th Cir. 2006) ............................................................................... 44

*Edmond v. United States,*
    520 U.S. 651 (1997) ...................................................................................... 8, 9, 10

*Freytag v. Commissioner,*
    501 U.S. 868 (1991) ................................................................................................ 5

*Friends of Tahoe Forest Access v. U.S. Dep't of Agric.*,
    641 Fed.Appx. 741 (9th Cir. 2016) .................................................................. 45

*Hackett v. Barnhart*,
    395 F.3d 1168 (10th Cir. 2005) ..................................................................... 16

*Hiram Clarke Civic Club v. Lynn*,
    476 F.2d 421 (5th Cir. 1973) ......................................................................... 43

*Koon v. United States*,
    518 U.S. 81, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996) ............................... 15

*Lax v. Astrue*,
    489 F.3d 1080 (10th Cir. 2007) ..................................................................... 16

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024) ................................................................................. 15

*Lucia v. SEC*,
    138 S. Ct. 2044 (2018) ............................................................................... 5, 6

*Minnesota Pub. Int. Rsch. Grp. v. Butz*,
    498 F.2d 1314 (8th Cir. 1974) ....................................................................... 44

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ..................................................................................... 38

*Nat'l Res. Def. Council, Inc. v. Grant*,
    341 F. Supp. 356 (E.D.N.C. 1972) ................................................................ 43

*Northwest Motorcycle Association v. U.S. Department of Agriculture*,
    18 F.3d 1468 (9th Cir. 1994) ......................................................................... 14

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
    625 F.3d 1092 (9th Cir. 2010) .................................................................. 41, 42

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015) ......................................................................... 37

*Panama Refining Co. v. Ryan*,
    293 U.S. 388 (1935) ....................................................................................... 5

*S. Utah Wilderness All. v. U.S. Dep't of Interior*,
    No. 2:13-cv-01060-EJF, 2016 U.S. Dist. LEXIS 140624 (D. Utah Oct. 3, 2016) .......... 42

*Sierra Club v. Bosworth*,
    352 F. Supp. 2d 909 (D. Minn. 2005) ................................................................ 20

*Sierra Club v. U.S. Dep't of Agric.*,
    No. 96-2244, 1997 WL 2905308 (7th Cir. May 28, 1997) ................................ 20

*Sierra Club v. U.S. Forest Serv.*,
    857 F. Supp. 1160 (D. Utah 2012) .................................................................... 19

*Southern Utah Wilderness Alliance v. U.S. Department of the Interior*,
    No. 2:12-cv-257 (Dist. Utah) ............................................................................. 25

*Sw. Williamson Cnty. Comty. Ass'n v. Slater*,
    243 F.3d 270 (6th Cir. 2001) ............................................................................. 43

*Trump v. United States*,
    603 U.S. 593 (2024) ............................................................................................. 9

*United States ex rel. New v. Rumsfeld*,
    350 F. Supp. 2d 80 (D.D.C. 2004) ................................................................. 8, 10

*United States v. Akers*,
    76 F.4th 982 (10th Cir. 2023) ........................................................................... 16

*United States v. Arthrex*,
    141 S. Ct. 1970 (2021) ......................................................................................... 8

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ............................................................................. 42

**Statutes**

16 U.S.C. § 1232 ............................................................................................. 1, 10, 11

28 U.S.C. § 2202 .................................................................................................. 1, 42

28 U.S.C. § 2412 ...................................................................................................... 42

28 U.S.C. §§ 2201 ................................................................................................ 1, 42

42 U.S.C. § 4332 ...................................................................................................... 39

43 U.S.C. § 1201 ........................................................................................................ 7

43 U.S.C.A. § 1701 .................................................................................................. 14

5 U.S.C. § 706 .............................................................................................. 1, 13, 14

U.S. Const. art. II, § 2, cl. 2 ................................................................................ 5, 7

***Regulations***

40 C.F.R. § 1502 ................................................................................................... 39

40 C.F.R. § 1508 ................................................................................................... 40

43 C.F.R. § 1601 ..................................................................................................... 7

43 C.F.R. § 8340 ..................................................................................................... 6

43 C.F.R. § 8342 ............................................................................................. passim

7 C.F.R. § 650 ...................................................................................................... 41

This case involves a challenge to the constitutionality and legality of a Travel Management Plan ("TMP" or "Plan"), adopted by Defendants, that closes 317.2 miles of historical off-road trails near Moab, Utah. Plaintiffs seek to have the Plan declared void and set aside, in whole or in part, pursuant to 5 U.S.C. § 706, 28 U.S.C. §§ 2201, 2202 and Fed. R. Civ. P. 57, 65 for the reasons stated below.

### ISSUES PRESENTED FOR REVIEW

Plaintiffs show below that the Plan should be held void for four reasons:

1. The Travel Management Plan violates the Appointments Clause of the U.S. Constitution, Article II, § 2, cl. 2;

2. The Travel Management Plan violates the Dingell Act, 16 U.S.C. § 1232;

3. The road closures are arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 706; and

4. Defendants failed to take a "hard look" at the effect of the closures under the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*, and failed to prepare the required Environmental Impact Statement.

### STATEMENT OF THE CASE

On September 29, 2023, Defendant Bureau of Land Management ("BLM") released the Final Environmental Analysis ("EA"), Finding of No Significant Impact ("FONSI"), and Decision Record ("DR") officially adopting the TMP. The EA analyzed four alternative travel plans from which the final Plan was originally to be chosen. BLM's District Manager then adopted a plan fitting none of the four proposals. DR at DR-3, LGB042017, Ex. C at 102. That plan most approximated Alternative B, which was the most restrictive of motorized recreation and sought to "constrain" such recreation within the TMA. EA at 16; LGB042231, Ex. C at 171. This resulted in

1

the closure of approximately 317.2 miles of historical trails. DR at DR-3, LGB042017, Ex. C at 102.

Plaintiffs BlueRibbon Coalition, Inc., and Colorado Offroad Trail Defenders are organizations whose members are adversely affected by the DR because those members use the now-closed routes for motorized recreation and heavily participated in the decision-making process regarding the Plan. *See* McKay Comment Excerpt, LGB005106-31, Ex. C at 1-26; BlueRibbon Comment, LGB002253-58, Ex. C at 27-32. Plaintiff McKay is the Vice President of COTD and previously made plans to visit the TMA in Spring 2024 and travel the routes. *See* Pls.' Prelim. Inj. Mot., ECF No. 4, Ex. C, at ¶ 37. BlueRibbon was also an intervenor in previous litigation, which resulted in BLM's reconsidering a prior travel plan. Pls.' Compl., ECF No. 1, at ¶ 12.

The TMA consists of over 300,000 acres of BLM lands located in Grand and San Juan Counties, Utah, north and west of Moab. EA at 1; LGB042216. It has historically had "a particularly high level of OHV use" and is home to "several world class 4WD/OHV routes." EA at 88; LGB042303, Ex. C at 178. Bounded by the Green River to the west, Arches National Park to the east, and Canyonlands National Park to the south, the TMA's appeal is its scenic beauty, featuring canyons, mesas, arches, bluffs, and more. EA at 2, LGB042217, Ex. C at 167. It is also unique in the region for having fewer use restrictions than nearby public lands. BlueRibbon Comment at 2, LGB002254, Ex. C at 28. Indeed, the TMA is one of the last areas in the region where Americans and their families may enjoy motor-facilitated access to some of the most beautiful places in the nation's Southwest.

Anti-OHV groups, however, have continued to push BLM toward their own preferences and close routes Congress dedicated to the *whole* of the American public. As a result, OHV access

2

in the TMA has been shrinking for decades. The current travel network dates back to the 2008 Moab Field Office Record of Decision and Approved Resource Management Plan. BUREAU OF LAND MGMT., *Record of Decision and Approved Resource Management Plan*, DOI-BLM-UT-Y010-2008-0001-RMP-EIS (Oct. 2008), Ex. D at 1-182, available at: https://eplanning.blm.gov/eplanning-ui/project/66098/570 (the "2008 RMP"). That decision closed 766 miles of trails in the TMA. EA at 11; LGB042226, Ex. C at 168. Still, anti-OHV groups continued to push BLM to close more trails and filed suit to ensure the agency would do so. That suit ended in a settlement agreement in which BLM agreed to issue new travel management plans for fourteen different TMAs, including the Labyrinth/Gemini Bridges TMA. Pls.' Prelim. Inj. Mot., ECF No. 4, Ex. D, at 6-7.

As noted, the Plan was originally intended to be chosen from between four proposals explained in the EA. *See* EA at 11, LGB042226, Ex. C at 168. Also as noted, the District Manager instead chose a network fitting none of the proposals but most approximated Alternative B with respect to OHV access. DR at DR-3, LGB042017, Ex. C at 102. Alternative B was meant to "constrain[]" OHV use and emphasize "natural resource[s]." EA at 16, LGB042231, Ex. C at 170. She chose this drastic closure option despite the fact that, as recently as 2015, BLM found that the travel network inside the TMA did not require any changes. *See* Pls.' Prelim. Inj. Mot., ECF No. 4, Ex. E, BUREAU OF LAND MGMT., *Land Use Plan Evaluation Report* (Sept. 30, 2015).

After BLM issued the DR, Plaintiffs filed a Notice of Appeal and Petition for Stay. *See* Compl., ECF No. 1, Ex. E. The Petition for Stay raised all the issues in this opening brief. On November 28, 2023, the Interior Board of Land Appeals ("IBLA") denied Plaintiffs' petition. Compl., ECF No. 1, Ex. F. In doing so, it did not consider any of the legal issues raised in the stay request, but only decided there was no immediate and irreparable harm. On December 22, 2023,

Plaintiffs moved this Court for injunctive relief, *see* Pls.' Prelim. Inj. Mot., ECF No. 4, which was denied on March 20, 2024, *see* Order, ECF No. 48.

