## Exhibit C Index: Citations to the Administrative Record

**Comments:**

| | | |
|---|---|---|
| McKay Comment Excerpt (at 40-65) | LGB005106-131 | Ex. C at 1-26 |
| BlueRibbon Comment | LGB002253-58 | Ex. C at 27-32 |
| Comments of Ride with Respect and the Colorado Trails Preservation Alliance, Oct. 21, 2022 | LGB005915-6225 | Ex. C at 33-43 |
| Ramey Comment | LGB006167-81 | Ex. C at 44-58 |

**Baseline Report ("BLR"):**

| | | |
|---|---|---|
| BLR: Appendix C | LGB010866-1299 | Selected Excerpts Below |
| BLR: Appendix C, Route D2031 | LGB010879 | Ex. C at 59 |
| BLR: Appendix C, Route D1395 | LGB011001 | Ex. C at 63 |
| BLR: Appendix C, Route D1434 | LGB011031 | Ex. C at 67 |
| BLR: Appendix C, Route D1026 | LGB011066 | Ex. C at 71 |
| BLR: Appendix C, Route D2658 | LGB011267 | Ex. C at 75 |
| BLR: Appendix C, Route D2656 | LGB011296 | Ex. C at 79 |
| BLR Summary | LGB011300-3 | Ex. C at 83-86 |

**Interim Monitoring Report ("IR"):**

| | | |
|---|---|---|
| IR Summary | LGB011335-39 | Ex. C at 87-91 |
| IR: Appendix B | LGB011340-433 | Selected Excerpts Below |
| IR: Appendix B, Route D1434 | LGB011342 | Ex. C at 92 |
| IR: Appendix B, Route D2693 | LGB011348 | Ex. C at 93 |
| IR: Appendix B, Route D2678 | LGB011350 | Ex. C at 94 |
| IR: Appendix B, Route D2661 | LGB011364 | Ex. C at 95 |
| IR: Appendix B, Routes D2656 and 2657 | LGB011366 | Ex. C at 96 |
| IR: Appendix B, Route D1520 | LGB011390 | Ex. C at 97 |
| IR: Appendix B, Route 2031 | LGB011401 | Ex. C at 98 |
| IR: Appendix B, Route D1026 | LGB011423 | Ex. C at 99 |

**Decision Record ("DR"):**

| | | |
|---|---|---|
| DR at DR-1-10 | LGB042015-24 | Ex. C at 100-09 |
| DR at DR-2 | LGB042016 | Ex. C at 105 |
| DR at DR-5 | LGB042019 | Ex. C at 108 |
| DR at DR-10 | LGB042020 | Ex. C at 109 |
| DR at A1-1-4, Attachment 1 | LGB042025-29 | Ex. C at 110-14 |
| DR at A2-1-174, Attachment 2 | LGB042030-2203 | Selected Excerpts Below |
| DR at A2-5 | LGB042034 | Ex. C at 115 |
| DR at A2-8 | LGB042037 | Ex. C at 116 |
| DR at A2-9 | LGB042038 | Ex. C at 117 |

| DR at A2-10 | LGB042039 | Ex. C at 118 |
|---|---|---|
| DR at A2-13 | LGB042042 | Ex. C at 119 |
| DR at A2-19 | LGB042048 | Ex. C at 120 |
| DR at A2-20 | LGB042049 | Ex. C at 121 |
| DR at A2-21 | LGB042050 | Ex. C at 122 |
| DR at A2-23 | LGB042052 | Ex. C at 123 |
| DR at A2-25 | LGB042054 | Ex. C at 124 |
| DR at A2-27 | LGB042056 | Ex. C at 125 |
| DR at A2-33 | LGB042062 | Ex. C at 126 |
| DR at A2-34 | LGB042063 | Ex. C at 127 |
| DR at A2-35 | LGB042064 | Ex. C at 128 |
| DR at A2-37 | LGB042066 | Ex. C at 129 |
| DR at A2-45 | LGB042074 | Ex. C at 130 |
| DR at A2-46 | LGB042075 | Ex. C at 131 |
| DR at A2-47 | LGB042076 | Ex. C at 132 |
| DR at A2-48 | LGB042077 | Ex. C at 133 |
| DR at A2-49 | LGB042078 | Ex. C at 134 |
| DR at A2-50 | LGB042079 | Ex. C at 135 |
| DR at A2-51 | LGB042080 | Ex. C at 136 |
| DR at A2-52 | LGB042081 | Ex. C at 137 |
| DR at A2-54 | LGB042083 | Ex. C at 138 |
| DR at A2-65 | LGB042094 | Ex. C at 139 |
| DR at A2-68 | LGB042097 | Ex. C at 140 |
| DR at A2-69 | LGB042098 | Ex. C at 141 |
| DR at A2-74 | LGB042103 | Ex. C at 142 |
| DR at A2-75 | LGB042104 | Ex. C at 143 |
| DR at A2-82 | LGB042111 | Ex. C at 144 |
| DR at A2-86 | LGB042115 | Ex. C at 145 |
| DR at A2-89 | LGB042118 | Ex. C at 146 |
| DR at A2-90 | LGB042119 | Ex. C at 147 |
| DR at A2-93 | LGB042122 | Ex. C at 148 |
| DR at A2-94 | LGB042123 | Ex. C at 149 |
| DR at A2-108 | LGB042137 | Ex. C at 150 |
| DR at A2-109 | LGB042138 | Ex. C at 151 |
| DR at A2-112-15 | LGB042141-44 | Ex. C at 152 |
| DR at A2-123 | LGB042152 | Ex. C at 156 |
| DR at A2-124 | LGB042153 | Ex. C at 157 |
| DR at A2-125 | LGB042154 | Ex. C at 158 |
| DR at A2-130 | LGB042159 | Ex. C at 159 |
| DR at A2-134 | LGB042163 | Ex. C at 160 |
| DR at A2-146 | LGB042175 | Ex. C at 161 |
| DR at A2-147 | LGB042176 | Ex. C at 162 |
| DR at A2-149 | LGB042178 | Ex. C at 163 |
| DR at A2-157 | LGB042186 | Ex. C at 164 |
| DR at A2-163 | LGB042192 | Ex. C at 165 |

**Environmental Assessment ("EA"):**

| EA | LGB042206-656 | Selected Excerpts Below |
|---|---|---|
| EA at 1 | LGB042216 | Ex. C at 166 |
| EA at 2 | LGB042217 | Ex. C at 167 |
| EA at 11 | LGB042226 | Ex. C at 168 |
| EA at 12 | LGB042227 | Ex. C at 169 |
| EA at 16 | LGB042231 | Ex. C at 170 |
| EA at 28 | LGB042243 | Ex. C at 171 |
| EA at 29 | LGB042244 | Ex. C at 172 |
| EA at 47 | LGB042262 | Ex. C at 173 |
| EA at 50 | LGB042265 | Ex. C at 174 |
| EA at 55 | LGB042270 | Ex. C at 175 |
| EA at 69 | LGB042284 | Ex. C at 176 |
| EA at 70 | LGB042285 | Ex. C at 177 |
| EA at 88 | LGB042303 | Ex. C at 178 |
| EA at 175, Appendix L | LGB042390 | Ex. C at 179 |
| EA at 208, Appendix M | LGB042423 | Ex. C at 180 |
| EA at 209, Appendix M | LGB042424 | Ex. C at 181 |
| EA at 210, Appendix M | LGB042425 | Ex. C at 182 |
| EA at 347, Appendix N | LGB042652 | Ex. C at 183 |

**Finding of No Significant Impact ("FONSI"):**

| FONSI at 18 | LGB042674 | Ex. C at 184 |
|---|---|---|

## 7. RS. 2477 and Mining Claim Access Routes

The Labyrinth Rims Gemini Bridges travel plan provides bearing on and addresses the validity of R.S. 2477 assertions. The plan reduces access or closes completely multiple routes that are the means of access to active mining claims. Rights of way that access mining claims are granted rights under R.S. 2477.

MS-1626 Travel and Transportation Management Section 6.2 states, "A travel management plan is not intended to provide evidence, bearing on, or address the validity of any R.S. 2477 assertions. R.S. 2477 rights are determined through a process that is entirely independent of the BLM's planning process.

In these proceedings, whether routes have existed historically and whether they currently exist on the ground are part of the evidentiary record for R.S. 2477 claims. A closure of an R.S. 2477 route through a TMP planning process provides bearing against the validity of any R.S. 2477 assertion by erasing the primary source of evidence upon which these assertions rely: the continued existence of the route itself. As such the closure of R.S. 2477 routes through the TMP process violates MS-1626 (6.2).

We recognize that RS 2477 claims cannot be adjudicated through an administrative process, but we also recognize that closing R.S. 2477 routes through an administrative process will bias any future adjudication, and closures of these routes should be avoided at all costs until any contested route can be thoroughly adjudicated. At the very least, BLM should develop an alternative that keeps all of these routes open.

The closure of R.S. 2477 routes also creates an undue burden on active mining operations, and BLM Manual 2801.8(G) requires BLM to "Recognize as an authorized use, any ROW facility constructed on public land on or before October 21, 1976, under the authority of any act repealed as to future authorization by FLPMA. No further authorization is required by the holder for […] b. A ROW for a public highway constructed on public land under R.S. 2477." During my explorations in the area, I saw numerous mining claim stakes along routes proposed for closure in alternative C. We believe the closure of routes that provide the sole access to valid mining claims is illegal.

## 8. Bighorn Sheep Habitat and Seasonal Closures

We acknowledge that desert bighorn sheep are important residents of southeast Utah. The 2008 TMP already closed many routes in bighorn sheep habitat, and local motorized groups have subsequently contributed hundreds of hours with the BLM planning and implementing TMP amendments to further avoid lambing habitat, migration corridors, etc. The elongated nature of this habitat requires crossing it in places in order to get anywhere. By avoiding springs and rims, trails can be routed to provide sufficient escape terrain for the sheep. Because bighorn sheep habitat was already considered in the last round of travel planning in 2008, the worst impacts have already been mitigated.

While the motorized community is open to considering further restrictions, too many more restrictions would make it a lot harder to gain compliance with the resulting TMP, undermining the predictable organization of travel patterns that a TMP is supposed to provide. The most effective

way to benefit sheep would be to bolster trail work, enforcement, and education efforts to ensure that vehicles stay out of closed areas and that drivers and riders understand the importance of yielding to wildlife (not to mention the reward of stopping to watch wildlife in their natural habitat).

The simple reality is that almost the entire Labyrinth Rims Gemini Bridges TMA is in bighorn sheep habitat, and many of the best motorized trails are in lambing habitat. Therefore some impacts on bighorn sheep must be allowed in order to continue to accommodate motorized recreation in the region. While a handful of less popular routes may be suitable for seasonal closures to mitigate impacts during bighorn lambing season, we strongly oppose seasonal closures of any major trails, particularly Easter Jeep Safari routes like Day Canyon Point. In alternative C, the BLM is proposing to seasonally close that trail during peak tourism season in the spring, including over Easter Jeep Safari week.

While this alternative appears to make an exception for special use permit holders that would presumably still allow Day Canyon Point to be run as part of that event, many other people like to drive this trail during the spring outside of EJS. Any benefits to wildlife would be outweighed by the severe impact on recreation caused by closing a major motorized route during peak spring season, and we strongly oppose this closure. On the other hand, we could support spring seasonal closures on less popular trails in more remote areas such as Ten Mile Canyon, Hell Roaring Canyon, and Mineral Canyon if it would allow for these trails to remain open rather than closing two-thirds of each of them as is proposed in alternative C.

We also question the science behind considering bighorn sheep extremely sensitive to recreation activities. Near my house in southern Denver, a bighorn sheep herd is known to inhabit Waterton Canyon, which is a popular recreation area. Thousands of hikers and mountain bikers every month travel along the service road at the bottom of the canyon adjacent to the South Platte River, which is the sheep's only water source. The bighorn sheep there have long become accustomed to the constant human presence in the canyon, and can be regularly seen wandering along the busy pathway unperturbed by people. I have witnessed this myself several times. I have also seen bighorn sheep walking along the shoulder of major highways in the Colorado mountains such as the road over Guanella Pass.

It is common knowledge among anyone who has ever seen them that bighorn sheep can become accustomed to human presence. At the very least, they are not hyper sensitive to humans at all times of the year. Outside of lambing season, recreation likely has very little impact on them, especially in a popular recreation area like Moab. All of the motorized routes in this TMA that are within bighorn sheep habitat have been used by motorists for many decades, and the local bighorn sheep herds have almost certainly adapted to human presence. There is simply no need for the BLM to close important motorized routes to protect them.

Studies relied on by the BLM to prove that bighorn sheep are sensitive to recreation are flawed and do not support the BLM's conclusions that motorized recreation poses a threat to bighorn sheep. The bighorn sheep population around Moab has been stable for decades and has long since become accustomed to human activity there. There is no evidence that further restrictions on recreation are necessary to prevent bighorn sheep population decline. Comments submitted by a coalition of motorized groups during the recent comment period for the Labyrinth Rims / Gemini

Bridges camping management project (which cross apply to this travel planning project) explain this in detail and are are reproduced below:

**1. A narrative is developed in the Draft EAs that wildlife populations are threatened from currently regulated recreational use.**

It is important that the BLM acknowledge that there is no demographic data that indicates a long-term decline in bighorn sheep inhabiting the La Sal/Potash/South Cisco population unit, or a decline in individual bighorn sheep fitness in this population that can be directly attributable to "human use." It is therefore disingenuous that the Labyrinth Rims/Gemini Bridges EA attempts to link a study about bighorn sheep vigilance (Sproat 2012) without first demonstrating that there has also been bighorn sheep abandonment of an area and/or population-level decline, in order to justify new camping and travel route restrictions in the EA.

As an initial matter, all the cited studies in the EA on human disturbance of bighorn sheep cited in the study share the following important characteristics:

a) None of the studies have shown a demonstrable, causal link between human activity and population decline, loss of individual fitness, or permanent habitat abandonment that is *independent of other factors* (i.e. predation, disease, livestock, drought, or permanent removal due to agriculture or development).

b) The studies rely on speculation, that the worst-case circumstances they describe "could," "may," or "potentially" lead to population declines. The authors of these papers generally *assume*, without supporting demographic data, that any observed effect in flight distance or time spent foraging or scanning results in a decrease in individual fitness and ultimately population number.

c) Anecdotes and opinions expressed by authors, often in the conclusions or management implications of their papers, have been erroneously cited by subsequent authors, as if these anecdotes and opinions were actual demographic results. This leads to a "snowball effect" of opinions, beliefs, and biases becoming uncritically entrenched in the "scientific literature" on human disturbance of bighorn sheep. In other words, if repeated often enough, anything can take on the appearance of truth.

d) The authors fail to acknowledge that their study population has been repeatedly exposed to humans as predators either through hunting and/or repeated capture and handling (for radio- collaring, research, or translocation). Both of these activities can be expected to result in bighorns having increased wariness around humans. The simple fact is that bighorn sheep, like many other animals, habituate to predictable and non-threatening human behavior (i.e. they will habituate to humans if they are not hunted or otherwise pursued).

Despite dire predictions of what could happen in the cited studies, there is no compelling data to indicate that the La Sal/Potash population has declined, has abandoned habitat critical to survival, or that recruitment and adult survival have been compromised due to human disturbance from recreational use, including camping. Quite to the contrary, the State of Utah allows hunting of this population on BLM and State lands outside of Canyonlands and Arches National Parks. Furthermore, this population has also had bighorn sheep regularly captured and removed for translocations elsewhere for decades.

**2. The BLM presents no data on bighorn sheep locations to indicate that they are habitat limited.**

We are concerned that some of the language in the EA and proposed conservation measures are built on the false premise that the resident bighorn sheep population is in decline or in imminent threat of decline due to recreational use. However, no data are presented in the EA that bighorn or wildlife populations are in decline, or that populations are declining as a result of recreational use of a road and trail network that has been in continuous use for over 50 years. The BLM presents no data on bighorn sheep locations to indicate that they are habitat limited.

**3. The EA has an over reliance on papers that misrepresent conclusions.**

In order for the BLM to take a more measured and scientifically-defensible view of the data and issues surrounding bighorn sheep in the SRMA, we ask that the BLM reconsider its reliance on the following papers as they misrepresent the factual basis of their conclusions and therefore are not up to the data quality standards required of the BLM. (Reasons are detailed in the attached reviews below). Those papers include: Papouchis et al. 2000, 2001; Sproat 2012 and Sproat et al. 2019, and Widedmann and Bleich 2014.

**A review of scientific issues in Papouchis (2000, 2001):**

Papouchis did not design the study or participate in the fieldwork, but was recruited by the late Dr. Francis Singer to analyze and publish a paper out of the data gathered, essentially to salvage results from a flawed study design.

The study by Papouchis et al. (2000, 2001) was methodologically flawed and biased in its interpretation of results because the "hikers" in that study were actually researchers who used telemetry to locate radio-collared bighorn sheep and intentionally harassed them until they fled by approaching directly, off-trail and on foot. Thus, the results of Papouchis et al. (2000, 2001) were an artifact of the experimental design rather than an unbiased comparison of bighorn reaction to "hikers." Thus, no conclusions can be drawn to hikers on trails or humans in campsites. The intentional harassment used in Papouchis et al. (2000, 2001) is clearly a different circumstance from trail hikers and even the occasional cross-country hiker who does not have the intention or means of locating, tracking, and approaching bighorn sheep until they flee. Instead, the methods of Papouchis et al. (2000, 2001), as well as similar harassment used in MacArthur (1979) and Phillips and Alldredge (2000) more closely approximated the behavior of hunters pursuing their quarry. The BLM needs to understand and acknowledge this fundamental bias in the results and conclusions of Papouchis et al. (2000, 2001).

The authors of Papouchis et al. (2000, 2001) did not acknowledge that the bighorn sheep in their study, and the population of bighorn sheep in general, had already been subject to capture and handling by humans and that bighorn in that study population are hunted on BLM land outside of the national parks. Thus, the bighorn sheep were pre-conditioned to react to humans approaching on- foot and in close proximity.

Notably, Papouchis et al. (2000, 2001) reported that the radio-collared ewes whose home ranges were along road corridors had obviously habituated to cars, and recommended that these habituated bighorn should not be captured and removed for translocations. Such

captures and removals would deplete the population of resident bighorn that had habituated to habitat along roads in Canyonlands National Park, which is also a safe haven from hunting. This is an important finding because it underscores how bighorn sheep readily habituate geographically to predictable and non-threatening human activity. This habituation is also why desert bighorn sheep near Palm Springs, California wander into the suburbs and city, why hikers have to walk around them on trails, and why they have to be shooed off of lawns and golf courses in the area. Other examples of habituation in desert bighorn include those along the banks of the Green and San Juan rivers in Utah, as well as in the Grand Canyon and along roads in Canyonlands National Park.

The only quantitative data used by Papouchis et al. (2000, 2001) to distinguish human use in the high vs. low-use areas was as follows, "Approximately 1 vehicle passed along roads/hour during peak visitor months in the low-use area. ... Between 5 and 13 vehicles passed along roads/hour during peak visitor months in the high-use area." Papouchis et al. (2000, 2001) also did not mention whether this human use statistic was on paved or dirt roads, the footprint of roads in bighorn habitat, the types of use or intensity of other human use in bighorn habitat, and most importantly, differences in habitat quality which would lead to differences in bighorn sheep density and behavior. The purported increase in human use in the study area was entirely anecdotal.

**A review of scientific issues in:**

**Sproat 2012a, thesis,** *Alteration of behavior by desert bighorn sheep from human recreation and Desert Bighorn Sheep Survival in Canyonlands National Park: 2002 – 2010;*

**Sproat 2012b**, report and presentation, *Potash Desert Bighorn Sheep Research;*

and

**Sproat et al. 2019,** publication, *Desert bighorn sheep responses to human activity in south-eastern Utah.*

The titles used by Sproat (2012) and Sproat et al. (2019) were not accurate because the authors never actually measured bighorn reactions to human activity. Instead, the authors measured scanning vs. foraging behaviors in two different areas, designated high and low human use, but made no attempt to quantify habitat differences, bighorn density, or predation rates that would have influenced their results.

The author(s) of Sproat (2012a,b) and Sproat et al. (2019) assume that a bighorn sheep observed "scanning" is looking at "threats" resulting from human use of the environment although they never consider any alternative hypotheses. Those alternative hypotheses include (a) the bighorn is looking for other bighorn sheep, (b) the bighorn is scanning to locate additional food resources, or (c) the bighorn is scanning for predators, including mountain lions, coyotes, bobcats, and golden eagles, all of which prey on bighorn sheep or their lambs. The authors present no data that time spent scanning vs. grazing has a fitness consequence to the bighorn population.

In the abstract of their paper, the authors of Sproat et al. (2019) make several bold and inaccurate statements. For example, under "Implications" the author(s) state:

"From 1979 to 2000, human recreation increased over 300% in areas occupied by desert bighorn sheep (*O. c. nelsoni*) in south-eastern Utah. Concurrently, the population of desert bighorn sheep occupying the Potash Bighorn Sheep Management Unit of south-eastern Utah was in steep decline."

"We raise a cautionary flag because recreational use in bighorn sheep habitat near Moab, Utah, continues to increase and bighorn numbers continue to decline."

However, no bighorn sheep population data was presented by the authors of Sproat et al. (2019) to support these statements. Quite to the contrary, data from the State of Utah (2019) for the La Sal- Potash population, which includes bighorn sheep in Island in the Sky, Potash, Professor Valley and Dolores Triangle subpopulations, clearly refutes this claim. The State data reveal that this population had increased despite both repeated captures and removals of bighorn sheep from the La Sal-Potash population for translocations, with 289 bighorn captured and translocated between 1982-2008, mainly from the Potash area and other parts of Canyonlands National Park (Wild Sheep Working Group 2015). Additionally, 2 to 4 bighorn sheep are hunted annually on BLM, state, and private land outside of the national parks (including the Potash area), with 31 bighorn sheep killed by hunters between 2010 and 2019 (see big game report above). This bighorn population increase also occurred despite the fact that predation accounted for 44% of radio-collared mortalities reported by Sproat (2012b). And most importantly, the bighorn population increase occurred despite the reported increase in recreational use which Sproat et al. (2019) attempted to link to a non-existent bighorn sheep decline.

Something is clearly amiss with Sproat et al. (2019) because in Sproat's own words (Sproat 2012b, which included annual survival data from radio-collared bighorn), he concluded:

"Survival for desert bighorn sheep in CNP [Canyonlands National Park] relatively high (83%—88%; Table 7), as evidenced by population estimates (*n* = 400, status = stable/increasing). Our statistical analyses indicate that temporal variables (season and month) had the greatest effect on survival."

And in the discussion of Sproat et al. (2019), those authors state:

"We determined that bighorn sheep grazed less and scanned more in areas of high human use, but there was no apparent effect on the survival rates of adult desert bighorn sheep in the study area, as documented by Sproat (2012)."

Oddly, in the concluding sentences that follow, Sproat et al. (2019) tried to qualify this non-effect by reiterating speculation that increasing human use will have population level impacts on bighorn that needs to be mitigated and further research is needed. Specific wording includes "links among human activity, behavior of bighorn sheep and resulting consequences for fitness [which] will provide additional information useful to managers." This inability to let go of a desired but undemonstrated research outcome is typical of some of the most frequently cited literature on human disturbance of wildlife.

Sproat (and his coauthors) were attempting to squeeze a conclusion out of data that are contrary to that conclusion.

Plaintiffs' Exhibit C-6                                    LGB005111

In the discussion of their paper, Sproat et al. (2019) attempt to build a case that bighorn sheep habitat in Canyonlands is under threat of being abandoned citing other bighorn studies. Contrary to Sproat et al's (2019) assertion, Longshore et al. (2013) did not report any abandonment of habitat or population

Also typical is the call for more data but never the critical tests that could potentially falsify their human disturbance hypothesis. It appears that decline in Joshua Tree National Park, instead those desert bighorn sheep ewes merely moved away from centers of human activity on busy weekends and moved back during the week when human use was lower. No deleterious effect on demography was reported. We also note that those desert bighorn sheep in Joshua Tree are not hunted. As pointed out in the attached reviews, Widedmann and Bleich (2014) did not even attempt to rule out more obvious cases for decline and eventual abandonment in a study area in North Dakota along the Little Missouri River; namely, extensive residential, commercial, and agricultural development, and suboptimal habitat to begin with. They did not rule out these factors because they never admitted that they existed.

Also cited by Sproat (2019) is the thesis by Courtemanch (2014) which presented data about constriction of winter range bighorn habitat by backcountry skiers and snowboarders in the Tetons of Wyoming. However, neither that study nor Sproat et al. (2019) mentioned the fact that bighorn sheep from the Teton bighorn population are hunted, which results in bighorn avoiding humans because they are potential predators. In addition to bighorn, mountain goats that utilize the same habitat as bighorn in the Tetons, are hunted on USFS land just outside the Grand Teton National Park. The State of Wyoming Bighorn Sheep Hunt Area #6 lists a quota of one bighorn sheep annually with a hunting season extending from August 1st through October 31st. This bighorn population also overlaps Mountain Goat Hunt Areas #2 and #5 with a current quota of 4 and 8 mountain goats respectively and a hunting season from August 15 to October 31st. While these quotas may not seem high, it is significant that hunters and their guides often spend weeks scouting and hunting in bighorn and mountain goat habitat, approaching their potential quarry as predators, and killing them with archery or rifle. Consequently, it should come as no surprise that bighorn sheep in the study by Courtemanch (2014) avoided other humans as potential predators. Like the subpopulation studied by Wieddemann and Bleich (2014), the Grand Teton bighorn sheep population was also compromised by extensive development, as Courtemanch (2014) notes:

"The Teton bighorn sheep population has experienced numerous changes to its habitats and migration patterns due to residential development, construction of roads and fences, historical livestock grazing, and wildfire suppression, culminating in the population abandoning its traditional low elevation winter ranges (Whitfield 1983)."

Also unusual is the fact that 78% of backcountry skiers and snowboarders in the study by Courtemanch (2014) accessed the backcountry and bighorn habitat from ski lifts in Jackson Hole Mountain Resort and Grand Targhee ski resorts, a situation very different from the desert of southeastern Utah.

In conclusion, Sproat and the EA make apples-to-oranges comparison to studies with very different circumstances and uncritically accept the authors conclusions without first evaluating the assumptions, methods and data used.

**A review of scientific issues in Wideman and Bleich (2014):**

Plaintiffs' Exhibit C-7

The paper by Wiedmann and Bleich (2014), cited by Sproat et al. (2019) and in the EA, attempted to lay blame for the abandonment of habitat by a ewe group on construction of a trail, while ignoring other, far more obvious factors for the decline and eventual abandonment of this translocated ewe group and associated lambing area. The authors of that paper failed to account for and test other, far more obvious factors, including disease, habitat fragmentation and development. Additionally, because Wiedmann and Bleich (2014) erroneously cited the speculation in Papouchis et al. (2000, 2001) as if they were data-driven results, other authors have used this study to further reinforce their belief that human recreational disturbance of bighorn sheep is deleterious to their health and population survival. However, a closer examination of that paper reveals it to be factually deficient and misleading.

The authors of Wiedemann and Bleich (2014) failed to acknowledge that Sully Creek was a marginal site to translocate bighorn sheep into for reasons that now appear to be obvious. This area has low topographic relief as it is along the river breaks of the Little Missouri River in North Dakota. Connectivity to the northern ewe groups required that bighorn ewes migrate along a river corridor under or over the four-lane highway (Interstate 94), across a railroad track as well as across numerous paved and unpaved roads, and around development. The close proximity to the town of Medora, North Dakota and availability of private land, where the bighorn were released in the 1950's, would inevitably lead to extensive development of the surrounding area including habitat occupied by bighorn. Seen from Google Earth historical imagery, permanent land conversion and development over the past 20 years in (and surrounding) the Sully Creek ewe home ranges and lambing areas has included: a golf course, a bible camp, agricultural field development, livestock, new private home construction, expansion of existing ranching and private land infrastructure (trailers, pens, fences, outbuildings, livestock, paved and dirt roads), oil and gas development, and artificial water ponds. This land conversion and development fragmenting and encroaching on the limited bighorn sheep habitat and movement corridors was not mentioned at all by Widedmann and Bleich (2014).

And finally, given that bighorn sheep are highly susceptible to strains of bacteria that cause fatal respiratory pneumonia in bighorn sheep and that the State of North Dakota has over 72,000 domestic sheep, it would seem obvious that disease should be strictly ruled out as a cause of decline before invoking other causes. However, none of the tonsillar swabs used to test for this disease were taken from sick or dying lambs. The only tonsil swabs were taken from healthy ewes that were captured for radio-collaring and the authors did not mention the number of samples that were taken from the Sully Creek ewe group.

In conclusion, if obvious sources of bighorn population loss, including capture and removal for translocations and ongoing mortality from hunting and predation have not been found to negatively affect population status, then why is the BLM proposing additional restrictions in bighorn sheep habitat? Can the BLM demonstrate why (and where) previous regulations and restrictions were found to be inadequate for maintaining a stable bighorn sheep population? Is the BLM willing to base its wildlife regulations on the hypothetical threat that bighorn sheep are not eating enough in areas where humans are present, based on worst-case scenarios from a study that could not find those effects? Why does the BLM not acknowledge in the EA that bighorn sheep habituate to predictable and non-threatening human behaviors?

To conclude, the BLM must recognize the indisputable fact that bighorn sheep habituate to human non-threatening human behaviors including motorized recreation, and the continued use of

long-established motorized routes in bighorn sheep habitat do not pose any significant threat to the bighorn sheep population around Moab. We urge the BLM to find ways to mitigate impacts to bighorn sheep other than closing valuable motorized routes in bighorn sheep habitat.

The BLM has already taken numerous actions designed to reduce impacts to bighorn sheep under the 2008 RMP, from closing routes to limiting camping in lambing areas, to banning climbing and aerial activities in most of Hell Roaring and Mineral Canyons a couple years ago, and should focus on bolstering those efforts instead. Unless there is strong evidence that past mitigation measures have failed and that motorized recreation on specific routes is causing serious harm to bighorn sheep (ie. verified population decline directly attributable to motorized impacts), the BLM should refrain from closing additional motorized routes to protect them.

## 9. Raptor Nest Sites

Under the BLM's likely preferred alternative C, numerous motorized routes are proposed for closure at least in part because of concerns regarding the impact of motorized vehicles on various species of raptors nesting in cliffs and rock formations above or below those routes. This is particularly the case with the motorized routes in the bottoms of Hell Roaring and Mineral Canyons, as well as others like 7-Up and the trail around Pasture Butte (part of the Buttes and Towers Safari trail). We do not believe that these closures are warranted by either the facts on the ground or the best available science.

We note that the best available science around raptor sensitivity to human activities does not support the common belief that raptors are extremely sensitive to the noise of human activities in nearby areas. As stated in the 2002 raptor guidelines (Romin and Muck 2002), the guidelines are applicable to new projects and expanding development/activity, rather than existing land uses to which raptors have habituated, such as those in the SMRA. Therefore, rather than restrict or eliminate existing travel routes within the 0.5 mile one-size-fits-all buffer zone of raptor nests, as proposed in this travel plan, we recommend retaining these but posting educational signage and/or physical impediments (i.e., logs or boulders) to discourage use outside of the existing travel route envelope. The BLM could also monitor these raptor nesting locations as part of its adaptive management strategy to evaluate and refine future mitigation measures with systematically collected data.

The BLM needs to acknowledge the fact that raptors do adapt to human activity that is much closer and more intense than camping and recreational use. For example, the specific language in the Romin and Muck (2002) guidelines are as follows:

> *Prior disturbance history and tolerance of raptors* -- As mentioned previously, some individual and breeding pairs of raptors appear relatively unperturbed by some human disturbance and human-induced impacts and continue to breed successfully amid these activities. Nesting within or near human-altered environments may be a manifestation of the decreased availability of high- quality natural nest sites; indicative of high densities of breeding birds; indicative of abundant or available prey; or simply a display of higher tolerance for disturbance by certain individuals or breeding pairs. Accordingly, it is not the intent of these guidelines to restrict current land use activities in those situations where raptors appear to have acclimated to the current level of disturbance and human-induced impacts. However,

these Guidelines should be closely followed if proposed land use activities may result in exceeding the current levels and timing of disturbance.

As discussed in the raptor guidelines, this habituation has been documented to occur at more intense levels of human disturbance, and more frequently than that associated with campsites and travel routes, trails, and current recreational activities in the planning areas:

> Some individual breeding pairs appear relatively unperturbed by human disturbance and human- induced impacts and continue to breed successfully amid development (Mathisen 1968, Bird et al. 1996). In addition, some land-use actions are potentially beneficial for some raptor species, such as: selective logging, utility lines, dams and reservoirs, farming, grazing, fire, mechanical/chemical, and public observation (Olendorff et al. 1989). For example, peregrine falcons and prairie falcons have been observed nesting on transmission towers, bridges, and buildings in many cities and raptors, including bald eagles and golden eagles, have nested within a few hundred meters of airports, blasting, construction, quarry, and mine sites (Pruett-Jones et al. 1980, Haugh 1982, White et al. 1988, Holthuijzen et al. 1990, Russell and Lewis 1993, Steenhof et al. 1993, Bird et al. 1996, Carey 1998).

As described in a peer review of a recent county recreation management plan in Colorado by Rob Roy Ramey II, Ph.D.:

> Experimental evidence reveals a greater tolerance of golden eagles (and other raptors) to human presence and activities than typically parroted in the literature. Three studies on human disturbance of raptors stand out in contrast to the trend described above because they relied on controlled experiments to test the effects of human disturbance on the fitness of raptors (White and Thurow 1985; Holthuijzen et al. 1990; Grubb et al. 2007, 2010). All three utilized disturbances that were clearly threatening (e.g. blasting; threatening approach via foot, vehicle, or helicopter; gunshots and noisemakers), as compared with relatively benign activities such as hiking, rock climbing, and horseback riding. Yet, all three reported a remarkable tolerance of human presence, a decreased response when habituated, and recommended substantially smaller buffer zones than those typically imposed.

> Holthuijzen et al. (1990) measured the effects of nearby blasting on nesting prairie falcons, as compared to undisturbed controls. They reported: *"This study demonstrated that, in general, blasting had no severe adverse effects on the falcon's behavioral repertoire, productivity, and occupancy of nesting territories. Therefore, we suggest that when blasting does not occur prior to aerie selection and ceases prior to fledging, blasting that takes place at least 125 m from occupied prairie falcon aeries need not be restricted, provided that peak noise levels do not exceed 140 dB at the aerie (i.e., the noise level we measured for our experimental blasts). We recommend that no more than 3 blasts occur on any given day or 90 blasts during the nesting season."*

> White and Thurow (1985) used an experimental approach to quantify the effects of human disturbance on nesting ferruginous hawks. Their "low level" disturbance involved approaching nests on foot while firing a rifle every 20m, driving up to nests, and continuously operating a 3.5hp gasoline motor or noisemaker within 30-50m of a nest. They reported, *"Unlike previous reports of substantial nest desertion by raptors as a result of human activity, the number of disturbed nests that were deserted in our study was unexpectedly low." And, "Our observations suggest that a sufficient buffer zone for brief human disturbance around*

Plaintiffs' Exhibit C-10

*ferruginous hawk nests is 250 m. Adults will not flush 90% of the time if human activity is confined to distances greater than this."*

Grubb et al. (2007, 2010) directly approached golden eagle nests at close range via helicopter, and quantified behavior and nest success. This study was a poignant refutation to an often repeated but erroneous perception (discussed above) that golden eagles are highly susceptible to human disturbance. The authors reported results contrary to expectations:

*"Multiple exposures to helicopters during our experimentation in 2006 and 2007 had no effect on golden eagle nesting success or productivity rates, within the same year, or on rates of renewed nesting activity the following year, when compared to the corresponding figures for the larger population of non- manipulated sites. During our active testing and passive observations, we found no evidence that helicopters bother golden eagles nor disrupt nesting. In 303 helicopter passes near eagles, we observed no significant, detrimental, or disruptive responses. 96% of 227 experimental passes of Apache helicopters at test distances of 0-800 m from nesting golden eagles resulted in no more response than watching the helicopter pass (30%). "*

*"We found no relationship between helicopter sound levels [even though Apache helicopters were twice as loud as the civilian helicopters] and corresponding eagle ambient behaviors or limited responses, which occurred throughout recorded test levels (76.7-108.8 dB, unweighted)."*

*"Between all the other aircraft and human activities occurring in the Tri-Canyon Area, as well as their long term coexistance with WPG and apparent indifference to current operations, golden eagles in the area appear acclimated to current levels of activity. "*

*"For the specific question of WPG operating in the Tri-Canyon Area without potentially impacting nesting golden eagles, we found no evidence that special management restrictions are required. (Authors' Note: The results of this research were very much unexpected since helicopters are usually considered more disruptive to bald eagles than any other type of aircraft. Plus, golden eagles are traditionally thought to be more sensitive, and therefore more responsive, to human intrusions than bald eagles. However, we found the golden eagles studied during this project to be just as adaptive, tolerant, and acclimated to human activities as any bald eagles in our rather considerable, collective experience with this species. We hypothesize this may at least be in part due to the proximity of the large, growing, and outdoor-oriented population of the Salt Lake Valley and Wasatch Front."[36]*

Dr. Ramey further suggests that many prior studies on human disturbance of raptors improperly conflated harmless recreational activities with deliberate hunting of raptors that occurred in the past, which are very different. Because raptors are not as sensitive to human activities as is commonly assumed, and because motorized use has already been occurring on existing roads close to raptor nests for many decades, the raptors there have likely long ago become accustomed

---

[36] Rob Roy Ramey II, Ph.D., *Peer Review of the Chaffee County "Wildlife Decision Support Tools for Recreation"*, July 30, 2021,
http://www.coloradotpa.org/2021/08/23/peer-review-of-the-chaffee-county-wildlife-decision-support-tools-for-recreation/.

to the low levels of disturbances associated with motorized activity. It is therefore likely that all existing roads in these areas could remain open with no serious impacts on raptors.

Unlike rock climbers or people engaged in aerial activities, motor vehicles in canyon bottoms or canyon rims are not up along the cliffs right near raptor nests. As the BLM stated in response to one comment on its 2020 Roped and Aerial Activities restrictions project for Mineral and Hell Roaring Canyons, "vehicles currently are restricted to designated routes, and vehicles cannot access the inaccessible cliffs, steep walled canyons, slot canyons, alcoves and talus slopes so important to the species in question."[37] This natural separation combined with the infrequent nature of motorized use on most of these routes should be sufficient to protect the raptors without needing to close these roads.

We therefore strongly oppose closing any existing motorized routes based on the false assumption that such closures are necessary to protect raptors. If absolutely necessary, seasonal closures during raptor nesting season should be considered instead. While seasonal closures are inconvenient, they would be preferable to permanent closures of high value motorized trails.

## III.   Alternatives Discussion

### 1. The no-action alternative and baseline route inventory do not accurately reflect current management

Turning to a discussion of the various alternatives presented in the Draft EA, we first wish to point out that the no-action alternative (alternative A) does not accurately reflect the current management situation for numerous baseline routes. The no-action alternative appears to be a direct copy of the travel management plan adopted in the 2008 RMP and it does not reflect any route closures, additions, re-routes, or other management actions the BLM has implemented since the 2008 RMP was adopted. The GIS data for the baseline route inventory is also replete with errors, showing many routes with incorrect alignments or erroneous endpoints. While some of these errors may be innocuous, others could result in trails the BLM wishes to keep as-is being mistakenly cut short because the BLM's maps fail to reflect their true endpoints.

The most glaring way in which the no-action alternative fails to reflect current management is the fact that it does not acknowledge closures implemented during the creation of the Mag-7 and Horsethief trail systems. When I explored these areas in October 2021, I found that both D1284 and D1972/D1980 had already been wholly or partially closed to motorized use and converted to non-motorized single-track trails. When I attempted to drive D1972 and D1980, I found that D1972 has been converted to non-motorized single-track north of 38.61702, -109.80152 and D1980 is no longer accessible to vehicles. D1284 appears to have been closed to motorized use when the Horsethief Campground was constructed, and is now signed at both ends as the Horsethief Campground hiking trail. D1249 and D1250 were also closed during the construction of the Horsethief Campground and no longer exist.

---

[37] BLM Moab Field Office, "Limiting Roped and Aerial Activities - Environmental Assessment", November 2020, p. 84.

Plaintiffs' Exhibit C-12                    LGB005117

None of these closures (and likely others I did not personally encounter) is reflected in the no-action alternative, making it an inaccurate representation of the current motorized route network. Consequently, every comparison made between the action alternatives and the no-action alternative throughout the text of the Draft EA is incorrect, as those comparisons falsely assume that all designated motorized routes from the 2008 travel plan are still open to motorized use today and would continue to be if the no-action alternative was adopted.

Another significant post-2008 management action the no-action alternative and baseline inventory fail to reflect is the demarcation of designated dispersed campsites in the Mineral Point and Cotter Mine Road areas. None of the BLM maps acknowledge the existence of these campsites, and the baseline route inventory fails to include multiple short campsite access spurs that are clearly signed as open on the ground. This problem is particularly acute along routes D1199/D1207, D1190/D1195, D1167, D1164, and B215 (Cotter Mine Road). Along these routes, there are multiple campsites that are signed on the ground as official designated campsites that are accessed by short spurs a few hundred feet in length which are not included in the BLM's route inventory and are not reflected in the no-action alternative. Recently constructed campgrounds like the Horsethief Campground and the North Klondike Campground are also not shown. This needs to be corrected.

The no-action alternative and baseline inventory also fail to account for new roads constructed in the TMA since 2008 for purposes of oil and gas development. This problem is particularly severe in the northern part of the TMA between Ten Mile Canyon and the town of Green River, where multiple new roads have been built to service oil and gas wells. Some of these roads overlap with inventoried routes and have caused some to be realigned or altered. For example, there is a long access road running to a well site at 38.899385, -110.043237 that partially overlaps with the Guy's Trail motorcycle route (GT2). This road is open to full-size motorized vehicles, yet is not included in the BLM's route inventory. If the BLM's route inventory does not account for every route within the TMA open to motorized use, it provides an inaccurate and incomplete picture of the management situation that undermines the accuracy of the BLM's analysis.

Beyond these errors and omissions, the GIS data for the BLM's baseline route inventory contains numerous errors, both minor and serious, regarding the alignment and endpoints of many routes. It is common for the BLM's maps to show routes curving where they go straight, going straight where they curve, or following paths that are physically impossible such as going straight over cliffs. One example of a serious alignment error is on D0017 in Arths Pasture, which in reality turns north at 38.61928, -109.70626 and follows a wash to the northwest, while the BLM's maps show it proceeding straight to the southwest. Another example is D3066, which the BLM's maps show switch-backing to the south straight up a cliff at 38.880332, -110.055374, when it actually switch-backs to the north.

While those are fairly minor routes, the BLM's route maps contain serious errors regarding major trails as well. For example, the BLM's GIS data for the Ten Mile Canyon trail appears to be seriously out-of-date and does not reflect the current alignment of the route, which has shifted over time as the river bottom has been altered by flood events, and may also have been re-routed by the BLM. Based on comparing my own GPS track from when I drove it last October and other recent GPS tracks I found online, the BLM's official track for this route appears to coincide with the

actual route on the ground for less than 50% of its length. We urge the BLM to re-map this route to ensure its impact analysis is correct.

In the Poison Spider Mesa area, the BLM's GIS data contains significant errors regarding the alignment of the Golden Spike and Where Eagles Dare trails, and is completely missing the optional loop off Golden Spike known as Skyline Drive. This is an officially authorized part of the Golden Spike Safari Route that is clearly signed and blazed on the ground and has long been a highlight of Easter Jeep Safari. It is also shown in the Funreks guidebook. The Mashed Potatoes Jeep trail (D2562 - part of the 3D Safari route) is also mapped incorrectly, showing only one route when there are actually two distinct paths on the ground. It is critical that the BLM work with Red Rock 4 Wheelers to ensure its mapping of these routes is correct.

Endpoint errors are another serious concern. As will be discussed in greater detail below, D1408 (which is part of the Hellroaring Rim Safari Route), D1504 (which is part of the Deadman Point Safari Route), and D1511 (a popular viewpoint access and camping route on Deadman Point) all have incorrect endpoints in the BLM's route maps and GIS data, which shows them each ending roughly a tenth of a mile short of their true endpoints at scenic overlooks on the canyon rim.

When I drove each of those routes in October 2021, I found that D1504 and D1511 both had official painted blazes on the slickrock continuing past the BLM's mapped endpoints. For D1504, the blazes continue to a famous overlook of the mouth of Hell Roaring Canyon at the edge of the canyon rim at 38.56792, -109.98554, which has long been a highlight of Easter Jeep Safari's Deadman Point trail. For D1511, the blazes continued to a prominent campsite at the end of the point at 38.58717, -109.99410. D1408 clearly continues on the ground to an established overlook canyon rim at 38.55028, -109.99331, and has been documented as doing so in the published Funtreks guidebook, which places its endpoint at 38.549967, -109.992983.

While those were the most prominent endpoint errors I found, many other routes I drove last October appeared to continue past the endpoints shown in the BLM's route inventory. While some of these may be cases of unauthorized user-created tracks extending authorized routes, in many cases these were long-established roads that were inaccurately mapped in the BLM's original 2008 route inventory. Each of these erroneous endpoints needs to be corrected or else important trails could end up being inadvertently cut short of their true endpoints when the new travel plan is implemented.

Based on the errors and omissions described above, the no-action alternative A and the BLM's baseline route inventory simply do not accurately reflect the existing management situation on the ground today, and we urge the BLM to correct these errors in the final EA. Unless that is done, all analysis in the EA that depends upon comparing the action alternatives to the no-action alternative will be fatally flawed and inaccurate; and valuable routes could be inadvertently shortened with no intentional decision to do so.

## 2. Action Alternatives Comparison

We are extremely disappointed to see that not a single action alternative would maintain current levels of motorized access on even the most popular trails in the Easter Jeep Safari trail system. Every action alternative under consideration would close at least some segments of BLM

recognized Jeep Safari trails. While the text descriptions of both alternatives C and D claim that they leave all routes in the Easter Jeep Safari trail system open, this is incorrect, as the chart on page 87 of the Draft EA acknowledges.



In that chart, alternative A is the yellow line and the green, orange, and blue lines represent alternatives B, C, and D respectively. All three action alternatives show a reduction in the Jeep Safari trail system compared to alternative A. Unless alternatives C and D are modified to remove these closures, all statements that these alternatives do not close Easter Jeep Safari trails should be removed from the EA.

Below is a brief analysis of the different action alternatives from the perspective of motorized users. **We would prefer that the BLM adopt alternative A** and keep the existing route network unchanged, as it is currently managed effectively with no need for significant change. However, we understand that the no-action alternative is purely pro forma and is never seriously considered for adoption in NEPA processes such as this. Therefore, of the action alternatives considered in this process, we support alternative D, on the condition that it be modified to remove the closure of D2393 (part of the Buttes and Towers safari trail) and other closures discussed in our comments.

**Alternative B** is the "natural resource emphasis" alternative and has by far the most closures of existing motorized routes. It was already an extreme alternative as originally drafted in the BLM's preliminary alternatives release in 2021. As we expected, alternative B has since been modified as requested by Grand County to close even more trails. It would now close all or at least most of the Hey Joe Canyon, Hell Roaring Canyon, Ten Mile Canyon, Golden Spike, Gold Bar Rim, Rusty Nail, Day Canyon Point, Dead Man Point, Dry Fork Bull Canyon, Four Arches Canyon, and 3D / Mashed Potatoes Jeep trails, plus the Dead Cow and Tubes motorcycle trails, plus parts of the Where Eagles Dare, Buttes and Towers, Wipe Out Hill, Sevenmile Rim, and Hell Roaring Rim safari trails.

At Grand County's request, alternative B was modified from the preliminary alternative so that it would close the most iconic section of the Sevenmile Rim trail across the slickrock bench below Monitor and Merrimac Buttes to the top of Wipeout Hill (D2398D), as well as the portion running through Tusher Wash connecting to the Tusher Tunnel area (D2398B), which is the only connector route between the Courthouse Rock trail system and the Tusher Canyon trail system. These added closures cause alternative B to directly conflict with the express direction in the 2008 RMP which requires "continued use of the Sevenmile Rim Jeep Safari route for motorized use."[38]

If this extreme alternative was chosen, it would utterly eviscerate the Easter Jeep Safari trail network and close at least portions of most of the famous named trails within the TMA that are featured in guidebooks and motorized events. Almost all of the best trails in the Labyrinth Rims / Gemini Bridges TMA would be closed and motorized users (including people with disabilities who rely on motor vehicles as their sole means of accessing public lands) would no longer be able to enjoy them. Numerous trails that currently provide loop opportunities or serve as through routes

---

[38] 2008 RMP, p. 91.

Plaintiffs' Exhibit C-15

would be severed and turned into out-and-back routes, completely destroying connectivity and fragmenting the currently well-ordered trail system.

It is important to understand that the effects of these closures on the Easter Jeep Safari trail system are far greater than mere route mileage suggests. Easter Jeep Safari trails are each a combination of multiple route segments under consideration in this travel plan. Closing even a single component route segment can effectively destroy the entire Safari route by cutting off connectivity to other routes, severing loop opportunities or through routes, or by closing off the main attraction of the trail.

By my calculations, 15 out of 43 individual trails used in the 2022 Easter Jeep Safari would be either completely or mostly closed in alternative B, rendering them unable to be used in future events. In 2022, these trails hosted 53 separate trail runs, out of 158 total. The trails proposed for closure in alternative B thus accounted for 34% of the trails used in the event and 33.5% of individual trail runs -- approximately one-third of the entire EJS event. Each trail run during EJS has a maximum of 30 vehicles. If each of these trail runs were filled to capacity, with an average of two people per vehicle, that would mean roughly 1,590 vehicles and 3,180 people participated in trail runs on the trails proposed for closure.

With so many Jeep Safari trails closed, we doubt that Easter Jeep Safari and similar off-road jamborees would continue to be viable events and would have to either shut down permanently or be drastically scaled down, as approximately a third of the safari trails they rely on would be closed. Based on the numbers above, roughly 3,000 fewer people would be able to attend EJS at minimum. This would have a devastating economic impact on Moab and surrounding communities which the BLM's economic analysis utterly fails to account for, as it fails to consider the likely permanent cancellation (or at least severe downsizing) of Easter Jeep Safari and similar off-road events which bring thousands of visitors to Moab every year.

Needless to say, alternative B is utterly unacceptable to the motorized community. If it were adopted as the final decision, the motorized community would have no choice but to litigate and/or pursue legislation to overturn the new travel plan and have the 2008 travel plan reinstated. If this alternative were adopted, it would almost certainly put a permanent end to any cooperation or partnership between the motorized community and Moab Field Office, and would likely result in widespread civil disobedience and non-compliance as well. Litigation and R.S. 2477 assertions from the State of Utah should also be expected, resulting in years if not decades of further conflict and uncertainty surrounding the motorized route system in Moab. The BLM should thus consider very carefully whether the benefit of appeasing SUWA and other environmental groups is worth the cost of the complete alienation of motorized users and political escalation if it chooses this alternative.

**Alternative C** is the so-called "multiple use emphasis" alternative, which we presume is the BLM's preferred alternative due to its positioning as the middle-ground "compromise" alternative. While it is more reasonable than alternative B, alternative C would close two-thirds of Ten Mile Canyon, half of Hell Roaring Canyon, all of the D-road portion of Mineral Canyon, one of the main overlooks on Deadman Point, part of the Buttes and Towers safari trail and the 7-Up trail, and many other lesser known routes, including valuable connecting trails and trails which access important scenic

overlooks and dispersed campsites (including multiple officially designated dispersed campsites). We object to each of these closures, which are discussed in detail in our route-specific comments.

We note that page 16 of the Draft EA states, "Under this alternative, all high-value routes in the BLM-recognized Jeep Safari trail system would remain designated for OHV use." This assertion is patently false, as alternative C includes the closure of D2393, which is part of the Buttes and Towers safari route. The BLM's route report acknowledges that D2393 is part of the BLM's authorized Jeep Safari Trail System, yet it is proposed for closure in all of the action alternatives.

Given that alternative C as currently drafted would close a key portion of the Buttes and Towers Safari route, the claim that it would not close any Easter Jeep Safari routes is completely inaccurate. In reality, alternative C would have a severe impact on the Jeep Safari trail system by closing the most iconic portion of one of the most popular Jeep Safari trails. Unless Alternative C is modified to keep that route open, this sentence must be removed in the final EA and the EA should be corrected to reflect the true negative effect of this alternative on the Jeep Safari trail network.

**Alternative D** is the "access emphasis" alternative and is as close to a "pro-motorized" alternative as the BLM is considering. It has the least number of route closures, but still closes part of the Buttes and Towers safari trail just like alternative C. The assertion on page 17 of the draft EA that, "Under this alternative, routes in the BLM-recognized Jeep Safari trail system would remain designated for OHV use" is therefore inaccurate and must be removed unless the alternative is modified to not close D2393. Alternative D could be acceptable to motorized users if that closure is eliminated. However we are disappointed that the BLM is not considering a true "pro-motorized" alternative which would keep all existing routes open (and even add additional routes), using management techniques other than closure to mitigate impacts.

Nevertheless, we support alternative D, and urge the BLM to adopt it (with route-specific modifications requested below) as the basis for the final travel plan. While the BLM is clearly attempting to frame alternative C as the "compromise" alternative in this process, we submit that alternative D is the only true compromise alternative being considered, as it closes only a few lesser-used routes while still largely preserving the status quo.

Alternative D would cause the least disruption to visitor expectations and the quality of recreational experiences in the TMA, and thus is the least likely to result in further legal and political controversy. It is also the most likely to gain user compliance and preserve positive relationships between the Moab Field Office and the motorized community. While the BLM may be hesitant to choose this alternative due to an appearance of favoring motorized users over others, in reality this alternative merely maintains the existing balance of recreational opportunities in the status quo. It is therefore the safest and most logical choice for the final travel plan.

## 3. User Concentration

On page 20 of the Draft EA, the Moab Field Office lists the following general assumption regarding the effects of each alternative under consideration in this travel management process:

> Concentration of use as a result of OHV-Closed designations is not anticipated as an issue in this TMA. This conclusion was reached by the BLM IDT and applies for archaeology, wildlife, and other resources. Many of the routes proposed for OHV-Closed designations in the

alternative networks are very lightly used, and therefore would not result in any appreciable concentration of use on the remaining open routes.

This assumption is simply not correct, and we especially dispute its accuracy when applied to alternatives B and C. As mentioned above, alternative B would severely fragment the motorized trail network in the Labyrinth Rims / Gemini Bridges TMA and would close major portions of 15 separate Easter Jeep Safari trails. A full third of the EJS trails would no longer be available for use during Easter Jeep Safari. This would require the event to either be dramatically scaled back or else require the number of trail runs on the remaining EJS trails to be increased proportionately.

Alternative B would also close numerous other heavily used and highly popular trails featured in published guidebooks and online trail guides. These include extremely popular trails like Sevenmile Rim, Buttes and Towers, Wipe-Out Hill, Day Canyon Point, Hey Joe Canyon, and 3D / Mashed Potatoes, Golden Spike, Goldbar Rim, and Rusty Nail. With all of these major trails closed, the high numbers of motorized users which previously used them would inevitably be displaced to other popular trails in the Moab area that remain open, such as Metal Masher, Hell's Revenge, and others. This would dramatically increase traffic and user concentration on the remaining routes, causing severe overcrowding, safety issues, environmental impacts, and degraded visitor experiences.

The closure of most or all of the Golden Spike, Goldbar Rim, and Rusty Nail trails would be particularly devastating, as those would destroy the so-called "Moab Trifecta" route (the combination of Poison Spider, Golden Spike, and Goldbar Rim, with Rusty Nail as a more challenging alternative to part of Goldbar Rim). If alternative B was adopted, it would no longer be possible to drive straight through from the Poison Spider trailhead on Potash Road to Gemini Bridges Road. The Poison Spider trail would provide the only access route to all the remaining trails on Poison Spider Mesa and Gold Bar Rim, which would include all of the Poison Spider trail plus dead-end fragments of Where Eagles Dare and Golden Spike. All of the vehicles that would have continued on Golden Spike and gone out Gold Bar Rim would now have to travel both in and out on Poison Spider, greatly increasing traffic on what is already a very crowded trail.

The closure of Rusty Nail would have a particularly severe effect in concentrating users on other trails. Not only is it an Easter Jeep Safari trail, it is one of only four trails in the Moab area rated an 8 or higher difficulty level by Red Rock 4-Wheelers. As such, it is one of the few extreme level trails around Moab where highly modified rock crawlers and buggies can find adequate challenges. Its closure would inevitably displace these users to the only other three extreme trails in the area: Cliffhanger (rated 8), Hell's Revenge incorporating the Hell's Gate and Escalator obstacles (rated 8), and Pritchett Canyon (rated 9). Coyote Canyon is another extreme level trail that could be affected, though its capacity to absorb displaced users is already limited by a highly restrictive permitting system.

These are only some examples of the severe user displacement and resulting concentration that would be caused by alternative B. With so many popular trails closed, overcrowding of the remaining trails is almost inevitable, likely necessitating the imposition of restrictive permitting systems like those currently employed for Coyote Canyon, the White Rim Trail, and Elephant Hill.

Plaintiffs' Exhibit C-18

User concentration under alternative C would be less than under alternative B, but still significant. The seasonal closure of the popular Day Canyon Point trail would displace users to other Jeep Safari trails in the Gemini Bridges area. The closure of the most iconic section of the Buttes and Towers Safari trail (D2393) would at minimum force a re-route onto other nearby trails that are not currently used for Easter Jeep Safari and similar events, increasing impacts there. It would likely make the trail less desirable, displacing users to other nearby trails like Sevenmile Rim.

Alternative C also closes numerous named trails that receive regular use for motorized recreation, such as Ten Mile Canyon, Upper Hidden Canyon, Mineral Canyon, 7-Up, Lost World Butte, and others. While the effects of each route closure individually may be relatively small, the total number of closures will still have significant effects in displacing and concentrating users on the remaining routes in the Moab Field Office.

According to the recreational opportunities chart on page 113 of the draft EA, alternative B would result in a 57% reduction in routes primarily used for Jeeping/4-Wheeling and alternative C would result in a 24% reduction. Even if the majority of the routes closed in both of these alternatives are lightly trafficked, the sheer number of closures in each alternative, plus the fact that both alternatives include the closure of popular named trails featured in published guidebooks and online trail guides, will inevitably result in significant user displacement and concentration on remaining routes. The BLM's assumption that user concentration would not be an issue for any of the alternatives under consideration is simply false. This assumption must be removed from the EA, and the BLM should include a thorough analysis of user displacement and concentration impacts for each of the action alternatives in the final EA.

## 4. The range of alternatives is insufficient due to the BLM's refusal to consider an alternative which adds additional routes not designated in the 2008 travel plan or uses means other than closure to mitigate impacts

We remind the Moab Field Office that it has a legal obligation under NEPA to consider a reasonable range of alternatives. The legal duty to consider a reasonable range of alternatives applies to both EIS and EA processes. *Surfrider Foundation v. Dalton*, 989 F. Supp. 1309, 1325 (S.D. Cal. 1998) (citing Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1229 (9th Cir. 1988) ("Alternatives analysis is both independent of, and broader than, the EIS requirement."). A NEPA analysis must "explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14 (EIS); Id. at § 1508.9 (EA); *Bob Marshall Alliance*, 852 F.2d at 1225 (applying reasonable range of alternatives requirement to EA). A NEPA analysis is invalidated by "[t]he existence of a viable but unexamined alternative." *Resources, Ltd. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1993).

The reasonableness of the agency's choices in defining its range of alternatives is determined by the "underlying purpose and need" for the agency's action. *City of Carmel-by-the-Sea v. U.S. Dept. of Transportation*, 123 F.3d 1142, 1155 (9th Cir. 1997); *Methow Valley Citizens Council v. Regional Forester*, 833 F.2d 810, 815-816 (9th Cir. 1987), rev'd on other grounds, 490 U.S. 332 (1989). The entire range of alternatives presented to the public must "encompass those to be considered by the ultimate agency decision maker." 40 C.F.R. § 1502.2(e).

Plaintiffs' Exhibit C-19

The agency is entitled to "identify some parameters and criteria—related to Plan standards—for generating alternatives…." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1522 (9th Cir. 1992) (italics in original). However, in defining the project limits the agency must evaluate "alternative means to accomplish the general goal of an action" and cannot "rig" "the purpose and need section" of a NEPA process to limit the range of alternatives. *Simmons v. U.S. Army Corps of Engineers*, 120 F.3d 664, 669 (7th Cir. 1997) (emphasis added).

The BLM cannot define the purpose and need for the project so narrowly as to exclude reasonable alternatives that should be evaluated in depth.

> In the Tenth Circuit, federal courts are required to "look closely" at the EIS's purpose to determine whether the agency considered reasonable alternatives. *Save Our Canyons*, 297 F.3d at 1030. It is well established that an agency cannot define the purpose of its project so narrowly that it precludes consideration of reasonable alternatives. *Davis*, 302 F.3d at 1119. This is because "[o]ne obvious way for an agency to slip past the structures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." Id. (quoting Simmons v. U.S. Army Corps of Eng'rs, 120 F.3d 664, 666 (7th Cir. 1997)).

*State v. U.S. Department of Agriculture*, 570 F. Supp. 2d 1309, 1336 (D. Wyo. 2008). Instead, agencies must evaluate all reasonable alternatives. "A 'reasonable alternative' is one that is non-speculative and bounded by some notion of feasibility." *State v. U.S. Department of Agriculture*, 570 F. Supp. 2d 1309, 1336 (D. Wyo. 2008), citing *Utahns for Better Transp.*, 305 F.3d at 1172.

Throughout the EA, BLM relies exclusively on route closures as the only way to mitigate or minimize anticipated potential impacts. Signing, fencing/gating, patrol/surveillance, route designation, public education, and relocation of routes are all management tools that can be used to minimize potential impacts. It is clear in the route reports for numerous routes that the public interest favors leaving those routes open while mitigating impacts through a range of management approaches other than closure. Motorized users are harmed by these closures. It is arbitrary and capricious and abuse of discretion, and a complete failure to take a hard look at proposed alternatives to utilize closure as the only tool for mitigating impacts.

By only considering route closures, BLM did not adequately explore and evaluate all reasonable alternatives. Even though it created route evaluation forms to provide the basis for route-by-route analysis and site specific management, the Draft EA relies almost exclusively on route percentage comparisons that use route closures as justification for the agency's compliance with NEPA. The BLM should have considered at least one alternative that keeps open all currently designated routes and uses other management techniques to mitigate impacts, but it failed to do this.

Additionally, the BLM utterly failed to consider any alternative which adds additional designated routes or reopens routes that were closed in the 2008 travel plan, despite numerous scoping comments requesting the addition of specific routes. In the Scoping Report for the Labyrinth Rims Gemini Bridges Travel Plan published in August 2021, the Moab Field Office made the following statement about the scope of this travel planning process:

Plaintiffs' Exhibit C-20

> Multiple commenters also asked the BLM to add new OHV trails and trail systems; close all trails to motorized traffic; engage in more education of "tread lightly", "leave no trace", "don't bust the crust", etc.; increase fees for hikers/bicyclists; address the increase of trash and human waste; and, increase dispersed camping opportunities; however, these actions are outside the scope of the current Travel Planning effort.[39]

In this statement, the Moab Field Office declared that adding new motorized routes was "outside the scope of the current Travel Planning effort." The Moab Field Office thus appears to be taking the same position it adopted in the Canyon Rims Travel Planning process, where it treated the 2008 travel plan as a ceiling and refused to consider designating any routes not designated in the 2008 travel plan. We believe this improperly defines the purpose of this project so narrowly as to preclude consideration of reasonable alternatives.

We strongly object to the BLM's decision not to consider designating all routes that currently exist on the ground, but to instead limit its route inventory for this process to only those routes designated as open in the 2008 travel plan. All routes that were closed in the 2008 travel plan, plus many more that were erroneously left out of the 2008 route inventory are not being considered in this planning process at all, thus artificially and unreasonably limiting the range of alternatives the BLM is considering. At the very least, all routes in the baseline inventory from the 2008 travel planning process should be considered for designation in this process, as this planning process is basically a do-over of the 2008 travel plan.

The BLM's decision to only include in its inventory routes designated open in the 2008 travel plan is extremely unfair to motorized users, as it guarantees that fewer routes will be designated as open to motorized use at the end of this travel planning process than were designated in the 2008 travel plan, and deprives motorized users of any chance to to advocate for reopening routes that were closed in 2008. It establishes a one-way ratchet where anti-motorized groups are given an infinite number of attempts to get motorized routes closed in every new travel planning process, but motorized users are never allowed to seek re-opening of previously closed routes because those routes are invariably excluded from the route inventory of the next travel planning process.

Many of the routes that were technically closed by the 2008 travel plan were never signed as closed on the ground and have continued to be regularly driven in the intervening years by motorized users who are unaware they are closed. Thus numerous "closed" routes still exist on the ground and could reasonably be considered for designation. An alternative that considers designating these routes as open is both non-speculative and feasible, and the BLM is therefore legally obligated to consider at least one alternative that does so.

Many other routes existed on the ground before 2008 but have never been considered for designation due to the BLM's failure to ever include them in its route inventory. As mentioned in scoping comments by several local motorized groups, in some cases during the 2008 travel planning process, the BLM either lost or ignored GIS data submissions from motorized groups, causing the routes they contained to be left out of the baseline inventory.

Notably, of all the Utah field offices currently creating new travel plans mandated by the 2017 Settlement Agreement, the Moab Field Office is alone in its refusal to inventory and analyze routes

---

[39] Scoping Report, p. 3.

Plaintiffs' Exhibit C-21                                    LGB005126

that were mistakenly left out of prior travel planning processes. After acknowledging that its 2008 route inventory was woefully inadequate and missed hundreds of miles of primitive roads, the Price Field Office created entirely new route inventories for both the San Rafael Desert TMA and the San Rafael Swell TMA. Both of these route inventories included many more routes than were designated in 2008. While the San Rafael Swell travel plan has only gotten through the scoping phase so far and there are no draft alternatives available for it yet, the San Rafael Desert TMP has already been completed. The final travel plan adopted for that area ended up designating many more miles of routes than were designated in 2008, though it should be noted that the 2008 TMP did not designate any routes as closed, so each of the previously undesignated routes could continue to be legally driven in the intervening years.

In southern Utah, the Kanab Field Office is likewise considering for designation multiple routes which existed prior to 2008 but were mistakenly left out of its original route inventories for the Trail Canyon TMA and the Paunsaugunt TMA. While it is not considering reopening any routes designated as closed in the 2008 travel plan, neither has it adopted the position of the Moab Field Office that the 2008 travel plans must act as a ceiling, rather than a floor, for subsequent travel planning processes. Thus in the travel plans being developed by the Kanab Field Office, there is at least the possibility that route additions may balance out route closures, resulting in no net loss of motorized routes. That is not the case in the Moab Field Office, where a net loss of routes has been predetermined by the baseline route inventories used for both this travel planning process and the already completed Canyon Rims TMP.

There is absolutely no legal basis for the Moab Field Office's interpretation of the Settlement Agreement as a mandate to only consider route closures and not any route additions beyond those designated in the 2008 travel plans. It contains no such requirement, but instead states:

> ...nothing herein restricts BLM's discretion to revise or amend the 2008 TMPs, to impose limitations or closures, as provided by 43 CFR §§ 8341.2 and 8364.1, **to open, close, modify, or add new routes**, or otherwise consider or institute temporary management prescriptions in accordance with applicable law and regulations.[40]

The Settlement Agreement therefore expressly *allows* the BLM to consider adding new routes beyond those designated in the 2008 travel plans. There is nothing in the Settlement Agreement that requires the BLM to consider the 2008 route designations as a ceiling prescribing the maximum number of open routes permitted. No other BLM field office has interpreted it this way, and the Moab Field Office stands alone in adopting this flawed interpretation of its obligations under the Settlement Agreement. The Moab Field Office's refusal to consider any alternatives adding routes or using management techniques other than closure to mitigate impacts is therefore arbitrary and capricious and an abuse of discretion.

We believe it is highly unlikely the Moab Field Office's refusal to consider these other reasonable alternatives will hold up in court when challenged, and urge the BLM to reconsider this approach. Though it is probably a futile attempt, we have included a short list of routes in our route-specific comments below which were not designated as open in 2008, which we request that the BLM designate as open in its final decision in this travel planning process. Should the BLM choose not

---

[40] 2017 Settlement Agreement, p. 7.

to consider designating any of these additional routes, we reserve our right to appeal the final decision on that basis.

## 5. Data Errors

The BLM has a legal obligation to provide thorough and accurate data regarding the basis for its decisions to the public. As the 9th Circuit Court has stated:

> The CEQ regulations state that, to comply with NEPA, an agency "must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b). To fulfill NEPA's public disclosure requirements, the agency must provide to the public "the underlying environmental data" from which the Forest Service develops its opinions and arrives at its decisions. *See Idaho Sporting Cong. v. Thomas,*137 F.3d 1146, 1150 (9th Cir.1998), *overruled on other grounds by Lands Council v. McNair,* 537 F.3d 981 (9th Cir.2008) (en banc).

*WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015). In the case of a travel management plan, the most important piece of underlying environmental information is the baseline route data and the agency's proposed actions for each route under each alternative.

The BLM has utterly failed to meet its legal obligations to provide thorough and accurate data to the public throughout this travel planning process. As discussed in our comments about alternative A, the baseline route inventory is replete with errors and missing routes. Many routes are mapped with incorrect endpoints or in the wrong locations, some are shown as open when they have already been closed on the ground, and other routes such as the Skyline Drive section of Golden Spike are managed as open on the ground but are not included in the baseline route inventory. Many of these errors were mentioned in public comments during the scoping process but the BLM has done nothing to correct them.

These errors should have been prevented by the pre-NEPA engagement process required by the 2017 Settlement Agreement. The Agreement specifically required a pre-NEPA engagement with the public once preliminary route inventories were finalized. This did not happen and basic mapping problems persist throughout the NEPA process. The Settlement Agreement required additional public input efforts to avoid more problems with bad data, but the public remains in this situation again. We believe the BLM's failure to conduct pre-NEPA engagement with off-road clubs to verify the accuracy of its route data constitutes a violation of both the 2017 Settlement Agreement and its basic obligations under NEPA and CEQ regulations.

During the comment period on the Draft EA, the Moab Field Office has only continued to compound its failure to provide complete and accurate information to the public. The comment period began on September 7, 2022, when the BLM posted the Draft EA on the ePlanning site. At the beginning of the comment period, the PDF maps, GIS data, and route reports all contained inaccurate and contradictory information regarding multiple key routes, including several segments of Sevenmile Rim Jeep Safari trail, the 7-Up trail, the Major Point trail, and the Mineral Canyon trail. I discovered these errors on September 9 and notified Moab FO staff by phone the same day.

I provided more detailed information about the specific errors by email to Katie Stevens on September 12.

Moab Field Office staff finally posted an errata sheet correcting these errors on September 21, and posted corrected GIS data and route reports on September 22. It wasn't until September 23, after multiple failed attempts, that the BLM finally managed to post a corrected PDF map for alternative C that fixed the errors above and did not introduce new errors like missing ATV trails. This was already half way through the comment period, with only 14 days remaining until the deadline. Even now there are discrepancies between the PDF maps and GIS data regarding the designations of ATV trails, with the PDF maps indicating all ATV trails are limited to 50 inches, while many of these routes in the GIS data are listed as restricted to 60 inches.

As a direct result of the BLM's failures to provide accurate data, the public was denied access to accurate maps and information regarding the route designations in the various alternatives for fully half of the comment period. They arguably still do not have access to accurate PDF maps that are consistent with the GIS data regarding the designations of ATV trails. Multiple motorized groups and individuals requested an extension of the comment period on account of this, but the BLM has denied all such requests. Though it was fully within the authority of the Moab Field Office to extend the comment period, and extensions have been recently granted in other planning processes in the area (such as the scoping comment period on the RMP amendments for the Dingell Act last winter), the Moab FO has refused to extend the comment period to allow the public time to accurately understand the designations in the various alternatives.

The BLM also never provided its own interactive ArcGIS map for the Draft EA alternatives, despite the fact that doing so has become customary for BLM Utah field offices in travel planning. The Moab Field Office created an interactive ArcGIS map for the Draft EA in the Canyon Rims travel management process and for the scoping period in the Labyrinth Rims / Gemini Bridges travel planning process in 2021, but did not create one for the Draft EA in this process. While the BLM has made ArcGIS GeoDatabase files available for download on the ePlanning site, most members of the general public lack the technical knowledge to view these files or use them to create their own maps. As a result, most members of the public have had to rely on low resolution PDF maps that were inaccurate for half of the comment period and did not include vital information like route numbers, which are necessary to effectively comment on individual routes.

We contend that the BLM's failures to provide accurate and consistent information to the public regarding the baseline route inventory, the route designations in each alternative, and an interactive map with route numbers constitutes a clear violation of the BLM's legal obligations under CEQ regulations to provide high quality data, and that those failures severely harmed the public's ability to effectively participate in the public comment period. At the very least, the BLM should have extended the comment period after erroneous data was discovered, but it refused to do this. These errors and omissions have severely compromised the integrity of the travel planning process. The BLM must at minimum withdraw the Draft EA, correct all the mapping errors discussed in our route specific comments below, and then issue a new Draft EA and hold a new comment period. Anything less would leave the resultant decision vulnerable to legal challenge based on the BLM's failure to provide accurate and complete information to the public for public comment.

Plaintiffs' Exhibit C-24

LGB005129

# IV.   <u>Route Specific Comments</u>

Below we have listed a number of specific routes that are particularly important for motorized recreation within the Labyrinth Rims/Gemini Bridges TMA. Our comments primarily focus on routes that are proposed for closure in at least one action alternative, particularly alternative C which we presume to be the BLM's preferred alternative. Routes are organized in multiple categories including ten priority routes which we consider to be the most important motorized trails in the area that are threatened with closure, and a group of routes which have officially designated dispersed campsites. All other routes are grouped by geographic area.

Though I have only been visiting the Moab area to go four-wheeling for a few years, since the start of this travel planning process I have attempted to learn as much about the trails in this area as possible. Most of the information presented below is based on my personal visits to the area, including a field trip I made in October 2021 specifically to explore as many of the routes proposed for closure in alternative C as I could over five days. For routes that I have not personally explored, my comments are based on extensive research consulting published guidebooks, online trail guides, accounts from other motorized users, videos, maps, and Google Earth imagery.

In general terms, it is critical that the BLM keep open all routes used for Easter Jeep Safari (Safari routes), as well as all named trails featured in published guidebooks and online trail guides. The Safari routes are all world-renowned, named 4x4 trails that exemplify the best the Moab region has to offer for motorized recreation. Several are also Jeep Badge of Honor trails. From the perspective of the motorized community, it is absolutely non-negotiable that all Easter Jeep Safari routes must remain open.

We are highly concerned by the fact that every action alternative as currently drafted would close D2393, which is part of the Buttes and Towers Safari route. Buttes and Towers was approved by the BLM for inclusion in the Safari route system in 2018 and is one of the most popular trails run during Easter Jeep Safari. Why the BLM would consider closing it in all alternatives after approving it as a Safari trail only four years ago is a mystery, and we strongly oppose this closure. Besides Buttes and Towers, alternative C would close one of the three overlook spurs on the Deadman Point Safari trail, which is critical to keep open. Additional Safari routes are proposed for either complete or partial closure in alternative B, including Day Canyon Point, Rusty Nail, Hey Joe Canyon, 3D, Sevenmile Rim, Hell Roaring Rim, Deadman Point, Goldbar Rim, Where Eagles Dare, and Golden Spike. These closures of some of the most famous 4x4 trails in the country make alternative B utterly unacceptable to motorized users.

Most of these closures were incorporated into B at the request of the Grand County Commission in a letter the commission approved in December 2021. The primary reason given by Grand County for these closures was that it believes each of these areas should be managed for non-motorized recreation and wilderness characteristics instead. This request directly contradicts the management direction for each of these areas and trails in the Moab Field Office Resource Management Plan and is an absolute non-starter to the motorized community.

Beyond the Safari routes, we strongly oppose the closure of routes featured in published guide books such as Hidden Canyon, Ten Mile Wash, Hell Roaring Canyon, Mineral Canyon, and 7-Up,

Plaintiffs' Exhibit C-25

all of which are slated for closure in alternative C. Many other inventoried "D" routes connect to the named Safari routes, providing loops and alternate routes, bypasses around difficult obstacles, access to scenic overlooks, and rapid access for emergency vehicles to different areas. All of these routes must be kept open to preserve the high-quality motorized recreation experience for which the Moab region is known. Only routes which have naturally reclaimed to the point where they are no longer present on the ground and are impossible to follow should be closed. All routes that are being regularly used serve an important purpose and should be kept open.

While it is impossible to cover every route in the TMA in detail, the fact that a route is not mentioned here does not mean it is not an important route for motorized recreation. Some important routes are not discussed in detail because they are not being considered for closure in any of the draft alternatives and we have chosen to prioritize threatened routes.

We emphasize again that use for motorized recreation is *in itself* a sufficient purpose and need to justify keeping a given route open to motorized use. The BLM would not require mountain bikers to provide an additional purpose beyond mountain biking in order to justify the existence of a mountain bike trail; therefore motorized users should not be required to provide an additional purpose beyond motorized recreation for our routes. While many motorized routes have additional purposes such as accessing scenic overlooks and campsites or providing access to hiking trails, a specific destination should not be required in order to keep a given route open. Most often, the route itself is the destination, providing technical driving challenges, scenic viewing, and opportunities for general exploration. Even routes which do not appear to lead to a specific destination therefore have value. Neither is a route "redundant" because it leads somewhere that is a relatively short straight-line distance from another route. The varied topography of the region results in significant differences in experiences over even a short distance. For example, a route at the bottom of a canyon provides a very different experience than a route on the rim.

Many lesser known and less popular routes serve a critical function of dispersing motorized users across a broader area, lessening concentration and overcrowding on the more popular trails. They also provide opportunities for motorized users to seek some degree of solitude. While solitude is a value more frequently associated with non-motorized recreation in Wilderness areas, motorized users also desire opportunities for solitude which can be found on more remote and less popular roads. In my personal experience, the vast majority of motorized traffic around Moab is concentrated on a handful of well-known routes, primarily the Easter Jeep Safari trails. Even during the busiest times in Moab such as during EJS or Memorial Day weekend, I have found it possible to spend a day driving lesser-known, more obscure roads and not see a single other vehicle. These lesser known trails therefore serve a crucial function in allowing motorized users to spread out across the landscape and escape the crowds on the more popular trails.

Remote and lesser known trails like those along Labyrinth Rims, Courthouse Rock, the rims of South Fork Sevenmile Canyon, Arths Rim, and the Bull Canyon complex south of Gemini Bridges Road are perfect for this, as they generally see very little traffic. Lightly trafficked roads also have minimal environmental impact, whether on soils and vegetation or on wildlife and hikers, who would only infrequently encounter vehicles. The mere fact that a road is lightly trafficked therefore should not be considered a reason to close it. Instead, the BLM should keep such routes open to provide opportunities for off-the-beaten-path exploration and motorized solitude.

Plaintiffs' Exhibit C-26



**Ben Burr, Policy Director**                                                    April 26, 2021
BlueRibbon Coalition
P.O. Box 5449
Pocatello, ID 83202


Nicollee Gaddis-Wyatt, Field Office Manager, Moab Field Office
82 Dogwood Ave.
Moab, UT 84532


Dear Ms. Gaddis-Wyatt,

BlueRibbon Coaliton/ShareTrails (BRC) is writing to provide scoping feedback for Labyrinth
Rims/Gemini Bridges Travel Management Area (DOI-BLM-UT-Y010-2020-0097-EA). BRC is a
national non-profit organization that champions responsible recreation and encourages a strong
conservation ethic and individual stewardship. We champion responsible use of public lands
and waters for the benefit of all recreationists by educating and empowering our members to
secure, protect, and expand shared outdoor recreation access and use by working
collaboratively with natural resource managers and other recreationists.

Our members use motorized and non-motorized means of recreation, including OHV, horses,
mountain bikes, and hiking to access and enjoy recreating upon state and federally managed
lands throughout the United States, including those of the Bureau of Land Management.

Many of our members and supporters live in Utah or travel across the country to visit Utah and
use motorized vehicles to access BLM managed lands throughout Utah, including the Labyrinth
Rims/Gemini Bridges Travel Management Area. In addition to access travel itself, BRC
members visit the lands mentioned herein for motorized recreation, sightseeing, photography,
rockhounding, hunting, wildlife and nature study, camping, observing cultural resources, and
other similar pursuits. BRC members and supporters have concrete, definite, and immediate
plans to continue such activities in the future. Many of our members hold organized events that
include guided rides in this area. A significant portion of the education mission of organizations
like ours and the fundraising that supports organizations like ours comes from these organized
events, and we see the continuation of these events as an integral expression of protected
rights including freedom of speech and freedom of assembly. We support any additional
comments that encourage the BLM to designate the maximum number of routes in this area as
open. Many of our members are organizations with extensive on-the-ground experience. If any
route specific comments are made which identify routes missing from the inventory, we support
BLM adding these routes to the baseline inventory. We support comments submitted by
Colorado Offroad Trail Defenders.

The Labyrinth Rims/Gemini Bridges Area is an incredibly popular area for off-highway use and
dispersed camping. To the south of this area is Canyonlands National Park, to the east is
Arches National Park, to the west is the Labyrinth Canyon Wilderness, and to the north are the
roadless areas of the Book Cliffs. In other words, this travel area is completely surrounded by
land managed with aggressive restrictions on motorized recreation, dispersed camping, and

other forms of outdoor recreation, BLM should work to maximize OHV use in this area, since minimization of OHV related impacts occurs by land management designations in surrounding areas.

Not surprisingly, because this is one of the few areas of open multiple-use public land near Moab, UT, it is an incredibly popular destination. According to the Southern Utah Wilderness Alliance (SUWA), "This area has also experienced a dramatic increase in motorized recreation over the past decade, with ORV noise and dust disproportionately impacting the majority of public land users." We agree with SUWA that this area receives heavy use, and that each and every proposed mile of roads in the scoping map serves the purpose and need of off-road recreation, dispersed camping, mountain biking, and other forms of outdoor recreation.

We recognize that organized efforts to restrict recreation on public land often point to impacts such as noise and dust. Neither of these impacts rise to the level of requiring route closures at the travel management planning level, since they can be mitigated through other means. In the case of increased dust levels, we recommend the BLM rely on best available science which suggests the largest sources of dust pollution are burn scars from wildfires – not surface disturbance from OHV use. In their appeal of the San Rafael Desert TMP Record of Decision, SUWA complains that the acreage of surface disturbance caused by roads is 6,487 acres of an area 377,609 acres in size. As a percentage, the area of disturbance was 1.7% of the total area. We encourage the BLM to recognize the small percentage of the area that is subject to disturbance in preparing their alternatives. We also encourage the BLM to not base their decision on exaggerated claims of impact.

We also want to point out that in a recent exchange of letters with the Grand County Attorney concerning the county's adoption of a restrictive noise ordinance that limits noise allowed from vehicles at 92 dBA, that the Grand County Attorney said, "For example, 96 dBA may be a fine level on public lands where there is no impact to residential areas." We appreciate that the Grand County Attorney recognizes that higher tolerance for noise impacts should exist on public lands.

SUWA also claims, "Federal law requires the BLM to minimize impacts to natural and cultural resources when designating motorized vehicle routes. The agency's current travel plan—pushed through in the waning days of the George W. Bush administration—blanketed the area with ORV routes, prioritizing motorized recreation at the expense of all other public land uses. The high density of ORV routes in the Labyrinth Canyon and Gemini Bridges area means there are few areas to escape the whine of all-terrain vehicles (including the now ubiquitous "utility" models known as UTVs) and dirt bikes."

We believe the BLM can adopt a permissive travel management plan that minimizes impacts to natural and cultural resources without closures. Closure should be a last resort and only considered after a wide range of alternative mitigation measures have been documented with failure. Impacts that lead to closure must be objectively measured and present immediate and irreparable harm. BLM shouldn't close any routes based on speculative, subjective, or imagined harm.

BLM should also document how many users access this area with no use of a motorized vehicle. With the exception of the small, regulated number of users on the Green River, all other recreation users in this travel area use motorized access at some level. As a result, the prioritization of motorized recreation is made to the **benefit** of all other public land uses instead of at the expense of all other public land uses.

We appreciate SUWA documenting the high density of ORV routs in this area, and we encourage BLM to recognize that this high density of routes should preclude the area from ever being considered for potential designation as wilderness or wilderness study area. The high

**Sharetrails.org – it's what we do!**
Plaintiffs' Exhibit C-28

saturation of roads also suggest that none of this area should be recognized as having wilderness characteristics. Any attempt to close roads or suggestion that roads are reclaiming should be seen as an attempt to launder lands with no wilderness characteristics into potential wilderness inventories. Also, the Dingell Act prohibits the creation of buffer zones around wilderness, and it prohibits BLM from considering sight or sound impacts on wilderness from lands not included in wilderness. This areas proximity to the Labyrinth Canyon Wilderness qualifies this area to be managed by these prohibitions in the Dingell Act.

We also must point out that those who wish to escape the exaggerated "whine of all-terrain vehciles and dirt bikes," in this area have numerous choices at their disposal. They can choose to recreate in the Labyrinth Canyon Wilderness, which will give them access to nearly identical landscape features with the protections of wilderness. SUWA and numerous other organizations united to prevent the allowance of OHVs on roads in National Parks, so there are two national parks adjacent to this area where users can escape off-road recreation. Each of these areas are vast and part of an even larger system of wilderness, wilderness study areas, designated roadless areas, and other National Parks. The claim that there are few areas to escape the noise of OHV recreation is false on its face. If anything, off-road recreationists and those who enjoy dispersed camping are the ones seeing decreasing access and limitations on areas of use. BLM should use this travel management process to protect these uses.

We strongly support the development of alternatives that leave as much of the existing routes open as possible while also adding any new routes that are identified during the scoping process.

In the appeal to the recently completed San Rafael Desert TMP, we were concerned to see an effort to force BLM to restrict dispersed camping in that travel area. We are worried that similar justifications will be used to limit dispersed camping in this area. The popularity of dispersed camping has exploded in recent years as public land users of all ages and backgrounds have found great value in open, free, dispersed camping on multiple-use public land. Overlanding vehicles, camper vans, RVs, car camping, and dual sport adventure bikes are recreation activities that are attracting new users at record rates. The COVID-19 pandemic greatly increased the number of Americans who now work remotely. These factors have attracted many dispersed camping users to this area. It is common for hotels and reserved camping sites in and around Moab and Green River to fill up. Because this area is surrounded by so many other areas with restrictive management, Labyrinth Rims and Gemini Bridges will become an increasingly popular destination for those who want to camp in vehicle accessible areas. For this reason, BLM should be looking to expand dispersed camping in this area and other eligible areas while also working educate users on how to minimize impacts. BLM should also consider that routes that might otherwise appear superfluous, redundant, or lacking in purpose and need are often used for dispersed camping.

Open riding areas are becoming increasingly rare on BLM lands, and we support BLM's decision to leave Whitewash Sand Dunes Open OHV Area status as an open travel area unchanged.

We want to add our voice to Colorado Offroad Trail Defenders in advocating that the BLM finally begin to reverse its decades-long systematic discrimination against those with mobility impairment-related disabilities:

> On his first day in office, President Joe Biden issued an "Executive Order On Advancing Racial Equity and Support for Underserved Communities Through the Federal Government." This executive order established "an ambitious whole-of-government equity agenda" which focuses on addressing "entrenched disparities in our laws and public policies," and mandates a "comprehensive approach to advancing equity for all,

including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality."

Under this executive order, "The term 'equity' means the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment, such as ... persons with disabilities...." Historically, there has been no group more greatly marginalized and excluded by public land management policies, and motorized travel management policies in particular, than people with disabilities. Outdoor enthusiasts with ambulatory disabilities frequently rely on motorized travel as their sole means to enjoy recreating on public lands. Not everyone has the ability to hike into a remote wilderness area, but many such people are still able to drive Jeeps, side-by-sides, and ATVs, which are restricted to the designated motorized route network.

Travel management policies focused on "minimizing" the environmental impacts of motorized recreation have resulted in a dramatic decrease in motorized recreation opportunities on public lands over the last 20 years which has disproportionately impacted people with disabilities. Wilderness focused environmental groups with extreme ableist biases have pushed for more and more areas to be closed to motorized recreation and reserved exclusively for hikers, mountain bikers, and other "human powered" and "quiet use" forms of recreation in which many people with disabilities are unable to participate.

Every time motorized routes are closed, people with disabilities that require the use of motorized means to access public lands are barred from those areas forever. There has been little recourse for such people in the past because the Americans With Disabilities Act does not require public land management agencies to consider disproportionate effects on the disabled community, but only requires that they be given access to public lands on equal terms with everyone else. As a result, the BLM has historically failed to give any real consideration to the impacts of motorized route closures on the disabled community when developing travel management plans.

The Biden Administration's focus on equity, however, changes the equation. While the ADA focuses only on equality of opportunity, equity inherently focuses on equality of outcome. Any policy that is facially neutral but disproportionately harms a disadvantaged or marginalized group is considered inequitable. The BLM is therefore required by this executive order and others mandating that federal agencies consider "environmental justice" in NEPA proceedings to consider whether any route closures in the Labyrinth Rims/Gemini Bridges travel management plan would disproportionately harm disabled users' ability to access public lands.

Any approach to travel management that presumes the superiority of non-motorized forms of recreation like hiking over motorized recreation, or that justifies closing motorized routes on the basis that people can still hike on those routes, is inherently discriminatory toward people with disabilities. Any large scale closures of existing routes would unfairly and inequitably deprive people with disabilities of the ability to recreate in the area using the only means available to them. It is imperative that the BLM consider the access needs of disabled users in drafting the alternatives for this travel plan and ensure that people with disabilities who depend on motorized means do not lose access.

Many of our members are also members of other groups. We have seen significant response from our community related to the travel-management scoping for this area. While not all users are fully informed on the processes of the Administrative Procedures Act and the National Environmental Policy Act, we understand that many of them commented about the need to keep the route networks in this area open. We support this general sentiment.

We also have many members who also represent their own organizations. It is our understanding that many of them have submitted detailed route evaluations. To the extent they

**Sharetrails.org – it's what we do!**

Plaintiffs' Exhibit C-30

advocate keeping the maximum number of trails open we support any route evaluations submitted by Colorado Offroad Trail Defenders, Ride with Respect, Trails Preservation Alliance, Sage Riders Motorcycle Club, COHVCO, Utah's Public Land Policy Coordinating Office, Utah Public Lands Alliance, and SITLA.

We strongly recommend keeping all trails included as part of Jeep Safari, commercial tour operations, and other permitted organized events be kept open.

We also hope BLM will use this travel management process to ensure that the entirety of Ten-Mile wash is opened to motorized recreation. BLM should consider other mitigation measures instead of closure for managing impacts to this route.

As recent events have shown with the San Rafael Desert Travel Management Plan, SUWA will not accept anything less than the total closure of all motorized routes in the area and will sue to challenge this travel plan no matter what the outcome. Rather than closing motorized routes in a futile effort to appease SUWA, the BLM should take this opportunity to officially designate as open all existing motorized routes in the TMA in a manner that will hold up in court.

BRC would like to be considered an interested public for this project. Information can be sent to the following address and email address:

Ben Burr
BlueRibbon Coalition
P.O. Box 5449
Pocatello, ID 83202
brmedia@sharetrails.org


Sincerely,



Spencer Gilbert                                    Ben Burr
Executive Director                                 Policy Director
BlueRibbon Coalition                               BlueRibbon Coalition
brspencer@sharetrails.org                          brben@sharetrails.org


**Sharetrails.org – it's what we do!**

Plaintiffs' Exhibit C-31

LGB002257

**Sharetrails.org – it's what we do!**
Plaintiffs' Exhibit C-32

LGB002258

 

October 21st, 2022

BLM Moab Field Office
Attn: Labyrinth/Gemini Bridges
        Travel Management
82 East Dogwood
Moab, UT 84532

Re: Labyrinth Rims/Gemini Bridges Travel Management Plan
EA #DOI-BLM-UT-Y010-2020-0097-EA

Dear Planning Team Members:

The Trails Preservation Alliance and Ride with Respect appreciate the opportunity to submit the following comments on the above-referenced draft Environmental Assessment:

1.     **The BLM should start the present NEPA process over and issue a Notice of Intent to do a full Environmental Impact Statement (EIS) instead of an Environmental Assessment (EA)/Finding of No Significant Impact (FONSI), because alternatives are being seriously considered, which if adopted would significantly impact the human, socio-economic environment, for NEPA purposes.**

This EA/FONSI process cannot stand the test of validity, because such a high percentage of established open roads and trails are being considered for permanent closure in the planning area—a globally recognized motorized recreation destination of unquestioned significant economic and cultural value in the planning area, in adjacent communities, and really in the entire State of Utah and much of Colorado. The Trails Preservation Alliance and Ride with Respect advocate to keep such roads and trails open (Alternative A), or at worst adopt an

1

Plaintiffs' Exhibit C-33

alternative that only scarcely reduces access to such roads and trails, in either of which cases the "impact" to the human, socio-economic environment would not be "significant" for FONSI purposes.

However, the mere fact that alternatives are just being seriously considered, that would greatly reduce the motorized recreation values in the planning area, demonstrates the legal necessity of converting this process to a full-blown EIS process. Again, a finding of no significant impact would not stand the test of validity under some of the alternatives being seriously considered, as such closures portend impacts to the human, socio-economic environment that are significant, and the human, socio-economic environment is just as much the "environment" for NEPA purposes, as any other resource value at issue here.

Without waiving the foregoing request to re-launch this process as an EIS, the Organizations, under respectful protest, participate in this comment period during the current EA process, by submitting the additional points that follow.

2.    **Introduction**

Please accept this correspondence as the input on the Labyrinth Rims/Gemini Bridges Travel Management Plan ("The Proposal") of the Organizations identified above. The Proposal fails to properly apply relevant federal law and settlement agreements that the motorized community has been party to, and the Proposal fails to recognize that it may have significant negative pre-decisional impacts on other efforts that are ongoing in the Field Office and planning area. Each of these challenges are presented in addition to noting the direct conflict between the Proposal and basic NEPA requirements and practices.

Too often the Proposal fails to correctly apply Congressional actions and determinations on the management of Congressionally designated areas, such as Wild and Scenic River areas and management of the Old Spanish Trail. Often the Proposal seeks to exclude usages that are

2

Plaintiffs' Exhibit C-34

identified by Congress as defining characteristics of these areas. Moreover, the Proposal seeks to elevate usages that are low in priority for the Congressionally designated areas. Given the systemic failures throughout the Proposal, the Organizations have no choice but to support Alternative A and request that the Proposal be reviewed for basic consistency with the applicable federal laws. Once corrected, the Proposal should be released to the public for a meaningful comment period. Alternative D once appeared at first blush to be something the Organizations could support, we are unable to do so on closer review as the Proposal's overall range of alternatives is artificially skewed due to defects in the planning process.

**3.     Who We Are**

Prior to addressing the specific concerns of the Organizations regarding the Proposal, here is a brief summary about the Organizations submitting these comments.

The Organizations, their counsel, or affiliates including groups for which the Organizations are members, have been involved in discussions with the BLM for decades, both concerning access to these areas in general and concerning the development of travel and resources management plans for these areas. In addition to the planning efforts, our involvement has continued on behalf of recreation interests in litigation by the Organizations, their counsel, or affiliates including groups for which the Organizations are members. This work stretches from the Settlement in *SUWA v. U.S. DOI*, Case No. 2:12-cv-257 DAK (D. Utah) to bringing successful jurisdictional challenges in *SUWA v. Babbitt*, 2000 U.S. Dist. LEXIS 22170 (D. Utah 2000), *rev'd*, 301 F.3d 1217 (10th Cir. 2002), *rev'd and remanded*, *Norton v. SUWA*, 542 U.S. 55 (2004). We remain committed to this presence in ongoing management of Utah BLM lands. Many of our local partners have intervened in defense of the BLM when its plans and decisions were legally challenged. Some of these efforts have resulted from the 2017 SA now being implemented, and we continue to be involved with planning/travel efforts throughout the region. We have worked diligently to support these efforts in many ways. While we understand the difficulties that the BLM has encountered in the management of this area, we believe strongly that all

3

Plaintiffs' Exhibit C-35

recreational interests must be allowed access to the planning area, as it is one of an increasingly few parts of the region left in true multiple-use management.

Moving forward with the successful path that has been developed for this area is the right way forward in the Organizations' opinion, but the Proposal does not provide for or follow that path. Arbitrary decisions have been made on which to base the Proposal, and the Proposal appears to rely on Supreme Court decisions that are not germane to the management of NTSA routes. Moreover, pre-decisional actions impacting camping resource planning call the validity of the Proposal into question. Routes and opportunities at issue in the Proposal are world class; they are worthy of expert and thorough analysis that the Proposal currently does not provide.

The Trails Preservation Alliance ("TPA") is an advocacy organization created to be a viable partner to public lands managers, working with the United States Forest Service (USFS) and the Bureau of Land Management (BLM) to preserve the sport of motorized trail riding and multiple-use recreation. The TPA acts as an advocate for the sport and takes the necessary action to ensure that the USFS and BLM allocate a fair and equitable percentage of public lands access to diverse multiple-use trail recreational opportunities.

Ride with Respect ("RwR") was founded in 2002 to conserve shared-use trails and their surroundings. RwR has educated visitors and performed over twenty-thousand hours of high-quality trail work on public lands including several-thousand hours in the planning area such as rerouting over a dozen trails away from sensitive resources through travel-plan amendments of the 2008 RMP. Over 750 individuals have contributed money or volunteered time to the organization.

Collectively, the TPA and RwR are referred to as "The Organizations" herein.

4

Plaintiffs' Exhibit C-36

LGB005918

4.   **The 45-day comment period provided is arbitrarily brief and does not reflect the recreational value of the routes in the area.  It should be extended at least another 45 days.**

The Organizations strongly object to the unreasonably short comment period that has been provided for the Proposal. While 45 days may be slightly more than the minimum required by law, 45 days is far too short for the public to digest and provide meaningful input on the Proposal. The goal of this effort should be to provide a high quality meaningful plan for the management of the area that is based on high quality data and analysis. That goal is not evident in the Proposal as it does not adequately reflect the global values of the subject routes being addressed.

The short response time frame was made even shorter by how the basic data for the Proposal was rolled out well.  Original versions of maps and other information were often incomplete, contradictory and an obstacle to public engagement, instead of the detailed high quality information that NEPA requires. Often routes were identified as closed in PDF versions of alternative maps but were identified as open in GIS data for the same alternative  provided with the Proposal.  Other routes were only partially reflected in maps provided, as start or finish locations might have been identified but are simply not connected.  This is conflicted further by the fact that managers often informed the public that routes were open or closed in alternatives when the data and mapping indicated otherwise.  The BLM should have completely released all pertinent information prior to commencing this NEPA process.

The BLM has the authority to extend the public comment deadline as we are requesting. Refusing this request on the guise of avoiding further delay makes no sense.  Because the development phase of this EA took years, the all-important public process should not be compromised just because the BLM took so long in development.  Long development phases mean longer time for public review and comment.  That is only fair.

Plaintiffs' Exhibit C-37

LGB005919

5. **Alternatives B and C fundamentally violate the Moab FO RMP and hence NEPA, FLPMA and the APA.**

    5(a). **The planning area's existing route network underwent extensive analysis in 2008, and that analysis, documented heavily in the 2008 RMP, strongly supports the existing route network for all issues except the additional review agreed to in the 2017 Settlement Agreement (2017 SA).**

The 2017 SA left the BLM free to add routes to the currentTMP (whether the routes are existing or even just proposed for construction), as much as subtract routes from the current TMP, as much as make no changes at all to the current TMP. In short, the 2017 SA did not obligate, let alone authorize, any sort of bias or pre-decision on the BLM's part when revisiting TMPs. Further, the BLM had already obviously demonstrated minimization when the 2008 TMP closed 40% of the routes that were inventoried by 2003 in this planning area, many of which were in lands with inventoried wilderness characteristics.

At the very least, the 2017 SA did not relieve the BLM of its FLPMA and NEPA obligations to conduct a full-scale EIS and amendment of the 2008 RMP before considering changes to polygon-based, wilderness characteristics management suitability determinations. But that is what alternatives B and C effectively do, by presuming that all routes in lands with wilderness characteristics polygons should be closed by default unless proven again to have an overriding purpose and need. The 2017 SA did not authorize such an unfounded reversal of presumptions, especially given that the routes up for closure in alternatives B and C were verified to exist and thoroughly analyzed in the 2008 RMP, and given, as stated above, the BLM had already undergone a rigorous minimization in 2008 and still had just as free of a hand under the SA to add routes to the current TMP as it did to subtract routes. This reversal of presumptions and resulting massive-scale proposed closure in polygons determined not suitable for WC management, evidences the BLM's shirking of its FLPMA and NEPA obligations.

The mistaken nature of the BLM's reversed presumption is further shown by the fact that virtually all existing routes, particularly the 60% of existing routes that were left open by the 2008 TMP, provide some recreational value even if they're low in use (and even if they have

Plaintiffs' Exhibit C-38

LGB005920

some degree of revegetation). Granted, if a new route is proposed for construction, the onus may be on justifying its purpose. The Proposal considers only existing routes, in fact only those routes currently designated open, so the onus should be justifying what the purpose would be of closing them.

The following cannot be emphasized enough:  How thorough was that 2008 analysis and minimization of existing routes? Thorough enough that approximately 40% of inventoried motorized routes in the current planning area were closed. That is the fruit of the 2008 RMP. Further underscoring the presumptive validity of the 2008 RMP, the Moab Field Office's 2015 review of the effectiveness of the 2008 RMP, found that the current recreation management strategies are working well and there was no need to amend the 2008 RMP. The upshot is that the remaining routes which survived that rigorous 2008 analysis and wholesale cuts, bear the controlling imprimatur of valid purpose and need, subject only to the required additional review scoped in the 2017 SA.

It is unfounded to draw from this background and context the mistaken presumption that all routes in the current planning area are worthy of closure unless they are once again re-proven to validly serve a purpose and need. This reversal of presumptions and resulting looming closure of still another 40% of routes, is a material legal flaw of the Proposal's action alternatives to varying degrees. Thus the obvious wholesale suitability changes contemplated in alternatives B and C can be legitimately adopted only through an RMP amendment.[1]

       **5(b).**   **Alternatives B and C run headlong into the 2008 RMP's rejection of the invitation to conform motorized travel management to the pro Red Rock Wilderness Proposal alternative**.

During development of the 2008 RMP, wilderness-expansion groups tried to court the Moab FO into manufacturing wilderness by eliminating the roads that were anathema to the groups' Red Rock Wilderness Proposal.  The 2008 RMP ROD at Page 13 rejected this invitation:

---

[1] *See*, 43 C.F.R. § 1610.5-3, *and*  Norton v. Southern Utah Wilderness Alliance , 542 U.S. 55, 69 (2004).

Plaintiffs' Exhibit C-39

> The RRH [Redrock Heritage Travel Plan Alternative] plan's roadless polygons match almost identically with wilderness proposals submitted by Southern Utah Wilderness Alliance (SUWA) and/or other interest groups. To achieve this "roadlessness," RRH has recommended for closure virtually all roads within these proposed wilderness polygons, without specific mention or regard for purpose and need.
> ...
> The RRH Travel Plan mirrors the Red Rock Wilderness proposal, which encompasses over 46 percent of public lands in the MPA. RRH assumes that if currently available motorized routes were eliminated, these areas would be eligible for the protection of their wilderness characteristics.
> …
> Almost all of these routes and areas lie within RRH wilderness proposals. In its comments, there is repeated emphasis on the need to set aside areas for non-motorized recreation and, if necessary, to "create a rare remote and wild area." Current BLM policy prohibits the creation of new wilderness study areas, although it does allow managing areas to protect wilderness characteristics. Several of the areas cited in RRH's proposal were found by BLM in 1999 to lack wilderness character. Many of the specific routes identified by RRH were either described as roads in the BLM 1999 inventory or described as roads at the time of the establishment of the original WSAs. Roads, by definition, are an impact on wilderness characteristics.

Alternatives B and C of the current draft EA are attempts at an "end around" of the controlling 2008 RMP's stance against creating de facto wilderness through road closures.

    5(c).   Alternatives B and C run headlong into the 2008 RMP's rejection of the invitation to manage for alleged wilderness characteristics in areas found not suitable for wilderness characteristics management.

The near complete overlap between the concentrations of road closure under alternatives B and C of the Proposal, and the polygons for wilderness designation/wilderness characteristics management perennially demanded by wilderness-expansion groups, is too great to be legitimately coincidental. It belies a conscious, illegitimate purpose, a purpose to undermine the non-suitability management determinations of the 2008 RMP.  While several areas within the Labyrinth Rims/Gemini Bridges TMA are considered Lands With Wilderness Characteristics, the 2008 RMP expressly decided those areas were *not suitable* for wilderness characteristics management due to their high density of popular motorized routes.  In short, alternatives B

8

LGB005922

and C attempt an "end around" the 2008 RMP's controlling stance against managing for wilderness characteristics, lands for which the 2008 RMP determined are not suitable.

Further, as stated above, even though the 2008 RMP determined none of the current planning area to be suitable for wilderness characteristics management, it did minimize impacts to lands with wilderness characteristics within the current planning area by closing many existing routes for other purposes. The Proposal should recognize the minimization already done in all of the current alternatives including Alternative A.

6.      **Alternatives B and C effectively ignore the Congressional prohibition on wilderness buffer zones adjacent to Labyrinth Canyon in Emery County.**

The 2019 Dingell Act passed by Congress created the Labyrinth Canyon Wilderness Area on the other side of the Green River from the Labyrinth Rims/Gemini Bridges TMA. But Congress expressly mandated against wilderness-type management in so-called buffer zones adjacent to any wilderness areas created in the Dingell Act. Moreover Congress left the Labyrinth Rims/Gemini Bridges TMA for continued multiple-use management that includes motorized recreation. The BLM should reject alternatives B and C for the additional reason that they essentially create a de facto wilderness zone to "buffer" the Labyrinth Canyon Wilderness. Sight and sound impacts experienced in Labyrinth Canyon are simply irrelevant and immaterial to the question of how to manage the Labyrinth Rims/Gemini Bridges TMA.

Moreover the Green River's Wild and Scenic River designation does not justify buffer zone management either, as the Scenic designation for the relevant river segment does not limit motorized use within the corridor, let alone limit use outside of the corridor. Compliance with the Dingell Act's mandate against buffer management for the Labyrinth Canyon Wilderness and management of Labyrinth Canyon as a Scenic River (and not a Wild River) is only possible by rejecting alternatives B and C of the Proposal.

7(a).      **The mapping issues displayed in the Draft EA Proposal should be corrected.**

Plaintiffs' Exhibit C-41

LGB005923

Problems with the Proposal's maps were immediately identified by the OHV community after the Proposal's initial release. Yet agency managers waited a significant time to post PDF maps of the revised alternatives from scoping.  The BLM's e-Planning page has a maps tab, which is still showing the PDF maps for the preliminary alternatives for all except Alternative B. The main documents tab includes PDF maps for all the updated alternatives; however, these maps do not match either the BLM's GIS data files or the alternative actions listed in the individual route report files. More significantly, many discussions with BLM staff on concerns around a particular route have been based on information that is not reflected in any of the maps.  As a result, the public have been forced to devote significant time in the 45-day comment period just trying to understand what each alternative actually proposes.  That is not acceptable. Basic notions of Moab FO pride and professionalism dictate that you correct these mapping issues and give the public significantly more time for review and comment with proper mapping in hand.

On top of delays and inaccuracies, the PDF maps provided are not sufficient for the general public to follow. They are 11" x 17" pages representing a planning area that's over 300,000 acres, containing no place names, and no way to tell which routes are the graded (Class B) roads that visitors use to orient themselves to the area. In addition to improving these maps, the BLM should have included alternatives B, C, and D as layers in the interactive map that it posted on ePlanning. The Moab FO demonstrated this capability when posting all of the alternatives as layers in the interactive map for the Canyon Rims travel plan, a planning area that didn't have nearly the public interest of Labyrinth Rims/Gemini Bridges. Further, when clicking on a route, the interactive map should display more GIS fields than simply the route number and length such as the dates of a seasonal closure. In fact, clicking a route on the interactive map ought to provide most or all contents of the route report, as currently the public can only view a route report by downloading a 650MB-folder of all route reports. The fact that the interactive map shows only Alternative A and lists only the route number and

Plaintiffs' Exhibit C-42

LGB005924

length prevents most members of the public from understanding which actual routes on the ground are open/closed or limited by width/season in each alternative.

When PDF maps were finally released, there were immediate and significant conflicts with other documents that had been provided. This challenged understanding of even Alternative A as the Proposal did not align with routes on the ground nor accurately reflected the open status of some globally recognized routes.   According to the GIS files that BLM provided, examples of serious errors with PDF maps throughout each alternative are:

1. The upper part of the Mineral Canyon trail shows as open with a seasonal closure when it is actually closed and limited to administrative use;

2. The Bull Canyon Overlook trail shows as closed when it is actually open with a seasonal closure;

3. Newly added closures are not shown in several alternatives for several key segments of the Seven Mile Rim Jeep Safari trail;

4.   Alternative B was modified to close parts of the Seven Mile Rim trail as requested by Grand County.   However, it appears those same closures were incorporated into Alternative C as well, but that is not reflected in the PDF maps;

5. The current version of Alternative C will now close the most iconic section of the Seven Mile Rim trail across the slickrock bench below Monitor and Merrimac Buttes to the top of Wipeout Hill;

6. It will also close the segment through Tusher Wash leading over to the Tusher Tunnel area. This is the only connector route between the Courthouse Rock trail system and the Tusher Canyon trail system, so those are now isolated from each other; and

7.   A third segment of the Seven Mile Rim trail by the overlook of highway 313 is also closed. This closure, plus the closure in Tusher Wash, would leave several route segments designated open orphaned with no legal routes accessing them.

11

Plaintiffs' Exhibit C-43

LGB005925

**Wildlife comments on the:**

**Labyrinth/Gemini Bridges Travel Management Plan, Draft Environmental Assessment (September 2022): A review of wildlife-related scientific issues.DOI-BLM-UT-Y010-2020-0097-EA**

**Prepared by:**
Rob Roy Ramey II, Ph.D.
Wildlife Science International, Inc.
P.O. Box 386
Nederland, CO 80466
USA

October 21, 2022

**1) Desert bighorn sheep are not the fragile creatures, or as susceptible to human disturbance, as they have been portrayed in the EA.** Instead, these animals live in extreme environments, are well adapted to avoid predation by mountain lions, coyotes, bobcats, and golden eagles. And where human activities are predictable and non-threatening, bighorn sheep habituate to human activity. They are already habituated to human activity in areas where they are not hunted, such as the more remote areas of Canyonlands National Park, and elsewhere, such as major golf resorts, popular hotels, and the most widely used traffic arteries in the Coachella Valley of Southern California. However, ongoing disease issues, (including respiratory pneumonia passed from domestic sheep) and predation have adversely affected many desert bighorn sheep populations, including those in the TMA. We emphasize this and the points below because bighorn sheep figure prominently in the EA's analyses (for example, page 123, Appendix E, *"The TMA supports big game and other general wildlife species. Routes occurring within wildlife habitat may impact wildlife behavior, habitat loss, and physical wellbeing. Species of concern in the TMA include desert bighorn sheep and pronghorn and analysis in EA will focus on those species."*).

**In the field of desert bighorn sheep research, there is an absence of clearly defined, scientifically defensible, causal link between human recreational disturbance and reduced bighorn survival or habitat abandonment ultimately resulting in population decline.** The main sources of decline in bighorn sheep populations are predation, rainfall, and disease, all of which are independent of the number of and proximity to vehicles, cyclists, and hikers. In fact, the only experimental research that actually tested, instead of speculating on, a population response noted that the population increased as the number of hikers increased (Wehausen 1980). The hypothesis that human disturbance has had demographic effects on bighorn sheep populations lacks factual support. The same can be said of research in Joshua Tree National Monument, where bighorn sheep made adjustments in their use patterns in response to increased human activity. Avoiding heavily visited areas on weekends they readjusted their use patterns to periods after the people had left. Despite speculation, no demographic effect of human disturbance was reported. The EA has similarly based its analysis of alternatives on such speculation, which also extends to presumed impacts on other species as well.

Plaintiffs' Exhibit C-44

Desert bighorn sheep hunting is permitted by state governments in Arizona, California, New Mexico, Nevada, and Utah. State wildlife agencies, including Utah DWR, permit ewes, (including ewes with lambs), to be chased down by helicopter and net-gunned at close range, subdued and hobbled, fitted with radio collars, and/or slung below helicopters or loaded into horse trailers prior to their being taken to a new area for release. This is considered to be an acceptable risk, while somehow, predictable trail use by motorcycles and OHV's on the fringes of bighorn habitat is considered to be an unacceptable risk and a natural resource loss by the BLM in its EA.

The fact is that the published literature on the subject of human disturbance and bighorn sheep is almost entirely based on opinion without supporting experimental evidence or rigorous hypothesis testing. The majority of papers frequently cited to support claims of human disturbance have relied on unsubstantiated opinion or interpretation of limited or anecdotal observations. None have demonstrated decreased fitness of individuals or populations as a result of human disturbance. Similarly, none have documented any permanent abandonment of range due to transient human disturbance, and any apparent displacement or behavior was temporary (Blong and Pollard 1968; Dunaway 1971; Deforge 1972, 1980; Jorgenson 1974; MacArthur et al. 1979, 1986; Graham 1980; Leslie and Douglas 1980; Wilson et al. 1980; Campbell and Remington 1981; Wehausen 1980; Purdy and Shaw 1981; Cunningham 1982; Deforge 1982; DeForge et al. 1982; Holl and Bleich 1983; Wehausen 1983; Cunningham and Omart 1986; DeForge et al. 1997; Etchberger et al. 1989; Boyce at al. 1992; Harris 1992; McCarthy and Bailey 1994; Rubin et al. 1998, 2000; Etchberger and Krausman 1999; Wagner 1999; Sproat 2012a,b and Sproat et al. 2019; Lowrey and Longshore 2017). Studies that have measured activity, movement, or flight response to humans were only able to suggest a limited and transitory behavioral response over short distances. Again, none have documented any permanent abandonment of range due to transient human disturbance, and any apparent displacement was temporary and of no demographic consequence (Hicks and Elder 1979; Hamilton et al. 1982; King and Workman 1986; Papouchis et al. 1999, 2001; Rubin et al. 2002; Keller and Bender 2007). This includes bighorn sheep in nearby Canyonlands National Park.

One recent paper on Rocky Mountain bighorn sheep *(Ovis canadensis canadensis)* included bold but unsubstantiated claims that a translocated bighorn sheep ewe group's decline and abandonment of an area was the direct result of human disturbance by hikers and a trail (Wiedmann and Bleich 2014). However, a closer examination of that paper revealed that the authors ignored other, far more obvious factors. (For a thorough review of that and other papers recently cited in the BLM's camping plans, please refer to the June 21, 2022 Wildlife Report on DOI-BLM-UT-Y010-2021-0096; DOI-BLM-UT-Y010-2021-0095-EA; DOI-BLM-UT-Y010-2021-0094-EA that is attached and included here by reference.)

Research documenting impacts of construction and mining projects in or near bighorn sheep habitat, highway construction and maintenance, and transmission line construction and maintenance, have not indicated resulting bighorn sheep population declines (Andaloro and Ramey 1981; Wehausen 1980; Oehler et al. 2005). And contrary to expectations, one study (Oehler et al. 2005) reported that mountain lion predation was lower near an active mine than in the undisturbed area away from it. Therefore, much of what has passed for scientific analysis of human disturbance on bighorn sheep has been nothing more than unsupported opinion and

Plaintiffs' Exhibit C-45

speculation on what the effects might be. Like competition, human disturbance is only of importance if it has a negative demographic effect on populations. While such an effect has not been found, we acknowledge that a threshold of disturbance may not have been reached.

Based on an understanding of plausible cause and effect mechanisms, as long as a few reasonable precautions are taken, effects of OHV and motorcycle trail riding, cycling, and hiking in bighorn sheep habitat will have minimal effect or be non-existent. For example, the presumed level of risk of ewes abandoning lambs is frequently overstated. Even during the lambing season, there is little risk of ewes permanently abandoning lambs. This is because ewes have a substantial parental investment in gestation and rearing and, consequently the probability of lamb abandonment under any circumstance is extremely low. In fact, in the 1980s and 1990s, researchers at the Bighorn Institute in Palm Springs California regularly captured young lambs by hand or with hand-held nets in order to attach radio collars. They reported no problems with abandonment. However, if bighorn ewes are flushed from steep escape terrain in a lambing area, very young lambs (less than 2-3 weeks old) can be placed at risk of predation or injury from falls. Therefore, measures to limit access into an active lambing area (as determined by direct observations of ewes and lambs), can be justified, but there is no credible scientific justification for limiting access to the viewshed of the surrounding area, including "modeled habitat" as used in the EA.

Access to water during the hot, dry summer months is necessary for desert bighorn sheep survival. Seasonal restrictions or rerouting of trails in the immediate vicinity of water points may be reasonable where water sources are few or limited, however, this makes no sense when trails are on the canyon rims or are infrequently used. It is important to realize that bighorn sheep may use alternative sources of water (i.e. the Green River adjacent to the TMA) or adjust the timing of when they access water. In areas where bighorn sheep are habituated to humans, restrictions may not be necessary, hence underscoring the importance of restricting hunting if the BLM wishes the bighorn sheep in their management area to more readily habituate to human activity.

While opponents to motorcycle and OHV use are well-intentioned and share our collective concern for the well-being of the desert bighorn sheep and other species, they are simply mistaken on the science of this issue. We should not allow antiquated assumptions and beliefs to pass as scientific understanding and creep into BLM environmental analyses and decisions. If there are clear, unbiased data and analyses showing a deleterious demographic effect or habitat abandonment that has occurred as a result of excess motorized trail use in a particular area, then regulation and mitigation would clearly be needed for natural resource protection. In the absence of such data, the BLM needs to step back and not attempt to use bighorn and other wildlife as an excuse for its land use agenda.

**2) Accurate and transparent data are required for mapping the potential human-wildlife interaction areas for different species, and especially bighorn sheep.** According to the EA on page 65, *"The MFO in cooperation with the UDWR, Foundation for North American Wild Sheep, Brigham Young University, Canyonlands Natural History Association, and the National Fish and Wildlife Foundation have done extensive GPS collar studies from 2002 through 2010 and currently Joel Berger with Colorado State University is conducting additional research via collars the UDWR placed on animals in 2019. This large pool of collar data has allowed the*

Plaintiffs' Exhibit C-46

*Moab BLM to further refine the crucial habitats that support this herd. These animals are mostly found in the large canyon systems, making canyon bottoms, talus slopes, and canyon rims vital habitats for this herd. The UDWR has incorporated this data into their statewide habitat files as lambing habitat, though these areas are utilized yearlong."*

There are several issues with this statement. First, where are these data and why is the location data not publicly available? Second, it appears that the BLM has made the error of conflating the importance of desert bighorn sheep lambing habitat with yearlong habitat. This is obviously the case with the modeled habitat overlays, which encompass large areas that are clearly not steep and rugged lambing habitat. The BLM needs to separate lambing habitat from general habitat used year-round by rams and outside of lambing season by ewes and lambs.

## 2a) Species location data on the NatureServe Explorer are not publicly accessible at any meaningful level of resolution.

We also bring to the BLM's attention that NatureServe Explorer does not provide publicly accessible occurrence data on any species with a level of precision that would allow any meaningful analysis of the data relative to the TMA travel routes in question. The finest level of precision available to the public, without a license and end user agreement typically reserved for state and federal biologists and researchers, is a randomized area of 49 square miles in extent, that surrounds each species location (https://explorer.natureserve.org/AboutTheData/Maps). Therefore, how can the public be regulated based upon data that they do not have access to? Minimally, the BLM needs to make such data available for independent review and analysis. This reviewer would agree to a data sharing and non-disclosure agreement to facilitate such access for sensitive species.

## 2b) Potential habitat and hypothetical impacts are no substitute for verifiable location data and demonstrable impacts with a sound scientific basis.

We are concerned that the data layers used in BLM's GIS analyses are approximations of *potential habitat* upon which the BLM applies *hypothetical impacts* rather than verifiable data on species occurrence(s) and demonstrable, specific impacts to each species. We are further concerned that habitat layers used by the BLM weigh all habitat or nesting site data equally, regardless of when use was last documented. In other words, we have observed a tendency in some GIS analyses to extend polygons to capture and weigh all historical locations regardless of how many years ago they were made and how rarely the area is used (see Turner et al. 2004 and 2006 for examples specific to bighorn sheep). Therefore, we specifically request that the BLM utilize a transparent approach and verifiable location data in its GIS analyses so that validation by independent experts and qualified members of the public would be possible. Additionally, we propose that actual location data be plotted to delineate habitat rather than GIS-modeled potential habitat, to determine overlap with threatened and endangered species, bighorn sheep, pronghorn, BLM sensitive species, migratory species of concern, and/or raptor nesting locations. It is problematic that the entire cumulative effects analysis is built around potential use of potential habitat, rather than actual documented use of habitat in specific areas of interest.

## 2c) Smart buffers, that account for the mitigating factor of elevation, are needed.

In cases where there is a potentially valid resource conflict, such as a trail passing near important habitat such as a verifiable lambing area, we propose that the BLM employ "smart buffers" that are tailored to the unique topography and likelihood of an animal being present. For example, an

Plaintiffs' Exhibit C-47

animal living below a canyon rim will generally be unaffected by human activities atop the canyon rim or across a canyon. By incorporating smart buffers, the BLM's decisions would be based on defensible scientific information, and in conformance with the Information Quality Act. Currently, the buffer analyses are simplistic two-dimensional models that completely ignore the obvious mitigating factor of elevation. A digital elevation model and data on actual species occurrence is needed in a revised EA or EIS analysis.

**3) The EA's rationale for evaluating OHV route impacts on wildlife is based upon flawed reasoning that equates potential or hypothetical impacts with actual on-the-ground impacts by OHVs. Furthermore, the EA does not accurately portray the science it cites on the adverse effects of OHVs on wildlife.** The EA focused on an often assumed, but unproven, deleterious effect of OHV trail use on wildlife populations. However, that assumption is currently not supported by empirical data. None of the studies cited in the EA (or other published research) has demonstrated a deleterious population-level effect of OHV activity on species in the TMA, or adjacent areas in Utah which would potentially rise to the level of significant impact. In the absence of such data, the BLM cannot rely on the surmise and opinion of hypothetical impacts in its analysis of alternatives. We review the most influential papers cited in the EA below and point out the flaws in the EA's uncritical use of them.

The EA states that, "The effects of OHV use can be wide-ranging and detrimental to species and their populations especially if important habitats, like riparian areas, are affected (Gutzwiller et al. 2017)." The paper by Gutzwiller et al. 2017 did not provide any analyses that demonstrated those impacts had occurred. Instead, Gutzwiller et al. 2017 was a GIS methods paper illustrating a *potential* approach for characterizing *potential* recreation disturbance at different spatial scales using three different three software systems (ArcGIS, FRAGSTATS, and Conefor). Clearly, an EA prepared by the BLM should avoid making such misrepresentations and steer clear of GIS methodology that conflates potential impacts with actual impacts to the threatened, endangered, or BLM-sensitive species listed in the EA.

The EA further makes the claim that, "These effects can include direct mortality, injury, habitat destruction, habitat alteration, and habitat fragmentation (Brooks and Lair 2005, Ouren et al. 2007, Trombulak and Frissell 2000)." Brooks and Lair (2005) was only a generalized review of the literature on *Effects of Vehicular Routes on Animals in the Mojave Desert* and concluded that, "No studies that we know of have directly evaluated the role of vehicular routes in fragmenting wildlife habitat in the Mojave Desert." Furthermore, none of the studies cited included any of the species that occur in the TMA. The effects on animals that were noted in most of the cited studies were in areas of open riding in the southern Algodones Sand Dunes in southern California (i.e. Luckenbach and Bury (1983). This is a vastly different ecological setting with different riding regulations than the narrow, regulated trails of the TMA in Utah. Where routes were involved in the reviewed papers, mortalities on invertebrates, lizards and small mammals were only in the immediate vicinity of dirt roads, and no population-level declines were reported. Mortalities of slow-moving desert tortoises were reported along highways, not OHV routes.

Ouren et al. (2007), cited in the EA, was a similar literature review to Brooks and Lair (2005) and claimed a number of generalized impacts to wildlife based upon the opinions of the authors, rather than data. Yet, a closer examination of the text and references in Ouren et al. (2007)

Plaintiffs' Exhibit C-48

reveals that: 1) none of the studies cited included any of the species that occur in the TMA; 2) the generalized claims of impacts to animals were the surmise and opinion of the authors who used wiggle words such as "may", "could" and "if" to qualify their claims rather than present consistent and conclusive findings; and 3) the authors of Ouren et al. (2007) erroneously conflated the effects of highways, dirt roads, and open riding areas in sand dune fields with restricted, low-speed OHV routes like those proposed for closure in the TMA.

It is also worth noting that the studies of the acoustic effects of OHVs on desert kangaroo rats cited in Ouren et al. (2007), which the EA then cites, were based upon unrealistic and inhumane, 40+ year old lab experiments that would not be allowed by Animals Use and Care committees today. Those included auditory implants and exposure to high-decibel playbacks, under improbable, conditions of 95 dBA as measured at the kangaroo rat's ear, for 8+ minutes (and a sample size of two kangaroo rats). Further contributing to the unrealistic conditions are the facts that: 1) kangaroo rats are nocturnal while OHV's are virtually always diurnal, so the two would rarely overlap; 2) kangaroo rats reside in underground burrows where they are sheltered from sound, while OHV's travel on the surface; 3) the loud "dune buggies" of the 1970's and early 1980's are virtually extinct and the acoustic signatures of their unregulated exhaust systems were much louder than the regulated and licensed OHV's of today. As for the studies purported to report bleeding of kangaroo rat's ears, we note: 1) the three issues in the previous sentence above, and 2) the studies were not listed in the literature cited by Ouren et al. (2007).

Trombulak and Frissell (2000) is another review paper uncritically cited by the EA, which like the two above, editorializes its conclusions rather than presenting new data and analyses or meta-analyses that could result in definitive conclusions. Trombulak and Frissell (2000) focused on reviewing the effects of highly-trafficked, high-speed roads, not dirt OHV trails and single tracks. The only two studies they included that remotely resemble OHV trails (unpaved roads less than 3 meters wide), reported that: 1) a land snail (*Arianta arbustorum*) from Eastern Europe avoided crossing these, and 2) Cotton rats (*Sigmodon hispidus*), prairie voles (*Microtus ochrogaster*), and white-footed mice (*Peromyscus leucopus*) were "reluctant" to cross these as well. We note that none of these species occur in the TMA and "reluctance" (by rodents) and "avoidance" (by a snail) of dirt roads do not equate to permanent barriers to movements. Similarly, chemical impacts described in Trombulak and Frissell (2000) involved highways (i.e. de-icing salts) not unimproved OHV trails and single tracks. Moreover, the assertion in the EA that roads lead to "increased poaching", with citation to Trombulak and Frissell (2000), comes from studies on brown and black bears, Iberian lynx and Egyptian mongooses. Clearly, the EA is lacking in any evidence that poaching in the TMA is a problem. Plus, Iberian lynx, and Egyptian mongooses do not occur in the TMA. Other examples in Trombulak and Frissell (2000) of physical changes and spread of exotics species did not involve the species or ecological setting of the TMA.

And finally, the EA speculates that, *"Additionally, roadside use, whether by foot, camping, roadside parking, passing, staging, or other means, can lead to the alteration of animal behavior or alteration or destruction of foraging, burrowing, or nesting habitats. Because of this, travel routes that go through or are adjacent to nesting, burrowing, or riparian habitat areas are of particular concern."* However, the EA presents no direct, empirical evidence to support its

6

LGB006172

assertion that this is a biological issue in the TMA that rises to the level of significance (i.e. a population-level demographic impact) in any of the EA's analysis of alternatives.

Other papers cited in the EA include the literature review by Ortega et al. (2012), which reported on the findings of other studies of noise on birds instead of presenting new evidence directly relevant to species and OHV trails in the TMA. The one study involving busy OHV trails and small songbirds, was from Northeastern California and none of the species overlapped with those threatened, endangered, or BLM-sensitive in the TMA. Rather than a consistent negative effect, the authors reported: *"Our results suggest a positive effect of proximity to OHV trail on nest desertion and abandonment* [though the later was not statistically significant] *and a negative relationship of proximity to OHV trail on predation rates of nests built in shrubs. These effects have opposite net effects on nesting success, making interpretation difficult."* In other words, negative effects in the immediate area of OHV trails were unproven.

The literature review by Larson et al. (2016) interestingly reported that, *"We found that non-motorized activities had more evidence for negative effects* [on wildlife] *than motorized activities. Motorized activities are often expected to be more harmful to animals because of vehicle speed and noise, but our results suggest the opposite across a wide range of study locations and taxa."* Thus, that study does not support the EA's assertions regarding presumed wildlife impacts of OHV use.

A recurring problem with the EA's uncritical reliance on such review literature is that the BLM fails to recognize that the opinions and recommendations that are stated in the conclusions of the reviewed papers (and in some cases statistically insignificant results) are often treated by the authors of the reviews as if they were valid experimental results, which they are not.

We urge the BLM to support and base management conclusions on unbiased, experimental research with study designs that include analysis of the effects of independent environmental variables on demographic parameters and ideally, incorporate a spatio-temporal analysis.

Most importantly, the EA's authors fail to understand that while wildlife may respond to human activities by adjusting their behavior (i.e. temporary avoidance, timing, route selection) these do not automatically equate to a negative effect on the entire population (i.e. lower productivity, survivorship, or recruitment, such that total number decline). If regulation of disturbing human activities is required for conservation, then data showing a population decline must be a prerequisite.

**4) Double standards being applied to some of the proposed wildlife closures based on unfounded assumptions regarding mode of travel and impact to species.** More specifically, there appears to be double standard applied to some of the proposed closures based on unfounded but implicit assumptions in the EA that: 1) vehicles on nearby route are more disturbing to nesting raptors than non-motorized traffic, and 2) that nesting raptors, especially peregrine falcons, are incapable of habituation to non-threatening and geographically predictable human travel along established routes, regardless of mode. To illustrate these broader issues in the EA, consider the case of route D1944, which is the northern section of the "7-Up" trail. There is no credible scientific rationale for this route to be closed completely under Alternative B or

Plaintiffs' Exhibit C-50

with only non-motorized travel with seasonal restrictions under Alternative C, simply because it is in the vicinity of a peregrine falcon nest.

As an initial matter, the BLM provides no evidence that this nest site (or others) is active or that if recently active, it has failed to produce fledglings as a result of human recreational use in the area. In the absence of such data the BLM cannot rely on surmise that the nest site is annually occupied by peregrines or that they are disturbed by activity such that their individual fitness is compromised or more importantly, that the population fitness has been compromised.

Second, simplistic one-size-fits-all, two-dimensional, circular closure buffers do not take into account the obvious influence of topography that obviates their utility (hence the need for using smart buffers that are tailored to the situation). This is important because peregrines nest on cliffs, so while a seasonal climbing closure in the immediate vicinity of an active nest may be appropriate, there are no data to suggest that a route such as D1944 ("7-Up") which passes atop the mesa above and to the west of the canyon is a threat to peregrines nesting in a nearby canyon. (Using the information on this and nearby route descriptions, I was able to triangulate on the approximate location of the nearby peregrine nest site in the Seven Mile Canyon, east of the southern end of D1944.)

Third, the reference cited in the EA for raptor buffers, a table in an appendix of the 2008 RMP, like other such recommended buffers are not based on data, and thus, are only guidelines based upon opinion of those writing them. In the case of the recommended 2008 RMP raptor buffers, no credible, data-based scientific research are cited, and the reason for this is simple, it does not exist. Similarly, there are no data to suggest that peregrines are more tolerant of non-motorized versus motorized modes of travel. In contrast, there is abundant evidence that peregrines have adapted to urban life in cities across North America, nesting on bridges and buildings in close proximity to humans using all modes of transportation. Similarly, peregrines successfully nest on the cliffs of Yosemite, Zion, and Grand Canyon National Parks, that are bustling with human activity, well within the BLM's recommended one-mile circular buffer. **Simply put, peregrines are not the fragile, disturbance-susceptible animals they have been portrayed to be.** Should the BLM require additional convincing, I include the excerpt from peregrine expert, Dr. Clayton White (2012):

"I have ridden in helicopters hundreds of times to within 50 feet of peregrine nests, even while females were incubating, with the falcons showing no signs of disturbance. I have also seen injured adult falcons brought in from the wild that were kept in a cage and would allow people to approach within 10 feet of them, as long as the people were outside the cage which measured some 10 feet by 20 feet, while exhibiting no signs of alarm or distress. This observation is published. I have seen peregrines hunting bats during crepuscular periods over the bustling streets of Porto Alegre, Brazil (a city of several million people), only 30-40 feet above the sweeping sidewalks lined with people. These are wintering falcons from the unspoiled, unpeopled, wilderness of Arctic North America. I have heard of peregrines in Australia eagerly greeting the arrival of climbers who periodically brought them pigeons for food. And I have seen peregrines follow a car down a dirt road to catch birds flushed by the car. In the Aleutian Islands I have witnessed a peregrine learn to use our helicopter as cover, as we slowly precede across a lake while surveying ducks, and awaiting the ducks on the lake

Plaintiffs' Exhibit C-51

to reach the lake shore and be flushed. At that time the falcon turned on the speed, left the cover of the helicopter, and pursed the ducks. Professor Tom Cade has seen peregrines nesting in the face of a quarry in Britain that was being used as a landfill. Throughout the day, trucks backed up to the edge of the quarry and dumped trash over the side, right past the entrance to the nest site. The falcons were so accustomed to it they took no notice."

In my work on research and management with peregrine falcons, I have had similar experiences with directly approaching peregrine nests in helicopters. I have also not experienced any nest failures (or abandonment) after climbing directly into dozens of nests to recover eggs for captive incubation and fostering captive-reared young into the nests. Clearly, part of the peregrine falcon's post-DDT era recovery success has been their ability to adapt to human activity.

In conclusion, the BLM needs to do a more thorough inventory of peregrine and other raptor nesting sites in the TMA, and take a more tailored approach to considering closures. More specifically, this can be done adaptively, using spatially-limited, ad-hoc seasonal closures where specifically warranted rather than blanket, one-sized-fits-all closures that are not scientifically justified.

**5) There is a logical inconsistency that pervades this EA: that harassment of wildlife is to be minimized, yet hunting, which results in harassment and death of game animals and displacement of others need not be minimized.** Hunting virtually always involves on-trail motorized access, followed by off-trail hiking for scouting, pursuit of game, the load report of firearm being shot, killing of game, and then dissection and transporting segments of the carcass back to the waiting vehicle. Clearly, hunting results in significant disruption of wildlife. Hunting also creates a "landscape of fear" for wildlife in the area which leads to avoidance of human activity, particularly when humans are on-foot during hunting seasons. The EA fails to acknowledge that bighorn sheep and other hunted species will eventually habituate to nonthreatening and predictable human activities. However, since hunting of bighorn sheep is allowed within the TMA it can be expected that some avoidance of human activity by bighorn sheep may occur. Therefore, a simple solution presents itself: stop hunting in the TMA and surrounding area so the bighorn and other previously hunted species may habituate. This solution is well-supported in the peer-reviewed scientific literature: big game species that are hunted tend to avoid human activity, yet readily tolerate human presence in areas where they have not been hunted (Thurfjell et al. 2017; Goumas et al. 2020; Sergeyev et al. 2020; Zanette and Clinchy 2020). For additional proof, a visit to any national park in the world is a revelation as to what non-hunted animal behavior can become.

**6) A more detailed analysis is required in the Route Reports as per the requirements of the Interdisciplinary Team Checklist, Determination of Staff** (i.e. PI = present with potential for relevant impact that needs to be analyzed in detail in the EA). We note that on page 77, Environmental Effects Analysis, the EA states that, *"During the route evaluation process, the IDT considered special status wildlife species and their habitat in addressing designation criterion 8342.1 (b): Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats. This attention to special status wildlife species and their habitat as a potential resource conflict is noted in the route reports and informed the IDT's*

Plaintiffs' Exhibit C-52

*formulation of alternative route networks. The action alternatives include measures to minimize impacts to special status wildlife species and their habitats, such as proposing routes for closure or seasonal limitations."* Despite this bold claim, the BLM has not provided proof that any of the trails subject to proposed closures have resulted in harassment of wildlife or significant disruption of wildlife habitats such that their populations have declined, independent of other factors. Impacts are presented without describing the type of impact, its magnitude, or quantitative effect on the local wildlife population(s). Thus, "impacts" as presented in the EA's Draft Route Reports are vague, speculative, and scientifically unsupported. The BLM has the capacity to provide the detailed information required and needs to provide it to the public.

**7) The BLM has conducted a basic inventory of travel routes for the EA but the route descriptions proposed for closure in Alternatives B and C are lacking in detail and scientifically defensible rationale as to why they are to be closed.** More specifically, the decision to close a number of individual routes appears to be based on the undocumented opinion of the BLM biologist, which in some cases, is clearly inconsistent with scientifically defensible and rational biological criteria as to what constitutes "harassment of wildlife or significant disruption of wildlife habitats" for each of the species listed in the EA. Otherwise, it appears that the EA's Route Reports are simply based on the subjective opinions of BLM staff. Specific information used for each segment closure is required for the sake of transparency and consistency with the Information Quality Act.

For an example of these inconsistencies, please see the Draft Route reports for EL2A (Enduro Loop west of Big Drop) and D2750. This is in mapped bighorn sheep habitat and there is a water source located atop a point that's north of and over 500' above EL2A and that's west of and at the same elevation as D2750. The EA is inconsistent in proposing the closing of EL2A under Alternatives B and C, as it is a single-track through route along a wash in a relatively flat area south of the point (and as a single-track route, thus a more restricted use), and it exits the wash to stay 200 yards away from a minor spring, thus it's mostly outside of mapped bighorn habitat. In contrast D2750 (closed under Alternative B, open under Alternative C) is also on the rim and allows travel to the same point by any means available, and being an overlook, is a location where people are more likely to venture about on foot. There is no credible scientific evidence (beyond hearsay, anecdote, and opinion) that bighorn sheep, pronghorn, or other species would be displaced from the point habitat or the water source by vehicles moving over a half-mile south and over 500' below them. Therefore, we urge the BLM to leave EL2A (and similar routes) open with management under alternatives B and C, like EL2 is, and focus management efforts instead taking measures to reduce route proliferation and potentially rerouting minor sections to reduce conflicts, rather than assuming that wildlife harassment occurs while motorcycles and other vehicles remain on geographically predictable route and exhibit non-threatening behavior (i.e. following a through route, where stops are less likely to occur).

**8) A double standard is being applied to proposed closures for wildlife.** The EA states that, *"Route networks with open or limited designations can contribute to the perpetuation of OHV use-related effects as discussed above. Conversely, closed and limited designations that prohibit OHV use wholly or in part can reduce or eliminate the perpetuation of the OHV-use effects, thereby benefitting wildlife species."* We do not see how the authors of the EA can make such a misleading statement when closed routes will still be open to foot, bicycle and horseback,

Plaintiffs' Exhibit C-53

including cross-country travel on foot. As shown by Papouchis et al. (2001) bighorn flee at far greater distances when humans are on foot and approaching them, than bicycles or vehicles traveling predictable routes. Again, foot-travel would not be such an issue if the bighorn were not hunted.

**9) In conclusion, there may be other reasons to manage OHV trail use, such as erosion, route proliferation, visitor experience, and acoustics. However, impacts on bighorn sheep and other wildlife is not the primary reason and should not be used as an excuse.**

**Literature Cited**

Andaloro L, RR Ramey RR 1981. The Relocation of Bighorn Sheep in the Sierra Nevada Mountains of California. Environmental Field Program Publication #7, University of California, Santa Cruz. 60 pp.

Blong B, Pollard W. 1968. Summer water requirements of desert bighorn in the Santa Rosa Mountains, California, in 1965. *California Fish and Game* 54(4):289-296.

Boyce WM, Bunch T, Cunningham S, DeForge J, Jessup D, Wehausen J. 1992. Stress and bighorn sheep. Panel Discussion. *Desert Bighorn Council Transactions*.

Brooks ML, Lair B. 2005. Ecological effects of vehicular routes in a desert ecosystem. U.S. Geological Survey, Western Ecological Research Center, Las Vegas Field Station, Technical Report, 23 p.

Campbell BH, Remington R. 1981. Influence of construction activities on water- use patterns of desert bighorn sheep. *Wildlife Society Bulletin* 9:63-65.

Cunningham SC. 1982. Aspects of the ecology of Peninsular desert bighorn sheep (*Ovis canadensis cremnobates*) in Carrizo Canyon, California. Unpublished Masters Thesis. Arizona State University.

Cunningham SC, Ohmart RD. 1986. Aspects of the ecology of desert bighorn sheep in Carrizo Canyon, California. *Desert Bighorn Council Transactions* 14-19.

DeForge JR. 1972. Man's invasion into the bighorn's habitat. *Desert Bighorn Council Transactions* 20:15-17.

DeForge JR. 1980. Population biology of desert bighorn sheep in the San Gabriel Mountains of California. *Desert Bighorn Council Transactions* 24:29-32.

Deforge JR, Osterman SD, Willmott CW, Brennen KB, Torres SG. 1997. The ecology of Peninsular bighorn sheep in the San Jacinto Mountains, California. *Desert Bighorn Council Transactions* 41:8-25.

Plaintiffs' Exhibit C-54

LGB006177

Dunaway DJ. 1971. Human disturbance as a limiting factor of Sierra Nevada bighorn sheep. *Transactions of the North American Wild Sheep Conference* 1:165-173.

Etchberger, R.C., Krausman, P.R., and R. Mazaika. 1989. Mountain sheep habitat characteristics in the Pusch Ridge Wilderness, Arizona. *Journal of Wildlife Management* 53(4):902-907.

Etchberger and P.R. Krausman. 1999. Frequency of birth and lambing sites of a small population of mountain sheep. *Southwestern Naturalist* 44(3):354-360.

Goumas M, Lee VE, Boogert NJ, Kelley LA, Thornton A. 2020. The role of animal cognition in human-wildlife interactions. *Frontiers in Psychology* 11:589978. doi: 10.3389/fpsyg.2020.589978.

Graham, H. 1980. The impact of modern man. Pages 288-309 *in:* The desert bighorn: its life history, ecology, and management. G. Monson and L. Sumner, eds. University of Arizona Press, Tucson, AZ.

Gutzwiller KJ, D'Antonio A, Monz C. 2017. Wildland Recreation Disturbance: Broad- Scale Spatial Analysis and Management. *Frontiers in Ecology and the Environment* 15(9): 517–24. DOI.org (Crossref), doi:10.1002/fee.1631.

Hamilton KS, Holl SA, Douglas CL. 1982. An evaluation of the effects of recreational activity on bighorn sheep in the San Gabriel Mountains, California. *Desert Bighorn Council Transactions* 26:50-55.

Harris LK. 1992. Recreation in mountain sheep habitat. Doctoral dissertation, University of Arizona.

Hicks LL, Elder JM. 1979. Human disturbance of Sierra Nevada bighorn sheep. *Journal of Wildlife Management* 43:909-915.

Holl SA, Bleich VC. 1983. San Gabriel Mountain sheep: biological and management considerations. USDA, San Bernadino National Forest, San Bernadino, CA.

Jorgensen P. 1974. Vehicle use at a desert bighorn watering area. *Desert Bighorn Council Transactions* 18:18-24.

Keller BJ, Bender LC. 2007. Bighorn Sheep Response to Road-Related Disturbances in Rocky Mountain National Park, Colorado. *Journal of Wildlife Management* 71(7):2329-2337.

King MM, Workman GW. 1982. Desert bighorn on BLM lands in southeastern Utah. *Desert Bighorn Council Transactions* 26:104-106.

Larson C.L., Reed SE, Merenlender AM, Crooks KR. 2016. Effects of recreation on animals revealed as widespread through a global systematic review. PLOS One 11, no. 12 (December).

Plaintiffs' Exhibit C-55

LGB006178

Leslie DM, Douglas CL. 1980. Human disturbance at water sources of desert bighorn sheep. *Wildlife Society Bulletin* 8:284-442.

Longshore KM, C. Lowery C, Thompson DB. 2013. Detecting short-term responses to weekend recreation activity: desert bighorn sheep avoidance of hiking trails. *Wildlife Society Bulletin* 37:698–706.

Lowrey C, Longshore KM. 2017. Tolerance to disturbance regulated by attractiveness of resources: a case study of desert bighorn sheep within the River Mountains, Nevada. *Western North American Naturalist*. 77(1)82-98.

MacArthur, R.A., Johnston, R.H., and V. Geist. 1979. Factors influencing heart rate in free-ranging bighorn sheep: a physiological approach to the study of wildlife harassment. *Canadian Journal of Zoology* 57:2010-2021.

MacArthur, R.A., Geist, V., and R.H. Johnston. 1986. Cardiac responses of bighorn sheep to trapping and radio instrumentation. *Canadian Journal of Zoology* 64(5):1197- 1200.

McCarthy, C.W. and J.A. Bailey. 1994. Habitat requirements of desert bighorn sheep. Colorado Division of Wildlife Terrestrial Wildlife Research Special Report Number 69.

Oehler MW, Bleich VC, Bowyer RT, Nicholson MC. 2005. Mountain sheep and mining: implications for conservation and management. *California Fish Game* 91:149–178

Ortega C.P. 2012. Chapter 2: Effects of noise pollution on birds: A brief review of our knowledge. *Ornithological Monographs*, 74(1), 6–22. doi:10.1525/om.2012.74.1.6.

Ouren, D.S., Christopher Haas, C.P. Melcher, S.C. Stewart, P.D. Ponds, N.R. Sexton, Lucy Burris, Tammy Fancher, and Z.H. Bowen. 2007. Environmental effects of off-highway vehicles on Bureau of Land Management lands: A literature synthesis, annotated bibliographies, extensive bibliographies, and internet resources. U.S. Geological Survey, Open-File Report 2007-1353, 225 p. https://pubs.usgs.gov/of/2007/1353/report.pdf.

Papouchis CM, Singer FJ, Sloan WB. 1999. Effects of increased recreational activity on desert bighorn sheep in Canyonlands National Park, Utah. Pages 364-391 In Singer, F. J., and M. A. Gudorf. (eds). Restoration of bighorn sheep metapopulations in and near 15 national parks: Conservation of severely fragmented species. Volume III: Research Findings. U.S. Geological Survey Open File Report 99-102, Midcontinent Ecological Science Center, Fort Collins, Colorado. 391pp.

Papouchis CM, Singer FJ, Sloan WB. 2001. Responses of Desert Bighorn Sheep to Increased Human Recreation. *Journal of Wildlife Management* 65(3):573-582.

Purdy KG, Shaw WW. 1981. An analysis of recreational use patterns in desert bighorn habitat: The Pusch Ridge Wilderness case. *Desert Bighorn Council Transactions* 25:1-5.

Plaintiffs' Exhibit C-56

LGB006179

Rubin ES, Boyce WM, Jorgensen MC, Torres SG, Hayes CL, O'Brien, CS Jessup DA. 1998. Distribution and abundance of bighorn sheep in the Peninsular Ranges, California. *Wildlife Society Bulletin* 26(3):539-551.

Rubin ES, Boyce WM, Bleich VC. 2000. Reproductive strategies of desert bighorn sheep. *Journal of Mammalogy* 81(3):769-786.

Rubin ES, Boyce WM, Stermer CJ, Torres SG. 2002. Bighorn sheep habitat use and selection near and urban environment. *Biological Conservation* 104:251-263.

Sergeyev M, McMillan BR, Hersey KR, Larsen RT. 2020. The influence of habitat use on harvest vulnerability of cow elk (*Cervus canadensis*). PLoS ONE 15(11): e0242841. https://doi.org/10.1371/journal.pone.0242841

Sproat KK. 2012. Alteration of behavior by desert bighorn sheep from human recreation and desert bighorn sheep survival in Canyonlands National Park: 2002–2010. M.Sc. Thesis, Brigham Young University, Provo, UT, USA.

Sproat KK. 2012b. Potash Desert Bighorn Sheep Research. Unpublished report. Available: https://www.academia.edu/3591133/Potash_Desert_Bighorn_Sheep_Research

Sproat KK, Martinez NR, Smith TS, Sloan WB, Flinders JT, Bates JW, Cresto JG Bleich VC. 2019. Desert bighorn sheep responses to human activity in south-eastern Utah. *Wildlife Research*. Available: https://doi.org/10.1071/WR19029

Trombulak, Stephen C., and Christopher. A. Frissell. 2000. Review of ecological effects of roads on terrestrial and aquatic communities. C*onservation Biology* 14(1): 18–30.

Turner JC, Douglas CL, Hallum CR, Krausman PR, Ramey RR. 2004. Determination of critical habitat for the endangered Nelson's bighorn sheep in southern California. *Wildlife Society Bulletin*. 32(2):427-448.

Turner JC, Douglas CL, Hallum CR, Krausman PR, Ramey RR. 2006. Ostermann's assumption of a flawed habitat model is premised on facts not in evidence: Turner et al. (2005) response to Ostermann et al. (2005). *Wildlife Society Bulletin* 33(4):1465–1473.

Thurfjell H, Ciuti S, Boyce MS. 2017. Learning from the mistakes of others: How female elk (*Cervus elaphus*) adjust behaviour with age to avoid hunters. *PLoS ONE* 12(6): e0178082. https://doi.org/10.1371/journal.pone.0178082

Wagner G. 1999. Activity patterns of Rocky Mountain bighorn ewes in central Idaho. In. *Second North America Wild Sheep Conference*. April 6-9 1999. Reno, NV. 103-121.

Wehausen JD. 1980. Sierra Nevada bighorn sheep: history and population ecology. Doctoral dissertation, University of Michigan, An Arbor.

Plaintiffs' Exhibit C-57

LGB006180

Wehausen JD. 1983. White Mountain bighorn sheep: an analysis of current knowledge and managemement alternatives. Administrative Report, Inyo National Forest, contract 53-9JC9-0-32.

White C. 2012. Letter from Dr. Clayon White to the Santa Clara County Department of Parks and Recreation, regarding The Peregrine Falcon Nesting Site at Summit Rock, Sanborn County Park. March 3rd, 2012.

Wiedmann BP, Bleich VC. 2014. Demographic responses of bighorn sheep to recreational activities: a trial of a trail. *Wildlife Society Bulletin* 38:773–782.

Wilson, L.O., J. Blaisdell, G. Welsh, R. Weaver, R. Brigham, W. Kelly, J. Yoakum, M. Hinks, J. Turner, and J. DeForge. 1980. Desert bighorn habitat requirements and management recommendations. *Desert Bighorn Council Transactions* 1-7.

Zanette LY, Clinchy M (2020) Ecology and neurobiology of fear in free-living wildlife. *Annual Review of Ecology, Evolution, and Systematics* 51:297–318. https://doi.org/10.1146/annurev-ecolsys-011720-124613

Plaintiffs' Exhibit C-58

LGB006181

## TMA Settlement

**Submitted By: bridgetmurray_ucc_geoplatform**

**Submitted Time: 12/17/2017 6:08 PM**

## Survey Date:

December 17, 2017 3:42 PM

## Geographic Location



## TMA

Moab Field Office, Labyrinth/Gemini Bridges TMA

## Route ID

2031

## Type of Inspector

Youth Corps

## Name of Inspector

Bridget Murray

**Is the Inventory Route Apparent?**

Yes

**Observed Usage Intensity**

Medium

**Apparent Geographic Extent**

**Linear Extent**

100 - 200 ft, Continues beyond LOS

**Comments**

**Area Extent**

**Comments**

**Type of Motor Vehicle**

Full Sized Vehicle

**Purpose of Damage**

Cross Country Travel

Plaintiffs' Exhibit C-60

**Public Land Resource**

Soil, Vegetation, Wilderness Characteristic

**Was the Damage/Disturbance Rehabilitating?**

No

**Optional Rehab Comments**

**Site Photo**

Plaintiffs' Exhibit C-61

LGB010881



LGB010882

# TMA Settlement

**Submitted By: bridgetmurray_ucc_geoplatform**

**Submitted Time: 12/17/2017 10:56 PM**

## Survey Date:

December 16, 2017 1:04 PM

## Geographic Location



## TMA

Moab Field Office, Labyrinth/Gemini Bridges TMA

## Route ID

1395

## Type of Inspector

Youth Corps

## Name of Inspector

Plaintiffs' Exhibit C-63

Andrew Johnson

**Is the Inventory Route Apparent?**

No Damage Observed - End of Route

**Observed Usage Intensity**

**Apparent Geographic Extent**

**Linear Extent**

**Comments**

**Area Extent**

**Comments**

**Type of Motor Vehicle**

**Purpose of Damage**

Plaintiffs' Exhibit C-64

**Public Land Resource**

**Was the Damage/Disturbance Rehabilitating?**

**Optional Rehab Comments**

**Site Photo**

**Rehabilitation Photo**

**Additional Comments**

**Additional Photo**

Plaintiffs' Exhibit C-65

LGB011003



LGB011004

# TMA Settlement

**Submitted By: bridgetmurray_ucc_geoplatform**

**Submitted Time: 12/17/2017 10:56 PM**

## Survey Date:

December 16, 2017 10:34 AM

## Geographic Location



## TMA

Moab Field Office, Labyrinth/Gemini Bridges TMA

## Route ID

1434

## Type of Inspector

Youth Corps

## Name of Inspector

Andrew Johnson

**Is the Inventory Route Apparent?**

Access Issue

**Observed Usage Intensity**

**Apparent Geographic Extent**

**Linear Extent**

**Comments**

**Area Extent**

**Comments**

**Type of Motor Vehicle**

**Purpose of Damage**

Plaintiffs' Exhibit C-68

LGB011032

**Public Land Resource**

**Was the Damage/Disturbance Rehabilitating?**

**Optional Rehab Comments**

**Site Photo**

**Rehabilitation Photo**

**Additional Comments**

**Additional Photo**

Plaintiffs' Exhibit C-69

LGB011033



Plaintiffs' Exhibit C-70

LGB011034

# TMA Settlement

**Submitted By: ajohnson_BLM_geoplatform**

**Submitted Time: 12/18/2017 5:48 PM**

## Survey Date:

December 18, 2017 3:00 PM

## Geographic Location



## TMA

Moab Field Office, Labyrinth/Gemini Bridges TMA

## Route ID

1026

## Type of Inspector

Youth Corps

## Name of Inspector

Andrew Johnson

**Is the Inventory Route Apparent?**

End of Route

**Observed Usage Intensity**

**Apparent Geographic Extent**

**Linear Extent**

**Comments**

**Area Extent**

**Comments**

**Type of Motor Vehicle**

**Purpose of Damage**

Plaintiffs' Exhibit C-72

LGB011067

**Public Land Resource**

**Was the Damage/Disturbance Rehabilitating?**

**Optional Rehab Comments**

**Site Photo**

**Rehabilitation Photo**

**Additional Comments**

**Additional Photo**

Plaintiffs' Exhibit C-73

LGB011068



LGB011069

## TMA Settlement

**Submitted By: bpsteven_BLM**

**Submitted Time: 06/04/2021 8:27 AM**

## Survey Date:

June 3, 2021 11:35 AM

## Geographic Location



## TMA

Moab Field Office, Labyrinth/Gemini Bridges TMA

## Route ID

D2658

## Type of Inspector

BLM Employee

## Name of Inspector

Bill Stevens

**Is the Inventory Route Apparent?**

Yes

**Observed Usage Intensity**

Low

**Apparent Geographic Extent**

**Linear Extent**

**Comments**

**Area Extent**

**Comments**

**Type of Motor Vehicle**

Full Sized Vehicle, ATV/UTV, Dirt Bike

**Purpose of Damage**

Short Spur, Cross Country Travel

Plaintiffs' Exhibit C-76

**Public Land Resource**

Soil, Vegetation, Wilderness Characteristic

**Was the Damage/Disturbance Rehabilitating?**

No

**Optional Rehab Comments**

**Site Photo**



**Rehabilitation Photo**

**Additional Comments**

Extension at end,use of no designated but unsigned routes

Plaintiffs' Exhibit C-77

LGB011269

**Additional Photo**



# TMA Settlement

**Submitted By: bpsteven_BLM**

**Submitted Time: 06/04/2021 8:28 AM**

## Survey Date:

June 3, 2021 2:06 PM

## Geographic Location



## TMA

Moab Field Office, Labyrinth/Gemini Bridges TMA

## Route ID

D2656

## Type of Inspector

BLM Employee

## Name of Inspector

Plaintiffs' Exhibit C-79

Bill Stevens

**Is the Inventory Route Apparent?**

Yes, Access Issue

**Observed Usage Intensity**

Low

**Apparent Geographic Extent**

**Linear Extent**

**Comments**

**Area Extent**

**Comments**

**Type of Motor Vehicle**

Full Sized Vehicle, ATV/UTV, Dirt Bike

**Purpose of Damage**

Short Spur

Plaintiffs' Exhibit C-80

LGB011297

**Public Land Resource**

Soil, Vegetation, Wilderness Characteristic

**Was the Damage/Disturbance Rehabilitating?**

No

**Optional Rehab Comments**

Sort turnaround loop at end of route-very low use

**Site Photo**



**Rehabilitation Photo**

**Additional Comments**

Plaintiffs' Exhibit C-81

**Additional Photo**



LGB011299

# Summary

# Labyrinth Rims/Gemini Bridges Travel Management Area Baseline Monitoring Report



Moab Field Office

Bureau of Land Management

Plaintiffs' Exhibit C-83

LGB011300

# Table of Contents

**I.**      **Introduction**

**II.**     **Summary**

**III.**    **Appendices**

     **a.**  **Protocol**

     **b.**  **Maps**

           i.   Map 1: Damaged

          ii.   Map 2: Not Damaged

     **c.**  **Individual Reports**

Plaintiffs' Exhibit C-84

**Introduction**

This section of the report summarizes off-highway vehicle (OHV) monitoring data potentially impactin lands with wilderness characteristics (LWC) collected within the Bureau of Land Management (BLM), Moab Field Office's Labyrinth Rims/Gemini Bridges Travel Management Area (TMA). This report has been prepared in accordance with the Settlement Agreement in *Southern Utah Wilderness Alliance, et al. v. U.S. Department of the Interior, et al*., U.S. District Court (D. Utah) Consolidated Case No. 2:12-cv-257 DAK, U.S. Court of Appeals for the Tenth Circuit Nos. 15-4151, 15- 4152, 15-4153, 15-4155, 15-4158.  This Agreement was approved on May 31, 2017. The Settlement Agreement resolved long-standing litigation challenging six of BLM Utah's Resource Management Plans (RMP) and Travel Management Plans (TMPs) that were approved in 2008. As a part of the Settlement Agreement, BLM-Utah committed to developing 12 TMPs in five BLM field offices by 2025.

As a part of the Settlement Agreement, BLM-Utah committed to monitor motorized vehicle use along specific routes within each of the 12 TMAs prior to approving each TMP and making such monitoring data publicly available. Paragraph 20 of the Settlement Agreement established the monitoring requirements and protocols[1] for the Labyrinth Rims/Gemini Bridges TMA, which states:

> *Except for the Henry Mountains and Fremont Gorge TMA, for each TMA identified in paragraph 13, BLM will complete a baseline monitoring report that will document visually-apparent unauthorized surface disturbances off routes as well as visually-apparent damage to public lands resources caused by motorized vehicle use within WSAs, Natural Areas, and lands with BLM-inventoried wilderness characteristics. To create the baseline monitoring report, BLM will physically inspect those portions of routes within the TMA that are within or constitute a boundary to a WSA, Natural Area, and/or lands with BLM-inventoried wilderness characteristics. For those potions of routes, BLM will document by site photography and written narrative each disturbance and damage site. At a minimum, BLM will document the following information: (1) the geospatial coordinate of the site of disturbance or damage; (2) the route number or other identifier where the damage or disturbance was observed, the date of the physical inspection, the TMA in which the inspection took place, and the name of the inspector; (3) the observed usage intensity (i.e., none, light, medium, or heavy); (4) the apparent geographic extent of the disturbance or damage; and (5), if possible, (a) the apparent type of motor vehicle(s) that caused the disturbance or damage, (b) the apparent purpose of the disturbance (e.g., short spur, dispersed camping, play area, or inadvertent travel), and (c) the type of public land resource damaged by motor vehicle use.  The baseline monitoring report will include the information gathered and recorded during the physical inspection, as well as maps showing the location and nature of any documented disturbance or damage sites. BLM will make its baseline monitoring report available for public review at the same time as the preliminary route evaluation documents identified in paragraph 16.d. BLM need not complete the baseline monitoring report prior to that time, but may do so at its discretion. Baseline monitoring reports described in this paragraph may be used to explain or support any BLM final agency action, but do not themselves constitute final agency action.*

---

[1]Data was collected in accordance with the Motor Vehicle Impact Monitoring Protocol, version Feb. 2018 (Appendix A)

Plaintiffs' Exhibit C-85

LGB011302

# Summary

This report includes monitoring observations and the associated data regarding a total of 110 locations monitored within the TMA from December 16, 2017, to June 3, 2021. Youth Corps interns and BLM staff collected the observations. Moab BLM recreation professionals then reviewed these observations for accuracy. The monitoring data has been organized into two appendices that correspond to Paragraph 20(a) of the Settlement Agreement. Appendix B1 maps points of visually apparent damage caused by unauthorized motor vehicle use. Appendix B2 maps points that are considered to be not damaged (access issue, end of routes, no damage observed, non- apparent routes, and other).

Monitoring efforts for the Labyrinth Rims/Gemini Bridges TMA show 34 points of visually apparent damage caused by unauthorized motor vehicles, which include varying usage intensity (high, medium, low or none).

Plaintiffs' Exhibit C-86

Labyrinth-Gemini Bridges TMA Interim Monitoring Report Summary

Moab Field Office

Bureau of Land

Management

April 2023



LGB011335

# Table of Contents

**I.**      **Introduction**

**II.**     **Summary**

**III.**    **Appendices**

        **A Map of Damage Points Monitored**

        **B Reports**

Plaintiffs' Exhibit C-88

LGB011336

**Introduction**

This section of the report summarizes off-highway vehicle (OHV) monitoring data potentially impacting lands with wilderness characteristics (LWC) collected within the Bureau of Land Management (BLM), Moab Field Office's Labyrinth-Gemini Bridges Travel Management Area (TMA). This report has been prepared in accordance with the Settlement Agreement in Southern Utah Wilderness Alliance, et al. v. U.S. Department of the Interior, et al., U.S. District Court (D. Utah) Consolidated Case No. 2:12-cv-257 DAK, U.S. Court of Appeals for the Tenth Circuit Nos. 15-4151, 15- 4152, 15-4153, 15-4155, 15-4158 that was approved on May 31, 2017. The Settlement Agreement resolved long-standing litigation challenging six of BLM-Utah's Resource Management Plans (RMP) and TMPs that were approved in 2008. As a part of the Settlement Agreement, BLM-Utah committed to developing 12 TMPs in five BLM field offices by 2025. As a part of the Settlement Agreement, BLM-Utah committed to monitor motorized vehicle use along specific routes within each of the 12 TMAs prior to approving each TMP and making such monitoring data publicly available. Paragraph 20 of the Settlement Agreement established the monitoring requirements and protocols[1] for the Labyrinth-Gemini Bridges TMA, which states:

*Except for the Henry Mountains and Fremont Gorge TMA, for each TMA identified in paragraph 13, BLM will complete a baseline monitoring report that will document visually-apparent unauthorized surface disturbances off routes as well as visually-apparent damage to public lands resources caused by motorized vehicle use within WSAs, Natural Areas, and lands with BLM-inventoried wilderness characteristics. To create the baseline monitoring report, BLM will physically inspect those portions of routes within the TMA that are within or constitute a boundary to a WSA, Natural Area, and/or lands with BLM-inventoried wilderness characteristics. For those potions of routes, BLM will document by site photography and written narrative each disturbance and damage site. At a minimum, BLM will document the following information: (1) the geospatial coordinate of the site of disturbance or damage; (2) the route number or other identifier where the damage or disturbance was observed, the date of the physical inspection, the TMA in which the inspection took place, and the name of the inspector; (3) the observed usage intensity (i.e., none, light, medium, or heavy); (4) the apparent geographic extent of the disturbance or damage; and (5), if possible, (a) the apparent type of motor vehicle(s) that caused the disturbance or damage, (b) the apparent purpose of the disturbance (e.g., short spur, dispersed camping, play area, or inadvertent travel), and (c) the type of public land resource damaged by motor vehicle use. The baseline monitoring report will include the information gathered and recorded during the physical inspection, as well as maps showing the location and nature of any documented disturbance or damage sites. BLM will make its baseline monitoring report available for public review at the same time as the preliminary route evaluation documents identified in paragraph 16.d. BLM need not complete the baseline monitoring report prior to that time, but may do so at its discretion. Baseline monitoring reports described in this paragraph may be used to explain or support any BLM final agency action, but do not themselves constitute final agency action.*

---

[1] Data was collected in accordance with the Motor Vehicle Impact Monitoring Protocol, version Feb. 2018

LGB011337

**Summary**

The original baseline monitoring report identified 110 locations which were monitored within the TMA from December 16, 2017 to June 3, 2021. Youth Corps interns and BLM staff collected the observations. This initial effort identified 34 points of potential damage. BLM undertook interim monitoring of these damage points from November, 2022 through April, 2023. The monitoring data has been organized into two appendices that correspond to Paragraph 20(a) of the Settlement Agreement. Appendix A maps points of visually apparent damage caused by unauthorized motor vehicle use. Appendix B contains the reports for each of these points prepared by BLM staff.

As a result of this monitoring, BLM observed the following:

- Ten routes showed low use; 13 had moderate use; the remainder had either no use, were not findable on the ground, or had access issues.
- 24 of the 34 original damage points continued to have damage and were not rehabilitating. In most cases, the observed damage seemed similar in extent to what was observed in the original inventory.

Plaintiffs' Exhibit C-90

**Appendix A: Map of Damage Points Monitored**



## TMA Settlement
**Submitted By: bpsteven_BLM**



**Latitude: 38.59982427 - Longitude: -109.88482104**

**TMA:** Indian Creek TMA    **Survey Date:** April 6, 2023 4:38 PM
**Route ID:** 1434    **Observation Type:** Damage
**Name of Inspector:** Bill Stevens    **Type of Inspector:** BLM Employee

**Observed Usage Intensity:** Low
**Linear Extent:** Continues beyond LOS    **Comments:** constructed seis line


**Type of Motor Vehicle:** Full Sized Vehicle
**Purpose of Damage:** Unknown
**Public Land Resource:** Soil, Vegetation, Wilderness Characteristic
**Was the Damage/Disturbance Rehabilitating?:** No
**Optional Rehab Comments:**    **Observation Type Justification:** should have been cherrystem
**Site Photo**

## TMA Settlement
**Submitted By: bpsteven_BLM**



**Latitude:** 38.63903651 **- Longitude:** -110.00062003

**TMA:** Indian Creek TMA        **Survey Date:** December 27, 2022 3:24 PM
**Route ID:** d2693        **Observation Type:** No Damage Observed - End of Route
**Name of Inspector:** Bill Stevens        **Type of Inspector:** BLM Employee

**Observed Usage Intensity:**


**Type of Motor Vehicle:**
**Purpose of Damage:**
**Public Land Resource:**
**Was the Damage/Disturbance Rehabilitating?:**
**Optional Rehab Comments:**        **Observation Type Justification:** revisit
**Site Photo**


**Additional Photo (take photo back towards route observed)**

Plaintiffs' Exhibit C-93

## TMA Settlement
**Submitted By: bpsteven_BLM**



**Latitude: 38.63542542 - Longitude: -110.03744885**

**TMA:** Indian Creek TMA      **Survey Date:** December 27, 2022 3:24 PM
**Route ID:** d2678      **Observation Type:** Other
**Name of Inspector:** Bill Stevens      **Type of Inspector:** BLM Employee

**Observed Usage Intensity:**


**Type of Motor Vehicle:**
**Purpose of Damage:**
**Public Land Resource:**
**Was the Damage/Disturbance Rehabilitating?:**
**Optional Rehab Comments:**      **Observation Type Justification:** no use beyond-did not drive.
Part of Hey Joe bike-hike
**Site Photo**



**Additional Photo (take photo back towards route observed)**

Plaintiffs' Exhibit C-94

LGB011350

## TMA Settlement
**Submitted By: bpsteven_BLM**



**Latitude:** 38.6731873 - **Longitude:** -110.01778361

**TMA:** Indian Creek TMA        **Survey Date:** December 27, 2022 3:24 PM
**Route ID:** d2661        **Observation Type:** Route not Apparent
**Name of Inspector:** Bill Stevens        **Type of Inspector:** BLM Employee

**Observed Usage Intensity:**


**Type of Motor Vehicle:**
**Purpose of Damage:**
**Public Land Resource:**
**Was the Damage/Disturbance Rehabilitating?:**
**Optional Rehab Comments:**        **Observation Type Justification:** no damage observed
**Site Photo**




**Additional Photo (take photo back towards route observed)**

Plaintiffs' Exhibit C-95

**TMA Settlement**
**Submitted By: bpsteven_BLM**



**Latitude:** 38.67371479 **- Longitude:** -110.0224953

**TMA:** Indian Creek TMA      **Survey Date:** December 27, 2022 3:24 PM
**Route ID:** 2656 and 2657      **Observation Type:** Other
**Name of Inspector:** Bill Stevens      **Type of Inspector:** BLM Employee

**Observed Usage Intensity:**

**Type of Motor Vehicle:**
**Purpose of Damage:**
**Public Land Resource:**
**Was the Damage/Disturbance Rehabilitating?:**
**Optional Rehab Comments:**      **Observation Type Justification:** route showed no use- not driven
**Site Photo**

**Additional Photo (take photo back towards route observed)**

Plaintiffs' Exhibit C-96

## TMA Settlement
**Submitted By: bpsteven_BLM**



**Latitude:** 38.6084704 - **Longitude:** -109.95347651

**TMA:** Indian Creek TMA       **Survey Date:** December 9, 2022 4:10 PM
**Route ID:** 1520       **Observation Type:** Damage
**Name of Inspector:** Bill Stevens       **Type of Inspector:** BLM Employee

**Observed Usage Intensity:** None
**Linear Extent:** 50 - 100 ft

**Type of Motor Vehicle:** Full Sized Vehicle
**Purpose of Damage:** Unknown
**Public Land Resource:** Soil, Vegetation, Wilderness Characteristic
**Was the Damage/Disturbance Rehabilitating?:** Yes, rehabilitating naturally
**Optional Rehab Comments:**       **Observation Type Justification:** revisit
**Site Photo**

Plaintiffs' Exhibit C-97

## TMA Settlement
**Submitted By: bpsteven_BLM**



**Latitude: 38.61849232 - Longitude: -109.97603777**

**TMA:** Indian Creek TMA    **Survey Date:** December 9, 2022 4:10 PM
**Route ID:** 2031    **Observation Type:** Damage
**Name of Inspector:** Bill Stevens    **Type of Inspector:** BLM Employee

**Observed Usage Intensity:** Medium
**Linear Extent:** Continues beyond LOS
   **Comments:** well defined, constructed


**Type of Motor Vehicle:** Full Sized Vehicle
**Purpose of Damage:** Cross Country Travel
**Public Land Resource:** Soil, Vegetation, Wilderness Characteristic
**Was the Damage/Disturbance Rehabilitating?:** No
**Optional Rehab Comments:**    **Observation Type Justification:** route
**Site Photo**

### TMA Settlement
Submitted By: bpsteven_BLM



**Latitude: 38.48722106 - Longitude: -109.89232569**

**TMA:** Indian Creek TMA   **Survey Date:** November 17, 2022 4:34 PM
**Route ID:** 1026   **Observation Type:** Damage
**Name of Inspector:** Bill Stevens   **Type of Inspector:** BLM Employee

**Observed Usage Intensity:** Low
**Linear Extent:** Continues beyond LOS   **Comments:** short spur to overlook

**Type of Motor Vehicle:** Full Sized Vehicle
**Purpose of Damage:** Short Spur
**Public Land Resource:** Soil, Vegetation, Wilderness Characteristic
**Was the Damage/Disturbance Rehabilitating?:** No
**Optional Rehab Comments:**   **Observation Type Justification:** revisit
**Site Photo**

Plaintiffs' Exhibit C-99



Department of the Interior
Bureau of Land Management

**September 2023**

# DECISION RECORD

## Labyrinth/Gemini Bridges Travel Management Plan

**DOI-BLM-UT-Y010-2020-0097-EA**



**Moab Field Office**
**82 East Dogwood**
**Moab, Utah 84532**
**Phone: 435-259-2100**
**FAX: 435-259-2106**

Plaintiffs' Exhibit C-100

**Labyrinth/Gemini Bridges Travel Management Plan**

# DECISION RECORD

## DOI-BLM-UT-Y010-2020-0097-EA

**Decision**

After evaluating the four alternative off-highway vehicle (OHV) travel networks analyzed in the Moab Field Office's Labyrinth/Gemini Bridges Travel Management Area (TMA) Travel Management Plan (TMP) Environmental Assessment (DOI-BLM-UT-Y010-2020-0097-EA) (EA); considering comments from the general public, user groups, Tribes, and government agencies; examining the potential effects of network designations to a host of natural and cultural resources, and applying the route designation criteria (also commonly referred to as the "minimization criteria") at 43 CFR § 8342.1, it is my decision to select a route network consisting of a combination of the route networks analyzed in the EA as Alternatives B, C, and D.

The selected travel network contains 712.1 miles of route open[1] to all motorized vehicles at all times of the year, and 98.4 miles of route open but limited to certain types of vehicles or to use during certain times of year. Approximately 317.2 miles of route are designated OHV-Closed. In total, the selected travel network designates 810.5 miles of route available for public OHV use in the Labyrinth/Gemini Bridges TMA. The selected travel network supersedes the travel network designated within the TMA boundaries in the 2008 Moab Field Office Record of Decision and Approved Resource Management Plan (2008 RMP), as amended.[2]

Table 1 provides a summary of the selected travel network. Figure 1 below provides a comparison of the selected travel network to route designations across alternatives. A map illustrating the routes designated as available for OHV use is included as Attachment 1. The ePlanning project website for this TMP, located here: https://eplanning.blm.gov/eplanning-ui/project/2001224/510, also contains a map of routes affected by this decision. Attachment 2 provides route-specific rationales for each route's designation in the selected travel network.

---

[1] Routes referenced as "open" or "open with management" are equivalent for designation purposes. While making route evaluations, the Interdisciplinary Team identified routes needing special on-the-ground implementation as "open with management". For example, certain routes may require extra signing to accommodate public use and address resource conflicts.

[2] The 2008 RMP is available at https://eplanning.blm.gov/eplanning-ui/project/66098/510.

Plaintiffs' Exhibit C-101

Table 1:  Miles of Routes and Percentages by Designation for the Selected Travel Network[3]

| Designation | Miles | Percent of route mileage |
|---|---|---|
| *OHV-Open* | *712.1* | |
| *OHV-Limited* | *98.4* | |
| Total Designated for Public Use | 810.5 | 72% |
| *OHV-Closed* | 317.2 | 28% |

Specifically, the route designations break down as follows:

OHV-Open: Open to all vehicle types at all times of the year: 712.1 miles

OHV-Limited:
        Limited to motorized singletrack: 68.3 miles
        Limited to vehicles 50 inches or less in width: 3.3 miles
        Limited to vehicles 60 inches or less in width: 20.8 miles
        Limited to ebikes: 5.4 miles[4]
        Limited seasonally: 0.6 mile

OHV-Closed: 317.2 miles of route closed to public OHV use. Non-motorized bicycle use may continue on 10.7 miles of the closed routes, as detailed in Attachment 2.



Figure 1:  Miles of routes in each alternative and the selected travel network by designation.

This decision does not alter any OHV area designations made in the 2008 RMP. This decision does not designate or authorize the construction of new routes. Any additional designations or authorization of new route construction will be addressed in future implementation-level decisions and in accordance with applicable legal requirements, including NEPA.

---

[3] This decision designates as available for OHV use a subset of the total TMA routes designated in the 2008 RMP, as amended.  As explained in the EA at Section 1.4, the BLM used the 1127.7-mile network of routes designated in the 2008 RMP, as amended, to define the collection of routes evaluated and considered for designation as OHV open, closed, or limited in this travel planning effort.

[4] The ebike mileage is on the Moab Canyon Bike Path. This route was designated for ebikes in a decision analyzed in DOI-BLM-UT-Y010-2021-0076-EA. This decision occurred during this travel planning effort.

Plaintiffs' Exhibit C-102

This decision is not intended to provide evidence, bearing on, or address the validity of any R.S. 2477 assertions. R.S. 2477 rights are determined through a process that is entirely independent of the BLM's planning process. Consequently, in developing this TMP, the BLM did not consider any R.S. 2477-related evidence. The BLM bases travel management planning on purpose and need related to resource uses and associated access to public lands and resources. At such time as a decision is made on R.S. 2477 assertions, outside of any planning process, the BLM will adjust its travel routes accordingly (BLM Manual 1626).

This decision does not affect existing or future authorized uses, which are excluded from the definition of OHV (43 CFR 8340.0-5(a)). Authorized uses can include, but are not limited to, grazing permittees who need to use a route to access their grazing allotments or range improvements, private landowners who obtain a right-of-way to access their inholding, or various entities who obtain a right-of-way to access Utah School and Institutional Trust Land Administration (SITLA) parcels. The BLM will continue to work with private landowners, the State of Utah, SITLA permittees, and other authorized users to ensure reasonable access to, among other things, range improvements, private lands, and SITLA parcels.

**Alternatives Considered**

In making this decision, the BLM analyzed four travel network alternatives in detail, which are described in the EA at Section 2.2 and summarized below.

- Alternative A represents no action/continuation of current conditions within the TMA; it consists of the routes designated for motorized travel in the TMA by the 2008 RMP, as amended.
- Alternative B is a travel network that prioritizes protection of wildlife habitats, natural resources, ecosystems, and landscapes. OHV use is more constrained under this alternative than under any other alternative. In Alternative B, 54 % of the evaluated network mileage would be designated as OHV-open, 7% would be designated as OHV limited and 39% would be designated as OHV-closed.
- Alternative C is a travel network that balances OHV access opportunities with travel restrictions which resolve resource conflict issues and management concerns while still ensuring substantial OHV access. This alternative has OHV-open and OHV-limited, as well as OHV-closed designations that accommodate natural and cultural resource protection while designating more miles of routes as OHV-open than Alternative B. In this alternative, 74 % of the evaluated network mileage would be designated OHV-open, 11% would be designated as OHV-Limited and 15% would be designated OHV-closed.
- Alternative D is a travel network that would designate the most miles of evaluated routes as OHV-open, thus representing the action alternative that would allow the most OHV-based access opportunities while still mitigating travel-related impacts. In this alternative, 86 % of the evaluated network mileage would be designated as OHV-open, 9% would be designated as OHV-limited and 5% would be designated OHV-closed.

Plaintiffs' Exhibit C-103

**Rationale**

This decision responds to the purpose and need, as stated in the Labyrinth/Gemini Bridges TMP EA, by comprehensively designating the evaluated routes within the TMA as either open, limited, or closed to OHV use and by adopting a TMP Implementation Guide, thus adopting an OHV travel network that provides predictability and clarity for users, minimizes user conflicts and damage to natural and cultural resources, meets access needs, and increases public safety. Additionally, this decision complies with the BLM's commitment in the 2017 Settlement Agreement[5] to issue a new TMP for the Labyrinth/Gemini Bridges TMA pursuant to applicable statutes, regulations, and policies and the terms identified in the 2017 Settlement Agreement. This decision complies with, among other things, the requirements of the BLM's OHV regulations at 43 CFR Part 8340, BLM OHV policy in Manual 1626-Travel and Transportation Management and BLM Handbook H8342-Travel and Transportation, and Presidential Executive Orders 11644 and 11989.

The selected travel network best meets the BLM's multiple-use mandate and obligation to conform with the requirements of the minimization criteria at 43 CFR § 8342.1. The selected travel network provides equitable and sustainable recreation opportunities for all visitors, while protecting environmental and cultural resources. I did not select Alternative A because it would not conform with the 2017 Settlement Agreement, wherein the BLM committed to issuing a new TMP. In addition, Alternative A does not sufficiently minimize impacts to natural or cultural resources or user conflicts. Alternative B was not selected because I elected to select a travel network that maintained more mileage for motorized access in the TMA. I did not select Alternatives C or D because natural resource impacts and user conflicts could be better minimized by the selection of a blended travel network, without restricting motorized access to important routes and areas in the TMA.

My decision to designate the selected travel network represents my consideration of the project's purpose and need, resource impacts as described in the EA, and the need for reasonable OHV access to and across federally managed lands in the Labyrinth/Gemini Bridges TMA. My decision, which provides for appropriate public OHV access to and across BLM managed lands while also meeting the BLM's multiple use mandates and responsibilities, was made in light of the BLM's obligations to comply with the requirements of 43 CFR § 8342.1 and minimize the impacts to resources and user conflicts when designating roads and trails for public OHV use. The selected travel network is within the impacts analyzed in the EA, as the designations fall within the range of alternatives analyzed. As detailed in the Finding of No Significant Impact, none of the impacts analyzed under the range of action alternatives (Alternatives B, C, and D) are significant; therefore the impacts of the selected travel network are not significant.

In general, when developing the selected travel network the BLM applied 43 CFR § 8342.1 and minimized impacts to resources and user conflicts on a network-wide and route-specific scale, by focusing OHV use on routes where the BLM's data suggests that use is less impactful and prohibiting (or limiting) OHV access to routes where use is more impactful.

For instance, the selected travel network designates many regularly used routes as available for OHV use. One example of this approach in the selected travel network is that approximately 91% of the highly used "Jeep Safari" routes within the TMA remain available for OHV use. These routes are popular with OHV-based recreation enthusiasts, and—as relevant for purposes of the

---

[5] The 2017 Settlement Agreement can be accessed online at https://www.doi.gov/sites/doi.gov/files/agreements-settlements/document/suwa-ex-1-settlement-agreement-101718.pdf

Plaintiffs' Exhibit C-104

minimization criteria—do not frequently lead to unauthorized off-route use and present relatively few resource impacts or known user conflicts. Because of their popularity and high use levels, new impacts and conflicts are unlikely to occur, and on-going impacts and conflicts are already minimized. For example, because the public is aware that such routes frequently experience substantial OHV use, visitors engaged in activities that may be incompatible with OHV use may choose to recreate in other areas. As a result, user conflicts are less pronounced on the "Jeep Safari" routes designated in the selected travel network. Similarly, resource impacts—such as soil-related impacts and wildlife disturbance—are less prominent on these routes, since soils along these routes were compacted long ago, and wildlife has already become conditioned to the impacts of OHVs in these areas. Consequently, allowing continued use of these "Jeep Safari" (and other similar) routes, while closing other routes that are causing more new or on-going impacts and conflicts (e.g., closing reclaiming routes that are more susceptible to new resource impacts), the selected travel network helps avoid and minimize resource and user disturbances.

The selected travel network also minimizes impacts to resources by closing and limiting the use of routes where impacts to resources are more likely to occur. One of many examples is, as explained in the EA at Section 3.2.6, water resources. Water resources, including riparian areas, springs, and perennial and intermittent streams, are particularly important within the TMA because such lotic and lentic systems are rare in the area. These systems are especially important for riparian-dependent wildlife species. Travel route proximity to riparian areas or intermittent or perennial drainages is an important factor relating to the condition of aquatic and riparian habitats including impacts to water quality. As a result, the selected route network helps to avoid impacts stemming from route presence and ongoing OHV use by reducing the miles of routes available for OHV use within 100 meters of riparian areas by 42 percent and reducing the number of routes crossing perennial, ephemeral, or intermittent streams by 42 percent.

Additional route-specific designation rationales are included as Attachment 2. The route specific rationales help to further illustrate how the selected route network conforms with the BLM's obligations under 43 CFR § 8342.1.

**Compliance, Monitoring, and Modifications**

Implementation

The BLM will implement, operate, and maintain the selected travel network according to the *Implementation Guide for the Labyrinth/Gemini Bridges Travel Management Plan* (TMP Implementation Guide), which is included as Appendix N of the EA.

Closures

Where OHVs are causing or will cause considerable adverse effects upon soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species or other resources, the affected areas will be immediately closed to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures are implemented to prevent their recurrence (43 CFR § 8341.2).

Use Monitoring for Designation Changes

Regulations at 43 CFR § 8342.3 require that the BLM monitor the effects of using OHVs to determine if/when route designations may need to be revised. Use monitoring as a part of TMP implementation will occur to determine if resource and resource use objectives are being met, evaluate user satisfaction, and document use patterns and volumes, conditions of routes and public

Plaintiffs' Exhibit C-105

use areas, and effectiveness of enforcement. Monitoring details can be found in the TMP Implementation Guide, Section 4.

OHV Monitoring During Planning and Long Term Monitoring

In Paragraph 20 of the 2017 Settlement Agreement, the BLM agreed to create a baseline monitoring report documenting visually apparent unauthorized surface disturbances off routes as well as visually apparent damage to public lands resources caused by motorized vehicle use within Wilderness Study Areas, Natural Areas, and/or lands with BLM-inventoried wilderness characteristics in the TMA. The Labyrinth/Gemini Bridges TMA contains no Wilderness Study Areas or Natural Areas. The BLM posted its baseline monitoring report to the project ePlanning webpage on September 16, 2021.

In Paragraph 20.b of the 2017 Settlement Agreement, the BLM agreed to, during the development of this TMP, inspect all sites where the BLM's baseline monitoring report previously identified disturbance and damage at least one time per year, as well as any other areas where the BLM has received credible information for new disturbances or damage. The BLM conducted this annual site inspection and posted it on the project ePlanning webpage on April 27, 2023.

In Paragraph 23 of the 2017 Settlement Agreement, the BLM agreed to develop a long-term monitoring plan for the TMA to be implemented after the TMP is issued. The BLM will monitor the implementation of the TMP pursuant to the Implementation Guide (included as Appendix N of the EA), as well as applicable BLM policy.

Historic Property Treatment Plan

The BLM will implement the measures written, consulted on, and concurred with in the Historic Properties Treatment Plan for the Labyrinth/Gemini Bridges TMP, as per the *Programmatic Agreement among the Advisory Council of Historic Preservation, the Bureau of Land Management – Utah and the Utah State Historic Preservation Office Regarding National Historic Preservation Act Responsibilities for Travel and Transportation Management Undertakings* (Travel PA, signed November 28, 2018), Section 106 of the National Historic Preservation Act (NHPA), and the NHPA implementing regulations at 36 CFR Part 800, as discussed in the EA, Section 4.3.1 and Appendix G.

Wildlife Conservation Measures

The conservation measures from the 2008 Moab RMP will apply to routes designated under this TMP. Additional conservation measures were developed though consultation with the United States Fish and Wildlife Service (USFWS) and referenced in the Biological Opinion on the Labyrinth TMP (received by BLM in June of 2023). These TMP-specific Conservation Measures are detailed in Section 2.3.6 and Attachment 1 of the EA.

TMP Modifications

The Moab RMP provides a process for travel plan modifications (TRV-3, Moab 2008 RMP)[6]. Individual route designations and decisions within the Labyrinth/Gemini Bridges TMA can be added to, modified, or removed as appropriate following appropriate NEPA documentation.

---

[6] TRV-3: Provides opportunities for a range of motorized recreation experiences on public lands while protecting sensitive resources and minimizing conflicts among various users. Identification of specific designated routes will be

Plaintiffs' Exhibit C-106

**Authorities and Policies**

In addition to the 2008 RMP, authorities and policies guiding this decision include, but are not limited to, the following:

- The 2017 Settlement Agreement. In the 2017 Settlement Agreement, the BLM agreed, among other things, to issue a new TMP for the Labyrinth/Gemini Bridges TMA.
- Presidential Executive Orders 11644 and 11989
- 43 CFR Part 8340: Off-Road Vehicles including 43 CFR § 8342.1, Designation Criteria, BLM's *Travel and Transportation Manual*, MS-1626
- BLM's 2001 *National Management Strategy for Motorized Off-Highway Vehicle Use on Public Lands*
- 43 CFR § 8364.1: Closures and Restrictions
- BLM's 2008 *National Environmental Policy Act Handbook* (H-1790-1)
- BLM's 2012 *Travel and Transportation Handbook* (H-8342)
- Federal Land Policy and Management Act (FLPMA)

**Plan Conformance and Consistency**

The selected travel network is in conformance with applicable management decisions reflected in the 2008 RMP, which provide overarching management requirements and guidance for this travel planning effort. Some 2008 RMP decision and goals to which this project conforms are listed in Section 1.5 of the EA. The selected travel network complies with the transportation (TRV) decisions listed in that section. The selected travel network supports public OHV access while reducing user conflicts and retaining healthy ecosystems. The evaluation criteria used to reach the selected travel network are tied to RMP decisions and goals and are documented in route reports (see Appendix J for route report details).

**Public Involvement**

Public involvement and input occurred extensively throughout this TMP process in accordance with the requirements of NEPA and the commitments made in the 2017 Settlement Agreement. An ePlanning website was created for the project. The map of the routes being considered for designation in the TMA was uploaded for the public to view. Public scoping occurred from March 24 through April 26, 2021, to solicit input from the public on the issues, impacts, and potential alternatives that could be addressed in this EA. Scoping comments are summarized in the Scoping Report which was posted on the ePlanning website on August 8, 2021. These scoping comments were considered in the preparation of the EA.

The preliminary route evaluations, including the Scoping Report, preliminary alternatives maps, preliminary route reports and the baseline monitoring report, were made available to the public in September of 2021. The BLM posted this material on the ePlanning website and made it available for public review. GIS data and an interactive webmap were also made available to the public. A

---

initially established through the Travel Plan accompanying this RMP and may be modified through subsequent implementation planning and project planning on a case-by-case basis… adjustments will occur only in areas with limited route designations and will be analyzed at the implementation planning level. These adjustments will be done through a collaborative process with local government and will include public review of proposed route changes. Site-specific NEPA documentation will be required for changes to the route designation system (page 126, Moab RMP).

Plaintiffs' Exhibit C-107

formal comment period was held on the draft EA from September 7, 2022, to October 21, 2022. The BLM received approximately 12,000 public comment letters. All comments received were considered in detail by BLM, and summaries of the substantive comments and responses can be found in Appendix M of the final EA. The BLM updated the final EA to address comments raised by the public on the draft EA.

**Consultation**

NHPA Section 106

The BLM conducted NHPA consultation in accordance with the Travel PA. These consultation efforts included seeking input and agreement with Tribes and consulting parties regarding the BLM's Class I Inventory, cultural resource potential models, the Area of Potential Effect, the need to conduct additional cultural resource surveys, and the BLM's finding of effect. The BLM's consultation efforts are documented in Appendix G. *Conformation to Section 106 of the National Historic Preservation Act Through the Travel and Transportation Programmatic Agreement*.

Endangered Species Act Section 7

The BLM engaged in ongoing coordination and communication with the USFWS throughout the development of this TMP. On March 15, 2019, the BLM contacted the USFWS about Travel Management Planning in Utah and discussed the process for consultation. As part of this exchange, the USFWS requested to receive information as soon as possible. On January 16, 2023, the BLM submitted a draft biological assessment for consultation on Alternative D. (The selected travel network makes fewer routes available for public OHV use than Alternative D, particularly near sensitive resources, and therefore impacts a smaller footprint than Alternative D.)

The BLM received a Biological Opinion on the project on June 22, 2023, in which the USFWS concluded:

"After reviewing the proposed action, the current status of species and critical habitat, the environmental baselines for the action area, the effects of the proposed action and the cumulative effects, it is our biological opinion that the proposed action {Alternative D} is not likely to jeopardize the continued existence of the Mexican spotted owl, Jones cycladenia, Southwestern willow flycatcher, Bonytail chub, Colorado pikeminnow, Humpback chub or Razorback sucker or result in the adverse modification of critical habitat for Mexican spotted owl, Colorado pikeminnow or razorback sucker." (USFWS, 2023, page 46)

The USFWS further concludes:

"We concur with your determination of may affect, not likely to adversely affect for Navajo sedge because Plan routes do not occur in close proximity to cliffs containing the species; thus direct and indirect effects are unlikely to occur. California condor (Gymnogyps californianus) was also analyzed as part of the Biological Assessment, and we concur with your determination of no jeopardy within the experimental, non-essential population area because there is no suitable nesting habitat within the Plan area, and we do not expect use of routes in the Plan area to affect condor feeding behavior such that behavioral responses resulting from indirect or direct effects of route use would jeopardize the population." (USFWS, 2023, page 1)

The Biological Opinion is attached to the EA as Attachment 1.

Plaintiffs' Exhibit C-108

**Appeal**

This decision may be appealed to the Interior Board of Land Appeals, Office of the Secretary, in accordance with the regulations contained in 43 CFR Part 4. If an appeal is taken, your notice of appeal must be filed in the authorizing office within 30 days of the decision. BLM will not accept appeals filed by e-mail.

Detailed instructions for filing an appeal are contained in the attached Form 1842-1 (Attachment 3).

**Approval**

NICOLLEE GADDIS-WYATT

Digitally signed by NICOLLEE GADDIS-WYATT
Date: 2023.09.28 06:59:40 -06'00'

Nicollee Gaddis-Wyatt,
BLM Canyon Country District Manager

Decision Record
Labyrinth/Gemini Bridges Travel Management Plan

DR-10
LGB042024

Plaintiffs' Exhibit C-109

**Attachment 1:  Maps of Selected Travel Network**

Map 1:  Overview Map of Travel Management Plan Area



Plaintiffs' Exhibit C-110

Map 2:  Map 1 Area



Plaintiffs' Exhibit C-111

A1-2

LGB042026

Map 3:  Map 2 Area



Plaintiffs' Exhibit C-112
LGB042027

Map 4:  Map 3 Area



Plaintiffs' Exhibit C-113

Map 5:  Map 4 Area



Plaintiffs' Exhibit C-114

| Route Number Length | Decision | Rationale |
|---|---|---|
| D0006 0.37 miles | Closed | D0006 is closed to motorized use; it is one of several reclaiming routes in the Mineral Point area. The route is reclaiming naturally, which suggests it receives little to no recreation use. It is redundant with D1455A, which remains open to motorized travel. The route does not lead to any known recreation opportunities, or destinations. D0006 does not provide a unique recreation opportunity. Because the route is largely reclaimed, OHV use of the route will result in new surface disturbance which displaces native vegetation utilized by desert bighorn sheep and other species. Changing this designation to OHV closed will help minimize the loss of vegetation and soil, as well as minimize damage to other resources. Closing D0006 will reduce habitat fragmentation for desert bighorn sheep |
| D0007 0.32 miles | Closed | D0007 is closed to motorized use. It is a dead-end route in the Mineral Point area. Its use level is low; it runs parallel to D1429, which remains open and provides connectivity to the route network in the Mineral Point area. The route does not lead to any known recreation opportunities or destinations. D0007 does not provide a unique recreation opportunity. Closing this route will minimize the loss of vegetation and soil, as well as minimize damage to other resources; habitat fragmentation for desert bighorn sheep will be reduced. Closing this route, along with natural reclamation, will reduce visual contrast created by the route. Closing D0007 will reduce route confusion in an area of route proliferation. |
| D0009 015 miles | Closed | D0009 is closed to motorized use. It is a 0.15-mile-long spur off route D1888. As indicated in the route report, this route receives low use. Closing the route will reduce route proliferation in the area. Closing D0009 will contribute to restoring and retaining vegetation (e.g., blackbrush) and soil cover. |
| D0009A 0.63 miles | Closed | D0009A is closed to motorized use; it is a 0.63-mile-long connector route. Connectivity between D1888 and D1797 are maintained through D1858 to the north and 1888 to the south. Closing D0009A will contribute to retaining and restoring vegetation (e.g., salt desert shrub, blackbrush). |
| D0010 0.14 miles | Closed | D0010 is closed to motorized use. D0010 is largely reclaiming naturally, which suggests it receives little to no OHV use. The route does not provide known recreation opportunities and is redundant with routes D1888 and D1906. Closing this route will reduce route proliferation in the area. Because the route is reclaiming, closing the route will contribute to restoring and retaining soil and vegetation cover. Closing the route will reduce the route footprint in the area and reduce the overall visual impact of routes in the area. |

LGB042034

Plaintiffs' Exhibit C-115

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1000B 0.43 miles | Closed | D1008B is closed to motorized use. It is redundant with B129 and D1019. It is 0.43 miles long and provides no unique recreation opportunity or access. Route connectivity is maintained via B129 and D1019, which remain open to motorized use. D1000B receives low use and barely exists on the ground. Closing D1000B will reduce visual impacts, reclaim vegetation and soil cover and decrease habitat fragmentation, especially for desert bighorn sheep. Closing D1000B will minimize route proliferation in the area. |
| D1002 1.0 miles | Open | D1002 is open to motorized use. D1002 is a 0.1 mile long connecting route between B129 (the Mineral Bottom Road) and D1000. It is primarily on SITLA managed land. It provides access to dispersed vehicle camping sites as well as SITLA land and provides connectivity for motorized users. Keeping D1002 open will reduce the impacts of cross-country travel as users attempt to connect B129 and D1000. |
| D1005 1.86 miles | Open | D1005 is open to motorized use; it is 1.86 miles long and provides connectivity between the Mineral Bottom Road (B129) and D1000. Relocation of this connector will cause greater impacts to documented resources than allowing continued use of the route. Furthermore ,nearby routes D1124, D1126 and D1247 are being closed, which helps minimize impacts to desert bighorn sheep habitat and erosive soils. |
| D1006 0.97 miles | Open | D1006 is open to motorized use; it is a 0.97-mile-long connector between B129 (Mineral Bottom Road) and D1005. It provides connectivity in an area just west of State Highway 313. Keeping the route open will minimize impacts to soil and vegetation by providing recreation access on an existing route. |
| D1008 0.70 miles | Open | D1008 is open to motorized use; it is a 0.7-mile-long loop off D1000. It provides access to an interesting rock recess and provides dispersed vehicle camping opportunities. Continued use of D1008 will reduce impacts to soil and vegetation cover by providing recreation opportunities on existing routes, reducing the potential for off-route travel. |
| D1014 0.48 miles | Closed | D1014 is closed to motorized use. D1014 is redundant with D1015, which remains open so that motorists can access the Beehive Butte area south of the Mineral Bottom Road. D1014 parallels D1015 for 0.48 miles; its use is low. Closing D1014 will reduce visual contrast, restore vegetation and soil cover and minimize the potential for soil erosion. |

LGB042037

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1015<br><br>0.43 miles | Open | D1015 is open to motorized use; it provides access to the Beehive Butte area as well as views into Taylor Canyon (via D1026B). D1015 provides a recreation opportunity for dispersed vehicle camping. Providing an existing access route for users will minimize impacts to soils and vegetation by reducing the potential for cross country travel. |
| D1019<br><br>0.28 miles | Open | D1019 provides the link to B129 from D1000. Motorized users are able to access D1000 by using D1019. Allowing continued use of this route will minimize potential impacts to resources by maintaining motorized use on an alignment capable of accommodating the route's anticipated traffic volume. In addition, closing the nearby D1000B reduces impacts to bighorn habitat. Closing this route will reduce route confusion and route proliferation in the area while still allowing access to the area south of the Mineral Bottom Road (B129) on D1019. Moreover, this route has several known recreation opportunities including photography and camping. |
| D1019A<br><br>5.42 miles | Open | D1019A allows drivers to access BLM lands south of the Mineral Bottom Road (B129). This route is used for scenic driving as well as photographic pursuits. Impacts to resources are minimized and route proliferation decreased by closing nearby routes D1020, D1022, D1026B, D 1079, and D1095. |
| D1019B<br><br>2.61 miles | Closed | D1019B is closed to motorized use. Although D1019B leads to an overlook of Taylor Canyon, it is redundant with D1116 and D1026B, which also provide overlooks of Taylor Canyon.. The recreation opportunity provided by D1019B (overlook of Taylor Canyon) is provided via routes D1116, D1026B and D1042A, which remain open for travel. Dispersed camping opportunities are available on nearby D1116 and D1091. Closing route D1019B will minimize the potential for conflicts between offroad vehicle users and dispersed, non-motorized/non-mechanized forms of recreation. Closing this route will minimize impacts to desert bighorn sheep habitat by eliminating motorized uses (reducing the potential for harassment of wildlife) and removing the route footprint (reducing habitat fragmentation.) Closing this route will contribute to retaining or restoring vegetation and soil cover by eliminating motorized use and reducing the route footprint, thereby minimizing the potential for future soil erosion and vegetation damage. This route is in close proximity to a spring. By closing the route and allowing it to reclaim, the potential for impacts to the spring from the route footprint will be minimized. D1112 also closed, which provides the only access to D1019B. |

LGB042038

Plaintiffs' Exhibit C-117

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1020<br><br>1.01 miles | Closed | D1020 is closed to motorized use. D1020 is 1.01-mile-long dead-end spur and is redundant with D1019A, which remains open to the OHV public. D1020 does not provide access to an overlook or other recreation opportunities or destinations. Closing D1020 will enhance wildlife habitat by minimizing habitat fragmentation in desert bighorn sheep habitat. Closing this route will reduce visual contrast and restore vegetation, minimizing soil erosion. |
| D1022<br><br>0.31 miles | Closed | D1022 is closed to motorized use. It is a 0.31-mile-long dead-end spur and does not have an identified purpose and need for the OHV public. Designating the route OHV-closed will minimize the potential for desert bighorn sheep habitat fragmentation and other damage to resources documented within the route report. Closing route D1022 will reduce route proliferation in the Big Draw area. |
| D1026A<br><br>1.21 miles | Open | D1026A provides a link between D1019A and D1047. Closing the nearby D1026, D1048A and D1045 routes reduces route confusion and route proliferation in the area and minimizes impacts to resources. Providing a designated access route between D1019A and D1047 will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1026A will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D1026B<br><br>2.18 miles | Closed | D1026B is closed to motorized use; it is a 2.18-mile-long spur that terminates at the National Park Service boundary. Closing D1026B minimizes impacts to grasslands, salt desert shrub and blackbrush communities, desert bighorn sheep habitat from OHV use, and contributes to retaining soil cover. Closing D1026B minimizes the impacts of D1042A.<br><br>D1026B provides access to a SITLA section, and will not be actively reclaimed nor rehabilitated . |
| D1027<br><br>0.28 miles | Closed | D1027 is closed to motorized use; it is accessed via D1026B, which is also closed. Closing D1027, along with natural reclamation will reduce visual contrast created by the route. Closing this route will contribute to retaining and restoring vegetation (e.g., blackbrush) and soil cover, minimizing the potential for soil erosion. Closing D1027 will minimize impacts to desert big horn sheep habitat by reducing the route footprint in the area. |
| D1029<br><br>0.23 miles | Closed | D1029 is closed to motorized travel. D1029is 0.23 miles long and does not have a purpose and need for the OHV public because, among other reasons, the route does not lead to a known destination or recreation opportunity. Closing D1029 will reduce impacts to soil and vegetation cover as a result of reduced motorized use. |

LGB042039

Plaintiffs' Exhibit C-118

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1045 1.23 miles | Closed | D1045 is closed to motorized use; it is a 1.23-mile-long connector route that connects D1047 to D1042A. Connectivity is retained through D1047 itself. Closing this route will minimize impacts of D1047 by reducing route redundancy and proliferation in the area. Closing D1025 will contribute to retaining and restoring vegetation (e.g., pinyon-juniper and blackbrush) and soil cover, and minimizing impacts to desert big horn sheep habitat. |
| D1047 1.89 miles | Open | D1047 provides a link between D1042A and D1026A. Closing the nearby D1045, D1048A and D1042B routes reduces route confusion and route proliferation in the area and minimizes impacts to resources. Providing a designated access route between D1042A and D1026A will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1047 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D1048A 0.86 miles | Closed | D1048A is closed to motorized use; it is a 0.86-mile spur route, is redundant with D1026B and has no unique purpose and need for the OHV public. For example, among other things, the route does not lead to any known recreation opportunities, destinations, or provide connectivity to other routes in the network. Closing 1048A will reduce visual contrast by reducing route redundancy and allowing natural reclamation of the route. Closing the route will enhance wildlife habitat for desert bighorn sheep, peregrine falcons and other raptors. It will also reduce habitat fragmentation in potential bald eagle winter habitat. |
| D1048B 0.35 miles | Closed | D1048B is closed to motorized use; it is a 0.35-mile-long connector route that is redundant with D1047. D1048B does not lead to any known recreation opportunities, or destinations. While it provides connectivity to other routes, D1047 (which remains open) also provides similar route connectivity, making D1048B a redundant connector. The BLM's inventory of dispersed campsites shows one campsite located on D1048B; however, dispersed camping opportunities are available on D1047, which remains open. Closing D1048B will enhance wildlife habitat for desert bighorn sheep, peregrine falcons and other raptors. It will also reduce habitat fragmentation in potential bald eagle winter habitat. Natural reclamation of the route will contribute to retaining and restoring vegetation cover. |

LGB042042

Plaintiffs' Exhibit C-119

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1167<br><br>0.77 miles | Open | D1167 is open to motorized use; it is a 0.77-mile long spur route off Mineral Canyon Road (B129) which leads to the rim of Mineral Canyon and offers designated dispersed vehicle camping opportunities. While D1167 is within desert bighorn sheep lambing habitat, radio-collar data shows less use in this area than the area of canyon adjacent to D1164. Continued use of D1167 provides recreation opportunities for the OHV public in lesser used desert bighorn sheep habitat compared to other areas. Continued use of this route will result in reduced potential for off-route travel by providing a recreation opportunity on an existing route. |
| D1168<br><br>0.74 miles | Open | D1168 accesses land managed by SITLA; it is the only route designated which accesses that SITLA section. This section is leased by BLM for recreation management. D1168 is the sole access to the highlining area known as the Fruit Bowl. Closing the other route on this leased section (D1217) reduces route proliferation in the area and minimizes impacts to resources. Providing a designated access route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1168 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D1186<br><br>0.50 miles | Closed | D1118 is closed to motorized use; it is 0.5 miles in length and is naturally reclaimed which suggests little to no recreation use. Closing D1186, along with natural reclamation, will reduce visual contrast created by the route. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will eliminate motorized use, minimizing the potential for harassment of wildlife, especially desert bighorn sheep. Closing this route minimizes the potential for route proliferation on public land. Because this route is reclaimed or currently reclaiming, officially closing the route will contribute to minimizing potential impacts to documented resources by eliminating motorized use. |
| D1190<br><br>0.56 miles | Open | D1190 is open to motorized use; it leads to several identified dispersed campsites used by the recreating public. Allowing continued use of D1190 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. The route provides access to unique and/or exceptional recreational opportunities without causing greater than minimal adverse effects on documented resources. |

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1195 0.73 miles | Open | D1195 is open to motorized use. It leads to a take off zone within the Mineral Point Base Jumping Focus Area. Allowing continued use of D1195 will minimize potential impacts to documented resources by directing motorized use on an alignment capable of accommodating the route's anticipated traffic volume. |
| D1199 0.38 miles | Open | D1199 provides access to the Mineral Canyon/Horsethief Point Competitive BASE Jumping Focus Area, which is managed to provide base jumping opportunities. Closing nearby D1118 and D1207 reduces route confusion and route proliferation in the area and minimizes impacts to resources. Providing a designated access route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1199 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume |
| D1207 0.19 miles | Closed | D1207 is closed to motorized use; it is 0.19 miles long and most of the recreation use in this area can be accessed on route D1199. Closing D1207, along with natural reclamation, will reduce visual contrast created by the route. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will eliminate motorized use, minimizing the potential for harassment of wildlife, especially desert bighorn sheep. Closing the route will reduce the potential for impacts to migrating birds, as it is within a Bird Habitat Conservation Area by eliminating motorized use and removing the route footprint. Closing this route minimizes the potential for route proliferation on public land. |
| D1217 1.29 miles | Closed | D1217 is closed to motorized use. D1217 is a continuation of B129; it continues up Mineral Canyon but does not lead to a recreation destination; use levels are low. It is limited to authorized use for SITLA on a seasonal basis and closed to the public to enhance wildlife habitat, specifically for desert bighorn sheep lambing and for raptor nesting. The SITLA section in question is leased by BLM so that it can manage recreation in an area that constitutes prime wildlife habitat. The upper portions of Mineral Canyon are very important refugia for desert bighorn sheep, raptors and other species. Closing D1217 minimizes impacts to this important wildlife habitat and helps prevent habitat fragmentation. |

LGB042049

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1223A<br><br>1.93 miles | Closed | D1223A is closed for motorized travel; it is the road along the Green River between the Mineral Bottom Airstrip and the mouth of Hell Roaring Canyon. D1223A is within the Canoe Focus Area; closing this route will minimize known conflicts between OHV public and river users that is caused by vehicle-based noise. Closing D1223A will reduce impacts to desert big horn sheep year long and lambing habitat. As indicated in the route report, D1223A is within a Bird Habitat Conservation Area; closing this route will reduce impacts to migratory bird habitat. |
| D1223B<br><br>2.08 miles | Closed | D1223B is closed to motorized use, SITLA shall retain access to its section. The route will not be reclaimed nor rehabilitated.<br><br>D1223B is the road up Hell Roaring Canyon from the D. Julien inscription to the SITLA section within the canyon. The route is closed to enhance wildlife habitat, including desert bighorn sheep lambing habitat and nesting habitat for a myriad of raptors, including golden eagle and Mexican spotted owl, two federally protected species. The road dates from the uranium mining days of the 1950's; it is in disrepair and staying on the roadbed is difficult to impossible due to flash flooding. The roadbed travels in an active canyon and is within a Bird Habitat Conservation Area. Closing the road minimizes impacts to wildlife and bird habitat. |
| D1223C<br><br>5.6 miles | Closed | D 1223C is closed to motorized use. D1223C is the road in the upper portion of Hell Roaring Canyon, from the SITLA section to its end (5.6 miles in length). This road is closed to enhance wildlife habitat for desert bighorn sheep and a myriad of raptors and limit habitat fragmentation. It is within desert bighorn sheep lambing habitat, as well as nesting habitat for many raptors, including golden eagle and Mexican spotted owl (a Threatened species). The road dates from the uranium days of the 1950's, and it is in disrepair; staying on the route is very difficult for those few users that make it this far up the canyon. This often leads to cross country travel as users attempt to continue up the canyon whether or not they can stay on the roadbed. Closing the route will reduce the overall impact of vehicle use in the area and enhance wildlife habitat by eliminating motorized use in an area of great importance to wildlife including desert bighorn sheep and raptors. |
| D1228<br><br>2.21 miles | Open | D1228 provides the link between the paved road to the Island in the Sky District of Canyonlands National Park and Utah Highway 313 to the east. Closing D1241 reduces route proliferation in the area and thus minimizes impacts to resources. Providing a designated access route will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |

LGB042050

Plaintiffs' Exhibit C-122

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1239 0.21 miles | Closed | D1239 is closed to motorized travel. It is a 0.21 mile long route. Closing the route will restore vegetation and soil cover, lessening erosion. The route has no known recreational purpose or need. |
| D1240A and D1240B 0.39 miles and 2.53 miles | Open | D1240A and D1240B provide a link between the Island in the Sky entrance road and Utah Highway 313 (which terminates at Dead Horse Point State Park). Closing D1239 and D1242 minimizes impacts to resources and reduces route proliferation. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1240A and D1240B will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D1241 1.31 miles | Closed | D1241 is closed to motorized use; it is a lightly used 1.31. mile route on the northern boundary of Dead Horse Point State Park. Closing this route will be beneficial to the management of the state park, as people illegally camp along it. It is also in the viewshed of the state park, as well as of the State Scenic Byway, and closing the route, along with natural reclamation, will reduce visual contrast and contribute to restoring vegetation and soil cover. Closing the route will also decrease habitat fragmentation in desert bighorn sheep habitat. |
| D1244 1.70 miles | Open | D1244 provides a link between Utah Highway 313 and D1240B. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1244 will minimize impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D1247 0.25 miles | Closed | D1247 is closed to motorized use. It is a 0.25 mile long dead spur off Highway 313. It has no recreational purpose and need. Closing D1247 will lessen visual contrast along the Scenic Byway (313). Closing the route will enhance wildlife habitat, especially for desert bighorn sheep and restore vegetation and soil cover. |
| D1248 1.04 miles | Closed | D1248 is closed to motorized use. D1248 is a 1 mile long old route along the Dead Horse Lateral Pipeline. The pipeline is buried; D1248 is utilized as a service road along that buried pipeline. Closing this redundant road route will not limit access to D1266C as users may utilize D1256 to access it. Closing D1248 will reduce visual contrast within the Dead Horse Scenic Byway corridor, as well as minimize damage to soils and vegetation. |

LGB042052

Plaintiffs' Exhibit C-123

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1262A 0.61 miles | Open | D1262A is open to motorized use; it is 0.61 miles in length and provides access to a SITLA parcel from B340; D1262A provides route connectivity to D1266D. D1262A provides dispersed vehicle camping opportunities and contributes to route connectivity and provides OHV loop opportunities. Continued use of this route will minimize potential impacts to resources (e.g., desert bighorn sheep habitat, erosive soil) by providing a recreation opportunity on an existing route where minimal adverse effects on resources are occurring. |
| D1263 0.23 miles | Closed | D1263 is closed to motorized use; it is a 0.23 mile long, lightly used spur route off D1262A. D1263 is redundant with D1266D and does not provide access to a known recreation opportunity or destination. Closing this route will reduce the overall impact of vehicle use and route footprint in the area and contribute to restoring and retaining vegetation and soil cover. |
| D1264 0.09 miles | Closed | D1264 is closed to motorized use; it is a 0.09 mile long, lightly used spur route off D1262A. D1264 does not lead to a known recreation opportunity or destination; it does not provide connectivity to other routes in the network. Closing this route will reduce the overall impact of vehicle use and route footprint in the area and contribute to restoring and retaining vegetation and soil cover. |
| D1265 0.49 miles | Open | D1265 is open for motorized travel. It is a 0.49 mile long spur that provides a loop opportunity with D1270; it is part of the Hell Roaring Rim Jeep Safari route. D1265 provides recreational value; the Hell Roaring Rim Jeep Safari Route is of particular value because it is a relatively easy jeeping route and is drivable by stock vehicles. Keeping D1265 open for travel lessens the likelihood of drivers going cross country to access the area. Moreover, BLM is closing nearby D1264, D1270A, and D1434 which will aid in minimizing impacts to desert bighorn lambing habitat. |
| D1266A and D1486 2.52 miles and 0.62 miles | Open | D1266A and D1486 are open for motorized travel. The are part of the Hell Roaring Rim Jeep Safari route and provide recreation value. Hell Roaring Rim is of particular value because it is a relatively easy jeeping route and is doable by stock vehicle. D1266A provides a link between B140 and D1473. D1486 is a part of this road. Closing parallel route D1482, as well as closing D1483, D1474A and D1474B reduces route proliferation and minimizes impacts to area resources. There are minimal known resource conflicts along this route. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1266A and D1486 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

LGB042054

Plaintiffs' Exhibit C-124

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1270A<br><br>1.00 miles | Closed | D1270A is closed to motorized use. It is one of three overlooks on the south side of Hell Roaring Canyon near its head. Closing 1270A reduces route proliferation as it is redundant with D1434 and D1463, both of which remain open to travel. Closing D1270A reduces route proliferation in desert bighorn sheep lambing habitat which reduces potential for OHV disturbance of wildlife. |
| D1280<br><br>0.63 miles | Open | D1280 is open to motorized use; it is a 0.63 mile long spur route off B340 which provides a recreation opportunity for 4-wheeling and dispersed vehicle camping. This route provides a popular dispersed vehicle camping opportunity off a maintained route in relatively close proximity to Highway 313. Continued use of this route will minimize potential impacts to resources such as desert bighorn sheep habitat, erosive soil, and salt-desert scrub, blackbrush and pinyon-juniper biomes by directing use on an existing route. |
| D1284<br><br>1.59 miles | Closed | D1284 is closed to motorized use; it dead ends at the fence around the Horsethief Campground and is not available as a connector route between D1122A and B340. In addition,  D1284 crosses the Rodeo bike trail. Closing D1284 will create a non-motorized buffer to the Horsethief Campground and the Rodeo bike trail. Closing the route, along with natural reclamation, will reduce visual contrast, retain vegetative and soil cover and minimize impacts to natural and cultural resources. |
| D1286<br><br>0.80 miles | Closed | D1286 is closed to motorized use; it is a 0.8 mile connector route that is redundant with D1122A and D1136. Closing D1286 provides a non-motorized buffer to the Rodeo bike trail and reduces route proliferation in the area. Closing this route will contribute to restoring and retaining vegetation and soil cover, minimizing the potential for soil erosion. |
| D1290<br><br>1.23 miles | Open |  D1290 provides a link between D1291 and D1136. Closing the parallel D1122B and D1302 (as well as nearby D1286 and D1284) reduces route proliferation and confusion and minimizes impacts to area resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1290 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

LGB042056

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1363 1.01 miles | Closed | D1363 is closed to motorized travel. Closing D1363 will minimize route proliferation, as it parallels D1455B and D1353, which remain open for travel and are closer to views of Mineral Canyon. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance desert bighorn sheep habitat by eliminating motorized use and removing the route footprint. |
| D1382A 0.65 miles | Open | D1382a is open to motorized travel. It is part of the Hell Roaring Rim Jeep Safari route and has recreation value for the completion and wholeness of that route. The Hell Roaring Rim Jeep Safari route provides a scenic tour of the Mineral Point area for motorized recreationists. Allowing continued use of the Hell Roaring Rim Jeep Safari route will minimize impacts by reducing cross country travel. Moreover, the closure of routes D1394, D1382B, D1390, and D1393 in this area will help minimize impacts to sensitive resources such as desert bighorn sheep habitat. |
| D1382B 0.40 miles | Closed | D1382B is closed to motorized travel. Closing D1382B will minimize route proliferation, as it parallels D1402A, which remains open for motorized travel on a seasonal basis. The route has no known recreation purpose or need. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance desert bighorn sheep habitat by eliminating motorized use and removing the route footprint. |
| D1382C 0.18 miles | Closed | D1382C is closed to motorized travel. It is a 0.18 mile long spur route that leads toward the rim of Mineral Canyon. D1382C is closed to minimize impacts of OHV use to desert big horn sheep yearlong and lambing habitat. Desert big horn sheep collar data shows Mineral Canyon as a frequented habitat. Closing D1382C, D0004, and D1403 minimizes impacts to their habitat. Closing this route will contribute to retaining and restoring vegetation (e.g., blackbrush, pinyon-juniper) and soil cover, minimizing potential for soil erosion. |
| D1390 1.18 miles | Closed | Closing D1390 will contribute to minimizing route redundancy and proliferation, as the points it accesses are reachable by both D1455A and D1455B, which remain open for motorized travel. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance desert bighorn sheep habitat by eliminating motorized use and removing the route footprint. Closing the route will reduce route proliferation and help users navigate. |

LGB042062

Plaintiffs' Exhibit C-126

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1393<br><br>0.24 miles | Closed | D1393 is closed to motorized travel. Closing D1393 (0.24 mile) will contribute to minimizing route redundancy and proliferation, as the points it accesses are reachable by both D1482A and D1455B, which remain open for motorized travel. Closing D1393 will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance desert bighorn sheep habitat by eliminating motorized use and removing the route footprint. Closing the route will reduce confusion in route finding on the part of the public. |
| D1394<br><br>1.85 miles | Closed | D1394 is closed to motorized travel. D1394 is a 1.85 mile long loop route off D1455B. Additional loop routes exist in the vicinity. Closing D1394 will minimize impacts to desert big horn sheep habitat and blackbrush and pinyon-juniper vegetation communities. Closing this route will minimize route proliferation and redundancy in the area of Mineral Point. Closing this route will provide a more straightforward travel network in the area. |
| D1395<br><br>0.53 miles | Closed | D1395 is closed to motorized travel. Closing D1395 will minimize route proliferation, as it parallels and is redundant with D1398A (which remains open to motorized travel). Closing D1395 will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance desert bighorn sheep habitat by eliminating motorized use and removing the route footprint. Closing the route will lessen confusion on the part of those wishing to travel D1398A to the viewpoint at the end of the mesa. |
| D1398A<br><br>1.38 miles | Closed | D1398A is closed to motorized travel. D1398A, as shown in the route report, is a 1.38 mile long spur route that receives low use, in the Mineral Point area. Closing D1398A minimizes impacts of adjacent overlooks D1408 and D1455A to other recreation users, wildlife habitat, and vegetation, by reducing route proliferation. |
| D1398B<br><br>0.31 miles | Closed | D1398B is closed to motorized travel. It is a dead end and is accessed via D1398A; it is 0.31 miles long. The viewpoint over Labyrinth Canyon can be accessed from D1398A, which remains open to motorized travel. Closing D1398B will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will minimize potential impacts to desert bighorn sheep and raptor habitats by eliminating motorized use and removing the route footprint. As a dead end route, it has no value as a connector route. |

LGB042063

Plaintiffs' Exhibit C-127

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1399<br><br>0.32 miles | Closed | D1399 is closed to motorized travel. It is 0.32 miles long and is reclaiming naturally, which suggests it receives little to no OHV use. BLM confirmed that the route is not findable on the ground, indicating a lack of purpose and need for the recreating public. Closing this route, along with natural reclamation, will reduce visual contrast created by the route. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will reduce overall impact of vehicle use and route footprint in the area. Closing this route will enhance desert bighorn sheep movement by reducing habitat fragmentation. Because this route is reclaimed or currently reclaiming, officially closing the route will contribute to minimizing potential impacts to documented resources by eliminating motorized use. |
| D1400<br><br>0.83 miles | Closed | D1400 is closed to motorized travel. The route is not locatable on the ground, indicating a lack interest by the recreating public. It is a 0.83 mile long dead end. The route contributes to route proliferation and redundancy as it closely parallels D1398A, which remains open to motorized travel. Closing D1400, along with natural reclamation, will reduce visual contrast created by the route. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will reduce overall impact of vehicle use and route footprint in the area. Closing this route will enhance desert bighorn sheep movement by reducing desert bighorn sheep lambing habitat fragmentation. Because this route is reclaimed or currently reclaiming naturally, which suggests it receives little to no OHV use, officially closing the route will contribute to minimizing potential impacts to documented resources by eliminating motorized use. |
| D1402A<br><br>0.88 miles | Closed | D1402A is closed to motorized travel. The 0.88 mile spur route is located in desert bighorn sheep lambing area and yearlong habitat. Closing D1402A will minimize impacts to desert big horn sheep habitat and blackbrush and pinyon-juniper vegetation communities. Closing this route will minimize route proliferation and redundancy in the area of Mineral Point. Closing this route will provide a more straightforward travel network in the area. |
| D1402B<br><br>016 miles | Closed | D1402B is closed to motorized travel. It is 0.16 miles long and is parallel and redundant to D1402A, which remains open. Closing D1402B will minimize route proliferation and will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance desert bighorn sheep lambing habitat by eliminating motorized use and removing the route footprint. Closing the route will lessen confusion on the part of the motorized public; D1402A is the route that accesses the overlook and this route remains open to motorized travel. |

LGB042064

Plaintiffs' Exhibit C-128

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1429 2.20 miles | Open | D1429 links B340 with D1455A in the Mineral Point area. Closing parallel D005, D007, D1430 and D1438 will reduce route proliferation and confusion and minimize impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1429 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume |
| D1430 0.22 miles | Closed | D1430 is closed to motorized travel; it is a 0.22 mile dead end spur route off D1429. D1430 does not have a purpose and need for the OHV public because, among other reasons, the route does not lead to a known destination or recreation opportunity and does not provide connectivity to the route network. Closing the route will contribute to restoring and retaining vegetation and soil cover, minimizing the potential for soil erosion. |
| D1432, D1433, D1440 and D1442 0.33 miles, 1.26 miles, 0.78 miles and 1.17 miles | Open | D1432 links D1428 with D1455A in the Mineral Point area: D1433, D1440 and D1442 access viewpoints in the area. Closing nearby D1438, D1446, D1441, D1437, D0005, D0007 and D1430 will reduce route proliferation and confusion and minimize impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1432, D1433, D1440 and D1442 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume |
| D1434 1.62 miles | Closed | D1434 is closed to motorized travel. It is a 1.62 mile spur route off 1455A. that leads to an overlook near the head of Hell Roaring Canyon. Closing D1270A and D1434 will minimize route proliferation and redundancy in the area; D1463, D1478, D1480, and D1494 remain open to provide recreation opportunities including camping, 4-wheeling, and scenic driving. Closing D1434 will minimize impacts to wildlife habitat (e.g., desert big horn lambing, raptor), vegetation (e.g., blackbrush, pinyon-juniper), and soils. Closing the route will contribute to retention and restoration of vegetation and soil, reducing potential for erosion. |

Plaintiffs' Exhibit C-129

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1514<br><br>0.21 miles | Open | D1514 is open to motorized travel; it provides part of a loop route for OHV recreationists with other nearby routes. Creating such loops minimizes the need for vehicles to turn around and backtrack, creating additional impacts. Allowing continued use of this route will minimize the potential for impacts to resources by providing targeted recreation activity and experience opportunities that reduce or eliminate the inclination for users to travel off-route. |
| D1515A<br><br>0.76 miles | Closed | D1515A is closed to motorized travel. Closing this route will enhance desert bighorn sheep lambing and migratory bird habitats by reducing motorized use and removing the route footprint. |
| D1515B<br><br>0.13 miles | Closed | D1515B is closed to motorized travel. Closing this route will enhance desert bighorn sheep lambing habitat by reducing motorized use and removing the route footprint. |
| D1515C<br><br>0.05 miles | Closed | D1515C is closed to motorized travel. Closing D1515C (a 0.05 mile long dead end spur) will minimize route proliferation in the Deadman Point area, while still allowing access to popular viewpoints using open routes such as D1520A to other points on the rim. Closing D1515C will enhance desert bighorn sheep lambing habitat by eliminating motorized use and removing the route footprint. |
| D1518<br><br>0.48 miles | Closed | D1518 is closed to motorized travel. Closing route D1518 will minimize route proliferation in the Deadman Point area. Closing this route will enhance desert bighorn sheep lambing habitat by eliminating motorized use and removing the route footprint. The route has no known recreation purpose and need. |
| D1520A<br><br>2.17 miles | Closed | D1520A is closed to motorized travel. Closing D1520A will minimize route proliferation in the Deadman Point area. Closing D1520A and 1515A minimizes impacts of D1511, which remains open, by reducing the route footprint in the area. Closing D1520A will minimize impacts to desert bighorn sheep and desert bighorn sheep lambing habitat by reducing motorized use and habitat fragmentation. Closing the route will contribute to retaining and restoring soil and vegetation cover, minimizing potential for soil erosion. |
| D1520B<br><br>0.60 miles | Closed | D1520B is closed to motorized travel. It is a 0.60 mile long route that is naturally reclaiming, which suggests little to no recreation use. It is parallel to and redundant with D1520A. Closing this route will minimize route proliferation, contribute to retaining or restoring vegetation and soil cover, thus minimizing the potential for soil erosion. Closing the route will enhance desert bighorn sheep habitat by eliminating motorized use and removing the route footprint |

LGB042074

Plaintiffs' Exhibit C-130

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1522<br><br>1.17 miles | Closed | D1522 is closed to motorized travel. D1522 is parallel to and redundant with D1497A, which remains open to motorized travel. Closing this route will enhance desert bighorn sheep habitat by reducing motorized use and removing the route footprint. Closing the route will reduce the potential for impacts to endangered or threatened species and their habitats by reducing motorized use. |
| D1526A<br><br>0.60 miles | Open | D1526A is a 0.6 mile long route at the mouth of Spring Canyon. D1526A provides access from Spring Canyon to the Green River and provides recreation opportunities for camping, 4-wheeling, and river access. |
| D1526B<br><br>2.84 miles | Closed | D1526B is closed to motorized travel. It is a 2.84 mile long route that receives low use, as indicated in the route report. Closing D1526B will minimize impacts to wetlands and riparian habitats and reduce potential for sediment transport into the Green River. Closing D1526B will minimize impacts to wildlife habitat (e.g., desert bighorn sheep, migratory birds) by reducing habitat fragmentation by reducing the route footprint in the area. Closing the route would minimize the potential for conflicts between offroad vehicle users and dispersed, non-motorized/non-mechanized forms of recreation (e.g., canoeists). |
| D1527A and D1527B<br><br>0.48 miles and 7.49 miles | Closed | D1527A and D1527B are closed to motorized travel. D1527A and D1527B constitutes the last 8 miles of the Hey Joe Jeep Safari and runs along the Green River, within the Green River Scenic corridor. Closing D1527A and D1527B will minimize impacts to wetlands and riparian habitats and reduce potential for sediment transport into the Green River. Closing D1527A and D1527B will minimize impacts to wildlife habitat (e.g., desert bighorn sheep, migratory birds, raptors) and would minimize the potential for conflicts between offroad vehicle users and dispersed, non-motorized/non-mechanized forms of recreation (e.g., canoeists). The 2008 RMP ROD explained that potential resource conflicts with non-motorized users and riparian areas along this route were outweighed by the purpose and need of this route because it is named in guidebooks and is a Jeep Safari route. Despite that prior conclusion, the BLM has an obligation to minimize resource impacts which is not negated by the popularity of the route. |
| D1528<br><br>0.27 miles | Closed | D1528 is closed to motorized travel. It is 0.27 miles in length in the mouth of Hey Joe Canyon. Closing this route minimizes route proliferation and redundancy as it parallels D1527, which is closed. Closing this route minimizes impacts to wildlife habitat, especially desert bighorn sheep. |

LGB042075

Plaintiffs' Exhibit C-131

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1529<br><br>.023 miles | Closed | D 1529 is closed to motorized travel; it consists of two short spurs totaling 0.23 miles in length. These spurs are reclaiming naturally, which suggests it receives little to no OHV use. They were access routes to uranium diggings. Closing Route 1529 will minimize route proliferation. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance desert bighorn sheep habitat by eliminating motorized use and removing the route footprint. |
| D1532<br><br>0.13 miles | Open | D1532 is open to motorized travel; it is a 0.13 mile route off B338 (Spring Canyon Point Road) and provides access to a viewpoint of Bowknot Bend of Labyrinth Canyon. Route D1533 to the east will be limited to seasonal use to minimize disturbances to desert bighorn sheep. Continued use of this route will contribute to restoring and retaining soil and vegetation cover, minimizing potential for soil erosion (high potential of erosive soil) by providing a recreation experience on an existing route. |
| D1533<br><br>0.60 miles | Limited to Seasonal Use (open from June 16 through April 14) | D1533 is open to motorized travel on a seasonal basis. It is not available for motorized use during desert bighorn lambing season (April 15 – June 15). It is 0.6 miles long and provides access to a viewpoint over Labrinth Canyon and a dispersed campsite. A route open year-round with a similar view is available to the west (D1532). Closing this route seasonally will minimize disturbances to desert bighorn sheep, while still providing recreation access for the majority of the year. |
| D1567<br><br>5.33 miles | Open | D1567 is the primary route of the Poison Spider Route, one of the most heavily used off-highway vehicle routes in the Moab Field Office. The route is used by Special Recreation Permit holders, as well as by the general public. Its popularity is evidenced by the fact that it is featured in guidebooks which describe it as "a fun filled combination of challenging obstacles and incredible scenery."  D1567 is within the Gemini Bridges/Poison Spider Mesa Focus Area for Motorized Backcountry Touring (2008 Moab RMP), which is "intensively managed for motorized use".<br><br>Allowing continued use of D1567 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |

Plaintiffs' Exhibit C-132

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1568<br><br>0.98 miles | Open | D1568 is a dead end spur route to Barney's Overlook; it is part of the very popular Poison Spider Jeep Route and is heavily utilized route. Barney's Overlook (D1568) affords a view of the Moab Valley and the Colorado River. It is utilized by organized four wheel drive events and by Special Recreation Permit holders. D1568 is within the Gemini Bridges/Poison Spider Mesa Focus Area for Motorized Backcountry Touring (2008 Moab RMP), which is "intensively managed for motorized use".<br><br>Allowing continued use of D1568 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |
| D1569<br><br>0.60 miles | Open | D1569 constitutes the northeastern portion of the Poison Spider Route, one of the most heavily used off-road vehicle routes in the Moab Field Office. The route is used by Special Recreation Permit holders, as well as by the general public. Its popularity is evidenced in that it is featured in guidebooks. D1569 is within the Gemini Bridges/Poison Spider Mesa Focus Area for Motorized Backcountry Touring (2008 Moab RMP), which is "intensively managed for motorized use".<br><br>Allowing continued use of D1569 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |
| D1572<br><br>0.15 miles | Open | D1572 is open to motorized travel. It is a 0.15 mile long spur route off the Poison Spider Jeep Safari Route (D1567). It leads to an overlook of the Colorado River and provides a "break" while on the Poison Spider route. Allowing use of this route will minimize damage to resources by directing motorized use to a route capable of sustaining the traffic. Providing this route minimizes the inclination to travel off road to access views of the Colorado River and thus minimizes impacts to the Class II visual resources on Poison Spider Mesa. |

LGB042077

Plaintiffs' Exhibit C-133

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1573<br><br>1.41 miles | Open | D1573 constitutes a portion of the Golden Spike Route, the most heavily used of the challenging four-wheel drive routes in the Moab Field Office. The route is used by Special Recreation permit holders, as well as by the general public. Its popularity is shown in that it is featured in guidebooks which describe it as "one of the longest and most popular trails in Moab, with nonstop obstacles and many stunning overlooks."  D1573 is within the Gemini Bridges/Poison Spider Mesa Focus Area for Motorized Backcountry Touring (2008 Moab RMP), which is "intensively managed for motorized use".<br><br>Allowing continued use of D1573 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |
| D1574<br><br>1.52 miles | Open | D1574 constitutes the northwestern portion of the Poison Spider Route, one of the most heavily used off-road vehicle routes in the Moab Field Office. The route is used by Special Recreation Permit holders, as well as by the general public. D1574 is within the Gemini Bridges/Poison Spider Mesa Focus Area for Motorized Backcountry Touring (2008 Moab RMP), which is "intensively managed for motorized use".<br><br>Because of the high level of use on this route, maintaining use on the route as opposed to dispersing the use to other less used routes contributes to an overall minimization of impacts. Allowing continued use of D1574 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will reduce user concentrations and the potential for impacts to documented resources. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |

LGB042078

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1577<br><br>2.01 miles | Open | D1577 constitutes the northern portion of the Poison Spider Route, one of the most heavily used off-road vehicle routes in the Moab Field Office. It also constitutes the southern portion of the Golden Spike Jeep Safari Route. The route is used by Special Recreation Permit holders, as well as by the general public. It is so popular that is featured in guidebooks. D1577 is within the Gemini Bridges/Poison Spider Mesa Focus Area for Motorized Backcountry Touring (2008 Moab RMP), which is "intensively managed for motorized use".<br><br>Allowing continued use of D1577 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |
| D1579, D1579A and D1579D<br><br>3.28 miles, 1.20 miles and 0.75 miles | Open | D1579, D1579A and D1579D constitute portions of the Golden Spike Route, the most heavily used of the challenging four-wheel drive routes in the Moab Field Office. The route is used by Special Recreation permit holders, as well as by the general public. It is so popular that it is featured in guidebooks which describe it as "one of the longest and most popular trails in Moab, with nonstop obstacles and many stunning overlooks." These routes are within the Gemini Bridges/Poison Spider Mesa Focus Area for Motorized Backcountry Touring (2008 Moab RMP), which is "intensively managed for motorized use".<br><br>Allowing continued use of D1579, D1579A and D1579D will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |

LGB042079

Plaintiffs' Exhibit C-135

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1579B<br><br>1.47 miles | Open | D1579B is open to motorized travel. It constitutes the "Where Eagles Dare" section of the Golden Spike Jeep Safari Route. This challenging motorized trail is a valuable recreation experience for those who enjoy testing their skills and their vehicles. It is used by commercial and organized group permittees and is part of the Jeep "Badge of Honor" trail (one of only 11 in the State of Utah). D1579B is within a Motorized Focus Area, managed in the Moab RMP to enhance such experiences. Where Eagles Dare combines steep slickrock climbs with "breathtaking scenery". Allowing use of this route will minimize potential impacts to resources by directing motorized use on an alignment capable of accommodating the traffic (the surface is almost entirely on slickrock). The route, while in desert bighorn sheep habitat, minimizes impacts to that species because abundant escape terrain is available to the animals. Impacts to non-motorized users, including noise, in the adjoining Hiking Focus Area are minimized by the topography separating the motorized and non-motorized recreationists. The trail is largely over slickrock and impacts to vegetation and soils are minimized because of that alignment. |
| D1579C<br><br>5.07 miles | Open | D1579C is open to motorized travel. It is part of the Golden Spike Jeep Safari route and provides a valuable and challenging recreation experience for the motorized community. It is regularly utilized by commercial and organized group permittees. It is a Jeep "Badge of Honor" trail (one of 11 in the State of Utah) and is a revered trail in the motorized recreation community. D1579C is in the Gemini Bridges Motorized Focus Area, managed in the Moab RMP to enhance such experiences. Motorized users are able to drive up and down steep slickrock fins and domes that provide outstanding views of the red rock country as well as into Arches National Park. D1579C provides the connecting route between the Gold Bar Rim (D1592A) route and the Poison Spider (D1567) route. Drivers are able to connect these two routes in an all day long challenging outing.  Allowing use of this route will minimize impacts by directing motorized use on an alignment capable of accommodating the traffic. Impacts to non-motorized users, including noise, in the adjoining Hiking Focus Area are minimized by the topography which separates the non-motorized and motorized recreationists. The location of the route, while in desert bighorn sheep habitat, minimizes impacts to that species because abundant escape terrain is available to the sheep. The trail is largely over slickrock and impacts to vegetation and soils are minimized because of that alignment |

LGB042080

Attachment 2:  Decision Rationales
Labyrinth/Gemini Bridges Travel Management Plan

Plaintiffs' Exhibit C-136

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1580A and D1595<br><br>0.97 miles and 1.00 miles | Open | D1580A and D1595 constitute portions of the Gold Bar Rim route, a very popular challenging four-wheel drive route. The route is used by Special Recreation permit holders, as well as by the general public. It is so popular that it is featured in guidebooks. These routes are within the Gemini Bridges/Poison Spider Mesa Focus Area for Motorized Backcountry Touring (2008 Moab RMP), which is "intensively managed for motorized use".<br><br>Allowing continued use of D1580A and D1595 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |
| D1580B<br><br>0.28 miles | Open | D1580B is open to motorized travel to provide a loop opportunity to a location known as "Surprise Overlook". This route ends with a cliff-edge view into Day Canyon. Keeping D1580B open allows motorized users to have a safe turnaround at the end of D1580A. The use level of this route is medium; continued use of the route will minimize damage to soils and vegetation from inappropriate and unauthorized turning around at the end of D1580A. |
| D1583<br><br>0.10 miles | Open | D1583 is open to motorized travel. It is a 0.1 mile long dead end spur off the Poison Spider Jeep Safari route. It provides a view of the surrounding mesas; a short walk from the end of the route adds views of the Colorado River. Keeping the route open will minimize impacts to resources from unauthorized cross country travel |
| D1584<br><br>0.68 miles | Closed | D1584 is closed to motorized travel. It is 0.68 mile long dead end spur off the Poison Spider Jeep Safari route. The use of the route is very low. It was originally built to build a now defunct stock pond. Closing the route will enhance the motorized experience as people are not confused and drive down a spur that does not link to the remainder of the Poison Spider Jeep Safari route. Closing the route will minimize the visual contrast in the area. Restoring vegetation and soil to the route will minimize soil erosion. |

LGB042081

Plaintiffs' Exhibit C-137

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1593<br><br>0.25 miles | Open | D1593 is closed to motorized travel. It is a 0.25 mile long dead end spur off the Gold Bar Rim Jeep Safari route. Its use level is low and it accesses nothing of recreational value (views from the rim are available on nearby D1579c, which remains open to motorized travel). Closing D1593 minimizes impacts to desert bighorn sheep by enhancing habitat and reducing habitat fragmentation. Closing the route will restore vegetation and soil cover, reducing erosion; it also minimizes the potential for roue proliferation and confusion. |
| D1594<br><br>1.05 miles | Closed; non-motorized bike use authorized | D1594 is closed to motorized travel. Non-motorized bike use is authorized. It is a dead end spur for motorized travel. It receives only light vehicle use as most users prefer to stay on the Gold Bar Rim Jeep Safari Route (D1579C). D1594 is primarily used by mountain bikers on the Magnificent Seven Mountain Bike Route. Closing the route to motorized travel will minimize conflicts between motorized and non-motorized users. D1594 is within desert bighorn sheep lambing habitat; closing the route to motorized travel reduces habitat fragmentation in that important habitat. In addition, the potential for harassment of wildlife (inadvertent or not) will be minimized by the closure of the route to the motorized public. |
| D1596<br><br>0.26 miles | Closed; non-motorized bike use authorized | D1596 is closed to motorized travel. Non-motorized bicycle use is authorized. It is a 0.26 mile long. D1596 forms a part of the Little Canyon Bicycle Route (a segment of the Magnificent Seven Bicycle Route). Closing the route to motorized vehicles reduces conflicts between motorized and non-motorized users and reduces the possibility of route proliferation as motorized users start in on the route, become frustrated and attempt to backtrack. |
| D1602<br><br>1.72 miles | Open | D1602 is open to motorized travel. It accesses a remote and scenic canyon (the Dry Fork of Bull Canyon). D1602 is 1.72 miles long and is a dead end. In a busy area (Gemini Bridges), D1602 offers a more secluded motorized experience. D1602 is a route on which Grand County has a maintained road ROW and it is also claimed as a RS2477 right by the state of Utah. Allowing motorized travel on D1602 minimizes impacts to resources such as desert bighorn sheep by continuing motorized use on an alignment that is sustainable. |
| D1605<br><br>2.13 miles | Open | D1605 traverses Bull Canyon and accesses the area underneath the Gemini Bridges. Closing nearby D1607 and D8669 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1605 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

LGB042083

Plaintiffs' Exhibit C-138

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1749<br><br>1.79 miles | Open | D1749 links B118 with itself. Closing nearby D1739, D1748, and D1753 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1749 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D1751<br><br>0.10 miles | Open | D1751 is a spur road to an overlook of Bull Canyon. Closing nearby D8710, D1914 and D1753 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1751 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D1752<br><br>0.63 miles | Closed; non-motorized bike use authorized | D1752 is closed to motorized travel Non-motorized bicycle use is authorized. It is 0.63 miles long and is part of the Upper Bull Run Bicycle Route on the north rim of that canyon. There currently is a width restrictor in the fence and it has not been available for motorized travel since the Bull Run bike route was approved. D1752 is redundant with D1749, which parallels it directly to the north. Closing D1752 to OHVs reduces the conflict between motorized and non-motorized users; closing D1752 also reduces on-the-ground confusion on the part of motorized users. |
| D1753<br><br>0.23 miles | Closed | D1753 is closed to motorized travel. D1753 is 0.23 miles long, redundant with B118 and D1845 and has no recreational value; it does not provide a recreational experience. Closing D1753 will reduce route proliferation in desert bighorn sheep lambing habitat. It will reduce visual contrast and reduce the vehicle footprint in the area. |
| D1754<br><br>2.35 miles | Open | D1754 links B118 (the Gemini Bridges Road) with D1946. Closing nearby D1248, D1250, D1758B, D1809, D1828, D1766, and D1833 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1754 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

LGB042094

Plaintiffs' Exhibit C-139

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1799<br><br>2.37 miles | Open | D1799 links D1888 with itself in the Arth's Pasture area. Closing nearby D1884, D1916, D0017 and D1859A reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1799 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D1801A<br><br>0.22 miles | Closed | D1801A is closed to motorized travel  D1801A parallels the power lines that were installed to service Dead Horse Point State Park. D1801A is a 0.22 mile long spur and has no recreational value. It is redundant with D1797. Closing D1801A lessens the route footprint and restores vegetation and soil cover. |
| D1801B<br><br>0.57 miles | Open | D1801B links D1888 with D1799 in the Arth's Pasture area. Closing nearby D0017, D1859A, D1801A ad D8704 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1801B will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D1804<br><br>0.59 miles | Closed | D1804 is closed to motorized travel. D1804 parallels and is within desert bighorn sheep lambing habitat. Closing this route will minimize impacts to desert bighorn sheep lambing habitat by reducing the route footprint resulting in reduced habitat fragmentation. Closing the route will minimize potential conflict between motorized use and wildlife. Closing this route will contribute to retaining and restoring vegetation and soil cover, minimizing potential for soil erosion. |
| D1809<br><br>0.56 miles | Closed | D1809 is closed to motorized travel. It is a 0.56 mile long connector route between Highway 313 and Arths Pasture area. Connectivity remains via D1758A and D1732. Closing D1809 minimizes route proliferation in the area, resulting in a less redundant route network. Closing this route will contribute to retaining and restoring soil and vegetation cover, minimizing the potential for soil erosion. Closing the route will minimize the potential for conflicts between offroad vehicle users and mountain bikers on the designated mountain bike singletrack trails which cross this route. |

Plaintiffs' Exhibit C-140

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1821<br><br>0.79 miles | Open | D1821 is a dead end spur accessing an overlook of the Seven Mile area from Utah Highway 313. Closing nearby D8847, D1980 and D1248 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1821 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D1827<br><br>0.34 miles | Closed | D1827 is closed to motorized travel. It is 0.34 miles in length; it accesses nothing of recreational value nor does it provide a recreational experience. Closing D1827 will reduce route proliferation and restore vegetation and soil cover, minimizing soil erosion. Closing the route minimizes desert bighorn sheep habitat fragmentation. |
| D1828<br><br>0.24 miles | Closed | D1828 is closed to motorized travel. It is 0.24 miles in length. D1828 accesses nothing of recreational value nor does it provide a recreational experience. Closing D1887 will reduce route proliferation and restore vegetation and soil cover, minimizing soil erosion. Closing the route minimizes desert bighorn sheep habitat fragmentation. |
| D1829<br><br>0.16 miles | Closed | D1829 is closed to motorized travel. It is 0.16 miles long connector that connects closed routes D1758B and D1833. D1829 no longer has a purpose and need because it no longer contributes to the route network or provides route connectivity. |
| D1833<br><br>1.39 miles | Closed | D1833 is closed to motorized travel. It is a 1.39 mile long connector route between D1754 and D1962. Route connectivity is retained via the routes themselves. Closing D1833 will minimize impacts to cultural resources. Closing the route will minimize impacts to wildlife habitat (e.g., desert bighorn sheep, raptors). Closing this route will reduce route proliferation in the area and result in a less redundant route network. |
| D1838<br><br>0.66 miles | Closed | D1838 is closed to motorized travel. It is a 0.66 mile long dead end spur and is parallel to and redundant with D1754, which remains open for motorized travel. Closing D1838 reduces route confusion in a heavily roaded area; closing the route will restore vegetation and soil cover, minimizing the potential for soil erosion. Closing the route will enhance wildlife movement by reducing fragmentation in desert bighorn sheep lambing habitat. |

LGB042098

Plaintiffs' Exhibit C-141

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1888<br><br>9.15 miles | Open | D1888 is the primary route of the Metal Masher Route, one of the more heavily used routes in the Moab Field Office. Metal Masher is so popular that it is featured in guidebooks and is a trail that is sought out by enthusiasts. D1888 is within the Gemini Bridges/Poison Spider Mesa Focus Area for Motorized Backcountry Touring (2008 Moab RMP), which is "intensively managed for motorized use". Closing nearby D0010, D0009, D0009A, D1913, D1884, D1915, D1864, D1860, D1804, D0017 and D0013 reduces route proliferation and confusion and reduces impacts to resources.<br><br>Allowing continued use of D1888 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |
| D1896<br><br>0.61 miles | Open | D 1896 is a dead end spur route that is heavily used by campers in BLM-designated sites. The side road is known as the Bride Canyon Road. D1896 allows the camping along the Gemini Bridges road to occur out of sight of this scenic drive. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1896 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

LGB042103

Plaintiffs' Exhibit C-142

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1900<br><br>1.72 miles | Open | D1900 joins the Gemini Bridges Road (B118) with D1888. D1900 is the eastern portion of the Metal Masher Route, one of the most popular routes in the Moab Field Office. Metal Masher is so popular that it is featured in guidebooks and is a trail that is sought out by enthusiasts. D1900 is within the Gemini Bridges/Poison Spider Mesa Focus Area for Motorized Backcountry Touring (2008 Moab RMP), which is "intensively managed for motorized use". Closing nearby D0014, D0013 and D0017 reduces route proliferation and confusion and reduces impacts to resources.<br><br>Allowing continued use of D1900 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |
| D1903<br><br>0.32 miles | Closed | D1903 is closed to motorized travel. It is a 0.32 mile dead end spur off the Gemini Bridges Road (B118). It is faded and mostly reclaimed naturally, suggesting little to no recreation use. It does not access anything of recreational value. Closing D1903 will reduce visual contrast and improve wayfinding. Closing D1903 will restore vegetation and soil cover, as well as minimize fragmentation in desert bighorn sheep lambing habitat. |
| D1904<br><br>0.33 miles | Closed | D1904 is closed to motorized travel. It is 0.33 miles long, and is parallel to and redundant with the Gemini Bridges Road (B118). Closing D1904 will reduce visual contrast along a popular route (B118) and improve wayfinding. Closing D1904 will restore vegetation and soil cover, as well as minimize fragmentation in desert bighorn sheep lambing habitat. |
| D1906<br><br>1.90 miles | Open | D1906 links D1845 with D1907 in the Arth's Pasture area.   Closing nearby DD1914, D1843, D1908 andD1908A reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D1906 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

LGB042104

Plaintiffs' Exhibit C-143

| Route Number Length | Decision | Rationale |
|---|---|---|
| D1991<br><br>1.07 miles | Closed | D1991 is closed to motorized travel; it is a one mile long dead route off Highway 313 that receives little motorized use. While the end of the route does approach the rim of Seven Mile Canyon, the route is intermingled with Rocky Tops Bicycle Route and can be a source of confusion for both motorized and non-motorized users. Closing D1991 will eliminate a problematic intersection with Highway 313. Closing D1991 will reduce visual contrast along a State Scenic Byway (Highway 313). Closing the route will minimize conflict between motorized and non-motorized users and restore vegetation and soil cover, minimizing the potential for soil erosion. Closing the route will enhance wildlife movement by reducing fragmentation in desert bighorn sheep habitat. |
| D1992<br><br>0.29 miles | Closed | D1992 is closed to motorized travel. D1992 is 0.29 mile long dead end spur off D1991 which is also closed to travel. Closing D1992 will reduce visual contrast along a State Scenic Byway (Highway 313). Closing the route will minimize conflict between motorized and non-motorized users and restore vegetation and soil cover, minimizing the potential for soil erosion. Closing the route will enhance wildlife movement by reducing fragmentation in desert bighorn sheep habitat. |
| D1994<br><br>1.62 miles | Closed | D1994 is closed to motorized travel. Motorized use of D1994 is low; it is a dead end that accesses no particular recreation destination (it was formed as an old wood-cutting route). D1994 has several crossings with the Rocky Tops Bicycle Trail and leads to route confusion for both motorized and non-motorized users. Closing D1994 will minimize impacts between motorized and non-motorized users. Closing D1994 will also reduce habitat fragmentation in desert bighorn sheep lambing habitat. Closing D1994 will also eliminate a problematic entrance onto Highway 313. Closing D1994 will reduce visual contrast along a State Scenic Byway (Highway 313). |
| D1994A<br><br>0.27 miles | Closed | D1994A is closed to motorized travel. Motorized use of D1994A is low; it is a dead end that accesses no particular recreation destination (it was formed as an old wood-cutting route). D1994A has several crossings with the Rocky Tops Bicycle Trail and leads to route confusion for both motorized and non-motorized users. Closing D1994A will minimize impacts between motorized and non-motorized users and will also reduce habitat fragmentation in desert bighorn sheep lambing habitat. |

LGB042111

Plaintiffs' Exhibit C-144

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2036<br><br>0.21 miles | Open | D2036 accesses SITLA lands near B139. Closing nearby D2034 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D20362 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D2041<br><br>1.56 miles | Open | D2041 links D2621 and D2063. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2041 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D2042<br><br>0.62 miles | Open | D2042 provides access to lands managed by SITLA. Closing nearby D2034 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2042 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D2043, D2046 and D2053<br><br>2.12 miles, 0.28 miles and 1.03 miles | Open | D2043 and D2046 are part of the Secret Spire Route, as is D2053, which provides access to a feature known as Dellenbaugh Tunnel. It accesses the viewpoint over Spring Canyon (which is on lands managed by SITLA). It is one of the more heavily used off-road vehicle routes in the Moab Field Office. The route is used by Special Recreation Permit holders, as well as by the general public. It is so popular that is featured in guidebooks.<br><br>Allowing continued use of D2043, D2046 and D2053 minimizes potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |

LGB042115

Plaintiffs' Exhibit C-145

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2376A<br><br>3.45 miles | Open | D2376A is the connection to Wipeout Hill from Utah Highway 313. D2376A is part of the Wipe Out Hill Route, which provides access to the Monitor and Merrimac Buttes. It also accesses a famous obstacle on the route, Wipeout Hill. It is one of the more heavily used off-road vehicle routes in the Moab Field Office. The route is used by Special Recreation Permit holders, as well as by the general public. It is so popular that it is featured in guidebooks. Closing nearby (and parallel) D2375 reduces route proliferation and confusion and reduces impacts to resources.<br><br>Allowing continued use of D2376A minimizes potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |
| D2377<br><br>1.89 miles | Closed | D2377 is closed to the public. D2377 is parallel to and redundant with B341, the Bartlett Flat road. D2377 accesses no recreation features and has no particular recreational value. Closing D2377 to the public will restore vegetation and soil cover, thus decreasing soil erosion. Closing the route will reduce habitat fragmentation in desert bighorn sheep lambing habitat. |
| D2379<br><br>2.67 miles | Open | D2379 is open to motorized travel. It connects Wipeout Hill to Utah Highway 313 via an easier and lower route than D2376A.   While parallel to D2376A (both access Wipeout Hill from Highway 313), D2379 is on a lower elevation level and provides different views than does D2376A. Closing parallel D2375 reduces route proliferation and confusion and reduces impacts to resources. With D2376A, this route creates a loop opportunity and connectivity with Wipeout Hill. Keeping D2379 open for motorized use will minimize impacts by providing access into the area on an existing route, reducing the potential for new disturbance from cross country travel. |
| D2383A<br><br>2.75 miles | Open | D2383A links B139 (Dubinky Well Road) with D2383B. Closing nearby D2524 and D2524A reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2383A will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

LGB042118

Plaintiffs' Exhibit C-146

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2383B<br><br>3.71 miles | Open | D2383B is open to motorized travel. D2383B forms a 3.7 mile long portion of the 3D Jeep Safari Route. To close D2383B would render the 3D trail a dead end and would lessen its value as a popular Jeep Safari trail and as a valued recreation experience. D2383B provides the connectivity necessary to preserve the trail's integrity and value. The 3D route is one of the oldest, most popular and easiest of the Jeep Safari trails (it is run almost every day during Jeep Safari). D2383B is relatively easy to drive and forms a valuable recreation experience. It is used by both commercial outfitters and motorized organized groups. Very little non-motorized recreation occurs in this area; conflicts between motorized and non-motorized users are thus minimized by providing a route that avoids these interactions. Keeping D2383B available for motorized recreation minimizes potential impacts to resources by directing motorized use on a route that can sustain the traffic level and by reducing the potential for cross country travel. Designating D2383B provides a valuable motorized recreation experience and minimizes the possibility of off-road travel by allowing travel on a well-managed route that reduces the inclination for visitors to travel off-trail. In addition, D2383B provides access to SITLA-managed land. |
| D2383C<br><br>2.42 miles | Open | D2383C is part of the 3D Route, one of the more heavily used off-road vehicle routes in the Moab Field Office. The route is used by Special Recreation Permit holders, as well as by the general public. It is so popular that it is featured in guidebooks. Closing parallel D2562 and D2491, as well as nearby D2387A and D2387 reduces route proliferation and confusion and reduces impacts to resources.<br><br>Allowing continued use of D2376A minimizes potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |

LGB042119

Plaintiffs' Exhibit C-147

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2393A<br><br>1.16 miles | Open | D2383C is part of the 3D Route (the Pickle), one of the more heavily used off-road vehicle routes in the Moab Field Office. The route is used by Special Recreation Permit holders, as well as by the general public. It is so popular that it is featured in guidebooks. Closing nearby D2367, D2387 and D2387A reduces route proliferation and confusion and reduces impacts to resources. Allowing continued use of D2393A minimizes potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |
| D2397<br><br>0.24 miles | Open | D2397 provides a link between D2413 and D2398G in the Seven Mile Rim area. Closing nearby D2475 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2397 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D2398<br><br>0.09 miles | Closed | D2398 is closed to motorized travel. D2398 is a dead end route into the upper reaches of Hidden Canyon. It is 0.09 miles long. It is closed to minimize desert bighorn sheep habitat fragmentation and to allow escape terrain in the upper reaches of Hidden Canyon while still allowing the main portion of the very scenic Hidden Canyon to be accessed by motorized users. Hidden Canyon itself is accessible by D2383C and D2393A and is the designated Jeep Safari route. D2398 travels up the head of the wash; it is in sand and invites cross country travel. The upper reaches of Hidden Canyon have seasonal water which is also important to wildlife. Closing D2398 will minimize the impacts of motorized use on wildlife habitat. |

LGB042122

Plaintiffs' Exhibit C-148

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2398A, D2398C<br><br>D2398E, D2398G and<br><br>D2398H<br><br>0.73 miles, 1.44 miles, 0.16 miles, 6.19 miles and 0.11 miles | Open | D2398A, D2398C, D2398E, D2398G and D2398H are part of the Seven Mile Rim/Wipeout Hill route, one of the more heavily used off-road vehicle routes in the Moab Field Office. The route is used by Special Recreation Permit holders, as well as by the general public. It is so popular that it is featured in guidebooks. Closing nearby D2482, D2398I, D2437 and D2484 reduces route proliferation and confusion and reduces impacts to resources.<br><br>Allowing continued use of D2398A, C, E, G and H minimizes potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |
| D2398B<br><br>2.35 miles | Open | D2398B is open to motorized travel. D2398B is a 2.35 mile connecting route between Seven Mile Mesa and Tusher Canyon. D2398B provides the only connectivity between these two popular motorized recreation routes, starting at Determination Towers in the south and travelling north in Tusher Canyon. D2398B is utilized as part of three popular Jeep Safari routes (3D, Seven Mile Rim and Wipeout Hill); these are routes that are particularly popular with motorized users. The route is utilized by many motorized outfitters and organized group permittees. Although home to a few cottonwoods, Tusher Wash is an ephemeral stream and does not have year-round active water. Providing a common access to this area reduces the potential for new disturbances from cross country use and concentrates motorized use on an alignment capable of accommodating the route's traffic. |
| D2398D<br><br>1.34 miles | Open | D2398D is open to motorized travel. D2398D is an essential part of the Seven Mile Rim and Backwards Bill Jeep Safari trails, which are utilized by commercial outfitters and organized group permittees. D2398D provides connectivity between D2366 and D2436 and is the most iconic segment of the Seven Mile Rim trail. It follows a slickrock bench below Merrimac Butte and provides a very popular photography spot to highlight vehicles parked under that butte. No other route in the area provides this recreation experience. The route is 80% slickrock and thus impacts to vegetation and soil are minimized by allowing vehicles to stay on this route. Very few non-motorized users utilize this area and conflicts with non-motorized users are thus minimized. Designating D2398D as a managed route will minimize potential impacts to documented resources by directing motorized use rather than dispersing it on an alignment incapable of accommodating this traffic. |

Plaintiffs' Exhibit C-149

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2588A<br><br>0.3 miles | Closed | D2588A is closed to motorized travel. This portion of the route is past the end of the SITLA section. This route is a dead end spur and has no particular recreation value. Closing D2588A restores vegetation and soil cover and reduces soil erosion. Closing D2588A provides additional unfragmented habitat in pronghorn fawning habitat and in desert bighorn sheep habitat. |
| D2591<br><br>1.00 miles | Closed | D2591 is closed to motorized travel. It is a one mile long dead end spur. D2591 also accesses a developed wildlife guzzler providing water to pronghorn during the dry season. Closing the route to the public will provide protection for the watering wildlife, as well as allow the utility companies access to their facilities. Those wishing to drive the road under the powerlines can utilize D2803, which remains open to travel by the general public. |
| D2613<br><br>0.88 miles | Closed | D2613 is closed to motorized travel. D2613 is a 0.88 mile long dead end spur route of B137. Closing this route will minimize impacts to wildlife habitat (e.g., desert bighorn sheep lambing) by reducing habitat fragmentation. Closing this route will contribute to retaining and restoring vegetation (e.g., blackbrush, salt desert shrub) and soil cover, minimizing potential for soil erosion. |
| D2615<br><br>0.12 miles | Closed | D2615 is closed to motorized travel. It  is parallel to and redundant with B137. D2615 is reclaimed naturally, which suggests it receives little to no OHV use,  and barely visible on the ground. D2615 is 0.12 miles long and is confusing for the motorized user who recognizes it as a road. Closing D2615 will reduce visual contrast, restore vegetation and soil cover and decrease route proliferation. Closing D2615 will decrease habitat fragmentation in desert bighorn sheep lambing habitat. |
| D2616<br><br>0.57 miles | Closed | D2616 is closed to motorized travel. It is a 0.57 mile long dead end spur route off B137. Closing this route will minimize impacts to wildlife habitat (e.g., desert bighorn sheep). Closing will minimize route proliferation in the area. Closing D2616 will contribute to retaining and restoring vegetation and soil cover, minimizing potential for soil erosion. |
| D2618<br><br>3.31 miles | Open | D2618 provides a link between B338 (Spring Canyon Point Road) and B137 (Dubinky Well Road). Closing nearby D2613, D2616 and D2624 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2618 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

Plaintiffs' Exhibit C-150

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2621, D2642 and D6971<br><br>5.84 miles, 0.88 miles and 0.05 miles | Open | D2621 is part of the Secret Spire Route, as are D2642 and D6971. Secret Spire is one of the more heavily used off-road vehicle routes in the Moab Field Office. The route is used by Special Recreation Permit holders, as well as by the general public. It is so popular that is featured in guidebooks. Closing nearby D2639 reduces route proliferation and confusion and minimizes impacts to resources.<br><br>Allowing continued use of D2621, D2642 and D6971 minimizes potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel. |
| D2622<br><br>0.05 miles | Open | D2622 is open to motorized travel. It is 0.05 mile long and constitutes the fenced parking area at the base of the Needle Rock (aka Tombstone). D2622 is popular for dispersed vehicle camping use. Allowing continued use of this route contains the impacts from parking and camping to the fenced area. |
| D2624<br><br>2.23 miles | Closed | D2624 is closed to motorized travel. D2624 is redundant with D2626, which remains open for travel. D2626 (with D2629, B331 and B338) allows travel around the base of the mesa known as "Lost World Buttle". Closing D2624 will decrease habitat fragmentation in desert bighorn sheep lambing habitat, as well as provide increased undisturbed habitat for nearby raptor nests (Prairie falcon and Cooper's hawk). Closing D2624 will lessen route proliferation and confusion. |
| D2626<br><br>6.13 miles | Open | D2626 is part of the Crystal Geyser Route. It links B338 and B372. The route is used by Special Recreation Permit holders, as well as by the general public. It is popular enough to be included in guidebooks. Closing parallel D2624, as well as nearby D2633, D2639, D2638 and D2624 reduces route proliferation and confusion and minimizes impacts to resources.<br><br>Allowing continued use of D2626 minimizes potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. Continued use of this route will minimize conflicts among various users of public land by providing access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface. Providing a designated access route for users will minimize impacts to resources by reducing the potential for unauthorized cross country travel |

LGB042138

Plaintiffs' Exhibit C-151

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2653<br><br>0.94 miles | Closed | D2653 is closed to motorized travel. D2653 is parallel to and redundant with D2652, which remains available for travel. (D2652 accesses the same SITLA section as does D2653). D2653 is barely visible on the ground, indicating a lack of purpose and need (the recreation destinations are more easily accessed using D2652). Closing D2653 will minimize route proliferation, as it connects destinations accessible from other open routes and parallels the open route D2652 for its entire length. Closing D2653 will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance wildlife habitat by eliminating motorized use and removing the route footprint. |
| D2654<br><br>0.09 miles | Closed | D2654 is closed to motorized travel. It has reclaimed naturally, which suggests it receives little to no OHV use  and is not visible on the ground. It is a 0.09 miles long dead end spur. It provides no access due to the decision to close route D2653. Closing route D2654 will minimize route proliferation, as it connects destinations accessible from other open routes. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance wildlife habitat by eliminating motorized use and removing the route footprint. |
| D2656<br><br>0.56 miles | Closed | D2656 is closed to motorized travel. It is a 0.56 mile long seldom used dead end spur. Closing D2656 will minimize route proliferation, as it connects destinations accessible from other open routes such as D2658. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance wildlife habitat, especially desert big horn sheep lambing habitat, by eliminating motorized use and removing the route footprint. |
| D2658<br><br>2.15 miles | Closed | D2658 is closed to motorized travel. It is a 2.15 mile long dead end spur that ends at an overlook above the Green River. D2658 is largely within desert bighorn sheep lambing habitat; closing this route will minimize impacts to its habitat, as well as pronghorn crucial fawning range, and raptor habitat. Closing the route will minimize impacts to vegetation and soil cover, minimizing the potential for soil erosion. |
| D2659<br><br>1.72 miles | Open | D2659 links D2652 with B338. Closing nearby DD2658, D2656, D2661, D2663 and D2664A reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2659 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

LGB042141

Plaintiffs' Exhibit C-152

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2661<br><br>1.04 miles | Closed | D2661 is closed to motorized travel. It is redundant with D2659, which remains open to travel. Closing D2661 will reduce route confusion and route proliferation. Closing D2661 will enhance wayfinding. Closing D2661 will restore vegetation and soil cover, reducing soil erosion. Closing the route will reduce fragmentation in pronghorn fawning habitat. |
| D2662 and D2664<br><br>1.31 miles and 0.59 miles | Open | D2662 leads to a view into Ten Mile Wash (off B336). D2664 offers a view into a tributary of Ten Mile known as Rock Canyon. Closing nearby D2664A, D2656, D2658 and D2661 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2662 and D2664 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D2663<br><br>0.45 miles | Closed | D2663 is closed to motorized travel. D2663 is 0.45 miles long and is reclaimed naturally, which suggests it receives little to no OHV use  (it commenced on an oil pad which was reclaimed recently). Closing D2663 will reduce route confusion and route proliferation. Those wishing to access the rims of Ten Mile Wash are able to utilize D2659, the better road, which remains open. Closing D2663 will restore vegetation and soil cover and reduce fragmentation in pronghorn fawning habitat. |
| D2664<br><br>0.59 miles | Open | D2664 is open to motorized travel. D2664 accesses the rim of a scenic tributary of Ten Mile Wash that is known as "Rock Canyon". D2664 provides a moderate motorized driving experience with a valued destination. It remains open to provide this experience.   Keeping D2664 open will lessen the likelihood of cross country driving and provide an existing route for travel in this area. |
| D2664A<br><br>1.40 miles | Closed | D2664A is closed to motorized travel. It is a 1.4 mile long connector route between D2662 and D2664. D2664A is within desert bighorn sheep lambing habitat and pronghorn crucial fawning range; closing this route will minimize impacts to these habitats. Closing this route will contribute to retaining and restoring vegetation and soil cover, minimizing the potential for soil erosion. |

LGB042142

Plaintiffs' Exhibit C-153

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2674<br><br>0.64 miles | Closed | D2674 is closed to motorized travel. D2674 is a little used, 0.64 mile long dead end spur. D2674 lacks access due to the decision to close D2653. Closing D2674 will minimize route proliferation, as it connects destinations accessible from other open routes. Closing D2674 will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance wildlife habitat, especially desert bighorn sheep lambing habitat, by eliminating motorized use and removing the route footprint. |
| D2675<br><br>0.57 miles | Closed | D2675 is closed to motorized travel. It is a 0.57 mile long, little used, dead end spur. D2675 lacks access due to decision to close route D2653. Closing D2675 will minimize route proliferation, as it connects destinations accessible from other open routes. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance wildlife habitat, especially desert bighorn sheep lambing habitat, by eliminating motorized use and removing the route footprint. |
| D2678A<br><br>1.06 miles | Open | D2678A leads to an overlook of Hey Joe Canyon. Closing the extension of this road (D2678B) as well as closing D2680, D2686 and D2685 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2678A will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D2678B<br><br>0.57 miles | Closed | D2678B is closed to motorized travel. D2678B is an 0.57 mile long, little used, extension of D2678A. Closing 2678B will minimize route proliferation. Closing D2678B will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance desert bighorn sheep lambing habitat and avoid a nearby peregrine falcon nest by eliminating motorized use and removing the route footprint. |
| D2680<br><br>2.47 miles | Closed | D2680 is closed to motorized travel. Closing Route D2680 will minimize route proliferation; views of the Green River remain available from other routes such as B338. Closing D2680 will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance desert bighorn sheep lambing habitat by eliminating motorized use and removing the route footprint. |

LGB042143

Plaintiffs' Exhibit C-154

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2685<br><br>0.41 miles | Closed | D2685 is closed to motorized travel. It is a 0.41 mile long spur and reclaimed naturally, which suggests it receives little to no OHV use. Closing D2685 will minimize route proliferation, as it connects destinations accessible from other open routes including B338. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance wildlife habitat, especially desert bighorn sheep lambing habitat, by eliminating motorized use and removing the route footprint |
| D2686<br><br>1.30 miles | Closed | D2686 is closed to motorized travel. Closing D2686 will minimize route proliferation.. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance wildlife habitat, especially desert bighorn sheep lambing habitat and avoid a nearby peregrine falcon nest, by eliminating motorized use and removing the route footprint. |
| D2691<br><br>0.17 miles | Closed | D2691 is closed to motorized travel. It is a 0.17 mile long dead end spur that has reclaimed naturally, which suggests it receives little to no OHV use. Closing D2691 will minimize route proliferation. Closing this route will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance wildlife habitat, especially desert bighorn lambing habitat, by eliminating motorized use and removing the route footprint |
| D2693<br><br>0.34 miles | Closed | D2693 is closed to motorized travel. It is a 0.34 mile long spur route off B338. Closing this route, along with adjacent routes minimizes impacts to wildlife habitat (e.g., desert bighorn sheep). Closing this route will contribute to retaining and restoring vegetation and soil cover, minimizing the potential for soil erosion. |
| D2696<br><br>0.2 miles | Open | D2696 is the sole access to SITLA managed land. It also links B338 with its southern extension. Closing nearby D2661, D2663 and D2646 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2696 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

LGB042144

Plaintiffs' Exhibit C-155

| D2759B 10.6 miles | Closed | D2759B is closed to motorized travel. D2759B is the lower 10.6 miles of Ten Mile Wash, from "Midway" to the Green River; it generally travels directly within the streambed. D2759B is closed to motorized travel to minimize impacts to wildlife, cultural and riparian resources, as well as to minimize known visual and noise-induced conflicts with non-motorized users on the Green River. Ten Mile Wash was designated an ACEC in the Moab RMP to protect the relevant and important values of natural systems(riparian/wetlands), wildlife, cultural resources and natural hazards. The lower portion of Ten Mile Wash is historically less popular with motorized users than D2759A; however, the impacts to the above-mentioned values from continued motorized use is harming those resources and is not sustainable. Each of these values will be discussed in turn:

Cultural:  Ten Mile Wash is rich in cultural resources, including important habitation sites and unusual artifacts; these have been impacted by recent human activities.

Wildlife: Ten Mile Wash is one of the few sources of water in a very arid area; it is within desert bighorn sheep lambing and pronghorn fawning habitat and also provides habitat for many other wildlife species, including migratory birds, amphibians and reptiles. Amphibians include Great Basin spadefoot (*Spea intermontana*), red-spotted toad (*Anaxyrus punctatus*), Woodhouse's toad (*Anaxyrus woodhousii*), tiger salamander (*Ambystoma tigrinum,*), northern leopard frog (*Lithobates pipiens*), and canyon tree frog (*Hyla arenicolor*). A UDWR amphibian report states that "of all locations surveyed to date, Kane Creek and Ten Mile Canyon appear to hold the most diverse and thriving amphibian populations" (UDWR 2016). This important and rare habitat is fragmented and degraded by continued motorized use.

Riparian/wetlands: Ten Mile Wash contains a rich mixture of riparian, wetland and hydrologic resources that is rare in the Moab Field Office. Ten Mile is a drought imperiled 303d-listed water with impairment for temperature and dissolved oxygen. A proper Functioning Condition (PFC) assessment performed by an IDT in 2012 at Ten Mile Wash concluded that the area from Dripping Springs to Trail Canyon is Functioning at Risk. Specifically, this PFC report on Ten Mile states, "roads are impacting banks" and there is "accelerated bank erosion" and the presence of gullies and active "downcutting" within the roadway. PFC assessments also indicate the presence of "cut banks, unnatural overflow channels" and that "roads influence overflow channels … old roads become overflow channels." The PFC report shows that the banks are not laterally stable because the channel follows the roads resulting in less sinuosity. Therefore, point bars are not forming nor is vegetation establishing on them. The PFC report summary states that "road impacts have become major since the 1980s" and that the road in Ten Mile Wash may be one of the biggest influences on riparian condition. Impacts to the riparian habitat, stream |

Plaintiffs' Exhibit C-156

| Route Number Length | Decision | Rationale |
|---|---|---|
| | | geomorphology, and hydrologic function has increased commensurate with increased use and in the context of persistent drought. |
| | | D2759B reaches the Green River. When vehicles reach the Green River (at low water), they often try to go up and down the river, which constitutes unauthorized off-route travel. Closing D2759B will reduce this route proliferation in a Wild and Scenic River corridor, and will thus reduce known conflicts between motorized and non-motorized users (boaters). |
| | | To minimize impacts to the resources listed above, D2759B is closed to motorized use. While Ten Mile is a desirable motorized experience, especially for those on UTVs and motorcycles, the impacts to cultural, wildlife, and riparian resources, as well as the known conflicts between motorized and non-motorized users outweigh the recreation experience that can be obtained elsewhere. The BLM has attempted to mitigate these impacts since the road was designated in the 2008 RMP Travel Plan but monitoring shows that the impacts have only increased. See EA sections 3.2.1, 3.2.4, 3.2.6, 3.2.8 and 3.3.1 for additional information specific to Ten Mile Wash. |
| | | While D2759B accesses the extreme southeast corner of a SITLA section (Sec 32, T24S., R17E), the majority of the acreage of that section is above the rim of the canyon and is accessed by B336. |
| D2760 0.98 miles | Open | D2760 provides access off B336 (Ten Mile Point Road) to an overlook of Ten Mile Wash on the north and to a natural stone arch. Closing nearby D2845, D7059 and D2844 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2760 will minimize potential impacts to documented resources by maintaining motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D2761 0.38 miles | Open | D2761 is open to motorized travel. D2761 provides access between B336, B377, and DC3, providing recreation access and opportunities. Continued use of D2761 will minimize impacts to soil and vegetation cover by providing a recreation opportunity on an existing route. Impacts to wildlife habitat from D2761 will be minimized by closing the D2761A and D2761B portions of the route. |
| D2761A 0.52 miles | Closed | D2761A is closed to motorized travel. It is a 0.52 mile long spur that is reclaiming naturally, which suggests it receives little to no OHV use . Closing D2761A will restore vegetation and soil cover and reduce soil erosion. Closing D2761A will reduce visual contrast and reduce fragmentation in desert bighorn sheep lambing habitat and in pronghorn fawning habitat. |

LGB042153

Plaintiffs' Exhibit C-157

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2761B<br><br>0.38 miles | Closed | D2761B is closed to motorized travel. Closing D2761B will contribute to retaining and restoring vegetation and soil cover, minimizing potential for soil erosion. Closing D2761B will reduce visual contrast and reduce fragmentation in desert bighorn sheep lambing habitat and in pronghorn fawning habitat. |
| D2763A<br><br>0.71 miles | Closed | D2763A is closed to motorized travel. Closing D2763A will contribute to retaining and restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing the route to OHV use will reduce impacts to riparian habitat. Closing this route will enhance wildlife habitat, especially desert bighorn sheep habitat, by eliminating motorized use and removing the route footprint. |
| D2763B<br><br>0.84 miles | Closed | D2763B is closed to motorized use. D2763B is directly adjacent to the Green River. Closing D2763B will minimize visual and noise-induced conflicts between motorized and non-motorized users (e.g., canoeist on the Green River). Closing this route will contribute to retaining and restoring soil and vegetation cover (e.g., blackbrush, riparian/wetland ecosystem), minimizing potential for soil erosion, including soil erosion into the Green River. |
| D2763C<br><br>0.84 miles | Closed | D2763C is closed to motorized use. It is directly adjacent to the Green River. Closing D2763C will minimize visual and noise-induced conflicts between motorized and non-motorized users (e.g., canoeists on the Green River). Closing this route will enhance riparian habitat. Closing this route will enhance wildlife habitat, especially for desert bighorn sheep. |
| D2766<br><br>0.60 miles | Open | D2766 is open to motorized travel. D2766 provides route connectivity in the Dee Pass Motorized Focus Area; specifically, it provides connectivity and flow among TTIP1, D2800 and D2761. Closing nearby D7070, D2761A, DC2 and DC3 reduces route proliferation and confusion and reduces impacts to resources. Continued use of D2766 provides a recreation opportunity in a Focus Area (RMZ) designated to provide focused motorized trail opportunities. Continued use of D2766 will minimize impact to vegetation, soil cover, and desert bighorn sheep and pronghorn fawning habitat by providing route connectivity on an existing route. |

LGB042154

Plaintiffs' Exhibit C-158

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2849 and D2855<br><br>0.53 miles and 0.30 miles | Open | D2849 and D2855 are dead end spurs to overlooks of Ten Mile Wash. Closing nearby DC1, D2840, D2840B, D2850, D2867, D2846, D7073 and D2759B reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2849 and D2855 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D2850<br><br>1.38 miles | Closed | D2850 is closed to motorized travel. D2850 is parallel to and redundant with B336 to the north. Route connectivity and recreational opportunities (driving on maintained and unmaintained routes) remain available on B336. Closing D2850 will improve wayfinding and reduce confusion. Closing D2850 will contribute to restoring and retaining vegetation and soil cover, minimizing impacts to soil erosion. Closing this route will reduce the visual contrast created by the route and reduce route proliferation in the area. |
| D2850A<br><br>1.39 miles | Closed | D2850A is closed to motorized travel. D2850A is a 1.39 mile long dead end and while it provides access to an overlook of Labyrinth Canyon, additional overlooks exist to the north and south of D2850A. These overlooks (B377 and D2852), while not redundant with D2850A, provide similar recreation opportunities (viewpoints of Labyrinth Canyon). Closing D2850A will minimize route proliferation while continued use of D2852 will retain recreational opportunities in the area. Closing D2850A will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing this route will enhance wildlife habitat, specifically desert bighorn sheep and pronghorn fawning habitat, by eliminating motorized use and removing the route footprint. |
| D2852<br><br>0.24 miles | Open | D2852 is a dead end route to an overlook of the Green River. Closing nearby D7070, D2850A, D2854 and DC2 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2852 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

LGB042159

Plaintiffs' Exhibit C-159

| Route Number Length | Decision | Rationale |
|---|---|---|
| D2929<br><br>0.29 miles | Closed | D2929 is closed to motorized travel. D2929 is a 0.29 mile dead end spur. D2929 not provide a purpose and need to the OHV because, among other reasons, the route does not lead to a known destination or recreation opportunity and does not provide connectivity to the route network. . Closing D2929 will enhance safety for the OHV public in an area where known hazards exist, as well as reduce on-the-ground confusion and improve wayfinding. |
| D2930<br><br>3.06 miles | Open | D2930 links the White Wash Sand Dunes with an overlook of the Green River. Closing nearby OWW1, D2929, D2925, D2945, D7308 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D2930 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D2936<br><br>0.98 miles | Closed | D2936 is closed to motorized travel. It is a 0.98 mile long connector route; route connectivity will be maintained through other routes in the area. Closing D2936 will minimize impacts to wildlife habitat (e.g., desert bighorn sheep, pronghorn crucial fawning range). Closing the route will contribute to retaining and restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing the route will minimize route proliferation in the area. |
| D2936A<br><br>0.49 miles | Limited (Singletrack) | D 2936A is open but limited to motorized singletrack. The primary use of D2963A is motorcycle use and it provides route connectivity for the Oil Well Wash (OWW2) route that is limited to vehicles less than 50 inches wide and Salt Wash route (SW1) that is also limited to vehicles less than 60 inches wide. D2936A provides motorcycle single track connectivity within the Dee Pass Motorized Focus Area. Limiting motorized use to motorcycle only will minimize damage to soil, watershed, and vegetation by reducing the size of route footprint. |
| D2936B<br><br>0.98 miles | Limited to vehicles less than 50 inches in width | D2936B is open but limited to vehicles less than 50 inches wide. D2936B is open to provide connectivity between OWW2, D2955 and SW1. Keeping D2936B open to vehicles less than 50 inches wide enables the closure of parallel and redundant SWL-1, thus reducing impacts to soil, vegetation and visual footprint. |

LGB042163

Plaintiffs' Exhibit C-160

| Route Number Length | Decision | Rationale |
|---|---|---|
| D3200<br><br>0.10 miles | Closed | D3200 is closed to motorized travel. D3200 is a 0.1 mile long dead end spur with no identified purpose and need. Closing D3200 minimizes route redundancy and proliferation. Closing this route minimizes impacts to wildlife habitat, especially for desert bighorn sheep and fawning pronghorn antelope. |
| D3211<br><br>0.89 miles | Closed | D3211 is closed to motorized travel. It is 0.89 miles long and reclaiming naturally, which suggests it receives little to no OHV use. Closing D3211 minimizes route redundancy and proliferation, as access is available from route D2972. Closing D3211 will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing D3211 will reduce overall impact of vehicle use and route footprint in the area. |
| D3212<br><br>0.87 miles | Closed | D3212 is closed to motorized travel. It is 0.87 miles and is reclaiming naturally, which suggests it receives little to no OHV use. Closing D3212 minimizes route redundancy and proliferation, as access is available from D2972. Closing D3212 will contribute to retaining or restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing D3212 will reduce overall impact of vehicle use and route footprint in the area. |
| D3236<br><br>0.51 miles | Open | D3236 open to motorized travel. It provides access to SITLA-managed land and provides the only access to the southern end of Green River missile test facility. |
| D3244 and D3247<br><br>0.28 miles and 0.20 miles | Open | D3244 and D3247 access lands managed by SITLA. Closing nearby D3270, D3284, and D3280 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D3344 and D3247 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D3262<br><br>2.98 miles | Open | D3262 accesses a viewpoint above Crystal Geyser. Closing nearby D3270, D3284, and D3280 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D3262 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

LGB042175

Plaintiffs' Exhibit C-161

| Route Number Length | Decision | Rationale |
|---|---|---|
| D3263<br><br>1.10 miles | Open | D3263 is open to motorized travel. It is 1.1 miles in length and provides connectivity for a "loop" motorized experience. It is in a motorized focus area. Directing motorized use on this route will reduce trespass and cross-country travel, thus minimizing impacts to soil, vegetation and wildlife. |
| D3270<br><br>1.41 miles | Closed | D3270 is closed to motorized travel. D3270 services a high voltage transmission line and is its only access. It accesses no recreation sites and no recreation purpose and need. Closing D3270 minimizes route redundancy and route proliferation and minimizes impact to wildlife habitat, including pronghorn fawning and desert bighorn sheep. |
| D3280<br><br>0.73 miles | Closed | D3280 is closed to motorized travel. D3280 is reclaiming naturally, which suggests it receives little to no OHV use; it is 0.73 dead end spur. Closing D3280 minimizes route redundancy and proliferation. Closing this route minimizes impacts to wildlife habitat, including pronghorn antelope and desert bighorn sheep. |
| D3284<br><br>0.65 miles | Closed | D3284 is closed to motorized travel. D3284 is an 0.65 mile extension of D9130 and receives low use as indicated in the route report. Closing D3284 will minimize conflicts between motorized and non-motorized users on the Athena mountain bike trail. Closing the route will minimize impacts to wildlife habitat (e.g., desert bighorn sheep, pronghorn crucial fawning range), soil and vegetation. |
| D3330<br><br>0.73 miles | Open | D3330 accesses a high point. Closing nearby D3035 and D3054 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D3330 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D3488,<br>D3498,<br>D3499 and D3501<br><br>2.43 miles, 0.94 miles, 1.27 miles and 0.16 miles | Open | D3488, D3498, D3499 and D3501 are within the Bar M Mountain Bike Focus Area. D3501 accesses the trailhead parking lot. Closing nearby D3494, D3500, D3503 and D3559 reduces route proliferation, user conflict, and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources and non-motorized users by reducing the potential for unauthorized cross-country travel. Allowing continued use of D3488, D3498, D3499 and D3501 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |

LGB042176

| Route Number Length | Decision | Rationale |
|---|---|---|
| D3547<br><br>0.41 miles | Open | D3547 accesses two parcels of SITLA lands just west of Arches National Park. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D3547 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D3551, and<br><br>D3569<br><br>1.20 miles and 3.3 miles | Open | D3551 and D3569 provide access to lands managed by SITLA just west of Arches National Park. Closing nearby D3590, D3589 and D3505 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D3551 and D3569 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D3559<br><br>0.42 miles | Closed | D 3559 is closed to motorized travel. It is within the Bar M Mountain Bike Focus Area, the most popular of the mountain bike areas in Moab. It receives extensive use by bicyclists, including children, as it provides an easier mountain bike opportunity than some of the singletrack bike trails in the Focus Area. The road is closed to enhance the mountain biking experience and to enhance safety in this popular mountain biking venue. Closing the will minimize conflicts between motorized and non-motorized users in this area. |
| D3565<br><br>0.9 miles | Closed | D3565 is closed to motorized use. D3565 is a very low use road that is reclaiming naturally, which suggests it receives little to no OHV use . It is within the Klondike Mountain Bike Focus Area and it parallels several designated bike routes. It is primarily used for hiking into Arches National Park. Closing D3565 will reduce the visual contrast created by the route (it is clearly visible from the designated bicycle routes) and contribute to retaining vegetation and soil cover. Closing D3565 minimizes conflicts between motorized and non-motorized users in an area that is primary used by bicyclists and, secondarily, by hikers. In addition, closing D3565 will prevent vehicular trespass into Arches National Park. Note: the trailhead for Klonso authorized in DOI-BLM-UT-Y010-20130-0239-EA is at the intersection of D3565 and B378. This trailhead remains authorized. |
| D3571<br><br>0.59 miles | Open | D3571 is open to motorized travel. D3571, while on BLM managed lands, is a part of the Sovereign ATV loop, which is primarily on Utah Raptor State Park. D3571t is 0.59 miles long remains open for motorized use to enable these types of motorized recreation opportunities. Directing motorized use on this route will reduce trespass and cross country travel, thus reducing impacts to soil, vegetation and wildlife. |

Plaintiffs' Exhibit C-163

| Route Number Length | Decision | Rationale |
|---|---|---|
| D7066<br><br>0.35 miles | Closed | D7066 is closed to motorized travel. D7066 is a 0.35 mile long route between D2700 and D2707. Both of these routes are accessed by other open roads, making D7066 redundant  Closing D7066 reduces confusion with on-the-ground navigation and minimizes impacts to such wildlife resources as desert bighorn sheep and pronghorn fawning habitat. D7066 is quite faint on the ground, indicating a low level of use. |
| D7070<br><br>1.10 miles | Closed | D7070 is closed to motorized travel. D7070 is reclaiming naturally, which suggests it receives little to no OHV use . D7070 forms a "triangle" between B377 and D2761; vegetation is growing in the route and it is very seldom used.  D7070 is redundant, as B377 and D2761 can be accessed using other open routes. Closing  D7070 will reduce visual contrast and restore vegetation and soil cover, minimizing the potential for soil erosion. Closing the route will enhance wildlife habitat by reducing habitat fragmentation in desert bighorn sheep and pronghorn fawning habitat. |
| D7073<br><br>0.30 miles | Closed | D7073 is closed to motorized travel. D7073 is a 0.3 mile long dead end spur that is reclaimed naturally, which suggests it receives little to no OHV use; it is no longer used. D7073 provides no particular recreation destination or benefit. Closing D7073 will decrease habitat fragmentation in desert bighorn sheep lambing habitat. Closing D7073 will reduce visual contrast and restore vegetation and soil cover. Closing this route will eliminate the route footprint in an area with sensitive resources. |
| D7209<br><br>0.04 miles | Closed | D7209 is closed to motorized travel. It is a 0.04 mile long spur off D2014, which is closed, therefore making D7209 inaccessible. Closing D7209 will contribute to retaining and restoring vegetation and soil cover, minimizing the potential for soil erosion. Closing D7209 will minimize impacts to desert bighorn sheep lambing habitat by reducing habitat fragmentation and vehicle/wildlife conflicts. Closing this route will minimize conflict between motorized and non-motorized users (e.g., canoers on the Green River) |
| D7268<br><br>0.90 miles | Closed | D7268 is closed to motorized travel. D7268 is a 0.9 mile long route between D2909 and B147. The route is redundant with these two routes. Closing D7268 will reduce route redundancy in an area rife with routes; it will enhance route navigability as there will be fewer intersections to decipher. Closing D7268 will reduce visual contrast and restore vegetation and soil cover. Closing the route will minimize pronghorn fawning and desert bighorn sheep habitat fragmentation. |

LGB042186

| Route Number Length | Decision | Rationale |
|---|---|---|
| D8869<br><br>0.09 miles | Closed | D8869 is closed to motorized travel. It is a 0.09 mile long route which is reclaimed naturally, which suggests it receives little to no OHV use. D8869 is parallel to and redundant with D1394, which accesses the same recreation destinations and opportunities. Closing D8869 minimizes route redundancy and proliferation. Closing this route minimizes impacts to wildlife habitat, especially that of desert bighorn sheep. |
| D9010<br><br>0.35 miles | Closed | D9010 is closed to motorized travel; it is a 0.35 mile long spur that has reclaimed naturally, which suggests it receives little to no OHV use. D9010 accesses no destination of any recreational value. It leaves B215 (the Cotter Road) and approaches private property to the north of that road. Closing D9010 protects the integrity of the private property and reduces raptor and desert bighorn sheep habitat fragmentation. The surrounding area is also habitat for the stagecoach milkvetch, a BLM sensitive plant. Closing this reclaimed route minimizes impacts to these resources. |
| D9099<br><br>0.25 miles | Limited (Singletrack) | D9099 is open but limited to motorized singletrack. The primary use of D9099 is motorcycles and it provides a unique recreational opportunity (overlook). Both open routes (EL6 and D2739) that access D9099 are limited to motorized single track. Limiting motorized use to motorcycle only will minimize damage to soil, watershed, and vegetation by reducing the size of route footprint. |
| D9130<br><br>0.70 miles | Open | D9130 is a dead end spur. Closing nearby D3280, D3238A and D3270 reduces route proliferation and confusion and reduces impacts to resources. Providing a designated route will minimize impacts to resources by reducing the potential for unauthorized cross-country travel. Allowing continued use of D9130 will minimize potential impacts to documented resources by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume. |
| D9141<br><br>0.17 miles | Closed | D9141 is closed to motorized travel. D1527 (Hey Joe Canyon) is the access to this route, and it is closed. Closing D9141 will reduce route proliferation, as well as minimize impacts to wetlands and riparian habitats and reduce potential for sediment transport into the Green River. Closing D9141 will minimize impacts to wildlife habitat (e.g., desert bighorn sheep, migratory birds, raptors) and will minimize the potential for conflicts between offroad vehicle users and dispersed, non-motorized/non-mechanized forms of recreation (e.g., canoeists). |
| DC1<br><br>0.54 miles | Closed | DC1 is closed to motorized travel. DC1 is 0.54 miles long and provides access to Ten Mile Wash, which is closed to motorized travel. Closing DC1 reduces confusion and minimizes impacts to soil, water, vegetation and desert bighorn sheep and pronghorn fawning habitat. |

Attachment 2: Decision Rationales
Labyrinth/Gemini Bridges Travel Management Plan

Plaintiffs' Exhibit C-165

# 1. INTRODUCTION AND BACKGROUND

## 1.1 INTRODUCTION

The Labyrinth/Gemini Bridges Travel Management Plan (TMP) will designate a comprehensive travel network of motorized routes and trails, and provide for the long-term operation, monitoring, and maintenance of the network within the Labyrinth/Gemini Bridges Travel Management Area (TMA).

This Environmental Assessment (EA) analyzes potential impacts of the proposed travel network alternatives on the TMA's natural and human environment and is focused on issues raised during scoping. The final selected travel network will be developed from the range of alternatives considered in this EA and may include the modification of an alternative or a combination of the alternatives.[1] This EA was prepared in compliance with the National Environmental Policy Act (NEPA) and will assist the Bureau of Land Management (BLM) decision maker in determining whether any significant impacts could result from implementing the project. If there are no significant impacts anticipated, the BLM will prepare a Finding of No Significant Impact and a signed Decision Record will be issued. The Decision Record documents the decision regarding the selected travel network. The TMP may then be implemented after all other program-specific procedural requirements (i.e., any appeals) have been met.

## 1.2 BACKGROUND

The BLM's Moab Field Office (MFO) is proposing to designate routes within the TMA to form an off-highway vehicle (OHV) travel network. The proposed network alternatives were developed from 1,127.7 miles of evaluated travel routes on an estimated 303,994 acres of BLM lands in the Labyrinth/Gemini Bridges TMA (see map in Appendix K). Though the term "OHV" is generally associated with off-road vehicles, the regulatory definition includes full-size cars and trucks as well as utility terrain vehicles (UTVs), all-terrain vehicles (ATVs), motorcycles, e-bikes[2], etc., *when in use by the general public*; the regulations exempt military, fire, emergency, or law enforcement vehicles from the OHV definition while being used for emergency purposes. Also exempt are vehicles in official BLM use and those that have been authorized by BLM or otherwise officially approved.

The designated travel network will be implemented, operated, and maintained according to the network's route designations and the TMP Implementation Guide (see Appendix N). The travel network designation chosen for this project will replace the route designations assigned in the TMA by the BLM's 2008 Moab Field Office Record of Decision and Approved Resource Management Plan (2008 RMP) and TMA route designations that have been modified from those established in the 2008 RMP. For details on these earlier designation efforts, see pages 18-20 and 36-37 as well as Appendix N (page N-1) of the 2008 RMP (BLM 2008c). The travel network

---

[1] See Section 2.1.4 for details on route designations within the range of alternatives.

[2] Under 43 C.F.R. § 8340.0-5(a)(5), e-bikes are considered OHVs unless an authorized officer expressly determines, as part of a land-use planning or implementation-level decision, that e-bikes should be treated the same as non-motorized bicycles.

Plaintiffs' Exhibit C-166

alternatives in this EA incorporate updated consideration and evaluation of all inventoried routes in the TMA. Any subsequent route designation(s) would be completed in compliance with regulatory and legal requirements, including NEPA.

## 1.3 PURPOSE AND NEED

The BLM needs to comply with a settlement agreement reached in 2017 (2017 Settlement Agreement).[3] As part of the 2017 Settlement Agreement, the BLM committed to issue a new TMP for the Labyrinth/Gemini Bridges TMA.

In addition to meeting its commitment in the 2017 Settlement Agreement, revisiting the designated travel network within the Labyrinth/Gemini Bridges TMA will allow BLM to ensure the network designated in the 2008 RMP continues to meet the goals and objectives of the resource values and uses and evaluate whether previously designated routes still have a purpose and need. Additionally, revisiting the designated travel network will enable BLM to ensure compliance with Presidential Executive Orders 11644 and 11989 and regulations at 43 C.F.R. § 8342.1, which require that BLM will designate routes in a manner that protects the resources of public lands, promotes the safety of all users of those lands, and minimizes conflicts among the various users of those lands.

Any newly designated travel network will provide for a variety of public OHV opportunities in conformance with applicable laws, regulations, and BLM travel management policies (see Section 1.5 and Appendix D for more details on compliance). Additionally, a comprehensive TMP Implementation Guide (Appendix N) would set direction for long-term operation and maintenance of the network, and for enhancements such as new signing and maps to aid users in navigating the network.

## 1.4 TMA OVERVIEW

The TMA is comprised of four separate units located north and west of Moab (see map in Appendix K), entirely within Grand County, Utah. The TMA is generally west of Arches National Park, east of the Green River, south of Interstate 70 and north of the Island in the Sky District in Canyonlands National Park. The majority of the TMA is west of U.S. Highway 191 while smaller sections including Klondike Bluffs and Bar M are east of Highway 191. The TMA includes popular destinations and recreation opportunities such as Poison Spider Mesa, Bar M, Klondike Bluffs, the State Route 313 corridor, Gemini Bridges, Mill Canyon, Mineral Point, White Wash Sand Dunes open OHV area[4], and the Green River. Traffic counts on State Route 313, which is the principal access into the TMA, show that use of the TMA peaks each spring and fall (BLM 2022b). TMA features include canyons, mesas, arches, and scenic byways, and the area is popular for many types of motorized and non-motorized recreation, including scenic driving, OHV use, mountain biking, BASE jumping, hiking, and equestrian use. The entire TMA

---

[3] The 2017 Settlement Agreement was a result of *Southern Utah Wilderness Alliance, et al. v. U.S. Department of the Interior, et al.*, U.S. District Court (D. Utah), Consolidated Case No. 2:12-cv-257. The 2017 Settlement Agreement can be accessed online at https://www.doi.gov/sites/doi.gov/files/agreements-settlements/document/suwa-ex-1-settlement-agreement-101718.pdf

[4] The White Wash Sand Dunes Open Area (1,866 acres) is within the TMA. Routes are not designated within the area because it is open to cross-country OHV use.

# 2   ALTERNATIVES

## 2.1   TRAVEL NETWORK DEVELOPMENT METHODOLOGY

### 2.1.1   OVERVIEW

During several sessions in 2019, the BLM's IDT evaluated all OHV travel routes considered for designation in the Labyrinth/Gemini Bridges TMA and created a preliminary range of alternative travel networks. In evaluating each travel route, the IDT applied and documented compliance with the 43 CFR § 8342.1 designation criteria (i.e., minimization criteria). BLM Manual 1626 explains that the minimization of impacts "means to limit the degree or magnitude of the action and its implementation (40 CFR § 1508.20(b) – CEQ Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act)" (BLM 2016). The BLM route evaluation process along with further review and scoping contributed to the development of a range of reasonable network alternatives. Reasonable alternatives are those that "are *practical or feasible* from the technical and economic standpoint and using common sense, rather than simply *desirable*. . ." (BLM 2008a). Each of the proposed travel network action alternatives meets the purpose and need and responds to the issues described in Chapter 1.

### 2.1.2   ROUTE INVENTORY

The Labyrinth/Gemini Bridges TMA route inventory consists of the travel network designated as part of the 2008 RMP and includes only routes designated for OHV use in the 2008 RMP and subsequent route designation revisions. Unauthorized off-route OHV use in the TMA occurs only occasionally and, due to extensive management (such as monitoring and enforcement), new route proliferation is generally not a significant issue. The addition of new routes beyond those designated for OHV use as part of the 2008 Travel Plan or subsequent amendments, including the 766.0 miles closed in the TMA in 2008, are not considered in this EA.

The travel network designated in the 2008 Travel Plan was verified in 2017 and 2018 using field surveys, aerial imagery, and IDT input. The BLM collected inventory data, which include GPS-collected lines showing route locations and attributes. Data also include GPS-collected points describing travel management-related features on or near routes. During the 2008 Travel Plan, some linear features (see Glossary for definition), generally old seismic exploration lines, were identified that are not, nor were ever, routes intended to become part of the travel network. BLM staff examined these linear features as part of the 2008 Travel Plan and determined that they were not appropriate for designation under any alternative; none of these linear disturbances were included in any of the route network alternatives.

### 2.1.3   ROUTE EVALUATION

In 2019, the BLM IDT and cooperating agencies (see Section 4.1.2 for a list of cooperating agencies) began evaluating the 1,127.7 miles of inventoried routes, all of which were designated as OHV-Open or OHV-Limited in the 2008 RMP Travel Plan or its subsequent route designation

Plaintiffs' Exhibit C-168

revisions. The results of these route evaluations are shown, route by route, in each of the route reports (Appendix J). There is a separate route report for each route or route segment in the TMA. The route reports catalogue the resources relating to each route, along with route attributes. The reports include the proposed designation for the subject route under each alternative travel network. For example, a route with serious or multiple resource conflicts may have been closed in one or more network alternatives. The IDT weighed the purpose and need for each route against the resource conflicts, along with the route's role in the overall travel network, to determine in which, if any, of the action alternatives B-D the route would be designated for OHV use.

All routes designated for OHV use (OHV-Open or OHV-Limited) in the 2008 RMP are also designated for OHV use in Alternative A; the route evaluation process (e.g., resource conflicts vs. purpose and need for the route) was used to inform proposed route designations across the action alternatives. Except for 2.5 miles in Alternative B, all regularly maintained roads (see Section 2.2, below) were proposed as available for OHV use in all action alternatives.

In conducting evaluation of each inventoried route, the BLM IDT:

- Considered the goals and objectives for resource values and uses established in the 2008 RMP
- Considered best available information from surveys, data sets, and professional expertise
- Considered, discussed, and documented any purpose and need of the route, including but not limited to activities relating to existing motorized and non-motorized uses for recreation, livestock grazing, law enforcement, search and rescue, fire suppression, access to private or SITLA (School and Institutional Trust Lands Administration) lands, mineral exploration and development, administrative access, and authorized motorized travel
- Considered, discussed, and documented any known or asserted resource or user conflict; and consideration of designating spur routes leading to SITLA lands, facilities, campsites, and other points of interest, which may include overlooks and natural and historic features; and whether there are multiple routes leading to the same location
- Considered and discussed route locations and characteristics and exploration of alternative opportunities and techniques for avoiding or mitigating project effects to minimize damage, disruption, and conflict with various resources and among users. The IDT also proposed leaving routes open in areas where doing so would result in minimal resource damage or redirecting travel to routes in less sensitive areas
- Identified routes that were redundant (i.e., a route leading to the same destination and serving the same purpose and need as another nearby route)
- Proposed individual route designations based on alternative themes
- Considered whether OHV use of the route conflicts with resources and other uses of the public lands and whether those conflicts could be minimized under various proposed designations
- Documented rationale for each proposed route designation

In Alternative A, route designations for the TMA would remain unchanged—that is, all 1,127.7 miles of currently designated routes would remain available for OHV use. Of these, 1,056.9 miles would remain OHV-Open, 65.3 miles would remain limited by vehicle width, and 5.5 miles would remain limited to e-bikes. The miles of routes designated as OHV-Open or OHV-Limited includes 197.3 miles of regularly maintained routes (17% of total evaluated miles) and 930.4 miles of minimally maintained routes (83% of total evaluated miles). While changes are not proposed under Alternative A, it still provides for continuation of current route use and would have route use-related effects comparable to the action alternatives.

## 2.2.2   ALTERNATIVE B (NATURAL RESOURCE EMPHASIS)

Alternative B prioritizes protection of resources, including, but not limited to, wildlife habitats, natural and cultural resources, ecosystems, and landscapes. OHV use is more constrained under this alternative than under any other alternative. Maps posted to ePlanning on September 16th, 2021, showed routes to be designated in preliminary Alternative B as follows: 682.0 as OHV-Open, 81.0 as OHV-Limited, and 364.0 as OHV-Closed. After the maps were posted, internal and external comments resulted in further adjustment to the proposed network wherein several proposed designations were changed to further constrain OHV use and reduce resource and user conflicts (see Section 4.2.1).

In Alternative B, 606.0 miles (54% of the evaluated route miles) would be designated OHV-Open, 84.0 miles (7%) OHV-Limited, and 437.8 miles (39%) would be closed. Of the routes designated as OHV-Limited, 75.6 miles would be limited by vehicle size and 8.4 miles would be limited to e-bikes. The routes designated OHV-Open or OHV-Limited would consist of 194.9 miles of regularly maintained routes and 495.1 miles of minimally maintained routes. All but 2.5 miles of routes that would be closed to OHV use under this alternative are minimally maintained. Of the OHV-Closed routes under this alternative, 52.6 miles would remain available for authorized or official use only, 5.0 miles would be reserved for passive non-motorized trail use, and the remaining 380.3 miles would be decommissioned and earmarked for reclamation. This alternative would close some segments that are part of the BLM-recognized Jeep Safari trail system (see Section 3.2.11 for more details).

## 2.2.3   ALTERNATIVE C (MULTIPLE USE EMPHASIS)

Alternative C represents a balanced approach to OHV access opportunities and a variety of management actions which resolve resource conflict issues and management concerns while still ensuring substantial OHV access. This alternative has OHV-Open, OHV-Limited, and OHV-Closed designations that accommodate natural and cultural resource protections while designating more miles of routes for OHV use than Alternative B. In this alternative, 838.7 miles (74% of the evaluated route miles) would be designated OHV-Open, 121.4 miles (11%) OHV-Limited, and 167.7 (15%) OHV-Closed. Of the OHV-Limited routes, 97.6 miles would be limited by vehicle size, 5.5 miles would be limited to e-bikes, and 18.3 miles would be limited seasonally. The routes designated OHV-Open or OHV-Limited would consist of all 197.3 miles of regularly maintained routes as well as 762.7 miles of minimally maintained routes. All routes that would be closed to OHV use under this alternative are minimally maintained. Of the OHV-Closed routes under this alternative, 23.5 miles would remain available for authorized or official use only, 10.1 miles would be reserved for passive non-motorized trail use, and the remaining

Plaintiffs' Exhibit C-170

## 3.2  POTENTIAL IMPACTS ON THE TMA'S NATURAL AND HUMAN ENVIRONMENT

### 3.2.1  CULTURAL RESOURCES

*How would the travel network alternatives affect cultural resources within the TMA?*

**Affected Environment**

BLM Manual 8100 – Foundations for Managing Cultural Resources defines cultural resources as "definite location[s] of human activity, occupation, or use identifiable through field inventory (survey), historical documentation, or oral evidence." The term includes archaeological, historic, or architectural sites, structures, or places with important public and scientific uses, and may include definite locations (sites or places) of traditional cultural or religious importance to specified social and/or cultural groups. Cultural resources are concrete, material places and things that are located, classified, ranked, and managed through the system of identifying, protecting, and utilizing for public benefit. They may be, but are not necessarily, eligible for the National Register of Historic Places (NRHP).

Cultural resources are identified though cultural resource inventories and surveys, which are defined as "a representation of the cultural resource content of a geographical locale" by BLM Manual 8110. The BLM cultural resource inventory system is composed of three kinds of inventory: Class I Existing Information Inventory, Class II Probabilistic Field Survey, and Class III Intensive Field Survey (BLM 2004b). All three kinds of inventory were used to identify cultural resources in this TMA.

The TMA contains important cultural resources of prehistoric and historic value, which may take the form of sites (such as lithic debitage scatters), artifacts, buildings, structures, features (such as rock imagery panels), and natural landscapes. Human presence in the TMA spans the last 12,000 years and includes a number of distinctive cultures: Paleo-Indian (12,500-8,000 years ago), Archaic (8,000-2,000 years ago), Formative (including Ancestral Puebloan and Fremont cultures; AD 1 to 1300), Protohistoric (AD 1400 to 1850), and Euro-American (1800s and 1900s) (Beck et al. 2016).

**Environmental Effects Analysis**

Both incidental and intentional human actions pose a threat to cultural resources (Sampson 2009). Direct and indirect impacts may occur to cultural sites from OHV use of routes designated as OHV-Open or OHV-Limited. For example, OHV travel through or immediately adjacent to a cultural resource site may cause a displacement of cultural artifacts or features at the site that would occur at the time of the activity or cause soil movement that may lead to erosion which could further displace cultural materials. Additional adverse OHV use-related impacts include site vandalism, collectors' piles, unauthorized artifact collection, etc. Impacts to cultural resources from routes designated OHV-Closed will be less than those designated as OHV-Open or OHV-Limited. Travel access restrictions (i.e., OHV-Closed designations) may be effective in reducing unauthorized damage to archaeological resources (Hedquist, Ellison, and Laurenzi 2014).

While it is assumed that route users will behave responsibly and not engage in illegal activities, the BLM acknowledges that the designation of routes as available for OHV use in areas with cultural resources may lead to impacts from vandalism, including looting, graffiti, or the illegal collection of artifacts. The level and nature of these potential impacts are influenced by the fragility of each cultural resource, their collectability, and their location and visibility. Even though a route may be designated as OHV-Open or OHV-Limited and may pass through or near a cultural resource, impacts to the cultural resource may not be major—that is, may not affect the resource's potential to convey the significance that may qualify it for the NRHP.

Closures of redundant routes were assessed in accordance with Stipulation III.B.1.c. of the Travel PA for the potential to shift, concentrate, or expand use on open routes. When designating routes as OHV-Closed, traffic may be concentrated on nearby routes with the same destination. However, this assumes an equal distribution of use across a finite route network; designating a rarely used route as OHV-Closed may not appreciably increase traffic (concentrate use) on others. When evaluating potential impacts to cultural resources from route designations and resultant changes in route concentration (if any) the BLM considered numerous factors, including the use level of the route (primary, secondary, or tertiary), the durability of the route surface (i.e., sandy soil, natural gravels, or bedrock), the durability of the cultural resource, the extent of any impacts (minor, moderate, or major), and the reasons users select the route for travel (as documented in the Route Reports (Appendix J) and in notes from IDT meetings for this project).

Previously documented cultural resources data was recorded during the route evaluation process described in Section 2.1.3. As noted above, cultural resources include archaeological sites that are both eligible and not eligible for the NRHP. Occasionally sites that were recorded prior to 1980 were not assigned an NRHP eligibility status. Sites that are eligible for the NRHP are often a focus in cultural resources management because they contain information, distinctive design and/or construction, or are associated with significant events or persons. Cultural resources that have not been evaluated for the eligibility for the NRHP may or may not possess this significance. As such, route analysis was divided into eligible, not eligible, and unevaluated cultural resources categories. Figure 4 – Figure 6 show the number of routes in each alternative network that are proximate to cultural resource sites. Proximity distances are based on the professional judgment of BLM cultural specialists. For eligible and unevaluated cultural resources, proximate is defined as within ¼ mile of the site. For cultural resources that have been determined not eligible for the NRHP, proximate is defined as being within 15 meters of the site. Both measures of proximity were used as indicators of potential impacts that an alternative network may have on archaeological resources.



Figure 17: Miles of Evaluated Routes in Green River Scenic WSR Corridor



Figure 18: Miles of Evaluated Routes within 1 Mile of the Old Spanish NHT

**Alternative A (No Action/Current Management)**

Under Alternative A, all 22.4 miles of evaluated routes within the Ten Mile Wash ACEC and all 0.9 miles of evaluated routes within the Highway 279/Shafer Basin/Long Canyon ACEC would remain designated for OHV use (OHV-Open or OHV-Limited). These travel designations leave the ACECs susceptible to travel-related effects such as those discussed above which could potentially impact the ACECs' scenic qualities, increase the potential for damage to their cultural resources, and damage or destroy plant and wildlife habitat. Impacts to the ACECs' relevant and important values from ongoing OHV use would reflect a continuation of current management.

The WSR corridor within the TMA contains 27.8 miles of evaluated routes. Because these route miles would remain designated for OHV use under Alternative A, the WSR's outstandingly remarkable values (scenery, recreation, wildlife, fish, cultural resources, and ecology) would remain susceptible to travel route-related adverse effects of route proliferation, increases or decreases in recreation opportunities, sediment transport and water quality degradation, illegal off-road landscape damage, degradation of cultural resources, littering, etc. Overall, impacts to the WSR's outstandingly remarkable values from ongoing OHV use would reflect a continuation of current management.

Plaintiffs' Exhibit C-173

- Livestock grazing and related range improvement and facility developments; livestock water infrastructure development to facilitate better grazing management on soils and vegetation

Accumulating impacts to the ACECs include visual impacts from development activities and equipment use; disturbance and loss of cultural site integrity from development and use activities; disturbance of wildlife and wildlife habitat from human activity and development and equipment use; stream sedimentation and contamination from the presence of road prisms in areas with steep slopes or high erosion potential; livestock trampling of riparian vegetation. Accumulating impacts to the WSR corridor include loss of solitude and naturalness due to human activity and development in the vicinity of the river. Accumulating impacts to the Old Spanish NHT include loss of integrity from human activity on and around the trail as well as disruption of travelers' experiences from human activity or livestock grazing in the trail's vicinity.

Under Alternative A, there would be no route designation changes in the TMA. Impacts from the existing route network and ongoing OHV use would be a continuation of current conditions, and an overall incremental change to the ACECs, WSR, and Old Spanish NHT is not anticipated.

The route network action Alternatives B-D do not propose construction of any new routes. Alternatives B and C would reduce miles of routes designated for OHV use in all of the specially designated areas. Alternative D would reduce miles of routes designated for OHV use in the Ten Mile Wash ACEC and proximate to the Old Spanish NHT but would not reduce miles designated for OHV use in the Highway 279/Shafer Basin/Long Canyon ACEC or the Green River Scenic WSR corridor. The action Alternatives would all provide for reclamation of decommissioned routes. The action alternatives would also implement comprehensive route network operation and management activities through a TMP Implementation Guide (Appendix N), with formal guidance for signing, reclamation, and adaptive management protocols that are designed to help offset ongoing route-related impacts to the TMA's special designation areas. None of the action alternatives are expected to result in incremental impacts on the TMA's specially designated areas when added to other past, present, and reasonably foreseeable actions.

## 3.2.5   VISUAL RESOURCES

*How would the travel network alternatives impact visual resources within the TMA?*

### Affected Environment

The Labyrinth/Gemini Bridges TMA is an internationally recognized, world-famous scenic destination containing many areas that possess a high degree of scenic quality and a high level of visual sensitivity. The area draws an increasing number of visitors each year who come to the area to recreate and sightsee. The TMA contains a high level of visual appeal, as far-range views are attainable throughout much of the area. The Green River and its four major eastern canyons (Mineral, Hell-Roaring, Spring, and Ten Mile) drain much of the western portion of the TMA and provide dramatic canyon scenery. The Highway 313 corridor leading to Dead Horse Point State Park and the Island in the Sky entrance of Canyonlands National Park offers high scenic quality and visual sensitivity; Highway 313 is designated as a State Scenic Byway.

improvements and facility development; and changes in form, line, and color from wildland fires.

Under Alternative A, there would be no route designation changes in the TMA. Impacts from the existing route network and ongoing OHV use would be a continuation of current conditions, and an overall incremental change to visual resources in the CIAA is not anticipated.

None of the action alternatives B-D propose any new construction of routes or other surface-disturbing activities that could degrade the TMA's visual appearance. Each of the network alternatives would reduce OHV-Open designations and provide for reclamation of decommissioned routes. Over time these reclaimed route footprints would blend back in with the surrounding landscape. The action alternatives would also implement new comprehensive route network operation and management activities through a TMP Implementation Guide (Appendix N), with formal guidance for signing, reclamation, and adaptive management protocols that are designed to help offset ongoing route-related impacts to the TMA's physical environment and visual appearance. None of the travel network action alternatives are expected to result in incremental impacts on visual resources when added to other past, present, and reasonably foreseeable actions.

### 3.2.6   WATER RESOURCES: RIVERS AND STREAMS, RIPARIAN AREAS AND FLOODPLAINS, AND WATER QUALITY

*How would the travel network alternatives impact water resources within the TMA?*

**Affected Environment**

Water resources—particularly important in this arid portion of the MFO—are managed to ensure that water quality standards, stream conditions, and floodplain and riparian function are not diminished as a result of BLM actions such as travel route designations (see goals, objectives, and management decisions for riparian and soil and water, pages 99-105 of the 2008 RMP). The surface waters of the TMA consist primarily of 44 miles of the Green River as well as numerous springs, several perennial and intermittent streams, and seasonal vernal/ephemeral pools. The area includes a number of tributaries to the Green River, including Ten Mile Canyon, Spring Canyon, Hell Roaring Canyon, and Mineral Canyon. Perennial streams within the TMA are spring fed with increased flows and recharge occurring in conjunction with spring snowmelt and monsoonal precipitation events. Interrupted flow in both perennial and intermittent stream systems is common, and the dimensions of the wetted area may vary seasonally based upon available precipitation. All stream systems are flashy. The subbasins and watersheds within and adjacent to the TMA typically have a lower snowpack than others in the MFO. Numerous stock ponds in the area provide water to cattle and wildlife.

Riparian areas are a form of wetland transition between permanently saturated wetlands and upland areas. In the arid Southwest, the riparian ecosystems depend on water availability, defined by the amount, timing, duration, and source. Stream systems supporting riparian areas are characterized as perennial (yearlong), intermittent (seasonal), or ephemeral (storm). Riparian areas are defined as areas of land directly influenced by permanent (surface or subsurface) water. They have visible vegetation or physical characteristics reflective of permanent water influence. Lakeshores and streambanks with perennial water flow are typical riparian areas. They include wetlands and those portions of floodplains and valley bottoms that support riparian vegetation

Plaintiffs' Exhibit C-175

placed on animals in 2019. This large pool of collar data has allowed the Moab BLM to further refine the crucial habitats that support this herd. These animals are mostly found in the large canyon systems, making canyon bottoms, talus slopes, and canyon rims vital habitats for this herd. The last population estimate of the number of desert bighorn sheep was 223 animals; the population objective is 300 animals (UDWR 2019). Mineral and Hell Roaring Canyons provide particularly valuable desert bighorn habitat. The UDWR has incorporated this data into their statewide habitat files as lambing habitat, though these areas are utilized yearlong. The TMA is part of UDWR's La Sal, Potash management unit; the bighorn in this unit is under its population objective (UDWR 2019).

**Pronghorn antelope (*Antilocapra americana*)**

Pronghorn historically ranged widely west of the Mississippi. The late 1800s saw drastic declines in population due to fencing, habitat loss, and unregulated hunting, but populations have since recovered; recent estimates place the North American population around 800,000, including nearly 16,000 in Utah. Pronghorn primarily inhabit grasslands and shrub steppe biomes with succulent forb vegetation and available water (UDWR 2017). Pronghorn prefer areas with large tracts of flat to rolling open terrain where they rely on keen eyesight and swift movement to avoid predators (BLM 2013). The northern half of the TMA contains yearlong crucial pronghorn habitat.

**Amphibians**

Amphibians common in the TMA include Great Basin spadefoot (*Spea intermontana*), red-spotted toad (*Anaxyrus punctatus*), Woodhouse's toad (*Anaxyrus woodhousii*), tiger salamander (*Ambystoma tigrinum*), northern leopard frog (*Lithobates pipiens*), and canyon tree frog (*Hyla arenicolor*). A UDWR amphibian report states that "of all locations surveyed to date, Kane Creek and Ten Mile Canyon appear to hold the most diverse and thriving amphibian populations" (UDWR 2016).

**Environmental Effects Analysis**

Motorized visitation and use levels within the TMA varies by season (with March, April, May, September, and October being the most popular months). High-visitation months often coincide with the most crucial seasons for wildlife (especially the spring seasons). This means that the effects of travel on wildlife can be exacerbated because of the timing of that visitation.

The nature and type of impacts on big game and general wildlife and their habitats from travel route designations and route-related uses include habitat avoidance and abandonment, interference of daily movement, increased physical stress that can result in decreased health and parturition, and increased vehicle collisions resulting in injury or mortality (Ouren et al. 2007, Ortega 2012). Studies suggest noise from OHV use is a factor in wildlife disturbance (Naidoo and Burton 2020). Recreational disturbance from motorized and non-motorized activities affects big game behavior by increasing travel time and decreasing feeding and resting time (Naylor et al. 2009). Avoidance of human disturbance can also cause indirect habitat loss and impair forage availability (Dwinnell et al. 2019); species avoidance is strongest for mountain biking and motorized vehicles (Naidoo and Burton 2020). These impacts can escalate seasonally during sensitive birthing, rearing, and breeding seasons and during extreme weather regimes such as

drought, extreme heat or cold, or heavy snowfall. <mark>Habitat loss and fragmentation are direct impacts of OHV route designations and OHV use.</mark> OHV use can contribute to:

- Increased soil erosion and direct loss of vegetative habitat
- Invasive plants and noxious weed establishment in disturbed areas which in turn increases the potential and frequency for wildland fire
- Surface disturbances that promote growth and spread of invasive plants and noxious weeds into native vegetative communities, reducing habitat quality, foraging availability, and thermal cover
- Increased dusting of crucial native vegetative habitat resulting in plant mortality, and subsequent reduction of habitat quality, foraging availability, and thermal cover

The potential for direct and indirect impacts on big game and general wildlife habitats from OHV use can be estimated by comparing miles of routes and/or percentage of a given travel network designated as OHV-Open, OHV-Limited, and OHV-Closed in areas of wildlife habitats. Hunting and game retrieval access serves to support UDWR management efforts where hunting is used as a management tool to control populations of big game species. UDWR is the agency with jurisdictional authority over the desert bighorn sheep herd within the TMA. The Utah Bighorn Sheep Statewide Management Plan (UDWR 2018) states,

> Bighorn habitat can be degraded, fragmented, or lost to a variety of causes including human disturbance, energy development, and natural succession. Reductions in the quality or quantity of habitat can result in corresponding losses to bighorn populations (DeForge 1972, Hamilton et al. 1982). Human disturbance may cause bighorn sheep to change use areas and abandon certain habitats because of those disturbances. Loss of preferred habitat can compel bighorns into habitats that reduce productivity, decrease survival rates, and increase risk of pathogen transmission. Human disturbance is also thought to be a possible stress inducer, which may lead to disease problems in some populations (DeForge 1981, Bunch et al. 1999). Working with federal land management agencies to protect the habitat needed for healthy herds may improve herd health.

For potential OHV-related impacts to amphibians, see Section 3.2.6, which describes effects from OHV use in riparian areas.

TMP implementation activities that could affect general wildlife and their habitats include preparation of new maps and brochures that would benefit wildlife and wildlife habitat by helping to direct and keep users on designated routes; installation of new signs; route maintenance (grading, installing water control structures, surfacing, etc.); route decommissioning or reclamation (including ripping the ground and planting seed, grading/recontouring); or installation of fencing or barriers. If implementation is proposed that falls outside of the previously disturbed area, additional site-specific NEPA may be required before the activity could occur. Seeding and planting on closed routes could accelerate reclamation and help to reestablish habitat. Implementation activities in riparian areas are of particular concern for general wildlife and migratory birds, though some implementation activities would have a positive effect on riparian habitats; for example, sign placement could encourage managed travel on routes less disruptive to riparian resources.

The wildlife analysis below focuses on desert bighorn sheep, pronghorn antelope, and amphibians, but identified impacts will have similar effects on other wildlife species and habitat

Under Alternative A, there would be no route designation changes in the TMA. Impacts from the existing route network and ongoing OHV use would be a continuation of current conditions, and overall incremental impacts to special status wildlife and their habitats within the CIAA is not anticipated.

None of the travel network action alternatives B-D propose any new construction of routes, and each of the alternatives would reduce routes designated for OHV use and provide for reclamation of decommissioned routes. The action alternatives would also implement comprehensive route network operation and management activities through a TMP Implementation Guide (Appendix N), with formal guidance for signing, reclamation, and adaptive management protocols that are designed to help offset ongoing route-related impacts to the TMA's special status wildlife species. None of the action alternatives are expected to result in incremental impacts on the TMA's special status wildlife species and their habitats.

## 3.2.11   RECREATION

*How would the travel network alternatives impact recreation opportunities and experiences in the TMA?*

### Affected Environment

The TMA offers significant opportunities for a variety of outdoor recreation activities, particularly scenic driving and viewing, full-sized vehicle and UTV/ATV exploring, dirt biking, mountain biking, climbing, camping, hiking, and hunting. Tourism and recreation accounts for 48.9% of the Grand County economy (U.S. Department of Commerce, Bureau of Economic Analysis, 2022). The number of visitors continues to grow annually—peaking each year during spring and fall months. The TMA is wholly within the Labyrinth Rims/Gemini Bridges SRMA which is managed as a Destination SRMA, where the majority of the visitation is from outside the community (see the 2008 RMP for management direction specific to the SRMA; BLM 2008b), with sufficient facilities and infrastructure in order to provide opportunities for primarily front-country recreation experiences. Most of the TMA is easily accessible from Moab, and receives moderate to heavy recreation use, both motorized and non-motorized. Recreation infrastructure ranges from developed campgrounds and trailheads to directional signing (BLM 2018). The TMA adjoins Canyonlands National Park and Dead Horse Point State Park, further attracting visitors to the area.

Motorized recreation is popular in the TMA and while the area offers a wide variety of recreation opportunities, it absorbs a particularly high level of OHV use relative to other areas within the MFO. There are several world class 4WD/OHV routes used by the annual Easter Jeep Safari event, including the Secret Spire, Hell Roaring Rim, Gemini Bridges, Copper Ridge, Long Canyon, and Crystal Geyser routes. A 1,866-acre open OHV area (i.e., open to cross-country travel) is located at the White Wash Sand Dunes. Utah Highway 313 is a Utah State Scenic Byway and is popular for scenic driving outings; Highway 313 terminates at Dead Horse Point State Park. One backcountry airstrip in the TMA has been considered for designation (Mineral). There are three other airstrips in the TMA (Big Flat, Spring Canyon and Deadman Point) that are seldom used; while they are not considered for designation in this TMP, they could be considered for designation in the future on a case-by-case basis through a separate implementation-level planning decision.

data known as attribute data. Attribute data can be generally defined as additional information about each of the spatial features. An example of this would be schools. The actual location of the schools is the spatial data. Additional data such as the school name, level of education taught, student capacity would make up the attribute data. It is the partnership of these two data types that enables GIS to be such an effective problem-solving tool through spatial analysis. GIS is more than just software. People and methods are combined with geospatial software and tools, to enable spatial analysis, manage large datasets, and display information in a map/graphical form." (University of Wisconsin-Madison Libraries)

**Ground Transportation Linear Feature (GTLF):** A geospatial database of all transportation linear features (from motorized to foot use) as they exist on the ground, not just those in the BLM transportation system (refer to the Ground Transportation Linear Features Data Standard Report, October 22, 2014, version 2.0 or later, for detailed information on the GTLF data standard).

**Habitat fragmentation:** The degree to which an area of habitat is divided into smaller patches of habitat as a result of human activities and developments (e.g., trails, roads, fencing) or as a result of natural barriers (e.g., cliffs, rivers).

**Hard look:** A reasoned analysis containing quantitative or detailed qualitative information. (BLM 2008a)

**Historic property:** Historic property means any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior. This term includes artifacts, records, and remains that are related to and located within such properties. The term includes properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization and that meet the National Register criteria.

**Implementation decisions:** Decisions that take action to implement land use planning; generally appealable to Interior Board of Land Appeals under 43 CFR § 4.410. These decisions are generally more site-specific than land-use plan decisions.

**Implementation plan:** An area or site-specific plan written to implement decisions made in a land use plan. Implementation plans include both activity plans and project plans. Examples of implementation plans include interdisciplinary management plans, habitat management plans, and allotment management plans.

**Interdisciplinary Team (IDT):** A group of individuals with different training, representing the physical sciences, social sciences, and environmental design arts, assembles to solve a problem or perform a task. The members of the team proceed to a solution with frequent interaction so that each discipline may provide insights to any stage of the problem and disciplines may combine to provide new solutions. The number and disciplines of the members preparing the plan vary with circumstances. A member may represent one or more disciplines or BLM program interests.

**Land use plan:** A set of decisions that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA; an assimilation of land-use-plan level decisions developed through the planning process outlined in 43 CFR

Plaintiffs' Exhibit C-179

| Comment | BLM Response |
|---|---|
| | Thus, the Ouren study is referenced as providing both impact to wildlife themselves and to wildlife habitat. |
| The indirect impacts of noise on wildlife (disturbance, avoidance, reduction of migration routes, quality of habitat, and loss of habitat) should be more fully discussed. | The impacts of noise on wildlife are disclosed in the EA (see comment above). The study referenced in the comment (Switalski) is a summary of the "possible impacts by OHVs on ecological and social issues based on an extended literature review." The reference has been added to the list of references. |
| The BLM must state that OHV impacts on wildlife can lead to population declines and, rarely, impacts on entire populations. | The impacts on wildlife from OHV use is detailed in Sections 3.2.7, 3.2.8, 3.2.9 and 3.2.10. The Ouren study is cited in the Environmental Effects Analysis section for these resources. Although specific impacts are detailed, it is speculative to claim that these impacts will lead to direct population declines. |
| The BLM relies on a study by Ouren et al. that is neither published nor peer reviewed. | The Ouren citation is not a single research study, but rather a meta-analysis of many studies on the environmental effects of off-highway vehicles on BLM lands. It was prepared by the U.S. Geological Survey in 2007. The results of peer-reviewed research on this topic were synthesized and summarized in this report. It was not published in 1980, as stated by the commentor. It was published as a U.S. Geological Survey report in 2007. |
| The BLM should state that road density overestimates the impact of motorized recreation on wildlife. | See Section 3.2.8 for road density impacts to wildlife. The BLM presents the road density data as a comparison across alternatives; the analysis does not attempt to directly link the road density data to direct wildlife impacts. Habitat fragmentation is an accepted wildlife issue. |
| The BLM must make the wildlife occurrence data publicly available. | For non-listed species, the BLM utilizes species data from the Utah Division of Wildlife Resources. For listed species, the BLM utilizes species data from the U.S. Fish and Wildlife Service, which is reported on the Information for Planning and Conservation (IPaC) and NatureServe Explorer (2021). Much of the Threatened and Endangered Species data is not public due to sensitivity of information. |
| The BLM must provide verifiable data on species and on impacts to them. | The BLM follows guidelines and protocols established by the U.S. Fish and Wildlife Service and Conservation Agreements developed by the Utah Department of Natural Resources for wildlife monitoring and survey requirements.<br><br>The BLM utilizes habitat and occurrence data from the agencies with jurisdictional authority over the species in question—the Utah Division of Wildlife Resources and the U.S. Fish and Wildlife Service.<br><br>For nesting locations, especially of protected raptors, the BLM has time-dated data from both the Raptor Inventory Nesting Survey (a BLM partner) as well as from U.S. Fish and Wildlife Service and its own survey data from various projects. Much of this data is protected information and cannot be shared publicly in order to protect the species. |

Plaintiffs' Exhibit C-180

| Comment | BLM Response |
|---|---|
| The BLM uses erroneous research and none show a significant impact from OHV use. | The BLM utilizes current, scientific literature from peer-reviewed journals to inform impact analysis. While the research on OHV impacts to resources is a growing field, the BLM is using best available science and research identified by resource specialists within the agency. |
| The BLM is proposing closures based on false assumptions that motorized traffic causes more disturbance than non-motorized traffic. | The TMP's scope is motorized vehicle use on designated routes. The BLM acknowledges that non-motorized users can also disturb wildlife.<br><br>The Moab Field Office has indeed tackled non-motorized use of important wildlife habitats. One example is the Proposed Supplementary Rule to limit roped and aerial recreation in Mineral and Hell Roaring Canyons is currently published in the *Federal Register* (January 31, 2023). |
| The BLM's analysis on impacts to wildlife is inconsistent with scientifically defensible and rational biological criteria. | The EA analyzes a range of network alternatives with varying amounts of road closures. See Section 3.2.8 for analysis on impacts to wildlife. This analysis was based on scientifically sound literature and studies from peer-reviewed journals. |
| The BLM must prioritize the protection of desert bighorn sheep, taking into consideration Section III.C of the Utah Bighorn Sheep Statewide Management Plan. | Section III.C of the Utah Bighorn Sheep Statewide Management Plan discusses habitat degradation or loss. Habitat fragmentation and human disturbance are discussed as a stressor that can reduce productivity, decrease survival rates, and increase risk of pathogen transmission.<br><br>The relevant paragraph from the Utah Bighorn Sheep Statewide Management Plan has been added to Section 3.2.10 and to the list of references. |
| The BLM must disclose that bighorn sheep populations are increasing, rather than declining. | Population numbers are maintained by the UDWR, the agency with jurisdictional authority over the wildlife. *The Bighorn Sheep Unit Management Plan: LaSal, Potash/South Cisco WMU #13* (UDWR, 2019; cited in References section) outlines a population goal of 300 animals for this unit. The current estimate of the number of animals is 223. While this is an improvement over the 2014 count, the population now only matches that counted in 2010. In short, the population has fluctuated from 2008 to present, but remains well short of the population objectives. This data has been added to Section 3.2.8. |
| The BLM must aver that the published research on human disturbance and bighorn sheep is based on opinion. | UDWR, the agency with jurisdictional authority, states in its Statewide Bighorn Management Plan (UDWR, 2018): *Bighorn habitat can be degraded, fragmented, or lost to a variety of causes including human disturbance, energy development, and natural succession. Reductions in the quality or quantity of habitat can result in corresponding losses to bighorn populations (DeForge 1972, Hamilton et al. 1982). Human disturbance may cause bighorn sheep to change use areas and abandon certain habitats because of those disturbances. Loss of preferred habitat can compel bighorns into habitats that reduce productivity, decrease survival rates, and increase risk of pathogen transmission. Human disturbance is also thought to be a possible stress inducer, which may lead to disease* |

Plaintiffs' Exhibit C-181

| Comment | BLM Response |
|---|---|
|  | *problems in some populations (DeForge 1981, Bunch et al. 1999). Working with federal land management agencies to protect the habitat needed for healthy herds may improve herd health.*<br><br>This information has been added to Section 3.2.8, and the citations added to the list of References. It should be noted that the bighorn sheep residing within the TMA are desert bighorn sheep, not Rocky Mountain bighorn sheep which, anecdotally, seem more habituated to human activities. |
| The BLM must disclose the bighorn collar data referred to in the EA. | The Moab BLM has cooperated in the studies undertaken by UDWR on desert bighorn sheep (See Utah Bighorn Sheep Statewide Management Plan, UDWR, 2018). In that document, UDWR states in its description of bighorn populations: *In addition to the helicopter surveys, many bighorn sheep populations in Utah have radio and GPS collared bighorns. These collars allow biologist to monitor annual survival and movements. The collars also allow biologists to locate animals and collect ground classification data in years without helicopter surveys. In conjunction with Brigham Young University, Utah State University, Utah Wild Sheep Foundation (UWSF), and Sportsmen for Fish and Wildlife (SFW), UDWR has conducted and participated in many valuable bighorn sheep research projects. Findings from those research projects have greatly improved the current knowledge of bighorn sheep and have improved management practices.* These are the desert bighorn sheep collar studies referred to in the comment.<br><br>UDWR has shared the bighorn collar data with BLM; the release of the data to the public is under the purview of UDWR. The Bighorn Sheep Statewide Management Plan has been added to the References accompanying EA. |
| The BLM must defend the raptor nest buffers that it utilizes. | Raptor buffers that guide raptor management on BLM lands in Utah are provided to the BLM by the United States Fish and Wildlife Service (USFWS). The USFWS is the agency with jurisdictional authority over protected species. The buffers are based on research undertaken by USFWS (Romin and Muck, 2002, Utah Field Office Guidelines for Raptor Protection from Human and Land Use Disturbances. U.S. Fish and Wildlife Service). This reference is supplied in reference section of the EA. Use of these buffers is an RMP-level decision (Appendix R of the 2008 RMP) and they are applied to all programs across the BLM.<br><br>The BLM is obligated to use USFWS's raptor buffer requirements. |
| The BLM must do an inventory of raptor nesting sites in the TMA and use those inventories for adaptive management through targeted seasonal closures. | The BLM has undertaken a partial survey of raptor nesting sites in the TMA in conjunction with the Raptor Inventory and Nesting Survey, as well as contracted surveys done in conjunction with specific projects. Information from those surveys was available during route-by-route discussions and has been utilized to inform proposed designations of individual routes, including seasonal closures. Seasonal closures to protect raptor nesting sites is part of ongoing adaptive management in the BLM and can be used to minimize impacts to raptor habitat.<br><br>Additionally, the BLM is obligated to utilize the raptor nest buffers provided by the USFWS. |
| The BLM should pay special attention to reducing roads in the Mineral and | Section 3.9.2 states that the "riparian vegetation found along the Green River corridor and in the canyon bottoms within the TMA are particularly valuable." Mineral and Hell Roaring canyons are two of these canyon bottoms. |

# ROUTE RECLAMATION

## *Closed OHV Routes and Travel Maps*

In general, OHV-Closed routes should not appear on the travel map associated with the TMP. However, the BLM may choose to include some OHV-Closed routes on maps as helpful points of reference or when needed or helpful for authorized users.

## *Disguising Routes with Natural Materials*

This method, sometimes referred to as "vertical mulching," is used to hide routes from view. If routes are not on travel maps and are not evident to visitors, they will be unlikely to receive additional use. Often, the first several hundred feet of illegal routes or routes slated for reclamation may be disguised to look like surrounding areas by placing rocks, dead wood and plants, and in some cases planting live vegetation in a natural-looking arrangement. Where possible, materials used should be large enough and abundantly placed in order to deter people familiar with route locations from easily removing them. In some cases, mechanical tools such as shovels, rakes, and other hand tools may be employed to obliterate embankments, ruts, water bars and ditches.

## *Ripping and Reseeding Routes*

This process mechanically removes routes from the landscape and revegetates them. Native seed mixes should be used. Mechanical removal may be accomplished by hand or, among other methods, with the use of power equipment, excavators, bulldozers, or harrow or seed drills. Herbicides may also be used for revegetation. Based on site-specific conditions, seeding and planting treatments may include:

- Preparing a seedbed.
- Selecting an appropriate seed mix.
- Applying the seed.
- Covering the seed.

Due to the broad spectrum of situations encountered, all possible treatment options and combinations of treatments may be utilized. This process ultimately results in closed routes becoming undetectable.

## *Barrier Installation*

In locations where it is impractical to employ any of the previous methods (e.g., extremely rocky areas) and in areas where administrative use may occasionally be required on a route closed to the public, it may be necessary to install natural or human-made barriers such as large boulders, fences with gates, or other barriers to physically prevent unauthorized use. Where possible and practical, these measures may be removed when routes are reclaimed or fully disguised.

## *Closing Routes with Informational Signs*

This measure may be applied in cases where the previous measures have failed and ripping and seeding or the use of physical barriers is impractical or ineffective. It may also be used on routes to establish an "administrative use only" designation or to identify seasonal closures. Signs may

Plaintiffs' Exhibit C-183

| Resource Issue | Effect  Summary (both Beneficial and Adverse) and Significance Conclusions |
|---|---|
| Recreation<br><br>EA, Section 3.3.1 | All action alternatives provide recreation opportunities to varying degrees based on the recreation type (motorized versus non-motorized). Under the action alternatives, beneficial effects include gains in access for desired recreation opportunities and experiences and enhances user safety through the separation of motorized users and non-motorized users. Users seeking quiet, non-motorized recreation experiences may in some cases benefit from OHV-Closed designations. Users seeking OHV opportunities and maximum dispersed vehicle camping options would benefit from OHV-Open designations. TMP implementation activities under all action alternatives that could temporarily impact recreation include route maintenance , and sign placement). Maintenance could interrupt or temporarily block normal route use or access to recreation opportunities; however, these actions  would likely enhance long-term access and safety for recreation experiences. Sign installation would direct recreationists to their destinations and educate recreationists on allowable uses for a particular route helping to avoid user conflicts (EA, Section 3.3.1).<br><br>Alternative B would result in the greatest effect on OHV-centric recreation opportunities by reducing the number of Jeeping/4-wheeling, scenic driving, and motorcycling routes by 43%-57%, while Alternative D would result in a 5% reduction in these routes compared to Alternative A. Under Alternative B, effects to non-motorized users would occur from a 14-40% reduction in routes designated for use that currently access non-motorized activities (depending on activity type), while Alternative D would result in a 1-10% reduction in these routes compared to Alternative A. Under Alternative B both motorized and non-motorized users would be impacted by a 34% reduction in routes accessing recreation destinations, and Alternative D would result in a 4% reduction in these routes compared to Alternative A. Reduction in routes designated for OHV use under Alternative C would be less than Alternative B, but more than Alternative D (EA, Section 3.3.1).<br><br>Because all action alternatives would continue to provide recreation opportunities to a variety of user types (see discussion in Table 1) across the TMA and user conflicts would be addressed through management and ongoing monitoring provided in the Implementation Guide, significant effects to recreation opportunities would not occur as a result of any of the action alternatives. |

LGB042674