KATHY A.F. DAVIS (4022)
ROGER R. FAIRBANKS (3792)
K. TESS DAVIS (15831)
Assistant Attorneys General
Utah Attorney General's Office
KENDALL G. LAWS (14700)
Special Assistant Attorney General
SEAN D. REYES (7969)
UTAH ATTORNEY GENERAL
1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
kathydavis@agutah.gov
rfairbanks@agutah.gov
kaitlindavis@agutah.gov
klaws@utah.gov

*Attorneys for Plaintiffs*

---

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF UTAH, SOUTHERN DIVISION

| | |
|---|---|
| BLUERIBBON COALITION, INC., *et al.,*<br><br>and<br><br>STATE OF UTAH, *et al.,*<br><br>   Plaintiffs,<br><br>vs.<br><br>U.S. BUREAU OF LAND MANAGEMENT,<br><br>*et al.,*<br><br>   Defendants,<br><br>and<br><br>SOUTHERN UTAH WILDERNESS ALLIANCE,<br><br><br>   Defendant-Intervenor. | Consolidated Case Nos.:<br><br>   4:24-cv-00046-DAK-JCB<br>   2:23-cv-00923-DAK-JCB<br><br><br>**PLAINTIFF STATE OF UTAH'S OPENING BRIEF**<br><br><br>District Judge Dale A Kimball<br>Magistrate Judge Jared C. Bennett |

i

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF ISSUES ......................................................................................................... 1

SUMMARY OF THE ARGUMENT ......................................................................................... 2

    I.      The BLM acted arbitrarily and capriciously in violation of the APA in closing 114 miles of roads subject to the State of Utah's pending Quiet Title Action, Grand County v. United States, 2:12-cv-00466-CW ................................................................................................................................. 2

    II.    The BLM violated the Utah Enabling Act by eliminating access to one section of Trust Lands located within the TMA, as well as prohibitively restricting access to three other sections of Trust Lands located within the TMA. ....................................................................................................... 3

    III.   The BLM violated FLPMA and implementing regulations by failing to provide and render a TMP consistent with Utah Land Management Plans or provide opportunity for a Governor's Consistency Review.......................................................................................................................... 4

    IV.   The BLM violated FLPMA and the APA by failing to comply with the Multiple Use and Sustained Yield Mandate. ......................................................................................................................... 5

    V.    The BLM violated FLPMA and other federal statutes by implementing *de facto* wilderness management on non-Wilderness Study Area ("WSA") and non-Wilderness lands. ............................... 5

    VI.   The BLM violated NHPA Section 106 regulations by failing to evaluate R.S. 2477 roads for National Register of Historic Places eligibility and assess affects to National Register-eligible roads. .. 6

    VII.  The BLM acted arbitrarily and capriciously in violation of the APA by allowing its Principal Deputy Director to participate in the decision-making process for the Labyrinth/Gemini Bridges TMP and DR despite her previous involvement as counsel for a plaintiff environmental organization in the 2017 SUWA Settlement Agreement. ................................................................................................ 7

STATEMENT ON STANDING ................................................................................................. 7

LEGAL FRAMEWORK ............................................................................................................ 8

    I.      The Utah Enabling Act ....................................................................................................... 8

    II.    R.S. 2477 .............................................................................................................................. 9

    III.   The Wilderness Act ........................................................................................................... 10

    IV.   The Federal Land Policy and Management Act .................................................................. 11

A. Inventory and Land Use Plans ................................................................................................11

B. Consistency with State and Local Land Use Plans .................................................................12

C. Multiple Use and Sustained Yield..........................................................................................12

D. Wilderness Study Areas ..........................................................................................................13

E. Areas of Critical Environmental Concern...............................................................................14

F. Rules and Regulations..............................................................................................................15

V. Administrative Procedures Act....................................................................................................15

A. Rulemaking .............................................................................................................................15

B. Judicial Review .......................................................................................................................16

VI.      National Historic Preservation Act.......................................................................................16

**FACTUAL BACKGROUND** ............................................................................................................17

Interference with RS 2477 Litigation...........................................................................................19

State Involvement as a Consulting Party under the NHPA...........................................................20

Diminished Access to SITLA Lands ............................................................................................21

History of the Labyrinth/Gemini Bridges TMP ...........................................................................22

Inconsistency with the Utah Statewide Resource Management Plan and the Governor's Consistency Review .....................................................................................................................................24

Conflict of Interest .......................................................................................................................25

**STANDARD OF REVIEW** ...............................................................................................................26

**ARGUMENT**....................................................................................................................................27

I.      BLM's Closure Of Roads Subject To A Pending Quiet Title Lawsuit Was Both Arbitrary And An Abuse Of Discretion ................................................................................................................27

II.    Closures Of Access To SITLA Parcels Violate Utah's Right To Access Trust Lands Under The Utah Enabling Act ................................................................................................................... 30

III.   BLM's DR Is A Land Use Plan Which Violates The Consistency Provision Of FLPMA ....... 31

IV.    BLM'S DR Fails The "Multiple Use And Sustained Yield" Mandate In FLPMA ................... 32

V.     BLM'S DR Closes Roads in Violation of the Express and Implied Terms of the Dingell Act ..... 33

VI.    BLM Failed To Evaluate R.S. 2477 Roads For Eligibility On The National Register Of Historic Places ........................................................................................................................... 35

VII.   BLM HAS VIOLATED THE STATE'S VALID AND EXISTING RIGHTS OF WAY OVER CLOSED R.S. 2477 ROADS ................................................................................................... 37

VIII.  BLM Abused Its Discretion By Failing To Exclude Official With Conflict Of Interest From Decision Making Process ......................................................................................................... 40

CONCLUSION AND REQUEST FOR RELIEF ...................................................................................... 40

# TABLE OF AUTHORITIES

## **Cases**

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 at (2013) ................................................................................................. 7

*Colo. Wild, Heartwood v. U.S. Forest Serv.,*
  435 F.3d 1204, 1213 (10th Cir. 2006) ....................................................................... 27

*Grand County v. United States of America,*
  Case No. 2:12-cv-00466 (D. Utah 2012) .............................................................. 19, 37

*Kobach v. United States Department of Interior,*
  72 F.4th 1107, 1125 (10th Cir. 2023) ......................................................................... 28

*Lucas v. South Carolina Coastal,*
  505 U.S. 1003, 1027 (1992) ........................................................................................ 30

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139, 149 (2010) .............................................................................................. 7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29, 56, 103 S. Ct. 2856, 2873, 77 L. Ed. 2d 443 (1983)................................ 15, 26, 27

*Olenhouse v. Commodity Credit Corp.,*
  42 F.3d 1560, 1574 (10th Cir. 1994)........................................................................... 26

*Rich County et al v. U.S.A. et al*
  2:12-cv-00424-CW....................................................................................................... 19

*Rocky Mountain Helicopters, Inc. v. F.A.A.,*
  971 F.2d 544, 546 (10th Cir. 1992)............................................................................. 16

*Southern Utah Wilderness Alliance et al v. Allred et al*
  Case No. 2:12-cv-00257-DAK.............................................................................. 23, 24

*Southern Utah Wilderness Alliance v. Bureau of Land Mgmt.,*
  425 F.3d 735, 741 (10th Cir. 2005).............................................................................. 9

*State of Utah v. Andrus,*
  486 F. Supp. 995, 1009-1010 (D. Utah 1979)................................................... 3, 30, 31

*Utah v. Kleppe,*
  586 F.2d 756, 758 (10th Cir. 1978)............................................................................. 30

*Western Watersheds Project v. BLM*,
   721 F.3d 1264, 1268 (10th Cir. 2013).......................................................... 32

### State Statutes

UTAH CODE § 63J-8-104 ..................................................................................... 25

UTAH CODE §72 ................................................................................................. 23

UTAH CONST. Art. XX. ....................................................................................... 21

Utah Enabling Act, ch. 138, 28 Stat. 107 (1894) ............................................... 3

### Statutes

5 U.S.C. § 706.......................................................................... 3, 5, 7, 26, 33, 40

16 U.S.C. § 1131 ........................................................................................ 10, 18

16 U.S.C. 1273 ................................................................................................. 34

30 U.S.C. §§20 ................................................................................................... 5

36 C.F.R. § 60 .................................................................................................. 36

36 C.F.R. § 800 .......................................................................................... 17, 36

40 CFR § 1502 .................................................................................................. 12

43 C.F.R. § 1610 ..................................................................................... 4, 25, 31

43 C.F.R. § 8342 ......................................................................................... 5, 33

43 U.S.C. § 1702 ......................................................................................... 5, 14

43 U.S.C. § 1711 .............................................................................................. 11

43 U.S.C. § 1712 ......................................................................................... 4, 31

43 U.S.C. § 1732 .................................................................................... 5, 12, 32

43 U.S.C. § 1740 .............................................................................................. 15

43 U.S.C.§ 1782 .............................................................................................. 13

5 U.S.C. 706 .................................................................................................... 15

5 U.S.C. § 553 ................................................................................................................ 15

5 U.S.C. § 702 ................................................................................................................ 26

5 U.S.C. §§ 500-596 ...................................................................................................... 15

54 U.S.C. § 100101 ................................................................................................. 16, 35

54 U.S.C. § 300308 ........................................................................................................ 36

54 U.S.C. § 306108 ................................................................................................. 17, 36

Administrative Procedure Act ............................................................................... passim

Dingell Act, ............................................................................................................ passim

Federal Land Policy and Management Act ........................................................... passim

National Historic Preservation Act ....................................................................... passim

Quiet Title Act ...................................................................................................... passim

R.S. 2477 ............................................................................................................... passim

Taylor Grazing Act ........................................................................................................... 5

Wilderness Act ..................................................................................... 10, 13, 23, 33

## INTRODUCTION

In this case, the State of Utah ("the State" or "Utah") challenges the Bureau of Land Management's ("BLM") final Decision Record ("DR") for the Labyrinth/Gemini Bridges Travel Management Plan ("TMP"). The BLM initiated the development of the Labyrinth/Gemini Bridges TMP in 2020 for the purpose of evaluating whether to keep roads open, limit them to certain uses, or close them to all motorized uses. The BLM issued its final DR for the Labyrinth/Gemini Bridges TMP on September 28, 2023. The DR closed 317.2 miles of roads to all motorized uses and limited motorized use on 98.4 miles of roads. The closure of these roads impairs the recreational value of the Labyrinth/Gemini Bridges Area and negatively affects various other State interests.

