TODD KIM, Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

PAUL A. TURCKE, Trial Attorney
Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (202) 532-5994
paul.turcke@usdoj.gov

*Attorneys for Federal Defendants*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| BLUERIBBON COALITION, INC., *et al.*, <br><br> and <br><br> STATE OF UTAH, *et al.*, <br><br>     Plaintiffs, <br><br> v. <br><br> U.S. BUREAU OF LAND MANAGEMENT, *et al.*, <br><br>     Defendants, <br><br> and <br><br> SOUTHERN UTAH WILDERNESS ALLIANCE, <br><br>     Defendant-Intervenor. | Case Nos.  2:23-cv-00923-DAK (lead) <br>          4:24-cv-00046-DAK <br><br><br> **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR REVIEW OF AGENCY ACTION IN AN ADMINISTRATIVE CASE UNDER DUCivR 7-4** <br><br><br> District Judge Dale A. Kimball <br> Magistrate Judge Jared C. Bennett |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF THE ISSUES PRESENTED ................................................ 1

STATEMENT OF THE CASE ............................................................................ 2

    I.     Legal Background ............................................................................ 2

          A.    Federal Land Policy and Management Act .......................... 2

          B.    National Environmental Policy Act ..................................... 2

          C.    National Historic Preservation Act ...................................... 2

          D.    Revised Statute 2477 ............................................................ 3

    II.    The Labyrinth/Gemini Bridges Travel Management Plan ............... 3

    III.   Prior Proceedings ............................................................................ 7

SUMMARY OF ARGUMENT ........................................................................... 8

STANDARD OF REVIEW ................................................................................. 9

ARGUMENT ...................................................................................................... 9

    I.     The BlueRibbon Plaintiffs Do Not Carry Their Burden ................... 10

          A.    Appointments Clause ........................................................... 10

          B.    Dingell Act ........................................................................... 16

          C.    Arbitrary and Capricious Agency Action ............................. 20

               1.    Scope of FLPMA ....................................................... 21

               2.    Factors for Route Designations ................................. 23

               3.    Designation Rationales ............................................. 28

                    a.    Soils and vegetation ....................................... 30

                    b.    User conflict .................................................... 31

                    c.    Bighorn sheep ................................................. 34

                    d.    Habitat fragmentation ..................................... 36

           D.    NEPA .................................................................................... 37

i

II.     The State's Claims Also Fail ................................................................. 40

        A.      Arbitrary and Capricious Agency Action ................................. 41

        B.      SITLA Parcels ........................................................................ 43

        C.      FLPMA ................................................................................... 46

                1.      Consistency Review .................................................... 46

                2.      Multiple Use and Sustained Yield .............................. 48

        D.      Dingell Act .............................................................................. 49

        E.      NHPA ...................................................................................... 51

        F.      R.S. 2477 ................................................................................. 58

        G.      Conflict of Interest .................................................................. 60

III.    Plaintiffs Fail to Address the Proper Remedy Standard ....................... 60

CONCLUSION .......................................................................................................... 61

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................. 61

*Anderson v. U.S. Dep't of Lab.*,
  422 F.3d 1155 (10th Cir. 2005) ........................................................... 38

*Bicycle Trails Council of Marin v. Babbitt*,
  82 F.3d 1445 (9th Cir. 1996) ......................................................... 32, 33

*Biodiversity Conservation All. v. Jiron*,
  762 F.3d 1036 (10th Cir. 2014) ..................................................... 24, 37

*BlueRibbon Coal., Inc. v. U.S. Bureau of Land Mgmt.*,
  No. 2:23-CV-923-DAK-JCB, 2024 WL 1197862 (D. Utah Mar. 20, 2024) ................ passim

*Braidwood Management, Inc. v. Becerra*,
  104 F.4th 930 (5th Cir. 2024) ............................................................. 15

*Bruce v. Ogden City Corp.*,
  640 F. Supp. 3d 1150 (D. Utah 2022) ..................................................... 44

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ............................................................... 11, 13, 15

*Califano v. Sanders*,
  430 U.S. 99 (1977) ......................................................................... 41

*Carter v. United States*,
  333 F.2d 354 (10th Cir. 1964) ............................................................. 14

*Colo. Env't Coal. v. Dombeck*,
  185 F.3d 1162 (10th Cir. 1999) ........................................................... 35

*Comm. to Pres. Boomer Lake Park v. Dept. of Transp.*,
  4 F.3d 1543 (10th Cir. 1993) ............................................................. 38

*Copar Pumice Co. v. Tidwell*,
  603 F.3d 780 (10th Cir. 2010) ............................................................. 9

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
  746 F. Supp. 2d 1055 (N.D. Cal. 2009) .................................................... 4

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
  72 F.4th 1166 (10th Cir. 2023) ........................................................... 35

*Ctr. for Sierra Nev. Conservation v. U.S. Forest Serv.*,
  832 F. Supp. 2d 1138 (E.D. Cal. 2011) ................................................... 25

iii

*Dine Citizens Against Ruining Our Env't v. Haaland,*
  59 F.4th 1016 (10th Cir. 2023) ............................................................ 61

*Earth Island Inst. v. U.S. Forest Serv.,*
  87 F.4th 1054 (9th Cir. 2023) .............................................................. 41

*Ecology Ctr., Inc. v. U.S. Forest Serv.,*
  451 F.3d 1183 (10th Cir. 2006) ............................................................ 35

*Edmond v. United States,*
  520 U.S. 651 (1997)................................................................... 11, 15

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010)......................................................................... 16

*Friends of the Flathead River v. U.S. Forest Serv.,*
  614 F. Supp. 3d 747 (D. Mont. 2022)................................................... 50

*Gordon v. Norton,*
  322 F.3d 1213 (10th Cir. 2003) ............................................................ 44

*Hells Canyon All. v. U.S. Forest Serv.,*
  227 F.3d 1170 (9th Cir. 2000) ....................................................... 33, 50

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.,*
  140 F. Supp. 3d 1123 (D.N.M. 2015)................................................... 41

*Kane Cnty. Utah v. Salazar,*
  562 F.3d 1077 (10th Cir. 2009) ....................................................... 47, 60

*Kane Cnty. v. United States,*
  No. 2:10-CV-1073, 2024 WL 4285110 (D. Utah Sept. 25, 2024)................. 58, 59

*Kane County v. United States,*
  No. 2:10-CV-1073-CWW, 2024 WL 3760024 (D. Utah Aug. 9, 2024) ............ 58, 59

*Loper Bright Enterprises v. Raimondo,*
  603 U.S. 369 (2024)......................................................................... 23

*Lucas v. S.C. Coastal Council,*
  505 U.S. 1003 (1992)........................................................................ 44

*Lucia v. SEC,*
  585 U.S. 237 (2018)............................................................ 10, 11, 13, 16

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)......................................................................... 40

*Morrison v. Olson,*
  487 U.S. 654 (1988)......................................................................... 11

*Nat. Res. Def. Council, Inc. v. EPA,*
  822 F.2d 104 (D.C. Cir. 1987)............................................................... 2

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) ..................................................................................... 22, 24, 46

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,*
   18 F.3d 1468 (9th Cir. 1994) ............................................................................. 19, 32

*Olenhouse v. Commodity Credit Corp.,*
   42 F.3d 1560 (10th Cir. 1994) ............................................................................. 9, 40

*Oregon-California Trails Ass'n v. Walsh,*
   467 F. Supp. 3d 1007 (D. Colo. 2020) ................................................................ 35, 36

*Perkins v. Bergland,*
   608 F.2d 803 (9th Cir. 1979) ............................................................................... 21, 49

*Riverhawks v. Zepeda,*
   228 F. Supp. 2d 1173 (D. Or. 2002) ........................................................................ 50

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) ............................................................................................. 2, 38

*Rocky Mountain Oil & Gas Ass'n v. Watt,*
   696 F.2d 734 (10th Cir. 1982) .................................................................................. 49

*Rocky Mt. Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.,*
   40 F.4th 1133 (10th Cir. 2022) ................................................................................ 38

*S. Utah Wilderness All. v. Burke,*
   908 F.3d 630 (10th Cir. 2018) .................................................................................... 5

*S. Utah Wilderness All. v. Burke,*
   981 F. Supp. 2d 1099 (D. Utah 2013) ...................................................................... 52

*S. Utah Wilderness All. v. Norton,*
   326 F. Supp. 2d 102 (D.D.C. 2004) ......................................................................... 56

*San Carlos Apache Tribe v. United States,*
   417 F.3d 1091 (9th Cir. 2005) .................................................................................... 3

*San Juan Citizens All. v. Stiles,*
   654 F.3d 1038 (10th Cir. 2011) ................................................................................ 24

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
   591 U.S. 197 (2020) ................................................................................................. 11

*Sierra Club v. U.S. Dep't of Agric.,*
   116 F.3d 1482 (Table), No. 96-2244, 1997 WL 295308 (7th Cir. May 28, 1997) ............. 26, 27

*Sierra Club v. U.S. Forest Serv.,*
   857 F. Supp. 2d 1167 (D. Utah 2012) ...................................................................... 26

*Sierra Trail Dogs Motorcycle & Rec. Club v. U.S. Forest Serv.,*
   470 F. Supp. 3d 1186 (D. Nev. 2020) ...................................................................... 41

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
    433 F.3d 772 (10th Cir. 2006) ........................................................................ 32

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
    No. 02-RB-325, 2004 U.S. Dist. LEXIS 30844 (D. Colo. Nov. 1, 2004) .............................. 32

*State ex rel. Sullivan v. Lujan*,
    969 F.2d 877 (10th Cir. 1992) ........................................................................ 40

*State of Utah v. Andrus*,
    486 F. Supp. 995 (D. Utah 1979) ..................................................................... 43

*Strickland v. Morton*,
    519 F.2d 467 (9th Cir. 1975) ......................................................................... 21

*SUWA v. BLM*,
    425 F.3d 735 (10th Cir. 2005) ........................................................................ 42

*U.S. ex rel. New v. Rumsfeld*,
    350 F. Supp. 2d 80 (D.D.C. 2004) .................................................................... 11

*United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021) .......................................................... 11, 15, 17, 21, 23, 27, 30, 54

*United States v. Germaine*,
    99 U.S. 508 (1878) ............................................................................... 13, 16

*United States v. Grimaud*,
    220 U.S. 506 (1911) ................................................................................. 14

*United States v. Jenks*,
    22 F.3d 1513 (10th Cir. 1994) ........................................................................ 43

*Utah Env't Cong. v. MacWhorter*,
    No. 2:08-CV-118-SA, 2011 WL 4901317 (D. Utah Oct. 14, 2011) ........................................ 39

*Utah Shared Access All. v. U.S. Forest Serv.*,
    288 F.3d 1205 (10th Cir. 2002) ................................................................... 38, 39

*Valley Cmty. Pres. Comm'n v. Mineta*,
    373 F.3d 1078 (10th Cir. 2004) ........................................................................ 2

*W. Expl., LLC v. U.S. Dep't of the Interior*,
    250 F. Supp. 3d 718 (D. Nev. 2017) ................................................................... 47

*W. Watersheds Project v. Vilsack*,
    No. 23-8081, 2024 WL 4589758 (10th Cir. Oct. 28, 2024) ................................................ 61

*Wild Wilderness v. Allen*,
    12 F. Supp. 3d 1309 (D. Or. 2014) .................................................................... 33

*Wild Wilderness v. Allen*,
    871 F.3d 719 (9th Cir. 2017) ......................................................................... 33

*Wilderness Ass'n v. Connell,*
  725 F.3d 988 (9th Cir. 2013) ........................................................... 57

*Wilderness Soc. v. U.S. Forest Serv.,*
  850 F. Supp. 2d 1144 (D. Idaho 2012) ............................................ 39

*Wildlife v. U.S. Forest Serv.,*
  94 F.4th 1210 (10th Cir. 2024) ......................................................... 9

*Williams v. Bankert,*
  No. 2:05-CV-503-DAK, 2007 WL 3053293 (D. Utah Oct. 18, 2007)...................... passim

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008)................................................................................ 2

*Wyoming v. U.S. Dep't of Agric.,*
  661 F.3d 1209 (10th Cir. 2011) ........................................................ 21

*Wyoming v. U.S. Dep't of the Interior,*
  674 F.3d 1220 (10th Cir. 2012) ........................................................ 40

**Statutes**

16 U.S.C. § 1281(a) ............................................................................ 50

28 U.S.C. § 2409a .............................................................................. 58

28 U.S.C. § 2409a(b) .......................................................................... 59

42 U.S.C. § 4331 ................................................................................ 42

42 U.S.C. § 4332(C) ....................................................................... 2, 38

43 U.S.C. § 1701 ............................................................................. 2, 3

43 U.S.C. § 1701(a) ........................................................................... 21

43 U.S.C. § 1701(a)(8)............................................................. 21, 23, 24

43 U.S.C. § 1712(a) ....................................................................... 2, 46

43 U.S.C. § 1732(a) .................................................................... 2, 4, 48

43 U.S.C. § 1733(a) ........................................................................... 14

43 U.S.C. § 1740 ............................................................................... 22

43 U.S.C. § 932 .................................................................................. 3

5 U.S.C. § 706(2) ................................................................................ 2

5 U.S.C. § 706(2)(A)............................................................................ 9

5 U.S.C. §§ 701-706 ............................................................................ 9

54 U.S.C. § 306101.............................................................................. 2

54 U.S.C. § 306108 ........................................................................................................ 3

Pub. L. 116-9, 133 Stat. 580 (2019) ........................................................................ 16, 17

Utah Code Ann. § 72-3-105(1) ...................................................................................... 59

**Rules**

Fed. R. Civ. P. 34 ............................................................................................................ 43

**Regulations**

36 C.F.R. § 60.4 .............................................................................................................. 56

36 C.F.R. § 800.4 ....................................................................................................... 51, 52

36 C.F.R. §§ 60.6 ........................................................................................................... 56

36 C.F.R. Part 60 ........................................................................................................... 56

36 C.F.R. Part 800 ..................................................................................................... 3, 52

40 C.F.R. § 1501.3 ......................................................................................................... 39

40 C.F.R. § 1501.3(b) (2020) ........................................................................................ 39

40 C.F.R. § 1502.23 (2020) ........................................................................................... 35

40 C.F.R. § 1508.1(m) .................................................................................................... 41

40 C.F.R. § 1508.14 (1978) ............................................................................................ 42

40 C.F.R. § 1508.27 (2019) ............................................................................................ 39

43 C.F.R. § 1610.3-2(e) .................................................................................................. 46

43 C.F.R. § 4.1 ................................................................................................................ 12

43 C.F.R. § 8341.1(b) ....................................................................................................... 4

43 C.F.R. § 8342.1 .............................................................................................. 4, 18, 22

43 C.F.R. § 8342.1(a)-(b) .................................................................................................. 4

43 C.F.R. § 8342.1(b) ................................................................................................ 35, 36

43 C.F.R. § 8342.1(c) ...................................................................................................... 20

43 C.F.R. Part 1600 ........................................................................................................ 12

**Other Authorities**

37 Fed. Reg. 2,877 (Feb. 9, 1972) .......................................................................... 4, 5, 22

85 Fed. Reg. 43,375 (July 16, 2020) .............................................................................. 41

## INTRODUCTION

These consolidated cases challenge the U.S. Bureau of Land Management ("BLM") Labyrinth/Gemini Bridges Travel Management Plan ("TMP"). Its decision record ("DR") made route designations for off-highway vehicle ("OHV") use near Moab, Utah, leaving 810.5 miles of previously available routes open to OHV, while closing OHV travel on 317.2 miles of routes.

