Stephen H.M. Bloch (# 7813)
Laura Peterson (# 16135)
Hanna Larsen (# 18458)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, Utah 84111
Telephone: (801) 486-3161
steve@suwa.org
laura@suwa.org
hanna@suwa.org

*Attorneys for Defendant-Intervenor
Southern Utah Wilderness Alliance*

---

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **BLUERIBBON COALITION** *et al.* and **STATE OF UTAH** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **U.S. BUREAU OF LAND MANAGEMENT**, *et al.*, <br><br> Defendants, <br><br> and <br><br> **SOUTHERN UTAH WILDERNESS ALLIANCE**, <br><br> Defendant-Intervenor. | Case Nos. 2:23-cv-00923-DAK-JCB (lead) <br> 4:24-cv-00046-DAK-JCB <br><br> **DEFENDANT-INTERVENOR'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR REVIEW OF AGENCY ACTION IN AN ADMINISTRATIVE CASE UNDER DUCivR 7-4** <br><br> District Judge Dale A. Kimball <br> Magistrate Judge Jared C. Bennett |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

GLOSSARY ..................................................................................................................... ix

INTRODUCTION ............................................................................................................... 1

STATEMENT OF THE CASE............................................................................................. 2

    I.    Legal Background ................................................................................................ 2

        A.    Regulation of Off-Highway Vehicles ................................................... 2

        B.    National Environmental Policy Act ...................................................... 4

        C.    National Historic Preservation Act ....................................................... 4

        D.    R.S. 2477 ............................................................................................. 5

    II.    Factual Background............................................................................................. 5

        A.    Labyrinth/Gemini Bridges Area........................................................... 5

        B.    Prior Travel Planning in the Moab Field Office ................................... 6

        C.    Labyrinth/Gemini Bridges Travel Planning.......................................... 7

        D.    Final EA and Final Travel Management Plan......................................... 7

        E.    Procedural History ............................................................................... 9

SUMMARY OF THE ARGUMENT ................................................................................... 10

STANDARD OF REVIEW ................................................................................................ 11

ARGUMENT ................................................................................................................... 12

    I.    BlueRibbon Has Failed to Demonstrate that the Labyrinth/Gemini Bridges TMP is Arbitrary and Capricious.......................................................................... 12

        A.    The TMP Does Not Violate the Dingell Act......................................... 12

        B.    The TMP is Not Arbitrary & Capricious. .............................................. 17

C.    The Labyrinth/Gemini Bridges EA Satisfies NEPA. ............................................... 25

II.    The State Fails to Prove the Labyrinth/Gemini Bridges TMP Violates Federal Law.... 30

A.    BLM's Closure of Claimed R.S. 2477 Roads Was Not Arbitrary, Capricious, or an Abuse of Discretion. ........................................................................................... 30

B.    The Labyrinth/Gemini Bridges TMP is Consistent with FLPMA. ........................ 32

C.    The State Did Not Raise a Dingell Act Claim. ...................................................... 37

D.    BLM Did Not Violate the National Historic Preservation Act. ............................. 38

E.    BLM's Closure of Claimed R.S. 2477 Rights-of-Way Does Not Violate Any Valid Existing Rights. ...................................................................................................... 43

CONCLUSION............................................................................................................................ 47

# **TABLE OF AUTHORITIES**

## **Cases**

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
462 U.S. 87 (1983) ................................................................................................... 27

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................. 37

*BlueRibbon Coal. v. Bureau of Land Mgmt.*, No. 2:23-CV-00923-DAK-JCB,
2024 U.S. Dist. LEXIS 49991 (D. Utah March 20, 2024) ................................... 10, 14

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
746 F. Supp. 2d 1055 (N.D. Cal. 2009) ..................................................................... 3, 4

*Ctr. for Biological Diversity v. United States Dep't of the Interior*,
72 F.4th 1166 (10th Cir. 2023) .......................................................................... 27, 28, 29

*Diné Citizens Against Ruining Our Env't (Diné CARE) v. Bernhardt*,
923 F.3d 381 (10th Cir. 2019) ................................................................................. 39, 43

*Hayes v. Whitman*,
264 F.3d 1017 (10th Cir. 2001) ................................................................... 17, 28, 31, 38

*Hillsdale Env't. Loss Prevention, Inc. v. United States Army Corps of Eng'rs*,
702 F.3d 1156 (10th Cir. 2012) ..................................................................................... 28

*Idaho Conservation League v. Guzman*,
766 F. Supp. 2d 1056 (D. Idaho 2011) ......................................................................... 3

*Kane Cnty v. United States*, 2:10-cv-01073,
2024 U.S. Dist. LEXIS 142312 (D. Utah Aug. 9, 2024) ................................. 43, 44, 46

*Kane Cnty. v. Salazar*,
562 F.3d 1077 (10th Cir. 2009) ............................................................... 32, 45, 46

*Kane Cnty. v. United States*, 2:10-cv-01073,
2024 U.S. Dist. LEXIS 174705 (D. Utah Sept. 25, 2024) ....................................... 43

*Kane Cnty. v. United States*,
772 F.3d 1205 (10th Cir. 2014) ..................................................................................... 46

*Marsh v. Or. Natural Res. Council*,
490 U.S. 360 (1989) ...................................................................................................... 4

*Motor Vehicle Mfrs Ass'n v. State Farm Mut. Ins. Co.,*
463 U.S. 29 (1983)............................................................................. 11, 17, 30

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*
177 F.3d 800 (9th Cir. 1999) ......................................................................... 5

*Norton v. S. Utah Wilderness All.,*
542 U.S. 55 (2004)......................................................................... 19, 35, 36

*Olenhouse v. Commodity Credit Corp.,*
 42 F.3d 1560 (10th Cir. 1994) ............................................................. 11, 30

*Pennaco Energy, Inc. v. U.S. Dep't of the Interior,*
377 F.3d 1147 (10th Cir. 2004) ................................................................. 12

*Pueblo of Sandia v. United States,*
50 F.3d 856 (10th Cir. 1995) ...................................................................... 4

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989)............................................................... 4, 25, 27

*S. Utah Wilderness All. v. Burke,*
908 F.3d 630 (10th Cir. 2018) ................................................................... 7

*S. Utah Wilderness All. v. Burke,*
981 F. Supp. 2d 1099 (D. Utah 2013)................................................... 3, 33

*S. Utah Wilderness All. v. U.S. Dep't of the Interior,*
44 F.4th 1264 (10th Cir. 2022) ................................................................. 5

*S. Utah Wilderness All. v. U.S. Dep't of the Interior,*
No. 2:12-cv-257 (D. Utah Jan. 13, 2017) ................................................. 7

*United States v. Bedford Assocs.,*
657 F.2d 1300 (2d Cir. 1981)................................................................ 44

*United States v. Mottaz,*
476 U.S. 834 (1986)................................................................. 44, 45

*Utah Shared Access All. v. Carpenter,*
463 F.3d 1125 (10th Cir. 2006) ............................................................ 2, 20

*Utah Shared Access All. v. U.S. Forest Serv.,*
288 F.3d 1205 (10th Cir. 2002) .......................................................... 26, 27

*WildEarth Guardians v. Conner*,
920 F.3d 1245 (10th Cir. 2019) .................................................................... 26, 27, 28

*WildEarth Guardians v. Mont. Snowmobile Ass'n*,
790 F.3d 920 (9th Cir. 2015) ....................................................................................... 3

*Williams v. Bankert*, No. 2:05-cv-503-DAK,
2007 WL 3053293 (D. Utah Oct. 18, 2007) ......................................................... 31, 45

*Wyoming v. U.S. Dep't of Agric.*,
661 F.3d 1209 (10th Cir. 2011) .............................................................................. 30

*Wyoming v. U.S. Dep't of the Interior*, 22-cv-247-SWS,
2024 U.S. Dist. LEXIS 235015 (D. Wyo. Dec. 31, 2024) ....................................... 30

*Zokari v. Gates*,
561 F.3d 1076 (10th Cir. 2009) .............................................................................. 37

**Statutes**

28 U.S.C. § 2409a ................................................................................................ 44, 45

42 U.S.C. § 4321 .................................................................................................... 1, 4

42 U.S.C. § 4332 ................................................................................................ 25, 29

43 U.S.C. § 1701 ................................................................................................ passim

43 U.S.C. § 1702 ...................................................................................................... 19

43 U.S.C. § 1712 ...................................................................................................... 33

43 U.S.C. § 1732 ............................................................................................ 22, 24, 35

43 U.S.C. § 932 (recodified) ................................................................................... 5

43 U.S.C. §1702 ........................................................................................................ 2

5 U.S.C. § 551 ........................................................................................................... 1

5 U.S.C. § 702 ......................................................................................................... 11

5 U.S.C. § 706 ......................................................................................................... 11

54 U.S.C. § 300101 ................................................................................................... 1

54 U.S.C. § 300320 ................................................................................................ 4

54 U.S.C. § 306108 ................................................................................................ 4

Utah Code § 72-3-103 ........................................................................................... 24

Utah Code § 9-81-201 ........................................................................................... 40

**Regulations**

36 C.F.R. § 2122.55 ............................................................................................... 3

36 C.F.R. § 800.1 ................................................................................................. 38

36 C.F.R. § 800.14 ............................................................................................... 39

36 C.F.R. § 800.16 ............................................................................................... 38

36 C.F.R. § 800.2 ............................................................................................ 38, 40

36 C.F.R. § 800.4 ................................................................................................. 38

36 C.F.R. § 800.5 ................................................................................................. 38

40 C.F.R. § 1501.3 (2023) .................................................................................... 29

40 C.F.R. § 1501.6 (2023) .................................................................................... 26

40 C.F.R. § 1502.14 (2023) .................................................................................. 26

40 C.F.R. § 1502.16 (2023) .................................................................................. 26

40 C.F.R. § 1508.1 (2023) .................................................................................... 26

43 C.F.R. § 1601.0-5 ............................................................................................ 33

43 C.F.R. § 1610.3-2 ............................................................................................ 34

43 C.F.R. § 1610.5-3 ............................................................................................ 34

43 C.F.R. § 8342.1 ................................................................................................. 3

**Rules**

Fed. R. Civ. P. 34 ................................................................................................ 32

Fed. R. Civ. P. 8 ................................................................................................ 37

Off-Road Vehicles; Use of Public Lands, 44 Fed. Reg. 34,834 (June 15, 1979) ........................ 20

**Other Authorities**

Black's Law Dictionary (2d ed.) ........................................................................... 24

Burton's Legal Thesaurus (6th ed.) ....................................................................... 24

Exec. Order No. 11,644, 37 Fed. Reg. 2877 (Feb. 9, 1972) ............................................. 2

Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 25, 1977) .......................................... 2

## **GLOSSARY**

APA          Administrative Procedure Act

BLM          Bureau of Land Management

DR           Decision Record

EA           Environmental Assessment

EIS          Environmental Impact Statement

FLPMA        Federal Lands Policy and Management Act

FONSI        Finding of No Significant Impact

IBLA         Interior Board of Land Appeals

NEPA         National Environmental Policy Act

NHPA         National Historic Preservation Act

OHV          Off-Highway Vehicle, synonymous with Off-Road Vehicle (ORV)

ORV          Off-Road Vehicle, synonymous with Off-Highway Vehicle (OHV)

PA           Programmatic Agreement

PLPCO        Public Lands Policy Coordinating Office

RMP          Resource Management Plan

SHPO         State Historic Preservation Office

SITLA        School and Institutional Trust Lands Administration

SUWA         Southern Utah Wilderness Alliance

TMA          Travel Management Area

TMP          Travel Management Plan

VRM          Visual Resource Management

## INTRODUCTION

Plaintiffs BlueRibbon Coalition *et al.* (BlueRibbon) and the State of Utah *et al.* (State) challenge the Bureau of Land Management's (BLM) Labyrinth/Gemini Bridges Travel Management Plan (TMP) Decision Record (DR). The Labyrinth/Gemini Bridges DR authorizes public motorized vehicle use on over 800 miles of dirt roads and trails near Moab, Utah and closes 317 miles to such use.

