KATHY A.F. DAVIS (4022)
ROGER R. FAIRBANKS (3792)
K. TESS DAVIS (15831)
RACHELLE SHUMWAY (8177)
Assistant Attorneys General
Utah Attorney General's Office
KENDALL G. LAWS (14700)
Special Assistant Attorney General
DEREK E. BROWN (10476)
UTAH ATTORNEY GENERAL
1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
kathydavis@agutah.gov
rfairbanks@agutah.gov
kaitlindavis@agutah.gov
rashumway@agutah.gov
klaws@utah.gov

*Attorneys for Plaintiffs*

---

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF UTAH, SOUTHERN DIVISION

| | |
|---|---|
| BLUERIBBON COALITION, INC., *et al.,* <br><br> and <br><br> STATE OF UTAH, *et al.,* <br><br>     Plaintiffs, <br><br> vs. <br><br> U.S. BUREAU OF LAND MANAGEMENT, <br><br>     Defendants, <br><br> and <br><br> SOUTHERN UTAH WILDERNESS ALLIANCE, <br><br>     Defendant-Intervenor. | Consolidated Case Nos.: <br><br>     4:24-cv-00046-DAK-JCB <br>     2:23-cv-00923-DAK-JCB <br><br><br> **PLAINTIFF STATE OF UTAH'S REPLY MEMORANDUM** <br><br> District Judge Dale A. Kimball <br> Magistrate Judge Jared C. Bennett |

The State of Utah submits this Reply Memorandum in support of its opposition to the road closures in the Labyrinth Canyon/Gemini Bridges Travel Management Area. The BLM's DR is unlawful for a variety of reasons, including violation of the law as it pertains to R.S. 2477 rights-of-way, the Utah Enabling Act, the Administrative Procedure Act ("APA"), the Federal Land Policy and Management Act ("FLPMA"), the National Historic Preservation Act ("NHPA"), and other federal statutes. For these reasons, the State of Utah requests this Court to declare and set aside the BLM's DR as unlawful.

## **ARGUMENT**

I.    R.S. 2477

Defendants and Intervenor-Defendants have once again fundamentally misconstrued R.S. 2477 law, and have argued again, as they always do, that BLM is not obligated to resolve R.S. 2477 claims and that "[a]t such time as administrative or judicial determinations are made acknowledging or adjudicating asserted R.S. 2477 rights-of-ways, the BLM will adjust its TMP accordingly." ECF 78 at 68-69. No one disputes that BLM cannot "resolve" R.S. 2477 claims. Only a Federal Court can do so in the context of the Quiet Title Act. However, the BLM cannot simply ignore R.S. 2477 law and close roads "pending judicial determination of such claims under the Quiet Title Act." *Id.* BLM's own citation above fully contemplates that BLM has plenary authority to make *administrative determinations acknowledging* R.S. 2477 rights of way. *Id.* The BLM's own manual once contained a provision which read, "When the history of a road is unknown or questionable, its existence in a condition suitable for public use is evidence that construction sufficient to cause a grant under RS 2477 has taken place." *Sierra Club v. Hodel*, 675 F. Supp. 594, 605 (D. Utah 1987) (quoting BLM Manual, Rel. 2-229, June 30, 1986).

Defendants and Intervenor-Defendants persist in their contention that they can simply ignore thousands of vested R.S. 2477 rights-of-way established under a law that was on the books for over a century, treat Utah as a non-holder of such vested rights and insist that, to establish itself as a holder, Utah must resolve its claims in a Quiet Title action. This argument was rejected by this Court in *Kane County (2) v. U.S.,* 2:10-cv-01073-CW, Dkt. 792 (D. Ut. Aug. 9, 2024). The Court held that "imposing a mandate of adjudicated title is contrary to law and the United States' authority." *Id*. at 60. The Court reasoned that R.S. 2477 "imposed no burden on [Utah] to prove to the United States [its] status as [a] holder before the State . . . could exercise [its] rights. Those who were holders on October 20, 1976, continued to be holders when Congress passed FLPMA the following day. [...] Congress also imposed no requirements on the State or counties to prove up their status before a court if they wanted to continue to be treated as holders." *Id.* at 27. The Decision clearly rejects Defendants' claims and holds that R.S. 2477 rights are self-executing, vested, and valid until such time as the United States chooses to challenge those rights under the Quiet Title Act. As such, "unless the United States disputes [Utah's] title, it has an obligation to treat the State . . . in the same manner as it did prior to [the passage of FLPMA], for the roads at issue." *Id*. at 29.

