Robert Henneke (Admitted Pro Hac Vice)
Chance Weldon (Admitted Pro Hac Vice)
Matthew Miller (Admitted Pro Hac Vice)
Clayton Way Calvin (Admitted Pro Hac Vice)
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78741
(512) 472-2700
rhenneke@texaspolicy.com
cweldon@texaspolicy.com
mmiller@texaspolicy.com
ccalvin@texaspolicy.com

Nicholas Barry (Admitted Pro Hac Vice)
James Rogers (Utah Bar No. 18783)
AMERICAN FIRST LEGAL FOUNDATION
611 Pennsylvania Ave., SE #231
Washington, DC 20003
(202) 964-3721
nicholasbarry@aflegal.org
james.rogers@aflegal.org

Krystaly N. Koch (Utah Bar No. 16491)
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
(385) 355-4826
krystaly.koch@freemanlovell.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| BLUERIBBON COALITION, INC.; PATRICK MCKAY; and COLORADO OFFROAD TRAIL DEFENDERS, <br><br> and <br><br> STATE OF UTAH, <br><br>       *Plaintiffs,* <br><br> v. <br><br> U.S. BUREAU OF LAND MANAGEMENT; U.S. DEPARTMENT OF THE INTERIOR, <br><br>       *Defendants.* <br> and <br><br> SOUTHERN UTAH WILDERNESS ALLIANCE, <br><br>       *Intervenor-Defendant.* | Case Nos.    2:23-cv-00923-DAK <br>               4:24-cv-00046-DAK <br><br><br> **PLAINTIFFS' REPLY BRIEF** <br><br><br><br> Judge Dale A. Kimball <br> Magistrate Judge Jared C. Bennett |

# Table of Contents

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 1

    I.    DEFENDANTS HAVE NOT REBUTTED PLAINTIFFS' ARGUMENT THAT THE TMP VIOLATES THE APPOINTMENTS CLAUSE OF THE U.S. CONSTITUTION. ......................... 1

        A.    BLM's Mischaracterizations of Plaintiffs' Arguments Are Unavailing. ................... 2

        B.    The Decision Was Not Subject to Meaningful Control or Direction. ....................... 3

        C.    The Decision Was Neither Specific in Its Objects nor Carefully Circumscribed. ...................................................................................................... 6

    II.    DEFENDANTS HAVE FAILED TO REBUT PLAINTIFFS' ARGUMENTS THAT THE TMP VIOLATES THE DINGELL ACT BY USING ROAD CLOSURES TO CREATE WILDERNESS BUFFER ZONES ......................................................................................................... 7

    III.    DEFENDANTS HAVE FAILED TO SHOW THAT THE TMP IS NOT CONTRARY TO LAW AND NOT OTHERWISE ARBITRARY AND CAPRICIOUS. ................................................ 10

        A.    The TMP Is Arbitrary and Capricious Because the Designation Criteria Are Contrary to the Controlling Statute. .......................................................................... 10

        B.    Defendants Have Failed to Show That the Individual Closure Justifications Are Not Arbitrary and Capricious. .......................................................................... 14

    IV.    THE TMP VIOLATES NEPA BECAUSE DEFENDANTS FAILED TO TAKE THE REQUISITE "HARD LOOK." ...................................................................................... 24

CONCLUSION .............................................................................................................. 28

CERTIFICATE OF COMPLIANCE ..................................................................................... 31

CERTIFICATE OF SERVICE ............................................................................................ 31

i

**T**ABLE OF **A**UTHORITIES

*Cases*

*Anderson v. U.S. Dep't of Labor,*
    422 F.3d 1155 (10th Cir. 2005) ............................................................... 24

*BlueRibbon Coal., Inc. v. U.S. Bureau of Land Mgmt.,*
    2024 U.S. Dist. LEXIS 49991 (D. Utah Mar. 20, 2024) ............................... 3

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ................................................................................... 2, 4

*Caring Hearts Personal Home Servs., Inc. v. Burwell,*
    824 F.3d 968 (10th Cir. 2016) .................................................................11

*Chevron, USA v. NRDC, Inc.,*
    467 U.S. 837 (1984) ................................................................................ 14

*Citizens for Const. Integrity v. United States,*
    70 F.4th 1289 (10th Cir. 2023) ............................................................... 12

*Comm. to Preserve Boomer Lake Park v. U.S. Dep't of Transp.,*
    4 F.3d 1543 (10th Cir. 1993) .................................................................. 25

*Ctr. for Biological Diversity v. United States Dep't of the Interior,*
    72 F.4th 1166 (10th Cir. 2023) .......................................................... 25, 28

*Edmond v. United States,*
    520 U.S. 651 (1997) ................................................................................ 4, 5

*Great Basin Resource Watch v. BLM,*
    844 F.3d 1095 (9th Cir. 2016) ................................................................. 23

*Hackett v. Barnhart,*
    395 F.3d 1168 (10th Cir. 2005) ...............................................................11

*Horne v. Dep't of Agric.,*
    576 U.S. 350 (2015) ................................................................................ 13

*Idaho State Snowmobile Ass'n v. U.S. Forest Serv.,*
    No. 1:19-cv-00195-DCN (D. Idaho Feb. 10, 2021) ................................ 20, 21

*Koon v. United States,*
    518 U.S. 81, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996) ...........................11

*Lax v. Astrue,*
    489 F.3d 1080 (10th Cir. 2007) ...............................................................11

*Loper Bright Ent. v. Raimondo,*
    603 U.S. 369 (2024) .....................................................................11, 12, 13

*Lucia v. SEC*,
    585 U.S. 237 (2018)........................................................................................................ 1

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)................................................................................................. 13, 20

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005).................................................................................................... 24

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
    795 F.3d 956 (9th Cir. 2015)...................................................................................... 24

*S. Utah Wilderness All. v. U.S. Dep't of Interior*,
    2016 U.S. Dist. LEXIS 140624 (D. Utah Oct. 3, 2016) ...................................... 24, 25, 26

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
    433 F.3d 772 (10th Cir. 2006) ................................................................................... 18

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
    No. 02-RB-325, 2004 U.S. Dist. LEXIS 30844 (D. Colo. Nov. 1, 2004)...................... 18

*United States ex. rel New v. Rumsfeld*,
    350 F. Supp. 2d 80 (D.D.C. 2004) ........................................................................... 2, 7

*United States v. Arthrex,*
    *594 U.S. 1 (2021)* ................................................................................................. 4, 5, 6

*United States v. Grimaud,*
    220 U.S. 506 (1911)............................................................................................. 2, 3, 4

*Utah Envt'l. Cong. v. MacWhorter*,
    2011 U.S. Dist. LEXIS 118970 (D. Utah Oct. 14, 2011).................................................. 27

*Utah Shared Access All. v. U.S. Forest Serv.*,
    288 F.3d 1205 (10th Cir. 2002)............................................................................... 26, 27

*Wild Wilderness v. Allen*,
    12 F. Supp. 3d 1309 (D. Or. 2014)............................................................................. 18

*Wilderness Society v. U.S. Forest Service*,
    850 F. Supp. 2d 1144 (D. Idaho 2012)........................................................................ 28

*Wilderness v. Allen*,
    871 F.3d 719 (9th Cir. 2017)..................................................................................... 18

*Williams v. Bankert*,
    2007 U.S. Dist. LEXIS 77503 (D. Utah Oct. 18, 2007) .................................................. 27

**Statutes**

16 U.S.C. § 1232.......................................................................................................... 8, 9

28 U.S.C. § 2412 ..................................................................................................... 29