## SUMMARY OF THE ARGUMENT

The Travel Management Plan should be declared void by this Court due to multiple fatal flaws in its preparation and content. The Plan closes and criminalizes the use of 317.2 miles of historic trails to motorized users who have been enjoying them for decades. This is a major governmental action and, as such, is held to a very high standard of review. To begin with, it was adopted by a mere government employee, in violation of the Appointments Clause of the U.S. Constitution. Furthermore, it violates the Dingell Act, which Congress recently enacted in order to prevent precisely what is occurring here: the use of non-wilderness areas to create *de facto* buffer zones for actual wilderness areas. If that were not enough, the plan is shot through with evidence that it was adopted arbitrarily and capriciously, in violation of the Administrative Procedures Act— including the fact that it completely ignores the Congressional directive to prioritize human recreation in the affected area. Finally, the National Environmental Policy Act of 1969 requires an Environmental Impact Assessment when closures have such a dramatic effect on the human environment, and one was not prepared here.

Taken together, these deficiencies amount to a closure plan that was adopted to further an agenda of ever-decreasing human recreation in remote areas of the country, rather than one that follows the specific and mandatory constitutional and legal requirements. For any and all of these reasons, it should be declared void and its enforcement should be permanently enjoined.

ARGUMENT

## I.   THE TRAVEL MANAGEMENT PLAN IS VOID BECAUSE IT VIOLATES THE APPOINTMENTS CLAUSE OF THE U.S. CONSTITUTION.

The BLM District Manager's decision to permanently close the routes violated the Appointments Clause, Article II, § 2, cl. 2, of the United States Constitution. District Manager Gaddis-Wyatt is a BLM employee and no more; the parties do not dispute this. *See, e.g.,* 43 C.F.R. § 1601.05(f).  Yet her decision to close a vast swathe of Utah wilderness to a large portion of the American public—under pain of criminal penalty unauthorized by statute—is an exercise of "significant authority" requiring proper appointment. *Lucia v. SEC*, 138 S. Ct. 2044, 2044 (2018).

An Appointments Clause analysis flows from the simple truth that Congress is the proper branch of government for creating crimes. *See, e.g., Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935); *A. L. A. Schechter Corp. v. United States*, 295 U.S. 495 (1935). It retains the corresponding power, then, to ensure the enforcement of criminal law is done by trusted officers. Thus, the Appointments Clause protects the separation of powers, ensuring the legislature retains the ultimate power over what constitutes criminal liability. *See, e.g., Freytag v. Commissioner*, 501 U.S. 868, 878 (1991); *Weiss v. United States*, 510 U.S. 163, 187 (1994) (Souter, J., concurring) ("any decision to dispense with Presidential appointment and Senate confirmation *is Congress's to make*, not the [executive branch's]") (emphasis added). As the non-delegation doctrine, for example, requires core legislative activity like defining crimes to be carried out by the legislature, the Appointments Clause requires that criminal liability be prosecuted by officials the legislature has approved.

The Clause is found at Article II, § 2, cl. 2 of the United States Constitution, and provides:

[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors … Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of the Departments.

Any federal worker who conducts herself as an "Officer[]" must be appointed in accordance with the Appointments Clause. Specifically, that worker must either be a principal officer nominated by the President and confirmed by the Senate, or whose appointment is otherwise provided for by statute; or else the worker must be an inferior officer whose appointment is provided for by statute. If neither of these conditions are met, she may not exercise the level of power reserved for federal officers.

An "Officer" is defined as exercising "significant authority pursuant to the laws of the United States" and as holding duties that are "continuing and permanent." *Lucia*, 138 S. Ct. at 2044. "Significant authority" or discretion includes the "power to issue legally binding recommendations." *Braidwood Mgmt. v. Becerra*, 104 F.4th 930, 940 (5th Cir. 2024). If "significant authority" includes "the power to issue legally binding recommendations," surely then, it includes final, binding decisions altering the scope of criminal liability. *Id*. Especially here, where the criminal penalties wielded by the District Manager are not even creatures of statute but were instead created out of whole cloth by regulation, the authority she wields is extremely (and unlawfully) significant. *See* 43 C.F.R. § 8340.0-7.

The District Manager's decision to permanently close hundreds of miles of historic roads is sufficiently significant to trigger the Appointments Clause. But even more significant is the fact that, as a result of her decision, entry onto the roadways does not just constitute simple trespass, but *criminal* trespass. A member of the American public caught accessing any part of the closed

6

portion of the Plan can spend up to *one year* in federal prison. 43 C.F.R. § 8340.0-7. Such individual can also be fined up to $1,000 on top of this year-long deprivation of his or her liberty. *Id.* The District Manager's decision to close and criminalize the use of over 300 miles of decades-old trails is an exercise of authority significant enough to trigger Appointments Clause requirements.

The District Manager's exercise of significant authority was not justified on the ground that she is a principal officer. As the parties do not dispute, her official title is "District Manager." She is an employee of the BLM, and was hired as such. BUREAU OF LAND MGMT., *BLM Canyon Country District Announces Key Leadership Changes* (Aug. 11, 2022), Ex. D at 183-87, available at https://tinyurl.com/53fwzpt2; 43 C.F.R. § 1601.05(f) (stating a "District Manager" is a type of "Field Manager" who is a "BLM employee"). Even if the District Manager had provided a statute specifically establishing her position or providing a manner for her appointment—which she has not—the Appointments Clause would still require she be nominated by the President and confirmed by the Senate. She was not. Because it is undisputed the District Manager is not a principal officer, her significant decision to criminalize the use of hundreds of miles of historic roadways cannot be justified on this basis.

Likewise, the decision cannot be saved by labeling her an inferior officer. The position of "inferior officer must be 'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *United States v. Arthrex*, 141 S. Ct. 1970, 1980 (2021) (quoting *Edmond v. United States*, 520 U.S. 651, 663 (1997)). There are three principal reasons the District Manager's conduct was not justified as an inferior officer. First, as described above, the authority she exercised was more significant than that exercised by inferior officers, who typically have "lesser responsibilities." *United States ex rel. New v. Rumsfeld*, 350 F.

Supp. 2d 80, 98 (D.D.C. 2004). Second, Congress did not "by Law vest the Appointment" of the District Manager "in the President alone, in the Courts of Law, or in the Head[] of [a] Department[]." U.S. Const. Art. II, § 2, cl. 2. Although 43 U.S.C. § 1201 grants the Secretary of the Interior the power to designate an officer "to enforce and carry into execution, by appropriate regulations" provisions related to public lands, there is no indication that such a designation ever actually took place here. Moreover, a statute must both "*create*[] *the … office* and g[i]ve the [Department Head] the power to fill it 'by Law.'" *Trump v. United States*, 603 U.S. 593, 649-50 (2024) (Thomas, J., concurring) (emphasis added). Section 1201's language does not *create* an office. *See id.* ("If Congress has not reached a consensus that a particular office should exist, the Executive lacks the power to unilaterally create and then fill that office.").

The third problem is that the District Manager's major decision to close the routes was not properly overseen by "some higher-ranking officer or officers below the President." *Edmond*, 520 U.S. at 881. This final requirement—proper oversight—applies to inferior officers and employees alike. The Court should revisit its preliminary rationale on the issue of oversight, as District Manager lacked proper oversight for at least three reasons.

First, the presence of a long chain of command is not equivalent to supervision. *See* ECF No. 48, at 7. Rather, courts have found adequate supervision where a superior oversees the exercise of discretion itself. The Supreme Court has opined on this point directly:

> It is not enough that other officers may be identified who formally maintain a higher rank, or possess responsibilities of a greater magnitude. If that were the intention, the Constitution might have used the phrase 'lesser officer.' Rather, in a clause designed to preserve political accountability relative to important government assignments, [the Court] think[s] it evident that 'inferior officers' are officers whose *work* is directed and supervised.

*Edmond*, 520 U.S. at 662-63 (emphasis added).

Courts are reluctant to apply this proposition narrowly, for example, "disagree[ing] that [a higher-ranking official]'s at-will removal authority is … sufficient to render [a lower-ranking official] constitutionally subordinate." *Braidwood*, 104 F.4th at 944. Here, the District Manager admitted the decision was entirely her own. The DR is written in the first-person ("it is my decision to select a route network," "my decision … represents my consideration") and signed by the District Manager and no one else. DR at DR-2, DR-5, DR-10, LGB042016, LGB042019, LGB042020, Ex. C at 105, 108, 109. The proper level of supervision over her work, therefore, was not exercised.

Second, the ability to appeal an erroneous decision is not equivalent to supervision. Neither an inferior officer's nor an employee's *work* can be "directed and supervised" by a post-hoc appeal of her decision. The Appointments Clause can only ensure proper supervision by prescribing the manner of appointing the federal officers that oversee agents' work. To produce any meaningful supervisory result, this process must necessarily take place *before* that work is carried out.

Third, the District Manager's decision differs from decisions courts have held to be "carefully circumscribed" or "specific in [their] objects." *Rumsfeld*, for example, involved United Nations officials, not federal officials, whose duties were clearly "circumscribed" because they were subject to international treaties and the President's discretion. 350 F. Supp. 2d at 98. Here, the route closures were not "carefully circumscribed," despite the existence of regulations, the RMP, and BLM's Travel and Transportation Management Manual 1626. The fact that the final decision diverged from these authorities indicates they could not logically have "circumscribed" the decision.