As a result, the State of Utah opposes all road closures in the Labyrinth/Gemini Bridges area. The State believes that the DR is unlawful for a variety of reasons. These reasons include violations of the Utah Enabling Act, the Administrative Procedure Act ("APA"), the Federal Land Policy and Management Act ("FLPMA"), the National Historic Preservation Act ("NHPA"), and other federal statutes. For these reasons, the State of Utah requests this Court to declare and set aside the BLM's DR as unlawful.

## STATEMENT OF ISSUES

1.      Whether the BLM acted arbitrarily and capriciously in violation of the APA by closing 114 miles of roads subject to the State of Utah's pending Quiet Title Action, *Grand County v. United States*, 2:12-cv-00466-CW (hereinafter the "Grand County R.S. 2477 case").

2.      Whether the BLM violated the Utah Enabling Act by eliminating access to one section of Trust Lands located within the TMA, as well as prohibitively restricting access to three other sections of Trust Lands located within the TMA.

1

3.      Whether the BLM violated FLPMA and implementing regulations by failing to provide and render a TMP consistent with Utah Land Management Plans or provide opportunity for a Governor's Consistency Review.

4.      Whether the BLM violated FLPMA and the APA by failing to comply with the Multiple Use and Sustained Yield Mandate.

5.      Whether the BLM violated FLPMA and other federal statutes by implementing *de facto* wilderness management on non-Wilderness Study Area ("WSA") and non-Wilderness lands.

6.      Whether the BLM violated NHPA Section 106 regulations by failing to evaluate R.S. 2477 roads for National Register of Historic Places eligibility and assess effects to National Register-eligible roads.

7.      Whether the BLM acted arbitrarily and capriciously in violation of the APA by allowing its Principal Deputy Director to participate in the decision-making process for the Labyrinth/Gemini Bridges TMP and DR despite her previous involvement as counsel for a plaintiff environmental organization in the 2017 SUWA Settlement Agreement.

<u>**SUMMARY OF THE ARGUMENT**</u>

Plaintiff State of Utah challenges the final DR for the Labyrinth/Gemini Bridges TMP as unlawful for the seven reasons described below. Utah requests this Court declare and set aside the BLM's DR as unlawful for these reasons.

**I.      The BLM acted arbitrarily and capriciously in violation of the APA in closing 114 miles of roads subject to the State of Utah's pending Quiet Title Action, Grand County v. United States, 2:12-cv-00466-CW.**

A thorough analysis of specific facts underlying BLM's DR reveals that the BLM acted

2

arbitrarily and capriciously in closing 114 miles of roads subject to the State of Utah's pending Quiet Title action, *Grand County v. United States*, 2:12-cv-00466-CW. These closures will impair Plaintiffs' ability to conduct discovery in the lawsuit. This is because driving on the roads with fact witnesses is an essential part of Plaintiffs' established discovery process. Additionally, the closure of disputed roads will increase the rate at which vegetation naturally grows in the roadbed, obscuring evidence of the roads' existence and condition, deteriorating critical evidence in the Plaintiff's Quiet Title lawsuit.

As a result, BLM's DR is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706 for materially interfering with Plaintiffs' discovery process and causing the deterioration of evidence central to the Plaintiffs' ongoing Grand County R.S. 2477 litigation.

**II.     The BLM violated the Utah Enabling Act by eliminating access to one section of Trust Lands located within the TMA, as well as prohibitively restricting access to three other sections of Trust Lands located within the TMA.**

The State of Utah holds fee title to approximately 70 sections of land within the Labyrinth/Gemini Bridges TMA that are administered and managed by SITLA, in trust, for the benefit of the public-school systems in the state ("Trust Lands"). The Trust Lands were originally granted to the State to be used for this purpose in the Utah Enabling Act, ch. 138, 28 Stat. 107 (1894). This Court held in *State of Utah v. Andrus* that "the state must be allowed access [to Trust Lands] which is not so narrowly restrictive as to render the lands incapable of their full economic development" and that "the terms of FLPMA itself would indicate that Congress did not intend to amend rights under the school land grant program." 486 F. Supp. 995, 1009-1010 (D. Utah 1979) (commonly referred to as the *Cotter* decision).

Through the Labyrinth/Gemini Bridges TMP, under the authority of FLPMA, the BLM eliminated access to one section of Trust Lands and prohibitively restricted access to three other sections of Trust Lands. The elimination and prohibitive restriction of access renders the affected lands incapable of their full economic development and amends the rights granted to the State under the school land grant program, in violation of the Utah Enabling Act.

**III.     The BLM violated FLPMA and implementing regulations by failing to provide and render a TMP consistent with Utah Land Management Plans or provide opportunity for a Governor's Consistency Review.**

The BLM's TMP and DR are not consistent with the State's duly adopted Resource Management Plan. FLPMA requires that BLM land use plans be "consistent with State and local plans to the maximum extent [the Secretary of Interior] finds consistent with Federal law and the purposes of [FLPMA]." 43 U.S.C. § 1712(c)(9). Regulations implementing FLPMA require the BLM to provide state governors with the opportunity to submit a "Governor's Consistency Review" of a BLM land use plan, and further require the BLM to consider and analyze the Governor's recommendations. 43 C.F.R. § 1610.3-2(e).

The BLM denies that travel management plans are "land use plans" under FLPMA, and therefore alleges that the FLPMA requirements of 43 U.S.C. § 1712(c)(9) or the regulatory requirements of 43 C.F.R. § 1610.3-2(e) do not apply to travel management plans. The BLM has not justified its reasoning that travel management plans are merely "implementation level decisions" that do not fall under the auspices of FLPMA land use plans. The BLM has violated FLPMA and its implementing regulations by not seeking consistency between its DR and the State Resource Management Plan, and by failing to provide the Governor of Utah with the formal opportunity to submit a Governor's Consistency Review of the DR.

IV.     **The BLM violated FLPMA and the APA by failing to comply with the Multiple Use and Sustained Yield Mandate.**

Under FLPMA, the guiding principle in the management of public lands generally, and the RMPs specifically, is multiple use and sustained yield. 43 U.S.C. § 1732(a). This means that RMPs must account for various resources, including "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values" while striving for "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of various renewable resources of the public lands consistent with multiple use." *Id*. § 1702(c), (h).

BLM's DR closed roads based upon a rationale that only considers conservation and fails to take into account livestock grazing, wildlife management, motorized recreation and travel and other uses. Keeping existing routes open helps accomplish the goal of "minimization of conflicts among various uses of the public lands," among other benefits. 43 C.F.R. § 8342.1. BLM's DR violates FLPMA by failing to manage the public lands of the Labyrinth/Gemini Bridges TMA in accordance with principles of multiple use and sustained yield and is arbitrary, capricious, and otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706.

V.     **The BLM violated FLPMA and other federal statutes by implementing *de facto* wilderness management on non-Wilderness Study Area ("WSA") and non-Wilderness lands.**

Constitutional authority to classify and manage public lands resides with Congress. United States Constitution, Article IV, Section 3 cl. 2. In various federal laws, including but not limited to the Taylor Grazing Act ("TGA"), 43 U.S.C. §§315-315q, FLPMA, 43 U.S.C. §§1701 *et seq.*, the 1872 Mining Law, as amended, 30 U.S.C. §§20, *et seq.*, and the Mineral Leasing

Laws ("MLA"), 30 U.S.C. §§181, *et seq*., Congress has delegated its constitutional authority to Defendants to manage public lands. This delegated authority is defined and limited by the terms of the respective federal statute.

Even though the DR does not use the term "wilderness" to describe its management of the Labyrinth/Gemini Bridges TMA, the practical effect of the BLM's decision to close 317.2 miles of roads in the DR was to create WSA-type management. BLM's wilderness review authority under §603 of FLPMA, 43 U.S.C. §1782(c), has terminated, and as a result, BLM must "not manage or otherwise treat public lands, other than §603 WSAs. . . as WSAs or as wilderness pursuant to the [FLPMA] §202 process." As a result, the BLM's DR unlawfully treats the non-WSA lands of the Labyrinth/Gemini Bridges TMA as a *de facto* WSA lands.

## VI.    The BLM violated NHPA Section 106 regulations by failing to evaluate R.S. 2477 roads for National Register of Historic Places eligibility and assess affects to National Register-eligible roads.