Despite the TMP's allowance for continuing recreation opportunities, Plaintiffs contend that BLM has unlawfully restricted OHV access. Plaintiffs in Case No. 2:23-cv-923 (the "BlueRibbon Plaintiffs") generally argue that BLM acted beyond its authority or failed to sufficiently prioritize motorized recreation among multiple uses. Plaintiffs in Case No. 4:24-cv-46 (the "State") raise similar arguments and additionally suggest that their mere assertion of a right-of-way under an 1866 law constrains BLM's options for addressing its multiple use mandate. But Plaintiffs' claims suffer multiple, significant flaws. They ignore a robust body of travel management case law from within and beyond this Court. And they largely fail to contend with the Court's preliminary injunction order finding the BlueRibbon Plaintiffs' claims unlikely to succeed. Most fundamentally, Plaintiffs' claims defy common sense.

Notwithstanding the span and stridency of Plaintiffs' arguments, this Court's task is relatively easy. Precedent and common sense compel rejection of Plaintiffs' claims. The Court should enter judgment for Defendants and dismiss Plaintiffs' cases with prejudice.

## STATEMENT OF THE ISSUES PRESENTED

Plaintiffs' claims all ask the Court, based on arguments purportedly arising from various legal authorities, to "hold unlawful and set aside" the DR and/or other final agency action associated with the TMP as being contrary to constitutional power, in excess of statutory jurisdiction or authority, without observance of procedure required by law, unsupported by

substantial evidence, or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2).

## STATEMENT OF THE CASE

### I.     Legal Background

#### A.     Federal Land Policy and Management Act

The Federal Land Policy and Management Act, 43 U.S.C. § 1701 et seq. ("FLPMA"), was enacted in 1976 and establishes a framework for BLM management of federal public lands. Such management occurs at a broad level through "land use plans which provide by tracts or areas for the use of the public lands" that are developed with "public involvement" and consistent with the terms and conditions of FLPMA. 43 U.S.C. § 1712(a). These generally include managing "under principles of multiple use and sustained yield[.]" 43 U.S.C. § 1732(a).

#### B.     National Environmental Policy Act

BLM must also comply with the National Environmental Policy Act ("NEPA"), which seeks to ensure that federal agencies consider the environmental impacts of proposed major federal actions. 42 U.S.C. § 4332(C); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 16 (2008). NEPA imposes purely procedural requirements, and "does not require that certain outcomes be reached as a result of the evaluation." *Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987). "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather than unwise – agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) (footnote omitted).

#### C.     National Historic Preservation Act

The National Historic Preservation Act, 54 U.S.C. § 306101, et seq. ("NHPA"), "is essentially a procedural statute and does not impose a substantive mandate" on BLM. *Valley*

*Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1085 (10th Cir. 2004); *see also San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1097 (9th Cir. 2005) (NHPA duties "are chiefly procedural in nature" (citation omitted)). NHPA Section 106 requires federal agencies to "take into account the effect of [an] undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" of Historic Places. 54 U.S.C. § 306108 (formerly 16 U.S.C. § 470f). Regulations promulgated by the Advisory Council on Historic Preservation ("ACHP") set forth procedures for implementing the NHPA. 36 C.F.R. Part 800. Agencies generally carry out their Section 106 compliance in conjunction with their efforts to address the similar procedural requirements of NEPA. *Id*. § 800.8.

D.   Revised Statute 2477

Congress enacted Revised Statute 2477 as part of the Mining Law of 1866. In its entirety, it provides: "The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." 43 U.S.C. § 932 (recodified) ("R.S. 2477"). This grant promoted establishment of highways over federal land during a period of western expansion. Congress repealed R.S. 2477 through FLPMA but preserved valid existing rights that were established as of FLPMA's enactment date, October 21, 1976. *See* 43 U.S.C. § 1701 note.

II.   **The Labyrinth/Gemini Bridges Travel Management Plan**

Plaintiffs each challenge the TMP for Labyrinth/Gemini Bridges travel management area ("TMA"), which comprises 303,994 acres of public land located north and west of Moab, within the BLM Utah Moab Field Office ("MFO") planning area. TMP Environmental Assessment at 1, LGB042216; *see also* BlueRibbon Compl. at ¶ 8, ECF No. 1 (Case No. 3:23-cv-923); State Compl. at ¶¶ 3-4, ECF No. 1 (Case No. 4:24-cv-46).

BLM began travel and transportation planning and management in the early 1980's following issuance of Presidential Executive Orders 11644 and 11989, to address "public concern regarding the proliferation of unplanned roads and trails and their impact on public land resources." LGB040017 (BLM Handbook H-8342-1, Travel and Transportation Management Handbook, I.B.) ("TTM Handbook"). BLM aspires to "be proactive in seeking travel management solutions that conserve natural resources, while providing ample recreation opportunities." *Id.*

BLM's travel management planning first occurs through adoption of a land use plan referred to as a resource management plans ("RMP"), 43 U.S.C. § 1732(a), that, among other things, designates areas as open, limited, or closed to OHV use. *See* 43 C.F.R. § 8342.1; *id.* §§ 8340.0-1, 8340.0-5(e)-(h). BLM's area designations often impose terms and conditions on OHV travel in "limited" areas, such as by designating how OHV travel may occur on designated routes. *See* 43 C.F.R. § 8341.1(b). BLM can subsequently issue a TMP within the same planning unit as the RMP, or some subunit. *See* TTM Handbook IV.F. (describing delineation of TMAs); LGB040027. A TMP typically involves a more granular route-by-route analysis than an RMP, resulting in "implementation level" designation of individual roads and trails. *Id.* at V; LGB040030-31. When BLM makes broad OHV area or route-by-route designations in RMPs and TMPs, respectively, it addresses various considerations, including regulatory criteria requiring that its decisions "minimize" harm to soil, vegetation, and other resources, including wildlife resources. 43 C.F.R. § 8342.1(a)-(b). These "minimization criteria" also require BLM to minimize conflicts between OHV uses and other recreational uses on public lands. *Id.* § 8342.1(c); *see Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009). The minimization criteria in section 8342.1 are closely derived from

4

Executive Order 11644, which established policies and procedures that were intended to "ensure that the use of [OHVs] w[ould] be controlled and directed so as to protect the resources of those [public] lands, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands." Richard M. Nixon, Executive Order 11644, Use of Off-Road Vehicles on Public Lands on Public Lands, 37 Fed. Reg. 2,877 (Feb. 9, 1972).

In 2008, the MFO finalized an RMP through a process that, among other things, "designated a travel network consisting of 1,127.7 miles for OHV use within the TMA." LGB042218. But the 2008 MFO RMP and travel plan were challenged by conservation groups, along with similar decisions in five other BLM Utah field offices, leading to "a longstanding, complex dispute" that was ultimately resolved through a settlement agreement approved by this Court. *S. Utah Wilderness All. v. Burke*, 908 F.3d 630, 632-33 (10th Cir. 2018). The settlement agreement provided, among other things, that BLM will issue new TMPs for specified TMAs throughout the six field offices, including the Labyrinth/Gemini Bridges TMA. *See* Settlement Agreement at 6-7, ECF No. 1-3 (Case No. 3:23-cv-923).

BLM initiated the TMP process in 2019 and through a working group of BLM and other specialists catalogued route attributes and associated resources for each inventoried route in the TMA.[1] LGB04226-27. Then, the team proposed designations for each route across a range of network alternatives. *Id*. These alternatives provide a designation for every evaluated route, "fall[ing] into one of the following categories" – OHV-Open (open year-round to all OHV

---

[1]     The baseline route inventory was comprised of all routes designated available for OHV use in the 2008 RMP (as amended). The individual route reports are available in the administrative record. *See* LGB043198-48215 (August 2019 initial reports); LGB058933-64378 (June 2023 final reports).

travel); OHV-Limited (allows for public OHV use subject to limits such as vehicle type/width or seasonal use restrictions); and OHV-Closed (route not available for public OHV use). LGB042228. In early 2021, BLM conducted scoping to solicit public input and in September 2022 BLM released a preliminary EA for public review. *See* LGB042311. The EA analyzed four alternatives in detail: Alternative A, the "no action" alternative consisting of the 1,127.7-mile route network designated for public OHV use in the 2008 Labyrinth/Gemini Bridges TMA; Alternative B prioritizing resource protection and providing for a total OHV route network of 690 miles; Alternative C balancing OHV access and resource conflicts providing for a total OHV route network of 960.1 miles; and Alternative D emphasizing access and providing for OHV use on 1,075.2 miles of routes. LGB042229 (Fig. 1); LGB042230-31 (narrative descriptions).

Certain key facts were reaffirmed and amplified during the planning process. Motorized recreation is popular in the TMA, particularly on routes used during the annual Easter Jeep Safari event. LGB042303.[2] The TMA "also offers well-known non-motorized opportunities" such as mountain biking, horseback riding, hiking, backpacking, and canyoneering. LGB042304. In particular, the portion of the Green River forming the western boundary of the TMA known as Labyrinth Canyon is popular for flatwater float trips by canoe or raft. *Id*. Under the 2008 RMP, approximately 28 miles of OHV travel routes were located within the 100-year floodplain and directly adjacent to this stretch of the Green River, including Hey Joe, the Tubes, Dead Cow, and Hell Roaring Canyon. *Id*. BLM has received oral and written complaints from boaters

---

[2]     There are approximately 671 miles of designated routes throughout the MFO planning area that are commonly referred to as "Jeep Safari" routes. *See* LGB042360. Several times per year OHV enthusiasts participate in popular events held pursuant to BLM-issued Special Recreation Permits on these routes. Under Alternative A, approximately 305 miles of Jeep Safari routes are designated OHV-Open within the TMA. LGB042306-07. Under the DR, approximately 91 percent of these routes remain available for OHV use. LGB042019.

concerning noise-induced conflicts associated with OHV use occurring within the TMA along this section of the Green River. *Id*.

BLM signed the DR on September 28, 2023, designating an OHV travel network that blended several alternative networks analyzed in the EA. *See* LGB042016. BLM's decision designated a total of 810.5 miles of routes as available for public OHV use in the TMA, with 98.4 miles designated as OHV-Limited and the remaining 721.1 miles designated as OHV-Open and thus available for travel by all OHVs at all times of the year. LGB042017. BLM's decision designated 317.2 miles of routes as OHV-Closed. *Id*. The DR includes a detailed summary of the rationale for every route's designation within the selected travel network and a description of how each designation is consistent with the requirements of the minimization criteria. *See* LGB042030-203.

### III.    Prior Proceedings

Both Plaintiff groups, and other advocates for motorized access, sought administrative review of the DR, and a stay of its implementation, before the Department's Interior Board of Land Appeals ("IBLA"). *See* Notice of Appeal and Petition for Stay, ECF No. 1-12 (Case No. 3:23-cv-923); State Compl. ¶ 25. On November 28, 2023, the IBLA issued a written decision denying the petitions for stay for failure to show that the DR would cause irreparable harm while the appeals were pending. *See* Order, Petitions for Stay Denied ("IBLA Order"), ECF No. 1-13 (Case No. 3:23-cv-923). The BlueRibbon Plaintiffs filed their complaint on December 22, 2023, along with a motion for preliminary injunction. Following a hearing, the Court denied the motion in an order dated March 20, 2024. *See* ECF No. 48 (Case No. 23-cv-923), *BlueRibbon Coal., Inc. v. U.S. Bureau of Land Mgmt.*, No. 2:23-CV-923-DAK-JCB, 2024 WL 1197862 (D. Utah Mar. 20, 2024). The State filed its complaint on May 29, 2024. The Court granted the parties' joint

motion to consolidate the cases. *See* ECF Nos. 60, 63 (Case No. 3:23-cv-923). The parties now present their briefs on the merits.

## SUMMARY OF ARGUMENT

The BlueRibbon Plaintiffs fail to show that the TMP was unlawful. Their Appointments Clause challenge fails because agency employees properly and frequently must take actions such as designating OHV routes within a TMA. BLM's TMP designations were based on impacts within the TMA, and thus did not violate any statutory restrictions on creating a "buffer zone" around adjacent wilderness. In making its route designations, BLM properly considered FLPMA and other legal authority to make reasonable designations supported by the administrative record; such designations satisfy the "arbitrary and capricious" standard of review. And BLM properly concluded that maintaining recreational opportunities for continuing OHV access on a system of designated routes was not a major federal action significantly affecting the human environment that required preparation of an environmental impact statement.

The State Plaintiffs similarly fail to meet their burden in challenging the TMP. By relying on the mere allegations of its complaint and foregoing discussion of relevant portions of the administrative record, the State has failed to provide any factual basis to support its claims. The claims also suffer significant legal flaws. Claims alleging unlawful impingement of rights associated with R.S. 2477 or state trust lands ignore that the TMP disclaims any effect on such rights. The Governor's consistency review process under BLM's land use planning regulations does not apply to the TMP, and BLM plainly considered and complied with FLPMA's multiple use mandate. And BLM satisfied its NHPA procedural duties through compliance with a programmatic agreement that specifically contemplated undertakings like the TMP. Finally, the

State provides neither a legal nor factual basis to set aside the TMP based on a perceived conflict of interest.

The Court should deny Plaintiffs' claims for relief and enter judgment for Defendants.

## STANDARD OF REVIEW

The Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), waives the sovereign immunity of the United States to allow for judicial review of certain types of agency action. Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is "deferential," and a plaintiff bears the burden of overcoming the "presumption of validity" afforded to an agency's action. *Defs. of Wildlife v. U.S. Forest Serv.*, 94 F.4th 1210, 1220 (10th Cir. 2024) (quoting *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 793 (10th Cir. 2010)). "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (footnote omitted).

## ARGUMENT

The TMP satisfies the deferential arbitrary and capricious standard of review. The BlueRibbon Plaintiffs generally restate the arguments raised in their motion for preliminary injunction. The State Plaintiffs either echo these flawed arguments, or raise different arguments finding even less legal or logical support. Finally, even if any Plaintiff demonstrated a legal violation, they have failed to address the remedy standard and have therefore failed to provide a basis for setting aside the TMP. In sum, Plaintiffs fail to meet their heavy burden, and the Court should thus reaffirm the lawfulness of the TMP and enter judgment for Defendants.

I.       **The BlueRibbon Plaintiffs Do Not Carry Their Burden**

The BlueRibbon Plaintiffs largely retrace the arguments presented in their preliminary

injunction motion, or offer new variations on their arguments that still fail to support a different

outcome. The Court analyzed each of these arguments and found them unlikely to succeed, *see*

*BlueRibbon*, 2024 WL 1197862, at *3-10, and it should confirm here that they have not

succeeded in meeting their burden.