BlueRibbon argues that BLM acted beyond its constitutional and statutory authority by closing dirt routes and trails to public motorized use, alleging violations of the Constitution as well as several statutes, including the the John D. Dingell Jr. Conservation, Management, and Recreation Act of 2019 (Dingell Act), Pub. L. No. 116-9, 133 Stat. 580 (2019), the Federal Lands Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*

The State echoes many of BlueRibbon's claims and further alleges that BLM's Labyrinth/Gemini Bridges TMP prevents access to School and Institutional Trust Land Administration (SITLA) parcels, violates the National Historical Preservation Act (NHPA), 54 U.S.C. § 300101 *et seq.*, and hinders the State's alleged rights under Revised Statute 2477 (R.S. 2477). The State also complains of an alleged conflict of interest regarding Labyrinth/Gemini Bridges TMP decisionmakers.

BlueRibbon's and the State's arguments are not grounded in law or fact. Tenth Circuit precedent and the administrative record refute each of Plaintiffs' claims. Accordingly, the Court should enter judgment upholding the Labyrinth/Gemini Bridges TMP in its entirety.

## STATEMENT OF THE CASE

I.    **Legal Background**

    A.    **Regulation of Off-Highway Vehicles**

FLPMA is the primary statute governing BLM's management of public lands. Among other things, it requires that BLM manage the public lands for multiple uses and in a manner that "will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological values . . . ." 43 U.S.C. § 1701(a)(7), (8). Recreation, including off-highway vehicle (OHV) use, is included amongst those multiple uses. *See id.* §1702(c); *Utah Shared Access All. v. Carpenter*, 463 F.3d 1125, 1129 (10th Cir. 2006).

In response to the growing use of OHVs on public lands and the resulting environmental damage caused by that activity, Presidents Nixon and Carter issued executive orders mandating that federal agencies like BLM only allow OHV use on public lands in a manner that protects lands and natural resources. Exec. Order No. 11,644, 37 Fed. Reg. 2,877 (Feb. 9, 1972); Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 25, 1977). BLM subsequently promulgated 43 C.F.R. § 8342.1 through notice and comment rulemaking, which governs the designation of routes for OHV use on public lands,[1] and is often referred to as the "minimization criteria:"

> (a)    Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.

> (b)    Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.

---

[1] These regulations also apply to BLM's designation in its resource management plans of areas as "open," "closed," or "limited" to OHV use. BLM's area designations in the 2008 Moab Resource Management Plan (Moab RMP) are not at issue in this case.

> (c)    Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.
>
> (d)    Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

43 C.F.R. § 8342.1(a)-(d).

When BLM designates specific routes for OHV use in its travel management planning process, it must apply the minimization criteria on both a route-by-route and travel-network wide basis. *See WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 932 (9th Cir. 2015).[2] BLM must do more than simply consider the minimization criteria when designating routes. Rather, agencies must apply the criteria and provide a reasonable articulation of the basis for the conclusion that such designations "minimize" impacts to important resources. *See id.* at 929-32; *S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099, 1104-06 (D. Utah 2013), *vacated sub nom. S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:12-cv-257-DAK, 2017 WL 11516766 (D. Utah May 17, 2017); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1071-81 (N.D. Cal. 2009). Minimize refers "to the <u>effects</u> of route

---

[2] Although BLM and the Forest Service are subject to different travel management regulations with variations in language—*compare* 36 C.F.R. § 212.55(b) *with* 43 C.F.R. § 8342.1—their rules are substantially similar and treated similarly by courts. *See, e.g.*, *Idaho Conservation League v. Guzman*, 766 F. Supp. 2d 1056, 1074 (D. Idaho 2011) ("Not only are both agencies bound by the plain language of the ORV Executive Orders, but both contemplate the same result: the land management agencies will consider the impacts of ORV use and, in selecting appropriate routes, will attempt to minimize those impacts.").

designations, *i.e.*, the BLM is required to place routes specifically to minimize 'damage' to public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts of uses.'" *Ctr. for Biological Diversity*, 746 F. Supp. 2d at 1080 (emphasis in original).

## B.    National Environmental Policy Act

Congress enacted NEPA "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. It serves two primary fundamental purposes. First, it "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" of a proposed action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Second, it requires "that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.* In other words, "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) (citations omitted).

## C.    National Historic Preservation Act

Congress enacted the NHPA to implement a broad national policy encouraging the preservation and protection of America's historic and cultural resources. *See* 54 U.S.C. § 300101. The heart of the NHPA is Section 106, which prohibits federal agencies from approving any federal "undertaking" unless the agency takes into account the effects of the undertaking on historic properties that are included in or eligible for inclusion in the National Register of Historic Places. 54 U.S.C. §§ 306108, 300320; *see also Pueblo of Sandia v. United States*, 50 F.3d 856, 859 (10th Cir. 1995). Analogous to NEPA's requirement that federal agencies think

first, then act, Section 106 is a "stop, look, and listen provision" that requires federal agencies to consider the effects of their actions and programs on historic properties and sacred sites before implementation. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).

### D.     R.S. 2477

R.S. 2477 was a one-sentence statute that granted rights-of-way over public lands to promote westward expansion. In its entirety, it read: "[t]he right of way for the construction of public highways over public lands, not reserved for public uses, is hereby granted." 43 U.S.C. § 932 (recodified). Congress repealed R.S. 2477 when it enacted FLPMA.

FLPMA preserved valid existing rights, including R.S. 2477 rights-of-way that were established as of October 21, 1976. 43 U.S.C. § 1701. Quiet Title Act litigation is the sole means for "conclusively establishing" the validity of a claimed R.S. 2477 right-of-way. *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, 44 F.4th 1264, 1268 (10th Cir. 2022).

## II.     Factual Background

### A.     Labyrinth/Gemini Bridges Area

The Labyrinth/Gemini Bridges Travel Management Area (TMA) encompasses approximately 300,000 acres of BLM-managed lands in southeastern Utah and within the agency's Moab Field Office. LGB042216-17. The Labyrinth/Gemini Bridges TMA is located west of Moab, east of the Labyrinth Canyon stretch of the Green River, and north of Canyonlands National Park and is a spectacular and varied landscape. The TMA is home to desert bighorn sheep, pronghorn antelope, and Endangered Species Act-listed species such as the Mexican spotted owl, southwestern willow flycatcher, and western yellow-billed cuckoo.

LGB042283-303. Fragile biological soil crusts, which are easily harmed or destroyed when disturbed, occur throughout the TMA. LGB042251-54. The Labyrinth/Gemini Bridges TMA also contains significant cultural sites reflecting thousands of years of human history, including rock art panels, rock shelters, and pot sherds. LGB042243.

Bordered on the west by the Green River, the TMA includes significant riparian resources. LGB042270-71. Although riparian areas account for less than one percent of BLM-managed lands in Utah, they are of immense ecological value; riparian areas "are among the most important, productive, and diverse ecosystems in the state." LGB042271. While riparian areas are vitally important for supporting aquatic organisms, wildlife, and biodiversity, they are also very fragile and vulnerable to disturbance. LGB042271.

The Labyrinth/Gemini Bridges TMA's deep canyons, soaring red rock cliffs, and sprawling mesas are also popular with recreationists. The area draws hikers, campers, climbers, canyoneers, and mountain bikers from all around the world. LGB042303-04. The TMA is also popular with motorized recreationists and includes routes used in the annual Easter Jeep Safari. LGB042303-04. The Labyrinth Canyon section of the Green River, which makes up the western boundary of the TMA, provides a unique and popular multi-day flatwater river trip that is suitable for recreationists of all experience levels. LGB042304.

B.    **Prior Travel Planning in the Moab Field Office**

Prior to BLM's decision in this matter, OHV use in the Labyrinth/Gemini Bridges TMA was governed by the Moab RMP. That plan and its contemporaneously-issued travel management plan designated 4,006 miles of routes for public motorized use throughout the field office, including approximately 1,127 miles within the Labyrinth/Gemini Bridges TMA.

6

LGB042216-18. SUWA challenged the Moab RMP and travel management plan, among other

plans also issued in 2008, for violating federal environmental and historic preservation laws.

After nearly a decade of litigation, SUWA, the United States Department of the Interior, plaintiff

BlueRibbon Coalition, and others reached a settlement agreement that directed BLM to prepare

11 new travel management plans between 2017-2024, including the Labyrinth/Gemini Bridges

TMP. *See generally S. Utah Wilderness All. v. Burke*, 908 F.3d 630 (10th Cir. 2018); Settlement

Agreement, *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:12-cv-257 (D. Utah Jan.

13, 2017) (ECF No. 513) (Settlement Agreement).

### C.    Labyrinth/Gemini Bridges Travel Planning

BLM initiated a 30-day scoping period for the Labyrinth/Gemini Bridges TMP in March

2021. LGB042223. In September 2021, BLM released preliminary alternative route networks as

well as a baseline monitoring report and scoping report. In September 2022, BLM released a

draft Environmental Assessment (EA) and held a 45-day public comment period. LGB042022-

23.

### D.    Final EA and Final Travel Management Plan

BLM released its final EA, DR, and Finding of No Significant Impact (FONSI) on

September 28, 2023. *See generally* LGB042015-205 (DR); LGB042206-042656 (EA);

LGB42657-76 (FONSI). The final EA analyzed four alternative route networks, including the No

Action Alternative (Alternative A) and three action alternatives that would designate between

690 and 1,075 miles of routes as open for public motorized use. *See generally* LGB042226-36.

The final EA details the many damaging impacts motorized use has caused and can cause

to resources within the TMA. For instance, OHV use can cause the destruction of cultural

artifacts or cause soil movement that leads to erosion, which can further displace cultural materials. LGB042243. OHV use also negatively impacts soils, including damaging cryptobiotic soils, and leading to increased wind and water erosion of soils, and sediment transport into water bodies and riparian areas. LGB042253.

As the final EA notes, water resources and riparian areas within the TMA are particularly important and among the most diverse ecosystems in the state, providing benefits that include filtering and purifying water, enhancing soil stability, and providing habitat for species. LGB042271. OHV use can contaminate stream systems and riparian areas, increase the potential for erosion and sediment transport into water bodies and riparian areas, and damage vegetative cover. LGB042272. The final EA specifically highlights Ten Mile Wash as one place where OHV use has accelerated erosion and prevented vegetation from establishing on banks such that "road impacts have become major since the 1980s." LGB042272-73.