The BLM's road closures and its associated TMP violate Utah's vested R.S. 2477 rights. These rights are self-executing and fully vested, according to the terms of both R.S. 2477 and FLPMA, and any requirement to establish those rights via adjudication is unlawful. The burden falls on the BLM to dispute those rights. Until that time, Utah's rights to manage and maintain the roads closed by BLM's DR may not be infringed.

II. <u>SITLA Parcels</u>

Defendants and Intervenor-Defendants cannot dispute the simple fact that the DR's closure of Hell Roaring Road (#1223) and Mineral Canyon Road (#1026) blocks motorized access to two different SITLA parcels and renders their economic development competitively unprofitable both to the State as well as its lessees. Defendants also cannot dispute the simple legal argument that "Utah [has] a right of access to state school trust lands." *State of Utah v. Andrus*, 486 F. Supp. 995, 1001, 1011 (D. Utah 1979). The *Andrus* Court also held that although Utah's access rights to state school trust lands are subject to federal regulation, such regulations cannot prohibit access or be so restrictive as to make economic development "competitively unprofitable," as such an outcome could "constitute a taking." *Id*. at 1011. This applies even when BLM issues regulations to prevent impairment of wilderness characteristics. *Id.* This prescient ruling foreshadowed the Supreme Court's later holding in *Lucas v. South Carolina Coastal* that regulations which "deprive[] land of all economically beneficial use" constitute a *per se* taking. *Lucas*, 505 U.S. 1003, 1027 (1992).

Federal Defendants cite to language in the AR stating that for "the great majority of cases" at least one public OHV route accessing SITLA parcels remains open and that "in all instances, SITLA and its permittees may receive authorization from BLM to access SITLA parcels." ECF 78 at 54. They further rationalize that "SITLA or relevant permittees will remain able to obtain authorization to access the parcels under applicable mechanisms" and clarifying that "BLM has not authorized, and does not intend to authorize, reclamation or rehabilitation of these two routes." *Id.* Apparently, BLM considers it permissible to cut off access to two SITLA parcels as long as the great majority of other SITLA parcels remain accessible. In addition,

SITLA and its lessees should not have to ask for permission or authorization, which can be denied, to access lands to which they already have a right of access. In addition, Defendants and Intervenor-Defendants know that routes in sandy desert terrain will become naturally reclaimed if they are not able to be maintained mechanically or by repeated use, and that without maintenance, weather and other natural events will eventually render the roads impassable even to a lessee who might be able to obtain permission from the BLM.

III. FLPMA

A.  *Consistency Review*

As anticipated, Defendants contend that BLM's DR is not subject to consistency review because it is not a "land use plan," but BLM simply cannot justify its reasoning that travel management plans are merely "implementation level decisions" that do not fall under the auspices of FLPMA land use plans. BLM's own *Land Use Planning Guidebook* says, "Land use plans . . . identify lands where specific uses are excluded to protect resource values. Certain lands may be open or closed to specific uses based on legislative, regulatory, or policy requirements or criteria to protect sensitive resource values." *Land Use Planning Handbook* 2005, p. 13. This description of land use plans would prima facie include Travel Management Plans such as the one at issue in this case.

B.  *Multiple Use and Sustained Yield*

Defendants argue that because the DR left open 810.5 miles of routes, it complied with FLPMA's multiple use and sustained yield mandate even though it closed 317.2 miles and limited motorized use on 98.4 miles. For the vast areas that are accessible only by these closed and limited access routes, BLM clearly did not consider anything but the interests of wilderness conservation and non-motorized recreation – the only uses that do not require motorized access.

4

BLM's DR violates FLPMA by failing to manage the public lands around these closed and limited access routes in accordance with principles of multiple use and sustained yield and is arbitrary, capricious, and otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706. Closing and limiting access to over 36 percent of the roads and land in an entire TMA cannot be reconciled with FLPMA's multiple use and sustained yield mandate.

IV. <u>NHPA</u>

Defendants argue that BLM considered and reasonably addressed the State's concerns regarding historical roads. As examples they cite consideration of the routes known as "Hell Roaring" and "Hey Joe." Despite substantial comments from proponents of continued access, BLM designated both routes as closed, because of what the agency claimed were impacts to wildlife and riparian habitat, wetlands, sediment transport, and user conflict. In other words, conservation and noise complaints from non-motorized users were deemed more important that all other uses combined. This one-sided approach disfavoring motorized recreation violates the NHPA and is arbitrary and capricious.