43 U.S.C.A. § 1702 ................................................................................................. 12

43 U.S.C.A. § 1732 ................................................................................................. 12

5 U.S.C. § 706 ......................................................................................................... 10

Federal Land Policy Management Act of 1976, 43 U.S.C.A. § 1701 ................... 10, 12

U.S. Const. art. II ................................................................................................... 2, 5

### *Regulations*

40 C.F.R. § 1502 (2020) ....................................................................................... 20, 26

43 C.F.R. § 8342 ................................................................................................... 6, 8, 11

43 C.F.R. Part 4 ...................................................................................................... 4

### *Rules*

Fed. R. Civ. P. 57 ................................................................................................... 28

Fed. R. Civ. P. 65 ................................................................................................... 28

### *Other Authorities*

165 Cong. Rec. S5571 (2019) ................................................................................. 8

3 Works of Alexander Hamilton 557 (J. Hamilton ed. 1850) ................................. 6

## INTRODUCTION

Defendants have failed to rebut Plaintiffs' central argument: that the Labyrinth/Gemini Bridges Travel Management Plan ("TMP" or "Plan") suffers from so many constitutional, statutory, and legal deficiencies that it must be thrown out and the process begun anew. Defendants are incredulous that this could be the case, and their arguments can be summarized as "this is the way we have always done it and we are not required to do any better." But an illegal practice can be practiced for decades and still be illegal. The fact that numerous district managers sign off on travel management plans does not mean any of them had the constitutional authority to do so. The fact that a road closure is not literally called a "buffer zone" does not change the fact that it creates one, and thereby violates the Dingell Act's prohibition against such a practice. The fact that Defendant Bureau of Land Management ("BLM") has not historically given weight to motorized recreation does not mean that Congress did not command BLM to account for it. The fact that an administrative record is 43,197 pages does not mean that closures were not arbitrary and capricious. And the fact that Defendants produced an Environmental Assessment does not mean they took the requisite "hard look" under the National Environmental Policy Act ("NEPA").

In other words, the fact that this TMP looks like other TMPs has no bearing on its legality. It may simply be the case that BLM's travel planning practice is badly broken. As shown below, in this particular instance, it absolutely is, and the TMP should be voided as a result.

## ARGUMENT

## I.    DEFENDANTS HAVE NOT REBUTTED PLAINTIFFS' ARGUMENT THAT THE TMP VIOLATES THE APPOINTMENTS CLAUSE OF THE U.S. CONSTITUTION.

Plaintiffs' Appointments Clause argument is straightforward. Plaintiffs assert that the TMP is unlawful because it was created by the unappointed District Manager's exercise of "significant authority." *Lucia v. SEC*, 585 U.S. 237, 245-46 (2018). This contravenes the Clause's purpose of

ensuring that significant matters, like the construction and enforcement of crimes, are executed by politically accountable officers. In an unsuccessful attempt to rebut this, BLM first engages in a series of mischaracterizations of Plaintiffs' arguments. BLM's Br. at 13-14. Second, BLM argues that the District Manager's authority *was* subject to meaningful "control or direction." BLM's Br. at 10-12; *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976). And third, it maintains that the decision was adequately "specific in its objects" and "carefully circumscribed." BLM's Br. at 10-12; *United States ex. rel New v. Rumsfeld*, 350 F. Supp. 2d 80, 98 (D.D.C. 2004). None is persuasive. The decision violated the Appointments Clause, U.S. Const. art. II § 2, cl. 2, and is void. Defendant-Intervenor Southern Utah Wilderness Alliance ("SUWA") does not respond to Plaintiffs' Appointments Clause claim.

### A. BLM's Mischaracterizations of Plaintiffs' Arguments Are Unavailing.

BLM suggests that, in bringing this Appointments Clause claim, Plaintiffs seek to "convert" the District Manager from an employee into an officer. BLM's Br. at 13. BLM similarly suggests that Plaintiffs' goal is for the District Manager to go through the appointments process herself. *Id.* Neither is true. Instead, Plaintiffs simply seek to void the TMP for having been unlawfully created.

BLM also attacks the premise that Congress is ultimately the proper branch for creating crimes, relying heavily on the 1911 case *United States v. Grimaud*, 220 U.S. 506 (1911). BLM's Br. at 13-14. Importantly, BLM seems to use the case to respond to a non-delegation argument that Plaintiffs do not bring. Plaintiffs do not argue that delegating the ability to make route designations is *per se* impermissible because of the associated criminal penalties. Instead, Plaintiffs bring an Appointments Clause claim, observing that the Clause correlates conceptually with the non-delegation doctrine in helping to preserve the separation of powers. Plaintiffs' claim is not that this power may never be delegated, but that it must be delegated to properly appointed officials.

2

A broader delegation, if anything, is all the *more* reason for Congress to select the officers administering that power. When the delegation includes affixed criminal penalties, the Appointments Clause does even *more* work to uphold the separation of powers by maintaining Congress's control over how that criminal liability is applied. In *Grimaud*, tellingly, the Secretary of Agriculture himself—an appointed official—made the designation at issue. *Id.* at 514. Rather than undermining Plaintiffs' non-existent non-delegation claim, *Grimaud* supports Plaintiffs' Appointments Clause claim.

BLM also argues that the mere designation of "employee" is enough to be dispositive. BLM's Br. at 13. This only warrants the commonsense rebuttal that it would thwart the whole body of Appointments Clause caselaw to allow evasion of its requirements with a simple office title.

### B.  The Decision Was Not Subject to Meaningful Control or Direction.

BLM next maintains that an adequate degree of "control [and] direction" existed over the District Manager's exercise of decision-making process. BLM's Br. at 10-12. But the Court should revisit whether this was truly the case. Indeed, the District Manager signed off on the TMP entirely by herself, and even did so using first-person verbiage. DR at DR-2, DR-5, DR-10, LGB042016, LGB042019, LGB042020, Ex. C at 105, 108, 109.

At first view, this Court found that the District Manager's decision appeared to reflect a high degree of control and direction by other executives. It cited three tiers of executives in the chain of command above the District Manager and under the BLM Director, who is the fourth tier and first official in the chain to be appointed by the President. *See BlueRibbon Coal., Inc. v. U.S. Bureau of Land Mgmt.*, 2024 U.S. Dist. LEXIS 49991, at *9-10 (D. Utah Mar. 20, 2024). The BLM Director serves under various appointed secretaries. But "the unchecked exercise of executive

power by an officer buried many layers beneath the President poses more, not less, of a constitutional problem." *Arthrex*, 594 U.S. at 18.[1]

Similarly, the Court noted (and BLM restated) that the IBLA "ensures political accountability." *Id.* at *10; BLM's Br. at 12. Even if that is true—and Plaintiffs do not believe it is—*retrospective* review is not what "control or direction" contemplates. The Appointments Clause mandates the manner in which officials are selected *before* they assume office and begin making decisions. It contemplates a very different form of political accountability than Article III or Article II courts—namely, it ensures that power is constitutionally exercised *when it occurs*, not after the fact. If IBLA review could cure an Appointments Clause violation, it would render the Clause meaningless: an unconstitutional exercise of power could become constitutional ex post facto. The notion that the "mere availability" of such review could realize these safeguards stretches this concept further beyond its limits. BLM's Br. at 12. Similarly, Plaintiffs' own IBLA review, which they sought because it was required, *see* 43 C.F.R. Part 4, has no post hoc redemptive value with respect to the Appointments Clause's insurances. Plaintiffs' denial only highlights this. *See* Pls.' Compl., ECF No. 1, Ex. E.

Relatedly, BLM incorrectly asserts that this case tracks *Edmond v. United States*, 520 U.S. 651 (1997). According to BLM, not only is this because the District Manager's decision was "subject to review … in the IBLA," but also because was subject to review "within BLM" as well.