The liberties BLM has taken in both relinquishing significant decision-making authority to mere employees, and in promulgating its own criminal offenses and associated penalties, demonstrate a violation of basic constitutional requirements that invalidates the Plan in its entirety.

## II.   DEFENDANTS VIOLATED THE DINGELL ACT BY CREATING AN ILLEGAL BUFFER ZONE AROUND A WILDERNESS AREA.

The John D. Dingell, Jr. Conservation, Management, and Recreation Act ("Dingell Act") created the Labyrinth Canyon Wilderness, which makes up most of the TMA's western border on the opposite side of the Green River. Section 1232(e)(2) of the Dingell Act explicitly provides "[t]he fact that nonwilderness activities or uses can be seen or heard from areas within a wilderness area *shall not* preclude the conduct of those activities or uses outside the boundary of the wilderness area." 16 U.S.C. § 1232(e)(2) (emphasis added). The Act states plainly that "Congress does not intend for the designation of the wilderness to create protective perimeters or buffer zones around the wilderness areas." *Id.* at § 1232(e)(1). Despite this, the Plan closes most of the routes along the Green River—directly across from the Labyrinth Canyon Wilderness—only leaving open a few miles of county B roads on the southwestern-most corner of the TMA. This violates the Dingell Act by effectively extending the Labyrinth Canyon Wilderness against Congress's instruction.

BLM's use of a "buffer zone" in the TMA is evident in the DR. Its map of new closures along the boundary of the wilderness illustrates that almost all the trails leading to or along the river are closed under the new Plan. *See* DR at A1-4, LBG042028, Ex. C at 114. BLM justified these closures as an attempt "to minimize known visual and noise-induced conflicts with non-motorized users on the Green River." DR at A2-123, LGB042152, Ex. C at 156 (discussing closure of D2759A). *See also* DR at A2-46, LGB042075, Ex. C at 131 (providing that closing D1527A and D1527B would "minimize potential conflicts between offroad vehicle users and dispersed,

non-motorized/non-mechanized forms of recreation (e.g., canoeists)"). The closures span the perimeter of the Labyrinth Canyon Wilderness abutting the TMA. BLM's desire to minimize noise along that perimeter, therefore, is an effective extension of the wilderness beyond its borders and into the Green River and TMA across the river to the east.

Defendant-Intervenors themselves admit the Plan's goal was to effectively designate both sides of the Green River as wilderness. Speaking about the new Plan, they stated, "With this forthcoming travel plan, the agency has the chance to correct decades of mismanagement and harmonize land management on *both sides of the Green River*." Kelsey Cruickshank & Laura Peterson, *Labyrinth Canyon Travel Planning: A New Opportunity to Solve Old Problems*, S. UTAH WILDERNESS ALL., Ex. D at 188-95, (available at: https://suwa.org/labyrinth-canyon-travel-planning-a-new-opportunity-to-solve-old-problems/) (emphasis added). SUWA might now pretend the Plan's goal was something other than treating both sides of the Green River as wilderness, but the evidence and their words expose the truth.

More pointedly, BLM also violated the Dingell Act's plain text by justifying route closures based on "[t]he fact that nonwilderness activities or uses can be *seen* or *heard* from areas within" the Labyrinth Canyon Wilderness. 16 U.S.C. § 1232(e)(2) (emphasis added). The District Manager stated that among her designation "criteria," DR at DR-2, LGB042016, Ex. C at 101, she considered the impact of "*visual* and *noise-induced* conflicts" from the TMA upon the Labyrinth Canyon Wilderness when deciding how to newly designate the Plan routes, DR at A2-123, LGB042152, Ex. C at 156 (emphasis added). *See also* DR at DR-2 (citing 43 C.F.R. § 8342.1); DR at A2-21, A2-51, A2-125, LGB042050, LGB042080, LGB042154, Ex. C at 122, 136, 158.

The District Manager expressly incorporated the criteria found in 43 C.F.R. § 8342.1, commonly referred to as "minimization criteria." DR at DR-2. In so doing, she indicated she would

violate both the "buffer zone" and the sound and sight provisions of the Dingell Act. And so she did. These minimization criteria aim to ensure that "[a]reas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or *neighboring public lands*, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account *noise and other factors*." 43 C.F.R. § 8342.1(c) (emphasis added). This is precisely what the Dingell Act forbids. BLM has no statutory authority to consider how the neighboring Labyrinth Canyon Wilderness is affected by noise or visuals from within the TMA. To the extent BLM regulations conflict with statute, they also have no authority. Even if BLM could hypothetically consider the effects of uses on neighboring public lands in other situations, it may not do so when those neighboring public lands are congressionally authorized wilderness areas subject to the Dingell Act.

Despite this, the District Manager incorporated noise and visual conflicts in "neighboring public lands" (the Labyrinth Canyon Wilderness) when determining which routes to close. For example, route D2763B, which abuts the Labyrinth Canyon Wilderness, was closed to "minimize visual and noise-induced conflicts between motorized and non-motorized users." DR at A2-125, LGB042154, Ex. C at 158. While this excerpt uses the example of a "canoeist on the Green River," the minimization criteria required to make this assessment necessitated the District Manager to analyze noise and visual factors within the Labyrinth Canyon Wilderness.

Notably, the Dingell Act's restrictions are not limited to closures that are "solely" based on the potential impact of a non-wilderness activity upon a wilderness area. The Wilderness Act's restrictions, by contrast, are. Defendants have previewed reliance on the Ninth Circuit's *Northwest Motorcycle Association v. U.S. Department of Agriculture* to argue the Dingell Act's restrictions are also so circumscribed, but that case was interpreting the Washington State Wilderness Act of

1984, not the Dingell Act (the case was decided decades before the Dingell Act was written). 18 F.3d 1468, 1480 (9th Cir. 1994). Congress intentionally altered the language when creating the Dingell Act, broadening it from a prohibition on non-wilderness use restrictions based *solely* on the restricted activity's potential impact on wilderness areas, to a prohibition on any use restriction *whatsoever* that considered a non-wilderness activity's potential impact on wilderness areas. The misapplication of *Northwest Motorcycle* and the legal standard for the Washington State Wilderness Act was determinative in this Court's preliminary-injunction analysis respecting Plaintiffs' Dingell Act claim. The Court should revisit its analysis here.

In this case, BLM's consideration of the impact of non-wilderness activities upon the Labyrinth Canyon Wilderness corrupted its entire decision. It is impossible to say what BLM's decision would have been had it refrained from using an explicitly prohibited factor. This corruption is not redeemed by the fact BLM left open other nearby routes; this suit focuses on the routes that were closed. Evidence of other factors considered, including those mentioned in an unlawfully-applied regulation, does not rebut the fact that BLM considered unlawful factors in its analysis—and stated so in its DR. *See* DR at DR-2 (citing 43 C.F.R. § 8342.1); DR at A2-21, A2-51, A2-123, A2-125, LGB042050, LGB042080, LGB042152, LGB042154, Ex. C at 122, 136, 156, 158.

### III.   THE CLOSURES ARE ARBITRARY AND CAPRICIOUS.

The Plan is a large-but-hollow document—one shot through with arbitrary reasoning that is contrary to the controlling statute. Globally, it fails to account for the value of recreational opportunities, despite Congress's unambiguous instruction to the contrary. On this basis alone, it is unlawful in its entirety. But the individual justifications for closing trails likewise fail in their particulars. As discussed below, the Plan demonstrates an "arbitrary and capricious" approach to closing trails; it should therefore be held "unlawful and set aside" under 5 U.S.C. § 706(2)(A).

13

## A. The Plan Is Arbitrary and Capricious Because It Applies a Legal Standard That Ignores the Controlling Statute.

The U.S. Supreme Court has been unequivocal that "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). An agency decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), if the agency applies an incorrect legal standard, *see Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996) ("A district court by definition abuses its discretion when it makes an error of law."); *see also Caring Hearts Personal Home Servs., Inc. v. Burwell*, 824 F.3d 968, 977 (10th Cir. 2016) (Gorsuch, J.) ("[A]n agency decision that loses track of its own controlling regulations and applies the wrong rules in order to penalize private citizens can never stand"); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("We review the [agency's] decision to determine whether … the correct legal standards were applied.") (*quoting Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005)).; *United States v. Akers*, 76 F.4th 982, 991 (10th Cir. 2023) ("A district court abuses its discretion when it … commits an error of law, such as applying an incorrect legal standard or misapplying the correct legal standard…").

The Plan is arbitrary and capricious because it fails to consider an important factor the agency is statutorily required to consider when designating trails as open or closed. Specifically, the Federal Land Policy Management Act, which provides the *statutory* authority for the closures, requires executive agencies to manage lands in a manner "that will provide for outdoor recreation and human occupancy and use." 43 U.S.C.A. § 1701(a)(8). This factor is one of four. The others are "[1] protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; [2] that, where appropriate, will preserve

14

and protect certain public lands in their natural condition; [and 3] that will provide food and habitat for fish and wildlife and domestic animals[.]" *Id.*

The statute is clear the executive branch must consider all these factors when managing public lands. However, outdoor recreation is given zero value in the agency's own "designation criteria" it adopted in the controlling regulation, and upon which the Plan is based. 43 C.F.R. § 8342.1 (2024) provides "[a]ll designations *shall* be based on the protection of the resources of the public lands, the promotion of the safety of all the users of the public lands, and the minimization of conflicts among various uses of the public lands; and in accordance with the following criteria." (Emphasis added.) Those open/closed designation criteria are:

> (a) minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.
>
> (b) minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.
>
> (c) minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.
>
> (d) [ensure] [a]reas and trails … not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

Outdoor recreation is nowhere to be found in the regulation or its designation criteria. This overemphasizes certain congressional directives while completely ignoring others. Indeed, the designation criteria treat outdoor recreation as a harm to be protected against—"minimize damage," "minimize harassment," ensure off-road vehicle use "will not adversely affect"—rather than a good to be sought in public land management, despite express congressional instruction to the contrary. Unsurprisingly, this approach is reflected in the Plan, which offers no indication

15

"outdoor recreation and human occupancy and use" is given equal—or any—weight in the closure decisions. While this may be consistent with the controlling *regulation*, it is illegal under the controlling *statute*, and is therefore arbitrary and capricious.