The federal regulations implementing Section 106 of the NHPA provide procedures for the BLM to meet its requirement to evaluate cultural resources for National Register eligibility and assess effects of National Register-eligible properties. The State, acting as a Section 106 Consulting Party, submitted documentation of its knowledge and concerns to the BLM that R.S. 2477 roads within the Labyrinth/Gemini Bridges TMA may be eligible for National Register of Historic Places evaluation, and may be adversely affected by the TMP.

Despite the State submitting this documentation, the BLM did not take any action to evaluate R.S. 2477 roads for National Register of Historic Places eligibility and assess effects to those roads eligible for National Register inclusion. The BLM has violated the implementing regulations of Section 106 of the NHPA by arbitrarily and capriciously failing to evaluate R.S.

2477 roads for National Register of Historic Places eligibility and assess effects to National Register-eligible roads, despite the specific request by a Section 106 Consulting Party to do so.

**VII.    The BLM acted arbitrarily and capriciously in violation of the APA by allowing its Principal Deputy Director to participate in the decision-making process for the Labyrinth/Gemini Bridges TMP and DR despite her previous involvement as counsel for a plaintiff environmental organization in the 2017 SUWA Settlement Agreement.**

The signatory for one of the plaintiffs in the 2017 SUWA Settlement Agreement (the document requiring the BLM to initiate the Labyrinth/Gemini Bridges TMP) now serves as the Principal Deputy Director for the BLM. It is the information and belief of the State that the BLM's Principal Deputy Director has been directly involved in the development of the Labyrinth/Gemini Bridges TMP and the decision-making process leading to the final decision in the BLM's DR. BLM acted arbitrarily, capriciously, and contrary to law, in violation of the APA, 5 U.S.C. § 706, by allowing its Principal Deputy Director to participate in the decision-making process for the Labyrinth/Gemini Bridges TMP and DR despite her previous involvement as counsel for a plaintiff environmental organization in the 2017 SUWA Settlement Agreement.

## STATEMENT ON STANDING

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 at (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). As a direct result of the BLM's DR, the State will suffer a variety of concrete, particularized, and actual or imminent injuries that are directly attributable to the BLM's DR. All of these injuries would be adequately redressed by this Court declaring and

setting aside the BLM's DR as unlawful.

The State has suffered or will imminently suffer the following injuries. First, the DR closed roads that provided exclusive access to two sections of State-owned Trust Lands administered by SITLA. UT's First Am. Compl. at ¶¶ 39-48. This will result in a significant loss of revenue for the State's public schools resulting from devaluation of the property. *See Id.* Second, the DR strips the State of regulatory authority over all motorized travel within its borders and impairs the State's claimed right-of-way ownership interest in approximately 114 miles of roads. *Id.* at ¶¶ 49-51. Third, the DR impairs the State's interest in the economic benefits of motorized recreation and associated tax revenue. *Id.* at ¶¶ 52-56. Fourth, the DR impairs the State's ability to manage the wildlife within its borders. *Id.* at ¶¶ 57-59. This impacts both the State's property interest in wildlife and the State's economic interest in the sale of hunting and fishing licenses. *Id.*

## LEGAL FRAMEWORK

### I.    The Utah Enabling Act

The Utah Enabling Act granted to the State sections two, sixteen, thirty-two, and thirty-six of every township within the State for the express purpose of supporting the State's public school systems. Utah Enabling Act, Sec. 6. In the *Cotter* decision, this Court explained:

> [T]he state school land grants were not unilateral gifts made by the United States Congress. Rather, they were in the nature of a bilateral contract entered into between two sovereigns. In return for receiving the federal lands Utah disclaimed all interest in the remainder of the public domain, agreed to forever hold federal lands immune from taxation, and agreed to hold the granted lands, or the proceeds therefrom, in trust as a common school fund. 486 F. Supp. at 1001.

Two of the findings in the *Cotter* decision are pertinent here. First, the Court found that, "Unless a right of access is inferred, the very purpose of the school trust lands would fail." *Id.* at 1002. Furthermore, because school trust grants are subject to liberal rules of statutory

construction, the Court applied the common law assumption "that a grantor intended to include in the conveyance whatever was necessary for the use and enjoyment of the land in question." *Id.* Second, the Court found that "the school land grants were accomplished under what is termed 'special' legislation." *Id.* at 1009. "Special acts" supersede general acts that deal with the same subject matter, unless there is some indication that Congress intended to modify the special act. *Id.* "There is, however, no such indication in the legislative history of FLPMA. Indeed, the terms of FLPMA itself would indicate that Congress did not intend to amend rights under the school land grant program." *Id.* at 1010. The Court summarized its findings with the following:

> Thus, the court finds that 1) BLM can regulate the method and route of access to state school trust lands; 2) this regulation may be done with a view toward preventing impairment of wilderness characteristics (assuming no existing use); 3) the regulation may not, however, prevent the state or its lessee from gaining access to its land, nor may it be so prohibitively restrictive as to render the land incapable of full economic development. *Id.*

## II.     R.S. 2477

R.S. 2477 provides as follows: "And be it further enacted, That the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, codified at 43 U.S.C. § 932, repealed by Federal Land Policy Management Act of 1976 (FLPMA), Pub. L. No. 94-579 § 706(a), 90 Stat. 2743. R.S. 2477 was an open congressional grant *in praesenti* of public highway rights-of-way for the benefit of miners, ranchers, homesteaders, and all other members of the public who had a need to travel across public lands. *Southern Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 741 (10th Cir. 2005) (hereinafter "*SUWA v. BLM*"). R.S. 2477 operated as a standing offer of a right-of-way over the public domain, and the grant may be accepted without formal action by public authorities. *Id*.

R.S. 2477 was repealed on October 21, 1976, by FLPMA, 43 U.S.C. § 1701 *et. seq*. In

repealing R.S. 2477, Congress preserved vested R.S. 2477 rights-of-way as valid existing rights and expressly directed the United States and its subordinate agencies (including the DOI and the BLM) to manage federal lands subject to these valid existing rights. Section 701(h) of FLPMA provides as follows: "All actions by the Secretary concerned under this Act shall be subject to valid existing rights." *Id*. § 1701, note; *see also* § 1769(a) ("Nothing in this subchapter shall have the effect of terminating any right-of-way or right of use heretofore issued, granted or permitted.").

### III.   The Wilderness Act

The Wilderness Act of 1964 was enacted "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a). Management of these wilderness areas was to be done in "such manner as will leave them unimpaired for future use and enjoyment as wilderness." *Id*. The Wilderness Act process for adding lands to the National Wilderness Preservation System ("NWPS") begins with recommendations to the President from the secretaries of either the Department of Agriculture or DOI. *Id*. § 1132(a)-(c). The President then makes a recommendation to Congress, which reserved to itself the power to designate wilderness. *Id*. Specifically, the Wilderness Act states that "no Federal lands shall be designated as 'wilderness areas' except as provided for in this chapter or by a subsequent Act." *Id*. § 1131(a).

The Act defines wilderness as "an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain" and "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvement or human habitation." *Id*. § 1131(c). A qualifying area is defined as an area that:

    (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities

for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, education, scenic, or historical value. *Id*.

## IV.     The Federal Land Policy and Management Act

Congress enacted FLPMA, 43 U.S.C. § 1701–1787, to establish uniform and coherent administration of public lands. This Congressional mechanism includes (1) the creation of resource inventories and land use plans; (2) implementation of "multiple use" management plans; (3) management of lands recommended for inclusion in the NWPS as Wilderness Study Areas ("WSAs"); and (4) designation and management of Areas of Critical Environmental Concern ("ACECs") according to land use plans. *Id*.

### A. Inventory and Land Use Plans

Section 201 of FLPMA requires the Secretary of the Interior to "prepare and maintain on a continuing basis an inventory of all public lands and their resources and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern." 43 U.S.C. § 1711(a). This inventory is to be kept current in order to reflect any changed conditions and to "identify new and emerging resource and other values." *Id*. In addition to the requirement to prepare an inventory, FLPMA requires that "[t]he preparation and maintenance of [the] inventory or the identification of such areas shall not, of itself, change or prevent change of management or use of public lands." *Id*. (emphasis added).

Section 202 of FLPMA requires the Secretary of the Interior, with public participation, to "develop, maintain, and when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." *Id*. § 1712(a). In developing these land use plans, currently known as Resource Management Plans (or RMPs), the BLM must rely "on the inventory of the public lands, their resources, and other values." *Id*. § 1712(c)(4). FLPMA also requires the

Secretary of the Interior to "coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of . . . the State and local governments within which the lands are located…" *Id*. § 1712(c)(9). Moreover, the Secretary of the Interior:

> shall provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands, including early public notice of proposed decisions which may have a significant impact on non-Federal lands. Such officials in each State are authorized to furnish advice to the Secretary [of the Interior] with respect to the development and revision of land use plans [and] land use guidelines. . . for the public lands within such State and with respect to such other land use matters as may be referred to [the Secretary of the Interior] by them. *Id*.