A.       Appointments Clause

The BlueRibbon Plaintiffs start by arguing that BLM violated the United States

Constitution because the BLM Canyon Country District Manager is an employee who, by issuing

the DR, exercised "significant authority pursuant to the laws of the United States" that could

only be performed by an "officer" installed through the procedures described by the

Appointments Clause. Opening Br. of Pls.' BlueRibbon Coal. et al, at 5-6, ECF No. 75

("BlueRibbon Br.") (citing *Lucia v. SEC*, 585 U.S. 237, 245 (2018)). The Court previously found

this claim "does not have a likelihood of success on the merits" because "making OHV route

designations does not, under governing precedent, amount to the exercise of significant authority

or discretion such that it must be performed by an appointed officer." *BlueRibbon*, 2024 WL

1197862, at *4. Plaintiffs have not provided any basis for the Court to change its prior analysis.

"OHV route designations are permissibly and customarily made by a non-officer employee

because they reflect routine decision-making with limited discretion, subject to the direction of

pre-existing management policies and decisions, under the control of multiple officials in the

chain of command, and subject to appeal to the IBLA." *Id*.

The Appointments Clause is a "significant structural safeguard" of the Constitution that

"preserve[s] political accountability" by specifying the process by which certain Executive

Branch officers must be appointed, while also recognizing that not every federal employee qualifies as an officer. *United States v. Arthrex, Inc.*, 594 U.S. 1, 17-18 (2021) (quoting *Edmond v. United States,* 520 U.S. 651, 663 (1997)). A key distinction between these "Officers of the United States" who must be appointed from individuals who are "simply employees of the Federal government" is their degree of authority – officers hold "significant authority pursuant to the laws of the United States," and exercise "significant discretion" when carrying out "important functions," *Lucia*, 585 U.S. at 247-48.[3]  Conversely, "employees" are described as having lesser responsibilities that are performed by the "broad swath of lesser functionaries" in the Government's workforce who carry out their duties "subject to the control or direction of any other executive" and have duties that are "carefully circumscribed" or "specific in [their] objects[.]" *U.S. ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 98 (D.D.C. 2004); *see also Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976).

The analysis and findings of preliminary injunction ruling remain valid. In significant part, the Court properly found that approving a TMP does not constitute the exercise of "significant authority" that requires an appointed officer, but is in fact a decision that is both "carefully circumscribed" and "specific in its objects" and thus appropriate for a non-officer employee. *Rumsfeld*, 350 F. Supp. 2d at 98; *see also Buckley*, 424 U.S. at 126 n.162. The District

---

[3]     Officer positions often entail "significant discretion" and "extensive" adjudicatory and regulatory powers including functions such as exercising discretion to issue subpoenas, administer oaths, rule on evidence, impose sanctions, and prosecute federal crimes. *See*, *e.g*., *Lucia*, 585 U.S. at 241, 248 (SEC Administrative Law Judges possessing "nearly all the tools of federal trial judges"); *Morrison v. Olson*, 487 U.S. 654 (1988) (investigation and prosecution of federal crimes under the Ethics in Government Act of 1978); *Edmond*, 520 U.S. 651 (1997) (adjudicating cases at the Court of Criminal Appeals); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020) (financial regulators exercising "extensive adjudicatory authority").

Manager who signed the DR did not exercise sweeping policy discretion or adjudicatory functions, but rather approved recommendations for discrete route decisions in accordance with the interdisciplinary team analysis, agency guidance, governing regulations, and RMP area designations. *BlueRibbon*, 2024 WL 1197862, at *4 (citing 43 C.F.R. Part 1600, Subpart 8342, § 8342.1, and BLM Travel and Transportation Management Manual 1626). In addition to reflecting "specific" and "carefully circumscribed" activity, the District Manager's role approving the TMP was subject to meaningful "control or direction" by other executives, extending to high level officials appointed by the President and confirmed by the Senate. *See BlueRibbon*, 2024 WL 1197862, at *3; Decl. of Nicollee Gaddis-Wyatt Exs. 5-7, ECF Nos. 31-5 to 31-7 (Case No. 3:23-cv-923). And the opportunity to seek "appellate" review of the TMP before the IBLA "further ensures political accountability" because the IBLA comprises "appointed administrative law judges who are considered 'officers.'" *BlueRibbon*, 2024 WL 1197862, at *4.[4] The mere availability of such additional review before officers within the Department of the Interior is arguably sufficient to address Plaintiffs' challenge, but is even more consequential here because Plaintiffs actually sought and obtained IBLA review before filing this action. *Id.*; BlueRibbon Compl. ¶¶ 62-65 (characterizing IBLA's denial of "Petition for Stay" as constituting "final agency action"); State Compl. ¶¶ 25-26.

---

[4]     The IBLA exists within the Department of the Interior Office of Hearings and Appeals, which "is an authorized representative of the Secretary for the purpose of hearing, considering, and deciding matters within the jurisdiction of the Department involving hearings, appeals, and other review functions of the Secretary." 43 C.F.R. § 4.1. The IBLA "decides finally for the Department appeals to the head of the Department from decisions rendered by Departmental officials relating to," among other things, "[t]he use and disposition of public lands and their resources[.]" *Id.* § (b)(2).

No successful Appointments Clause challenge has ever been framed in the fashion chosen by BlueRibbon Plaintiffs. They do not shy from the fact that the BLM representative who signed the DR "is a BLM employee and no more." BlueRibbon Br. at 5. Typically, a determination that the subject class of government officials "are not officers at all, but instead non-officer employees" would be dispositive, "[f]or if that is true, the Appointments Clause cares not a whit about who named them." *Lucia*, 585 U.S. at 245 (citing *United States v. Germaine,* 99 U.S. 508, 510 (1878)). Unsurprisingly then, Plaintiffs are unable to provide a single case in which a particular decision converts an employee into an officer requiring constitutional appointment.

Even if one reframes Plaintiffs' argument to assert that TMP route designations must be made by a Constitutional officer, the argument still fails. Plaintiffs seemingly ask the Court to revisit its earlier analysis for two reasons. First, they now attribute pivotal importance to the relationship between TMP route designations and possible criminal liability. *See* BlueRibbon Br. at 5 ("Congress is the proper branch of government for creating crimes"); *id*. at 7 (the TMP's "decision to close and criminalize the use of over 300 miles of decades-old trails is an exercise of authority significant enough to trigger Appointments Clause requirements"). But the Supreme Court addressed these concerns over a century ago in rejecting challenges brought by those facing criminal penalties arising from misconduct in using public lands:

> From the beginning of the government, various acts have been passed conferring upon executive officers power to make rules and regulations, – not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power. But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress, or measured by the injury done.

*United States v. Grimaud*, 220 U.S. 506, 517 (1911). While no statute expressly declared it unlawful for Grimaud and Carajous to graze sheep on a forest reserve without a permit, the relevant statute made use of such a reserve subject to applicable rules and regulations, and made "it an offense to violate those regulations; that is, to use them otherwise than in accordance with the rules established by the Secretary." *Id*. at 521. Thus, "[a] violation of reasonable rules regulating the use and occupancy of the property is made a crime, not by the Secretary, but by Congress. The statute, not the Secretary, fixes the penalty." *Id*. at 522. So too here, FLPMA provides that "[t]he Secretary shall issue regulations necessary to implement the provisions of this Act with respect to the management, use, and protection of the public lands, including the property thereon" and prescribes that any person "who knowingly and willfully violates any such regulation which is lawfully issued pursuant to this Act shall be fined . . . or imprisoned no more than twelve months, or both." 43 U.S.C. § 1733(a). The authority to criminalize conduct under a regulatory structure like that of the TMP has thus long been recognized, in contrast to the two cases cited by BlueRibbon Plaintiffs which have been distinguished as "penaliz[ing] the violation of an administrative rule or regulation which [Congress] has no constitutional power to authorize." *Carter v. United States*, 333 F.2d 354, 355 (10th Cir. 1964). Plaintiffs' emphasis on possible criminal liability is thus far wide of the mark – "while violations of route designations by OHVs may be subject to fines or other penalties, these are not penalties, despite what Plaintiffs imply, that the BLM District Manager has the power to create or prosecute herself." *BlueRibbon*, 2024 WL 1197862, at *4.

Second, BlueRibbon Plaintiffs ask the Court to "revisit its preliminary rationale on the issue of oversight" because they claim Defendants must show how superior officers actually directed the District Manager's work, that an opportunity to appeal the DR to the IBLA "is not

equivalent to supervision," and that the *Rumsfeld* standards are not met here because approving a TMP is factually different from the duties considered in *Rumsfeld*. BlueRibbon Br. at 8-9. None of these points are persuasive. Plaintiffs cite no authority for their "actual oversight" argument aside from a snippet of text from *Edmond*. *See id.* at 8. Indeed, comparison of *Arthrex* and *Edmond* rebuts Plaintiffs' argument. The *Arthrex* Court observed that "*Edmond* goes a long way toward resolving" the question whether Patent and Trial Appeal Board judges were officers because "[w]hat was 'significant' to the outcome there – review by a superior executive officer – is absent here: APJs have the 'power to render a final decision on behalf of the United States' without any such review by their nominal superior or any other principal officer in the Executive Branch." *Arthrex*, 594 U.S. at 14 (quoting *Edmond*, 520 U.S. at 665). This case is thus on all fours with *Edmond*, because the District Manager's decision is subject to review not only within BLM but separately in the IBLA as well, and indeed was reviewed by the IBLA at Plaintiffs' request. And the quoted passage dispatches the "actual oversight" argument because *Arthrex* focused on the availability of review by a "*nominal* superior" (or other officer) rather than turning on whether review (or supervision) actually occurred.[5]

    Aside from its legal flaws, BlueRibbon Plaintiffs' desired outcome would have unmanageable consequences; it would severely hamper efficient administration of public lands under the structure and direction that Congress provided in FLPMA, with no offsetting benefit for Appointments Clause oversight purposes. Plaintiffs presumably recognize that federal agency

---

[5]     Plaintiffs' reference to the Fifth Circuit's relatively recent decision in *Braidwood Management, Inc. v. Becerra*, 104 F.4th 930 (5th Cir. 2024), changes nothing. The "similarities between the PTAB in *Arthrex* and the Task Force" in *Braidwood* were "close, if not dispositive" – namely, that the "Task Force can, and does, issue legally binding decisions without any review by a higher-ranking officer." *Id.* at 946.

travel planning exists within "Congress's power to create a vast and varied federal bureaucracy" yet they provide no insight as to how their Appointments Clause analysis will strike a balance between "a government that functions without being ruled by functionaries, and a government that benefits from expertise without being ruled by experts." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010). It would meaningfully disrupt an established administrative structure to now declare that Constitutional officers must make individual route designations in a TMA (or Ranger District of a National Forest), along with all activities of equal or greater presumed "significant authority." Even in 1878 it was apparent that one could be "an agent or employe[e] working for the government and paid by it, as nine-tenths of the persons rendering service to the government undoubtedly are, without thereby becoming its officers." *Germaine*, 99 U.S. at 509.

For the above-stated reasons, the analysis of the Court's preliminary injunction ruling remains valid. Approving TMP route designations does not require the exercise of "significant authority" and thus needs not be made by an officer appointed pursuant to the Appointments Clause. Instead, it is proper for the BLM Canyon Country District Manager who is "not [an] officer[ ] at all, but instead [a] non-officer employee[ ]" to have made the decision. *See Lucia*, 585 U.S. at 245. The Court should enter judgment for Defendants on BlueRibbon Plaintiffs' Appointments Clause argument.

B.    Dingell Act

Next, BlueRibbon Plaintiffs argue that the TMP violates the John D. Dingell, Jr. Conservation, Management, and Recreation Act ("Dingell Act"), Pub. L. 116-9, 133 Stat. 580 (2019). *See* BlueRibbon Br. 10-13. First, they argue that BLM created an unlawful "buffer" around the Labyrinth Canyon Wilderness "effectively extending the [Wilderness] against

Congress's instruction." *Id*. at 10-11. Second, they argue that BLM justified route closures in the TMA based on impacts occurring inside the Wilderness in contravention of section 1232(e)(2) of the Dingell Act. *Id*. at 11. These contentions were previously rejected by the Court. Rather than adapting to the Court's ruling, Plaintiffs double down on their rhetoric and mischaracterize the record.

The Dingell Act, as relevant here, designated eighteen new areas as part of the National Wilderness Preservation System, including the 54,643-acre BLM-managed Labyrinth Canyon Wilderness in Emery County, Utah. *See* Dingell Act § 1231(a), Pub. L. 116-9, 133 Stat. 671-73 (2019). The Act provides that these lands shall be managed in accordance with the Wilderness Act, *id*. § 1232(a), 133 Stat. 673, but clarifies that "Congress [did] not intend for the designation of the wilderness areas to create protective perimeters or buffer zones around the wilderness areas," *id*. § 1232(e)(1), 133 Stat. 674. "The fact that nonwilderness activities or uses can be seen or heard from areas within a wilderness shall not preclude the conduct of those activities or uses outside the boundary of the wilderness area." *Id*. § (e)(2). Notably, the TMA is located "entirely within Grand County, Utah." LGB042217. The Green River is not in the Wilderness in Emery County, but rather is within the TMA. *Id*. Plaintiffs acknowledge as much. *See* BlueRibbon Br. at 10 (The Wilderness "makes up most of the TMA's western border on the opposite side of the Green River.").

The Court properly found that the TMP did not create a "buffer zone" because there remain multiple "overlook" or "viewpoint" OHV-Open routes near the River and Labyrinth Canyon. *BlueRibbon*, 2024 WL 1197862, at *5; *see*, *e.g*., LGB042072 (Route D1497B providing "opportunities for visiting scenic viewpoints" and Route D1504 providing "an excellent viewpoint over Labyrinth Canyon at its intersection with Hell Roaring Canyon); LGB042073

(Route D1509 "is the main overlook spur used during Easter Jeep Safari and is the only of the three overlook spurs that is officially considered part of the Jeep Safari Trail System.").[6] The record "not only rebuts the factual assertion that BLM created a 'buffer zone' eliminating motorized travel across the Green River from the designated wilderness, but also reflects BLM's reasoned application of the regulatory criteria at 43 C.F.R. § 8342.1 in making route designations." *BlueRibbon*, 2024 WL 1197862, at *5.

Similarly, the Court properly rejected BlueRibbon Plaintiffs' false claim that impacts within the Wilderness formed a basis for route closures. The Court found that "neither the EA nor the DR contain any discussion whatsoever about user experiences, or any other impact, within the wilderness. Instead, BLM's analysis addressed impacts along the Green River corridor that is located within the TMA." *Id*. at *6.