OHV travel can also significantly impact wildlife and wildlife habitat. LGB042277-303. Specifically, OHV use on routes can lead to habitat avoidance, habitat fragmentation, increased physical distress, and increased risk of direct collision between motorized vehicles and animals. LGB042284; LGB042288-89; LGB042297. High visitation to the TMA generally coincides with the most crucial seasons for wildlife, such as bighorn sheep and Mexican spotted owl. LGB042284; LGB042297.

The final EA outlines the varying impacts of the alternative travel networks BLM considered, as well as the potential for each travel network to comply with the minimization criteria. To support the final EA, BLM prepared route-specific reports that individually analyzed each route, including potential impacts from OHV use on the individual routes and how

designating each route would minimize damage in compliance with 43 C.F.R. § 8342.1. *See generally* LGB026709-32069.

In the DR, BLM selected a combination of the route networks analyzed in Alternatives B, C, and D. LGB042016. The new travel plan designates 810.5 miles for public OHV use and closes 317.2 miles to public OHV use.[3] LGB042016. The DR explains that the selected network "provides for appropriate OHV access to and across BLM managed lands while also meeting the BLM's multiple use mandates and responsibilities" and while minimizing damage in compliance with the minimization criteria. LGB042019. BLM provided a detailed rationale for each of the routes it designated as OHV-Open, OHV-Limited, or OHV-Closed in the selected travel network. *See generally* LGB042030-203.

### E.    Procedural History

Both sets of plaintiffs and two other groups of appellants appealed BLM's Labyrinth/Gemini Bridges TMP and DR to the Interior Board of Land Appeals (IBLA) and three of the appellant groups sought an order staying implementation of the plan. The IBLA denied the stay petitions and both BlueRibbon and the State subsequently dismissed their appeal. *See generally* Order, Interior Bd. of Land Appeals, Pet. for Stay Denied (Nov. 28, 2023) (ECF No. 15-3).

BlueRibbon filed its complaint on December 22, 2023, and also sought a preliminary injunction of the Labyrinth/Gemini Bridges TMP and DR. After a hearing, the Court denied the

---

[3] The route designations do not apply to "authorized uses" which includes "[m]ilitary, fire, emergency, and law enforcement vehicles while being used for emergency purpose, along with vehicles in official use." LGB042216 "Authorized use" also includes use by grazing permittees accessing allotments and entities with a valid right-of-way to access Utah Trust Lands Administration parcels. LGB042228.

motion on March 20, 2024. ECF No. 48, *BlueRibbon Coal. v. Bureau of Land Mgmt.*, No. 2:23-CV-00923-DAK-JCB, 2024 U.S. Dist. LEXIS 49991 (D. Utah March 20, 2024). The State filed its complaint challenging the TMP on May 29, 2024. The Court granted the parties' joint motion to consolidate the cases. Order Granting Joint Mot. to Consolidate Cases, ECF No. 63.

## SUMMARY OF THE ARGUMENT

To avoid duplication, SUWA adopts and incorporates BLM's arguments and provides the following additional arguments.

BlueRibbon fails to meet its burden to demonstrate that the Labyrinth/Gemini Bridges TMP DR was unlawful under any of its claims. The plain language of the Dingell Act coupled with the administrative record evidence refutes BlueRibbon's claim that the TMP created an illegal "buffer zone" around the Labyrinth Canyon Wilderness. Instead, BLM properly made route designations based on impacts within the TMP. Similarly, BLM complied with FLPMA when it applied the minimization criteria to determine whether to designate routes for public motorized use. Further, BLM supported its route designation decisions with multiple rationales which demonstrate reasoned analysis and decision-making rather than arbitrary agency action. Finally, BLM's conclusion that its decision to allow continued motorized use on over 800 miles of dirt routes and trails and close 317 miles to such use would not significantly affect the environment is well supported in the record.

The State likewise fails to demonstrate that the Labyrinth/Gemini Bridges TMP DR is unlawful. The State's arguments have minimal legal support and virtually no record support. The State also fails to acknowledge pertinent legal authorities and relevant facts. BLM's treatment of claimed R.S. 2477 rights-of-way is neither arbitrary nor capricious because the TMP does not

affect those rights. Nor does BLM infringe on the State's ability to conduct discovery related to its ongoing R.S. 2477 Quiet Title Act litigation or violate the State's claimed, but not adjudicated, rights-of-way. Furthermore, BLM did not violate FLPMA because it is not required to submit the implementation-level plan for governor's consistency review and BLM complied with FLPMA's multiple-use mandate by balancing competing uses of lands. Finally, BLM did not violate the NHPA because it adhered to alternative procedures established in a travel management planning-specific programmatic agreement.

## <u>STANDARD OF REVIEW</u>

Judicial review of agency actions is governed by the APA, which provides judicial review for "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Under the APA, a reviewing court will set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* § 706(2)(A). The court must "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (footnote omitted).

The arbitrary and capricious standard of review "focuses on the rationality of an agency's decisionmaking process." *Id.* at 1575. Agency action is not arbitrary and capricious if there is (1) a reasoned basis for the decision, (2) substantial evidence in the record to support it, and (3) "a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43-44 (1983); *Olenhouse*, 42 F.3d at 1574-75. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to

11

support a conclusion." *Pennaco Energy, Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004).

## **ARGUMENT**

**I.    BlueRibbon Has Failed to Demonstrate that the Labyrinth/Gemini Bridges TMP is Arbitrary and Capricious.**

BlueRibbon has not met its burden to show that BLM's Labyrinth/Gemini Bridges TMP decision is arbitrary, capricious or otherwise not in accordance with the law. To the contrary, BLM's decision is reasoned and based on substantial evidence in the record. Accordingly, the Court should affirm BLM's decision.

### **A.    The TMP Does Not Violate the Dingell Act.**

BlueRibbon alleges that BLM violated the Dingell Act by establishing a so-called "buffer zone" around the Labyrinth Canyon Wilderness and improperly considering noise and visual conflicts. *See* Opening Br. of Pls.' BlueRibbon Coal., Inc., Colo. Offroad Trail Defenders, and Patrick McKay, 10-13, ECF No. 75 (BlueRibbon Br.). BlueRibbon contends that the Dingell Act "explicitly" prohibits BLM from complying with certain aspects of the minimization criteria, specifically from considering visual and noise-induced impacts when analyzing routes within an undefined "buffer." *Id.* BlueRibbon argues further that BLM cannot consider visual and noise impacts from motorized vehicle use, even as one of multiple rationales justifying BLM's decision to close a route in the TMA. *Id.* at 13. BlueRibbon's arguments fail because they are premised upon on an inaccurate and unsupported interpretation of the Dingell Act, as well as a distortion of the DR.

Congress passed the Dingell Act in 2019 and established several wilderness areas in Emery County, including the Labyrinth Canyon Wilderness area on the western side of the

12

Green River. Dingell Act § 1231(a)(7). The Labyrinth Canyon Wilderness does not include the river itself, nor does it include any lands within or immediately adjacent to the Labryinth/Gemini Bridges TMA, which lies entirely within Grand County. *See id.*; Def.'s Mem. in Opp'n to Pls.' Mots. for Review of Agency Action in an Admin. Case Under DUCivR7-4, 17, ECF No. 78 (BLM Br.). The Dingell Act also designated the Labyrinth Canyon stretch of the Green River as a "Scenic River" under the Wild and Scenic Rivers Act. Dingell Act § 1241(a).

The Dingell Act states that Congress "does not intend for the designation of the wilderness areas to create protective perimeters or buffer zones around the wilderness areas," and "[t]he fact that nonwilderness activities or uses can be seen or heard from areas within a wilderness area shall not preclude the conduct of those activities or uses" outside the designated wilderness. *Id.* § 1232(e)(1) & (2). Neither this language, nor any other language in the Dingell Act, prohibits BLM from complying with the minimization criteria set forth in 43 C.F.R. § 8342.1.

This language also does not prevent BLM from taking into account noise and visual impacts when designating motorized vehicle routes in the TMA. Indeed, the Dingell Act <u>does not require</u> that BLM authorize activities that can be seen or heard from designated wilderness areas, it simply states that wilderness designation does not preclude these activities from occurring outside those areas. *See* Dingell Act § 1232(e). The plain language of the Dingell Act does not support BlueRibbon's claims, let alone "explicitly prohibit" BLM from considering visual and noise-induced impacts.[4] This is the same conclusion the Court reached in its decision denying

---

[4] BlueRibbon attempts to justify its reading of the Dingell Act by comparing language in the Dingell Act to language in the Washington State Wilderness Act, and asserts—without any

BlueRibbon's preliminary injunction motion. *See BlueRibbon*, 2024 U.S. Dist. LEXIS 49991, at *16 ("Nothing in the Dingell Act prohibits BLM from complying with the minimization criteria set forth in 43 C.F.R. § 8342.1").

Moreover, BlueRibbon's arguments about the Dingell Act are a distraction. While the unambiguous language of the Dingell Act does not prohibit BLM from considering noise or other impacts resulting from the TMP to wilderness, BLM has nevertheless not done so here. At no point in the DR does BLM rely on or cite to visual or noise impacts to wilderness as the reason it closed routes and BlueRibbon does not offer even a single example to the contrary. *Compare* LGB042030-203 *with* BlueRibbon Br. 10-13. Instead, BLM provided detailed rationales explaining why the agency decided to designate routes as closed, none of which cite to or mention visual or noise impacts to wilderness. LGB042030-203; *see also BlueRibbon*, 2024 U.S. Dist. LEXIS 49991, at *17 (recognizing that BLM made route designation decisions "divorced from the route's proximity to the Labyrinth Canyon Wilderness").

To support their claims that BLM intended to and did create a wilderness buffer, BlueRibbon cites to a SUWA newsletter article as well as selectively quoted language in the DR. BlueRibbon Br. 10-13. Neither of these supports BlueRibbon's arguments.

BlueRibbon argues that SUWA "admits" the goal of the Labyrinth TMP "was to effectively designate both sides of the Green River as wilderness," citing a SUWA newsletter

---

supporting citation—that "Congress intentionally altered the language when creating the Dingell Act . . . [to prohibit] any use restriction whatsoever that considered a non-wilderness activity's potential impact on wilderness areas." BlueRibbon Br. 13 (emphasis in original). BlueRibbon's argument is unavailing. The plain language of the Dingell Act carries no such prohibition. And BlueRibbon's argument is irrelevant because BLM did not consider OHV-related impacts to wilderness in the TMP.

article from 2022. BlueRibbon Br. 11. This article, published before BLM finalized the TMP, expressed SUWA's desire for a more balanced travel plan, harmonizing land management on both sides of the river. *See* Kelsey Cruickshank & Laura Peterson, *Labyrinth Canyon Travel Planning: A New Opportunity to Solve Old Problems*, S. Utah Wilderness All., *available at* http://suwa.org/wp-content/uploads/Autumn-Winter2022_WEB.pdf (last visited Jan. 23, 2025). To state the obvious, SUWA is not the BLM and SUWA had no decision-making power over the DR. SUWA's hopes for what a travel plan might look like has no bearing on the Court's determination whether BLM violated the Dingell Act. And BLM did not do so.