When seeking to identify historic properties within the area of potential effects, NHPA requires agencies to "make a reasonable and good faith effort." 36 C.F.R. § 800.4(b)(1). Here, the R.S.2477 roads subject to the TMP's closures are eligible for protection under the NHPA. They are intrinsically connected to the history of nearby towns and counties, having been created as part of Utah's settlement for purposes such as exploration, mining, ranching, and other activities which "made a significant contribution to the broad patterns of [Utah's] history." 36 C.F.R. § 60.4(a).

The State, acting as a Section 106 Consulting Party, submitted documentation of its knowledge and concerns to the BLM that R.S. 2477 roads within the Labyrinth Canyon/Gemini

Bridges TMA are cultural resources at least fifty years old, are eligible for National Register of Historic Places evaluation, and, if eligible for National Register inclusion, may be adversely affected by the TMP. *Grand County v. United States of America,* Case No. 2:12-cv-00466-CW (D. Utah 2012) Compl. ¶ 157.

Despite the State submitting this documentation, the BLM disregarded R.S. 2477 roads for National Register of Historic Places eligibility and failed to even assess those roads for eligibility. In failing to do so, the BLM violated the implementing regulations of Section 106 of the NHPA and acted arbitrarily and capriciously, and it did so despite the specific requests of a Section 106 Consulting Party.

V. <u>Dingell Act and De Facto Wilderness Management on Non-WSA Lands</u>

Both Defendant and Intervenor-Defendant allege that the State has not raised a Dingell Act claim; however, the State's Dingell Act claim has been sufficiently pled through its Fifth Cause of Action in the First Amended Complaint: "Violation of FLPMA and **other Federal Statutes**: Unlawful De Facto Wilderness Management on Non-WSA Lands" (emphasis added). BLM's closure of at least two roads — Hell Roaring Road (#1223) and Hey Joe Canyon Road (#1527) — in the Labyrinth Canyon/Gemini Bridges Travel Management Area ("TMA") is a violation of FLMPA and other federal laws, including the Dingell Act. Specifically, the closing of these roads creates an illegal "buffer zone" – essentially creating *de facto* wilderness management standards on non-WSA lands, in violation of the Dingell Act.

The State's Opening Brief sets forth the State's claim on page 5 with an explanation of the John D. Dingell, Jr. Conservation, Management, and Recreation Act ("Dingell Act" or "Act") in which Congress designated the Labyrinth Canyon Wilderness in Utah's Emery County, prohibiting permanent roads, temporary roads, and the use of motor vehicles within the

Labyrinth Canyon Wilderness. Pub. L 116-9. However, Congress did not authorize BLM to close other roads near the Labyrinth Canyon Wilderness. The Dingell Act specifically states that "Congress does not intend for the designation of the wilderness areas to create protective perimeters or buffer zones around the wilderness areas." *Id.* Congress also clarified that "[t]he fact that nonwilderness activities or uses can been seen or heard from areas within a wilderness area shall not preclude the conduct of those activities or uses outside the boundaries of the wilderness area." *Id.* These illegal buffer zones are created when BLM closes roads adjacent to the river.

The State has set forth a "short and plain statement" of its claim showing that it is entitled to relief in compliance with Federal Rules of Civil Procedure 8(a) and *Zokari v. Gates*, 561 F.3d 1076, 1084 (10th Cir. 2009). The Defendants are on notice that the State is claiming Dingell Act violations as part of "**other Federal Statutes**" in relation to its *de facto* wilderness argument, and this Court should hear this claim.

Here, the closing of Hell Roaring Road (#1223) and Hey Joe Canyon Road (#1527) in the Labyrinth Canyon/Gemini Bridges TMA creates a protective perimeter or buffer zone on the east side of the TMA in a manner expressly prohibited by the Dingell Act. Of the roads closed by the BLM, the majority, and the most significant, lie immediately across the Green River from the Labyrinth Canyon Wilderness Area ("LCWA"). BLM even cited reduction in vehicle noise as a rationale for closure of the roads closest to the LCWA. The closing of Hell Roaring Road (#1223) and Hey Joe Canyon Road (#1527) in the TMA therefore directly conflicts with the express language of the Dingell Act by creating a protective perimeter or buffer zone designed to minimize visual and auditory impacts to visitors and wildlife within the LCWA. The BLM has thus unlawfully created a *de facto* wilderness area by creating a "buffer zone."