---

[1] The language "subject to the control or direction of any other executive" appears in a footnote in *Buckley*, merely noting that the defendant officers there were not claimed to be employees like the District Manager is, and, descriptively, were also not subject to the control or direction of *any* other executive. *Buckley*, 424 U.S. at 126 n.162. The broader caselaw indicates that the required control must come from "an officer nominated by the President and confirmed by the Senate." *United States v. Arthrex*, 594 U.S. 1, 27 (2021). *See also, e.g., Grimaud*, 220 U.S. at 514. Here, BLM has not established that the BLM Director was personally involved in the TMP at all. The record demonstrates that the District Manager signed off on the TMP alone. DR at DR-2, DR-5, DR-10, LGB042016, LGB042019, LGB042020, Ex. C at 105, 108, 109. If she exercised authority without direction from an appointed official, it was likely too "significant" for Appointments Clause purposes.

BLM's Br. at 15. But *Edmond* is hardly "on all fours" with this case. *Id.* Most obviously, the government agents there, Coast Guard Court of Criminal Appeals judges, were inferior officers, not employees like the District Manager. *Edmond*, 520 U.S. at 666. This meant both that their appointment by the Secretary of Transportation, a "Head of Department[]," U.S. Const. art. II, § 2, cl. 2, satisfied the constitutional requirement, and that they were empowered to exercise a higher degree of authority than the District Manager. *Id.* More importantly, BLM's discussion of the review exercised within BLM belies a misreading of the contrast between *Edmond* and *United States v. Arthrex*, 594 U.S. 1 (2021).

On this score, misperceiving Plaintiffs' arguments regarding supervision, BLM contrives a distinction between "actual oversight" and oversight by a "nominal superior." BLM's Br. at 15. This framework is inapt. Plaintiffs' argument is that one reason the District Manager lacked proper oversight is that the required level of supervision did not occur here. Pls.' Opening Br. at 8-9. Rather than indicating that "[t]his case is … on all fours with *Edmond*," BLM's Br. at 15, *Arthrex* built on *Edmond*'s holding that "[i]t is not enough that other officers may be identified who formally maintain a higher rank." 520 U.S. at 662-63. Rather than licensing perfunctory oversight, the *Arthrex* Court took issue with "nominal" superiors who could not exercise the discretion to oversee the decision at issue. 594 U.S. at 14.

Here, the District Manager's superiors are effectively nominal as well because the District Manager has the "'power to render a final decision on behalf of the United States' without any such review by their nominal superior or any other principal officer in the Executive Branch." *Arthrex*, 594 U.S. at 14 (*Edmond*, 520 U.S. at 665). Indeed, the DR makes clear that the District Manager made the decision alone. DR at DR-2, DR-5, DR-10, LGB042016, LGB042019, LGB042020, Ex. C at 105, 108, 109. Therefore, like the Director in *Arthrex*, the BLM Director is

"the boss, except when it comes to the one thing that makes the [District Manager] exercising [her] 'significant authority in the first place—[her] power to issue decisions" like the DR. *Arthrex*, 594 U.S. at 14. This decision-making framework undermines the Constitution's careful distribution of power. As the Framers warned and the Supreme Court has recognized, the "'power to superintend … must imply a right to judge and direct,'" and "any deviations from [the Secretary's] instructions 'would be subversive of uniformity in the execution of the laws.'" *Arthrex*, 594 U.S. at 18-19 (quoting 3 Works of Alexander Hamilton 557 (J. Hamilton ed. 1850)). Plaintiffs' claim is completely aligned with *Arthrex*.

### C. The Decision Was Neither Specific in Its Objects nor Carefully Circumscribed.

Not only did the District Manager exercise "significant authority" herself, but the DR was neither "specific in its objects" nor "carefully circumscribed." BLM's main argument on these two latter points is that the District Manager merely "approved recommendations for discrete route decisions in accordance with the interdisciplinary team analysis, agency guidance, governing regulations, and RMP area designations." BLM's Br. at 11-12. However, the record shows that this is precisely what the District Manager did *not* do. Instead, she exercised her discretion in formulating a different alternative from the ones presented to her. DR at DR-3, LGB042017, Ex. C at 102. Although BLM does not characterize it as such, it is difficult to understand how "sweeping" would not be the appropriate descriptor for the closure of so many miles of wilderness roads, campsites, and vistas.

The existence of 43 C.F.R. § 8342 and Part 1600 also do not "carefully circumscribe[]" the decision. Just as the existence of a statute listing the roles and responsibilities of an officer does not obviate the constitutional requirement that the officer be appointed, the existence of regulatory prescriptions does not determine whether the authority exercised is significant enough to require appointment. The designation criteria of 43 C.F.R. § 8342 only describe the amount of power

6

wielded by the District Manager when she makes her decision; they do not make that power less significant by circumscribing it.

Importantly, the "carefully circumscribed" language comes from *United States ex. rel New v. Rumsfeld*, 350 F. Supp. 2d 80 (D.D.C. 2004). The court there provided that a "government office is different from a government contract. The latter from its nature is necessarily limited in its duration and specific in its objects." *Id.* at 98. There, the court held that United Nations agents contracted with the United States for a limited time and directed by the President were not officers because their contracts "carefully circumscribed" their authority. Here, by contrast, the District Manager occupies a full-time government office, and the limitations—namely the careful circumscription and specificity in objects inherent to the arrangement in *Rumsfeld*—are not present.

BLM makes the alarmist argument that "[i]t would meaningfully disrupt an established administrative structure to now declare that Constitutional officers must make individual route designations in a TMA." BLM's Br. at 16. While this claim is unsubstantiated, it is also not how constitutional restraints operate. The DR was an exercise of authority that was improperly made by an unappointed employee. Therefore, the DR is invalid and TMP is void, regardless of the consequences.

## II.    DEFENDANTS HAVE FAILED TO REBUT PLAINTIFFS' ARGUMENTS THAT THE TMP VIOLATES THE DINGELL ACT BY USING ROAD CLOSURES TO CREATE WILDERNESS BUFFER ZONES

Contrary to Defendants' assertions, Plaintiffs' arguments about the Dingell Act are not based on rhetoric or a mischaracterization of the record, but on a legitimate concern that BLM's actions ignore the trade-offs that Congress adopted with the Act. One of those trade-offs is that existing roads would remain open if new wilderness areas were created. As Senator Romney noted at the time of the Dingell Act's passage: "Fundamental to this process was the effort to avoid any

action that would end a current ongoing use," such as pre-existing roads. 165 Cong. Rec. S5571 (2019). Noise and visual disturbances to the Labyrinth Canyon Wilderness were used as justification for many of the TMP's route closures, and this exceeds the bounds of the law. *See* 16 U.S.C. § 1232(e). Defendants' dismissal of these concerns as unfounded fails to address the underlying legal and factual issues raised by Plaintiffs. BLM's actions must be scrutinized to ensure compliance with the Dingell Act, which forbids the preclusion of non-wilderness activities solely because they are visible or audible from wilderness areas. *See id*.

BLM justifies closures to mitigate conflicts with non-motorized users on the Green River, but this justification is misleading. *See* DR at A2-123, LGB042152, Ex. C at 156 (discussing closure of D2759A). *See also* DR at A2-46, LGB042075, Ex. C at 131 (providing that closing D1527A and D1527B would "minimize potential conflicts between offroad vehicle users and dispersed, non-motorized/non-mechanized forms of recreation (e.g., canoeists)"). The Decision Record itself makes clear that the TMP relies on the minimization criteria in 43 C.F.R. § 8342.1(c). DR at DR-2. These minimize conflicts between motorized use and *neighboring public land*s, *id.*, which in this case must include the Labyrinth Canyon Wilderness due to its adjacency to the TMA. In contrast, the Green River is not a neighboring public land, as Defendants state: "The Green River is not in the Wilderness in Emery County, but rather *is within the TMA*." BLM's Br. at 17. And, "[t]he Labyrinth Canyon Wilderness does not include the river itself[.]" SUWA's Br. at 13.