**B.    Many Closures Are Based on Factors Not Found in the Statute and That Are Otherwise Arbitrary and Capricious.**

A review of the DR shows that Defendants' justifications for closing roads fall into 17 categories:

| | | DR Justification | # Segments | # Miles |
|---|---|---|---|---|
| **Addressed in Subsection C Below** | 1 | Minimize impacts to soil, watershed, vegetation, grasslands, or shrubs | 324 | 228.9 |
| | 2 | Minimize user conflicts | 32 | 47.9 |
| | 3 | Minimize impacts to bighorn sheep | 297 | 245.4 |
| | 4 | Minimize other animal habitat fragmentation | 135 | 135.4 |
| **Administrative Convenience** | 5 | Route results in off-road travel | 2 | 10.8 |
| | 6 | Closure beneficial for park management | 6 | 5.7 |
| | 7 | No need or low use | 243 | 131.8 |
| | 8 | Route currently closed | 3 | 3.12 |
| | 9 | Route reclaiming naturally | 76 | 38.8 |
| | 10 | Closure protects cultural resources | 18 | 24.5 |
| **User Convenience** | 11 | Route is redundant | 146 | 103.4 |
| | 12 | Route open seasonally (public) | 5 | 3.2 |
| | 13 | Closure assists wayfinding | 84 | 43.2 |
| | 14 | Closure enhances visual contrast | 274 | 190.9 |
| | 15 | Closure avoids safety hazards | 13 | 16.3 |
| **Third-Party** | 16 | Route impacts private property | 1 | 0.1 |
| | 17 | Seasonal closure (SITLA) | 2 | 1.9 |

Detail for this summary is shown on Exhibit A to this motion, which identifies which routes are being closed based on which justifications (in many instances, there are multiple justifications for a given route).

Justifications one through four are each addressed at length in the next section. The remaining 14 justifications can be grouped into three subcategories: administrative convenience (5-10); user convenience (10-15); and matters involving third parties (16-17).[1]

As to the administrative-convenience categories (5-10), they are arbitrary and capricious for at least two reasons. First, these factors are nowhere to be found in the FLPMA, the authorizing statute. Second, the reasoning behind the factors is not adequately explained, nor based on actual evidence. For categories 8-9, the closure is being enacted because the routes are allegedly un- or under-utilized. For currently-closed routes (8), closure is redundant. For routes that are unused (7) or reclaiming naturally (9), official closure is unnecessary. Three other categories (5, 6, and 10) are being used simply to make administrators' jobs easier. For instance, take category 5—which justifies closure based on the allegation that lawful use of the route somehow results in unlawful use of the route. If this is true, then, absent sufficient explanation and evidence, the solution is enhanced enforcement and not closure.

The same is true for category 10, protecting cultural resources. If BLM wishes to assert that public access to these resources is resulting in criminals deciding to damage or destroy them, then it must "have at least discussed the issue, stated its conclusion and provided support. The discussion … would have been valuable in informing the public and aiding the decision maker. Alternatively, [BLM] could have shown that its expectations that illegal use would be reduced under [the] alternative[] were not merely wishful thinking … The lack of analysis and support make any conclusion arbitrary and capricious." *Sierra Club v. U.S. Forest Serv.*, 857 F. Supp. 1160, 1178 (D. Utah 2012). *See also Sierra Club v. Bosworth*, 352 F. Supp. 2d 909, 924 (D. Minn. 2005) (holding an agency must either explain why new enforcement efforts would minimize illegal use

---

[1] The third-party factors are not addressed herein because Plaintiffs take no position on them.

or include the impacts of illegal trail use in its analysis); *Sierra Club v. U.S. Dep't of Agric.*, No. 96-2244, 1997 WL 2905308, at *29 (7th Cir. May 28, 1997) (same).

The Plan mandates closure of nearly 132 miles of trails on the basis that they are not used at a level Defendants deem sufficient (Category 8). *See* Ex. A, Column 7. This criterion encapsulates a fundamental disconnect between Defendants and actual motorized users of public lands. People visit public lands for all sorts of reasons. Some of them want to get a taste of beautiful places and then move along. Some want to take the perfect photo for their Instagram account. Some want to spend time with friends and family. And some users—not very many—want a remote and challenging wilderness experience.

It is these people who are drawn to obscure and "low use" trails. This is no different than people who wish to summit difficult mountains. For example, a mere 200 people summited the famous K2 peak in Pakistan in 2022. WIKIPEDIA, *K2*, https://en.wikipedia.org/wiki/K2 (as of Nov. 4, 2024 9:36 CST), Ex. D at 196-99. That is the very definition of "low use," and yet it would be clearly arbitrary to close the summit just because Mount Everest is more popular. So too here. The fact that few people use a trail is not a reason to close it. Instead, such trails should remain open precisely because some users value difficult and challenging recreational opportunities, McKay Comment at 64-65, LGB005130-31, Ex. C at 25-26, and Congress, through the FLPMA, has mandated public lands be made available for such ends.

Furthermore, the DR justifies closing 274 routes totaling 190.3 miles to reduce visual contrast created by the route. BLM *Manual 8400* outlines standard agency practices for managing visual resources. BUREAU OF LAND MGMT., *Manual 8400 - Visual Resource Management* (Apr. 5, 1984), Ex. D at 200-14, available at: https://tinyurl.com/3asn679c. It is the policy of the agency to "prepare and maintain on a continuing basis an inventory of visual values on all public lands." *Id.*

at 4, Ex. D at 203. The manual makes it clear that Visual Resource Management (VRM) objectives are determined by a Resource Management Plan. The area affected by the DR is governed by the 2008 Moab RMP. 2008 RMP, Ex. D at 1-182.

It is a standard practice for BLM to "assign to one of four classes based on the scenic quality, visual sensitivity, and distance zones. Each class has an objective that determines the management objectives for that area." BUREAU OF LAND MGMT., *Visual Resources Management (VRM)*, Ex. D at 215, available at: https://tinyurl.com/bdecvcht. Here is a brief description of these four classes:

- Class I Objective: The level of change should be very low and must not attract attention.

- Class II Objective: Allow a low level of change that should not attract the attention of a casual observer.

- Class III Objective: Allow a moderate level of change that may attract attention but should not dominate the view of a casual observer.

- Class IV Objective: The level of change may be high and may dominate the view and be the major focus of viewer attention.

The 2008 Moab RMP assigns these classes to the areas affected by the DR according to this map:



The map shows that there are *no* Class I Objective areas in the area affected by the DR. There are very limited Class II Objective areas. (While these are the most restrictive designations for preserving the scenic quality of an area, even these designations allow "low levels of change" that do not "attract attention.") The majority of the planning area of the DR is designated as Class III and Class IV Objective areas. These designations allow for moderate or substantial levels of change to the scenic values of the landscape that would include activities such as building permanent paved roads, power lines, graded railways, and permanent infrastructure. Certainly,

primitive off-road trails would be allowed in VRM Class III and Class IV areas, and they are often allowed in Class I and Class II areas.

And yet, the DR closed two routes exclusively to reduce visual contrast created by the routes: D3811 and D3810. These routes are located within Class III management areas, so closing these routes to reduce the visual contrast created by the routes contradicts the 2008 RMP. Additionally, these routes are located less than a mile away from US Highway 191 and the railroad tracks running parallel to US Highway 191. Primitive off-road routes are the kind of visual resource impact that are perfectly allowable in a Class III area, especially where substantial impacts to scenic resources are already occurring.

Or consider Route D1312, which is located in a VRM Class III area and 2,000 feet away from and oil/gas installation, yet it was closed to reduce visual contrast in the area. Route D1652 is located in a VRM Class II area, and it runs directly next to a substantial oil/gas development. The closure of a route located so closely to a major industrial site for the justification of reducing visual contrast clearly shows BLM's use of this rationale for closing routes follows no discernible rhyme or reason. This is the essence of arbitrariness.

Furthermore, the DR justifies closing 146 routes totaling 103.36 miles in order to reduce route redundancy. *See* Ex. A, Column 11. According to the final EA, routes can be closed due to redundancy if it leads to the same location and provides the same purpose, "Identified routes that were redundant (i.e., a route leading to the same destination and serving the same purpose and need as another nearby route)."  EA at 12, LGB042227, Ex. C at 169. The FLPMA and the BLM handbook do not give any concrete directives for the need for closing redundant routes. The EA addresses closing redundant routes due to Section 106 of the National Historic Preservation Act, "Closures of redundant routes were assessed in accordance with Stipulation III.B.1.c. of the Travel

PA for the potential to shift, concentrate, or expand use on open routes. When designating routes as OHV-Closed, traffic may be concentrated on nearby routes with the same destination." EA at 29, LGB042244, Ex. C at 172. Stipulation III is regarding Section 106. Therefore, it implies a route should only be closed due to route redundancy if it causes negative impact to cultural resources.