## B. Consistency with State and Local Land Use Plans

Under FLPMA, when developing or creating Resource Management Plans, the BLM is required to coordinate its land use inventory, planning, and management activities for such lands with the land use planning and management programs of the states within which the lands are located.  43 U.S.C.A. § 1712(c)(9). The BLM also is required in the development of land use plans to ensure that consideration is given to the applicable state, local, and tribal plans "and to resolve, to the extent practical, inconsistencies between Federal and non-Federal Government plans." *Id.* FLPMA further mandates that BLM land use plans "shall be consistent with state and local plans to the maximum extent [the Agency] finds consistent with federal law and the purposes of this Act." *Id.* In addition to the coordination and consistency requirements, CEQ regulations require federal agencies to discuss the conflicts between the proposed action and the objectives of state and local plans. 40 CFR § 1502.16.

## C. Multiple Use and Sustained Yield

As set forth in FLPMA, the guiding principle in the management of public lands generally, and the RMPs specifically, is multiple use and sustained yield. 43 U.S.C. § 1732(a).

"Multiple use" is defined as "management of public lands and their various resources so that they are utilized in the combination that will best meet the present and future needs of the American people." *Id*. § 1702(c). These resources include, but are not limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id*.

"Sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of various renewable resources of the public lands consistent with multiple use." *Id*. § 1702(h). As set forth in FLPMA, the "principal or major uses" of public lands include and are limited to "domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production." *Id*. § 1702(l).

**D. Wilderness Study Areas**

Wilderness Study Areas, or WSAs, are those lands inventoried and identified by BLM as suitable for preservation as wilderness, subject to prior existing rights and uses. 43 U.S.C.§ 1782(c). Because the Wilderness Act does not directly address BLM's authority to designate or manage public lands as wilderness, FLPMA section 603 provides for a two-step inventory and management process.

First, within fifteen years of the October 21, 1976 passage of FLPMA, the Secretary of the Interior was directed to use the Section 201 Inventory to identify potential wilderness areas and "from time to time [within that fifteen-year period] report to the President his recommendation as to the suitability or nonsuitability of each area or island for preservation as wilderness." *Id*. § 1782(a). Second, the President was to advise Congress within two years of each report by the Secretary of the Interior of "his recommendations with respect to designation

13

as wilderness of each such area", with the President's recommendations for wilderness designations becoming effective only if so provided by an act of Congress. *Id*. § 1782(b). On October 21, 1991, BLM's authority to review, recommend, create, or manage lands as WSAs terminated. *Id*. § 1782(a).

Only Congress has the discretion to either designate WSA lands as part of the NWPS or to release them for other uses. *Id*. § 1782(b). Prior to congressional determination, management of recommended WSAs must be done in "a manner so as not to impair the suitability of such areas for preservation as wilderness," subject to prior existing rights and uses (the non-impairment standard). *Id*. § 1782(c). The BLM's Interim Management Policy for Lands Under Wilderness Review ("IMP") was? is? to provide management guidance to BLM staff for section 603 WSAs pending congressional action. Pursuant to FLPMA section 302(b), BLM is to manage all other lands to the lesser "undue degradation" standard.

### E. Areas of Critical Environmental Concern

FLPMA defines Areas of Critical Environmental Concern ("ACECs") as "areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." 43 U.S.C. § 1702(a). Under FLPMA Section 201, the Secretary of the Interior must give priority to ACECs in the inventory of public lands. *Id*. § 1711(a). Under FLPMA Section 202, the designation and protection of ACECs are given priority in the development and revision of land use plans. *Id*. § 1712(c)(3). Prior to designating an ACEC, the BLM State Director must provide a 60-day period for public comment on the proposed designation. 43 CFR § 1610.7-2(b).

14

**F. Rules and Regulations**

To carry out the purposes of FLPMA, the Secretary of the Interior is required to promulgate rules and regulations. "The promulgation of such rules and regulations shall be governed by the provisions of chapter 5, title 5," the Administrative Procedures Act, 5 U.S.C. §§ 500-596. 43 U.S.C. § 1740. In 1971, DOI promulgated a rule to follow rulemaking procedures, even if the subject matter would fall within APA exceptions to rulemaking procedures. 36 Fed. Reg. 8336 (May 4, 1971).

**V. Administrative Procedures Act.**

Congress enacted the APA to standardize the way federal administrative agencies propose and establish rules and regulations. The APA also establishes a process for judicial review of agency decisions. The APA authorizes the setting aside of agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; without observance of procedures required by law, and unwarranted or unsupported by the facts. 5 U.S.C. 706(2). There must be a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56, 103 S. Ct. 2856, 2873, 77 L. Ed. 2d 443 (1983).

**A. Rulemaking**

Rulemaking procedures are clearly laid out in the APA and require both notice and the opportunity to comment. 5 U.S.C. § 553. Notice of proposed rulemaking is to be published in the Federal Register and must include "(1) a statement of the time, place, and nature of the public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and

issues involved." *Id*. § 553(b). After providing notice, an agency must "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id*. § 553(c).

Except as otherwise required by statute, the APA provides an exception to the notice and comment requirements for "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id*. § 553(b)(3)(A). Courts will overturn a rule purporting to exist under this exception if it was promulgated pursuant to a direct delegation of legislative power by Congress or "if it changes existing law, policy or practice." *Rocky Mountain Helicopters, Inc. v. F.A.A.*, 971 F.2d 544, 546 (10th Cir. 1992).

**B. Judicial Review**

The APA also establishes a procedure for judicial review for those who are suffering a legal wrong as the result of a final agency action and have no other adequate remedy. *Id*. § 704. The reviewing court may decide "all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id*. § 706. The court shall, among other things "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . [or] without observance of procedure required by law." Id. § 706(2)(A) and (C)-(D).

**VI.     National Historic Preservation Act**

Congress enacted the National Historic Preservation Act ("NHPA") to preserve historic and archaeological sites in the United States. 54 U.S.C. § 100101. Section 106 of the NHPA requires federal agencies with jurisdiction over a proposed federal undertaking to consider the

effect of that undertaking on any historic property.  54 U.S.C. § 306108. Regulations at 36

C.F.R. § 800 Part B provide specific procedures for complying with the NHPA. Further

regulations at 36 C.F.R. §60.4 stipulate that a cultural resource—object, site, structure, building,

or district—must possess integrity of location, design, setting, materials, workmanship, feeling,

and association. 36 C.F.R. §60.4 also provides criteria for evaluation under the National Register

for Historic Places. These regulations describe National Register-eligible historic properties as:

(a) "… associated with events that have made a significant contribution to the broad patterns of

our history; or (b) … associated with the lives of persons significant in our past; or (c) …

embody the distinctive characteristics of a type, period, or method of construction, or that

represent the work of a master, or that possess high artistic values, or that represent a significant

and distinguishable entity whose components may lack individual distinction; or (d) … have

yielded, or may be likely to yield, information important in prehistory or history". 36 C.F.R.

§60.4(a)-(d).

  These regulations require the BLM to seek information from "consulting parties", such as

state governments, likely to have knowledge of, or concerns with, historic properties in the area,

and identify issues relating to the undertaking's potential effects on historic properties. 36 C.F.R.

§ 800.4(a)(3).

## **FACTUAL BACKGROUND**

  The Labyrinth/Gemini Bridges area consists of approximately 303,994 acres of federal

public land located in Grand County, Utah, and entirely within the BLM's Moab Field Office.

UT's First Am. Compl. at ¶ 1. The area provides some of the most celebrated off-highway

vehicle ("OHV") recreation opportunities in the United States and it attracts visitors from around

the world. *Id*. The area is surrounded on three sides by specially-designated federal public lands

17

where OHVs[1] are prohibited—the Labyrinth Canyon Wilderness Area, Canyonlands National Park, and Arches National Park. *Id.* at ¶ 2; *see e.g.* 16 U.S.C. § 1131 et seq. The Labyrinth/Gemini Bridges area provides unique and valuable OHV recreation in a similar landscape to the surrounding OHV-closed areas. UT's First Am. Compl. at ¶ 2.

In 2020, the BLM initiated the development of a Travel Management Plan ("TMP") for the Labyrinth/Gemini Bridges area, called the Labyrinth/Gemini Bridges TMP. *Id*. at ¶ 3. The Labyrinth/Gemini Bridges TMP evaluated whether to keep roads open, limit them to certain uses, or close them to all motorized uses. *Id*. Utah, through its state agency known as the Public Lands Policy Coordinating Office ("PLPCO"), signed a Memorandum of Understanding with the BLM in January 2019. *Id*. at ¶ 20. The purpose of this Memorandum of Understanding was to allow the State to participate in the planning process for the Labyrinth/Gemini Bridges TMP as a cooperating agency. *Id*.

After a years-long planning process, the BLM issued its final Decision Record ("DR") for the Labyrinth/Gemini Bridges TMP on September 28, 2023. *See Id.*, Exhibit #1, Labyrinth/Gemini Bridges Travel Management Plan Decision Record ("DR"). The BLM's DR ultimately closed motorized access to 317.2 miles of existing motorized routes within the Travel Management Area ("TMA"), while limiting access (either to certain types of vehicles or during certain times of the year) on an additional 98.4 miles. *See Id.*, Exhibit #2, Map of Roads Closed by the Labyrinth Gemini Bridges TMP DR. As a result, only 712.1 miles of roads were left open year-round to all motorized vehicles. DR, at 2.

---

[1] The terms OHVs ("off-highway vehicles"), ATVs ("all-terrain vehicles"), UTVs ("utility terrain vehicles"), and ORVs ("off-road vehicles") are often used interchangeably (although usage between terms can have subtle differences) and generally refer to vehicles primarily intended to be used off of paved roads.