Rather than reframing their argument or finding new support in the record, Plaintiffs persist in arguing that BLM "considered the impact of '*visual* and *noise-induced* conflicts' from the TMA upon the Labyrinth Canyon Wilderness when deciding how to newly designate the Plan routes." BlueRibbon Br. at 11. In doing so, they flatly mischaracterize the record. Support for the quoted assertion is allegedly first found in the DR discussion at A2-123. *Id*. But this discussion explains that Route D2759B is closed, in part, "to minimize known visual and noise-induced conflicts with non-motorized users *on the Green River*." LGB042152 (emphasis

---

[6]     BlueRibbon Plaintiffs suggest that BLM's route designations effectuate the Southern Utah Wilderness Alliance's purported goal "to effectively designate both sides of the Green River as wilderness." BlueRibbon Br. at 11. But again, these assertions cannot be squared with the record. BLM made "open" designations for routes like D1509 over the objections of wilderness advocates and made "closed" designations for other routes over the objections of BlueRibbon Plaintiffs. *Compare* LGB042452-55 (comments on routes D1500-1509) *with* LGB042072-73 (final designations).

added).[7] Moreover, since this route has facilitated "unauthorized off-route travel" up and down the Green River, its closure "will thus reduce known conflicts between motorized and non-motorized users (boaters)." LGB042153.[8]

Fact-checking Plaintiffs' other citations, BlueRibbon Br. at 11, reveals similar flaws: (a) the citation to A2-21 seemingly refers to Route D1223A which was designated closed to minimize impacts to bighorn sheep and migratory bird habitat, and to "minimize known conflicts between OHV public and *river users* that is caused by vehicle-based noise," LGB042050 (emphasis added); (b) the citation to A2-51 curiously involves two routes designated OHV-Open, where BLM noted the existence of "[i]mpacts to non-motorized users, including noise" but found such impacts sufficiently "minimized by the topography separating the motorized and non-motorized recreationists," LGB042080; (c) the citation to A2-125 seemingly addresses closed designations on Routes D2763B and C which again were justified, in part, to "minimize visual and noise-induced conflicts between motorized and non-motorized users (e.g., canoeists *on the Green River*)," LGB042154 (emphasis added). These discussions do not discuss impacts within the Wilderness, but sufficietly document BLM's designation rationales for user conflict and other factors. In fact, they note in designating certain routes OHV-Open that reported user conflict can be sufficiently minimized, thus rebutting Plaintiffs' themes that a Wilderness buffer

---

[7]    These conflicts are "known" through comments and user reports of perceived conflict. *See*, *e.g.,* LGB042304 ("The BLM has received verbal and written complaints from boaters concerning the noise made by motorized vehicles along the Labyrinth Canyon river corridor.") This is a suitable means of documenting recreational user conflict. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1480-81 (9th Cir. 1994).

[8]    Aside from mispresenting the user conflict rationale, Plaintiffs' argument ignores that "the DR gives several rationales . . . [describing] both physical resource impacts and user conflict within the TMA, not the wilderness area." *BlueRibbon*, 2024 WL 1197862, at *5; *see also* LGB042152-53 (discussing impacts to wildlife, cultural, and riparian resources).

even exists or that BLM's designations along the Green River singularly reflect some anti-motorized ideology. To the contrary, Plaintiffs' citations, along with every other DR Decision Rationale, demonstrate that BLM made reasoned route-by-route choices supported by substantial evidence.

BlueRibbon Plaintiffs close by suggesting that the minimization criteria required BLM to consider conflicts between OHV use and other recreational uses "of the same or neighboring public lands." BlueRibbon Br. at 12 (citing 43 C.F.R. § 8342.1(c)). From this snippet of text Plaintiffs claim the regulation "necessitated the District Manager to analyze noise and visual factors within the Labyrinth Canyon Wilderness." *Id*. But this argument too is devoid of any support in the record – BLM considered impacts in the TMA, not the Wilderness. If Plaintiffs were right, this regulatory command would doom virtually any BLM travel management effort because BLM would be forced to consider impacts not only to "neighboring" wilderness but presumably tribal or military reservations, or even nonfederal lands. And again, the Court considered and rejected this argument. *BlueRibbon*, 2024 WL 1197862, at *6 ("There is no conflict between the Dingell Act and the minimization criteria. In its closure rationales, BLM was required to analyze OHV impacts within the TMA.").

Plaintiffs' persistence in a Dingell Act "buffer zone" argument makes its failure now even more apparent than during the motion for preliminary injunction. It lacks any record support, and even the portions of the record that Plaintiffs feature in making this argument make clear that BLM appropriately exercised its discretion well within applicable bounds of the law.

C. Arbitrary and Capricious Agency Action

BlueRibbon Plaintiffs further contend the TMP is unlawful because it is "shot through with arbitrary reasoning that is contrary to the controlling statute." BlueRibbon Br. at 13. First,

they argue the TMP strays from FLPMA's statutory direction. *Id*. at 14-16. Second, they argue that some closures unlawfully rely on factors outside those established by FLPMA. *Id*. at 16-22. Third, they disagree with BLM's closure rationales based on soil erosion, user conflict, bighorn sheep, and habitat fragmentation. *Id*. at 22-38. None of these arguments meet their burden of showing that the TMP is arbitrary and capricious.

    1.    Scope of FLPMA

    BLM formulated the TMP within the broad discretionary parameters of FLPMA. BlueRibbon's argument to the contrary relies on a crabbed reading of the broadly framed statute that, unsurprisingly, finds no supporting legal authority. Focusing on one subsection of the FLPMA Section 102 "declaration of policy," Plaintiffs accuse BLM of ignoring a requirement to "provide for outdoor recreation and human occupancy and use" in making TMP route designations. BlueRibbon Br. at 14 (quoting 43 U.S.C. § 1701(a)(8)). But far from directing how any particular route (or area) should be designated, FLPMA's language "contain[s] the most general clauses and phrases . . . which 'breathe[ ] discretion at every pore.'" *Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir. 1979) (quoting *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir. 1975)); *see also Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1235 (10th Cir. 2011).

    Specifically, Plaintiffs imply the TMP is structurally flawed because FLPMA states:

it is the policy of the United States that –
. . .
(8) the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use[.]

43 U.S.C. § 1701(a). But FLPMA's aspirational declarations of policy do not provide a basis for setting aside the TMP, nor do they put a thumb on the scale in favor of outdoor recreation and

21

human occupancy relative to other referenced policy goals. They instead recite a multitude of

potentially conflicting resource uses and management goals, and the statute broadly charges

BLM with authority and discretion to strike an appropriate balance. Consistent with that charge,

the TMP reflects BLM's reasoned effort to balance conservation of resource values against

human occupancy and use.

Plaintiffs ignore an even more basic flaw, for a statutory plain text argument would

support them only if FLPMA directed BLM to prioritize "*motorized vehicle* recreation." But it

does not; OHV-based recreation is one of many forms of outdoor recreation. FLPMA more

broadly refers to "outdoor recreation and human occupancy and use," whereas the TMP

addresses the narrower topic of OHV use. And Plaintiffs simply fail to engage with the reality

that in this narrower context BLM "faces a classic land use dilemma of sharply inconsistent

uses." *Norton v. S. Utah Wilderness All*., 542 U.S. 55, 60 (2004). That FLPMA instructs BLM to

"provide for outdoor recreation" aids BlueRibbon Plaintiffs no more than "members of the

public [seeking] greater protection and more [motorized] route closures." *BlueRibbon*, 2024 WL

1197862, at *11. Plaintiffs "fail to grapple with BLM's role in weighing all the interests present

in public land management." *Id*.

Plaintiffs gain nothing by merely questioning whether the regulations at 43 C.F.R. §

8342.1 exceed FLPMA's grant of authority. FLPMA directed the Secretary of the Interior to

"promulgate rules and regulations to carry out the purposes of this Act and of other laws

applicable to the public lands." 43 U.S.C. § 1740.[9] Even without the minimization criteria,

---

[9]      As noted previously, the regulatory minimization criteria closely track the language
contained in Executive Order 11644. *See*, *supra*, at 4-5 (citing 37 Fed. Reg. 2,877 (Feb. 9,
1972)).

BLM's designation rationales address FLPMA's requirements to conserve and allocate resources. *See*, *e.g.*, 43 U.S.C. §§ 1701(a)(8), 1702(c). So, where BLM's route designations address resource concerns on a particular route, an OHV-Closed designation can be justified (if not obligated) under FLPMA's policy direction to manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values, 43 U.S.C. § 1701(a)(8), in addition to (or independently from) the regulatory duty to minimize impacts to any such resource values. And Plaintiffs fare no better by invoking *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), which recognized that Congress can and often does confer discretionary authority on agencies and explained that courts must "identify and respect such delegations of authority" where they exist. *Id*. at 374. Indeed, designation decisions within the broad ambit of FLPMA (or regulations adopted thereunder) require only that a reviewing court "police the outer statutory boundaries" of the delegation and "ensure that agencies exercise their discretion consistent with the APA." *Id*.

The Court should reject BlueRibbon Plaintiffs' argument that allowing or prohibiting OHV access on specified routes somehow violates FLPMA's plain language or exceeds BLM's authority under FLPMA.

### 2.    Factors for Route Designations

BlueRibbon Plaintiffs next argue that it was arbitrary and capricious for BLM to rely on certain factors to justify route designations. *See* BlueRibbon Br. at 16-17. But these arguments mischaracterize the record and, more fundamentally, misapprehend the nature of judicial review of an agency exercise like travel planning.

The argument starts with five "DR justifications" that BlueRibbon Plaintiffs categorize as "administrative convenience" that "are nowhere to be found" in FLPMA and thus, according to

Plaintiffs, cannot be considered in making route designations. *Id*. at 17. But Plaintiffs'
categorizations are unfaithful to FLPMA's plain language and obvious intent. Closing a route
that is facilitating "off-road travel" or that is not needed or receiving low use does not singularly
serve "administrative convenience" but the full array of BLM's regulatory authority (and
obligations), including to manage public lands in a manner that will protect enumerated
resources values or "preserve and protect certain public lands in their natural condition[.]" 43
U.S.C. § 1701(a)(8). Plaintiffs overlook the primary reason why BLM has to comply with
"environmental" laws to authorize OHV access – because OHV use "on federal land has
negative environmental consequences, including soil disruption and compaction, harassment of
animals, and annoyance of wilderness lovers." *Norton*, 542 U.S. at 60. While BLM may allow
such use in accordance with applicable law (such as the minimization criteria), any rationale for
restricting OHV access implicitly reduces these negative environmental consequences and serves
FLPMA's conservation directives.

The bulk of Plaintiffs' argument contends that "the reasoning behind the factors is not
adequately explained, nor based on actual evidence." BlueRibbon Br. at 17. This approach
misapprehends the placement of the burden and the nature of judicial review – "an agency's
decision is entitled to a presumption of regularity, and the challenger bears the burden of
persuasion." *San Juan Citizens All. v. Stiles,* 654 F.3d 1038, 1045 (10th Cir. 2011) (citation
omitted). Deferential review "is especially strong" where it concerns "technical or scientific
matters within the agency's area of expertise" and "an agency must have discretion to rely on the
reasonable opinion of its own qualified experts, even if, as an original matter, a court might find
contrary views more persuasive." *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1060
(10th Cir. 2014) (internal quotation marks and citations omitted). And courts considering a travel

plan have observed that "this standard extends beyond mere deference to the agency's considered judgment" where "the agency must comply with a multitude of obligations, many of which pull the agency in competing directions, and which collectively lead to a record of tens of thousands of pages[.]" *Ctr. for Sierra Nev. Conservation v. U.S. Forest Serv.*, 832 F. Supp. 2d 1138, 1149 (E.D. Cal. 2011). In brief, it is of no moment that BlueRibbon Plaintiffs would have made different decisions than BLM. What matters is whether the decisions that BLM made are arbitrary and capricious. And BlueRibbon Plaintiffs have not shown that they were.

Despite these principles, BlueRibbon Plaintiffs offer little more than narrative exposition and personal theories on how BLM could or should have reached different conclusions on certain topics. Plaintiffs contend that "official closure is unnecessary" for routes receiving low use or that are reclaiming naturally. BlueRibbon Br. 17. But BLM considered (and field verified) the "route inventory" of all routes designated in the 2008 MFO RMP/travel plan, totaling 1,127.7 miles of routes. LGB042226-27. Each route (or route segment) received a designation of OHV-Open, OHV-Limited, or OHV-Closed. LGB042228. Plaintiffs' suggestion that BLM avoid making any designation for certain routes and allow for continuing public OHV use of those routes was not a lawful option.

Plaintiffs' next discourse addresses unlawful use, starting with the premise that "absent sufficient explanation and evidence, the solution is enhanced enforcement and not closure." BlueRibbon Br. at 17. But this ignores the standard and inverts the analysis – the burden is on Plaintiffs to provide evidence or otherwise demonstrate that BLM's explanation lacks any rational basis or record support. For routes closed to protect cultural resources, the record contains extensive analysis and evidence. *See*, NHPA argument, *infra* at 51-58; LGB007662-732 (finding of adverse effect); LGB010289-355 (final historical properties treatment plan). Plaintiffs

cite three cases brought by *Sierra Club*, but these cases do not support Plaintiffs' argument that BLM must clear a high bar to justify closures based on concerns about illegal use.[10] To the contrary, the cases find that agency route designations violated NEPA for brushing aside impacts associated with illegal OHV use when such illegal use was apparent or admitted elsewhere in the agency's analysis. *See Sierra Club*, 857 F. Supp. 2d at 1178 ("[w]hile the Forest Service's aspiration to educate users and better enforce trail restrictions is appropriate, support is lacking that this will likely be effective"); *Sierra Club*, 1997 WL 295308, at *29 ("FSEIS fails to discuss the likelihood of keeping [OHV] users on designated trails or, in the alternative, what the increased environmental effects will be due to an inability to keep such users on the trails"). Far from aiding BlueRibbon Plaintiffs, these cases provide fodder for opponents to OHV-Open designations to argue the agency failed to consider sufficiently likely illegal use.

Plaintiffs next equate their category of "no need or low use" with routes "not used at a level Defendants deem sufficient." BlueRibbon Br. at 18. And this topic seems a particularly appropriate place to note the flaws in Plaintiffs' "methodology" underlying their "arbitrary and capricious" argument, for Plaintiffs' categories and resultant checkboxes often fail to accurately portray BLM's analysis and conclusions. According to Plaintiffs, this category is a listed rationale for 243 routes (reflecting 132 trail miles). *Id.*; Ex. A at 10 (column 7), ECF No. 75-1. Starting at the top, Plaintiffs' list includes Routes D0002, -04, -05, -06, -07, and -09 in this category. The length of those routes is 0.10, 0.29, 0.79, 0.37, 0.32, and 0.15 miles, respectively. *See* LGB042033-34. The rationales explain that because they are "reclaiming naturally" they

---

[10] The citations to two of the cases are wrong. The correct citations are *Sierra Club v. U.S. Forest Serv.*, 857 F. Supp. 2d 1167 (D. Utah 2012) and *Sierra Club v. U.S. Dep't of Agric.*, 116 F.3d 1482 (7th Cir. 1997) (Table), No. 96-2244, 1997 WL 295308 (7th Cir. May 28, 1997).

apparently receive "little to no OHV use," perhaps because they are "dead end" routes that "do not lead to any known recreation opportunities, or destinations." *Id*. The routes are not being closed solely for these reasons, but also to minimize surface disturbance, related impacts to soil/vegetation, and to minimize disturbance of bighorn sheep lambing. *Id*. And while BlueRibbon Plaintiffs' discussion about its members' Instagram posting or the comparative experience (or risk of death) in summiting K2 versus Everest are interesting, it does not contribute in any defensible way to judicial review of the administrative record for the TMP.