BlueRibbon also highlights several routes to try and support its argument that BLM relied on impacts to the Labyrinth Canyon Wilderness as the basis to close routes, including routes D2795B,[5] D1527A, D1527B, 2763B, 2763C and 1223A. BlueRibbon Br. 10-13. The DR simply does not support and in fact contradicts BlueRibbon's arguments. BlueRibbon claims, for example, that BLM "considered the impact of 'visual and noise-induced conflicts' from the TMA upon the Labyrinth Canyon Wilderness when deciding how to newly designate the Plan routes." BlueRibbon Br. 11 (emphasis in original). As BLM point outs, BlueRibbon's selective quotation of the DR intentionally ignores that BLM instead considered visual and noise-induced "conflicts with non-motorized users on the Green River." *See* BLM Br. 18-19; LGB042152 (reflecting BLM's decision rationale for route D2759B). And each of the route decision rationales BlueRibbon cites to support its argument shows that in fact BLM did not consider impacts to the Labyrinth Canyon Wilderness, but instead considered noise and visual-induced

---

[5] While Plaintiffs reference route D2759A, they quote language and cite to the page discussing BLM's rationale for closing D2759B. *See* BlueRibbon Br. 10.

impacts to non-motorized users such as rafters and canoers on the Green River (which is not designated wilderness). *Compare* BlueRibbon Br. 10-13 *with* LGB042050 (noting that BLM decided to close 1223A, within the Canoe Focus Area identified in the 2008 Moab RMP, in part to "minimize known conflicts between OHV public and river users that is caused by vehicle-based noise"); LGB042075 (highlighting that BLM decided to close routes D1527A and 1527B to, in part, "minimize the potential for conflicts between offroad vehicles users and dispersed, non-motorized/non-mechanized forms of recreation (*e.g.*, canoeists) [on the Green River]"); LGB042154 (reflecting BLM's decision to close routes D2763B and D2763C, in part, because closing the route "will minimize visual and noise-induced conflicts between motorized and non-motorized users (*e.g.*, canoeists on the Green River")).[6]

Conflicts between OHVs and non-motorized users on the Green River are well documented in the record. *See, e.g.*, LGB042304 ("The BLM has received verbal and written complaints from boaters concerning the noise made by motorized vehicles along the Labyrinth Canyon corridor."); LGB002816-18 (Moab area river guides and outfitters asking BLM to close routes in the TMA that conflict with river recreation, including Hey Joe, Dead Cow/Tubes and Hell Roaring Canyon ORV Routes); LGB00305 (encouraging BLM to close routes along the Labyrinth Canyon corridor in part to allow visitors to take a quiet float trip on the Green River); LGB001257 (recounting a packrafting trip disrupted by the noise and visual impacts from OHVs and encouraging the agency to close OHV routes in Labyrinth Canyon). And BLM properly considered these conflicts in compliance with the minimization criteria when it made route

---

[6] Also, each route decision BlueRibbon cites to includes multiple rationales for closing the referenced routes, including impacts to cultural sites, riparians areas and wildlife. *See, e.g.*, LGB042050; LGB042075; LGB042154.

designation decisions. 43 C.F.R. § 8342.1(c). The DR reflects BLM's analysis of OHV impacts and attempts to minimize those impacts as required by law. It does not reflect any intention to create a "wilderness buffer." BlueRibbon's arguments should be rejected.

**B.    The TMP is Not Arbitrary & Capricious.**

BlueRibbon next contends that the Labyrinth/Gemini Bridges TMP is arbitrary and capricious because it (1) does not adhere to FLPMA, BlueRibbon Br. 14-16, (2) closes routes based on factors not identified in FLPMA, *id.* at 16-22, and (3) closes routes specifically to protect soils and vegetation, minimize user conflict, protect bighorn sheep, and reduce habitat fragmentation. *Id.* at 22-38. But for the reasons articulated by BLM, *see* BLM Br. 20-37, and as explained further below, BLM's Labyrinth/Gemini Bridges TMP decision is reasoned and based on substantial evidence in the record, such that the Court may easily conclude there is a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

1.    *BlueRibbon Plaintiffs Waived Any Argument that the Minimization Criteria Violate FLPMA.*

As an initial matter, BlueRibbon waived its argument that the minimization criteria regulations violate FLPMA because BlueRibbon did not plead the allegation in its Complaint. *See generally* BlueRibbon Compl. (ECF No. 1); *cf. Hayes v. Whitman*, 264 F.3d 1017, 1025 (10th Cir. 2001) ("[A] court may not consider allegations or theories that are inconsistent with those pleaded in the complaint"). Despite claiming that BLM applied the wrong legal standard when determining route closures, *see* BlueRibbon Br. 14 ("The Plan is Arbitrary and Capricious Because it Applies a Legal Standard That Ignores the Controlling Statute"), section III.A of BlueRibbon's Opening Brief actually argues that the minimization criteria regulation itself, 43 C.F.R. § 8342.1, violates FLPMA. BlueRibbon Br. 15 (stating that the minimization criteria

17

"overemphasizes certain congressional directives while completely ignoring others. Indeed, the [minimization] criteria treat outdoor recreation as a harm to be protected against…rather than a good to be sought in public management, despite express congressional instruction to the contrary.") And, consequently, the Labyrinth/Gemini Bridges TMP is arbitrary and capricious because it is "consistent with the [minimization criteria]." *Id.* at 16.

BlueRibbon's Complaint neither alleges that the minimization criteria regulation itself is arbitrary and capricious because it violates FLPMA, nor that the TMP is arbitrary and capricious because BLM used the minimization criteria to discern which routes should be opened or closed. *See* BlueRibbon Compl. ¶¶ 85-97 (Count III generally alleges arbitrary and capricious agency action but makes no mention of the minimization criteria or FLPMA). Indeed, BlueRibbon's only reference to the minimization criteria in its Complaint is in passing to summarize its (incorrect) assertion that the <u>Dingell Act</u> prohibits use of the minimization criteria. *See id.* ¶ 84 ("[T]he plain language of the Dingell Act trumps the 'minimization criteria' the DR claims to have used to close these routes [along the Green River]. *See* 43 C.F.R. 8342.1(c)"). Because BlueRibbon did not include any cause of action alleging that (1) the minimization criteria regulation itself, or (2) the TMP's reliance on the minimization criteria in addition to FLPMA is arbitrary and capricious, the Court should not consider this argument.

> 2.  *The Labyrinth/Gemini Bridges TMP properly adheres to both FLPMA and the minimization criteria.*

Nonetheless, even if the Court determines this argument is not waived, BlueRibbon has not shown that BLM's consideration and application of the minimization criteria in the Labyrinth/Gemini Bridges TMP is arbitrary and capricious. As noted above, BlueRibbon argues—without any support—that the minimization criteria regulation is inconsistent with

FLPMA because "outdoor recreation is given zero value." BlueRibbon Br. 15-16. But BlueRibbon's arguments display a misunderstanding of the interplay between FLPMA, Executive Order 11644, and BLM's minimization criteria regulation, 43 C.F.R. § 8342.1.

Congress enacted FLPMA, the primary statute governing BLM, for a wide variety of purposes and to provide high-level mandates and guidance regarding BLM-managed lands. *See generally* 43 U.S.C. § 1701; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (describing FLPMA's sweeping multiple use mandate). Relevant here, FLPMA directs BLM to manage public lands

> in a manner that will <u>protect</u> the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, <u>will preserve and protect certain public lands in their natural condition;</u> that will provide food and habitat for fish and wildlife and domestic animals; and <u>that will provide for outdoor recreation and human occupancy and use.</u>

43 U.S.C. § 1701(a)(8) (emphasis added). Thus, FLPMA inherently requires that BLM balance the protection of natural, scenic, and cultural/historic/scientific resources with outdoor recreation opportunities. *See Norton*, 542 U.S. at 58 ("'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'") (quoting 43 U.S.C. § 1702(c)). FLPMA does not define "outdoor recreation" at all, nor does it suggest that BLM must prioritize motorized recreation over non-motorized recreation.[7]

---

[7] Throughout its brief, BlueRibbon repeatedly conflates "outdoor recreation" and "motorized recreation" by implying that motorized recreation is the only form of recreation BLM needs to

The minimization criteria regulation, on the other hand, is narrowly-focused on regulating off-road vehicle recreation. 43 C.F.R. § 8342.1. Although it was primarily promulgated to implement the directives in Executive Order 11644, Off-Road Vehicles; Use of Public Lands, 44 Fed. Reg. 34,834 (June 15, 1979) (explaining that the rulemaking, now codified at 43 C.F.R. Part 8340, was promulgated in response to Executive Order 11644, as amended by Executive Order 11989), the regulation adheres to FLPMA's general directive to protect natural, scenic, and cultural/historic/scientific resources while providing for recreation. *Compare* 43 U.S.C. § 1701(a)(8) (public lands are to be managed "in a manner that will <u>protect</u> the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values…and that will provide for outdoor recreation . . .") *with* 43 C.F.R. § 8342.1 ("All designations shall be based on the <u>protection</u> of the resources of the public lands") *and id.* § 8342.1(a) ("Areas and trails shall be located to <u>minimize damage</u> to soil, watershed, vegetation, air, or other resources of the public lands"). Thus, rather than conflict with FLPMA, as BlueRibbon argues, the minimization criteria regulation complements FLPMA's broad directives and applies them to a specific use on BLM-managed lands. *See Utah Shared Access All.*, 463 F.3d at 1130, 1136 (observing that 43 C.F.R. § 8342.1 was promulgated in part to implement

---

account for. For example, BlueRibbon states that "[o]utdoor recreation is nowhere to be found" in the minimization criteria. BlueRibbon Br. at 15. But the minimization criteria regulation clearly acknowledges the various forms of recreation by stating that BLM must locate areas and trails "to minimize conflicts between off-road vehicle use [*i.e.*, motorized recreation] and other existing or proposed recreational uses [*i.e.*, any other form of recreation]." 43 C.F.R. § 8342.1(c). As BLM explains, there is no support for this conflation and BlueRibbon offers none. *See* BLM Br. 21-22. Similarly, BlueRibbon asserts that "Congress, through the FLPMA" has mandated that public lands be made available" for "challenging and difficult" motorized recreation opportunities. BlueRibbon Br. at 18. But again, FLPMA contains no mandate directing BLM to allow <u>motorized</u> recreation.

FLPMA and holding that applying the minimation criteria "is a lawful discharge of the BLM's duty…to prevent undue degradation of resources").

For the foregoing reasons, the minimization criteria do not conflict with FLPMA and it was not arbitrary and capricious for BLM to utilize the criteria (as it must) when deciding which routes should be opened or closed to motorized vehicles.

3.    *BLM properly exercised its discretion when designating routes.*

BlueRibbon next argues that the Labyrinth/Gemini Bridges TMP DR is arbitrary and capricious because BLM closed routes for factors not expressly identified in FLPMA. BlueRibbon Br. 16. Specifically, BlueRibbon takes issue with justifications it labels as "administrative" or "user convenience" such as closures of reclaiming routes, low-use routes, redundant routes, and routes to protect cultural resources. *Id.* These arguments should be rejected.