In addition to violation of the express language of the Dingell Act, the closing of Hell Roaring Road (#1223) and Hey Joe Canyon Road (#1527) in the Labyrinth Canyon/Gemini Bridges TMA conflicts with Congress's intent that roads in this area be kept open for use pursuant to the Wild and Scenic Rivers Act of 1968 ("WSRA"). Defendant cites to *Hells Canyon All.*, *Riverhawks*, and *Friends of the Flathead River* in its Memorandum in Opposition to support the contention that it has broad powers (arguing it is similar to FLPMA) to close roads in the Labyrinth Canyon/Gemini Bridges TMA and must be accorded substantial deference in deciding to allow or prohibit motorized use pursuant to WSRA. Def. Br. at 50.

Defendant further asserts that "it is the agency's role—not the courts—to balance competing recreational uses" and that "an agency's decisions applying WSRA, including in concert with travel management, must be accorded substantial deference." *Id.* Defendant argues that there is neither statutory text nor any relevant case law to support the State's suggestion that a particular prescription or prohibition of motorized use is inherent in any WSRA designation. Defendant attempts to convince this Court that the holdings in each of the cases cited above allow BLM to reach so far as to grab roads at issue in this case and rope them into its authorization to restrict motorized access to roads in proximity to the Green River, a designated "scenic river" pursuant to WSRA. This analysis is flawed, in part because the cases cited have very different facts than those in the case presently before this Court, but also because Defendant misconstrues the intent and construction of the WSRA.

In the three cases cited above, the courts' references to "travel management" deal with motorized and non-motorized watercraft and camping on a river gravel bar. *Hells Canyon Alliance* and *Riverhawks* involve the U.S. Forest Service's recreational management on WSRA designated rivers and have nothing to do with BLM closing roads pursuant to a travel

management plan near a "scenic river." Each of the regulations in the cases cited by the Defendant involve competing interests between motorized and non-motorized watercraft on rivers, not road closures pursuant to a Travel Management Plan. *Riverhawks v. Zepeda*, 228 F. Supp. 2d 1173, 1176 (D. Or. 2002); *Hells Canyon All. v. U.S. Forest Serv.*, 227 F.3d 1170 (9th Cir. 2000), as amended (Nov. 29, 2000).

Further, the issues the court reviewed in *Friends of Flathead River* are centered in part around the "travel management rule" promulgated via the Forest Service Organic Act, which involved regulation of a small, dispersed camping area on a gravel bar near the confluence of two forks of the Flathead River, which was designated a "recreation river" under the WSRA. (Although the court spoke generally about motorized vehicles traveling from the bridge to the gravel bar, that issue was not germane to the case.) *Friends of Flathead River v. U.S. Forest Serv.*, 614 F. Supp. 3d 747 (D. Mont. 2022).

The facts in the case currently before this Court can be further distinguished from Defendant's cited cases because each case involves different designations than the Labyrinth Canyon/Gemini Bridges TMA/TMP. Congressional authority to classify and manage public lands resides with Congress. *See* State Br. at 44. Congress has delegated its constitutional authority to Defendant/BLM to manage public lands, but that delegated authority is defined and limited by the terms of the respective federal statutes. *Id.*

The cases cited by Defendant all involve major rivers of the United States, which are very different congressional designations than the Labyrinth Canyon/Gemini Bridges TMA. Rather than scenic rivers established pursuant to the WSRA, the Labyrinth Canyon/Gemini Bridges TMA has no such congressional designation but is instead only managed by BLM pursuant to its delegated authority as defined and limited by the terms Congress established.

Hells Canyon (which straddles both sides of the Snake River), the Rogue River and the Flathead River each have congressional designations under WSRA recognizing the unique condition of each part of the river with regard to recreation, roads, development, dams or impoundments, etc., which were found in and around those rivers at the time of the designation. Pub. L. 90-542 and 16 U.S.C. 1271 *et seq*. Under the WSRA, Hells Canyon is designated as a "National Recreation Area"; the Rogue River is designated as a "Wild and Scenic River"; and the Flathead River is designated as a "Recreation River." *Id*.