Despite this, Defendants insist that their justification stemmed solely from disturbances to non-motorized recreationists on the Green River. BLM's Br. at 18-19. But, again, this contradicts their own minimization criteria, as the term "neighboring public land" logically encompasses the Labyrinth Canyon Wilderness. The selective focus on the Green River conveniently omits any discussion regarding the Labyrinth Canyon Wilderness, but there is no plausible explanation for

why BLM would have closed routes *unless* it was considering the effect of those routs on adjacent wilderness.

Further, BLM suggests that the use of certain rationales such as "physical resource impacts and user conflict within the TMA" somehow negates the unlawful use of noise and visual impacts upon the wilderness. BLM's Br. at 19 n.8. BLM considered unlawful factors in its analysis, thereby tainting the whole thing. BLM attempts to fact-check Plaintiffs with respect to the Decision Record at A2-21, A2-51, and A2-125, but their arguments fall flat, as each plainly cites to either noise or visual impacts. BLM's Br. at 19-20. Additionally, BLM's argument that consideration of impacts outside of the TMA would "doom virtually any BLM travel management effort" would render the minimization criteria meaningless and is simply an attempt to avoid confronting the Dingell Act's plain language. *See* BLM's Br. at 20. Because the Labyrinth Canyon Wilderness is a congressionally authorized wilderness area subject to the Dingell Act, BLM's decision to close routes based on noise and visuals from OHV use creates a de facto barrier around said wilderness. This is illegal.

Moreover, the argument that designating certain routes as "open" negates the creation of a buffer zone is flawed: it assumes a buffer zone requires complete closure, which is not supported by the plain text of the Act. Congress, as reflected in §§ 1232(e)(1)-(2), was clear: *any* closure based on noise or visual disturbances from a wilderness area constitutes a de facto buffer zone. Therefore, leaving a few "overlooks" or "viewpoints" open does not negate the buffer zone created by BLM's actions. Defendants also cite multiple instances in which BLM "made 'open' designations for routes, like D1509, over the objections of wilderness advocates and made 'closed' designations for other routes over the objections of BlueRibbon Plaintiffs." BLM's Br. at 18. This

too is flawed for the same reason, as a mere *quid pro quo* exchange of routes does not suddenly make the creation of a buffer zone legal.

The fact remains that BLM's decisions, while technically classifying some routes as open, create a practical barrier that limits access to areas adjacent to the wilderness. This, in turn, undermines both the spirit and letter of the Dingell Act. BLM's reliance on noise and visual factors from OHV use to justify route closures, particularly near wilderness boundaries, constitutes an unlawful indirect buffer zone and should be invalidated.

### III. DEFENDANTS HAVE FAILED TO SHOW THAT THE TMP IS NOT CONTRARY TO LAW AND NOT OTHERWISE ARBITRARY AND CAPRICIOUS.

Plaintiffs showed that the TMP is arbitrary and capricious in two different, but related, ways. First, it is so generally because it was adopted contrary to controlling legislation. Second, it is so specifically because the individual justifications for trail closures are themselves arbitrary and capricious and unsupported by the record.

### A. The TMP Is Arbitrary and Capricious Because the Designation Criteria Are Contrary to the Controlling Statute.

In their Opening Brief, Plaintiffs showed how the designation criteria, which formed the bases upon which Defendants closed trails, are contrary to law and therefore arbitrary and capricious. Pls.' Opening Br. at 15. Specifically, the designation criteria find their statutory grounding in the Federal Land Policy Management Act of 1976 ("FLPMA"). The FLPMA lays out the factors that the agency is required to consider when making open/closed determinations for roads on public lands. One of those required factors is to "provide for outdoor recreation and human occupancy and use." 43 U.S.C.A. § 1701(a)(8). Indeed, "[i]t is the policy of the United States," declares the statute, "that … the public lands be managed … in [such] a manner[.]" *Id.*

As Plaintiffs showed, an agency decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), if the agency applies an incorrect

legal standard. *See Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996); *see also Caring Hearts Personal Home Servs., Inc. v. Burwell*, 824 F.3d 968, 977 (10th Cir. 2016) (Gorsuch, J.) ("[A]n agency decision that loses track of its own controlling regulations and applies the wrong rules in order to penalize private citizens can never stand"); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("We review the [agency's] decision to determine whether … the correct legal standards were applied.") (*quoting Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005)).

In response, Defendants make three arguments, all of which are unavailing. First, BLM argues that the FLPMA factors "recite a multitude of potentially conflicting resource uses and management goals, and the statute broadly charges BLM with authority and discretion to strike an appropriate balance." However, while it is true that these factors may sometimes be in tension with one another, the statute clearly instructs BLM to take account of *all* of the factors, which the designation criteria fail to do—recreation and human use are omitted entirely. *See* 43 C.F.R. § 8342. Nothing in the federal Defendants' argument negates this basic and fatal flaw in the TMP.

This Court is not required to give *any* deference to the agency's interpretation of the FLPMA. *See Loper Bright Ent. v. Raimondo*, 603 U.S. 369, 392 (2024) (the APA "specifies that courts, not agencies, will decide 'all relevant questions of law' arising on review of agency action, §706 (emphasis added)—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it. And it prescribes no deferential standard for courts to employ in answering those legal questions."). Accordingly, the Court should find that BLM simply does not have the discretion to omit recreation and human use from its designation criteria. Were it to conclude otherwise, it would have to ignore the plain statutory instruction from Congress to the agency.

Further, 43 U.S.C. § 1701(a)(8) is not the only instance where Congress makes clear that recreation must be factored into public lands determinations. When the FLPMA defines "principal or major uses" for public lands, it "includes, and is limited to, domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, *outdoor recreation*, and timber production." *Id.* at § 1702(l) (emphasis added). When it defines the principal of "multiple use," "recreation" is expressly listed as a resource for which the lands are to be managed. *Id.* at § 1702(c). The Secretary "shall manage the public lands under principles of multiple use." *Id.* at § 1732(a). The imperative "shall" is the strongest language that Congress can use when making demands under a law. Indeed, Congress's choice of "shall" "is strong evidence that the corresponding duties are nondiscretionary … one [e.g., the Secretary] is not free to choose whether to perform them." *Citizens for Const. Integrity v. United States*, 70 F.4th 1289, 1309 (10th Cir. 2023). The Secretary "shall" manage for "multiple use," and "multiple use" expressly includes "recreation." Thus, the FLPMA lays out Congressional policy, which includes "recreation and human use," and then it commands the Secretary to manage in a way that takes account of recreation as a public good and public resource. By failing to incorporate recreation into the route designation criteria, Defendants have acted in violation of the statute and have therefore acted arbitrarily and capriciously under the APA.

BLM also raises a second argument: even if the statute requires the agency to consider some forms of recreation, it is free to penalize and give no weight to *motorized* recreation because Congress was not specific about which kind of recreation the agency was required to prioritize. BLM's Br. at 22. But, again, this Court need give no deference to this unsupported claim. *See Loper Bright*, 603 U.S. at 392, 412-13 (2024). When making determinations about *roads*, the obvious inference is that the agency must take *motorized* recreation into account since that is the

type of recreation that occurs on roads. That hiking trails might still exist in the broader area is of no import because the open/closed determinations were not made about hiking trails—they were made about existing roads, the purpose of which is to facilitate motorized recreation.