That is not what is happening here. For instance, D1248 (DR at A2-23, LGB042052, Ex. C at 123) is being closed due to being a redundant route and soil impacts. But, if it is redundant, then the road B340 would also have soil concerns; however, it does not and remains open. D1248 also creates a loop route that no other route creates, showing that, by the own BLM's definitions, it is not redundant. D1263 (DR at A2-25, LGB042054, Ex. C at 124) goes to an area that no other route reaches. D1270A (DR at A2-27, LGB042056, Ex. C at 125): the other route that goes remotely to this area, 1434 (DR at A2-37, LGB042066, Ex. C at 129), is also closed. D0009A (DR at A2-5, LGB042034, Ex. C at 115) connects route D1888 to route D1797, no other route connects these two routes. D0009A also connects to 0009 which provides dispersed camping opportunities that no other route leads to.  And so it goes. Throughout the DR, redundancy is used as a reason to close routes but, upon further examination, it is shown to be arbitrary, capricious, and without a logical or evidentiary basis.

### C.    Even Closures Based on Arguably Statutory Factors Are Shown to Be Arbitrary and Capricious on Closer Examination.

#### 1.    The Plan's use of soil erosion to justify closures is arbitrary and capricious.

The DR's citation of the "need to minimize impacts to Soil/Watershed/ Vegetation/Grassland" is likewise arbitrary and capricious. Exhibit A: Rationales for Route Designations. Of the 437 routes closed by the DR, 357 include this reason. Id. For many of these

357 routes, BLM's reasoning is riddled with inconsistencies, or the evidence flatly contradicted the closures.

For instance, the 2017 Settlement Agreement requiring the completion of the Plan obligated BLM to produce and maintain a baseline monitoring report. *See* BLR Summary, LGB0011300-303, Ex. C at 83-86. Under the Settlement Agreement, BLM committed to monitoring motorized-vehicle use along specific routes within each of the agreement's 12 TMAs before approving each of the corresponding Plans. Final Settlement Agreement, Paragraph 13, *Southern Utah Wilderness Alliance v. U.S. Department of the Interior*, No. 2:12-cv-257 (Dist. Utah). BLM also committed to an outlined method for doing so and to making the data from this monitoring effort publicly available. *Id.* at ¶¶ 15-19. "To create the baseline monitoring report, BLM will physically inspect those portions of routes within the TMA that are within or constitute a boundary to a WSA, Natural Area, and/or lands with BLM-inventoried wilderness characteristics."

Monitoring efforts for the TMA show 34 points of visually apparent damage caused by unauthorized motor vehicles, which include varying usage intensity (high, medium, low, or none). BLM revisited these 34 sites where damage from unauthorized motor-vehicle use was visually apparent, and documented its findings in its "LWC Interim Monitoring Report 2023: Appendix B" ("Interim Report"). IR: Appendix B, LGB011340-433.

Many of the Plan's route closures, especially those based on impact to soil and vegetation, were entirely unsupported by the evidence in the Baseline and Interim Reports. For example, there were eighteen routes closed in the Plan for which neither the Baseline nor the Interim Report found any damage whatsoever to soil, vegetation, and LWC: D1395, D1438, D1454, D1478, D1020, D1642, D7860, D2658, D2653, D2678, D2675, D2654, D2658, D2035, D2845, D2854, D2850,

and D2693. *Compare* DR at A2-34, LGB042063, Ex. C at 127 ("[R]etaining or restoring vegetation and soil cover, minimizing the potential for soil erosion" is listed as the rationale for closing route D1395) *with* BLR: Appendix C, Route D1395, LGB011002, Ex. C at 64 (The report for route D1395 indicates "[n]o [d]amage [o]bserved") *and* Interim Report: Appendix B (Route D1395 is not listed in the Interim Report). Despite official findings of "no damage observed," the Plan justified closing these routes based on the need to mitigate damage to soil and vegetation. *Id.*

In fact, only three routes in the Plan were both closed and arguably supported by findings about impact on soil and vegetation in the Baseline and Interim Reports: D1434, D2031, and D1026. Even still, BLM's reasoning for these routes is flawed and the closures not genuinely supported by the documented evidence. Both D1434 and D1026 show low-usage intensity levels, and D2031 shows medium-usage intensity. BLR: Appendix C, Route D1434, LGB011031, Ex. C at 67; BLR: Appendix C, Route 1026, LGB011066, Ex. C at 71; BLR: Appendix C, Route D2031, LGB010879, Ex. C at 59; IR: Appendix B, Route D1434, LGB011342, Ex. C at 92; IR: Appendix B, Route D1026, LGB011423, Ex. C at 99; IR: Appendix B, Route D2031, LGB011401, Ex. C at 98. But none of the relevant photographs illustrate such damage; they simply show use of an existing route, and the Reports regularly consider "use" to be "damage." Additionally, in the case of D2031, the reasoning contradicts itself: first by describing the damage as "cross-country travel," IR: Appendix B, Route D2031, LGB011401, Ex. C at 98 (meaning travel off a designated route), and then by stating the route appears to be a constructed route. *Id*. This is a contradiction of facts. Of all the routes BLM could have justified closing by a consistent methodology to protect soil, vegetation, and LWC, it was these three. And yet, they do not genuinely provide evidence of such damage.

24

Five routes that were closed by the Plan were not monitored in the Baseline Report but were merely air-dropped by BLM staff into the Interim Report: 1520, 2693, 2678, 2661, and 2656. IR: Appendix B, Route D1520, LGB011390, Ex. C at 97; IR: Appendix B, Route D2693, LGB011348, Ex. C at 93; IR: Appendix B, Route D2678, LGB011350, Ex. C at 94; IR: Appendix B, Route D2661, LGB011364, Ex. C at 95; IR: Appendix B, Route D2656 LGB011366, Ex. C at 96. *See also* BLR: Appendix C, LGB010866-1299.  These were not documented as having any usage or damage. *Id*. It is not clear how this non-existent damage could have been assessed against a non-existent Baseline Report finding.

Furthermore, D2656 was closed to mitigate impacts to soil and vegetation, but although damage was identified in the Baseline Report, BLM did not include this route has having been revisited. BLR: Appendix C, Route D2656, LGB011296, Ex. C at 79; IR: Appendix B, Route D2656, LGB011366, Ex. C at 96. It is therefore not clear whether the damage was accurately reported. The rationale for this closure also did not involve damage, but was rather that "[c]losing D2656 will minimize route proliferation, as it connects destinations accessible from other open routes such as D2658." DR at A2-112, LGB042141, Ex. C at 152. This rationale assumes D2658 would remain open, but that route was closed by the final Plan. D2658 was included in the Baseline Report, but the site monitors were unable to find any damage. BLR: Appendix C, Route D2658, LGB011267, Ex. C at 75. *See* IR: Appendix B, LGB011340-433 (Route D2658 is not included in the report).

Numerous other routes were closed to mitigate impacts to soil and vegetation but were not subject to a court-mandated monitoring regime. See DR at 2-1-174, Attachment 2, LGB042030—2203; BLR: Appendix C, LGB010866-1299; IR: Appendix B, LGB011340-433. BLM's own documentation and data indicate it was difficult for BLM to find damage that was not merely usage

on an existing route. *See, e.g.*, IR: Appendix B, Route D20321, LGB011401, Ex. C at 98 (The indicated damages to soil and vegetation resources on route D2031 appears to merely be from the "medium usage" the route receives). As a result, many routes were closed with the protection of soil and vegetation as the stated rationale, but no genuine impacts of such damage were documented. *See id*. And often where mere usage was asserted as a damage, the usage intensity levels were low or medium. *See id*. This is shockingly sparse documentation to justify the closure of 357 routes based at least in part on the alleged impacts to soil and vegetation.

In sum, the DR's citation of the "need to minimize impacts to Soil/Watershed/Vegetation/Grassland" is arbitrary and capricious. A stunning 357 routes in the Plan were closed at least in part for this reason, despite pervasive inconsistencies, contradictions, and lack of supporting evidence between the two monitoring reports.

### 2.      The way in which the Plan uses "user conflicts" to close trails is arbitrary and capricious.

Likewise, the Plan's purported justification of "reduc[ing] user conflict" is arbitrary and capricious. Within the Labyrinth Rims/Gemini Bridges Plan, the Plan closes 33 routes on this basis. *See* Ex. A, Column 2.  BLM cites 43 C.F.R. § 8342.1, which addresses the need to minimize conflicts between users.

The Plan frequently pays lip service to this justification. *See, e.g.,* DR at A2-21, LGB042050, Ex. C at 122 (Route D1223A) ("closing this route will minimize known conflicts between OHV public and river users that is caused by vehicle-based noise"); *Id.* at A2-124, LGB042153, Ex. C at 157 (Route D2759B) ("… will thus reduce known conflicts between motorized and non-motorized users (boaters)"); *Id.* (Route D2759) ("[k]nown conflicts between motorized and non-motorized users outweigh the recreation experience that can be obtained elsewhere"). Yet BLM provides no documentation to support that actual user conflicts exist, such

as reported incidents of user conflict in the area. The AR provides zero citations, zero medical records, and zero documented cases of conflict from either BLM or the local sheriff's department.