**Interference with RS 2477 Litigation**

Of the 317.2 miles of closed routes, approximately 114 miles are roads currently subject to litigation in the Grand County R.S. 2477 case. UT's First Am. Compl. at ¶ 5. All 317.2 miles of closed roads were previously open to public use under the BLM's 2008 Moab Field Office Resource Management Plan (hereinafter "Moab RMP"). *See Id.,* Exhibit #3, 2008 Moab Field Office Resource Management Plan Map #2 "Designated Routes."

In the Grand County R.S. 2477 case, the State seeks to quiet title to numerous roads within Grand County which cross BLM land under the Mining Act of 1866 (usually referred to as R.S. 2477).  *Grand County v. United States of America,* Case No. 2:12-cv-00466-CW (D. Utah 2012). That case is currently stayed to allow the State to conduct discovery on the roads at issue, and to allow for a bellwether case on related legal issues to proceed in Kane County, Utah. UT's First Am. Compl. at ¶ 5. Counsel for Plaintiffs are currently conducting discovery on roads included in the State's Grand County R.S. 2477 case, including the 114 miles of roads closed in the BLM's DR that were already at issue in the R.S. 2477 case. *Id*. at ¶ 6.

The State regularly drives fact witnesses on the claimed R.S. 2477 roads to refresh their memory before preservation deposition. *Id*. at ¶ 7. Visiting and driving the claimed R.S. 2477 roads is an essential step in Plaintiff's discovery process and is vital to the resolution of this case. *Id*. Prior to the BLM's closure of 114 miles of claimed R.S. 2477 roads in the Labyrinth/Gemini Bridges TMA, Plaintiff's attorneys planned to visit and drive the length of these roads during the current R.S. 2477 deposition block. *Id*. at ¶ 8. Plaintiff's attorneys are now placed in an unduly burdensome situation of having to seek permission from the BLM and its DOJ attorneys in order to conduct their established discovery process of driving with witnesses on the 114 miles of claimed R.S. 2477 roads closed by the BLM's DR. *Id*. at ¶ 9. Per the Case Management Order in

*Rich County et al v. U.S.A. et al.*, all R.S. 2477 witnesses must be over the age of 60 at the time

of deposition. Case 2:12-cv-00424-CW, Docket No. 50. Most witnesses are significantly older

than 60 and many are subject to deteriorating health conditions. *See Id*. at ¶ 9.

      As a cooperating agency in the Labyrinth/Gemini Bridges TMP, the State participated in

a series of "route evaluation meetings" hosted by the BLM from March 2019 to April 2020. *Id*.

at ¶ 21. The meetings were intended to develop a range of alternatives for the TMP. *Id*. While

participating in the route evaluation meetings, the State, through PLPCO, continually expressed

its position that roads subject to the ongoing Grand County R.S. 2477 case should remain open

under all alternatives in the draft TMP. *Id*. On April 26, 2021, the State submitted scoping

comments to the BLM on the Labyrinth/Gemini Bridges TMP. *Id*. at ¶ 22. In a comment letter

dated December 10, 2021, the State explained the need for all claimed R.S. 2477 roads to remain

open under the travel management plan until such time as the State's claims could be fully and

finally adjudicated. *Id*. The State reiterated this position with another comment letter on October

6, 2022. *Id*.

      The BLM did not take the State's concerns seriously and, instead, closed approximately

114 miles of disputed roads. *Id*. at ¶ 5. Many of the claimed R.S. 2477 roads closed by the

BLM's DR are exceptionally well-used popular routes for motorized recreation and dispersed

camping. *Id*. at ¶ 10. These routes are particularly popular for mobility-limited people who want

to visit scenic backcountry locations similar to those offered in nearby OHV-prohibited areas. *Id*.

These popular routes include the 9.41-mile Hell Roaring Road, the 2.82-mile Spring Canyon

Bottom Road, the 9.06-mile Hey Joe Canyon Road, and the 4.95-mile Knoll Road. *Id*. at ¶ 11.

**State Involvement as a Consulting Party under the NHPA**

      In addition to being a Cooperating Agency, the State was also a "Consulting Party" to the

BLM's Labyrinth/Gemini TMP's Section 106 process. *Id*. at ¶ 157. As a consulting party, the State explained to the BLM that R.S. 2477 roads are cultural resources that may be eligible for nomination to the National Register of Historic Places in a letter dated April 11, 2023. *See Id.*, Exhibit #13, Section 106 Consultation Letter. The State provided the BLM with locational information about each R.S. 2477 road within the Labyrinth/Gemini Bridges TMA and explained why these roads should be included in the Section 106 process by citing some specific examples, such as Hey Joe Canyon Road (County Road #1527). *Id*. at ¶ 157.

In spite of the State's engagement in the Section 106 process, the BLM ignored R.S. 2477 roads as cultural resources that were (1) located directly in the archaeological survey areas for the TMP (2) identified by the State (in its capacity as a Section 106 consulting party) that provided locational information and a rationale for including these cultural resources, (3) qualified as a type of cultural resource that must be recorded per BLM's own standards and guidelines and by agreement documents between the agency and the Utah State Historic Preservation Office, and (4) when eligible for National Register inclusion, assessed for effects. *Id.*

### Diminished Access to SITLA Lands

Pursuant to the Utah Constitution, the State of Utah owns all property interests acquired from the United States at or after the time of statehood. UTAH CONST. Art. XX. The State of Utah holds fee title to approximately 70 sections of Trust Lands within the Labyrinth/Gemini Bridges TMA that are administered and managed by SITLA. UT's First Am. Compl. at ¶ 40. Many of the roads within the TMA provide transportation and access to these Trust Lands and contribute to the financial viability of the public-school systems in the state. *Id*.

The BLM's DR closes and restricts access to two sections of Trust Lands located within

the TMA. *Id.* at ¶ 157. Those SITLA sections are located at Township 26 South, Range 18 East,

Section 36; and Township 25 South, Range 18 East, Section 32. Access to these parcels is closed

by the DR's closure of Hell Roaring Road, #1223 and Mineral Canyon Road, #1026. *See id.*,

Exhibit #11, Map of SITLA Parcels With Access Blocked by DR. The DR cuts off the only

existing route of access to the SITLA parcel located at Township 26, Range 18 East, Section 32.

*Id.* at ¶ 41. Although the DR does allow access to the extreme northwest corner of the SITLA

parcel located at Section 32 of Township 25 South, Range 18 East, the extreme topography of

the landscape renders access to the majority of the parcel impossible without access along Hell

Roaring Road, #1223. *Id.* at ¶ 42.

The marketability and value of the affected Trust Lands will be significantly reduced,

diminishing their per-acre value by as much as fifty percent. *Id.* at ¶ 44. The closure of access

roads severely limits the potential uses of these Trust Lands and their accessibility, thereby

reducing their attractiveness to potential buyers or lessees. *Id.* at ¶ 43. Continued access to these

Trust Lands is paramount for fulfilling the intent of the original land grant from the United

States. *Id.*

In addition to the valuation loss, SITLA has very limited budgets for road maintenance.

*Id.* at ¶ 45. It is that way by design, to maximize disbursements of revenue. *Id.* Therefore, it is

imperative for the State, SITLA, and their Trust Lands beneficiaries that roads leading to SITLA

Trust Lands be public; this allows SITLA to partner with the Grand County Road Department

and others to improve or maintain the roads when needed. *Id.*

### History of the Labyrinth/Gemini Bridges TMP

In October 2008, the BLM finalized the Moab RMP, which encompassed the entirety of

Grand County. *Id.* at ¶ 13. Included with the 2008 Moab RMP were maps depicting routes

specifically designated as open to motorized use. *Id.* All county roads crossing BLM land within Grand County, including Class B roads under UTAH CODE §72-3-103 and Class D roads under UTAH CODE §72-3-105 were incorporated in the travel maps for the Moab RMP and designated as open to motorized use. *Id.* These same roads designated as open in the 2008 Moab RMP were later included as claimed R.S. 2477 roads in Plaintiffs' Grand County R.S. 2477 case. *Id.*

Every year for the past twenty-five years, the Southern Utah Wilderness Alliance ("SUWA") and a few members of Congress sponsor a bill called the Red Rock Wilderness Bill, aimed at creating millions of additional acres of congressionally designated wilderness throughout Utah. *Id.* at ¶ 14. The approximately 317.2 miles of routes and route segments that were closed by BLM's DR are within the area SUWA has unsuccessfully sought to have Congressionally designated as Red Rock Wilderness. *See Id.*, Exhibit #4, Map of Proposed Wilderness Area, Red Rock Wilderness Act.