Similar deficiencies are apparent in Plaintiffs' arguments about visual resource management and route redundancy. BlueRibbon Br. at 18-22. Here, Plaintiffs draw attention to particular routes. *Id*. at 21. Routes D3810 and D3811 are not closed solely to "reduce visual contrast created by the route" but importantly, because they do "not access a destination with recreation value." LGB042179. Similarly, while reducing visual contrast is mentioned for Route D1312, the record demonstrates a broader rationale explaining that the route "does not lead to a known destination or recreation opportunity" and is functionally a "connector route" between two other routes but is not needed for that purpose because connectivity is accomplished through those other routes. LGB042059.[11] And Plaintiffs' assertions about four other routes mentioned in the final paragraph simply contradict BLM's rationales; this contradiction is unsupported and, in

---

[11]    For these reasons, it is unnecessary to address Plaintiffs' contradictory views on visual resource management for the sites in question. But while BLM had multiple reasons for closing the identified routes, management of visual resource impacts is a recognized basis for BLM action, including OHV route designations. *See* LGB038656-83 (BLM Manual H-8410-1, Visual Resource Inventory).

any event, does not merit finding the entire TMP to be arbitrary and capricious. *See* LGB042034, LGB042052-56 (discussing routes D0009A, D1248, D1263, D1270A).[12]

In making route designations, BLM considered various factors all within FLPMA's broad parameters, including resource protection and providing for different types of recreation. BLM's explanations demonstrate that it reasonably applied these factors in making individual route designations.

3.    Designation Rationales

The last subsection of the "arbitrary and capricious" argument involves four admittedly "statutory factors" under FLPMA that BlueRibbon Plaintiffs accuse BLM of addressing in an arbitrary and capricious manner. But again, Plaintiffs offer little more than disagreement and a misbegotten hope of having the Court substitute their management vision for that of BLM.

A fundamental problem with these arguments, indeed the entire "arbitrary and capricious" claim, is Plaintiffs' failure to grapple with the reality that nearly all route designations were based on multiple factors. *See*, *e.g.*, *BlueRibbon*, 2024 WL 1197862, at *8 (noting that "nearly all the routes closed to minimize impacts to sheep also include minimization of impacts to other resources such as soils, vegetation, and other wildlife species," and concluding that "[e]ven if BLM could not close routes to minimize impacts to bighorn sheep

---

[12]    Aside from mere disagreement, Plaintiffs do not address BLM's discussion and ultimate conclusions about route presence and connectivity within the area in question. For example, the discussion of Route D1248 suggests that a primary recreation destination/opportunity in the area is provided by Route D1266C, made accessible by Route D1256. LGB042052. The rationale for Route D1256 clarifies that designating it as OHV-Open will provide the needed link, and that the collective actions of designating this route open while closing others (including D1248) will reduce "route proliferation and confusion" and minimize resource impacts "by directing motorized use (rather than dispersing it) on an alignment capable of accommodating the route's anticipated traffic volume." LGB042053.

habitat, its decisions are justified on other minimization concerns."). While Defendants do not

concede its validity (or accuracy), Plaintiffs' Exhibit A amplifies this point. It encompasses 441

different routes, yet categories 1-17 reflect a cumulative total of 1,661 "trails affected." *See* ECF

No. 75-1 at 10 (tabulating 297 rationales mentioning bighorn sheep impacts, 243 for "no need or

low use," 274 for visual contrast). Simply dividing the total number of trails by Plaintiffs'

rationale boxes checked suggests an average of 3.77 rationales per trail designation. If the Court

were to agree with Plaintiffs that BLM's discussion of some resource issue was insufficient for

some particular route, it would not change the outcome where the ultimate designation decision

was supported by independent analyses of other resource issues.

Additionally, Plaintiffs fail to appreciate the nature of BLM's exercise of discretion in the

travel planning context. Consideration of applicable law (including FLPMA, implementing

regulations, and the designation criteria) is not an "all or nothing" exercise that proceeds in

regimented fashion. Rather, it occurs within the multiple-use framework where "all uses [will

not] be allowed on all areas of the public lands" but will instead reflect "tradeoffs between

competing uses." *Williams v. Bankert*, No. 2:05-CV-503-DAK, 2007 WL 3053293, at *10 (D.

Utah Oct. 18, 2007); *see also BlueRibbon*, 2024 WL 1197862 at *5 (observing that BLM

received "similar comments for and against OHV use" on Labyrinth Canyon "overlook routes"

and designated some routes open for OHV travel while closing others). So, the fact that BLM

made different route designations when faced with similar comments or similar impacts with

different route designations is not, as BlueRibbon Plaintiffs would contend, proof of arbitrary

and capricious agency action. Rather, it is a regulatory glass more than half full, where BLM

often allowed OHV use to continue despite some adverse impacts (or opposition), upon

determining that its designations would, on balance, minimize the impacts associated with OHV use.

    a.    *Soils and vegetation*

Turning to the specific issues, BlueRibbon Plaintiffs first target BLM's analysis of soil erosion (and vegetation). *See* BlueRibbon Br. at 22-24. The premise for this argument is that BLM prepared "baseline" and "interim" monitoring reports required by the 2017 Settlement to document "visually apparent damage caused by unauthorized motor vehicles" yet the TMP includes route closures that "were entirely unsupported by the evidence in the Baseline and Interim Reports." *Id*. at 23 (citing "LWC Interim Monitoring Report 2023: Appendix B" at LGB011340-433). This argument simply misunderstands the limited purpose and context of the cited reports. They are "LWC" reports, i.e., they address only "lands with wilderness characteristics." LGB011337. The reports are intended, at least in part, to "document visually-apparent unauthorized surface disturbance off routes as well as visually-apparent damage to public lands resources caused by motorized vehicle use within [Wilderness Study Areas], Natural Areas, and lands with BLM-inventoried wilderness characteristics." *Id*. (quoting "[p]aragraph 20 of the Settlement Agreement"). "The TMA has 8 inventoried LWC units comprising 62,594 acres of BLM lands, within which are 40.5 miles of evaluated routes." LGB042248. In other words, Plaintiffs' inability to find more TMA routes discussed in the LWC reports is explained by the fact that only 4 percent of TMA route mileage occurs in LWC. LGB042249.

BlueRibbon Plaintiffs fail to engage with BLM's straightforward discussion of impacts to soils and vegetation, which stands on its own merit. The EA provides background information and summarizes BLM's methodology for analyzing impacts across alternatives for soils and

native vegetation. *See* LGB042251-58. It combines these topics because soil disturbance and erosion can facilitate the spread of noxious weeds and invasive species, and it describes the different soil types in the TMA. It offers "environmental effects analysis" reviewing OHV impacts to soil composition, related changes to vegetation composition, and the spread of invasive plant species. LGB042253. The EA compares alternative route mileages in highly or moderately erodible soils as well as saline soils as indicators of "potential OHV impacts on soil health and stability" and also compares alternative route mileages in the TMA's vegetation communities and areas of invasive plants. LGB04254-56. Finally, the DR rationales make apparent that, in many instances, minimization of impacts to soil cover and vegetation communities is a likely consequence of closing redundant routes. *See*, *e.g.*, LGB042063. In other words, where route proliferation has resulted in unnecessary routes that each disturb native soils/vegetation and provide a mechanism for introduction of invasive plants, reducing the number of those routes allows for the prospect of reclamation to a native (or less disturbed) state of soil and vegetative cover. Even suggesting that this reasoning is arbitrary and capricious would defy common sense.

BlueRibbon Plaintiffs' soil and vegetation argument simply misunderstands the purpose and content of the LWC monitoring reports and fails to address BLM's analysis and intuitively logical findings on the effects of OHV use on soils and native vegetation.

b.    *User conflict*

Second, BlueRibbon Plaintiffs question BLM's analysis of user conflict, complaining that it is not "expressly define[d]," that it should not form a means of "favoring one user group over another," that "low use" routes cannot cause conflict, or that BLM's analysis otherwise "patently contradicts itself." BlueRibbon Br. at 26-29. However, conspicuous amidst this litany of

complaints and examples of purportedly unlawful invocation of user conflict is the failure to discuss any of the numerous cases directly rebutting Plaintiffs' arguments. The Court already noted this flaw in the preliminary injunction ruling, finding:

> BLM's approach to evaluating user conflicts is well recognized in the motorized travel planning context. A land management agency is justified in relying upon user comments to evaluate user conflict in making OHV route designations. *Silverton Snowmobile Club v. U.S. Forest Serv.*, No. 02-RB-325, 2004 U.S. Dist. LEXIS 30844, *10 n.3 (D. Colo. Nov. 1, 2004) *aff'd* 433 F.3d 772 (10th Cir. 2006) (rejecting argument that findings of user conflict based on comments "are not objectively quantifiable"). This is exactly what BLM did here. Contrary to Plaintiffs' suggestion, BLM is not required to use any particular scientific protocol for evaluating user conflict.

*BlueRibbon*, 2024 WL 1197862, at *7. Plaintiffs simply rehash the preliminary injunction argument on user conflict, which is again easily rejected.

No case law supports BlueRibbon Plaintiffs' argument. In the 1990's vehicle advocates brought legal challenges asserting that something more than subjective preferences of non-motorized users is required to support closures based on user conflict. Those challenges did not succeed – non-motorized users' comments can form a basis for vehicle closures because "user conflict" has "a significant subjective element to it." *Northwest Motorcycle*, 18 F.3d at 1475 (further concluding that "[i]ndividual comment is a very persuasive indicator of 'user conflict,' for determining the existence of conflicts between humans cannot be numerically calculated or counted"). Even bicycle riders extended that argument in challenging closures in a National Park (where motorized vehicles were prohibited) by arguing "that the only credible evidence of user conflict would be a survey or study performed scientifically to determine how many conflicts occur and how and why they occur." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1464 (9th Cir. 1996), *as amended* (June 17, 1996). This argument too was rejected, where the agency relied on "ample evidence" in the form of written and oral input from "hikers, bicyclists,

equestrians, and other users" about user experiences and preferences. *Id.* at 1465; *see also Hells Canyon All. v. U.S. Forest Serv.*, 227 F.3d 1170, 1184-85 (9th Cir. 2000), *as amended* (Nov. 29, 2000) (rejecting jetboaters' similar argument that conflict analysis relied on "primitive" methods rather than empirical studies). And courts will defer to the agency's evaluation of user conflict, even when non-motorized users claim that their identification of conflicts compelled restrictions on motorized use. *See Wild Wilderness v. Allen*, 12 F. Supp. 3d 1309, 1316-17 (D. Or. 2014), *aff'd,* 871 F.3d 719 (9th Cir. 2017). The upshot of these decisions is that an agency managing recreational access has particularly broad discretion in determining how to address subjective expressions of user conflict and balance user preferences for differing recreational experiences.

The record demonstrates that BLM acted well within the parameters of applicable law in addressing user conflict. The EA generally discusses recreation opportunities and experiences, including conflicts between motorized and non-motorized recreation. *See* LGB042303-05. BLM "acknowledges that user conflict may be both physical and social" and "further acknowledges that user conflict can be subjective; however, BLM also acknowledges that the noise of motorized vehicles could pose an impact to some of the recreating public." LGB042413; *see also* LGB042417 ("[u]ser conflicts, by nature, consists of interpersonal/physical conflicts and/or social conflicts . . .  user conflict is a social construct and individuals may differ in their definitions of conflict"). Numerous summaries of route-by-route comments note receipt of comments reflecting user conflicts. *See*, *e.g.*, LGB042432, -438-39, -450-51, -459-60. These summaries accurately reflect the comments received by BLM. *See*, *e.g.*, LGB004800, -5742, -5914, -6247, -6257, -6319, -6330, -6347. The DR discusses BLM's general approach to resolving user conflict, as well as route-by-route examples where user conflict factored into BLM's designation decision. *See* LGB042019-20, -038, -050, -075. And contrary to Plaintiffs'

suggestion that BLM treated user conflict as a one-dimensional tool for closure, the DR explains that some routes were designated OHV-Open "to minimize conflicts among various users of public land by providing [OHV] access to other public land areas beyond the urban interface, reducing user concentrations and the potential for impacts to documented resources within the urban interface." LGB042076-79.

The record demonstrates that BLM took a reasonable approach in addressing its obligations to minimize user conflict. BlueRibbon Plaintiffs fail to show that BLM's treatment of user conflict was arbitrary or capricious.

        c.    *Bighorn sheep*

Third, BlueRibbon Plaintiffs revisit their preliminary injunction arguments regarding impacts to bighorn sheep. *See* BlueRibbon Br. at 29. Plaintiffs contend that "BLM failed to present any non-speculative evidence that motorized use on the specific routes at issue had caused any measurable impact to bighorn sheep populations," failed to use best available science, and contradicted prior MFO analysis. *Id*. at 30.

The simplest response to this argument, like others, is that the Court already found it unpersuasive. The Court found that the EA "presents a reasoned analysis based largely on the research and findings of subject matter experts from academic institutions, non-governmental organizations dedicated to wild sheep conservation, and the Utah Division of Wildlife Resources." *BlueRibbon*, 2024 WL 1197862, at *7; *see also* LGB042283-89 (wildlife analysis including bighorn sheep).

Insofar as BlueRibbon Plaintiffs attempt to modify or expand their sheep-impact argument, they still "identify no legal authority supporting this contention." *Id*. It is not BLM's obligation to prove that it has non-speculative evidence, or to demonstrate route-specific

causation or population level effects to TMA bighorn sheep. Rather, BLM's obligation is to locate OHV areas and trails "to minimize harassment of wildlife or significant disruption of wildlife habitats." 43 C.F.R. § 8342.1(b). Plaintiffs provide no basis for imposing a freestanding "best available science" requirement in APA review.[13] Even where such a requirement does apply, it typically presents "an epic 'battle of the experts'" that, by failing to provide a reviewing court with "the competence to determine which among them is right[,]" often ends in the conclusion that the agency's analysis is "not so implausible that [it] cannot be considered the project of agency expertise." *Oregon-California Trails Ass'n v. Walsh*, 467 F. Supp. 3d 1007, 1038 (D. Colo. 2020). But Plaintiffs do not even offer "better" science – they attempt little more than to poke holes in BLM's discussion. These arguments collapse when confronted by the standard of review.

BLM's route designations to address bighorn sheep impacts reflect a similar degree of support from the record and common sense – wild animals are sensitive to human disturbance. OHVs facilitate increased human access to sheep habitat, so restricting OHV travel on some routes will contribute to minimizing disturbance of sheep. Plaintiffs offer neither a legal nor factual basis for finding BLM's reasoning to be irrational.

---

[13] Plaintiffs cite a case imposing a "best available science" requirement under NEPA. *See* BlueRibbon Br. at 30 (citing *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023)). But the NEPA regulations do not refer to "best available science"; they instead direct agencies to "ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents." 40 C.F.R. § 1502.23 (2020). "Best available science" is a regulatory term of art typically arising in disputes involving National Forest regulations or the Endangered Species Act. *See, e.g., Ecology Ctr., Inc. v. U.S. Forest Serv.*, 451 F.3d 1183, 1191-93 (10th Cir. 2006); *Colo. Env't Coal. v. Dombeck*, 185 F.3d 1162, 1170-71 (10th Cir. 1999).

      d.    *Habitat fragmentation*

Fourth, BlueRibbon Plaintiffs contend that BLM's treatment of "habitat fragmentation" was arbitrary and capricious because DR rationales contain "boilerplate language . . . used so vaguely and generically it is virtually meaningless." BlueRibbon Br. at 36.

This argument fails, in part, because once again BlueRibbon Plaintiffs attempt to shift the burden by combining unsupported assertions with accusations that BLM has failed to sufficiently document the TMP's analysis or conclusions. Plaintiffs contend "[t]he EA makes no effort to provide any scientific evidence demonstrating how lightly used dirt tracks 'fragment' habitat" and "[n]either does it in any quantify the actual impacts . . . or demonstrate population level harm." *Id*. As noted above, BLM's duty is "to minimize harassment of wildlife or significant disruption of wildlife habitats." 43 C.F.R. § 8342.1(b). Requiring quantification of impacts or proof of population level harms is not required, and in fact would contradict BLM's actual obligations.