*First*, BlueRibbon alleges that BLM's so-called "administrative convenience" justifications are arbitrary and capricious because those "factors are nowhere to be found in the FLPMA." *Id.* at 17. What BlueRibbon fails to recognize, however, is that each of these justifications—to prevent off-road travel (*e.g.*, to prevent damage to soils or vegetation, among other reasons), to protect cultural resources, or because the route is rarely used and/or is reclaiming naturally—protect the surrounding environment and minimize adverse impacts from motorized vehicles. Even if BLM did not expressly label a particular closure as necessary to minimize impacts, the net result of the decision reaches the same goal. For example, extending the closure of a currently "closed" route will minimize damage to soils, vegetation and wildlife; even if BLM does not expressly use the word "minimize," the result is the same. Further,

21

FLPMA mandates that BLM "take any action necessary to prevent unnecessary or undue degradation." 43 U.S.C. § 1732(b). BLM is thus afforded significant discretion in making management decisions to arrive at that result. And, as explained above, BLM must manage lands to "protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition." *Id.* § 1701(a)(8) (emphasis added).

*Second*, BlueRibbon claims, without any evidence, that what it labels "administrative convenience" justifications are "not adequately explained, nor based on actual evidence."[8] BlueRibbon Br. 17. The administrative record proves otherwise. LGB042098 (closing D1833 to minimize impacts to cultural resources); LGB028915 (route report for D1833 explaining that continued use of the route may impact cultural resources); LGB042178 ("D3565 is a very low use trail that is reclaiming naturally"); LGB031311 (route report explaining that closing D3565 would allow for natural reclamation and may contribute to "retaining or restoring vegetation and soil cover"). BlueRibbon takes particular issue with routes closed for low use, claiming that "[t]he fact that a few people use a trail is not a reason to close it." *See* BlueRibbon Br. 18. But again, this argument ignores the facts. Such routes were not closed solely due to low use and BlueRibbon fails to consider that infrequent use supports natural reclamation which, in turn, restores soils, vegetation, and wildlife habitat—resource values BLM is charged with protecting under FLPMA. 43 U.S.C. §§ 1701(a)(8), 1732(b); *see, e.g.*, LGB042156 (explaining that D2782 receives low use and was also closed to protect an ephemeral stream and pronghorn fawning

---

[8] As BLM points out, because BlueRibbon has not provided any support for this claim, it has not met its burden to prove the closure justifications are arbitrary and capricious. BLM Br. 25.

habitat); LGB042158 (stating that D2846B receives low use and that closing the route "will contribute to restoring and retaining soil and vegetation cover, minimizing the potential for soil erosion" as well as minimize wildlife habitat impacts); LGB042178 (explaining that "D3565 is a very low use trail that is reclaiming naturally." Thus closing D3565 will "contribute to retaining vegetation and soil cover").

*Third*, BlueRibbon argues that it was arbitrary for BLM to close routes based on visual resources objectives, taking specific issue with routes D3811, D3810, D1312, and D1652. BlueRibbon Br. 21. This argument is flawed for two reasons. *First*, BLM did not close these routes to reduce visual contrast, it closed the routes because none of them "access a destination with any recreation value." LGB042179 (rationales for D3811 and D3810); LGB042059 ("D1312 does not have a purpose and need for the OHV public because, among other reasons, the route does not lead to a known destination or recreation opportunity"); LGB042088 (D1652 "is used to access an oil and gas facility. It accesses nothing of recreation value and is not a recreation asset"); *see also* BLM Br. 27. In each instance, the respective closure rationales simply recognize that, as an added benefit, closing the route will reduce visual contrast. *See* LGB042179; LGB042059; LGB042088. BlueRibbon's argument conveniently declines to contextualize BLM's references to visual contrast. *Second*, by stating that BLM "contradicts the 2008 RMP" by closing routes in Visual Resource Management (VRM) Class III areas, BlueRibbon Br. 21, BlueRibbon ignores the operative language describing Class III VRM: "Management activities <u>may</u> attract attention but should not dominate the view of the casual observer." LGB038662 (emphasis added). Nowhere does it say BLM <u>must</u> allow activities that attract attention. Consequently, argument also fails.

23

*Finally*, BlueRibbon argues that it is arbitrary for BLM to close redundant routes because "FLPMA and the BLM handbook do not give any concrete directives for the need for closing redundant routes." BlueRibbon Br. 21-22. But again, BlueRibbon fails to recognize that FLPMA grants BLM significant discretion in how to manage its lands, so long as such decisions are consistent with FLPMA's mandates to prevent unnecessary and undue degradation, protect environmental values, and preserve lands in their natural condition. *See* 43 U.S.C. §§ 1701(a)(8), 1732(b). Moreover, "unnecessary" is the very definition of "redundant" and thus, closing redundant routes falls neatly within BLM's obligation to prevent "unnecessary or undue degradation." *See Redundant*, *Black's Law Dictionary* (2d ed.) ("that which goes beyond what is natural or ordinarily necessary"); *Redundant*, *Burton's Legal Thesaurus* (6th ed.) (stating that "unnecessary" is a synonym for "redundant").

The logical gap in BlueRibbon's reasoning is illustrated by their very own example claiming that because closed route D1248 has soil impacts and is redundant with route B340, then B340 should have also been (but was not) closed for soil impacts. *Id.* at 22; *see also* LGB042201-02 (open rationale for all maintained and "heavily used" roads, including B340). Route B340 does not have soil impacts from OHV use because it is "well maintained and heavily used." LGB042201; *see also* LGB042386 (defining a Class B road as one that is "maintained regularly by the County") (citing Utah Code § 72-3-103). D1248, on the other hand, is an old service route that is rarely, if ever, maintained. *See* LGB027604. Thus, BlueRibbon's example does not highlight arbitrary or capricious agency action, but rather rational decision-making wherein BLM decided to close one route that it determined had unnecessary soil impacts, while allowing motorized use on a nearby route to continue where it does not lead to similar impacts

24

because of frequent use and maintenance.

4.    *The rationales for specific route closures are reasonable and supported by the record.*

BlueRibbon also takes issue with specific route closure rationales that it concedes, as it must, are based on statutory factors found in FLPMA. *See* BlueRibbon Br. 22-38. BlueRibbon claims that it was arbitrary and capricious for BLM to close certain routes to protect soils and vegetation, reduce user conflicts, protect bighorn sheep, and minimize habitat fragmentation. *Id.* But like the others, this argument is refuted by a plain reading of BLM's regulations and the fact that a mere difference of opinion does not meet BlueRibbon's heavy burden.

SUWA adopts BLM's arguments regarding user conflicts, bighorn sheep, and habitat fragmentation. *See* BLM Br. 31-36. With regard to soils and vegetation, much of BlueRibbon's argument is focused on the "lack" of damage documented in the baseline and interim monitoring reports required by the Settlement Agreement. *See id.* at 23-26. But, as BLM correctly points out, those reports were limited to routes within identified Lands with Wilderness Characteristics, a mere four percent of the total TMA route mileage. BLM Br. 30. Thus, BlueRibbons's soils and vegetation argument misses the mark.

**C.    The Labyrinth/Gemini Bridges EA Satisfies NEPA.**

BlueRibbon likewise fails to meet its burden to prove that BLM violated NEPA when it decided not to prepare an environmental impact statement (EIS). NEPA achieves its purpose through "a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences." *Robertson*, 490 U.S. at 350 (citation omitted). The statute requires that all federal agencies prepare "a detailed statement" for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Known

as an EIS, this statement must "rigorously explore and objectively evaluate all reasonable alternatives," including the no action alternative; analyze all direct, indirect, and cumulative environmental impacts; and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14, 1502.16 (2023); *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1251 (10th Cir. 2019).

If it is unclear whether the proposed action will significantly affect the environment, the agency may first prepare an EA. *Conner*, 920 F.3d at 1251. An EA is "a concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.1(h) (2023). "If the EA concludes that the proposed action will have no significant effect on the environment, the agency may issue a FONSI and move forward with the proposed action. Otherwise, the agency must prepare an EIS." *Conner*, 920 F.3d at 1251 (internal quotation marks and citations omitted); *see also* 40 C.F.R. § 1501.6(a) (2023). As BLM notes, an agency's decision to rely on an EA and FONSI "is a factual determination which implicates agency expertise and, accordingly, is reviewed under the deferential arbitrary and capricious standard of review." BLM Br. 38 (quoting *Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002)) (additional citation omitted).

BlueRibbon asserts that BLM was required to analyze the TMP's environmental impacts in an EIS rather than an EA, and that BLM's failure to do so violated NEPA's "hard look" standard. *See* BlueRibbon Br. 38-42. However, this argument fails for two reasons: (1) BlueRibbon fundamentally misunderstands the difference between NEPA's "hard look" and "significant effect" standards, and (2) BlueRibbon has not met its burden to prove the

Labyrinth/Gemini BridgesTMP may significantly impact the environment.

        *1.      BlueRibbon improperly conflates NEPA's "hard look" and "significant effect" standards.*

      Although NEPA's "hard look" and "significant effect" standards are both integral to the statute's objective of ensuring informed and transparent decision-making regarding environmental impacts, they serve different purposes. The "hard look" requirement mandates that federal agencies thoroughly examine the environmental consequences of their proposed actions. *Robertson*, 490 U.S. at 349. This involves an analysis of the potential direct, indirect, and cumulative impacts of the action, as well as consideration of reasonable alternatives. *Ctr. for Biological Diversity v. United States Dep't of the Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023). When reviewing agency actions under NEPA, courts consider whether the agency has taken this "hard look" by deciding whether the agency has adequately "disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97-98 (1983); *Conner*, 920 F.3d at 1257 (an agency has taken a hard look when "its method of analyzing environmental effects 'had a rational basis and took into consideration the relevant factors.'" (quoting *Utah Shared Access All.*, 288 F.3d at 1212-13)). In short, the "hard look" standard pertains to the thoroughness and reasonableness of the agency's environmental review process.

      On the other hand, the "significant effects" standard (*i.e.*, the requirement to issue an EIS) is specifically tied to the substantive outcomes of the agency's decision. That is, the degree and significance of the action's environmental impacts. *Ctr. for Biological Diversity*, 72 F.4th at 1187-88 ("An agency may issue a FONSI only if, after reviewing the direct and indirect effects of a proposed action, it concludes that the action will not have a significant effect on the human

environment….The significance of an impact is determined by the action's context and its intensity.") (internal citations and quotation marks omitted). The caselaw has many examples of federal courts concluding that an agency has taken a hard look at the environmental consequences of a particular action while at the same time concluding that an EIS was not warranted because the action will not significantly affect the environment. *See, e.g.*, *id.* at 1184, 1185, 1190 (holding that the Bureau of Reclamation's EA took a hard look at environmental impacts, and it's FONSI and decision not to issue an EIS was not arbitrary and capricious); *Conner*, 920 F.3d at 1257, 1261, 1262, 1264 (same for EA issued by the U.S. Fish and Wildlife Service); *Hillsdale Env't. Loss Prevention, Inc. v. United States Army Corps of Eng'rs*, 702 F.3d 1156, 1162 (10th Cir. 2012) (same for EA issued by the U.S. Army Corps of Engineers).