The Rogue River, in *Riverhawks*, is a long river, and Congress has purposely divided it into two segments: one portion designated as "scenic" and one portion designated as "wild." Each segment is managed by a different federal agency, either Forest Service or BLM, with the use of motorized watercraft versus non-motorized watercraft a central issue in that case. *Riverhawks v. Zepeda*, 228 F. Supp. 2d 1173, 1176 (D. Or. 2002).

The Hells Canyon area of the Snake River in *Hells Canyon Alliance* was designed to be regulated by the Forest Service. It was specifically recognized as recreational, with watercraft being declared "legitimate recreational use" that "should be preserved and conserved for the public benefit[,]" with the use of motorized watercraft versus non-motorized watercraft a central issue in that case. *Hells Canyon All. v. U.S. Forest Serv*., 227 F.3d 1170 at 1173 (9th Cir. 2000), as amended (Nov. 29, 2000).

The issue the court reviewed in the *Friends of Flathead River* case centered around the "travel management rule" promulgated via the Forest Service Organic Act, which involved regulation of a small, dispersed camping area on a gravel bar near the confluence of the North Fork and Middle Fork of the Flathead River, which was designated as a recreation river under the WSRA. *Friends of Flathead River v. U.S. Forest Serv*., 614 F. Supp. 3d 747 (D. Mont. 2022).

The case before this Court does not involve congressionally designated areas involving watercraft in a river or camping on a river gravel bar, but rather, the closure of roads by BLM in the Labyrinth Canyon/Gemini Bridges TMA/TMP, some of which are in the vicinity of the Green River.

Defendants/Intervenor-Defendants oppose the State's assertion that the designation of the Green River within the TMA as "scenic" means that Congress intended that the BLM's management authority be limited to "protecting existing road access." Intervenor. Def. Br. at 50. That statement misconstrues the State's argument, which is that when Congress designated the Green River as "scenic," it was recognizing **already existing roads**, not giving BLM management authority to close such roads. The State is arguing that the use of or access to already existing roads in this area is built into the legislative framework of WSRA, which therefore cannot be closed off or restricted in the manner utilized by the BLM here.

Defendant asserts that in "similar fashion to FLPMA, the Wild and Scenic Rivers Act is framed broadly, directing that a designated river be managed 'in such manner as to protect and enhance the values which cause it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values.'" *Id.* (citing *Friends of Flathead River v. U.S. Forest Serv.*, 614 F. Supp. 3d 747 at 1270 (D. Mont. 2022) and 16 U.S.C § 1281(a)).

Defendant's analysis of WSRA is overly broad and misconstrues the rationale and framework of the WSRA by its very nature, which sets forth three types of river protections **depending on existing road or trails** as well as impoundments/developments. Wild and Scenic Rivers Act, Pub. L. 90-542 and 16 U.S.C. 1271 *et seq*. Congress enacted WSRA based on a policy of preserving, protecting, and enhancing select rivers and their **immediate environments**

11

"for the benefit and enjoyment of present and future generations." *Id*. The three types of river designations are Wild, Scenic, and Recreational, with the objective of establishing a system that protects rivers based on their **existing condition** and the degree of human impact. The WSRA does not advocate for reclamation or turning back the clock to restore rivers to a pre-developed state (although it does not prohibit the inclusion of a river if it is later reclaimed). *Id*.

Instead, Congress directed the completion of a comprehensive inventory of rivers in the United States and, in conjunction with local and state governments, the identification of rivers that were public or private, as well as identifying what current recreation, roads, development, dams or impoundments, etc., were found in and around those rivers that were important to keep and maintain; the goal being to identify which rivers would be good candidates to preserve in their free-flowing condition, protecting their values from future degradation. *Id.* At the time WSRA was passed, Congress understood that rivers traverse through various types of land ownership or designations, including private land, public lands that had already been Congressionally designated (such as Forest Service and Park Service lands), and other public lands with limited regulatory authority given by Congress, as set forth in the framework and language of WSRA. *Id.* Congress also intended the different federal agencies to regulate different segments of the rivers pursuant to their designation and mandates. *Id.*

Rivers defined by Congress as "Recreational Rivers" are those that are **readily accessible by road**, with some shoreline development, and may have been subject to some impoundment or diversion in the past. "Scenic River Areas" are "[t]hose rivers or sections of rivers that are free of impoundments,[1] with shorelines or watersheds still largely primitive and shorelines largely

---

[1] The definition of impoundment in 1968 generally referred to artificially stored water bodies created by dams or other structures that obstruct the natural flow of a river. This included reservoirs, ponds, or other bodies formed by human made barriers that hold back or control water

undeveloped, **but accessible in places by roads**." *Id*. (emphasis added). In contrast, Congress separately defined "Wild River Areas" as "[t]hose rivers or sections of rivers that are free of impoundments and **generally inaccessible except by trail**, with watersheds or shorelines essentially primitive and waters unpolluted." 16 U.S.C. § 1273 (emphasis added). The WSRA is similar in the framework and design of other Public Laws passed by Congress during the 1960s and 1970s protecting the environment and endangered species.