What the federal Defendants are really doing is claiming an unfettered and unilateral right to engage in a protracted, deliberate process of ratcheting down the number of roads in the affected area by giving zero weight to motorized use. This is contrary to a plain reading of the statute. Congress instructs the agency to give weight to "recreation and human use." And the obvious inference from this simple language is that "recreation" is to be considered in conjunction with the type of use at issue. If the agency is closing a road, then motorized recreation must be given weight. If it is closing a river, then aquatic recreation is the appropriate weighting criterion. And so on. *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (agency rule is arbitrary and capricious "if the agency … entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"). This is an elementary idea, but it is contrary to how BLM has been conducting business for several decades. However, an illegal regulatory scheme cannot be laundered into a legal one simply because an agency has been engaged in it for a long time. Instead, this Court must take a *de novo* look at the statute and render an independent judgment. *Loper Bright*, 603 U.S 392 n.4; *see also Horne v. Dep't of Agric.*, 576 U.S. 350 (2015) (holding that a law passed 78 years prior was unconstitutional).

Third and finally, contrary to the claims of the federal Defendants, *Loper Bright* does not stand for the proposition that the role of the courts is to "police the outer statutory boundaries" of a delegation of power to an agency by Congress and "ensure that agencies exercise their discretion

consistent with the APA." BLM's Br. at 23. Indeed, apart from the fact that Defendants' quoted language comes from the syllabus of the case—rather than the opinion itself—Defendants draw the wrong conclusion from *Loper Bright*. It is true that *one* of the things that courts are instructed to do is "police the outer boundaries" of agency discretion, but if *Loper Bright* had stopped there, it would be an unremarkable decision because this policing function was present under *Chevron, USA v. NRDC, Inc.*, 467 U.S. 837, 843 (1984), which *Loper Bright* expressly overruled, 603 U.S. at 412. Instead, Plaintiffs cite *Loper Bright* here for the proposition that this Court must make an independent, de novo inquiry into the meaning of the FPLMA. And when it does so, as explained above, it will see that Defendants' designation criteria are contrary to statute and thereby illegal.

### B. Defendants Have Failed to Show That the Individual Closure Justifications Are Not Arbitrary and Capricious.

Additionally, Defendants have failed to refute Plaintiffs' arguments about the specific closure justifications discussed in Plaintiffs' Opening Brief, as shown below.

#### 1. The "Soils and Vegetation" Justification for Closure Is Arbitrary Because the Closures Run Counter to the Best Evidence in the Record.

Regarding soils and vegetation, Plaintiffs' focus on the limited routes contained within the LWC Interim Monitoring Report was intentional, because the routes scrutinized in that report received repeated observations in the field that were documented. *See* Pls.' Opening Br. at 23-24. Those closures relied on Defendants' best evidence and still fell short. Because these routes received heavier scrutiny than most routes in the TMA, they provide a microcosm for determining if the broad claims made by BLM when relying on loosely relevant background information and less precise methodology for analyzing impacts to soils and vegetation in the EA. In its response, BLM failed to address BRC's claim that route closures included in the LWC Interim Monitoring Report were unsupported by evidence, because the LWC Interim Monitoring Report plainly shows that BLM closed routes despite a showing of little to no impact to the soils. *See id.* There was also

14

no evidence contained within the LWC Interim Monitoring Report that the spread of invasive vegetation was occurring. *See generally* LWC Interim Monitoring Report 2023.

Rather than admit that BLM relied on conclusions that ran counter to the best evidence in the record, they instead tried to claim that, because this hard evidence did not apply to more routes, the Court should simply defer to the weaker evidence cited in the EA. BLM's Br. at 30-31. Yet, the soft evidence in the EA was completely undermined by the hard evidence collected through the LWC Interim Monitoring Report. This is a strong indicia of arbitrariness.

Because no other routes in the TMA received repeated site visits that were documented with photographic evidence and a consistent monitoring regime, BLM's application of alternate methodology for analyzing soil impacts and the spread of invasive vegetation in the EA is suspect. While the findings of the effects of OHV use analyzed in the EA might be intuitively logical when left unscrutinized, intuitively logical findings do not carry the same weight as documented evidence of field observations in the specific area of the TMA that directly contradict the so called "intuitively logical findings."

For instance, the findings of the studies cited in Section 3.2.3 of the EA were based almost entirely on studies that failed to examine the specific soils and native vegetation of the Colorado Plateau. It is startling that the BLM relied on these studies over the findings of their own observations in the field. *See, e.g.,* EA at 38, LGB042253. The one study that referenced the Colorado Plateau specifically, Gelbard and Belnap 2003, admits "invasive cover is higher along verges of paved roads compared to primitive roads, indicating a greater effect along roads that receive higher levels of construction and maintenance." *Id.* at 39, LGB042254.

Most studies in the field of roadside ecology focus primarily on the impact of paved highways, and the BLM often misguidedly applies the findings of these studies to primitive roads

under the guise that this is "intuitively logical." The one study that analyzed the specific geographic conditions of the TMA found that the soil and vegetation impacts were *not* occurring on the ground when applied to the many primitive backcountry routes that were closed by the TMA. It is arbitrary and capricious to close routes to minimize impacts to soils and vegetation when monitoring of the routes shows little to no impact to be minimized. It is arbitrary and capricious to apply findings related to paved roads to primitive backcountry routes.

### 2. The "Visual Impacts" Justification Is Arbitrary Because It Is Riddled with Obvious Contradictions in Reasoning.

Defendants fail to show that the routes that were closed exclusively to minimize impacts to visual resources have no recreation value. Enjoying scenery is one of the recreation purposes that draw the public to visit the TMA. If the scenery is attractive enough that closing a primitive dirt road would improve the scenery, then the scenery itself provides recreation value. It is an inherent contradiction for BLM to claim that a route must be closed in order to reduce visual contrast while simultaneously claiming that the route has no recreation value. In many cases, the visual contrast of the route enhances the recreation value of the land for someone like a photographer who wants to capture the beauty of a road-less-traveled disappearing into a scenic landscape. The recreation value of these routes is enhanced by the fact that they are very near a major paved highway, and routes along the highway corridor are regularly used since they are easily accessible. Lightly used routes in heavily used corridors also provide the added recreation benefit of giving those seeking solitude an alternative when more popular areas are experiencing heavy use. For BLM to ignore this obvious contradiction in their analysis is an example of an arbitrary and capricious application of using minimization criteria to reach a predetermined, preferred outcome instead of a rational application of evidence before them.

Because BLM's analysis of the recreation value of these routes is flawed, closing them for the sole reason of reducing visual contrast is arbitrary and capricious. As discussed in Plaintiffs' Opening Brief at 19, routes are located within VRM Class III areas, where other activities are causing far more significant impacts to visual resources. It is axiomatically arbitrary and capricious to claim that closing and obliterating primitive, two-track dirt roads will dramatically impact the visual contrast of a landscape dominated by railroad tracks, a four-lane highway, power lines, and oil and gas installations.

As they usually follow the contours of a landscape, a primitive dirt road "repeats the basic elements found in the predominant natural features of the characteristic landscape." (LGB038662). As such, designating the routes identified by Plaintiffs as open would have been consistent with the 2008 RMP requirements for visual resource management. Closure of these routes results in a TMP where VRM Class III designation areas in the RMP are now being managed as de facto VRM Class I designations. If the scenic resources impacted by this route are so significant to require the equivalent of restrictive VRM Class I management, then BLM should be required to amend the RMP to reflect this change prior to implementing this level of management in a TMP. According to the RMP's VRM Class designations throughout the TMA, there are no routes that require closure, obliteration, or reclamation to meet the objectives for protecting scenic resources. For the BLM to insist that reducing visual contrast is a justifiable reason for route closure contradicts the 2008 RMP – even as an alleged "added benefit." This is arbitrary and illegal.