BLM does not even expressly define the term "user conflict" anywhere in the AR, and it is unclear what would constitute such a conflict. The Labyrinth Rims/Gemini Bridges Interdisciplinary Team Checklist also does not include "user conflict." In fact, the route report claims "[c]ontinued use of this route would minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impact to documented resources within the urban interfaces." DR at A2-19, A2-47, A2-48, A2-49, at A2-50, A2-52, A2-74, A2-75, A2-86, A2-89, A2-90, A2-93, A2-94, A2-109, LGB042048, LGB042076, LGB042077, LGB042078, LGB042079, LGB042081, LGB042103, LGB042104, LGB042115, LGB042118, LGB042119, LGB042122, LGB042123, LGB042138, Ex. C at 133, 137, 142, 143, 145, 146, 147, 148, 149, 151. Keeping routes open would, if anything, reduce user conflict. These portions of the Plan are attempts to resolve non-existent conflicts.

User conflict should not be used as a pretext for favoring one user group over another. BLM, however, appears to be doing just that. The Plan closes several routes to motorized vehicles to give preferential treatment to boaters, canoeists, and mountain bikers. Conversely, the Plan closes *no* routes to non-motorized users to give exclusive access to motorized users. *See, e.g.,* DR at A2-46, LGB042075, Ex. C at 131 (Route D1526B) ("closing the route would minimize the potential for conflicts between off-road vehicle users and dispersed, non-motorized/non-mechanized forms of recreationists (canoeists)"); *Id.* (Route D1527A and D1527B) (similar); *Id.* at A2-125, LGB042154, Ex. C at 158 (Route D2763B and D2763C) (similar) (however, route D2763C does not actually exist); *Id.* at A2-130, LGB042159, Ex. C at 159 (Route D2759B)

(similar); *Id.* at A2-157, LGB042186, Ex. C at 164 (Route D7209) (similar); *Id.* at A2-163, LGB042192, Ex. C at 165 (Route D9141) (similar); *Id.* at A2-21, LGB042050, Ex. C at 122 (Route D1223A) (similar); *Id.* at A2-146, LGB042175, Ex. C at 161 (Route D3284) (similar) (noting the route "receives low use"); *Id.* at A2-68, LGB042097, Ex. C at 140 (Route D1809) ("[c]losing the route will minimize the potential for conflicts between off-road vehicle users and mountain bikers on the designated mountain bike single track trails which cross this route").

On top of these incongruences, BLM has conceded many of the routes the Plan closed have seen low use, seldom use, infrequent motorized use, or no use whatsoever. Despite this rare or non-existent use, BLM claims the routes must be closed to motorized users to reduce conflicts. *See, e.g.,* DR at A2-54, LGB042083, Ex. C at 138 (Route D1594) (the route "[r]eceives only light vehicle use"; "closing the route motorized travel will minimize conflicts between motorized and non-motorized users"); *Id.* at A2-69, LGB042098, Ex. C at 141 (Route D1980) (similar); *Id.* at A2-82, LGB042111, Ex. C at 144 (Route D1994) (similar); *Id.* (Route D1994A) (similar); *Id.* at A2-146, LGB042175, Ex. C at 161 (Route D3284) (similar); *Id.* at A2-147, LGB042176, Ex. C at 162 (Route D3494) (similar); *Id.* at A2-149, LGB042178, Ex. C at 163 (Route D3565) (similar). For the routes documented as having no use at all, BLM merely claims the need to avoid *potential* user conflicts. *See., e.g., Id.* at A2-9, LGB042138, Ex. C at 117 (Route D1019B) ("[m]inimize the potential for conflicts between off-road vehicle users and dispersed, non-motorized/non-mechanized forms of recreation"); *Id.* at A2-46, LGB042075, Ex. C at 131 (Route D1526B) (similar); *Id.* (Route D1527A) (similar); *Id.* (Route D1527B) (similar); *Id.* at A2-134, LGB042163, Ex. C 160 (Route D2845) (similar); *Id.* at A2-163, LGB042192, Ex. C at 165 (Route D9141) (similar); *Id.* at A2-65, LGB042094, Ex. C at 139 (Route D1809) ("[c]losing the route will

minimize the potential for conflicts between off-road vehicle users and mountain bikers on the designated mountain bike single track trails which cross this route").

The Plan also closes routes to minimize "impacts." *See, e.g., Id.* at A2-82, LGB042111, Ex. C at 144 (Route D1994) ("[m]otorized use is low"; "[c]losing D1994 will minimize impacts between motorized and non-motorized users"); *Id.* (Route D1994A) ("[m]otorized use is low"; "[c]losing D1994 will minimize impacts between motorized and non-motorized users"). But all use makes an impact, and this justification is not supported by law or regulation.

Finally, BLM omits required information and patently contradicts itself with respect to user conflicts in its individual route reports. BLM did not list 43 C.F.R. § 8342.1(c) user conflicts as required in the section entitled "Specific Designation Criteria Addressed and Relevant to Route Issues." Nevertheless, BLM still closed routes D1526B, D1594, D1596, D1752, D3284, D3494, D3500, D3503, D3565, D3828, D7209, D8669, D8847, D9141 to minimize or reduce conflicts. Moreover, within the section entitled "Designation Criteria Addressed but Not Relevant to Route Issues," it states that D1019B, D1223A, D1527, D1809, D1941, D1944, D1949, D1980, D1991, D1992, D1994, D1994A, D2759B, D2763B, and D2845 had no known conflicts among users or no known resource concerns to minimize for. In patent contradiction, the very same routes cite 43 C.F.R. § 8342.1(c), and therefore user conflicts, in the section entitled "Specific Designation Criteria Addressed and Relevant to Route Issues" as indeed being relevant to closure.

Accordingly, the Plan's "user conflict" justification is arbitrary and capricious.

**3.      The bighorn sheep rationale is arbitrary and capricious.**

The Plan closed many roads by citing impacts to desert bighorn sheep habitat as a reason for the closure. *See* Ex. A: *Rationales for Route Designations*. These closures were particularly concentrated around Labyrinth Canyon, Taylor Canyon, Hell Roaring Canyon, Mineral Canyon, Tenmile Canyon, Bull Canyon, and Day Canyon. These closures were arbitrary and capricious

because they were unsupported by the evidence in the record and failed to rely on the best available science as required by NEPA. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior,* 72 F.4th 1166, 1178 (10th Cir. 2023). Specifically, the BLM failed to present any non-speculative evidence that motorized use on the specific routes at issue had caused any measurable impact to bighorn sheep populations, failed to consider the plaintiffs' comments and the best available science regarding the animals' habituation to human activity, and directly contradicted the Moab Field Office's prior findings, which determined conflicts with recreation on these same routes could be mitigated through seasonal restrictions rather than closures.

First, the Plan failed to provide any non-speculative evidence that motorized use on the roads harms the desert bighorn sheep population in the TMA. Every route closure that cited population harms assumed the route caused "habitat fragmentation" and "harassment" because the route simply traversed desert bighorn sheep habitat (which covers nearly the entire TMA). *See, e.g.*, DR at A2-9, LGB042038, Ex. C at 117 ("Closing this route will minimize impacts to desert bighorn sheep habitat by eliminating motorized uses (reducing the potential for harassment of wildlife) and removing the route footprint (reducing habitat fragmentation.)"). BLM especially targeted for closure routes in bighorn sheep lambing and rutting habitat. Yet some routes citing this justification (such as D2761B) were not even in areas mapped as lambing habitat in the 2016 Moab Master Leasing Plan.

The only evidence in the EA that motorized recreation in the area harms bighorn sheep comes from studies of OHV impacts on wildlife in general (EA at 69, LGB042284, Ex. C at 176) and the overall effects of "human disturbance" on bighorn sheep (which was not specific to OHV use). *Id.* at 69-70, LGB042285, Ex C. at 176-77 (citing the Utah Bighorn Sheep Statewide Management Plan (UDWR 2018)). The administrative record contains no evidence that population

deficiency is directly attributable to OHV impacts, nor do any of the studies cited demonstrate a causal link between human activity and population decline, loss of individual fitness, or permanent habitat abandonment that is independent of other factors. As discussed in Mr. McKay's comments, "the studies rely on speculation, that the worst-case circumstances they describe 'could,' 'may,' or 'potentially' lead to population declines." McKay Comment at 42, LGB005108, Ex. C at 3 (quoting comments from Ride with Respect and the Colorado Trails Preservation Alliance (Oct. 21, 2022) LGB002253-58, Ex. C at 27-32).

The EA and DR rely on these unsupported assumptions and ignore other factors that could be causing the shortfall in the bighorn sheep population. For example, the State of Utah has regularly relocated bighorn sheep from the TMA to other areas where it wished to establish herds— thus decreasing the local population—and allows limited bighorn sheep hunting within the TMA. The State of Utah's data reveal that 289 bighorn sheep have been relocated from the area between 1982–2008 and hunters harvested 31 bighorn sheep between 2010–2019. McKay Comment at 45, LGB005111, Ex. C at 6. Yet the overall population has remained steady or even increased. *Id.* Given that Utah has directly removed more bighorn sheep from the TMA than the entire current population, it is logical to assume the current population would be considerably higher absent these actions. It is irrational to blame motorized recreation for the population deficiency when other more direct causes are known.

Nevertheless, the EA arbitrarily assumes without evidence that generalized "disturbance" by OHVs has caused the observed population shortfall, and that reducing the number of OHV routes in sensitive bighorn sheep habitat will cause the population to increase. EA at 209, Appendix M, LGB042424, Ex. C at 181. Both the alleged negative impacts from the routes and the supposed

31

benefits of closing them are entirely speculative, unsupported by scientific evidence, and are directly contradicted by the evidence in the record

Second, the DR ignores evidence provided in plaintiffs' comments regarding habituation of bighorn sheep to human activities. Mr. McKay's comments on the draft EA describe how bighorn sheep become well habituated to human activity that does not directly threaten them (i.e. hunting), as evidenced by multiple scientific studies and the fact that bighorn sheep in Colorado routinely congregate in places with heavy human activity like Waterton Canyon and the highway over Guanella Pass. McKay Comment at 41-47, LGB005107-113, Ex. C at 2-8.