In December 2008, SUWA and other environmental plaintiffs filed a complaint against the BLM in the U.S. District Court for the District of Columbia for alleged defects in the Moab RMP, as well as alleged defects in other BLM resource management plans issued in BLM field offices across Utah. *Southern Utah Wilderness Alliance et al v. Allred et al*, No. 1:08-cv-02187, 2009 WL 765882 (D.D.C. Jan. 17, 2009) (later consolidated with Case No. 2:12-cv-00257-DAK and transferred to the District of Utah). The complaint specifically challenged the travel provisions and route designations in the Moab RMP. *Id.*

After SUWA filed its complaint, the State (along with numerous counties and community organizations) successfully intervened in the lawsuit to support the BLM's DR for the Moab RMP and the other BLM resource management plans. UT's First Am. Compl. at ¶ 16. After many years of litigation, SUWA and other environmental plaintiffs signed a settlement

agreement in January 2017 ("SUWA Settlement Agreement") (*see* UT's First Am. Compl.,

Exhibit #5) with the BLM. *Id*. at ¶ 17. The SUWA Settlement Agreement required the BLM to

generate new TMPs in certain TMAs. *Id.* This included the Labyrinth/Gemini Bridges TMP,

which was required to be completed within six years. *Id.*

      The State of Utah, as a Defendant-Intervenor, was excluded from the settlement

negotiations between SUWA and the BLM and later objected to the SUWA Settlement

Agreement. *Id*. at ¶ 18. Utah appealed the SUWA Settlement Agreement to the U.S. Court of

Appeals for the Tenth Circuit, but the State's challenge was dismissed as unripe for adjudication.

Case No. 2:12-cv-00257-DAK, Document No. 010110080254. Pursuant to the SUWA

Settlement Agreement, the BLM began developing the Labyrinth/Gemini Bridges TMP in 2019.

UT's First Am. Compl. at ¶ 20.

      **Inconsistency with the Utah Statewide Resource Management Plan and the**

**Governor's Consistency Review**

      The BLM released its final DR for the Labyrinth/Gemini Bridges TMP on September 28,

2023. *Id*. at ¶ 23. On October 25, 2023, Utah Governor Spencer Cox submitted his Governor's

Consistency Review letter to the BLM. *Id*. at ¶ 24. The Governor's letter detailed the

inconsistencies between the Labyrinth/Gemini Bridges TMP and Utah's Statewide Resource

Management Plan. *Id.* The Governor's letter also explained the need to keep all claimed R.S.

2477 roads open until final adjudication. *Id.*

      The Utah State Resource Management Plan ("Utah SRMP") includes locally adopted

objectives and policies for federal land management and includes findings, provisions, and

policies relating to natural resource development and environmental quality relevant to the

current planning process. Utah SRMP, *available at:*

https://storymaps.arcgis.com/collections/81d4406668e34acca4d98275ee41cd07?item=1(2022). In addition to the Utah SRMP, UTAH CODE § 63J-8-104(h)(i) also establishes the State's position that BLM land-use plans should "keep open to motorized travel, any road in the subject lands that is part of the respective counties' duly adopted transportation plan."

Despite Governor Cox's letter and Utah's position as a cooperating agency, the BLM declined to discuss the DR's inconsistency with the Utah SRMP or make any changes to the Labyrinth/Gemini Bridges TMP. *See Id*. at ¶ 142-51. On November 27, 2023, BLM Utah State Director Greg Sheehan responded with a letter stating that the Labyrinth/Gemini Bridges TMP, despite its name, is an "implementation-level" decision rather than a land use plan under FLPMA, and thus the BLM could not accept or respond to the Governor's Consistency Review. *Id*. at ¶ 150. The BLM has failed to explain why a travel management plan falls beyond the scope of "land use plans" under FLPMA and thus evades the BLM's consistency review requirements under 43 C.F.R. § 1610.3-2(e). *Id*. at ¶ 151. The State maintains the position that travel management decisions are the core management decisions upon which many other BLM decisions rest, and therefore argues that TMPs qualify as "land use plans" under FLPMA.

Seeking to stay the BLM's implementation of the Labyrinth/Gemini Bridges TMP, the State filed a Notice of Appeal and Petition for Stay with DOI's Interior Board of Land Appeals ("IBLA") on October 27, 2023. *Id*. at ¶ 25. The IBLA denied the State's Petition for Stay in an order dated November 28, 2023. *Id*. As a result of the denial, the State of Utah then moved to voluntarily dismiss its appeal from the IBLA on December 7, 2023. *Id*. at ¶ 26.

**Conflict of Interest**

The 2017 SUWA Settlement Agreement, which required the BLM to develop the Labyrinth/Gemini Bridges TMP, was signed by several plaintiffs, including The Wilderness

Society. *See* Am. Compl. Dkt 70., Exhibit #5, at 33. The Wilderness Society was represented by

the "Senior Counsel and Director" for its "BLM Action Center." Am. Compl., Dkt 70, at ¶ 159.

That individual was appointed as the BLM's Deputy Director for Policy and Programs in

February 2021. *Id*. at ¶ 160. She was later promoted to the BLM's Principal Deputy Director. *Id*.

The State possesses information and belief that, despite being a plaintiff signatory to the 2017

SUWA Settlement Agreement, the BLM's Principal Deputy Director has not recused herself but

has instead been directly involved in the development of the BLM's DR for the

Labyrinth/Gemini Bridges TMP. *Id*. at ¶ 161.

## STANDARD OF REVIEW

The State's claims arise under the APA, 5 U.S.C. § 702. Under the APA, 5 U.S.C. §

706(2), a court must:

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law; . . .
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

An action is arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"An agency's decision is entitled to a presumption of regularity, 'but that presumption is

not to shield the agency's action from a thorough, probing, in-depth review.'" *Olenhouse v.*

*Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (quoting *Citizens to Preserve*

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)) (alteration marks omitted). To survive

judicial review under the arbitrary and capricious standard, an agency must "examine the

relevant data and articulate a satisfactory explanation for its action including a 'rational

connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting

*Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Review this "focuses on the

rationality of an agency's decision making process rather than the rationality of the actual

decision." *Colo. Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006).

## ARGUMENT

BLM violated the APA, the Utah Enabling Act, federal case law, FLPMA, the Dingell

Act, and the NHPA by issuing is DR for the Labyrinth/Gemini Bridges TMP. First, BLM's DR

closure of 114 miles of roads subject to a pending Quiet Title Action by Plaintiffs was arbitrary

and capricious, directly interfering with the judicial process. Second, the BLM's DR deprives

SILTA of legally protected access to State-owned Trust Lands administered by SITLA, contrary

to Court precedent. Third, the BLM's DR, issued without allowing the Utah Governor the

opportunity to formally review the Proposed DR in a Governor's Consistency Review, violates

the consistency provisions of FLPMA. Fourth, the DR failed to comply with the "Multiple Use

and Sustained Yield" mandate in FLPMA. Fifth, BLM's established de facto wilderness

management within portions of the Labyrinth/Gemini Bridges TMA, in violation of FLPMA and

contravening the U.S. Congress. Sixth, the BLM failed to evaluate certain roads within the TMA

for eligibility on the National Register of Historic Places, in violation of the Section 106

regulations of the NHPA. And seventh, the BLM arbitrarily allowed for the involvement of a

senior BLM official in the decision-making process despite a known conflict of interest.

## I.     BLM's Closure Of Roads Subject To A Pending Quiet Title Lawsuit Was

**Both Arbitrary And An Abuse Of Discretion**

Under the APA, agency action may be overturned if it is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 § U.S.C. 706(2)(A). An agency action is arbitrary and capricious under the APA when it "relied on factors which Congress [did] not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Kobach v. United States Department of Interior,* 72 F.4th 1107, 1125 (10th Cir. 2023).

In this case, the BLM's Travel Management Plan failed to properly consider the effects which the road closures will have on the human environment. BLM also failed to properly consider alternatives which did not involve road closures.

While the TMP does contain a section addressing effects to the human environment, the BLM's analysis is lacking. This section is only a page and a half long, barely a fraction compared to the dozens of pages spent on analyzing the TMP's effects on the natural environment. This despite BLM's acknowledgment that "[t]ourism and recreation account[] for 48.9% of the Grand County economy." *Labyrinth/Gemini Bridges Travel Management Plan Environmental Assessment*, p. 88. Furthermore, the Environmental Assessment (EA) which BLM prepared for the TMP contained no discussion of effects to the human environment not relating to tourism. Although tourism is the primary industry affected by road closures in Grand County, it is not sufficient for the BLM to act as if it were alone.

Additionally, BLM failed to consider alternatives which involved either temporary closures or opening new trails. BLM justifies its closures citing "resource damage" caused by

recreation on its lands and notes that "the number of visitors [to Ground County] continues to grow annually." *Id*. However, it stands to reason that these closures will only increase congestion on the trails and lands which remain accessible, exacerbating the environmental harm experienced in these areas. The BLM itself acknowledges this risk in its EA. "As a result of increased visitation, resource damage is occurring and it is likely that additional . . . areas may be subject to additional management in the future." *Id*. at 89. To account for this, BLM should have considered opening new trails as a method of reducing congestion—and ecological harm— throughout the overall trail network.

In addition to being arbitrary and capricious, the Labyrinth/Gemini TMP also violates the APA for being an "abuse of discretion" on the part of BLM. After the passage of FLPMA, the BLM refused to adopt an administrative process that would validate the States' rights of way under R.S. 2477. Thus, the State was compelled to bring action under the Quiet Title Act against the BLM to prove the validity of its rights-of-way.

This places BLM in the unique position to be able to act in such a way that all but guarantees an unfavorable outcome for the State. The BLM may close roads at its discretion, and these roads may remain closed for the duration of what portends to be an extremely lengthy litigation process. During this period, D-roads—usually maintained through public use—may fall into a state of disrepair such as to be unusable. B-roads will likewise suffer, and any repairs necessary to return the roads to their pre-closure state would be extremely costly for the State. Additionally, should the federal government choose to exercise its authority under subsection (b) of the Quiet Title Act and purchase the roads through eminent domain, the value of the roads will have depreciated substantially from years of neglect.