Plaintiffs' argument also emphasizes comments submitted by Rob Roy Ramey II, Ph.D., who has various academic degrees and over 30 years' experience as a consultant on wildlife and endangered species management. *See* BlueRibbon Br. at 37-38; LGB006167-81 (comments); LGB006195-98 (curriculum vitae). Plaintiffs characterize these comments as providing "a detailed refutation of the wildlife impacts analysis in the EA[.]" BlueRibbon Br. at 37. But Plaintiffs are incorrect when they say that "BLM failed to respond to Mr. Ramey's comments," and for that reason their argument fails. *Id*. at 38. The EA contains meaningful responses to particular points and categories of issues raised by the Ramey comments, among others. *See* LGB042422-26. Merely providing contrary opinions, even from experts, is not responsive to

Plaintiffs' burden because BLM is entitled to rely on reasonable opinions of its own qualified experts. *See Biodiversity Conservation All.*, 762 F.3d at 1060.

Moreover, the EA response to wildlife comments provides additional context that supports route-specific designations based on wildlife impacts. It clarifies that BLM considered species occurrence data from the Utah Division of Wildlife Resources, and for listed species, from the U.S. Fish and Wildlife Service. *See* LGB042423. BLM also considered bird nesting locations, such as from the Raptor Inventory Nesting Survey. *Id.* These responses clarify that BLM in some instances invoked wildlife impacts in its designation rationales as a reflection of its obligation to implement broader requirements such as raptor nest buffers provided by the Service and MFO RMP. *See* LGB042425.

In sum, Plaintiffs' "arbitrary and capricious" claims ignore applicable legal requirements, are based on unsupported opinions, or reflect mere disagreement with BLM's conclusions. BLM's determinations follow applicable law and are supported by the administrative record. The TMP makes reasonable determinations about whether to allow or discontinue existing OHV travel on individual routes, and Plaintiffs' arbitrary and capricious claims therefore must fail.

D.  <u>NEPA</u>

BlueRibbon Plaintiffs' final argument under NEPA now solely contends that BLM analyzed the TMP's environmental impacts through an EA when an EIS was required. *See* BlueRibbon Br. at 38-42. Again, Plaintiffs provide no basis for the Court to modify its prior analysis finding this argument unlikely to succeed.[14]

---

[14]  In the preliminary injunction motion BlueRibbon Plaintiffs argued "that BLM's DR failed to take a sufficiently 'hard look' as required by NEPA", that BLM chose an improper alternative, "that the EA failed to provide site-specific impact analyses", and "that BLM was

NEPA requires agencies to take a "hard look" at the environmental consequences of a proposed federal action. *Robertson*, 490 U.S. at 350. For "major Federal actions significantly affecting the quality of the human environment" an agency must prepare an environmental impact statement ("EIS"), 42 U.S.C. § 4332(C). An agency decision supported by a more concise EA must be accompanied by a FONSI, which "is a document by a federal agency briefly presenting the reasons why an action will not have a significant effect on the human environment and for which an EIS therefore will not be prepared." *Rocky Mt. Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1143 (quoting 40 C.F.R. § 1508.13) (cleaned up).[15] An agency's compliance with NEPA by relying on an EA and FONSI "'is a factual determination which implicates agency expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review.'" *Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002) (quoting *Comm. to Pres. Boomer Lake Park v. Dept. of Transp.*, 4 F.3d 1543, 1555 (10th Cir. 1993)).

Again, the Court's preliminary injunction ruling found this same NEPA argument unlikely to succeed. *See BlueRibbon*, 2024 WL 1197862, at *9. BLM's FONSI addressed the

---

required to prepare an EIS instead of the EA." *BlueRibbon*, 2024 WL 1197862, at *8-9. Section IV of their argument indicates they now pursue only the latter claim. *See* BlueRibbon Br. at 38-42. The other claims are thus waived because "[t]he failure to raise an issue in an opening brief waives that issue." *Anderson v. U.S. Dep't of Lab.*, 422 F.3d 1155, 1174 (10th Cir. 2005) (citations omitted).

15      Courts have found that the Council on Environmental Quality ("CEQ") regulations implementing NEPA "are entitled to substantial deference," *Robertson*, 490 U.S. at 355, leading to development of a significant body of case law interpreting and applying those regulations.

regulatory criteria at 40 C.F.R. § 1501.3. *See* LGB042658.[16] Relying on the analysis in the EA, the FONSI provides a resource-by-resource evaluation of short- and long-term effects, including for recreation. *See* LGB042668. The District Manager concluded that "[b]ecause all action alternatives would continue to provide recreation opportunities to a variety of user types . . . significant effects to recreation opportunities would not occur as a result of any of the action alternatives." LGB042674. This is a factual determination that Plaintiffs conveniently ignore, and which implicates agency expertise. *Utah Shared Access All.*, 288 F.3d at 1213.

BlueRibbon Plaintiffs' NEPA argument is premised on the notion that "[t]he human environment encompasses more than what is traditionally considered part of the physical environment" and must also include "recreation." BlueRibbon Br. at 40. But Plaintiffs fail to cite a single case that found an EA/FONSI unlawful based on the possibility of significant effects to "recreation." Courts have upheld an agency's choice to proceed with an EA rather than an EIS for comparable projects. *See*, *e.g.*, *id.*; *Williams*, 2007 WL 3053293, at *3; *Utah Env't Cong. v. MacWhorter*, No. 2:08-CV-118-SA, 2011 WL 4901317, at *9-15 (D. Utah Oct. 14, 2011). Indeed, decisions finding a travel plan EA insufficient involved claims brought by conservation organization plaintiffs raising impacts to the physical environment. *See*, *e.g.*, *Wilderness Soc. v. U.S. Forest Serv.*, 850 F. Supp. 2d 1144, 1161-62 (D. Idaho 2012).

Like each of their other claims, the BlueRibbon Plaintiffs' NEPA claim must fail. BLM reasonably addressed NEPA's procedural requirements, and the TMP otherwise satisfies the arbitrary and capricious standard of review.

---

[16]    Historically, the regulatory criteria addressing whether a proposed action will have significant effects were found at 40 C.F.R. § 1508.27 (2019). But the FONSI applied CEQ regulations issued in 2020. *See* 40 C.F.R. § 1501.3(b) (2020).

## II.        The State's Claims Also Fail

The State's claims are similarly flawed. Some of its claims track the BlueRibbon

Plaintiffs' claims and therefore fail for the same reasons. Where it raises different claims, the

State ignores relevant legal authority. And the State eschews any meaningful effort at seeking

record support, relying on allegations of its complaint or on unsupported narrative alone to

provide any factual basis for its arguments. This shortcoming is fatal, because the State "bears

the burden of proof" on these elements but ignores the "degree of evidence required at the

successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). While

"mere allegations" based on information and belief might suffice "[a]t the pleading stage,"

factual positions advanced in briefing the merits must be supported by evidence. *Id*. And this

evidence must come from the administrative record, not "counsel's briefs" or "counsel's

statements as to what was in the record[.]" *Olenhouse*, 42 F.3d at 1576.[17] Defendants will

address the relevant law and applicable portions of the record for each argument, but in nearly

every instance the State's failure "to give any factual or legal analysis" renders their argument

"so thin that the court would be justified in declining to address it for that reason alone."

*Williams*, 2007 WL 3053293, at *8. The State falls far short of its burden of showing that the

TMP violates the arbitrary and capricious standard of review.[18]

---

[17]        Also, the State fails to meet its burden to demonstrate standing. Jurisdiction requires a
sufficient sovereign interest, because the State "does not have standing as a *parens patriae* to
bring an action on behalf of its citizens against the federal government[.]" *State ex rel. Sullivan
v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992); *see also Wyoming v. U.S. Dep't of the Interior*, 674
F.3d 1220, 1232 (10th Cir. 2012).

[18]        References to the State include its Public Lands Policy Coordinating Office within the
Utah Department of Natural Resources ("PLPCO"), as well as the Utah School and Institutional
Trust Lands Administration ("SITLA"), "as an agency of the State of Utah." Compl. ¶ 32 (Case
No. 4:24-cv-46).

A.      Arbitrary and Capricious Agency Action

The State argues that any "road closures" were "arbitrary and capricious." Pl. State of

Utah's Opening Br. at 28, ECF No. 76 ("State's Br."). This section of the argument hints at a

smattering of theories, all lacking a proper legal basis or any factual support.[19]

First, the State contends that BLM "failed to properly consider" the effects of "road

closures" on "the human environment" and "alternatives which did not involve road closures."

*See id*. While the State offers no supporting legal authority, this terminology suggests it frames

these arguments under NEPA. *See* 40 C.F.R. § 1508.1(m), 85 Fed. Reg. 43,375 (July 16, 2020)

(defining "human environment"); *Sierra Trail Dogs Motorcycle & Rec. Club v. U.S. Forest

Serv.*, 470 F. Supp. 3d 1186, 1192-1193 (D. Nev. 2020) (addressing NEPA range of alternatives

argument for a TMP EIS); *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1069-71 (9th

Cir. 2023) (applying same legal analysis to an EA). But the State cannot advance these claims

because it did not plead them. Regardless, the Court has already rejected the premise of the

State's late-raised NEPA argument. *BlueRibbon*, 2024 WL 1197862, at *9 (finding that

consideration of the "human environment" under NEPA does not mandate continuation of OHV

"historic use" on every route).[20]

---

[19]      The State improperly attempts a freestanding APA claim, adrift of any jurisdictional
standard or law to apply. The APA does not provide an independent basis for jurisdiction.
*Califano v. Sanders*, 430 U.S. 99, 107 (1977). Arbitrary or capricious review may not be
conducted under the APA independent of another statute that provides substantive law for a court
to apply. *See Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123,
1202 (D.N.M. 2015) (collecting cases).

[20]      The State seemingly argues that NEPA involves discrete analysis of impacts to the
"natural environment" on one hand and the "human environment" on the other. State's Br. at 28
(stating that BLM devoted "only a page and a half" on the latter "compared to the dozens of
pages" on the former). But this novel distinction contradicts the statutory text and longstanding
interpretation of NEPA's reference to the human environment. *See* 42 U.S.C. § 4331 (NEPA

Second, the State claims that BLM abused its discretion by "refus[ing] to adopt an administrative process that would validate the States' rights of way under R.S. 2477." State's Br. at 29. But this Court has already ruled that "BLM was not required to determine the validity of the R.S. 2477 claims prior to adopting the Travel Plan." *Williams*, 2007 WL 3053293, at *6-7 (citing *SUWA v. BLM,* 425 F.3d 735 (10th Cir. 2005)). Like the travel plans discussed in *Williams*, the TMP here "has not precluded a finding on these rights-of-way" and BLM "acknowledge[s] that the Travel Plan can be amended if the rights-of-way are demonstrated." *Id*. at *7; *see* LGB042229. The State further theorizes that closing "D-roads" may cause them to "fall into a state of disrepair" while closing "B-roads" will necessitate repairs that would be "extremely costly for the State." State's Br. 29. This discussion fails to identify any particular "D" or "B" roads in the TMP, let alone provide support for the assertions about their use or maintenance requirements. These shortcomings, indeed, the absence of any factual support, precludes any possibility of a defensible ruling in the State's favor.

Third, the State asserts that unspecified "road closures interfere with the State's ability to collect evidence necessary for its [quiet title] case." State's Br. at 29-30. This position too suffers the absence of an identified legal basis or any factual support in the administrative record. *See id*. at 19-20 (background for "Interference with RS 2477 Litigation" consisting entirely of citations to the State's First Amended Complaint). Defendants have repeatedly resolved the State's

---

policy declaration "recognizing the profound impact of man's activity on the interrelations of all components of the natural environment"); 40 C.F.R. § 1508.14 (1978) ("Human environment shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment."). And even if there was any basis for this "compare number of pages" argument (there is not), the State's tabulation mischaracterizes both the volume and nature of BLM's analysis. *See* LGB042303-09 (EA Chapter 3.2.11 Recreation); LGB042360-67 (EA Appx. H Estimated Economic Impact).

requests in the R.S. 2477 litigation seeking vehicular access for proffered "preservation" deponents, including on OHV-Closed routes. And, in any event, the Federal Rules of Civil Procedure amply accommodate the State's litigation needs. *See* Fed. R. Civ. P. 34 (describing process for requesting and obtaining entry upon land for inspection and other purposes).

      B.    <u>SITLA Parcels</u>

The next claim relies on *State of Utah v. Andrus*, 486 F. Supp. 995, 1001 (D. Utah 1979), in arguing that BLM has unlawfully impeded access to school trust lands. State's Br. 30-31; *see also* First Am. Compl. ¶ 46, ECF No. 70 (alleging that BLM regulation of access "cannot prevent the State or its lessee from gaining access to its land, nor may it be so prohibitively restrictive as to render the land incapable of full economic development"). In addition to lacking a factual basis, this argument relies on flawed legal analysis and ignores the TMP's plain language.

At the outset, there is no defensible factual basis for this claim because the State relies entirely on the mere allegations of its First Amended Complaint. *Id*. at ¶¶ 92-102. The failure to present any underlying factual basis again precludes a ruling in the State's favor.

The State's claim also lacks a legal basis. *Andrus* rejects any asserted "absolute" right of access, concluding that "the United States may regulate the manner of access under statutes such as FLPMA." 486 F. Supp. at 1009; *see also United States v. Jenks*, 22 F.3d 1513, 1518 (10th Cir. 1994) (finding "patent or common law rights" of access are subject, "[u]nder basic principles of property law, . . . to regulation by the Forest Service as the owner of the servient estate"). And the suggestion that TMP route designations could constitute a taking further exposes the State's shoddy reasoning. Restricting public motorized recreational access does not deprive a permittee (or the underlying SITLA parcel) "of all economically beneficial use." *Lucas v. S.C. Coastal*

*Council*, 505 U.S. 1003, 1027 (1992). The State's conclusory narrative on this point is insufficient to support a finding that the TMP somehow "denied *all* economically beneficial or productive use" of SITLA lands "as a *Lucas* categorical takings claim requires." *Bruce v. Ogden City Corp.*, 640 F. Supp. 3d 1150, 1162–64 (D. Utah 2022), *aff'd,* No. 22-4114, 2023 WL 8300363 (10th Cir. Dec. 1, 2023), *cert. denied,* No. 23-1260, 2024 WL 4426623 (U.S. Oct. 7, 2024). More fundamentally, there is no authority for the proposition that potential Fifth Amendment takings implications have any bearing on the issues before this Court in APA review of a TMP. And this Court could not resolve a takings claims anyway, even if the State had pleaded such a claim, because exclusive jurisdiction for such claims lies with the Court of Federal Claims under the Tucker Act. *See Gordon v. Norton*, 322 F.3d 1213, 1217-18 (10th Cir. 2003).