BlueRibbon argues that BLM "neglected its duty to take a 'hard look' by failing to create an [EIS] in violation of [NEPA]." BlueRibbon Br. 39. According to BlueRibbon, BLM erred in issuing the Labyrinth/Gemini Bridges FONSI because the EA does not "sufficiently explain the [TMP's] impact on recreation or the human environment," instead "merely mention[ing] recreation in passing."[9] *Id.* at 41. But this argument confuses NEPA's "hard look" and "significant effect" requirements and improperly collapses the two distinct requirements into one. BLM was not required to prepare an EIS merely on the grounds that the Labyrinth/Gemini Bridges EA did not analyze recreation impacts to a degree BlueRibbon deems satisfactory.

---

[9]To the extent these statements suggest the Labyrinth/Gemini Bridges EA failed to take a hard look at recreation, this argument is waived as BlueRibbon did not plead it in its Complaint. *See* BlueRibbon Compl. ¶¶ 98-106 (BlueRibbon's only NEPA cause of action, Count IV, merely alleges that BLM should have issued an EIS); *cf. Hayes*, 264 F.3d at 1025. Moreover, BlueRibbon provides no support for these statements and in fact, the record proves otherwise. Recreation is analyzed in detail in section 3.2.11 of the EA. LGB042303-09.

2.    *BlueRibbon has not proven that the Labyrinth/Gemini Bridges TMP would have a significant effect on the environment.*

As explained above, an EIS is required if a major federal action may have a significant effect on the environment. 42 U.S.C. § 4332(2)(C); *Ctr. for Biological Diversity*, 72 F.4th at 1188. "The significance of an impact is determined by the action's context and its intensity." *Id.* (citation omitted); *see also* 40 C.F.R. § 1501.3(b) (2023) ("In considering whether the effects of the proposed action are significant, agencies shall analyze the potentially affected environment and degree of the effects of the action"). "The decision not to prepare an EIS is only improper if the [plaintiffs] can demonstrate substantively that the agency's conclusion of non-significant effect on the environment represents a clear error of judgment." *Ctr. for Biological Diversity*, 72 F.4th at 1188-89.

Despite citing a litany of (non-precedential) caselaw, BlueRibbon provides no explanation or evidence demonstrating <u>how</u> BLM's reasoning in the Labyrinth/Gemini Bridges FONSI is improper. *See* BlueRibbon Br. 39-41 (quoting only caselaw and containing no analysis). Indeed, BlueRibbon cites to the FONSI only once to point out that recreation is mentioned "in passing." *Id.* at 41. Indeed, it does not even attempt to grapple with the reasoning set forth in the FONSI, *see generally* LGB042660-74 (tables of resource-specific effects analysis and significance conclusions, including recreation), let alone show how BLM erred in its ultimate conclusion that an EIS was unnecessary. Consequently, BlueRibbon has not substantively demonstrated how the FONSI "represents a clear error of judgment" such that an EIS was warranted. *Ctr. for Biological Diversity*, 72 F.4th at 1188-89.

In conclusion, BlueRibbon's NEPA argument is both premised on a faulty understanding of the statute and a lack of any evidentiary support. BlueRibbon has thus not met its burden of

proof and the Court should reject this argument.

## II.    The State Fails to Prove the Labyrinth/Gemini Bridges TMP Violates Federal Law.

Like BlueRibbon, the State[10] has failed to demonstrate that BLM's Labyrinth/Gemini Bridges TMP decision is arbitrary, capricious or otherwise not in accordance with the law. As BLM highlights in its response brief, the State's arguments lack both legal and record support. The State falls far short of its burden to prove unlawful agency action.

### A.    BLM's Closure of Claimed R.S. 2477 Roads Was Not Arbitrary, Capricious, or an Abuse of Discretion.

As explained above, an agency action is not arbitrary and capricious if there is (1) a reasoned basis for the decision, (2) substantial evidence in the record to support it, and (3) "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43-44; *Olenhouse*, 42 F.3d at 1574-75. "[D]etermining whether an agency action is arbitrary and capricious is generally the same as determining whether it was an abuse of discretion." *Wyoming v. U.S. Dep't of the Interior*, 22-cv-247-SWS, 2024 U.S. Dist. LEXIS 235015, *15 (D. Wyo. Dec. 31, 2024); *cf. Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1227 (10th Cir. 2011) (characterizing an "abuse of discretion" as "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment").

The State first argues that the Labyrinth/Gemini Bridges TMP's closure of claimed (but not adjudicated) R.S. 2477 rights-of-way[11] is arbitrary and capricious because the TMP "failed to

---

[10] References to the State include the Public Lands Policy Coordinating Office (PLPCO) as well as SITLA. The State has brought the case on behalf of both state entities. *See generally* State Am. Compl. (ECF No. 70).

[11] These claims, among others, are the subject of *Grand County v. United States of America*, 2:12-cv-00466-CW (D. Utah), which is a Quiet Title Act lawsuit that is currently stayed pending the ongoing R.S. 2477 bellwether process. State Br. 19.

properly consider the effects which the road closures will have on the human environment." Pl. State of Utah Opening Br. 28 (ECF No. 76) (State Br.). However, as BLM pointed out, the State appears to be attempting to bring a NEPA claim without actually making reference to NEPA or pleading such a claim. BLM Br. 41. Thus, this argument is waived. *Id.*; *cf. Hayes*, 264 F.3d at 1025.

Next, the State claims BLM abused its discretion in issuing the Labyrinth/Gemini Bridges TMP for two reasons: (1) BLM "refused to adopt an administrative process that would validate the States' [sic] rights of way under R.S. 2477,"[12] and (2) the closures "interfere with the State's ability to collect evidence" for its pending Quiet Title action. State Br. 29-30. Both arguments are without merit.

The State provides no legal or factual support for these arguments, which, fundamentally, means it does not meet its burden to prove BLM acted arbitrarily and capriciously or abused its discretion. *See* State Br. 29-30 (providing no citations to legal authorities or the administrative record). Moreover, there is ample evidence contradicting the State's arguments and demonstrating BLM acted rationally in deciding to close certain claimed R.S. 2477 rights-of-way.

For instance, as this Court has held, BLM is not required to administratively determine whether R.S. 2477 claims are valid prior to adopting a travel management plan. *Williams v. Bankert*, No. 2:05-cv-503-DAK, 2007 WL 3053293, *6-7 (D. Utah Oct. 18, 2007); *see also*

---

[12] This argument is also waived because it was not pled in the State's First Amended Complaint. *See* State Amend. Compl., ¶¶ 118-133 (factual allegations pertaining to R.S. 2477 and discussing only evidentiary concerns), 174-180 (First Cause of Action alleging only that the TMP interferes with the State's discovery process for its Quiet Title Act litigation); *cf. Hayes*, 264 F.3d at 1025.

*Kane Cnty. v. Salazar*, 562 F.3d 1077, 1086 (10th Cir. 2009) (rejecting Kane County's argument that the BLM must administratively determine the County's R.S. 2477 rights prior to closing a claimed R.S. 2477 right-of-way in order to avoid "diminishing or reducing any right-of-way"). Throughout the travel planning process, BLM has been clear that the TMP "has no effect on any legal rights relating to asserted R.S. 2477 rights-of-way.... At such time as administrative or judicial determinations are made acknowledging or adjudicating asserted R.S. 2477 rights-of-ways, the BLM will adjust its TMP accordingly." LGB042229; LGB042018 (same).

Similarly, BLM's closure decisions in the TMP do not apply to existing (or future) authorized uses. LGB042228; LGB042018 (same). Although not expressly identified as an "authorized use," BLM has been treating the State's requests to drive closed routes for discovery purposes as such. As the State notes, it now must seek permission from BLM prior to driving a closed route with a potential witness. State Br. 19. However, the State neglects to mention that (1) BLM has accommodated the State's discovery requests, thereby authorizing the State to drive routes otherwise closed to public use, *see* BLM Br. 42-43, and (2) this is the discovery process contemplated by the Federal Rules of Civil Procedure, *see* Fed. R. Civ. P. 34(a)(2).

In sum, the Labyrinth/Gemini Bridges TMP is not arbitrary and capricious, nor an abuse of discretion, with regard to the State's ongoing Quiet Title Act litigation and claimed R.S. 2477 rights of way.

### B.    The Labyrinth/Gemini Bridges TMP is Consistent with FLPMA.

The State raises two arguments alleging the Labyrinth/Gemini Bridges TMP violates FLPMA. *First*, the State claims, incorrectly, that the TMP is a land use plan subject to a governor's consistency review. State Br. 31-32. *Second*, the State alleges the TMP violates

FLPMA's multiple use and sustained yield mandates. *Id.* at 32-33. Each argument fails due to both a fundamental misunderstanding of FLPMA and a complete lack of evidentiary support.[13]

> 1. *The TMP is not a land use plan subject to FLPMA's governor's consistency review provisions.*

FLPMA requires that BLM develop land use plans to govern the management of public lands. *Burke*, 981 F. Supp. 2d at 1102 (citing 43 U.S.C. § 1712(a)). Land use plans are broad, high-level documents that consist of a variety of management decisions that, *inter alia*, "establish areas for limited, restricted, or exclusive use;" articulate allowable resource uses; set "resource condition goals and objectives;" and identify pertinent management practices. 43 C.F.R. § 1601.0-5(n) (defining a resource management plan as a "land use plan as described by [FLPMA]" and articulating the general components of a resource management plan). Likewise, BLM's Travel and Transportation Handbook defines a "land use plan" as

> A set of decisions contained in Resource Management Plans that establish management direction for land within an administrative area, as prescribed under the planning provisions of FLPMA, an assimilation of land use plan level decisions developed through the planning process outlined in 43 CFR 1600, regardless of the scale at which the decisions were developed. The [land use plan] addresses resource management and includes a defined travel management system of areas, roads, primitive roads, and trails.

LGB040058. In short, a land use plan is synonymous with a resource management plan.

The resource-specific management decisions in a land use plan are often put into effect via a series of step-down implementation plans. BLM's Travel and Transportation Handbook further defines an "implementation plan" as a

> site-specific plan written to implement decisions made in a [land use

---

[13] The State does not provide a single citation to the record to support either of its FLPMA arguments. *See* State Br. 31-33.

> plan]. An implementation plan usually selects and applies best management practices to meet land use plan objectives…. Examples of implementation plans include interdisciplinary management plans, <u>travel management plans</u>, habitat management plans, recreation area management plans, and allotment management plans.

*Id.* (emphasis added). In other words, an implementation plan, such as a travel management plan, is a resource-specific plan that fits under the umbrella of the land use plan.

Relevant here, FLPMA provides that "[p]rior to the approval of a proposed <u>resource management plan</u>…the [BLM] State Director shall submit to the Governor of the State(s) involved, the proposed plan or amendment and shall identify any known inconsistencies with State or local plans, policies or programs." 43 C.F.R. § 1610.3-2(e) (emphasis added). Importantly, this process, known as a "governor's consistency review," expressly applies to <u>resource management plans, management framework plans and proposed amendments to these plans</u>, but makes no reference to <u>implementation-level</u> plans, which BLM has defined as distinct from one another. LGB040058. Thus, a plain reading of the governor's consistency review regulation, supports the notion that a travel management plan, which is <u>not</u> a resource management plan, is not subject to that requirement.