In 2019, Congress added segments of Utah's Green River to the Wild and Scenic Rivers System in Section 1241 of the Dingell Act. Pub. L. 116-9, Section 1241. The segment of the Green River immediately adjacent to the BLM's Labyrinth Canyon/Gemini Bridges TMA was designated under the Dingell Act as a "Scenic River Area" with the classification "accessible in places by roads." *Id*. Congress clearly contemplated using the more restrictive "Wild River Area" designation along the Green River and did in fact designate a more northerly segment of the Green River as a "Wild River Area" "generally inaccessible except by trail." *Id.* Congress's selection of the "Scenic River Area" designation in lieu of the "Wild River Area" designation here demonstrates congressional intent to recognize existing road access along the Green River in the vicinity of the Labyrinth Canyon/Gemini Bridges TMA. Therefore, the BLM violated the Dingell Act by applying "Wild River Area" management criteria to a segment of the Green River that Congress explicitly categorized as a "Scenic River Area" accessible by roads.

---

levels. Black's Law Dictionary (4th ed. 1951, 5th ed. 1979). WSRA was specifically designed to protect rivers in their free-flowing condition. 16 U.S.C. § 1278. The definition of impoundments in this context aligns with the broader legal and hydrological understanding of the time, emphasizing the distinction between free-flowing rivers and those altered by artificial water storage. See Linsley, Kohler, and Paulhus, *Applied Hydrology* (1958), and similar works commonly describing impoundments using the above definition, as well as federal agency reports such as U.S. Geological Survey and the U.S. Army Corps of Engineers.

Congress did not delegate authority to the BLM to change management of the Labyrinth Canyon stretch of the Green River from "Scenic River" management to "Wild River" management. As the distinguishing characteristic between "Wild River Areas" and "Scenic River Areas" is the presence of roads, Congress clearly intended for existing roads within the scenic segment of the Green River to remain open. Yet BLM still chose to close roads within the Labyrinth Canyon corridor for the express purpose of protecting a greater portion of the Green River as a "Wild River" area instead of respecting the "Scenic" designation set forth by Congress. BLM's closure of roads along the Green River violates the congressional intent of the Dingell Act and is therefore unlawful.

The closure of Hell Roaring Road (#1223) and Hey Joe Canyon Road (#1527) in the Labyrinth Canyon/Gemini Bridges TMA violates FLPMA, the Dingell Act and other federal laws. As stated above, authority to classify and manage public lands resides with Congress. Even though the DR does not use the term "wilderness" to describe its management of the TMA, the practical effect of BLM's decision to close these two important roads is to create restrictive, WSA-type management, essentially expanding the boundaries of the already designated wilderness area.

Furthermore, BLM's wilderness review authority under § 603 of FLPMA, 43 U.S.C. § 172(c), has terminated, and as a result BLM must "not manage or otherwise treat public lands, other than §603 WSAs…as WSAs or as wilderness pursuant to the [FLPMA] §202 process." The BLM's DR unlawfully treats the non-WSA lands of the TMA as *de facto* WSA lands.

## CONCLUSION AND REQUEST FOR RELIEF

For the forgoing reasons, the Court should declare that BLM violated the APA, federal statutory and case law, FLPMA, and the NHPA. At a minimum, the Court should vacate the

agency's decision as arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C.

§ 706 5 U.S.C.

Respectfully submitted this 7th day of March 2025.

/s/*Roger R. Fairbanks*
Roger R. Fairbanks
Kathy A.F. Davis
K. Tess Davis
Rachelle Shumway

Attorneys for Plaintiffs
State of Utah *et al*.

## CERTIFICATE OF SERVICE

I certify that on this 7th day of March 2025, the undersigned electronically filed the foregoing PLAINTIFFS' REPLY BRIEF with the Clerk of the Court using the CM/ECF system which will send notification of this filing to all counsel of record.


/s/ *K. Tess Davis*
Assistant Attorney General