### 3. "User Conflicts" Is an Arbitrary Reason for Closure Because Those Conflicts Are Not Shown to Actually Occur, and All Preference Is Given to Non-Motorized Use.

Defendants have not shown that their user conflict concerns are anything but arbitrary and capricious. A land management agency may be justified in relying upon user comments to evaluate user conflict in making OHV route designations. *Silverton Snowmobile Club v. U.S. Forest Serv.*,

17

No. 02-RB-325, 2004 U.S. Dist. LEXIS 30844, *10 n.3 (D. Colo. Nov. 1, 2004) *aff'd* 433 F.3d 772 (10th Cir. 2006). But one of two problems must exist here. If BLM relied on undisclosed or pre-existing complaints to justify closures, this information was not subject to public scrutiny or challenge, violating basic principles of transparency and public participation. On the other hand, if BLM now claims it relied on public comments submitted during the NEPA process, the agency had already recommended route closures before those comments were gathered. This would make the decision pre-decisional and rendering public input meaningless.

Second, BLM applies the concept of "user conflict" in a one-sided manner that disproportionately impacts motorized users. No routes were closed to non-motorized users based on similar reasoning—there are no cases where a hiking or traditional mountain biking trail was closed to mitigate conflict with motorized users. The selective application of this standard arbitrarily restricts motorized recreation while privileging non-motorized users, in direct contradiction to BLM's multiple-use mandate under the FLPMA.

Third, BLM has failed to provide a substantive evaluation of user conflict. Courts may defer to the agency's evaluation of user conflict, even when non-motorized users claim that their identification of conflicts compelled restrictions on motorized use. *See Wild Wilderness v. Allen*, 12 F. Supp. 3d 1309, 1316-17 (D. Or. 2014), *aff'd,* 871 F.3d 719 (9th Cir. 2017). However, without documented evidence of widespread or route-specific conflict, the agency's decisions are arbitrary and capricious. Furthermore, many of the so-called "conflicts" could be mitigated through user education, route-sharing policies, or seasonal restrictions rather than outright closures.

For instance, LGB042303-05 gives the example of, "equestrian users on open OHV routes encountering OHV users." BLM acknowledges how vague user conflict is, nothing that the "individual values of a person cannot be separated; the TMP does not attempt to undertake this

18

type of differentiation." LGB042438 is closed in other to "reduce user conflicts—largely from noise—with river runners in Labyrinth Canyon." But it is unclear if these parts of the river can actually hear OHV noise from certain parts of the trail on the river.

Similarly flawed reasoning is evident in the case of LGB006319. Defendants state that the road should be closed because it receives minimal use, and closure will eliminate user conflict. But the conflicts identified in comments were proffered during the open comment period for the EA, and after BLM was already proposing to close this route. Indeed, the majority of the comments citing user conflict do not mention specific routes in which user conflict occurs. How, then, could BLM choose which should be closed to reduce noise and user conflict? This mystery is consistent with the fact that Plaintiff BlueRibbon Coalition submitted FOIA requests and contacted the local sheriff's office to see if there had been documented user conflict and nothing had been documented. *See* Pls.' Opening Br. at 26–27. The "user conflict" justification is unsupported by real evidence and should be rejected.

### 4. The "Bighorn Sheep and Habitat Fragmentation" Reasons for Closure Are Arbitrary Because They Are Contradicted by the Record.

BLM's response to the issues of bighorn sheep and wildlife impacts more generally (including habitat fragmentation) is simply to claim that their only obligation is "to minimize harassment of wildlife or significant disruption of wildlife habitats," and to argue that "quantification of impacts or proof of population level harms is not required, and in fact would contradict BLM's actual obligations". Defendant's Brief at 34. They claim that BLM need not provide any evidence that particular OHV trails are causing harm to wildlife or resulting in population level effects in order to close them on this basis.

This argument loses track of the BLM's basic obligation under the standard of review to "articulate a satisfactory explanation for its action including a rational connection between the

facts found and the choice made." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "An action is arbitrary and capricious 'if the agency ... offered an explanation for its decision that runs counter to the evidence before the agency.'" *Idaho State Snowmobile Ass'n v. U.S. Forest Serv.*, No. 1:19-cv-00195-DCN, at *14 (D. Idaho Feb. 10, 2021). While it may be true the BLM has no general obligation under NEPA to use the "best available science," it still has an obligation of "scientific integrity, of the discussions and analyses in environmental documents" (40 C.F.R. § 1502.23 (2020)), and a broader obligation under the APA to provide a rational explanation for any agency action which changes the status quo, including closing specific roads. If it misrepresents the science behind its decisions or fails to demonstrate actual evidence supporting them, its decisions cannot stand.

To meet its burden in justifying route closures under the wildlife minimization criterion, BLM must prove that specific route closures citing this rationale are necessary to minimize harassment of wildlife or significant habitat disruption. At minimum this requires proving that these routes are *actually causing* wildlife harassment and/or significant disruption of habitat, such that closing them advances this goal. Simple speculation and generalization is not sufficient.

A 2021 case in which the court ruled in favor of motorized users striking down a Forest Service snowmobile management plan is instructive here. In the course of applying the Forest Service's nearly identical travel management regulations, the court held that while "NEPA does not require the Court to decide whether the Forest Service used perfect, flawless, or even 'the best scientific methodology available'", "it must nevertheless determine whether the choices made by the Forest Service were rationally related to the evidence in the record." *Idaho State Snowmobile Ass'n v. U.S. Forest Serv.*, No. 1:19-cv-00195-DCN, at *26 (D. Idaho Feb. 10, 2021). The court explained that while judicial deference to agency analysis of scientific matters is high, "[t]he Court does 'not

20

automatically defer to any agency's conclusions, even when those conclusions are scientific.' Rather, the Court's review must be 'sufficiently probing' to ensure that the agency's decision is 'founded on a reasoned evaluation of the relevant factors.'" *Id*. at *30 (internal citations omitted). While NEPA "does not mandate any specific results, the results, must, nevertheless, be based on accurate, non-stale information." *Id*. at *29. "[A]ny expert opinions must be supported by 'both [] analysis and data.'" *Id*. at 31.

The court proceeded to reverse the Forest Service's decision to ban snowmobiles from a particular area because it did not provide sufficient, up-to-date evidence that lynx and wolverines were currently present in the area and its conclusions about snowmobile impacts to them and other animals were "speculative" and "not harmonious with the data." *Id*. at *32. The court made it clear that in motorized travel management cases, it is not enough for an agency to simply assert that closures are necessary to minimize impacts to wildlife; it must show that such impacts are real and that closure is in fact necessary to minimize them. *Id*. at *31 ("general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided"). If BLM does not need to show an actual connection between specific route closures and genuine wildlife impacts, then any closures based on this rationale are completely arbitrary.

If no analysis of individualized route impacts is necessary, then the BLM could justify closing any route in the TMA on this basis, making the specific routes the BLM choses to close completely arbitrary. BLM claims to have virtually unlimited discretion regarding specific route designations, without having to justify any of them in a quantifiable way. Without some form of "quantification of impacts", there is no way to distinguish one route from another, nor can the agency be said to have articulated a rational reason for closing some routes while keeping others

open. And without quantifying impacts from specific routes, there is no way to know whether those impacts are in fact minimized. If no impacts existed to begin with, then closing routes does not minimize anything.