Since motorized recreation on designated routes follows defined paths that have been established for decades and does not directly threaten bighorn sheep, the best available science indicates that the sheep would long ago have become habituated to infrequent vehicle traffic on these roads and are unlikely to be significantly disturbed by it. BLM dismissed these comments, saying they relate to Rocky Mountain bighorn sheep, not desert bighorn sheep. EA at 210, Appendix M, LGB042425, Ex. C at 182. This response ignores the studies cited in Mr. McKay's comments and the comments by the Trails Preservation Alliance that related to desert bighorn sheep specifically. *Id.* This evidence in the record and the best available science contradict BLM's assertions that the mass closure of motorized routes in bighorn sheep habitat is necessary to prevent disturbance and population decline.

Third, BLM's analysis in the DR and EA claiming that motorized route closures in Mineral and Hell Roaring Canyon is necessary to protect bighorn sheep habitat directly contradicts the Moab Field Office's own prior findings in another recent EA specifically related to this area. The DR closed D1217 in Mineral Canyon and D1223 in Hell Roaring Canyon based primarily on asserted impacts to bighorn sheep lambing habitat in these canyons. DR at A2-20-21, LGB042049-

50, Ex. C at 121-22. Yet in an August 2020 Environmental Assessment the BLM specifically found the motorized routes in these canyons posed no significant threat bighorn sheep and that D1217 was in a less sensitive part of Mineral Canyon. BUREAU OF LAND MGMT., *Limiting Roped and Aerial Activities in Mineral and Hell Roaring Canyons, Environmental Assessment: DOI-BLM-UT-Y010-2020-0068* (Nov. 2020), Ex. D at 216-315, available at https://tinyurl.com/4fuu3fwc.

BLM has stated that "vehicles currently are restricted to designated routes, and vehicles cannot access the inaccessible cliffs, steep walled canyons, slot canyons, alcoves and talus slopes so important to the species in question." *Id.* at 84, Ex. D at 299. BLM further acknowledged that bighorn sheep in these canyons are more sensitive to hikers and rock climbers because their locations are unpredictable and, unlike vehicle traffic, are more likely to be found off-trail on the talus slopes that comprise the animals' escape terrain. *Id.* at 33, 35, Ex. D at 248, 250. Bighorn sheep "coexist best with people when human activity in sheep habitat is predictable." *Id.* at 34, Ex. D at 249. Nevertheless, under the Plan, these routes remain open to hikers and closed to OHVs. Such a decision is the epitome of arbitrary and capricious.

Additionally, in the *Roped and Aerial Activities* decision, BLM divided Mineral Canyon into two different zones based on the relative sensitivity of wildlife in each zone to human impacts: a green zone where risk to wildlife is lower, and a red zone where wildlife risk is greater. BUREAU OF LAND MGMT., *Limiting Roped and Aerial Activities in Mineral and Hell Roaring Canyons: DOI-BLM-UT-Y010-2020-0068* (June 2021), Ex. D at 316-27, available at https://tinyurl.com/4xkjkf5x. These two zones are shown in the map below. *Id.* at 10.



Climbing is allowed anywhere in the green zone with a permit, while climbing is prohibited completely in the red zone due to the greater risk to wildlife (primarily bighorn sheep). BLM's rationale explained that "[a]lthough the amended decision seasonally allows climbing along the Green River (the 'Green Zone'), human activity is not unexpected in this area. Under this amended decision, the more important wildlife habitats remain heavily protected from the impacts of roped activities." *Id.* at 8.

The motorized route in Mineral Canyon (D1217) is entirely within the Green Zone—where BLM determined that risk to wildlife is lower because animals are already accustomed to human activity. It also is directly below the Fruit Bowl highlining area and the Mineral Bottom Base Jumping Focus Area—both of which were excluded from the restrictions created in the *Roped and*

*Aerial Activities Decision*. Based on BLM's own findings in this other management project, the motorized route should also have been regarded as posing minimal risk to bighorn sheep. Yet the DR asserted closure was necessary to protect bighorn sheep, stating "[t]he upper portions of Mineral Canyon are very important refugia for desert bighorn sheep, raptors and other species. Closing D1217 minimizes impacts to this important wildlife habitat and helps prevent habitat fragmentation." DR at A2-20, LGB042049, Ex. C at 121. This rationale arbitrarily conflated the upper portion of Mineral Canyon (the red zone in the climbing map) with the green zone (where D1217 is located). In doing so, BLM justified closing D1217 based on the sensitivity of the habitat in the upper canyon while ignoring its previous findings that the lower canyon does not have the same wildlife concerns. Much of D1223 is also in the green zone, yet it was closed in its entirety.

BLM used a double standard for motorized and non-motorized recreation in Mineral and Hell Roaring Canyons based on conflicting analyses of impacts to bighorn sheep habitat across two management projects. Non-motorized recreation was given a nuanced analysis that considered differing levels of impacts in different portions of these canyons, and was allowed to continue. Motorized recreation—which the BLM analysis showed actually had less impact on bighorn sheep than non-motorized recreation—was entirely banned. This sort of "'[u]nexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

Finally, while BLM's alternative C considered imposing seasonal instead of permanent closures on these and other roads in bighorn sheep lambing habitat, BLM ultimately decided to permanently close them. BLM did not explain why seasonal restrictions would not be sufficient (as they were for rock climbing) to resolve wildlife conflicts. Since nearly all bighorn sheep

closures in the Plan specifically concerned impacts in lambing and rutting habitat, which is seasonal, seasonal closures should have been sufficient to mitigate those impacts.

### 4.   Other "habitat fragmentation" rationales are also arbitrary and capricious.

As with soil impacts, the DR talismanically invokes the concept of "habitat fragmentation" to justify hundreds of route closures. This concept is referenced 173 times in the route specific rationale section of the DR, *see* Ex. A, Column 4, most often in regard to desert bighorn sheep, but also regarding multiple other species including bald eagles (DR at A2-13, LGB042042, Ex. C at 119) and other raptors, pronghorns (*Id.* at A2-108, LGB042137, Ex. C at 150), and simply wildlife in general. This boilerplate language is used so vaguely and generically it is virtually meaningless. The EA makes no effort to provide any scientific evidence demonstrating how lightly used dirt tracks "fragment" habitat for species ranging from large mammals to birds. Neither does it in any way quantify the actual impacts of such alleged fragmentation or demonstrate population level harm.

The EA defines habitat fragmentation as, "The degree to which an area of habitat is divided into smaller patches of habitat as a result of human activities and developments (e.g., trails, roads, fencing) or as a result of natural barriers (e.g., cliffs, rivers)." EA at 175, Appendix L, LGB042390, Ex. C at 179. The concept of wildlife habitat fragmentation refers to a physical disruption of an animal's habitat and restriction of its movements. It is the process by which large, continuous habitats are broken into smaller, isolated, patches that are separated by human activity. While habitat fragmentation is well-documented to result from large scale human development like urban construction and high speed paved highways, there is no scientific evidence supporting the assertion that lightly used dirt tracks in otherwise natural areas cause any significant habitat fragmentation for species that occur in the Labyrinth Rims/Gemini Bridges TMA.

While the EA claims "[h]abitat loss and fragmentation are direct impacts of OHV route designations and OHV use" (EA at 70, LGB042285, Ex. C at 177), extensive comments submitted by motorized recreationists proved that the studies the BLM relied upon to support this assertion were faulty and do not actually support this conclusion. Comments submitted by the Trails Preservation Alliance (which were also cited in Mr. McKay's comments) included a detailed refutation of the wildlife impacts analysis in the EA by wildlife biologist Rob Roy Ramey II, Ph.D., stating:

> The EA focused on an often assumed, but unproven, deleterious effect of OHV trail use on wildlife populations. However, that assumption is currently not supported by empirical data. None of the studies cited in the EA (or other published research) has demonstrated a deleterious population-level effect of OHV activity on species in the TMA, or adjacent areas in Utah which would potentially rise to the level of significant impact. In the absence of such data, the BLM cannot rely on the surmise and opinion of hypothetical impacts in its analysis of alternatives.
>
> ...
>
> The EA further makes the claim that, "These effects can include direct mortality, injury, habitat destruction, habitat alteration, and habitat fragmentation[."] [But this study] was only a generalized review of the literature on Effects of Vehicular Routes on Animals in the Mojave Desert and concluded that, "No studies that we know of have directly evaluated the role of vehicular routes in fragmenting wildlife habitat in the Mojave Desert." Furthermore, none of the studies cited included any of the species that occur in the TMA. The effects on animals that were noted in most of the cited studies were in areas of open riding in the southern Algodones Sand Dunes in southern California … This is a vastly different ecological setting with different riding regulations than the narrow, regulated trails of the TMA in Utah.
>
> ...
>
> [Yet another study] cited in the EA … claimed a number of generalized impacts to wildlife based upon the opinions of the authors, rather than data. Yet, a closer examination of the text and references in [the study] reveals that: 1) none of the studies cited included any of the species that occur in the TMA; 2) the generalized claims of impacts to animals were the surmise and opinion of the authors who used wiggle words such as "may", "could" and "if" to qualify their claims rather than present consistent and conclusive findings; and 3) the authors of Ouren et al. (2007) erroneously conflated the effects of highways, dirt roads, and open riding areas in sand dune fields with restricted, low-speed OHV routes like those proposed for closure in the TMA.