Additionally, the road closures interfere with the State's ability to collect evidence

necessary for its case. BLM's actions therefore influence both the quality of the judgement the State may receive should it prevail as well as its ability to present a case in its favor. This is not to ascribe malicious intent to BLM. Rather, it is to point out that, though BLM does have discretion to manage the lands under its purview, it should have taken into account the effects that its actions would have on the inevitable R.S. 2477 litigation which would follow its TMP decision. Considering this, the road closures represent an abuse of BLM's discretion under the APA and should be voided.

## II.    Closures Of Access To SITLA Parcels Violate Utah's Right To Access Trust Lands Under The Utah Enabling Act

In 1894, Congress passed the Utah Enabling Act which admitted Utah into the Union as a state. Case law from the 10th Circuit and Utah District Courts has called the Utah Enabling Act a "solemn bilateral agreement," and a "contract, with bargained-for consideration exchanged between two governments." *Utah v. Kleppe*, 586 F.2d 756, 758 (10th Cir. 1978); *State of Utah v. Andrus*, 486 F. Supp. 995, 1001 (D. Utah 1979). "In return for receiving the federal lands Utah disclaimed all interest in the remainder of the public domain, agreed to forever hold federal lands immune from taxation, and agreed to hold the granted lands, or the proceeds therefrom, in trust as a common school fund." *State of Utah v. Andrus*, 486 F. Supp. 995, 1001 (D. Utah 1979). Accordingly, "Utah [has] a right of access to state school trust lands." *Id*. at 1011.

In *Andrus*, the Court held that although Utah's access rights to state school trust lands are subject to federal regulation, such regulations cannot prohibit access or be so restrictive as to make economic development "competitively unprofitable," as such an outcome could "constitute a taking." *Id*. at 1011. This applies even when BLM issues regulations to prevent impairment of wilderness characteristics. *Id.* This prescient ruling foreshadowed the Supreme Court's late

holding in *Lucas v. South Carolina Coastal* that regulations which "deprive[] land of all economically beneficial use" constitute a *per se* taking. *Lucas*, 505 U.S. 1003, 1027 (1992).

Here, the DR's closure of Hell Roaring Road, #1223 and Mineral Canyon Road, #1026 blocks motorized access to two different SITLA parcels and renders their economic development competitively unprofitable both to the State as well as its lessees. Such restrictions violate Utah's right to access its trust lands and constitute a taking under both *Andrus* and *Lucas*. Additionally, granting the State administrative access to the now-closed roads would not provide the access rights owed under the Utah Enabling Act. These roads are primarily maintained through public use. Administrative use alone is insufficient to keep the roads in useable condition.

### III.   BLM's DR Is A Land Use Plan Which Violates The Consistency Provision Of FLPMA

FLPMA requires the BLM to develop "land use plans" to govern the management and use of BLM lands. 43 U.S.C. § 1712(a). These plans must be "consistent with State and local plans to the maximum extent [the Secretary of Interior] finds consistent with Federal law and the purposes of [FLPMA]." 43 U.S.C. § 1712(c)(9). Additionally, regulations implementing FLPMA require the BLM to provide state governors with the opportunity to submit a "Governor's Consistency Review" of a BLM land use plan, and further require the BLM to consider and analyze the Governor's recommendations. 43 C.F.R. § 1610.3-2(e). The BLM has violated FLPMA and its implementing regulations by not seeking consistency between its DR and the State Resource Management Plan, and by failing to provide the Governor of Utah with the formal opportunity to submit a Governor's Consistency Review of the DR.

The BLM denies that travel management plans are "land use plans" under FLPMA, and therefore alleges that the FLPMA requirements of 43 U.S.C. § 1712(c)(9) or the regulatory

31

requirements of 43 C.F.R. § 1610.3-2(e) do not apply to travel management plans. The BLM has not justified its reasoning that travel management plans are merely "implementation level decisions" that do not fall under the auspices of FLPMA land use plans.

However, BLM's own *Land Use Planning Guidebook* says, "Land use plans . . . identify lands where specific uses are excluded to protect resource values. Certain lands may be open or closed to specific uses based on legislative, regulatory, or policy requirements or criteria to protect sensitive resource values. *Land Use Planning Handbook* 2005, p. 13. This description of land use plans would undeniably include Travel Management Plans such as the one at issue in this case.

## IV.    BLM'S DR Fails The "Multiple Use And Sustained Yield" Mandate In FLPMA

The guiding principle in the management of public lands generally, and the RMPs specifically, is multiple use and sustained yield. 43 U.S.C. § 1732(a). 184.  "Multiple use" is defined as "management of public lands and their various resources so that they are utilized in the combination that will best meet the present and future needs of the American people" *Id*. at § 1702(c). 185.  These resources include, but are not limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id*. at 186. "Sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of various renewable resources of the public lands consistent with multiple use." *Id*. at § 1702(h). The Tenth Circuit has said, "To fulfill its multiple use mission, BLM must design its land use plans to strike a balance among the many competing uses to which land can be put." *Western Watersheds Project v. BLM*, 721 F.3d 1264, 1268 (10th Cir. 2013).

Contrary to the multiple use and sustained yield mandate, the BLM's DR considered conservation exclusively, failing entirely to take into account livestock grazing, wildlife management, motorized recreation and travel and other uses. Keeping existing routes open helps accomplish the goal of "minimization of conflicts among various uses of the public lands." 43 C.F.R. § 8342.1. Transportation connectivity reduces in and out traffic and can help disperse use. Additionally, keeping roads open provides the traveling public access while reducing the need and desire to pioneer new and unauthorized routes.

Therefore, BLM's DR violates FLPMA by failing to manage the public lands of the Labyrinth/Gemini Bridges TMA in accordance with principles of multiple use and sustained yield and is arbitrary, capricious, and otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706.

## V. BLM'S DR Closes Roads in Violation of the Express and Implied Terms of the Dingell Act

In 2019, Congress used its authority under the Wilderness Act to pass the John D. Dingell, Jr. Conservation, Management, and Recreation Act [hereinafter "the Dingell Act"] which designated the 54,643-acre Labyrinth Canyon Wilderness in Utah's Emery County, and prohibiting permanent roads, temporary roads, and the use of motor vehicles within the Labyrinth Canyon Wilderness. Pub. L. 116-9. Congress specifically stated that "[c]ongress does not intend for the designation of the wilderness areas to create protective perimeters or buffer zones around the wilderness areas." *Id*. Congress also clarified that "[t]he fact that nonwilderness activities or uses can be seen or heard from areas within a wilderness area shall not preclude the conduct of those activities or uses outside the boundary of the wilderness area." *Id*.

Here, the BLM's DR creates a protective perimeter or buffer zone on the east side of the Labyrinth Canyon Wilderness in a manner expressly prohibited by the Dingell Act. Of the roads closed by the BLM's DR, the majority, and the most significant, lie immediately across the Green River from the Labyrinth Wilderness Area.  *See* Map in AR at LGB 042028. BLM even cited reduction in vehicle noise as rationale for closure of roads closest to the Labyrinth Wilderness Area. AR at LGB 007595 and LGB 035364. This, even though the Dingell Act states that noise created outside the wilderness area "shall not preclude the conduct of [the] activities [causing that noise]." Pub. L. 116-9. Therefore, the DR's road closures directly conflict with the express language of the Dingell Act by creating a protective perimeter or buffer zone designed to minimize visual and auditory impacts to visitors and wildlife within the Labyrinth Wilderness Area.

In addition to violating the express language of the Dingell Act, the DR's road closures conflict with Congress's intent that roads in this area be kept open for use. For context, in the Wild and Scenic River Act of 1968, Congress created the National Wild and Scenic Rivers System. P. L. 90-542; U.S.C. 1271 *et seq*. In this system to preserve wild and scenic rivers, Congress created different classifications of rivers based on road accessibility. 16 U.S.C. 1273(b). Congress defined "Scenic River Areas" as "[t]hose rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but accessible in places by roads." *Id*. In contrast, Congress separately defined "Wild River Areas" as "[t]hose rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted."

In 2019, Congress added segments of Utah's Green River to the Wild and Scenic Rivers

System in Section 1241 of the Dingell Act. Pub. L. 116-9, Section 1241. The segment of the Green River immediately adjacent to the BLM's Labyrinth/Gemini Bridges TMA was designated under the Dingell Act as a "Scenic River Area" with the classification "accessible in places by roads." Id. Congress clearly contemplated using the more restrictive "Wild River Area" designation along the Green River and did in fact designate a more northerly segment of the Green River as a "Wild River Area" "generally inaccessible except by trail." Id. Congress's selection of the "Scenic River Area" designation in lieu of the "Wild River Area" designation demonstrates congressional intent to protect existing road access along the Green River in the vicinity of the Labyrinth/Gemini Bridges TMA. See Map in AR at LGB 042028.