The TMP reflects a reasoned exercise of BLM's regulatory authority. It makes clear that the "selected travel network" OHV designations "will not apply to existing or future authorized uses." LGB042228. Such authorized uses "include, but are not limited to, grazing permittees who need to access grazing allotments or range improvements, private landowners who obtain a right-of-way to access their inholding, or entities with a valid right-of-way to access SITLA parcels." *Id*. The TMP explicitly addresses the State's purported fears for existing or future uses of SITLA parcels:

> Existing authorizations will not be altered by the final TMP, when adopted. The final TMP will not prohibit new authorizations in the future. BLM will continue to work with private landowners, the State, SITLA permittees, and other authorized users to ensure reasonable access to, among other things, range improvements, private lands, and SITLA parcels. As the need arises, and in accordance with applicable laws and regulations, any route (including those that are designated OHV-Closed) can be made available to authorized uses.

LGB042228-29. The TMP interdisciplinary team considered the issue of access to SITLA parcels to be "present, but not affected to a degree that detailed analysis is required" because "[n]one of the alternatives will prohibit reasonable access to SITLA or other landowner parcels." LGB042338-39. And BLM reiterated this position and reasonably responded to comments addressing access to SITLA parcels. *See*, *e.g.*, LGB042419 (explaining that for "the great majority of cases" at least one public OHV route accessing SITLA parcels was provided in at least one action alternative and that "in all instances, SITLA and its permittees may receive authorization from BLM to access SITLA parcels"). Moreover, the TMP designates numerous routes as OHV-Open that provide access to SITLA parcels. *See* LGB042037 (Route D1002); LGB042048 (Route D1168); LGB042051 (Route D1234); LGB042054 (Route D1262A); LGB042148 (Routes D2474 and D2750); LGB042162 (Route D2919); LGB042178 (Routes D3547, D3551, and D3569); LGB042181 (Routes D3856 and D3860); LGB042183 (Routes D3906, D3922, D3923); LGB042184 (Routes D3926 and D3925); LGB042189 (Route D7436)

The State identifies only two SITLA parcels, previously accessed in some fashion by Hell Roaring Road (Route D1223) and Mineral Canyon Road (Route D1026), which it erroneously claims have been "cut off" from access by the TMP. *See* State's Br. at 22. Again, the TMP regulates public OHV travel, and has no effect on access by permittees or other authorized uses. The DR makes this clear, explaining that SITLA or relevant permittees will remain able to obtain authorization to access the parcels under applicable mechanisms and clarifying that BLM has not authorized, and does not intend to authorize, reclamation or rehabilitation of these two routes. *See*, *e.g.*, LGB042039 (Route D1026B "provides access to a SITLA section, and will not be actively reclaimed nor rehabilitated"); LGB042050 (while Route D1223B is closed to motorized

use "SITLA shall retain access to its section" and the route "will not be reclaimed or rehabilitated").

The TMP does not impede economic development or administration of state school trust lands. The State's concerns about access to SITLA parcels do not provide a basis for setting aside the TMP.

C.   FLPMA

The State raises two arguments under FLPMA. Each argument is insufficiently developed and ignores relevant authority.

1.   *Consistency Review*

The State presents a one-page argument contending that BLM failed to comply with FLPMA and its implementing regulations by failing to sufficiently allow for "Governor's Consistency Review." State's Br. at 31-32 (citing 43 U.S.C. §§ 1712(a), (c); 43 C.F.R. § 1610.3-2(e)). The relevant regulation outlines procedures to be taken "[p]rior to the approval of a proposed resource management plan, or amendment to a management framework plan or resource management plan." 43 C.F.R. § 1610.3-2(e). These requirements therefore apply to adoption (or amendment) of a land use plan, not implementation decisions. Land use plans "are a preliminary step in the overall process of managing public lands" which are followed by "site-specific implementation decisions." *Norton*, 542 U.S. at 69-70. This structural distinction is clear in BLM travel planning – a land use plan broadly designates areas for open, closed, or limited OHV access. Implementation level planning addresses designations for particular routes. *See* LGB040027-31. This distinction is punctuated by the fact that the TMA is a subunit within the MFO. *See* LGB042217 (explaining that the 2008 MFO travel planning process considered 6,199 miles of routes "throughout the MFO" of which "1,886.7 miles were located within the TMA").

46

Thus, there is an obvious factual disconnect in arguing that a TMP for a TMA can somehow constitute a FLPMA "land use plan" triggering the Governor consistency review requirements, because a resource management plan applies to a field office, i.e., a much broader administrative unit than the TMA.

The State's argument is also flawed insofar as it implies that consistency review obligates BLM to achieve consistency with "the State Resource Management Plan." State's Br. at 31. At most, BLM's obligations regarding "consistency review" require it to identify issues and explain how they were resolved, but "[t]he statute and regulations are silent on how detailed or specific BLM needs to be in doing so." *W. Expl., LLC v. U.S. Dep't of the Interior*, 250 F. Supp. 3d 718, 745 (D. Nev. 2017). In fact, the Tenth Circuit has indicated that "it is doubtful that the provision was intended to, or could reasonably be construed as, creating a 'procedural right' enforceable by state or local governmental entities." *Kane Cnty. Utah v. Salazar*, 562 F.3d 1077, 1088 (10th Cir. 2009).

Moreover, the issues raised in the purported "Governor's Consistency Review" were plainly considered and lawfully addressed by BLM. The Governor's letter dated October 25, 2023, states that "closing" 114 miles of asserted R.S. 2477 rights-of-way was "highly inappropriate," and that the TMP "closes access" to SITLA lands. ECF No. 1-10 (Case No. 4:24-cv-46) at 3-6. Contrary to the Governor's input, the TMP "does not adjudicate, analyze, or otherwise determine the validity of any asserted [R.S. 2477] rights-of-way." LGB042229 (EA); *see also* LGB042018 (DR). *Kane County* points to this same BLM approach to R.S. 2477 assertions in rejecting virtually the same "consistency" argument as Utah presents here. *See* 562 F.3d at 1088 ("even assuming that the [consistency] provision did create some type of 'procedural right,' that right was protected in this case because the Plan expressly recognizes that

the County plaintiffs may have valid R.S. 2477 rights-of-way and acknowledges that any such rights-of-way will be honored by the BLM"). Similarly, the TMP has no effect on authorized access to SITLA parcels. *See* LGB042228-29 (EA); LGB042018 (DR). The State has persistently communicated these positions, which BLM has rejected, beginning with the early stages of the TMP process. *See* LGB002821-25 (December 2021 comments addressing R.S. 2477 claims and consistency with "Utah's Resource Management Plan").

Any FLPMA Governor consistency review requirement did not apply here. But even if it did, the Utah Governor's letter submitted approximately one month after issuance of the DR did little more than repeat the State's longstanding disagreement on two issues. The TMP rationally addressed those issues in accordance with applicable law, and the State's consistency review argument therefore must fail.

2.   *Multiple Use and Sustained Yield*

The State additionally contends that that the TMP violates FLPMA's direction to provide for "multiple use and sustained yield." State's Br. at 32-33 (citing 43 U.S.C. § 1732(a)). This argument too is easily rejected. As with its other claims, the State fails to provide citations to the administrative record to support its argument. And the State's unsupported factual premise that the "DR considered conservation exclusively" is demonstrably false. The TMP leaves 810.5 miles of routes available for some form of continuing OHV travel. The DR makes clear that BLM considered an array of multiple uses in making individual route designations, in many instances emphasizing the importance of motorized recreation opportunities in providing for continuing OHV travel. *See*, *e.g*., LGB042046 (Route D1116 designated "open" because "it provides access to a scenic overlook of Taylor Canyon as well as to several dispersed campsites"); LGB042048 (Route D1167 designated "open" because it "provides recreation

48

opportunities for the OHV public in lesser used desert bighorn sheep habitat compared to other areas"); LGB042055 (discussing five Jeep Safari routes that each "provide[ ] recreation value"); LGB042079-80 (designating D1579 routes "open" noting they are "so popular" as to be "featured in guidebooks" featuring "challenging four-wheel drive routes" and providing "a valuable recreation experience for those who enjoy testing their skills and their vehicles").

The State's argument also ignores well established law flowing from any intuitive meaning of "multiple use" management. This FLPMA policy directive "represents an attempt by Congress to balance the use of the public lands by interests as diverse as the lands themselves" and "BLM need not permit all resource uses on a given parcel of land." *Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 738 (10th Cir. 1982). "The purpose of the [multiple use] mandate is to require the BLM to evaluate and choose an appropriate balance of resource uses, which involves tradeoffs between competing uses." *Williams*, 2007 WL 3053293, at *10-11. This "language which breathe(s) discretion at every pore" can "hardly be considered" to impose "concrete limits upon agency discretion." *Perkins*, 608 F.2d at 806 (internal quotation marks and citation omitted).[21]

The State has not established a FLPMA violation – the MFO's management, including the TMP, reflects reasonable consideration of multiple uses.

D.   Dingell Act

The State also brings a Dingell Act claim. *See* State's Br. 33-35. Insofar as the State raises a "buffer zone" argument, it fails for the same reasons as the BlueRibbon Plaintiffs'

---

[21]   The State pleaded a similar "de facto wilderness" argument. *See* First Am. Compl. ¶¶ 205-13, ECF No. 70. Again, by failing to include this claim in its opening brief the State has waived it.

argument – most notably because it is founded on the erroneous premise that TMP designations were "designed to minimize visual and auditory impacts to visitors and wildlife within the Labyrinth Wilderness Area." *Id.* at 34. Again, "neither the EA nor the DR contain any discussion whatsoever about user experiences, or any other impact, within the wilderness. Instead, BLM's analysis addressed impacts along the Green River corridor that is located within the TMA." *BlueRibbon*, 2024 WL 1197862, at *6.

The State also seemingly argues that by designating portions of the Green River within the TMA as "scenic," Congress cabined BLM's management authority and commanded that it "protect existing road access." State's Br. at 34-35. But in similar fashion to FLPMA, the Wild and Scenic Rivers Act is framed broadly, directing that a designated river be managed "in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values." 16 U.S.C. § 1281(a). Neither the statutory text nor any relevant case law supports the State's suggestion that a particular prescription (or prohibition) of motorized use is inherent in any WSRA designation. Rather, an agency's decisions applying WSRA, including in concert with travel management, "must be accorded substantial deference[.]" *Hells Canyon All.*, 227 F.3d at 1178. "Ultimately, it is the agency's role – not the court's – to balance competing recreational uses." *Riverhawks v. Zepeda*, 228 F. Supp. 2d 1173, 1184 (D. Or. 2002); *see also Friends of the Flathead River v. U.S. Forest Serv.*, 614 F. Supp. 3d 747, 753 (D. Mont. 2022) (agreeing with agency's position that WSRA "states only broad objectives for monitoring and protection and dictates no specific requirement for furthering those objectives"). That BLM is able to allow motorized access on (or in proximity to) a designated scenic river does not compel it to do so.

BLM's route designations in the vicinity of the Green River corridor appropriately consider impacts within the TMA and otherwise comply with applicable law.

E.    NHPA

Next, the State argues that BLM failed to consider whether "R.S. 2477 roads subject to the TMP's closures are eligible for protection" under the NHPA. State's Br. at 36. Again, the State's argument is insufficiently developed, and BLM amply addressed the NHPA's procedural requirements.

The State's argument again omits cogent discussion of the legal backdrop. The ACHP regulations provide a detailed structure to guide NHPA Section 106 analysis. These regulations outline the steps to be taken by the action agency (here BLM), which may include defining the undertaking's "area of potential effects" ("APE") and identifying historic properties within the APE (36 C.F.R. § 800.4), determining whether an adverse effect(s) may result from the undertaking (*id*. § 800.5), and if so, considering alternatives or modifications to the undertaking to avoid, minimize, or mitigate adverse effects (*id*. § 800.6). At each step the regulations address the agency's consultation options (or obligations) vis-à-vis the State Historic Preservation Officer ("SHPO") and any Tribal Historic Preservation Officer(s) ("THPO"), consulting parties, the public, and ACHP. *See*, *e.g*., *id*. §§ (a) (describing continuing consultation "with the SHPO/THPO and other consulting parties" regarding resolution of adverse effects) and (a)(1) (prescribing notice to be provided to ACHP); *see also id*. § 800.2.

However, an agency may adopt "program alternatives" to implement Section 106. *See id*. § 800.14. Here, various parties entered into "a programmatic agreement to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings." *Id*. § (b). "Compliance with the procedures

established by an approved [PA] satisfies the agency's section 106 responsibilities for all individual undertakings of the program covered by the agreement[.]" *Id*. § 800.14(b)(2)(iii). A programmatic agreement addressing NHPA responsibilities "for Travel and Transportation Management Undertakings" was executed by BLM, SHPO, and ACHP in November 2018 (the "PA"). *See* Exhibit 1 hereto.[22] The signatories entered the PA in recognition of "a need to establish greater clarity in how BLM-Utah's travel and transportation management undertakings should make 'a reasonable and good faith' effort to identify historic and traditional cultural properties" and to establish "procedures towards comprehensively meeting [BLM's] obligations under 36 C.F.R. Part 800 to identify, evaluate, and resolve potential adverse effects to historic properties (including traditional cultural properties) for travel and transportation management undertakings[.]" PA at 5-6. In part, the manner in which BLM could clarify these responsibilities developed as a result of litigation between these parties. *See S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099, 1107-11 (D. Utah 2013), *vacated sub nom. S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:12-CV-257 DAK, 2017 WL 11516766 (D. Utah May 17, 2017).

The PA tracks the ACHP regulations but offers specific refinements and procedures unique to BLM Utah travel planning processes. Section III of the PA addresses "Identification Efforts" starting with definition of the APE for OHV designations (and special recreation permits). PA at 12. Section IV addresses "Findings of Effect." *Id*. at 19. It directs that where BLM determines that "the undertaking may cause adverse effects to historic properties" it will provide consulting parties at least 30 days "to provide input on the finding." Section V provides:

---

[22]     The PA is also available at:
https://www.blm.gov/sites/blm.gov/files/BLM%20Utah%20Final%20Signed%20Programmatic%20Agreement%20for%20BLM%20Travel%20and%20Transportation%20Management%20Undertakings%20in%20Utah%2011-28-18%20(1).pdf (last viewed Jan. 10, 2025).

> The resolution of any adverse effects to historic properties from undertakings encompassed in this Agreement will be accomplished through the development of Historic Properties Treatment Plans (HPTP), and the completion and implementation of HPTPs will evidence BLM-Utah's compliance with the Section 106 process for these undertakings. Through the development of the HPTP, the agency official will identify and consult with consulting parties to develop and evaluate modifications to the undertaking that would avoid, minimize, or mitigate adverse effects to historic properties.

*Id*. at 20-21. BLM will provide consulting parties with 30 days to provide input on draft HPTPs and will revise an HPTP, "as needed, to address comments from this consultation process." *Id*. at 21. The draft HPTP, with any revisions, will be submitted to SHPO with a summary of consulting party input. *Id*. BLM ultimately determines "whether the HPTP will resolve the adverse effects in consultation with the SHPO." *Id*.