Nonetheless, the State argues—without citation—that "BLM has not justified its reasoning that travel management plans are merely 'implementation level decisions' that do not fall under the auspices of FLPMA land use plans." State Br. 32. This statement ignores the relationship between resource management plans and travel management plans, as well as the definitions provided in Travel and Transportation Handbook. *See* LGB040058; *see also* 43 C.F.R. § 1610.5-3(a) ("all future resource management authorizations and actions . . . shall

conform to the approved [resource management] plan").[14] In short, the State's argument is

entirely without merit and fails.

> 2.    *The Labyrinth/Gemini Bridges TMP comports with the principles of multiple use and sustained yield.*

FLPMA directs BLM to manage public lands according to the "principles of multiple use

and sustained yield." 43 U.S.C. § 1732(a). As the Supreme Court has observed,

> '[m]ultiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put, 'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'

*Norton*, 542 U.S. at 58 (citations omitted).

The State makes two glaringly inaccurate statements in its argument that the

Labyrinth/Gemini Bridges TMP violates FLPMA's multiple use mandate. *First*, it alleges,

without any evidence, that the Labyrinth/Gemini Bridges DR "considered conservation

exclusively, failing to take into account livestock grazing, wildlife management, motorized

recreation and travel[15] and other uses." State Br. 33 (emphasis added). The record squarely

refutes this claim. BLM considered livestock grazing, wildlife management, and recreation in

---

[14] "The designation of the individual roads, primitive roads and trails…are addressed as an implementation level plan tiered from the [resource management plan]." LGB040030 (emphasis added). As such, a travel management plan must be consistent with a resource management plan that was submitted for a governor's consistency review.

[15] On its face, it makes no sense that a travel management plan implemented to delineate and provide opportunities for motorized recreation somehow "fail[ed] entirely to take into account…motorized recreation." State Br. 33; *see* LGB042216 ("The Labyrinth/Gemini Bridges [TMP] will designate a comprehensive travel network of motorized routes and trails, and provide for the long-term operation, monitoring, and maintenance of the network within the Labyrinth/Gemini Bridges [TMA].").

both the EA and its route-specific decision rationales. *See* LGB042277-303 (EA wildlife analyses); LGB042303-09 (EA recreation analysis); LGB042339 (explaining how BLM considered impacts to livestock grazing, ultimately concluding that detailed analysis was not warranted because "[p]ermittee access to range improvements would be authorized under any alternative and access would be maintained as authorized use"); BLM Br. 48-49 (citing many examples of how BLM "considered an array of multiple uses in making individual route designations").

*Second*, the State broadly asserts that "[k]eeping routes open helps accomplish the goal of 'minimization of conflicts among various uses of the public lands.'" State Br. 33 (quoting 43 C.F.R. § 8342.1). But this ignores a core component of multiple use management: BLM must also take into account conservation and other uses "serving natural scenic, scientific and historical values." *Norton*, 542 U.S. at 58 (cleaned up); 43 U.S.C. § 1701(a)(8). The record is clear that in some instances keeping a route open would in fact <u>increase</u> conflict with conservation-oriented land uses such as wildlife habitat, riparian habitat, and cultural resources protection. *See, e.g.*, LGB042033 (closing D002 in part to protect bighorn sheep habitat); LGB042075 (closing D1526B. D1527A, and D1527B in part to minimize impacts to riparian habitat, bighorn sheep and migratory bird habitat, and to reduce habitat fragmentation); LGB042098 (closing D1833 to minimize impacts to cultural resources and bighorn sheep and raptor habitat; closing D1838 to minimize potential soil erosion and enhance wildlife movement through bighorn sheep lambing habitat). This is so even though BLM found that keeping over 810 miles of routes open would <u>not</u> conflict with conservation-based land uses. LGB042016.

Therefore, rather than violate FLPMA, the Labyrinth/Gemini Bridges TMP is a textbook

example of BLM balancing the multiple uses within the Labyrinth/Gemini Bridges TMA.

      **C.**      **The State Did Not Raise a Dingell Act Claim.**

The State further argues that BLM violated the Dingell Act by establishing a "wilderness buffer" and closing routes near the congressionally-designated "Scenic River" segment of the Green River. State. Br. 33-35. But, the State never raised this claim in its Amended Complaint and cannot now do so now for the first time in its merits briefing.

The Federal Rules of Civil Procedure require that a Complaint to include a "short and plain statement" of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a); *see also Zokari v. Gates*, 561 F.3d 1076, 1084 (10th Cir. 2009) ("[A] complaint must 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

The State did not plead a claim related to the Dingell Act in its Amended Complaint. *See generally* State Am. Compl. The term "Dingell Act" is not mentioned <u>at all</u> in the State's Amended Complaint; nor did the State cite to the Dingell Act. *See generally id.* Instead, the State alleged that BLM created "de facto wilderness" by closing 317 miles of roads in the plan. *Id.* ¶¶ 205-213; *see also* State Br. 5-6 (claiming that "BLM violated FLMPA and other federal statutes by implementing *de facto* wilderness management on non-Wilderness Study Area . . . and non-Wilderness lands"). This is an entirely different (and entirely unfounded) claim that the State ultimately did not argue in its Opening Brief. *See* State Br. 27-40 (stating on page 27 that "BLM established de facto wilderness management within portions of the Labyrinth/Gemini Bridges TMA" but failing to actually provide any argument on this assertion). By failing to plead the Dingell Act claim in its Amended Complaint and failing to argue its de facto wilderness claim,

the State has waived both claims. *Cf. Hayes*, 264 F.3d at 1025.

Even if the Court decides to consider the State's Dingell Act claim, the State's arguments nevertheless fail because (1) BLM did not create a wilderness buffer; (2) BLM properly considered noise and visual impacts within the TMA; and (3) nothing in the Dingell Act requires BLM to allow public motorized use on existing routes near the Green River. *See supra* § I.A; BLM Br. 49-51.

### D.    BLM Did Not Violate the National Historic Preservation Act.

The State also alleges that BLM violated the NHPA by failing to "take any action to evaluate R.S. 2477 roads for National Register of Historic Places eligibility and assess effects to these roads eligible for National Register inclusion," as requested by Utah's Public Lands Policy Coordinating Office (PLPCO). State Br. 37. The record does not support the State's argument.

The NHPA's Section 106 regulations outline the requirements with which federal agencies must comply with to "take into account" an undertaking's impacts on archaeological resources. *See* 36 C.F.R. § 800.1. These requirements include, "[d]etermin[ing] and document[ing] the area of potential effects," making a "reasonable and good faith effort" to "identify historic properties within the area of potential effects," and assessing potential adverse effects to historic properties.[16] 36 C.F.R. §§ 800.4; 800.5. Federal agencies must consult with the relevant State Historic Preservation Office (SHPO) and consulting parties at each stage of the Section 106 process. *Id.* § 800.2(a)(4); *see also id.* § 800.2(c) (detailing "consulting parties").

---

[16] An historic property is "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places." 36 C.F.R. § 800.16(l)(1).

Federal agencies may also "develop [alternate] procedures to implement Section 106" as long as those alternate procedures are consistent with Section 106 regulations. *Id.* § 800.14; *see also Diné Citizens Against Ruining Our Env't (Diné CARE) v. Bernhardt*, 923 F.3d 381, 846 (10th Cir. 2019). "Compliance with the procedures established by an approved programmatic agreement satisfies the agency's section 106 responsibilities" for undertakings covered by the agreement. 36 C.F.R. § 800.14(b)(2)(iii).

Here, BLM's Utah State Office developed and entered into a programmatic agreement to govern the implementation of the Section 106 process for BLM-Utah's travel and transportation management undertakings. *See Id.* § 800.14(b); BLM Br. Ex. 1 (Travel Plan Programmatic Agreement or "Travel Plan PA").[17] BLM, the Utah SHPO and the Advisory Council on Historic Preservation are signatories on that programmatic agreement. Accordingly, that programmatic agreement directs how BLM complies with the NHPA in the travel planning process.

Under the Travel Plan PA, BLM must undertake many of the same steps as those outlined in the Section 106 regulations, with some specific procedures to address issues particular to the travel planning process. *See generally* Travel Plan PA. Generally, BLM must (1) identify the area of potential effect of a given travel plan; (2) identify historic properties within that area of potential effect by developing a "literature review" and conducting on-the-ground cultural resource inventories in areas with an identified high potential for cultural resources; and (3) assess whether identified historic properties may be adversely affected by BLM's travel planning decision. *See id.* §§ III, IV. If historic properties may be affected by BLM's decision, the agency

---

[17] The Travel Plan Programmatic Agreement is not bate stamped as part of the Administrative Record. Therefore, SUWA cites to the document itself.

must prepare an "Historic Properties Treatment Plan" to "develop and evaluate modifications to the undertaking that would avoid, minimize, or mitigate adverse effects to historic properties." *Id.* § V. In accordance with the Travel Plan PA, completing and implementing a historic properties treatment plan resolves adverse effects to historic properties and "evidence[s] BLM-Utah's compliance with the Section 106 process for [travel planning] undertakings." *Id.*

The Travel Plan PA also details the required outreach and multi-step consultation BLM must conduct with both the SHPO[18] and consulting parties. Relevant here, BLM must invite consulting party and SHPO input when it determines the size of the area of potential effect, including seeking cultural resource site information and comments on whether to modify (*e.g.*, expand or reduce) the default area of potential effect for proposed route designations. Travel Plan PA § III.A.1.b. BLM must invite and seek consulting party and SHPO input regarding its determination of whether a travel plan may adversely affect historic properties. *See id.* § IV.D. If BLM determines that the travel plan may adversely affect historic properties and thus the agency will develop a historic properties treatment plan, then BLM also must provide consulting parties and the SHPO with 30 days to review and provide input on a draft treatment plan. *Id.* § V. After considering consulting party and SHPO input on a draft historic properties treatment plan, BLM must submit that plan, as well as a summary of consulting party comments to the SHPO for a 30-day review period. *Id.* BLM then makes the final determination regarding whether the historic properties treatment plan resolves the adverse effects, in consultation with SHPO. *Id.*

---

[18] The SHPO "reflects the interests of the State and its citizens in the preservation of their cultural heritage." 36 C.F.R. § 800.2(2)(c). It is a sub-agency of the State within the Department of Cultural and Community Engagement. Utah Code § 9-81-201.