Moreover, BLM ignores that what it claims is a common-sense argument is not supported by the scientific record. Plaintiff's arguments about the science in the record are not merely a "battle of experts," but demonstrate that the studies cited in the Environmental Assessment ("EA") simply do not support the propositions the BLM claims they do with regard to bighorn sheep and habitat fragmentation. This is not simply poking holes in minor points of the BLM's discussion; it is showing that the entire premise of their rationale for closing routes based impacts to bighorn sheep and other animals is scientifically unsupported.

The studies BLM cites provide no factual support for the assertion that OHV routes fragment habitat for species that occur in the area, or that they result in any significant harassment or disruption of habitat for bighorn sheep in any measurable way. The only possible metric of such harm (population deficiency) is more readily attributed to other factors, like removal, as discussed in Plaintiffs' Opening Brief. *See* Pls.' Opening Br. at 30-32. BLM even admitted in the EA that "it is speculative to claim that these impacts will lead to direct population declines," (EA at 208, Appendix M, LGB042423) yet still claimed bighorn sheep population deficiency as a justification for closing OHV routes (*Id*. at 211, LGB042426). Neither BLM nor the studies it cites have even suggested a mechanism by which lightly used dirt tracks in the desert "fragment" habitat, as they do not inhibit the animals' movement in any way. Instead, this claim depends entirely on lumping OHV routes in with far more major pieces of human infrastructure like interstate highways, which have radically different impacts.

BLM has grossly misrepresented the science on these issues, causing their arguments to fail the test of scientific integrity and rendering the claim that particular routes must be closed to minimize harassment or habitat disruption a "bare assertion of opinion from an [agency] expert," which, "without any supporting reasoning, would not pass muster in an EIS." *Great Basin Resource Watch v. BLM*, 844 F.3d 1095, 1103 (9th Cir. 2016). BLM cannot prove that closing routes "minimize[s] harassment of wildlife or significant disruption of wildlife habitats" if no such harassment or significant disruption is occurring in the first place. The BLM studies fail to prove that it is, and Mr. Ramey's analysis indicates that it is not. BLM's responses to Mr. Ramey's comments did not provide any new evidence but merely doubled down on misrepresenting the findings of their cited studies. Thus, BLM has failed to meet its burden of providing a rational basis for their decisions regarding specific routes citing the wildlife minimization criterion.

Finally, both BLM and SUWA failed to address the clear inconsistency between the BLM's analysis of impacts to bighorn sheep in the Mineral and Hell Roaring Canyon complex between the Labyrinth Rims travel plan and the Roped and Aerial Activities project. They ignore the fact that the BLM had previously found—only three years before—that the OHV routes at the bottoms of these canyons were *not* causing harassment of bighorn sheep or significant disruption of their habitat because sheep are habituated to human activity in these areas and "vehicles currently are restricted to designated routes, and vehicles cannot access the inaccessible cliffs, steep walled canyons, slot canyons, alcoves and talus slopes so important to the species in question." Roped and Aerial Activities EA at 84. If that is true, then closing these routes cannot be justified based on the idea of minimizing harassment and habitat disruption and the assertion that such closures are necessary for this reason directly contradicts BLM's own prior findings. "'Unexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary

and capricious change.'" *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956 (9th Cir. 2015) (*citing Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). Since both BLM and SUWA failed to address this argument, the argument is waived and they have implicitly conceded that the route closures in Mineral and Hell Roaring Canyons were arbitrary and capricious.

It may appear on the surface that "BLM presents a reasoned analysis based largely on the research and findings of subject matter experts" (Memorandum Decision at 15) regarding wildlife impacts, as the Court concluded in its preliminary ruling. Upon closer examination, however, that research does not support the proposition that OHV routes cause any significant harassment or disruption of wildlife habitat in the Labyrinth Rims area, and the BLM has grossly misrepresented the science, all while contradicting its own prior findings in another recent EA.

## IV.    THE TMP VIOLATES NEPA BECAUSE DEFENDANTS FAILED TO TAKE THE REQUISITE "HARD LOOK."

Both BLM and SUWA critique Plaintiffs' NEPA claims; their arguments overlap at points and diverge at others. SUWA misunderstands Plaintiffs' arguments, contending that Plaintiffs conflate NEPA's "hard look" requirement with the "significant effect" standard for whether an EIS is required. SUWA's Br. at 27-28. SUWA also argues that the TMP did not have a "significant effect" on the human environment. *Id.* at 29-30. BLM echoes SUWA in this respect, arguing that it did not violate NEPA by failing to prepare an EIS.[2] BLM's Br. at 37-39. Secondarily, it takes

---

[2] BLM claims that Plaintiffs waived their arguments that BLM failed to take a "hard look" under NEPA, that BLM chose an improper alternative, and that the EA failed to provide site-specific impact analyses. BLM's Br. at 37-38 n.14. However, Plaintiffs did in fact argue that "NEPA requires federal agencies to take a hard look." Pls.' Opening Br. at 38. It also argued that documents must provide the "necessary factual specificity" for the court to conduct its review. *Id.* at 39. The specificity contemplated here is "site specific." *See S. Utah Wilderness All. v. U.S. Dep't of Interior*, 2016 U.S. Dist. LEXIS 140624, at *19-20 (D. Utah Oct. 3, 2016). Moreover, in BLM's cited case, *Anderson v. U.S. Dep't of Labor*, the court did in fact consider an issue despite a waiver allegation. 422 F.3d 1155, 1175 (10th Cir. 2005). In any case, the arguments BLM claims are waived are necessary subsidiaries of Plaintiffs' claim that BLM failed to take a "hard look."

issue with Plaintiffs' discussion of the "human environment" and "recreation." *Id.* at 39. These are discussed in turn below.

SUWA characterizes Plaintiffs' NEPA claim as "assert[ing] that BLM was required to analyze the TMP's environmental impacts in an EIS rather than an EA, and that BLM's failure to do so violated NEPA's 'hard look' standard." SUWA's Br. at 26. The "'hard look' standard" it continues, "pertains to the thoroughness and reasonableness of the agency's environmental review process," whereas the "significant effects" standard is tied to the action's environmental impacts. *Id.* at 27. Plaintiffs do not argue otherwise. Rather, Plaintiffs argue that BLM failed to take a "hard look" by falling short of providing the necessary factual specificity. Pls.' Opening Br. at 39. Failure to recognize the TMP's impacts and create an EIS illustrates a failure to take the required thorough and specific "hard look" during the environmental review process.

Aside from the specific failure to prepare an EIS, for example, the District Manager also failed to take a "hard look" because she did not fully analyze "the potential, direct, indirect, and cumulative impacts of the action" that she took. SUWA's Br. at 27 (quoting *Ctr. for Biological Diversity v. United States Dep't of the Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023)) (emphasis added). Her decision was to select not a recommended alternative, but rather a plan that she herself formulated. There was no way for her to consider the direct, indirect, or cumulative impacts of this action with "the necessary factual specificity." *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:13-cv-01060-EJF, 2016 U.S. Dist. LEXIS 140624, at *23-24 (D. Utah Oct. 3, 2016) (quoting *Comm. to Preserve Boomer Lake Park v. U.S. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993)). This is true with respect to the "hard look" standard alone.