Ramey Comment at 5-6, LGB006167-81, Ex. C at 44-58.

As Dr. Ramey's comments demonstrate, all of the studies the BLM relied on to prove that OHV trails cause habitat fragmentation were based on pure speculation, concerned animals and ecological settings not even present in the TMA, and/or improperly conflated lightly used dirt tracks with paved highways. The BLM failed to respond to Mr. Ramey's comments except to reiterate its citations to the same studies Mr. Ramey refuted, as well as cite the assertion in the UDWR Bighorn Sheep Management plan that, "Bighorn habitat can be degraded, fragmented, or lost to a variety of causes including human disturbance..." (EA at 209, Appendix M, LGB042424, Ex. C at 181), which does not provide any specific link to OHV routes.

No evidence exists that natural surface roads rarely seeing more than a few vehicles a day (the majority of closed routes had their use levels listed as "low" in the route reports) serve as any kind of obstacle to the movements of ground animals like bighorn sheep or pronghorn, let alone birds who can simply fly over them. Nor does the EA provide evidence that OHV traffic on these routes and their associated noise results in widespread avoidance behavior by animals. These routes are a far cry from interstate highway corridors with constant high-speed traffic, lined with tall fences that animals cannot physically cross. Indeed, it is a common experience in the TMA to see bighorn sheep and other animals casually wandering across these roads with no regard for passing vehicles, or even using them as paths to get from one point to another. The only way in which OHV routes can be said to fragment habitat is through lines drawn on human maps, of which the animals themselves have no knowledge. Once again, the BLM's boilerplate language supporting mass route closures does not hold up to closer scrutiny.

## IV. DEFENDANTS FAILED NEPA'S "HARD LOOK" TEST BECAUSE THE PLAN IS A MAJOR FEDERAL ACTION SIGNIFICANTLY AFFECTING THE QUALITY OF THE HUMAN ENVIRONMENT, FOR WHICH BLM WAS REQUIRED TO CREATE AN EIS.

NEPA requires federal agencies to take a "'hard look' at how the choices before them affect the environment." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1099 (9th Cir.

2010). BLM failed to do so with respect to the Plan. Courts, in reviewing "hard look" cases, must ensure the agency's decision "was based on a consideration of the relevant factors," and in so doing make a "searching and careful" inquiry into the factual basis for the decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). This means agencies must provide "accurate scientific analysis … [for] public scrutiny before decisions are made and actions taken." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003). "[D]ocuments 'must … provide a reviewing court with the necessary factual specificity to conduct its review.'" *S. Utah Wilderness All. v. U.S. Dep't of Interior*, No. 2:13-cv-01060-EJF, 2016 U.S. Dist. LEXIS 140624, at *23-24 (D. Utah Oct. 3, 2016) (quoting *Comm. to Pres. Boomer Lake Park v. United States Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993)). "General statements" are not enough. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011). "[B]y requiring agencies to take a 'hard look' at how the choices before them affect the environment, and then to place their data and conclusions before the public, NEPA relies upon the democratic processes to ensure … that the most intelligent, optimally beneficial decision will ultimately be made." *Or. Nat. Desert Ass'n*, 625 F.3d at 1099.

BLM also neglected its duty to take a "hard look" by failing to create an environmental impact statement (EIS), in violation of 42 U.S.C. § 4332(2)(C) and 40 C.F.R. § 1502.14. BLM instead released a FONSI, erroneously concluding the Plan does not significantly affect the quality of the human environment. An EIS is required when a "major Federal action[] significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(C). A major federal action is one that "requires substantial planning, time, resources, or expenditure." *Nat'l Res. Def. Council, Inc. v. Grant*, 341 F. Supp. 356, 366 (E.D.N.C. 1972). "Typically, a project is considered a major

federal action when it is funded with federal money." *Sw. Williamson Cnty. Comty. Ass'n v. Slater*, 243 F.3d 270, 278 (6th Cir. 2001).

The "human environment means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment." 40 C.F.R. § 1508.1(m). In contemplating the human environment, an agency must consider the effects of its policies whether beneficial or detrimental. 40 C.F.R. § 1508.1(g)(4); *see also Hiram Clarke Civic Club v. Lynn*, 476 F.2d 421, 426 (5th Cir. 1973). The human environment encompasses more than what is traditionally considered part of the physical environment. *Breckenridge v. Rumsfeld*, 537 F.2d 864, 865-66 (6th Cir. 1976). Importantly, the human environment includes recreation. *See, e.g., Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1174-75 (10th Cir. 1999); *Minnesota Pub. Int. Rsch. Grp. v. Butz*, 498 F.2d 1314, 1322 (8th Cir. 1974). If there is a "long term impact" or "permanent commitment of a national resource," then an agency action affects the human environment. *Breckenridge*, 537 F.2d at 865; *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1153 (9th Cir. 2006). Here, BLM seeks to permanently "obliterate" the routes. EA at 347, LGB042424. BLM's action stands to have an irreversible impact upon an important part of the human environment: recreation.

An agency action "significantly" affects the human environment when such action "significantly degrade[s] some human environmental factor." *Columbia Basin Land Prot. Ass'n v. Schlesinger*, 643 F.2d 585, 597 (9th Cir.) (internal citations omitted). As noted above, recreation is a factor in the human environment, a factor which BLM seeks to significantly impair. Furthermore, when evaluating whether an action will have "significant" impacts, federal regulations require the agency to consider the "[u]nique characteristics of the geographic area such

as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 7 C.F.R. § 650.4(k)(2)(iii).

BLM's rationale for closing routes is heavily rooted in attempts to protect cultural resources, riparian areas, and scenery. *See, e.g.,* EA at 28, LGB042243 ("The TMA contains important cultural resources"); EA at 55, LGB042270 ("[T]hese small but unique [riparian] areas are among the most important, productive, and diverse ecosystems in the state"); EA at 50, LGB042265 ("The Labyrinth/Gemini Bridges TMA is an internationally recognized, world-famous scenic destination"). If these things are true—as BLM contends—it follows that BLM's decision "to regulate motor vehicle use … stands to have a significant impact on 'the quality of the human environment,'" and thus, "NEPA obligated the agency to prepare a detailed Environmental Impact Statement ('EIS') in order to assess the potential environmental effects of various alternative proposals prior to settling on a course of action." *Friends of Tahoe Forest Access v. U.S. Dep't of Agric.*, 641 Fed.Appx. 741, 754 (9th Cir. 2016).

Human recreation in, and enjoyment of, natural spaces is a part of the "human environment" to be considered, and these closures will have a significantly detrimental effect on this aspect of that environment. Rather than prepare an EIS (or sufficiently explain the Plan's impact on recreation or the human environment in the EA), BLM merely mentions recreation in passing, having employed none of its expertise. *See* FONSI at 18, LGB042674, Ex. C at 184. BLM argues these closures will have a beneficial effect on the environment. However, agencies are still required to conduct an EIS to determine the environmental importance of a proposed action they believe will have beneficial impacts upon the environment.

BLM violated NEPA because the Plan's road closures significantly affected the quality of the human environment, and BLM failed to create an EIS or otherwise sufficiently explain the Plan's impact on recreation. The Plan is therefore void.

## CONCLUSION AND REQUEST FOR RELIEF

For the foregoing reasons, the Court should, pursuant to 5 U.S.C. § 706(2)(A), 28 U.S.C. §§ 2201, 2202, and Fed. R. Civ. P. 57 and 65, grant the following relief to Plaintiffs:

(1)     Declare that the Travel Management Plan violates the Appointments Clause to the U.S. Constitution; it violates the Dingell Act; it is arbitrary and capricious; and an Environmental Impact Assessment was required under NEPA.

(2)     Hold unlawful and set aside the Travel Management Plan.

(3)     Issue a permanent injunction against the Defendants, as well as all agents, administrators, employees, or other persons acting on behalf of the Defendants, from enforcing the Travel Management Plan.

(4)     Award Plaintiffs their costs and expenses incurred in bringing this action, including, but not limited to, reasonable attorney fees pursuant to 28 U.S.C. § 2412; and

(5)     Grant such other and further relief as the Court deems equitable, just, and proper.

Dated: November 5, 2024

*/s/ Matthew Miller*

ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
MATTHEW MILLER
Texas Bar No. 24046444
mmiller@texaspolicy.com
CLAYTON WAY CALVIN
Texas Bar No. 24132780
ccalvin@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

JAMES ROGERS
Utah Bar No. 18783
NICHOLAS R. BARRY
Tennessee Bar No. 031963
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave, SE #231
Washington, DC 20003
nicholas.barry@aflegal.org
james.rogers@aflegal.org
Telephone: (202) 964-3721

KRYSTALY KOCH
Utah Bar No. 16491
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
Telephone: (385) 355-4826
krystaly.koch@freemanlovell.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations of DUCivR 7-4(d)(4) and Fed. R. App. P. 32(a)(7)(B)(i) because, using the word-count functionality in Microsoft Word, it contains 12,833 words, excluding the parts of the brief exempted by DUCivR 7-4(d)(4).

*/s/ Matthew Miller*
Matthew Miller

**CERTIFICATE OF SERVICE**

I hereby certify that on November 5, 2024, I electronically filed the foregoing Opening Brief with the Clerk of the Court via the CM/ECF system, which will provide service to counsel for Defendants and Intervenor-Defendant.

*/s/ Matthew Miller*
Matthew Miller