Therefore, the BLM also violated the Dingell Act by applying "Wild River Area" management to a segment of the Green River that Congress explicitly categorized as a "Scenic River Area" accessible by roads. Congress did not delegate authority to the BLM to change management of the Labyrinth Canyon stretch of the Green River from "Scenic River" management to "Wild River" management. As the distinguishing difference between "Wild River Areas" and "Scenic River Areas" is the presence of roads, it is clear that Congress intended for existing roads within the scenic river segment of the Green River to remain open. Yet BLM closed roads within the Labyrinth Canyon corridor for the express purpose of protecting the Green River's wild and scenic qualities. See AR discussion on Wild and Scenic River qualities, AR at LGB 042153. The BLM's closure of roads along the Green River clearly violates congressional intent for the Dingell Act and is therefore unlawful.

**VI.    BLM Failed To Evaluate R.S. 2477 Roads For Eligibility On The National Register Of Historic Places**

Congress enacted the National Historic Preservation Act ("NHPA") to preserve historic

and archaeological sites in the United States. 54 U.S.C. § 100101. Section 106 of the NHPA requires federal agencies with jurisdiction over a proposed federal undertaking to consider the effect of that undertaking on any historic property. 54 U.S.C. § 306108.

To comply with NHPA, agencies are required to identify any historic properties which lay within the "area of potential effects." 54 U.S.C. § 306108(b). A historic property is "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on" the National Register of Historic Places (NRHP). 54 U.S.C. § 300308. To be eligible for inclusion on the NRHP, a property must "possess integrity of location, design, setting, materials, workmanship, feeling, and association" and:

1. Be associated with events that have made a significant contribution to the broad patterns of our history; or

2. Be associated with the lives of persons significant in our past; or

3. that embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

4. have yielded, or may be likely to yield, information important in prehistory or history. 36 C.F.R. § 60.4.

When seeking to identify historic properties within the area of potential affects, NHPA requires agencies to "make a reasonable and good faith effort." 36 C.F.R. § 800.4(b)(1).

Here, the R.S.2477 roads subject to the TMP's closures are eligible for protection on the NHPA. They are intrinsically connected to the history of nearby towns and counties, having been created as part of Utah's settlement for purposes such as exploration, mining, ranching, and other

activities which "made a significant contribution to the broad patterns of [Utah's] history." 36 C.F.R. § 60.4(a).

The State, acting as a Section 106 Consulting Party, submitted documentation of its knowledge and concerns to the BLM that R.S. 2477 roads within the Labyrinth/Gemini Bridges TMA are cultural resources at least fifty years old, are eligible for National Register of Historic Places evaluation, and, if eligible for National Register inclusion, may be adversely affected by the TMP. *Grand County v. United States of America,* Case No. 2:12-cv-00466-CW (D. Utah 2012) Compl. ¶ 157.

Despite the State submitting this documentation, the BLM did not take any action to evaluate R.S. 2477 roads for National Register of Historic Places eligibility and assess effects to those roads eligible for National Register inclusion. In failing to do so, the BLM has violated the implementing regulations of Section 106 of the NHPA by arbitrarily and capriciously failing to evaluate R.S. 2477 roads for National Register of Historic Places eligibility and assess effects to National Register-eligible roads, despite the specific request by a Section 106 Consulting Party to do so.

## VII.   BLM HAS VIOLATED THE STATE'S VALID AND EXISTING RIGHTS OF WAY OVER CLOSED R.S. 2477 ROADS

Congress passed R.S. 2477 in 1866, granting a general "right-of-way for the construction of highways" over unreserved public lands. Furthermore, the 10th Circuit has held that "title to [R.S. 2477] rights of way pass[] independently of any action or approval on the part of the BLM." *SUWA v. BLM*, 425 F.3d 735, 754 (10th Cir. 2005). The BLM's own manual once contained a provision which read, "When the history of a road is unknown or questionable, its existence in a condition suitable for public use is evidence that construction sufficient to cause a

grant under RS 2477 has taken place." *Sierra Club v. Hodel*, 675 F. Supp. 594, 605 (D. Utah 1987) (quoting BLM Manual, Rel. 2-229, June 30, 1986).

Congress repealed R.S. 2477 in 1976 with the passage of FLPMA. However, Congress explicitly preserved R.S. 2477 roads, stating "[n]othing in this Act, or in any amendment made by this Act, shall be construed as terminating any valid . . . right-of way, or other land use right or authorization existing on the date of approval of this Act." Fed. Land Pol'y & Mgmt. Act of 1976, Pub. L. No. 94–579, §§ 501. § 701(a).

At issue in the current case are rights of way granted under R.S. 2477 which Utah obtained through the construction and maintenance of these roads prior to the passage of FLPMA. To this point, the BLM has asserted that its closures of R.S. 2477 roads do not constitute a dispute of Utah's vested R.S. 2477 rights. In doing so, BLM has treated Utah as a non-holder of vested R.S. 2477 rights and required that, to establish itself as a holder, Utah must bring action under the Quiet Title Act.

However, this practice has recently been condemned by this court in the case of *Kane County v. U.S.,* 2:10-cv-01073-CW, Dkt. 792 (D. Ut. Aug. 9, 2024) (Hereafter, "The Decision"). The Decision was issued as part of an ongoing suit between Kane County and the United States government regarding the closure of R.S. 2477 roads in the Grand Staircase-Escalante National Monument. Under its management authority over the Monument, the BLM developed a Monument Plan which set forth a "transportation system" which closed and otherwise attempted to manage roads within the Monument, many of which were subject to vested R.S. 2477 rights.

For example, in the case of the Hole-in-the-Rock Road, BLM refused to allow Kane County to improve the road, despite acknowledging the need for improvements, because it refused to recognize or treat Kane County as a valid R.S. 2477 holder until those rights had been

38

adjudicated. Kane County sued, and the BLM attempted to have the suit dismissed for a lack of title dispute, claiming that it neither admitted nor denied Kane County's title.

The *Kane* Court rejected the BLM's motion for dismissal and held that "imposing a mandate of adjudicated title is contrary to law and the United States' authority." *Id*. at 60. The Court reasoned that R.S. 2477 "imposed no burden on [Utah] to prove to the United States [its] status as [a] holder before the State . . . could exercise [its] rights. Those who were holders on October 20, 1976, continued to be holders when Congress passed FLPMA the following day. . .. Congress also imposed no requirements on the State or counties to prove up their status before a court if they wanted to continue to be treated as holders." *Id.* at 27.

Additionally, in response to the BLM's assertion that its road closures did not constitute a title dispute, the Court held that, until a title dispute arises, "the United States has an obligation to continue allowing the State and counties to exercise their vested property rights without interference." *Id*. at 32. Such vested rights include the rights to maintenance and management of R.S. 2477 roads. *Id.* at 34-35.

The case at bar likewise deals with the violation of vested R.S. 2477 rights. The fact that the road closures are the result of a Travel Management Plan rather than a Monument Plan is immaterial. In both cases, BLM has disregarded vested R.S. 2477 rights using the self-contradictory rationale that it can at once deny Utah its management and maintenance rights under R.S. 2477 while refusing to officially dispute those very rights. In both cases, BLM has asserted that the State carries the burden of proving its R.S. 2477 rights through adjudication. However, The Decision clearly rejects BLM's rationale and holds R.S. 2477 rights are self-executing, vested, and valid until such time as the United States chooses to challenge those rights under the Quiet Title Act. As such, "unless the United States disputes [Utah's] title, it has an

obligation to treat the State . . . in the same manner as it did prior to [the passage of FLPMA], for the roads at issue." *Id*. at 29.

For the reasons articulated above, BLM's road closures and its associated TMP violate Utah's vested R.S. 2477 rights. Said rights are self-executing and fully vested, according to the terms of both R.S. 2477 and FLPMA, and any requirement to establish those rights via adjudication is unlawful. The burden falls on the BLM to dispute those rights. Until that time, Utah's rights to manage and maintain these roads may not be infringed.

### VIII.   BLM Abused Its Discretion By Failing To Exclude Official With Conflict Of Interest From Decision Making Process

The 2017 SUWA Settlement Agreement, which required the BLM to develop the Labyrinth/Gemini Bridges TMP, was signed by several plaintiffs, including The Wilderness Society. *See id.*, Exhibit #5, at 33. The Wilderness Society was represented by the "Senior Counsel and Director" for its "BLM Action Center." *Id*. at ¶ 159. That individual was appointed as the BLM's Deputy Director for Policy and Programs in February 2021. *Id*. at ¶ 160. She was later promoted to the BLM's Principal Deputy Director. *Id*. The State possesses information and belief that, despite being a plaintiff signatory to the 2017 SUWA Settlement Agreement, the BLM's Principal Deputy Director has not recused herself but has instead been directly involved in the development of the BLM's DR for the Labyrinth/Gemini Bridges TMP. *Id*. at ¶ 161.

### CONCLUSION AND REQUEST FOR RELIEF

For the forgoing reasons, the Court should declare that BLM violated the APA, federal case law, FLPMA, and the NHPA. At a minimum, the Court should vacate the agency's decision as arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. § 706 5 U.S.C.

Respectfully submitted this 5th day of November 2024.

/s/*Roger R. Fairbanks*
Roger R. Fairbanks
Kathy A.F. Davis
K. Tess Davis

Attorneys for Plaintiffs
State of Utah *et al*.

**CERTIFICATE OF SERVICE**

I certify that on this 5th day of November 2024, the undersigned electronically filed the

foregoing PLAINTIFFS' OPENING BRIEF with the Clerk of the Court using the CM/ECF

system which will send notification of this filing to all counsel of record.


/s/ *Roger R. Fairbanks*
Assistant Attorney General