BLM closely followed the steps prescribed by the PA in adopting the TMP.[23] In March 2020 BLM sent a "consulting party invitation" to various entities and individuals, including PLPCO and SITLA. *See* LGB010186-221. In October 2021 BLM sent a further letter to consulting parties requesting input on the APE for the TMP. *See* LGB010669-86. In addition to describing how BLM would define the APE, those letters sought "any information you wish to share about cultural resources within the TMA." LGB010673 (PLPCO letter). The State, through PLPCO, provided a response on November 9, 2021, expressing appreciation for "BLM reconsidering the designation of each route using the most up-to-day information" and agreeing that the proposed APE "meets the requirements" of the PA. LGB010660-61. In March 2023 BLM sent consulting parties another letter "to follow up" on NHPA consultation for the TMP. *See* LGB007662-8016. These letters included several pages detailing the "identification efforts" for the TMP including site visits and Class II and Class III surveys where appropriate under the

---

[23]     The PA implementation process is summarized in EA Appendix I. *See* LGB042368-70.

PA. *See* LGB007663-66. The letters further summarized possible adverse effects, including for

specified sites, along with possible treatments. *See* LGB007666-68. In March 2023 BLM also

sent a similar update to SHPO. *See* LGB008227-302.

At this stage in the NHPA consultation process PLPCO sent the April 11, 2023, letter

mentioned it its complaint. *See* ECF No. 1-13 (Case No. 4:24-cv-46). PLPCO concurred with

BLM's finding of adverse effects, and its proposed treatment at seven sites, while suggesting

different treatments for six other sites "similar to those proposed for routes open in all planning

alternatives." *Id*. at 3. PLPCO further voiced a "concern" that BLM's "reluctance to consider any

information associated with R.S. 2477 claims means that numerous historical roads proposed for

closure, especially under Alternative B, have not been recorded and evaluated for National

Register eligibility. Some of these overlooked roads may quali[f]y as historic properties, and

closing them may alter characteristics that qualify these properties for National Register

inclusion." *Id*. at 3-4. PLPCO's letter identifies Routes 1527, 1019, 1112, 1190, and 1223 as

examples of such "historical" roads. *Id*. at 4.

On May 31, 2023, BLM circulated a draft HPTP. *See* LGB008305-08 (SHPO);

LGB008017-225, LGB009497-986 (tribes); LGB010356-635 (nontribal consulting parties).

Various parties submitted comments on the draft HPTP, including PLPCO in a letter dated June

8, 2023. *See* LGB010663-65. "PLPCO's comments consider two issues outlined in the *State*

*Resource Management Plan*, encouraging preservation and responsible use of cultural resources,

and protecting current and future access, use, and benefit of public lands." LGB010663. On the

first point, the comments indicate that PLPCO "fully supports" the HPTP's "proposed treatments

to minimize, mitigate, and monitor effects to historic properties" within the TMA. *Id*. On the

second point, PLPCO "urges" BLM to consider treatment options other than route closure, such

as site monitoring, interpretive signage, and increased law enforcement efforts. LGB010664. The

comments specifically discuss three routes, expressing concern that proposed closures might

adversely affect livestock grazing operations. LGB010663-64. The comments make no mention

of the historic eligibility of these three roads, or any other roads. In addition to PLPCO, BLM

received comments on the draft HPTP from three other consulting parties, which were

summarized in notes dated July 11, 2023. *See* LGB010687-88. BLM "considered these

comments and made some minor adjustments" and on July 11, 2023, transmitted a final HPTP to

SHPO. LGB008303-04.

In light of this background and relevant law, the State's NHPA argument fails for several

reasons.

BLM complied with the PA and obtained SHPO concurrence in the final HPTP, thus

resolving identified adverse effects and discharging BLM's Section 106 duties. Following

consultation, SHPO concurred in BLM's determinations of eligibility, findings of adverse effect,

and decisions regarding further Class II surveys. *See* LGB008227, LGB010666. BLM

appropriately communicated with SHPO regarding the draft HPTP. *See* LGB008305,

LGB010667. BLM's July 13, 2023, letter to SHPO summarized BLM's efforts, provided a copy

of the final HPTP, and advised that, "[c]onsistent with the [Travel Management] PA, the BLM

has determined that execution of the enclosed final HPTP will resolve adverse effects and the

BLM respectfully seeks your concurrence with this determination." LGB008303. On July 20,

2023, SHPO responded, noting BLM's "thoughtful consideration of comments received from our

office and other consulting parties" and concurring "that the revised HPTP is sufficient to guide

the next steps of this undertaking." LGB010668. The PA provides that "the completion and

implementation of HPTPs will evidence BLM-Utah's compliance with the Section l 06 process

for these undertakings." PA at 20. Compliance with an approved PA "satisfies the agency's

section 106 responsibilities for all individual undertakings of the program[.]" 36 C.F.R. §

800.14(b)(2)(iii); *see also S. Utah Wilderness All. v. Norton*, 326 F. Supp. 2d 102, 115-16

(D.D.C. 2004) ("The Court, in its deferential review of agency action, places great weight on the

fact that the instant agency action received the approval of the very entities charged with

overseeing compliance with NHPA.").[24]

In addition, BLM considered and reasonably addressed the State's concerns regarding

historical roads. BLM's response to comments acknowledged that some routes analyzed "have

been documented as cultural resources and that some may be eligible for the National Register of

Historic Places" and considered this information "as part of the BLM's compliance with [NHPA]

Section 106[.]" LGB042403. "BLM also considered historical and cultural purpose and need for

routes as part of the route evaluations, as described in Section 2.1.3." *Id*. As noted above, the

State's April 11, 2023, letter identified routes 1527, 1019, 1112, 1190, and 1223 as potential

"historical roads." ECF No. 1-13 (Case No. 4:24-cv-46) at 4. The DR designated two of these

routes as OHV-Open. *See* LGB042038 (D1019), LGB042048 (D1190). Route D1112 was

designated OHV-Closed, but no comments were submitted addressing its historic (or R.S. 2477)

---

[24]     The State mistakenly suggests the Court can independently consider whether routes
should be designated as historic properties pursuant to the regulations at 36 C.F.R. Part 60,
National Register of Historic Places. *See* State's Br. at 17, 36. Those regulations address a
process whereby SHPO or a federal agency can nominate a district, site, building, structure or
object for inclusion in the National Register. *See* 36 C.F.R. §§ 60.6, 60.9. Any other "person or
organization" can request a nomination by submitting the prescribed form to SHPO or a
designated federal preservation officer. *Id*. § 60.11. The State provides no evidence that it (or any
person or local government) completed these procedural requirements for any road within the
TMA (or elsewhere). Nor does the State cite to any case law or other legal authority suggesting
that a district court can rely on the criteria at 36 C.F.R. § 60.4 while conducting APA review of
agency action.

status. *See* LGB042046 (DR), LGB042435 (EA Appx. M comments by BlueRibbon and SUWA). Route D1223 (Hell Roaring Road) received substantial comments from proponents for and against continuing OHV access, including PLPCO and SITLA. *See* LGB04237-38. BLM designated each segment of D1223 as OHV-Closed, and noted that while "the road dates from the uranium mining days of the 1950's" the route "is in disrepair and staying on the roadbed is difficult to impossible due to flash flooding." BLM's rationale thus considers the road's historical context, while finding that that the road has been altered by recurrent flooding and concluding that closure to OHV travel is warranted to address wildlife habitat impacts and user conflict. LGB042050.[25] Similarly, comments on Route D1527 (Hey Joe) raised numerous considerations, including claimed R.S. 2477 status and access to "two famous inscriptions and an historic mining site[.]" LGB042459-60. Ultimately, based on impacts to wildlife and riparian habitat, wetlands, sediment transport, and user conflict, BLM chose to designate both segment of D1527 as OHV-Closed. *See* LGB042075. The State disagrees with this outcome, but BLM considered the route's historical context and addressed any NHPA procedural duties.

---

[25]    The State provides no authority supporting the proposition that motorized travel is ever essential to preserving the historical status of a road. Indeed, NHPA compliance in the travel management context typically focuses on whether motorized travel, even along existing routes, might cause adverse impacts to cultural resources or historic properties. *See Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1005-06 (9th Cir. 2013).

The State has failed to articulate a colorable legal or factual basis in support of an NHPA argument. Review of applicable law and the administrative record makes clear that BLM expended significant effort in formulating the PA and complying with its terms during the TMP process. The State's argument fails to address its role in establishing the PA and applying the PA during the TMP process. The State's NHPA claim provides no basis for setting aside the TMP.

F.   R.S. 2477

The State also argues that BLM should be precluded from making OHV-Closed designations on asserted R.S. 2477 rights-of-way. *See* State's Br. 37-40. This argument seeks to capitalize on the August 9, 2024, ruling in *Kane County v. United States*, No. 2:10-CV-1073-CWW, 2024 WL 3760024 (D. Utah Aug. 9, 2024). But the State's argument mischaracterizes the *Kane County* ruling(s), fails to acknowledge key aspects making those rulings inapplicable to this case, and ignores legal authority more clearly on point that ratifies BLM's longstanding approach to addressing R.S. 2477 assertions in formulating travel plans.

At the outset, it is important to clarify that what the State refers to as "The Decision," State's Br. at 38 (citing August 9 ruling) is in fact two decisions. The court issued a second decision to address "some confusion about one of the holdings" in the first decision, clarifying that the second decision "supplements its prior ruling" and that the two decisions "are to be read together." *Kane Cnty. v. United States*, No. 2:10-CV-1073, 2024 WL 4285110, at *1 (D. Utah Sept. 25, 2024).

The State overlooks several key aspects of the *Kane County* rulings. First, that case involves an action by the County (and the State) seeking to quiet title to asserted R.S. 2477 roads under the Quiet Title Act, 28 U.S.C. § 2409a, and the rulings address the United States' jurisdictional motion to dismiss. The rulings thus involve an entirely dissimilar procedural

context than review of agency action under APA and *Olenhouse* standards. Second, there are significant factual dissimilarities. The *Kane County* rulings only address eight roads that the court described as "well-defined roads on the ground and on maps" and "open for use by the public and motor vehicles." *Kane Cnty.*, 2024 WL 3760024, at *5. In most instances they are regularly maintained "Class B" roads.[26] In contrast, the State has not asserted that the TMP closes any Class B roads, but takes issue with TMP designations of about 114 miles of Class D roads claimed under R.S. 2477 by the State and Grand County. *See* ECF No. 1-10 (Case No. 4:24-cv-46) at 3-4. Third, even the *Kane County* court agrees that in the relevant context – Class D roads designated OHV-Closed by the TMP – the United States (BLM) "shall not be disturbed in possession or control" of those routes "pending a final judgment or decree" in the quiet title litigation. 28 U.S.C. § 2409a(b); *Kane Cnty.*, 2024 WL 4285110, at *6.

Moreover, the State fails to address this Court's rulings that resolves this question in the relevant travel planning context. The proper manner of asserting rights under R.S. 2477 is through "an action under the Quiet Title Act, not a challenge to the BLM's [TMP]." *Williams*, 2007 WL 3053293, at *7. BLM is not obligated to resolve R.S. 2477 claims and the TMP "has not precluded a finding on these rights-of-way" and "can be amended if the rights-of-way are

---

[26]    Roads potentially claimed by a Utah county are commonly referred to as "Class B" or "Class D" roads based on their status under Utah law. *See Kane Cnty.*, 2024 WL 3760024, at *4-5. Class B roads are maintained for travel by two-wheel drive passenger vehicles and are therefore reflected on maps prepared "in cooperation with the federal government" that have the effect, in part, of "obligat[ing] the State to provide funding to help maintain the road." *See Kane Cnty.*, 2024 WL 4285110, at *1-2. Class D roads do not meet the standards of Class A, B, or C roads, and are often "established by use" and "maintained to provide for usage by the public for vehicles with four or more wheels." *Id*. at *5; Utah Code Ann. § 72-3-105(1); *see also id*. § 102 (indicating that Class A roads are state highways), § 104(2) (indicating that Class C roads are city streets). The *Kane County* motion to dismiss involved only five Class B roads and three Class D roads. *Kane Cnty.*, 2024 WL 3760024, at *3 n.6, *5.

demonstrated." *Id.*; *Kane Cnty.*, 562 F.3d at 1088; LGB042229 (noting the State and counties "may hold valid existing rights-of-way within the TMA" under R.S. 2477" and that "[a]t such time as administrative or judicial determinations are made acknowledging or adjudicating asserted R.S. 2477 rights-of-ways, the BLM will adjust its TMP accordingly.").

The *Kane County* rulings do not aid the State's opposition to the TMP. Instead, the *Kane County* rulings, in concert with others by this Court, only make clear that BLM can restrict public OHV use on an asserted R.S. 2477 right-of-way pending judicial determination of such claims under the Quiet Title Act.

### G.   Conflict of Interest

The State's final argument contends that BLM "abused its discretion" by "failing to exclude" a BLM official purportedly having a "conflict of interest" from involvement in the TMP process. State's Br. at 40. The State fails to define "conflict of interest," articulate which "conflict of interest" it believes is at issue, or provide any legal authority demonstrating that a conflict of interest provides a basis for setting aside agency action. And yet again, the factual basis for this claim consists entirely of the mere allegations of the State's amended complaint. *See id.* (citing Am. Compl. ¶¶ 159-161). Indeed, the State admits to possessing no more than "information and belief" that the unnamed official in question was involved in the TMP process, preventing characterization of its claim as anything more than innuendo. There is no basis for granting the State's conflict of interest claim.

### III.   Plaintiffs Fail to Address the Proper Remedy Standard

Plaintiffs do not attempt the showing necessary to obtain their requested relief. Both Plaintiffs ask the Court to declare unlawful and vacate the TMP. *See* State's Br. at 40; BlueRibbon Br. at 42 (asking that the Court "set aside" the TMP). But "vacatur is not always the

appropriate remedy" in a case of this nature. *Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1049 (10th Cir. 2023) (considering NEPA violations). The Tenth Circuit now follows the "the *Allied-Signal* test" which considers "(1) the seriousness of the agency action's deficiencies (and thus the extent of doubt whether the agency chose correctly), and (2) the disruptive consequences of an interim change that may itself be changed." *Id*. (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (cleaned up)); *see also W. Watersheds Project v. Vilsack*, No. 23-8081, 2024 WL 4589758, at *15 (10th Cir. Oct. 28, 2024) (same). This determination "requires a fact-intensive inquiry that is typically left to the discretion of the district court." *Id*.

The Court should not have to consider remedy because Plaintiffs have not demonstrated that they are entitled to any relief. But if determining a proper remedy becomes necessary, Plaintiffs have not attempted to make an argument (or present evidence) under the *Allied-Signal* factors. In particular, vacatur of the TMP could lead to resumption of OHV use that some believe "poses a real threat to riparian areas and wildlife habitats." *BlueRibbon*, 2024 WL 1197862, at *11. The Court would need to conduct further proceedings, should it somehow become necessary to entertain Plaintiffs' request to vacate the TMP.

## CONCLUSION

For the above reasons, the Court should deny all of Plaintiffs' challenges to the TMP, and enter judgment for Defendants.

Respectfully submitted this 10th day of January 2025.

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

*/s/ Paul A. Turcke*
PAUL A. TURCKE, Trial Attorney
Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Tel: (202) 532-5994
paul.turcke@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum contains 18,786 words and complies with the type-volume limitation of DUCivR 7-1(a)(4)(C), as extended by the Amended Scheduling Order in Consolidated Administrative Cases, ECF No. 69. This memorandum has been prepared in a proportionately spaced typeface, Times New Roman 12-point font, and I obtained the word count using Microsoft Word 365 MSO (Version 2409 Build 16.0.18025.20214) 32-bit.

*/s/ Paul A. Turcke*
Paul A. Turcke