Here, BLM complied with the Travel Plan PA and accordingly complied with the NHPA and its implementing regulations for this undertaking. As required by the programmatic agreement, BLM worked closely with the SHPO throughout the Labyrinth/Gemini Bridges travel planning process. *See, e.g.*, LGB008227-302; LGB008305-07; LGB008303-04. BLM also worked with other state entities, including PLPCO. BLM invited PLPCO to be a consulting party for the Labyrinth/Gemini Bridges TMP and PLPCO accepted that invitation. LGB010194-LGB010197; LGB010662. In 2021, BLM sought PLPCO's input regarding the "area of potential effect" for the Labyrinth/Gemini Bridges TMP. LGB010672-74. BLM also asked PLPCO for "any information you wish to share about cultural resources within the TMA." LGB010673.[19] PLPCO responded to BLM agreeing with the BLM's proposed area of potential effect for the travel plan. LGB010660-61. PLPCO did not provide any additional information regarding cultural resources within the TMA. *Id.*

In March 2023, BLM provided PLPCO with its proposed "finding of effect" for the Labyrinth/Gemini Bridges TMP, detailing BLM's efforts to identify historic properties and describing potential adverse effects to 13 historic properties. LGB007662-732. In April 2023, PLPCO responded and "encourag[ed]" BLM to use a web-based application to identify "historic

---

[19] While the State focuses on BLM's communication with PLPCO, it is important to note that BLM also consulted with SHPO at every stage of the travel planning process. *See, e.g.*, LGB008227-302 (providing to SHPO the draft finding of effect for the Labyrinth LGB008305-07 (sending to SHPO the draft historic properties treatment plan); LGB008303-04 (providing the final historic properties treatment plan to SHPO); LGB10666 (SHPO commending BLM for the "thorough and clear nature of the consultation" for the Labyrinth/Gemini Bridges TMP, concurring with BLM's determination that 36 cultural sites are eligible for listing on the National Register of Historic Places and agreeing with BLM's finding of "adverse effect").

transportation features" and suggested that BLM consider whether certain roads were historic properties. State Br. Ex. 13, at 2-3.

In May 2023, BLM sent to PLPCO BLM's draft historic properties treatment plan, seeking PLPCO's input on the plan. LGB010356-425. The historic properties treatment plan detailed the historic properties potentially affected by BLM's travel planning decision as well as BLM's proposed actions to avoid, minimize or mitigate potential adverse effects to those properties. *See* LGB010356-425; Travel Plan PA § V. In its June 2023 response, PLPCO stated that it "fully supports the BLM Moab Field Office's (FO) proposed treatments to minimize, mitigate, and monitor effects to historic properties" within the TMA. LGB010663. PLPCO encouraged BLM to consider increased site monitoring as an alternative to closing three routes. LGB010663-65. PLPCO concluded its letter by stating it "wholly supports the BLM Moab [field office's] proposed treatments to minimize, mitigate and monitor historic properties" and encouraged the agency to consider certain signing and increased monitoring at potentially affected historic properties. LGB010665. SHPO also weighed in on the draft historic properties treatment plan, calling it "an excellent plan for identified impacts" and noting that the SHPO finds the historic properties treatment plan to be "in excellent quality." LGB010667.

Consistent with the Travel Plan PA, BLM "made some minor adjustments to the [historic properties treatment plan]" in response to consulting party comments on that plan, summarized the comments it received on the draft historic properties treatment plan and submitted that summary, along with the final historic properties treatment plan to the SHPO for feedback. Travel Plan PA § V; LGB00803-04. In response, SHPO thanked the BLM for "the thoughtful consideration of comments received from [SHPO] and other consulting parties" and agreed with

42

BLM that "the revised [historic properties treatment plan] is sufficient to guide the next steps of this undertaking." LGB010668.

BLM's completion of the historic properties treatment plan, in consultation with the SHPO, ended the Section 106 process and "evidence[d] BLM-Utah's compliance with the Section 106 process" for the Labyrinth/Gemini Bridges TMP. Travel Plan PA § V; *see also Diné CARE*, 923 F.3d at 846 ("When a governing programmatic agreement is in place, compliance with the procedures in that agreement satisfies the agency's NHPA Section 106 responsibility for all covered undertakings.").

Because it complied with the alternative Section 106 procedures set forth in the Travel Plan programmatic agreement, BLM did not violate the NHPA.

      **E.**      **BLM's Closure of Claimed R.S. 2477 Rights-of-Way Does Not Violate Any Valid Existing Rights.**

Finally, the State claims that BLM violated the State's "valid existing rights" by closing 114 miles of claimed R.S. 2477 rights-of-way in the TMA to public motorized use. State Br. 27-40. To support its claim, the State points to an August 2024 ruling in *Kane County v. United States.*, 2:10-cv-01073.[20] State Br. 38-40. The *Kane County* rulings are inapplicable here and the State ignores Tenth Circuit caselaw and decisions from this Court that directly contradict its claims. *See* BLM Br. 58-60. Accordingly, its arguments fail.

As explained in BLM's brief, the *Kane County* rulings are easily distinguishable from this case. *First*, the rulings were issued in a lawsuit to finally adjudicate the State and County's

---

[20] As BLM's brief states, the *Kane County* ruling the State relies upon is actually two rulings, issued in August and September of 2024. *See Kane Cnty v. United States,* 2:10-cv-01073, 2024 U.S. Dist. LEXIS 142312 (D. Utah Aug. 9, 2024), *Kane Cnty. v. United States*, 2:10-cv-01073, 2024 U.S. Dist. LEXIS 174705 (D. Utah Sept. 25, 2024).

claim to title under the Quiet Title Act, not an APA lawsuit. *See Kane Cnty*, 2024 U.S. Dist. LEXIS 142312, at *8-9; BLM Br. 58-59. *Second*, the portions of the rulings relied upon by Utah involved R.S. 2477 claims in Kane County that are not at issue here. *Kane Cnty*, 2024 U.S. Dist. LEXIS 142312 at *20; BLM Br. 58-59. The rulings did not address whether BLM has the authority close claimed R.S. 2477 rights-of-way during travel planning. *Kane Cnty*, 2024 U.S. Dist. LEXIS 142312 at *20. *Third,* the rulings' reasoning cited to by the State did not apply to R.S. 2477 claims that the State has self-identified as "Class D" (as opposed to "Class B") roads. *See* BLM Br. 59.

Further, the State's arguments are contrary to the express terms of the Quiet Title Act and prior binding Tenth Circuit precedent. In relevant part, under the Quiet Title Act: "The United States shall not be disturbed in possession or control of any real property involved in any action under this section pending a final judgment or decree, the conclusion of any appeal therefrom, and sixty days." 28 U.S.C. § 2409a(b) (emphasis added). The provisions of the Quiet Title Act are structured to avoid disruption of government operations and to prevent claimants who assert an interest in land from acting as if they have "actual possession" of the claimed property without a final adjudication of their rights. *See United States v. Mottaz*, 476 U.S. 834, 847-48 (1986) (explaining that if plaintiffs were allowed to assert title to property outside the Quiet Title Act then the plaintiffs could indefinitely act as though they in fact had title to the property in question); *United States v. Bedford Assocs.*, 657 F.2d 1300, 1318 (2d Cir. 1981). The State's argument that it may maintain and manage its claimed R.S. 2477 rights-of-way during the pendency of its Quiet Title Act litigation is directly contrary to the express terms of the Act. The

United States, not the State, exercises possession and control of the claims until final adjudication of title rights. 28 U.S.C. § 2409a(b).

The State's argument seeks to contradict this controlling precedent and subvert the purposes of the Quiet Title Act by allowing the State to act as if it has actual possession of the claimed routes in order to disrupt the normal operation of BLM's travel planning process.[21] Simply put, the State's argument that it, and not the United States, can manage claimed R.S. 2477 rights-of-way that are subject to an ongoing Quiet Title Act lawsuit contradicts the express terms and core purpose of the statute. *Mottaz*, 476 U.S. at 847.

Moreover, the Tenth Circuit has already definitively concluded that BLM can close routes that are claimed, but unproven R.S. 2477 rights-of-way during management planning. *See Salazar*, 562 F.3d at 1086; *cf. Williams*, 2007 WL 3053293, at *6-7 (holding that BLM was not required to determine the validity of R.S. 2477 claims prior to adopting a travel plan). In *Salazar*, also an APA case, multiple counties argued that BLM's management plan and transportation map for the Grand Staircase-Escalante National Monument violated their claimed, valid existing rights to R.S. 2477 rights-of-way. *Salazar*, 562 F.3d at 1078-79. The counties asserted that FLPMA required BLM to make a preliminary determination (called an administrative determination) of whether the counties' claimed R.S. 2477 rights-of-way were valid, prior to closing those routes for public or administrative uses. *Id.* at 1086. The Tenth Circuit squarely rejected the counties' argument, reasoning that BLM has the authority to, but is not required to make preliminary decisions regarding the validity of R.S. 2477 claims, and that allowing the

---

[21] Even if the State's R.S. 2477 claims are ultimately adjudicated in its favor, the Quiet Title Act gives the United States the option to pay "just compensation" for the right-of-way, rather than surrender control. 28 U.S.C. § 2409a(b).

counties to force BLM to make a preliminary validity determination would "shortcut the existing process" of requiring the counties to have their rights finally decided through the QTA litigation. *Id.* at 1086-87. The *Salazar* court specifically rejected the counties' attempt to frame their argument as merely asking the court to direct BLM to "consider . . . whether or not the County plaintiffs' purported R.S. 2477 rights-of-way are valid." *Id.* at 1087 (internal quotations omitted).

The State is making functionally the same argument here, albeit without invoking the phrase "administrative determination." The State is again arguing that to comply with FLPMA, BLM must employ a preliminary determination (without a final decision in the Quiet Title Act litigation) that the State's claims are valid, and therefore, according to the State, BLM cannot close routes subject to R.S. 2477 claims during travel management planning. Utah Br. 38-40. This argument is foreclosed by *Salazar*'s reasoning, which is binding on this Court.[22]

---

[22] The State's argument is also internally inconsistent. It argues that "<u>until</u> a title dispute arises, 'the United States has an obligation to continue allowing the state and counties to exercise their vested property rights without interference.'" Utah Br. 39 (quoting Judge Waddoups' August 2024 *Kane County* ruling) (emphasis added). Putting aside that this statement is contrary to the Quiet Title Act and Tenth Circuit precedent, the State's arguments acknowledge that the United States does not need to continue allowing the State or counties to exercise their purported rights <u>after</u> a title dispute arises. Because a dispute as to title is a prerequisite to bringing a claim under the Quiet Title Act, *Kane Cnty. v. United States*, 772 F.3d 1205, 1211-12 (10th Cir. 2014), the fact that Plaintiffs have in fact brought Quiet Title Act claims to all 114 miles in dispute here means that Utah itself believes <u>there is a dispute as to title</u> for these claims, regardless of the United States' position. Thus, under Plaintiffs own reasoning, the United States is not required to allow them to exercise their purported property rights unless and until the QTA litigation is finally resolved in Plaintiffs' favor.

## **CONCLUSION**

For the foregoing reasons, the Court should deny all of Plaintiffs' claims and uphold the

Labyrinth/Gemini Bridges TMP DR, EA and FONSI in its entirety.


Respectfully Submitted January 24th, 2025.


<div style="margin-left: 40%;">

*/s/ Hanna Larsen*
Stephen Bloch
Laura Peterson
Hanna Larsen

*Attorneys for Defendant-Intervenor*
*Southern Utah Wilderness Alliance*

</div>

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum contains 13,664 words (excluding the caption, table contents, table of authorities, glossary, and signature block) and complies with the DUCivR 7-1(a)(4)(C), as extended by the Amended Scheduling Order filed in the above-captioned consolidated matters (ECF No. 69). I obtained the word count using Microsoft Word.

*/s/ Hanna Larsen*
Hanna Larsen