Although SUWA believes that Plaintiffs did not explain why the Finding of No Significant Impact ("FONSI") is inadequate, Plaintiffs have explained that this is largely due to the improper

accounting for recreation within the FONSI's discussion on the human environment. The portions of the FONSI that SUWA identifies in its brief that reference recreation are either made in passing or in general, non-"site specific" terms and lack the requisite "factual specificity," *S. Utah Wilderness All.*, 2016 U.S. Dist. LEXIS 140624, at *19-20, or otherwise fail to account for the cumulative impact of the District Manager's formulated plan in contravention of 40 C.F.R. § 1502.14.

BLM similarly argues that an EIS was not required, and that the District Manager's conclusion to that effect is entitled to deference. BLM's Br. at 37-38 (quoting *Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002)). This echoes SUWA's erroneous characterization. Plaintiffs' claim is not against the choice itself that an EIS was not used, or that BLM's FONSI was arbitrary and capricious. *Cf. id.* Plaintiffs' claim is rather that a "hard look" was not taken under NEPA. Use of a FONSI rather than an EIS illustrates this.

Moreover, *Utah Shared Access Alliance* is highly distinguishable from this case. There:

[T]he Forest Service in fact assessed *all* relevant factors. … The EA contain[ed] an extensive discussion of the effects on the action, including the anticipated impact on recreational opportunities … It included an in-depth assessment of the direct and indirect impact on [myriad recreational activities], as well as the cumulative effects thereof. The Forest Service specifically recognized that the road closures would likely result in a large shift from vehicle-based activities to walk-in activities such as hiking, and also considered the possible increase in traffic density on roads that remained open.

*Id.* (emphasis added).

Here, the FONSI does not rise to this level of detail, especially with respect to recreation, which BLM does not dispute as included within the "human environment." The most detailed page in the FONSI on the issue of recreation only includes "short-term effects to recreation including route maintenance … and sign placement," "user conflicts between OHV users and non-motorized

users," and "reductions or gains in access for desired recreation opportunities" between two alternatives. LGB042668.

BLM provides three cases in which projects were upheld under NEPA despite "an agency's choice to proceed with an EA rather than an EIS." BLM's Br. at 39. The cases are *Williams v. Bankert*, 2007 U.S. Dist. LEXIS 77503 (D. Utah Oct. 18, 2007); *Utah Envt'l. Cong. v. MacWhorter*, 2011 U.S. Dist. LEXIS 118970 (D. Utah Oct. 14, 2011); and *Utah Shared Access All.*, 288 F.3d 1205. None of these cases provide BLM's argument with the meaning it suggests. *MacWhorter* is merely an example of a case in which a FONSI was found to be adequate, but it bears no factual similarity to this case. It involved an effort to clear flammable underbrush from a forested area blighted by the spruce beetle. 2011 U.S. Dist. LEXIS 77503, at *2-3. The project closed off less than 25 miles of roads and "recreation" is mentioned only a single time in the opinion, and that is with respect to a claim under the National Forest Management Act, not NEPA. *Id.* at *9-10. Similarly, the *Williams* plaintiffs waived their NEPA claim by not raising it before the IBLA, and failed to substantiate that the preparers of the plan at issue were biased against motor-vehicle use. 2007 U.S. Dist. LEXIS 77503, at *12-16, 24. Plaintiffs' analysis was "so thin that the court would [have been] justified in declining to address it for that reason alone." *Id.* at *24. This is not the case for Plaintiffs here.

Conversely, *Utah Shared Access Alliance* actually supports Plaintiffs' assertion because the court rejected the plaintiffs' "hard look" argument in part because of the Forest Service's detailed analysis of its decision's impact on recreation. 288 F.3d at 1213. Here, the FONSI does not provide the same level of detail, site-specific or otherwise, on the TMP's impact on recreation or other aspects of the human environment.

27

*Wilderness Society v. U.S. Forest Service* supports Plaintiffs' position, as well. 850 F. Supp. 2d 1144, 1161-62 (D. Idaho 2012). Like this case, *Wilderness Society* involved limiting motor-vehicle use to a designated network of routes. *Id.* at 1151-52. The court provided that "an agency cannot avoid preparing an EIS by making conclusory assertions that an activity will have only an insignificant impact on the environment. … The agency must supply a convincing statement of reasons to explain why a project's impacts are insignificant." *Id.* at 1154 (quotations omitted). Despite that FONSI's discussion of multiple issues bearing on the significance of the road closures' impact, the court found that the Forest Service had not properly accounted for the impact of the "specific" roads or how the new project would in fact diminish traffic elsewhere in the area at issue. *Id.* at 1157-58.

Neither BLM nor SUWA have rebutted Plaintiffs' claim that BLM failed to take a "hard look" at the TMA routes before issuing the DR. BLM did not look at the "direct, indirect, and cumulative impacts" of the action, and did not investigate the matter with the proper level of specificity. Its failure to provide an EIS underscores this. As a result, the TMP is the product of a NEPA violation and the Court should find it void. *Ctr. for Biological Diversity*, 72 F.4th at 1178.

## CONCLUSION

Any *one* of the deficiencies identified above is sufficient to render the TMP void. Together, they show that the Labyrinth/Gemini Bridges Travel Management TMP is the result of a process that violates the Constitution, the relevant statutes, and the legal duties of BLM to take great care in administering the public lands that have been trusted to its care.

For the foregoing reasons, the Court should, pursuant to 5 U.S.C. § 706(2)(A), 28 U.S.C. §§ 2201, 2202, and Fed. R. Civ. P. 57 and 65, grant the following relief to Plaintiffs:

(1)    Declare that the Travel Management Plan violates the Appointments Clause to the U.S. Constitution; it violates the Dingell Act; it is arbitrary and capricious; and the BLM failed to take a "hard look" under NEPA.

(2)    Hold unlawful and set aside the Travel Management Plan.

(3)    Issue a permanent injunction against the Defendants, as well as all agents, administrators, employees, or other persons acting on behalf of the Defendants, from enforcing the Travel Management Plan.

(4)    Award Plaintiffs their costs and expenses incurred in bringing this action, including, but not limited to, reasonable attorney fees pursuant to 28 U.S.C. § 2412; and

(5)    Grant such other and further relief as the Court deems equitable, just, and proper.

Dated: March 7, 2025

*/s/ Matthew Miller*
ROBERT HENNEKE
Texas Bar No. 24046058
rhenneke@texaspolicy.com
CHANCE WELDON
Texas Bar No. 24076767
cweldon@texaspolicy.com
MATTHEW MILLER
Texas Bar No. 24046444
mmiller@texaspolicy.com
CLAYTON WAY CALVIN
Texas Bar No. 24132780
ccalvin@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

NICHOLAS R. BARRY
Tennessee Bar No. 031963
JAMES ROGERS
Utah Bar No. 18783

AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Ave, SE #231
Washington, DC 20003
nicholas.barry@aflegal.org
james.rogers@aflegal.org
Telephone: (202) 964-3721

KRYSTALY KOCH
Utah Bar No. 16491
FREEMAN LOVELL, PLLC
4568 S Highland Drive, Suite 290
Salt Lake City, Utah 84117
Telephone: (385) 355-4826
krystaly.koch@freemanlovell.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations set by this Court's Scheduling Order, ECF No. 65 of July 30, 2024, which extended the word count limitation of DUCivR 7-4(d)(4) to 9,750 words for the Plaintiffs' Reply Briefs. Using the word-count functionality in Microsoft Word, it contains 9,520 words, excluding the parts of the brief exempted by DUCivR 7-4(d)(4).

*/s/ Matthew Miller*
Matthew Miller

**CERTIFICATE OF SERVICE**

I hereby certify that on March 7, 2025, I electronically filed the foregoing Opening Brief with the Clerk of the Court via the CM/ECF system, which will provide service to counsel for Defendants and Intervenor-Defendant.

*/s/ Matthew Miller*
Matthew Miller